UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE FIREMAN'S FUND INSURANCE COMPANY, as Subrogee of Julia Pavia, Plaintiff | ) ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO: 05-10827DPW |
| FALCO CONSTRUCTION CORP., P&D BUILDERS, INC. AND MICHAEL CARRESI d/b/a CARRESI PLUMBING & HEATING, Defendants P&D BUILDERS, INC., Third-Party Plaintiff | ) ) ) ) ) ) ) ) | |
| vs. | ) ) | |
| HEATMASTER, INC., Third-Party Defendant | ) ) | |

**THIRD PARTY DEFENDANT, HEATMASTER, INC.'S
MOTION FOR SUMMARY JUDGMENT**

Now comes the third party defendant, Heatmaster, Inc., and moves, pursuant to

Fed. R. Civ. P. 56, for summary judgment in its favor on the grounds that there are no

genuine issues of material fact for trial and that the third party defendant is entitled to

judgment in its favor as a matter of law.

In further support the third party defendant refers to, and incorporates herein by

reference, its arguments set forth in the supporting memorandum filed herewith.

WHEREFORE, the third party defendant, Heatmaster, Inc., requests that the court enter summary judgment in its favor at to all counts and claims in the Third Party Complaint.

## REQUEST FOR ORAL ARGUMENT

The third party defendant respectfully requests oral argument on this Motion.

HEATMASTER, INC.,

/s/ Scott T. Ober

David F. Hassett, Esquire #544443
Scott T. Ober, Esquire #567666
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, MA 01608
(508) 791-6287

## CERTIFICATE OF SERVICE

I, Scott T. Ober, counsel of record for the third party defendant in this action, do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 14, 2006.

/s/ Scott T. Ober

Scott T. Ober, Esquire

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE FIREMAN'S FUND INSURANCE            )
COMPANY, as Subrogee of Julia Pavia,    )
    Plaintiff                          )
                                       )
vs.                                     )
                                       )    CIVIL ACTION
FALCO CONSTRUCTION CORP.,               )    NO: 05-10827DPW
P&D BUILDERS, INC. AND                  )
MICHAEL CARRESI d/b/a                   )
CARRESI PLUMBING & HEATING,             )
    Defendants                         )
P&D BUILDERS, INC.,                     )
    Third-Party Plaintiff              )
                                       )
vs.                                     )
                                       )
HEATMASTER, INC.,                       )
    Third-Party Defendant              )

**MEMORANDUM OF LAW IN SUPPORT OF
THIRD PARTY DEFENDANT, HEATMASTER, INC.'S
MOTION FOR SUMMARY JUDGMENT**

## I.    CONCISE STATEMENT OF MATERIAL FACTS

1.    In the early morning hours of January 26, 2004, a fire occurred at the home of Julia

Pavia at 104 Hammondswood Road in Newton (Chestnut Hill), Massachusetts. (Ex.

1, Complaint ¶ 3; Pavia, 69).

2.    The fire originated in the floor construction below a second floor fireplace at the

Pavia home. (Ex. 12, Bures report).

3.    The fireplace, which included the installation of a gas log unit, was built and installed

as part of a renovation/addition to the house in 2000 and 2001. (Ex. 1, Complaint ¶

5).

4.  Fireman's Fund Insurance Company (FFIC) afforded coverage to Pavia at the time of the fire. (Ex. 1, Complaint ¶ 7).

5.  FFIC paid Pavia for damage to the building, damage to various contents in the home, and for additional living expenses. (Ex. 1, Complaint ¶ 11).

6.  FFIC filed this lawsuit seeking to recover the payments it made to Pavia for the fire loss. FFIC brought suit against P&D Builders, Inc. ("P&D"), Falco Construction Corp. ("Falco"), and Michael Carresi d/b/a Carresi Plumbing & Heating ("Carresi") claiming that the defendants' negligence caused the fire. (Ex. 1, Complaint, generally).

7.  P&D filed a Third Party Complaint against Heatmaster, Inc. asserting claims for contribution and indemnification. P&D alleges that Heatmaster was negligent in its "design, manufacture, and/or assembly" of the gas log unit, that the gas log unit was defective or unsafe, and that the warnings and instructions that accompanied the gas log unit were improper. (Ex. 2, Third Party Complaint, generally)

8.  P&D, which is owned by Philip Rothschild ("Rothschild"), served as the general contractor for the renovation/addition work at the Pavia home. (Ex. 3, Rothschild, 10, 186-187).

9.  P&D subcontracted masonry work to Falco. (Ex. 3, Rothschild, 187).

10. Falco also did the masonry work associated with the second floor fireplace in the area where the underlying fire originated. (Ex. 4, Falco, 21-22).

11. Carresi was the plumbing contractor for the Pavia work. (Ex. 3, Rothschild, 57-58). He was also responsible for installing the gas log insert in the second floor office. (Ex. 5, Carresi 21-23).

12. Michael Roach and Michael Conte performed the demolition and framing work for
the addition at the Pavia residence in 2000-01.  The framing work included the
second floor office.  (Ex. 6, Roach, 20; Ex. 7, Conte, 30-34).

13. The framing work was done without any formal plans or designs.  The homeowner,
Julia Pavia, and Rothschild provided the framing contractors with oral descriptions
and performed their based on these conversations.  (Ex. 6, Roach, 22).

14. When Roach first started his work, Rothschild told him that a fireplace was to be
included in the addition but that the location was not determined.[1]  Throughout his
work, Roach had many conversations with Pavia and Rothschild about the fireplace.
He indicated that the location of the fireplace changed "every day."  (Ex. 6, Roach,
23-24).

15. When Roach reached the second floor, he indicated that a conventional or solid fuel
burning[2] fireplace was going to take up too much space with all the required support
and clearances.  At that point, it was decided that a solid fuel burning fireplace would
not be installed because it would take up too much space, and Roach was told to
continue framing without any of the required accommodations[3] for a solid fuel
burning fireplace.  (Ex. 6, Roach, 25-29).

16. Roach and Conte framed the addition, including the second floor and the roof, as if no
fireplace was being built.  (Ex. 6, Roach, 28-29; Ex. 7, Conte, 37-40).

---

[1] Conte was not told that a fireplace was contemplated for the second floor addition.  (Ex. 7, Conte, 36-38).
[2] The terms "conventional fireplace" and "solid fuel burning fireplace" mean the same thing and are used
interchangeably in this Memorandum.  (Ex. 3, Rothschild, 195).
[3] A solid fuel burning fireplace on the second floor of the addition would require framing accommodations
from the basement to the roof before the construction of the fireplace and chimney as well as other
requirements set forth by the Massachusetts Building Code.  (Ex. 6, Roach, 25-33, 61-62; Ex. 7, Conte 37-
40; Ex. 3, Rothschild, 195-196; Ex. 4, Falco 52-62).

17. Roach indicated that there was discussion about installing a "zero-clearance" fireplace. A "zero-clearance" unit would allow for installation without the necessary preparations for a solid fuel burning fireplace. Roach stated that Pavia and Rothschild decided to go with the "zero-clearance" option about half way through framing. (Ex. 6, Roach, 30-36; 61-62).

18. After Falco completed his exterior masonry work, Rothschild approached Falco to install a "decorative" fireplace on the 2nd floor of the addition. (Ex. 4, Falco, 21-22)

19. Falco built the fireplace based on Rothschild's description without any formal plans or specifications. (Ex. 4, Falco, 32-33, 57).

20. Falco did not install the fireplace according to the requirements of the Massachusetts Building Code because it was not designed to be a solid-fuel burning fireplace. The decorative fireplace constructed by Falco had no working flue, no concrete hearth slab, no chimney, and no firebox. Falco also did not use firebricks, which look different from a common brick. Falco's "decorative" fireplace was not inspected according to normal procedure. (Ex. 4, Falco, 8-9, 51-54; 61-63).

21. Falco was not aware that anyone intended to install a gas log appliance in the decorative fireplace. Otherwise, Falco would have built a solid fuel burning fireplace. (Ex. 4, Falco, 36, 59-60).

22. According to Falco, someone would have to be "stupid" to think that the fireplace was a solid-fuel burning fireplace because it had no chimney, no flue box, no venting, no smoke chamber and it was not built with firebricks. (Ex. 4, Falco, 52-54; 61-63).

23. Rothschild understood that the fireplace built by Falco was not a solid fuel burning fireplace and testified that no reasonable person would have thought that the fireplace

constructed by Falco was a solid fuel-burning fireplace.  (Ex. 3, Rothschild 199-200, 218).

24. A solid fuel burning fireplace would have been much more expensive and more work to construct.  (Ex. 3, Rothschild, 210-211; Ex. 4, Falco, 52-54; 61-63).

25. Carresi installed the gas log after Falco constructed the fireplace.[4]  Carresi's work included running a gas line the fireplace and connecting it to the gas log.  (Ex. 5, Carresi, 37, 41).

26. Pavia purchased the gas log units installed during the renovations from a store while visiting her brother in North Carolina and had them shipped to Massachusetts. (Ex. 8, Pavia, 103-105).

27. Carresi reviewed the instructions that were provided with the gas log.  Carresi understood the instructions in their entirety and found them to be unambiguous.  (Ex. 5, Carresi, 44-45; 91-92; 106-107; Ex. 9, Installation and Operating Instructions).

28. Carresi understood that the gas log unit needed to be installed in a solid fuel-burning fireplace.  (Ex. 5, Carresi, 118).

29. When he installed the gas log unit in the second floor fireplace, he thought that the fireplace was a solid fuel-burning fireplace built according to the requirements of the Massachusetts Building Code[5] and the gas log instructions.  (Ex. 5, Carresi, 107-109).

30. Rothschild first saw the instructions for the gas log after Carresi installed the unit in the fireplace.  At that time, he only read the portion of the instructions.  He did not read the first page of the instructions which states, among other things, that gas log

---

[4] Carresi installed two other gas log units in existing fireplaces in the living room and the basement of the home. (Ex. 5, Carresi, 109).
[5] 780 CMR 3610.00.

unit "must be installed in a ***fully vented, solid-fuel burning fireplace with a working***

***flue*** and constructed of non-combustible materials." (Ex. 3, Rothschild, 252-253).

31. The gas log unit came with a Limited Warranty from Heatmaster. Carresi left the

warranty card with Pavia. (Ex. 5, Carresi, 139-141; Ex.10, Limited Warranty).

32. The Limited Warranty provided in part as follows:

> "1. HEATMASTER, Inc.'s obligations to the purchaser under this warranty is
> limited to the repair or replacement of defective part which will be made free of
> charge. Such repair or replacement shall constitute fulfillment of all
> HEATMASTER, Inc.'s liabilities to purchaser.
> …
> "4. To the extent allowed by law, any implied warranty of merchantability or
> fitness applicable to this product is limited to the duration of this warrant.
> HEATMASTER, Inc. shall not be liable for loss of use of this product, loss of
> time, inconvenience, commercial loss, or consequential damages. The remedy of
> repair or replacement of a defective part during the warranty period herein
> specified shall be the purchasers exclusive remedy."

The Warranty Card also includes a section "What is not covered?" that states as follows:

> "This limited warranty does **not** cover damage resulting from accident, misuse or
> abuse, lack of proper maintenance, affixing of any attachments not provided with
> the products, or loss of parts. IN NO EVENT SHALL HEATMASTER, INC. BE
> LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL
> DAMAGES RESULTING FROM MISUSE OR MODIFICATION OF THE
> PRODUCT."

33. FFIC identified two experts, Genevieve Bures and Jeffrey Lowe, to testify about the

cause and origin of the fire. Lowe concludes that the cause of the fire was the

"accidental ignition of the combustible floor construction due to heat conducting

down through masonry floor of the fireplace and igniting the plywood and joists."

Lowe attributes the fire to "insufficient thickness of masonry of the fireplace floor

construction." Bures agrees with Lowe's conclusion. Bures further concludes that

the construction of the fireplace and installation of the gas supply and gas log unit

violated code requirements. Neither Lowe nor Bures attributes the fire to any alleged

defect with the gas log unit. Further, there is no claim that the warnings and instructions that accompanied the gas log unit were improper or inadequate. (Ex.11, Lowe report; Ex. 12, Bures report).

34. P&D identified Sebastian Bongiorno to testify about the fire's cause and origin. Bongiorno concludes that the fire originated in the "wooden sub flooring beneath the fireplace hearth and appears to be the result of conducted heat from the gas fire log down through one layer of brick and layer of cement board." Bongiorno further concludes that Pavia's "failure to notify the fire department at the first indications of an odor of smoke was a significant factor effecting the growth and development of the fire and subsequent damage to the house." Bongiorno's report does not attribute the fire to any alleged defect with the gas log unit. Further, his report does not purport to claim that the warnings and instructions that accompanied the gas log unit were improper or inadequate. (Ex. 13, Bongiorno report).

35. Falco and Carresi also identified cause and origin experts. These experts also do not attribute the fire to any alleged defect with the gas log unit and further do not purport to claim that the warnings and instructions that accompanied the gas log unit were improper or inadequate. (Ex. 14, Gore report; Ex. 15, Splaine report; Ex. 16, Slowicki report).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as

a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue is one that "properly can be resolved only by the finder of fact because it may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A "material fact" is one that "might affect the outcome of the suit" under the applicable legal standard. *Id.* at 248.

"To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted).

The nonmoving party cannot simply rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts, which establish that there is a triable issue. *Id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *FDIC v. Fonseca*, 795 F.2d 1102, 1110 (1st Cir. 1986). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

### III.    LEGAL AUTHORITY AND ARGUMENT

**I.    P&D's contribution claims (Counts 1, 2, and 3 of the Third Party Complaint) must be dismissed where there is no evidence to support tort liability against Heatmaster for the subject fire.**

P&D's contribution claims against Heatmaster must fail were there is a complete lack of evidence that Heatmaster was negligent, that Heatmaster breached any alleged warranty, that the gas log unit was defective or unsafe, and that the warnings and instructions that accompanied the gas log unit were improper or inadequate. Contribution is available only "where two or more persons become jointly liable in tort from the same injury to person or property." M.G.L. c. 231B, § 1(a). The right to contribution is derivative of the joint liability in tort of the third party plaintiff and the third party defendant. Without liability in tort, there is no right to contribution. *Dighton v. Federal Pacific Elec. Co.*, 399 Mass. 687, 691 (1987).

P&D cannot establish that Heatmaster breached any duty or that any alleged breach caused the subject fire where there is a complete lack of evidence, expert or otherwise, that Heatmaster defectively designed, manufactured, or assembled the gas log unit or that Heatmaster breached any warranty. There is no duty on the part of a manufacturer to design a product that is risk free or risk proof. *Back v. Wickes Corp.*, 375 Mass. 633, 640-641 (1978). The test for whether the product is defective is one of reasonableness rather than one of perfection. *Smith v. Ariens Co.*, 375 Mass. 620, 624 (1978). Under Massachusetts law, where the nature of the alleged defect or breach of warranty and its causal connection to the accident are complex, expert testimony is required. *Hochen v. Bobst Group, Inc.*, 290 F.3d. 446, 451 (1st Cir. 2002); *Alves v. Mazda Motor of America, Inc.*, 448 F.Supp.2d 285, 297 (D.Mass. 2006).

P&D failed to designate any expert testimony with respect to its claims of negligent "design, manufacture, and/or assembly" of the gas log unit and its allegations of breach of warranty that the gas log unit was defective or unsafe. P&D's lone cause and origin expert, Sebastian Bongiorno, does not attribute the fire to any alleged defect with the gas log unit. The gas log unit involved in this instance is sufficiently complex to require P&D to introduce expert testimony to prove its allegations of a defect or breach of warranty. The alleged causal connection between any alleged defect or breach of warranty and the subject fire is also complex and appropriately the subject of expert testimony as evidence by the identification of experts by the plaintiff and defendants. It is notable that none of the experts identified by the parties attributes the subject fire to any alleged defect or breach of warranty involving the subject gas log unit.

P&D's contribution claim, to the extent that it is premised on allegations of improper or inadequate instructions and warnings, is equally devoid of support. There is no duty to warn of a condition that is fully obvious or known because such a warning will not reduce the likelihood of damage. *See Maldonado v. Thomson National Press Co.*, 16 Mass.App.Ct. 911 (1983). In the present case, the fire had nothing to do with the adequacy of the Installation and Operating Instructions but rather was the result of Carresi's failure to determine whether the second floor fireplace was "fully vented" and "solid fuel burning" as dictated by the instructions or P&D's failure to properly coordinate the work of its subcontractors or both.

The subject fire had nothing to do with any confusion with or inadequacy of the instructions that accompanied the gas log unit. The front page of the Installation and Operating Instructions that accompanied the gas log unit unequivocally stated that the gas

log unit "must be installed in a ***fully vented, solid-fuel burning fireplace with a working flue*** and constructed of non-combustible materials." (Italics and bold in original). Carresi, who was the contractor responsible for installing the gas log unit, reviewed the instructions that were provided with the gas log and understood the them in their entirety and found them to be unambiguous. Furthermore, Carresi knew that the gas log unit needed to be installed in a solid fuel-burning fireplace. Even Falco testified that he would have to build a solid fuel burning fireplace to accommodate a gas log unit. Carresi installed the gas log unit in the second floor office because he thought that the fireplace was a solid fuel burning fireplace.

P&D's contribution claims must fail where there is no evidence to support any liability on the part of Heatmaster for the alleged damages resulting from the subject fire. Accordingly, the Court should enter summary judgment in favor of Heatmaster as to P&D's contribution claims (Counts 1, 2, and 3).

## II. The Limited Warranty that accompanied the gas log unit bars P&D's contribution claims against Heatmaster.

Under North Carolina law[6], the Limited Warranty that accompanied the gas log unit bars P&D's claims for contribution against Heatmaster. When Pavia purchased the unit in North Carolina, the Limited Warranty that accompanied the unit provided in pertinent part as follows:

---

[6] Under Massachusetts choice-of-law rules, North Carolina law should be applied to the interpretation of the Limited Warranty involved in this case. Massachusetts seeks "a functional choice of law approach that responds to the interests of the parties, the states involved and the interstate system as a whole." *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). The law of the state that has the more significant relationship to the parties and the underlying circumstances will be applied. *See Dunfey v. Roger Williams University*, 824 F.Supp. 18, 20 (D.Mass. 1993). Factors to be considered in assessing a contractual choice of law issue include (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Bushkin Associates, Inc. v.*

"1. HEATMASTER, Inc.'s obligations to the purchaser under this warranty is limited to the repair or replacement of defective part which will be made free of charge. Such repair or replacement shall constitute fulfillment of all HEATMASTER, Inc.'s liabilities to purchaser.

…

"4. To the extent allowed by law, any implied warranty of merchantability or fitness applicable to this product is limited to the duration of this warranty. HEATMASTER, Inc. shall not be liable for loss of use of this product, loss of time, inconvenience, commercial loss, or consequential damages. The remedy of repair or replacement of a defective part during the warranty period herein specified shall be the purchasers exclusive remedy."

The Warranty Card also included a section "What is not covered?" that stated in pertinent part as follows:

"This limited warranty does **not** cover damage resulting from accident, misuse or abuse, lack of proper maintenance, affixing of any attachments not provided with the products, or loss of parts. IN NO EVENT SHALL HEATMASTER, INC. BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM MISUSE OR MODIFICATION OF THE PRODUCT."

Similar limited warranty language was deemed effective to bar breach of warranty claims in the property damage context. *See Moore v. Coachmen Industries, Inc.*, 129 N.C.App. 389, 499 S.E.2d 772 (1998). Such contractual limitations are permitted by North Carolina statute. N.C. Gen. Stat. § 25-2-719.

Further, there is no basis to find the limited warranty unconscionable or otherwise invalid. First, as this case does not involve personal injury, there is no presumption of unconscionability and P&D bears the burden of proving the same. *Moore v. Coachmen Industries, Inc.*, 129 N.C.App. 389, 398, 499 S.E.2d 772, 778 (1998). Also, the Limited Warranty that accompanied the gas log unit provided "minimum adequate remedies" so as to avoid any claim of unconscionability. *See Moore v. Coachmen Industries, Inc.*, 129 N.C.App. 389, 499 S.E.2d 772 (1998) (Warranty limiting remedies to repair or

---

*Raytheon Co.*, 393 Mass. at 632. In the present case, Pavia purchased the gas log unit in North Carolina,

replacement of any defective part at no cost while excluding liability for "incidental or consequential damages" found valid and barred breach of warranty claims). As the Limited Warranty accompanying the product would bar any breach of warranty claims, P&D's contribution claims based on these theories must fail. Accordingly, the Court should enter summary judgment in favor of Heatmaster.

### III.    P&D's indemnification claim (Count 4 of the Third Party Complaint) must be dismissed because none of the plaintiff's claims purport to hold P&D derivatively or vicariously liable for Heatmaster's acts.

P&D Builders is not entitled to indemnification from Heatmaster.[7]  While indemnification is allowed under common law principles, indemnity is permitted only when the would-be indemnitee does not join in the negligent act. The right to indemnity is limited to those cases in which the would-be indemnitee is held derivatively or vicariously liable for the wrongful act of another. *Decker v. Black & Decker Manufacturing Co.*, 389 Mass. 35, 40-41 (1983); *Rathbun v. Western Massachusetts Elec. Co.*, 395 Mass. 361, 364 (1985); *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.*, 693 F.2d 1, 3-4 (1982) (tort indemnification in appropriate where party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injuries); *Hollywood Barbecue Co. v. Morse*, 314 Mass. 368, 370 (where one party is liable by inference of law and did not join in the negligent act, that party may recover indemnity from a party who was negligent).

In the present case, FFIC's claims against P&D are based on allegations of P&D's independent negligence. FFIC alleges that P&D "failed to properly supervise the

---

the unit was shipped from North Carolina, and Heatmaster is incorporated and located in North Carolina
[7] P&D's claim for indemnification is not based on express or implied indemnification. For both express and implied indemnification, there must be a contract between the parties. *See Kelly v. Dimeo*, 31 Mass.App.Ct. 626 (1991).

installation" of the masonry fireplace and gas log unit, "failed to properly advise" its subcontractors, and "failed to take corrective action." None of the allegations of FFIC's Complaint purport to hold P&D derivatively or vicariously liable for any alleged wrongful act of Heatmaster. Indeed, the relationship (or lack thereof) between P&D and Heatmaster is not one that supports the imposition of vicarious or derivative liability.

If P&D is liable to FFIC in this case, it will be as a result of its negligence or breach of contract. Under that scenario, P&D is not entitled to indemnification from Heatmaster because its liability is not derivative or vicarious. If the alleged damages were not caused by P&D's negligence or breach of contract, P&D will have a defense to FFIC's claims. Such a defense does not provide the basis for an indemnity claim against Heatmaster. *Decker v. Black & Decker Manufacturing Co.*, 389 Mass. 35, 41 (1983). Accordingly, P&D's indemnification claim (Count 4) against Heatmaster must fail, and the court should enter summary judgment in Heatmaster's favor.

## IV.    CONCLUSION

WHEREFORE, the third party defendant, Heatmaster, Inc., requests that the court enter summary judgment in its favor at to all counts and claims in the Third Party Complaint.

HEATMASTER, INC.,

/s/ Scott T. Ober
_____
David F. Hassett, Esquire #544443
Scott T. Ober, Esquire #567666
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, MA 01608
(508) 791-6287

## CERTIFICATE OF SERVICE

I, Scott T. Ober, counsel of record for the third party defendant in this action, do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 14, 2006.

/s/ Scott T. Ober
_____
Scott T. Ober, Esquire

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE FIREMAN'S FUND INSURANCE )
COMPANY, as Subrogee of Julia Pavia, )
    Plaintiff )
     )
     )
vs. )
     )    CIVIL ACTION
FALCO CONSTRUCTION CORP., )    NO: 05-10827DPW
P&D BUILDERS, INC. AND )
MICHAEL CARRESI d/b/a )
CARRESI PLUMBING & HEATING, )
    Defendants )
P&D BUILDERS, INC., )
    Third-Party Plaintiff )
     )
vs. )
     )
HEATMASTER, INC., )
    Third-Party Defendant )

**AFFIDAVIT OF COUNSEL IN SUPPORT OF
THIRD PARTY DEFENDANT, HEATMASTER, INC.'S
MOTION FOR SUMMARY JUDGMENT**

I, Scott T. Ober, hereby state as follows:

1. I am attorney for the third-party defendant, Heatmaster, Inc., in the above-captioned

matter. I am an attorney in good standing in Massachusetts. The information

contained herein is based on my personal knowledge.

2. Attached hereto as Exhibit 1 is a true and accurate copy of the Complaint in this

matter.

3. Attached hereto as Exhibit 2 is a true and accurate copy of the Third-Party Complaint

in this matter.

4. Attached hereto as Exhibit 3 is a true and accurate copy of the deposition transcript of

Philip Rothschild from this matter.

5. Attached hereto as Exhibit 4 is a true and accurate copy of the deposition transcript of Joseph Falco from this matter.

6. Attached hereto as Exhibit 5 is a true and accurate copy of the deposition transcript of Michael Carresi from this matter.

7. Attached hereto as Exhibit 6 is a true and accurate copy of the deposition transcript of Michael Roach from this matter.

8. Attached hereto as Exhibit 7 is a true and accurate copy of the deposition transcript of Michael Conte from this matter.

9. Attached hereto as Exhibit 8 is a true and accurate copy of the deposition transcript of Julia Pavia from this matter.

10. Attached hereto as Exhibit 9 is a true and accurate copy of the Installation and Operating Instructions for the subject gas log unit.

11. Attached hereto as Exhibit 10 is a true and accurate copy of the Limited Warranty for the subject gas log unit.

12. Attached hereto as Exhibit 11 is a true and accurate copy of report of Jeffrey Lowe, an expert identified by the plaintiff.

13. Attached hereto as Exhibit 12 is a true and accurate copy of report of Genevieve Bures, an expert identified by the plaintiff.

14. Attached hereto as Exhibit 13 is a true and accurate copy of report of Sebastian Bongiorno, an expert identified by the defendant/third party plaintiff, P&D Builders, Inc.

15. Attached hereto as Exhibit 14 is a true and accurate copy of report of Brian Gore, an expert identified by Falco Construction Corp.

16. Attached hereto as Exhibit 15 is a true and accurate copy of report of Richard Splaine, an expert identified by Falco Construction Corp.

17. Attached hereto as Exhibit 16 is a true and accurate copy of report of Daniel Slowicki, an expert identified by Michael Carresi d/b/a Carresi Plumbing & Heating.

Signed and sworn to under the pain and penalties of perjury this _____ day of November, 2006.

/s/ Scott T. Ober

_____

Scott T. Ober, Esquire

3

# EXHIBIT 1

FROM :                          FAX NO. :                          May. 26 2005 03:50PM P2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------X

THE FIREMAN'S FUND INSURANCE                         CIVIL ACTION NO.
COMPANY as subrogee of JULIA PAVIA                        05-10827 DPW
77 San Marin Drive
Novato, California

                         Plaintiff,

            vs.

FALCO CONSTRUCTION CORP.;                            JURY TRIAL DEMANDED
P & D BUILDERS, INC.;
and
MICHAEL CARRESI d/b/a CARRESI                        APRIL 20, 2005
PLUMBING & HEATING

                         Defendants.

------------------------------------------------X

## COMPLAINT

1.      The Plaintiff Fireman's Fund Insurance Company (hereinafter

"FFIC") is a corporation organized and existing under the laws of the state of

California with a principal place of business at 777 San Marin Drive, Novato,

California, and at all times material to this action was authorized to issue

insurance policies within the Commonwealth of Massachusetts.

2.      The Defendant Falco Construction Corp (hereinafter "Falco") is a

corporation organized and existing under the laws of the Commonwealth of

Massachusetts with a principal place of business at 10 Willowood Drive,

Stoughton, Massachusetts and at all times material to this action, was engaged in the business of construction including masonry and the construction of fireplaces.

3.     The Defendant P & D Builders, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with a principal place of business at 6 Water Street, East Weymouth, Massachusetts, and all times material to this action, was engaged in business as a building contractor.

4.     The Defendant Michael Carresi d/b/a Carresi Plumbing & Heating (hereinafter "Carresi") is a resident of the Commonwealth of Massachusetts with a principal place of business at 513 Bird Street, Mansfield, Massachusetts and who, at all times material to this action, was engaged in the business of plumbing and HVAC service, installation and repair.

## JURISDICTION AND VENUE

5.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1332 (a). The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000 and there is a diversity of citizenship between the parties.

6.     The venue of this action is properly placed in this district pursuant to 28 U.S.C. Section 1391 as the claim which is the subject of this action arose within this district.

## GENERAL ALLEGATIONS

7.     On and prior to January 29, 2004, the Plaintiff insured the real and personal property owned by Julia Pavis located at 104 Hammondswood Road,

- 2 -

Newton, Massachusetts (hereinafter called "the property").

    8.    Prior to January 26, 2004, the Plaintiff's insured had done extensive renovations to the property including the installation of a fireplace.

    9.    During the course of those renovations the Defendant P & D Builders acted as the general contractor, the Defendant Falco constructed the masonry fireplace, and the Defendant Carres installed the gas log appliance in the fireplace.

    10.    On January 26, 2004, a fire occurred at the property causing substantial damage.

    11.    Pursuant to the terms and conditions of the policy of insurance which it issued to Julia Pavia, the Plaintiff has made payments to her in excess of $480,500 for the damages sustained and it is anticipated that further payments will be made.

## COUNT 1
## NEGLIGENCE (ERIC VS. FALCO)

    1-11.    The Plaintiff incorporates by reference paragraphs 1 through 11 inclusive as if they were set out in full.

    12.    The fire of January 26, 2004, was caused by the carelessness, negligence, and negligent omissions of the Defendant Falco, his agents, servants, or employees, in that they:

        a.    Improperly installed the masonry fireplace;

        b.    installed the fireplace in violation of the applicable building and fire codes;

        c.    failed to properly inspect and test the fireplace after it was

- 3 -

INSURE                Fax:9194674987        Sep 15 2005 11:22    P.18
FROM :                      FAX NO. :               May. 26 2005 03:52PM  P5

constructed; and

d.    otherwise failed to use due care under the circumstances.

13.    As a result of the aforesaid negligence, carelessness, and negligent omissions by the Defendant Falco, its agents servants or employees, the fire of January 26, 2004, occurred causing the resulting damage to the Plaintiff's Insured's property.

WHEREFORE, the Plaintiff demands judgment against the Defendant Falco in an amount in excess of $75,000 together with interest, the costs of this action, and such other relief as the court may deem appropriate.

## COUNT 2
## BREACH OF CONTRACT (FFIC VS. FALCO)

1-11.    The Plaintiff incorporates by reference paragraphs 1 through 11 inclusive as if they were set out in full.

12.    In agreeing to construct the masonry fireplace at the property, the Defendant Falco impliedly warranted that his work would be done in a workmanlike manner and in compliance with the applicable building and fire codes.

13.    The Defendant Falco, its agents, servants or employees, improperly constructed the masonry fireplace and constructed it in violation of the applicable building and fire codes.

14.    The fire of January 26, 2004, was caused by the aforesaid breach of implied warranty by the Defendant Falco.

WHEREFORE, the Plaintiff demands judgment against Defendant Joseph Falco d.b.a. Falco Construction in an amount in excess of $75,000 together with

- 4 -

FROM :                          FAX NO. :              May. 26 2005 03:52PM P8

interest, the costs of this action, and such other relief as the court may deem appropriate.

## COUNT 3
## NEGLIGENCE (FFIC VS. P & D BUILDERS)

1-11.  The Plaintiff incorporates by reference paragraphs 1 through 11 inclusive as if they were set out full.

12.  The fire of January 28, 2004, was caused by the negligence, carelessness, and negligent omissions of the Defendant P & D Builders, its agents, servants and employees in that they:

    a.  failed to properly supervise the installation of the masonry fireplace;

    b.  failed to properly advise the masonry subcontractor concerning the proper installation of the masonry fireplace;

    c.  failed to properly supervise the installation of the gas log appliance in the fireplace;

    d.  failed to take corrective actions upon learning that the masonry fireplace was installed with inadequate masonry or clearances from combustible surfaces; and

    e.  otherwise failed to use due care under the circumstances.

13.  As a result of the aforesaid negligence, carelessness and negligent omissions of the Defendant P & D Builders its agents, servants and employees, the fire of January 28, 2004, occurred causing the resulting damage to the property of the Plaintiff's insured.

WHEREFORE, the Plaintiff demands judgment against the Defendant PD

- 5 -

Builders in an amount in excess of $75,000 together with interest, the costs of this action, and such other relief as the court may deem appropriate.

### COUNT 4
### BREACH OF CONTRACT OF BREATH (FFIC VS. PD BUILDERS)

1-11.   The Plaintiff hereby incorporates by reference paragraphs 1 through 11 inclusive as if they were set out full.

12.     Defendant P & D Builders impliedly warranted that it would perform its duties as a general contractor in a workmanlike manner and that the renovations to the Plaintiff's insured's home would be done in accordance with the applicable building and fire codes.

13.     The Defendant P & D Builders breached the aforesaid warranty by failing to probably supervise, inspect and direct the installation of the masonry fireplace and gas log appliance, which was improperly installed and installed in violation of the appropriate building and fire codes.

14.     As a result of the aforesaid breach of implied warranty the fire of January 26, 2004, occurred resulting in damage to the property belonging to the Plaintiff's insured.

WHEREFORE, the Plaintiff demands judgment against Defendant P & D Builders in an amount in excess of $75,000 together with interest, the costs of this action, and such other relief as the court may deem appropriate

### COUNT 5
### NEGLIGENCE (FFIC VS. CARRESI)

1-11.   The Plaintiff incorporates by reference paragraphs 1 through 11 inclusive as if they were set out full.

- 6 -

12.   The fire of January 28, 2004, was caused by the negligence, carelessness, and negligent omissions of the Defendant Carresi, his agents, servants and employees in that they:

a.   improperly installed the gas log appliance in the fireplace;

b.   installed the gas log appliance in violation of the applicable building and fire codes;

c.   failed to properly inspect and test the fireplace after it was constructed; and

d.   otherwise failed to use due care under the circumstances.

13.   As a result of the aforesaid negligence, carelessness and negligent omissions of the Defendant Carresi, his agents, servants and employees, the fire of January 28, 2004, occurred causing the resulting damage to the property of the Plaintiff's insured.

WHEREFORE, the Plaintiff demands judgment against the Defendant Carresi in an amount in excess of $75,000 together with interest, the costs of this action, and such other relief as the court may deem appropriate.

## COUNT 6
## BREACH OF CONTRACT OF BREATH (EFIC VS. CARRESI)

1-11.   The Plaintiff hereby incorporates by reference paragraphs 1 through 11 inclusive as if they were set out full.

12.   Defendant Carresi impliedly warranted that he would perform his duties as a plumber and HVAC technician in a workmanlike manner and that the renovations to the Plaintiff's insured's home would be done in accordance with the applicable building and fire codes.

-7-

TREASURE          Fax:9194674997          Sep 16 2005
FROM :                    FAX NO. :              May. 26 2005 03:54PM  P9

13.   The Defendant Carrasl breached the aforesaid warranty by failing to probably install, inspect and test the installation of the gas log appliance in the fireplace, which was improperly installed and installed in violation of the appropriate building and fire codes.

14.   As a result of the aforesaid breach of implied warranty the fire of January 26, 2004, occurred resulting in damage to the property belonging to the Plaintiff's insured.

WHEREFORE, the Plaintiff demands judgment against Defendant Carrasl in an amount in excess of $75,000 together with interest, the costs of this action, and such other relief as the court may deem appropriate.

THE PLAINTIFF,

By _____

Stuart G. Blackburn, Esq.
Law Offices of Stuart G.
Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
Tel: 860-292-1116
Fax 860-292-1221
BBO# 549797

- 8 -

EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE FIREMAN'S FUND INSURANCE )
COMPANY as subrogee of JULIA PAVIA, )
    Plaintiff, )
 )
 )
v. )
 )
FALCO CONSTRUCTION CORP., P&D )
BUILDERS, INC., and MICHAEL )        CIVIL ACTION NO.: 05-10827DPW
CARRESI d/b/a CARRESI PLUMBING & )
HEATING. )
    Defendants, )
 )
 )
v. )
 )
HEATMASTER, INC. )
    Third-Party-Defendant. )

## THE DEFENDANT, P&D BUILDERS, INC.'S
## THIRD-PARTY COMPLAINT AGAINST HEATMASTER, INC.

1.  The defendant/third-party plaintiff, P&D Builders, Inc., is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with a principal place of business at 6 Water Street, East Weymouth, Massachusetts.

2.  The third-party defendant, Heatmaster, Inc., is a corporation organized and existing under the laws of the State of North Carolina, with a principal place of business at 3626 Benson Road, Angier, North Carolina.

### GENERAL ALLEGATIONS

3.  This is a subrogation action arising out of a fire alleged to have occurred on January 26, 2004 at the home of the plaintiff's subrogee, Julia Pavia, at 104 Hammondswood Road, Newton, Massachusetts (hereinafter called "the property").

4.  The plaintiff, Fireman's Fund Insurance Company, alleges that, prior to January 26, 2004, the defendant, P&D Builders, Inc., performed extensive renovations to the property including the installation of a fireplace.

5.  The plaintiff alleges that the defendants, P&D Builders, Inc., Falco Construction Corp., and Michael Carresi were negligent in performing the renovations and in installing a gas log appliance in the fireplace.

1150172v1



6.  Upon information and belief, the defendant/third-party plaintiff, P&D Builders, Inc., states that the gas log appliance alleged to have been installed by defendant Michael Carresi was a Model DGF M-24NAT, serial number 2027, manufactured by the third-party defendant, Heatmaster, Inc.

7.  If the plaintiff's subrogee sustained property damage as alleged, the damage was caused by the gas log appliance that was designed, manufactured or sold by third-party defendant Heatmaster, Inc.

## COUNT 1
## CONTRIBUTION FOR BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS

8.  The defendant/third-party plaintiff restates the statements and allegations set forth in paragraphs 1-7 as if expressly set forth and rewritten herein, and further states;

9.  The third-party defendant impliedly warranted that the gas log appliance it designed, manufactured, assembled, distributed, and/or sold would be of merchantable quality and fit for its intended or particular purpose and that such gas log appliances were to be used by the general public.

10. The defendant/third-party plaintiff and others relied on the third-party defendant's warranties when using the gas log appliance.

11. The third-party defendant breached its warranties in that the gas log appliance was not safe or merchantable and not suitable for its intended, or particular, or ordinary purpose and/or the third-party defendant failed to warn of its unsafe condition.

12. The third-party defendant breached its implied warranties of merchantability by designing, manufacturing, assembling, distributing, and/or selling the gas log appliance when was unreasonably dangerous and unsuitable for ordinary use by the general public.

13. If it is determined that the defendant/third-party plaintiff, P&D Builders, Inc., is liable in this action, which defendant/third-party plaintiff expressly denies, then such liability resulted from third-party defendant's breach of its implied warranties.

14. By reason of the third-party defendant's breach of implied warranties, defendant/third-party plaintiff is entitled to contribution for all of the alleged damages in the Complaint.

WHEREFORE, the defendant/third-party plaintiff demands judgment and damages against the third-party defendant, together with interests and costs.

2

## COUNT 2
## CONTRIBUTION FOR BREACH OF EXPRESS WARRANTY

14. The defendant and third-party plaintiff restates the statements and allegations set forth in paragraphs 1-13 as if expressly set forth and rewritten herein, and further states;

15. Prior to January 26, 2004, the third-party defendant expressly warranted to the general public and the defendant/third-party plaintiff in particular the gas log appliance was of merchantable quality and fit, safe and suitable for the purposes for which it was designed, manufactured, assembled, distributed, and/or sold and that it was free from defects.

16. The defects in the design, manufacture, warnings, instructions, and/or assembly of the gas log appliance, constitute a breach of any and all express warranties provided in that the product was unsafe, not of merchantable quality, and unfit for its intended and/or expected uses.

*isn't this implied warr?*

17. If it is determined that the defendant/third-party plaintiff, P&D Builders, Inc., is liable in this action, which defendant/third-party plaintiff, expressly denies, then such liability resulted from third-party defendant's breach of its express warranties.

18. By reason of the third-party defendant's breach of express warranties, defendant/third-party plaintiff is entitled to contribution for all of the alleged damages in the Complaint.

   **WHEREFORE**, the defendant/third-party plaintiff demands judgment and damages against the third-party defendant, together with interests and costs.

## COUNT 3
## CONTRIBUTION FOR NEGLIGENCE

19. The defendant and third-party plaintiff restates the statements and allegations set forth in paragraphs 1-18 as if expressly set forth and rewritten herein, and further states;

20. At all relevant and material times, the third-party defendant was under a duty to design, manufacture, and/or assemble the gas log appliance so as to not be unreasonably dangerous to foreseeable users including the defendant/third-party plaintiff and the plaintiff's subrogee.

21. The third-party defendant had a duty to warn and instruct foreseeable users of the gas log appliance that the design, manufacture, and/or assembly of the product made it potentially and/or actually unsafe for use.

3

1150172v1

22.   The third-party defendant had a duty to test and research the design, manufacture and or assembly of the gas log appliance prior to and after introducing the product into the stream of commerce.

23    The third-party defendant had a duty to warn foreseeable users of the tendency or potential tendency of the gas log appliance to cause damage, or a fire.

24.   The third-party defendant violated its duty of care to reasonably expectable and foreseeable user of the gas log appliance by committing one or more of the following negligent acts or omissions:

a.    Failing to design, manufacture, and/or assemble the gas log appliance in a condition which made it reasonably safe for all foreseeable uses;

b.    Failing to design, manufacture, and/or assemble the gas log appliance so that it was not unreasonably dangerous for all foreseeable uses;

c.    Failing to design, manufacture, and/or assemble the gas log appliance in such a manner so that it would not cause property damage in the course of reasonably foreseeable use;

d.    Failing to adequately and properly test and research the gas log appliance's propensity to cause property damage in the course of reasonably foreseeable use;

e.    Failing to issue proper warnings and instructions to the general public and to the plaintiff in particular, so as to properly advise foreseeable users that the gas log appliance was not reasonably safe for use, to warn of its dangerous propensities, and to instruct as to proper and safe installation;

f.    Failing to properly conduct inspections, tests, and/or engineering evaluations of the gas log appliance prior to releasing it into the stream of commerce;

g.    Failing to provide remedial devices for foreseeable users of the gas log appliance which would render the product reasonably safe for reasonably foreseeable uses;

h.    Failing to remedy the propensity of the gas log appliance to cause property loss once the third-party defendant knew or had reason to know of such propensity;

i.    Designed, manufactured, assembled, distributed, and/or sold the gas log appliance, which was unsafe, to the plaintiff when the third-party defendant knew or should have known said product was dangerous, not reasonably safe and/or defective in nature and design; and

j.    Failing to recall the gas log appliance.

25.   If it is determined that the defendant/third-party plaintiff, P&D Builders, Inc., is liable in this action, which defendant/third-party plaintiff, expressly denies, then such liability resulted from third-party defendant's negligence.

4

26.     By reason of the third-party defendant's negligence, defendant/third-party plaintiff is entitled to contribution for all of the alleged damages in the Complaint.

        **WHEREFORE,** the defendant/third-party plaintiff demands judgment and damages against the third-party defendant, together with interests and costs.

## COUNT 4
## INDEMNIFICATION

27.     The defendant and third-party plaintiff restates the statements and allegations set forth in paragraphs 1-26 as if expressly set forth and rewritten herein, and further states;

28.     If the plaintiff suffered damages as alleged, which the defendant/third-party plaintiff denies, these damages if any, were caused by the negligent acts or omissions and/or breach of warranty by the third-party defendant, Heatmaster, Inc., and the defendant/third-party plaintiff did not participate in the negligence or breach. The liability of the third-party plaintiff, if any, is vicarious and derivative, while the liability of Heatmaster, Inc. is direct and actual.

        **WHEREFORE,** the defendant/third-party plaintiff demands judgment against third-party defendant for all sums that it pays or is ordered to pay plaintiff, together with interest, costs, and attorneys fees incurred by defending against plaintiff's action and in bringing the third-party claim.

1150172v1

## JURY CLAIM

THE DEFENDANT/THIRD-PARTY PLAINTIFF CLAIMS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,
The Defendant/Third-Party plaintiff,
P&D Builders, Inc.,
By their attorney,

William Joseph Flanagan, BBO #556598
Curtis L.S. Carpenter, BBO #657358
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

1150172v1

6

EXHIBIT 3

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*********************************

THE FIREMAN'S FUND INSURANCE

COMPANY as subrogee of JULIA PAVIA,

                    Plaintiff

vs.

FALCO CONSTRUCTION CORP., P&DK

BUILDERS, INC. and MICHAEL

CARRESI d/b/a CARRESI PLUMBING &

HEATING,                    C.A. 05-10827DPW

                    Defendants

vs.

HEATMASTER, INC.,

                    Third-party Defendant

*********************************

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 6

1           I N D E X
2  WITNESS:        PHILLIP ROTHSCHILD
3
4  Examination by Mr. Blackburn . . . . . . 7
5  Examination by Mr. Crowley . . . . . . . 177
6  Examination by Mr. Ober  . . . . . . . . 232
7  Examination by Mr. Turner . . . . . . . 235
8  Examination by Mr. Blackburn . . . . . . 250
9  Examination by Mr. Crowley . . . . . . . 254
10 Examination by Mr. Ober  . . . . . . . . 255
11
12
13
14 EXHIBIT                      PAGE
15 1   Invoice                  31
16 2   Estimate                 31
17 3   Letter, September 6, 2000        31
18 4   Punch List               31
19 5   Application for Building Permit    36
20 6   Proposal                 39
21 7   Letter, December 17, 2000        46
22 8   Time Sheets              47
23 9   Time Sheets              47
24

Page 7

1          I N D E X
2  Exhibits
3  10  Time Sheets              47
4  11  Bills                   150
5  12  Building Documents          172
6  13  Time Sheets             172
7  14  Undated Letter              230
8  15  Instructions            234
9
   ** Exhibits retained by counsel.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1          MR. BLACKBURN:  Swear the
2  witness in, please.
3
4
5
6          PHILLIP ROTHSCHILD, Witness,
7          first having been satisfactorily
8          identified and having been duly
9          sworn, deposes and states as
10         follows:
11
12
13
14
15         EXAMINATION BY MR. BLACKBURN:
16
17         MR. BLACKBURN:  Good morning,
18 Mr. Rothschild.  We've just met.  My name is
19 Stuart Blackburn.  I represent the Fireman's
20 Fund Insurance Company in this case.
21      Q Have you ever had your
22 deposition taken before?
23      A Once in a divorce case.
24      Q Let me give you a few

Page 9

1  instructions.  Most of them are general.  At
2  least one will be probably more specific to
3  me than anything else.  I'm going to ask you
4  some questions today about this project out
5  at the Pavia home both before and after the
6  fire.
7       A Okay.
8       Q If at any time you don't
9  understand me, if I use a phrase that's not
10 clear to you or say something that you don't
11 understand, let me know that and I'll make
12 sure that you understand what I'm saying.
13      A Okay.
14      Q As you can see, the young lady's
15 taking down everything we say.  So ordinarily
16 you and I could sit and have a conversation
17 that would include both words and nods of the
18 head, things like that.  At least while we're
19 on the record today, we need to communicate
20 only with words; okay?
21      A Yes.
22      Q I think what you'll find, my
23 experience is that I have a tendency to draw
24 out my questions, stutter a bit.  My

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

## Page 14

1 going on at the same time that you were doing
2 that addition at the Pavia house?
3     A Yes, one other kitchen.
4     Q And do you recall where that
5 was?
6     A It was in Newton. I can't
7 remember the address, but it was in the city
8 of Newton at the same time.
9     Q So how often would you say that
10 you were at the Pavia house during the
11 construction in 99 and 2000?
12     A I would usually come in in the
13 morning, making sure everything is all set,
14 everyone had their work to do for the day and
15 I would be off doing other things.
16     Q Was there anyone at the job site
17 for the full time that any of the employees
18 were there that was in charge, for lack of a
19 better word?
20     A Well, I used Chip Gibbons almost
21 like a foreman at that time. Charles is his
22 name. Chip is just a nickname.
23     Q Does Mr. Petronelli still work
24 with you?

## Page 15

1     A No.
2     Q Do you know where he lives?
3     A He lives in Middleboro.
4     Q Do you know what he does these
5 days?
6     A He owns a day care center.
7     Q In --
8     A He left shortly after that.
9     Q Does Mr. Gubbins still work for
10 you?
11     A Yes.
12     Q Does Mr. Roach still work for
13 you?
14     A He went independent on his own
15 after that, right after we did that job. Now
16 he's a subcontractor.
17     Q You still use him as a
18 subcontractor?
19     A Yes, once in a while.
20     Q But at the time he was actually
21 a W-2 employee?
22     A Yes; at that time, for a short
23 period of time he was, yes.
24     Q And does Mr. Conti still do

## Page 16

1 subcontracting work with you?
2     A I haven't used him since that
3 job.
4     Q Any particular reason related to
5 that job?
6     A Just really haven't had the
7 need.
8     Q Nothing as a result of any hard
9 feelings --
10     A No.
11     Q -- or something that arose
12 during the course of that job?
13     A No.
14     Q Prior to building the
15 addition --
16     A Uh-huh.
17     Q -- how long had you known Julia
18 Pavia?
19     A I think three years prior to
20 that, when she lived in the other house in
21 Newton and we did two bathrooms in there.
22     Q Is that when you first met her?
23     A Yes.
24     Q In between that project that you

## Page 17

1 did on her other house and this addition that
2 was done in late 99, 2000, did you any
3 other work for her?
4     A No.
5     Q My understanding is that there
6 was some work done on the kitchen in her
7 house. Do you consider that to be part of
8 this same building of the addition or is
9 that --
10     A Yes.
11     Q Yes?
12     A That was done all at the same
13 time.
14     Q That was all part of the same
15 project?
16     A Yes, yes.
17         MR. CARPENTER: Wait until he
18 gets the question out before you answer.
19     Q In between those two projects,
20 the two bathrooms that you did at the other
21 house and this project that was done in late
22 99 or 2000, had you had any type of business
23 relationship with Miss Pavia?
24     A She designed a bathroom for us

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 22

1    Q When did you first contact Mr.
2 Falco about this job?
3        A Right after I priced it out and
4 got the permits and the permission to do it.
5            MR. BLACKBURN: We'll get back
6 to that in a minute.
7        Q How about Mr. Carresi, prior to
8 building the addition, did you have business
9 dealings with Mr. Carresi?
10       A Yes.
11       Q How far back does that go?
12       A I think probably 96 or 97 when
13 he started doing work for me.
14       Q In between 96 and 97, first of
15 all, leading up to this job at the Pavia
16 home, the addition at the Pavia home, how
17 frequently were you using Mr. Carresi as a
18 plumbing subcontractor?
19       A Every job.
20       Q I take it from the nature of
21 your business, every job probably needed a
22 plumbing subcontractor?
23       A Yes.
24       Q After the building of the

Page 23

1 addition at the Pavia house, again, leading
2 up to the date of the fire in January of
3 2004, did you continue to use Mr. Carresi on
4 every job?
5        A Yes.
6        Q Subsequent to the fire, have you
7 continued to use Mr. Carresi on every
8 plumbing job?
9        A Yes.
10       Q Tell me how it -- what your
11 recollection is about how things got started
12 on this project to build an addition on the
13 home?
14       A Mr. Pavia called me.
15       Q I'm sorry, did you say Mr.
16 Pavia?
17       A Yes. They were together at the
18 time this project started.
19           MR. BLACKBURN: Yes, I was aware
20 of that.
21       A We went over. We met, we
22 talked, decided, okay, this is what we're
23 going to do. They wanted to match the
24 existing old house. I said, okay. So we

Page 24

1 figured out our schedule of how we want to do
2 it, what we were going to do. I made up a
3 proposal. And that's how we started it.
4        Q Did -- what was the initial
5 plan? To build a two-story addition?
6        A Yes, to build a two-story
7 addition.
8        Q Did the basic footprint of the
9 addition change at any point during the
10 project?
11       A No, because there was a deck
12 there we pulled off and we built the new
13 addition the same size as that old deck
14 because there was big concrete posts down
15 underneath the deck that we could not move.
16       Q So that the dimensions of the
17 addition right from that outset through
18 construction were the same?
19       A Yes.
20       Q At the time that you were
21 contacted, had the Pavias developed any type
22 of a design?
23       A No, just sketches that she made.
24       Q Sketches that Mrs. Pavia made?

Page 25

1        A Yes.
2        Q Had there been any type of
3 engineer or architect retained by them at
4 that time?
5        A The engineering came after the
6 fact.
7        Q So to your knowledge, their
8 first discussion with anyone other than the
9 two of them about this project was with you?
10       A Yes.
11       Q Do you know whether they
12 contacted any other contractors?
13       A If they did, I'm not aware of
14 it; no.
15       Q So you drew up a proposal and
16 gave it to them about what the cost was going
17 to be?
18       A Yes.
19       Q They said okay?
20       A Yes.
21       Q What was the next step in the
22 process?
23       A Next step, I had to turn it all
24 into the town hall to get the building permit

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 30

1  at all?
2      A I don't think so, with the
3  exception of the bills that are in your
4  paperwork there, because I'd give her a bill
5  as we would go along, put all the hours,
6  everything on there.
7      Q What I'm going to do is I'm
8  going to give you a package of documents that
9  we received from your attorneys in this case.
10  It was actually in response to a request for
11  production of documents from one of the
12  defendants, Falco. But if you could go
13  through there and if you could locate the
14  bill --
15          MR. BLACKBURN: Actually, let me
16  broaden it a little bit.
17      Q If you could go through there
18  and locate any documents that either discuss
19  or relate to the fireplace, the work done on
20  the fireplace and we'll go off the record for
21  a second while you do that.
22
23          (Off The Record)
24

Page 31

1          (Exhibit Number 1, Invoice Dated
2          July 11, 2000, marked for
3          identification.)
4
5          (Exhibit Number 2, Estimate,
6          marked for identification.)
7
8          (Exhibit Number 3, Letter Dated
9          September 6, 2000, marked for
10          identification.)
11
12          (Exhibit Number 4, Punch List,
13          marked for identification.)
14
15          MR. BLACKBURN: Mr. Rothschild,
16  while we were off the record, you had an
17  opportunity to go through the documents that
18  had been produced in the case and as I had
19  asked you to take out any documents that
20  referred in any way to the fireplace prior to
21  the fire and I've had the court reporter mark
22  as Rothschild Exhibits 1, 2 and 3 three
23  documents that you pulled out and I also have
24  asked her to mark Rothschild Exhibit 4 which

Page 32

1  is another punch list that we'll get to in a
2  second.
3      Q Let me ask you first of all
4  whether any of these documents actually
5  document the cost that you charged to the
6  Pavias for the construction of that
7  fireplace?
8      A No.
9      Q Are you aware of any documents
10  that exist that do document the cost of that
11  fireplace?
12      A No.
13      Q As you sit here today, are you
14  able to tell me how much you got paid for
15  that?
16      A It would be a wild guess.
17          MR. CARPENTER: Don't guess.
18      Q Well, I guess I'm trying to
19  understand how it -- how you would have
20  gotten paid for it if you don't have --
21          MR. BLACKBURN: Withdrawn.
22      Q Was there a document that you
23  gave them that you just don't have any more?
24      A No.

Page 33

1      Q So tell me how it came to be
2  that you got paid something from the Pavias
3  for this fireplace?
4      A Because what we did, we did it
5  time and material. So we were on the job and
6  we just had that incorporated. As we were
7  doing our time, we just did the fireplace.
8      Q Did you receive a bill from Mr.
9  Falco for the work that he did on the
10  fireplace?
11      A Yes.
12      Q Do you still have a copy of
13  that?
14      A No, I do not because it was on
15  old fax paper. It -- you can't even read it
16  any more.
17      Q Do you recall how much he
18  charged you for doing the fireplace?
19      A I think -- I think it was around
20  2,800 to $3,000.
21      Q Do you still have that faxed
22  paper even though it's not legible?
23      A I think I do, yes; not with me,
24  but I do.

9  (Pages 30 to 33)

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 38

1    Q When was that application done?
2    A 9/27.
3    Q Now, Exhibit 1 is a letter to
4  the Pavias for July of 2000 --
5    A Uh-huh.
6    Q -- which is talking about a
7  project of $300,000, $331,000; correct?
8    A Yes.
9    Q Was that the project that the
10 Pavias accepted?
11   A This is what it ended up being,
12 yes.
13       MR. BLACKBURN: Well, I guess
14 I'm confused.
15   Q If this predates the
16 application, wasn't that the intent even
17 before the application?
18   A Except when I got the price of
19 this, they didn't want to do it, then they
20 decided, okay, we're going to do this. But
21 once we got into this, that's when the whole
22 thing was rotted, gone completely; so we had
23 to tear it all down. We weren't going to
24 tear it all down.

Page 39

1
2         (Witness Indicating)
3
4    Q As I understand it, you gave
5  them a quote in July for $331,000 worth of
6  work. They said, no, that's too much?
7    A Right.
8    Q So you backed it down? You
9  scaled it down?
10   A Yes.
11   Q Is there a document that
12 reflects the scaled-down version?
13   A Yes, I think there is in there.
14 Didn't we see that one when we went through
15 the paperwork?
16       MR. CARPENTER: I'm not sure if
17 I know what you're talking about.
18       MR. BLACKBURN: I think I did.
19
20       (Exhibit Number 6, Proposal,
21       marked for identification.)
22
23   Q Mr. Rothschild, let me show
24 what's been marked as Rothschild Exhibit 6.

Page 40

1  This is a proposal dated August 28, 2000. So
2  as I understand the progression, your first
3  quote was this Rothschild Exhibit 1, July 11,
4  2000, not accepted by the Pavias; correct?
5    A Yes.
6    Q Before we get away from that
7  document, the second page of Exhibit 1, does
8  that really belong with Exhibit 1? I know it
9  was together in the document production. I
10 know I stapled it together as part of the
11 exhibit, but would you look at that and see
12 whether that belongs with that letter.
13   A Well, it does; but up here the
14 following items for your list of items we
15 need to go over. Some of this stuff wasn't
16 spelled out on what we're going to do here.
17 What this price here is all of this.
18   Q Now, the second page of Exhibit
19 1, are you able to tell me what document that
20 is responding to?
21   A I think they had -- I think it's
22 right here; it's here.
23   Q We have Rothschild Exhibit 2 and
24 Rothschild Exhibit 4, that are both listings

Page 41

1  of things concerning the project.
2         Are you able to tell me as you
3  sit here whether the second page of
4  Rothschild Exhibit 1 is responding to
5  Rothschild Exhibit 2 or Rothschild Exhibit 4?
6    A I think this is what I went
7  through with them off of this list.
8
9         (Witness Indicating)
10
11   Q Which list?
12   A Off of their list, number --
13 this right here.
14
15       (Witness Indicating)
16
17   Q So Rothschild Exhibit 4, is that
18 correct?
19   A Yes.
20   Q So am I to understand that
21 Rothschild Exhibit 4 is something that the
22 Pavias prepared --
23   A Yes.
24   Q -- and gave to you --

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 46

1    MR. BLACKBURN: Right now I'm
2  just interested in the ones that relate to
3  the construction of the addition prefire.
4    We can go off the record.
5
6    (Off The Record Discussion)
7
8
9    (Exhibit Number 7, Letter Dated
10    December 17, 2001, marked for
11    identification.)
12
13    Q Mr. Rothschild, you've had a
14  chance to go through those documents and as I
15  understand it, the only document that you've
16  been able to locate that refers in any way to
17  billing or payments for the addition would be
18  marked as Rothschild Exhibit 7, correct, a
19  letter of December 17, 2001?
20    A Yes.
21    Q Do you have some others?
22    A Well, these time sheets from the
23  guys of those dates.
24    Q Is it -- the time sheets that

Page 47

1  you just handed me, are these all from 2001?
2    A This is when we started there,
3  right there, 2000. This is the next one; and
4  this one.
5
6    (Witness Indicating)
7
8    MR. BLACKBURN: Let's mark this,
9  please.
10
11    (Exhibit Number 8, Time Sheets,
12    marked for identification.)
13
14    (Exhibit Number 9, Time Sheets,
15    marked for identification.)
16
17    (Exhibit Number 10, Times
18    Sheets, marked for
19    identification.)
20
21    Q What was marked as Rothschild
22  Exhibit 8 is time records from July 6 of 2000
23  through November 14 of 2000; is that correct?
24    A Yes.

Page 48

1    Q As I understand it, that
2  includes not only the time records from your
3  own workers, but also any charges or payments
4  that you made to any subcontractors?
5    A Yes.
6    Q Subcontractors has its own
7  column you're showing me?
8    A Yes.
9    Q Would you agree with me that the
10  two pages that make up Rothschild Exhibit 8
11  do not reflect any payments to Mr. Falco?
12    A Yes.
13    Q Rothschild Exhibit 9, as I
14  understand it, would be the time records and
15  subcontractor payment records that cover the
16  period from November 15 of 2000 through
17  January 19th of 2001; correct?
18    A Yes.
19    Q And that does -- that Exhibit 9
20  does include payments to Mr. Falco, correct?
21    A Yes.
22    Q How many entries are there for
23  Mr. Falco?
24    A Two.

Page 49

1    Q And the amounts of those
2  payments?
3    A First one dated around 2/12 is
4  7,000; the second one dated around 11/19 is
5  8,500.
6    Q Now, other than the work on the
7  fireplace, what other work did Mr. Falco do
8  at the property?
9    A He did the whole outside, three
10  walls of this two-story addition.
11    Q He bricked it?
12    A Yes.
13    Q Did he give you a quotation
14  before he began his work of how much he was
15  going to charge you to brick the outside of
16  the house?
17    A It was a verbal quotation.
18    Q Do you recall what it was?
19    A No, I do not.
20    Q Do you recall whether -- setting
21  aside the work for the fireplace that you
22  already discussed, do you recall whether
23  there were any changes between what he
24  actually charged you for the exterior brick

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 54

1    Q Just indicate that for the
2  record for me.
3    A Yes.
4        MR. BLACKBURN:  Thank you.
5    A Number five.
6        MR. BLACKBURN:  Thank you.
7    Q What's the date of THE
8  certificate of occupancy?
9    A August 24, 01.
10   Q Does that correspond with when
11 you completed your work on the project?
12   A Yes.
13   Q At least substantially
14 completed?
15   A Yes.
16   Q Do you recall as you sit here
17 today whether there were punch list items
18 that still needed to be corrected even after
19 the certificate of occupancy?
20   A I don't recall.
21       MR. CARPENTER:  Can we go off
22 the record for one second here?
23       MR. BLACKBURN:  Absolutely.
24

Page 55

1        (Off The Record Discussion)
2
3        MR. BLACKBURN:  While we were
4  off the record, Mr. Rothschild, it was
5  pointed out to me that on Rothschild Exhibit
6  9, the dates in the left-hand column have
7  been cut off, making it appear as though it
8  ends in January.  However, if you look at the
9  date column in the middle of the page, it
10 does, indeed, run through March 28 of 01.
11   Q So here's my question:  The work
12 done by Mr. Carresi in installing the
13 components for the gas log fireplace, that
14 would have been work done after Mr. Falco had
15 done his work; correct?
16   A The only thing that they would
17 have had to have done together, Mike Carresi
18 had to run his pipe in when he was coming up
19 with the brick inside the fireplace.
20   Q But then Mike Carresi, didn't he
21 install the gas logs and all that?
22   A Yes.
23   Q So that would have been after
24 Mr. Falco was done, right?

Page 56

1    A Yes.
2    Q I don't see the payments to Mr.
3  Carresi on these sheets, but maybe I'm
4  missing something.  I certainly missed
5  something with the dates.  So can you
6  identify for me where the payments are to Mr.
7  Carresi on these sheets?
8    A Here.
9
10       (Witness Indicating)
11
12   Q So they're all contained on
13 Exhibit 8, am I right?  Are there any
14 payments to Mr. Carresi on Exhibit 9 or 10?
15   A No, there is not.
16   Q What is the last payment
17 reflected to Mr. Carresi on any of your
18 records of the project?
19   A 7/27.
20   Q You'd better check the second
21 page of that.  Is he on the second page of
22 that at all?  First of all, can you respond
23 to that question?  Is there any payment to
24 Mr. Carresi reflected on the second page of

Page 57

1  Exhibit 8?
2    A No.
3    Q So the last payment reflected on
4  any of your records to Mr. Carresi would have
5  been in July of 2000?
6    A Yes.
7    Q Do you see another one?
8    A No.
9    Q Let me ask you this, when you
10 first contacted Mr. Carresi to work on this
11 project --
12   A Yes.
13   Q -- what was he going to do?
14   A Mr. Carresi did all the
15 plumbing, changed the boiler, did all the air
16 conditioner work, all that.
17   Q So that included any work in
18 remodeling the kitchen as well as any
19 plumbing work that was necessary in the new
20 addition?
21   A Yes.
22   Q Correct?
23   A Yes.
24   Q And the plumbing work -- were

15 (Pages 54 to 57)

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 62

1  did you receive payment from the Pavias for
2  that amount?
3       A Yes.
4       Q Can you explain to me why Mr.
5  Carresi's work in connection with the
6  fireplace was being paid separately by Mrs.
7  Pavia but Mr. Falco's work in connection with
8  the fireplace was being billed through you?
9       A She came to me and she named
10 three people that she wanted to pay herself;
11 one was Carresi, one was the electrician and
12 the other was the cabinet people.
13      Q Why was that?
14      A She didn't want me adding
15 anything onto them after she paid these
16 initial two payments to get her air
17 conditioning covered and the boiler covered.
18 She wanted to work directly with them.
19      Q So let me ask you this, --
20           MR. BLACKBURN: Well, let's go
21 back a little bit.
22      Q Exhibit 2 and 4, I believe you
23 identified them previously as being the
24 documents that you received from the Pavias

Page 63

1  outlining the type of project that they
2  wanted to build; correct?
3       A Yes.
4       Q Both of them mention a fireplace
5  in the office, correct?
6       A Yes.
7       Q So from the outset, before you
8  gave them any quotes, there was discussion of
9  a fireplace in the office; correct?
10      A If you look back on one of mine,
11 I said in one of these, what fireplace. When
12 I gave them that bid, I didn't know there was
13 a fireplace going in until after we got
14 started.
15      Q Well, I think you're referring
16 to your letter of July 11, 2000, which is
17 Rothschild Exhibit 1, correct, sir, the
18 second page?
19      A Right here, the front page, no
20 fireplace.
21      Q But didn't you tell me before
22 that these sheets, Rothschild Exhibit 2 and
23 4, you received these before you did
24 Rothschild Exhibit 1?

Page 64

1       A Yes.
2       Q And both of those make reference
3  to a fireplace in the office, correct?
4       A Excuse me, let me find it here.
5  It has reference to it. That's why I wrote
6  the word, customer was going to take care of
7  that whole thing.
8       Q But my question was before --
9       A Yes, it is in there.
10      Q And that -- these -- this
11 proposal of what they wanted done was
12 something that was given to you prior to July
13 11, 2000; correct?
14      A Yes.
15      Q Correct?
16      A Yes.
17      Q So would you agree with me that
18 from the outset, from the Pavias's point of
19 view, the fireplace was going to be included?
20      A Yes.
21      Q However, your initial quote of
22 July 11, 2000 doesn't include the fireplace?
23      A Right.
24      Q Why not?

Page 65

1       A I didn't want anything to do
2  with the fireplace, building the fireplace.
3       Q Why not?
4       A Because that creates all kinds
5  of problems; an old house like that, I didn't
6  know how they were going to do it, where they
7  were going to put it. So I said, I don't
8  want to get involved in it.
9       Q You told the Pavias that prior
10 to July 11 of 2000?
11      A Yes.
12      Q So on Rothschild Exhibit 4, in
13 the last page under the section of office
14 where it says billed a room with a fireplace,
15 we supply man, who supplies gas fireplace and
16 two windows to match house, somebody has
17 written underneath that, customer; is that
18 your writing?
19      A Yes.
20      Q There's also a reference in the
21 master bedroom to the installation of a gas
22 fireplace and somebody has written, customer.
23 Is that your writing?
24      A Yes.

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 70

1    A Yes.
2    Q Did you have some understanding
3 of where in the office she wanted it?
4    A No.
5    Q And you mentioned that there
6 were discussions about a prefabricated
7 fireplace?
8    A Yes.
9    Q Was there a time when she was
10 considering putting in the prefabricated
11 fireplace?
12    A Yes, but it took up too much
13 room.
14    Q Did you obtain any information
15 for her concerning the prefabricated
16 fireplace?
17    A No, I did not.
18    Q So how did she come to the
19 conclusion that it took up too much room?
20    A She went and looked herself.
21    Q Do you know where she went?
22    A I think there's a fireplace shop
23 out on Route 9 in Natick that she went to.
24    Q Did you go with her?

Page 71

1    A No, I did not.
2    Q Did she bring any materials to
3 you to show you what she had found out there?
4    A Not to me, no.
5    Q To anyone else to your
6 knowledge?
7    A Maybe Mike Carresi because he
8 was going to put the gas part of it, hook it
9 up.
10    Q To your knowledge, when is the
11 first time that either yourself or Mrs. Pavia
12 discussed with Mr. Carresi working on this
13 fireplace?
14    A I think she told him right up
15 front they were going to try to put a
16 fireplace in there somewhere. He needed to
17 eventually get a gas pipe in there somehow.
18    Q Were you part of that
19 discussion?
20    A No, I was -- I wasn't there when
21 they discussed it. This is what he was
22 telling me.
23    Q So you found out about it from
24 Mr. Carresi --

Page 72

1    A Yes.
2    Q -- early in the project?
3    A Yes.
4    Q Before the framing?
5    A Well, yes, I did -- I found out
6 they wanted to try to put a fireplace in. So
7 I kind of backed myself out of it. I said,
8 you have to handle it.
9    Q You said that to who?
10    A To her and Mike Carresi.
11    Q So when you have this -- when
12 you learn about this conversation with --
13 that Mr. Carresi had with Miss Pavia, had the
14 concept of using a prefabricated insert
15 already gone by?
16    A I think so, yes.
17    Q So had Mrs. Pavia discussed with
18 you the gas log system that she wanted to
19 use?
20    A She just mentioned she wanted to
21 put a gas log. She did not say what kind.
22    Q Did you ask her?
23    A No, I did not.
24    Q Did you become aware of whether

Page 73

1 she had had any conversations with Mr.
2 Carresi about using a gas log?
3    A She might have. After the
4 initial discussion she had with him, I'm not
5 sure.
6    Q Tell me at what point in time
7 you became aware that the fireplace was
8 actually going in?
9    A Once Mr. Falco finished the
10 outside of the brick, we had to have him
11 inside and close up a window because the
12 window was too close to the corner where she
13 wanted this fireplace. After she made up her
14 mind, he had to close that window first
15 before he could build any kind of fireplace.
16    Q So it was sometime before he
17 came in to close up the window, that was your
18 understanding, that a fireplace was
19 definitely going in?
20    A Yes.
21    Q And where?
22    A Yes.
23    Q Was there any accommodation that
24 your framing people made for that fireplace?

19 (Pages 70 to 73)

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 78

1  That's not a fair question.
2      Q Would the only time that the
3  building inspector would have come to the
4  project with the fireplace built be for the
5  final inspection?
6      A Yes.
7      Q I assume at that point walls are
8  enclosed, ceilings are enclosed?
9      A It's all done.
10      Q All done?
11      A Yes.
12      Q Before Mr. Falco built the
13  fireplace, was the insulation above the first
14  floor ceiling sprayed in?
15      A Yes.
16      Q Before he built the fireplace,
17  was the first floor ceiling completed?
18      A Yes.
19      Q Is that plaster?
20      A Yes.
21      Q The room where the fireplace --
22  that the fireplace was located in, did that
23  also have plaster walls and a plaster
24  ceiling?

Page 79

1      A Yes.
2      Q Had that plaster work been done
3  before he installed the fireplace?
4      A Yes.
5      Q Did that have hardwood floors,
6  the office?
7      A Yes, only up to the hearth.
8      Q Until the brick started?
9      A Right.
10      Q Well, were the hardwood floors
11  installed before or after the fireplace went
12  in?
13      A After.
14      Q Did you tell me before that the
15  building inspector would come to inspect the
16  rough installation of the gas line?
17      A Not the building inspector, the
18  gas inspector, the plumbing inspector does
19  that.
20      Q Are they employees of the City
21  of Newton?
22      A Yes.
23      Q So, did they install or excuse
24  me, did they inspect the gas line that was

Page 80

1  going into the fireplace?
2      A Yes, they should have.
3      Q Well, were you there?
4      A No.
5      Q And why wouldn't you have been
6  there for that inspection?
7      A The plumber is required to be
8  there.
9      Q So generally, you're not there
10  when the gas people come in and inspect?
11      A Right.
12      Q You have no recollection of
13  being there on this occasion?
14      A No.
15      Q At any point, have you talked to
16  Mr. Carresi to ask him whether the plumbing
17  inspector from the City of Newton inspected
18  the gas lines that went into that fireplace?
19      A I think they did.
20          MR. BLACKBURN: No, that wasn't
21  my question.
22      Q My question was, did you discuss
23  with Mr. Carresi whether the plumbing
24  inspector came and inspected the gas lines --

Page 81

1      A Yes, I had that discussion.
2      Q -- to the fireplace?
3      A Yes.
4      Q When did you have that
5  discussion with him?
6      A Right before I got my building
7  inspection.
8      Q The final?
9      A Yes.
10          MR. BLACKBURN: Go ahead.
11          THE WITNESS: Can I back up?
12          MR. BLACKBURN: Of course.
13      A The gas inspector has to come in
14  on the rough --
15          MR. BLACKBURN: Yes.
16      A -- and inspect it --
17          MR. BLACKBURN: Yes.
18      A -- before we close up the other
19  walls. So he had a gas line in there. He
20  showed him where he was going to run it down.
21  He had it sticking in there. So when Joe
22  Falco built his, they could lay his pipe in
23  there where he wanted it.
24      Q So the gas line that was going

21 (Pages 78 to 81)

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

|  | Page 86 |
|---|---|

1      Q What's your recollection of the
2  method that they used to build that
3  wood-burning fireplace?
4      A All I've ever really seen is
5  when they're doing the same thing, he was
6  doing brick up on the inside, the fire brick
7  or whatever they call it, building it that
8  way.
9      Q Did you ever see that done on
10  anything but the grade floor of a home?
11      A No.  Normally there's a hearth
12  out in front like he put there.
13      Q My question is in any of the
14  other fireplaces that you saw constructed,
15  conventional fireplaces that you saw
16  constructed --
17          MR. BLACKBURN: Withdrawn. Let
18  me ask the question again.
19      Q With respect to any wood-burning
20  fireplaces that you saw constructed --
21      A Uh-huh.
22      Q -- were any of those built other
23  than on the first floor of a home?
24      A No.

|  | Page 87 |
|---|---|

1      Q Are you aware as you sit here
2  today what is required by any of the codes in
3  order to construct a fireplace on the second
4  floor of a home?
5      A No.
6      Q At the same time that Mr.
7  Carresi was roughing in the gas line, did you
8  see him roughing in any flue, chimney piping
9  for the gas fireplace?
10      A Well, he and Joe Falco came to
11  me.  They were bringing the brick up.  They
12  said they needed a piece of eighth-inch
13  metal, a cap over there with a ten-inch hole
14  in it with a collar in it for the duct pipe
15  that goes out.  I said, well, give me the
16  dimensions.  I gave to it my guy that builds
17  this stuff for me.  He built it.  I brought
18  it out.  They put it on, sealed it with the
19  mortar, whatever they had to do with it.
20  After Mr. Falco was gone, he came back out
21  and did the flue pipe.
22      Q Who came out and did the flue
23  pipe?
24      A A fellow named Jim Dusault came

|  | Page 88 |
|---|---|

1  out and installed the flue pipe up into the
2  attic.  He was just there one day.
3      Q Did your -- did any of your
4  carpenters have to cut any holes in order for
5  the flue pipe to be installed?
6      A Just where it came up through
7  the ceiling and the attic.
8      Q How about, did it exit the roof?
9      A That was from somebody else.
10      Q I'm sorry?
11      A That was from another
12  contractor.
13      Q Who did what?
14      A That put the chimney flue up on
15  the roof.
16      Q So Mr. Dusault didn't do that?
17      A No.
18      Q Who did the chimney flue up
19  through the roof?
20      A A & M Roofing I think it was,
21  right here.
22      Q What exhibit number is that,
23  sir?
24      A Number 3.

|  | Page 89 |
|---|---|

1          MR. BLACKBURN:  Thank you.
2      Q What type of accommodation did
3  your framers need to do in order to
4  accommodate the flue going through the roof?
5      A Nothing.
6      Q Did you -- did your carpenters
7  build the roof?
8      A Yes.
9      Q Everything but the slate?
10      A Yes.
11      Q So at the time that A & M
12  Roofing came to install the rest of that
13  chimney, did -- was there already a hole left
14  open for the chimney?
15      A No.
16      Q They cut it themselves?
17      A Yes.
18      Q That was before the slate was
19  put on, I assume?
20      A Well, that's no slate right
21  where this pipe came out.  There was a rubber
22  roof way up high because it was from -- it
23  was pretty flat.  They cut their own hole.
24  They flashed in the thing, hooked up the

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 94

1     A No.
2     Q To your knowledge, before -- so
3 what A & M Roofing did was pick up the flue
4 pipe from wherever Mr. Dusault left it in the
5 attic and completed it through the roof line?
6     A Yes.
7     Q And why did you need them to do
8 that? Why wouldn't Mr. Dusault do that?
9     A Because he's not a roofer.
10     Q So he was concerned about going
11 through the roof?
12     A Yes.
13     Q To your knowledge, was there any
14 type of a collar, a protective collar placed
15 in the area where the chimney flue pipe went
16 through the roof?
17     A Yes.
18     Q Did you actually see them
19 install that?
20     A Yes.
21     Q Were there any protective
22 collars installed on any of the other flue
23 piping as it worked its way down to the
24 fireplace?

Page 95

1     A No; it's called a B vent pipe,
2 it's a double line pipe.
3     Q So your understanding is that
4 there's no need for any accommodation of any
5 type of collars or sheathing where it --
6 where that pipe goes through any of the
7 floors, the attic floor or the ceiling or the
8 second floor, anything like that?
9     A Right.
10     Q Who purchased the gas log
11 assembly?
12     A Mrs. Pavia.
13     Q Do you know where she purchased
14 it?
15     A Somewhere in the Midwest. I
16 have no idea.
17     Q Did she talk with you at all
18 before she purchased it about what she was
19 going to buy?
20     A No.
21     Q Did you see it when it came to
22 the project?
23     A Yes.
24     Q Did you read the instructions?

Page 96

1     A No, I did not.
2     Q Did you give the instructions to
3 anybody to read?
4     A I think Mike Carresi is the only
5 one that read them. Julia gave them to him.
6     Q So you never had them in your
7 hands?
8     A No. He put the same type
9 fireplace downstairs on the first floor.
10     Q Conventional fireplace?
11     A Yes.
12     Q One not part of the addition,
13 correct?
14     A No.
15     Q She bought the two of them?
16     A Yes.
17     Q He did that at the same time?
18     A Yes.
19     Q Was there a fireplace built in
20 the master bedroom in this addition?
21     A (Witness Nodding).
22     Q No?
23     A No.
24     Q So that part of the initial

Page 97

1 scope of the project never made it to the --
2     A There was already one there. We
3 never built it. It was already there in the
4 master bedroom.
5     Q There was a reference, I think
6 it was in --
7     A A gas log went on the first
8 floor fireplace.
9     Q So the reference in Exhibit 4 to
10 master bedroom, install gas fireplace, that
11 was in an existing fireplace?
12     A Yes.
13     Q That's the one you're referring
14 to?
15     A No, we did not install it on the
16 second floor. We installed it on the first
17 floor.
18     MR. BLACKBURN: That's where I
19 got confused.
20     Q Did you build a master bedroom
21 as part of the addition?
22     A No.
23     Q So the last page of Exhibit 4
24 where it refers to install gas fireplace in

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# PHILLIP ROTHSCHILD
## March 30, 2006

|  | Page 102 |
|---|---|

1  the inside. And I said to him at that time,
2  I said, Julia called me this morning and she
3  wants you to do a herring bone pattern on the
4  floor. Is that okay? He said, I'll do
5  anything she wants.
6      Q So had the hearth or the hearth
7  extension been built when you saw it?
8      A No.
9      Q So he was just working on the
10 sides?
11     A (Witness Nodding).
12     Q That's a yes?
13     A Yes.
14     Q Was he building it right on the
15 subfloor?
16     A I think there was some Durarock
17 put down on the floor, which is cement board.
18 They call it Durarock.
19     Q You saw the Durarock?
20     A Yes.
21     Q Do you know who installed the
22 Durarock?
23     A I think Chip, my guy Chip.
24     Q And do you know how it came to

|  | Page 103 |
|---|---|

1  be that Chip installed the Durarock?
2      A I guess he did it because Joe
3  didn't want to do it, so he did it.
4      Q Joe being Mister --
5      A Joe Falco.
6      Q -- Falco?
7      A Right.
8      Q Do you have some understanding
9  of whether Mr. Falco asked Chip to put the
10 Durarock down?
11         MR. CROWLEY: Objection.
12         MR. BLACKBURN: You can answer.
13     A He probably did ask him. I'm
14 not sure, but he probably did.
15     Q Well, why was the Durarock put
16 down?
17     A As a concrete base between the
18 plywood subfloor and where he was going to
19 put his brick.
20     Q Who made the decision to install
21 the Durarock?
22     A I guess it was Joe Falco.
23         MR. BLACKBURN: This is going to
24 sound like I'm being a smart guy, but I'm

|  | Page 104 |
|---|---|

1  really not trying to be it.
2      Q Am I to understand that at no
3  point in time up to today have you ever
4  discussed with Chip why he put that Durarock
5  down?
6      A He talked to me about it in
7  casual after he put it down. I said, well,
8  did you glue it and screw it? How did you
9  put it down? He said, yeah, I glued it and
10 screwed it down for him. That's the only
11 conversation I had with him.
12     Q But you never had a discussion
13 with him of why he put it down or who asked
14 him to put it down?
15     A No.
16     Q You didn't ask him to put it
17 down?
18     A No.
19     Q He didn't decide on his own to
20 put it down?
21     A I don't -- I don't think so.
22     Q But you don't know?
23     A I don't know. He and Joe were
24 having conversations back and forth about

|  | Page 105 |
|---|---|

1  this.
2      Q So the first time you're there,
3  the walls of the fireplace are being built,
4  Durarock is down; correct?
5      A Yes.
6      Q Do you know how many layers of
7  it?
8      A One.
9      Q Is that okay with you?
10     A I really don't know because I'm
11 not the professional that does that. I
12 relied on these guys. If they have -- if
13 they're going to build a fireplace, they
14 should know what they're doing.
15     Q You understand that Mr. Falco's
16 position in this case is that he was only
17 asked to build the decorative fireplace,
18 never one that was going to be used in any
19 conventional way? Do you understand that to
20 be the case?
21     A I understand that, yes.
22     Q You don't agree with that?
23     A No.
24     Q What is -- what conversations

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 110

```
1        Q Do you recall whether you were
2    asked to do anything in connection with the
3    fireplace that day?
4        A No.
5        Q Did you return the next day?
6        A Yes.
7        Q When you returned, what was the
8    progress that was -- that had been made on
9    the fireplace?
10       A I didn't even go in that room.
11   I was busy everywhere else.
12       Q When is the next time that you
13   can recall actually seeing the fireplace?
14       A When they had it ready for that
15   cap that I had to have made.
16       Q At that point, had all the
17   masonry work been finished?
18       A Up to that point, yes. Well,
19   no, not the -- not the hearth.
20       Q The hearth still hadn't been
21   done?
22       A Right.
23       Q Had the gas pipe been brought
24   into the room?
```

Page 111

```
1        A Yes, it was just sticking in
2    there.
3        Q When you say sticking in there,
4    how far down from the ceiling was it coming?
5        A Well, the fireplace is about
6    five feet down from the ceiling. The end of
7    it was just sticking right there.
8        Q Right at the top of the
9    fireplace?
10       A Yes.
11       Q And was it both --
12          MR. BLACKBURN: Withdrawn.
13       Q Who was it that approached you
14   about needing the cap, the sheet metal cap?
15       A I had that conversation with
16   Mike Carresi and Joe Falco. They handed me a
17   piece of paper with some dimensions on it and
18   said, this is what I need.
19       Q The two of them together?
20       A Yes.
21       Q Were you able to get it done
22   that day?
23       A No, I think it took -- I think I
24   got it there sometime the next afternoon.
```

Page 112

```
1        Q Was it your understanding that
2    the work had ceased on the fireplace until
3    you got that?
4        A Yes, it did on the fireplace,
5    but he had other things that he was doing.
6        Q Who's he?
7        A A Joe Falco and the plumber.
8        Q What was Mr. Falco doing during
9    that time period?
10       A I think he had one window
11   outside, above the window to fix and bring
12   the brick up to the soffit to finish that
13   part of it out because the staging wasn't
14   high enough that one day.
15       Q So your understanding is that he
16   had not completed the exterior brick at the
17   time that he was building this fireplace?
18       A Right, yes.
19       Q What was Mister -- what other
20   projects was -- what other projects was Mr.
21   Carresi doing during that time period?
22       A He had the bathrooms and kitchen
23   stuff he was working on.
24       Q How many employees did Mr.
```

Page 113

```
1    Carresi have at the job?
2        A Just him and one other guy at
3    that time.
4        Q To your knowledge, did he ever
5    have more than one employee and himself on
6    that project?
7        A No, that was all he ever had.
8        Q Do you recall the other guy's
9    name, the guy that worked with him?
10       A He's been gone since. I don't
11   recall his name.
12       Q Did you return the next day --
13       A To bring --
14       Q -- to bring the cap?
15       A Yes.
16       Q You actually brought it?
17       A Yes.
18       Q Were both Mr. Carresi and Mr.
19   Falco there when you returned with the cap?
20       A Yes.
21       Q Who did you give it to?
22       A I leaned it up against the wall
23   in the room where the fireplace was going and
24   told them, there it is, when they get time to
```

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 118

1    A No.
2    Q Ever?
3    A No.
4    Q So when's the next time you
5    recall looking at the fireplace at all?
6    A When I was there with Jim
7    Dusault, the guy that put the pipe in two
8    days later, whatever it was. I went down.
9    He was up in the attic putting the pipe in.
10   I went down and looked. I said to Julia, is
11   that what you wanted? She said, yes, that's
12   what I wanted.
13   Q Did you have any further
14   discussion with her at that point about it?
15   A No.
16   Q At any point in time before the
17   fire, did you have any discussions with Mrs.
18   Pavia or Mr. Pavia about whether the
19   fireplace was adequate to accommodate a gas
20   log --
21   A No.
22   Q -- assembly?
23   A No.
24   Q Do you recall having any

Page 119

1    discussions with Mr. Carresi prior to him
2    installing the gas log assembly?
3    A I think maybe I asked him. Yes,
4    I did ask him about how he was going to run
5    his gas line across. Was he going to come
6    down in the corner, what was he going to do
7    with it. That's really all.
8    Q Why were you interested in that?
9    A So you wouldn't stand back, look
10   in there, see the gas line. If he brought it
11   down where it was, you would see it. So he
12   brought it over, dropped it in the corner
13   where you couldn't see it.
14   Q Did he indicate to you that was
15   always his plan --
16   A Yes.
17   Q -- or did he change the plan
18   based on your comment?
19   A No, that was always the plan,
20   bring it in the corner.
21   Q Were you there the day he was
22   installing it?
23   A I was there, but it wasn't --
24   but I wasn't paying any attention to what he

Page 120

1    was doing. I was doing other things in other
2    rooms.
3    Q Did you look at it after he had
4    installed it?
5    A Yes.
6    Q Now, at that point would I be
7    correct that everything was complete with the
8    fireplace other than the work that M & M, is
9    that it?
10   A A & M.
11   Q That A & M Roofing was going to
12   do?
13   A Yes.
14   Q Do you have any knowledge as to
15   whether the plumbing inspector from the City
16   of Newton came in and inspected the
17   installation of the gas log fireplace
18   assembly at any point during this process?
19   A I was not there when he came, so
20   no, I --
21   Q You don't know at what point in
22   time he came?
23   A No.
24   Q You just believe he did come?

Page 121

1    A Yes.
2    Q And is the reason why you
3    believe that because you got a CO?
4    A Yes.
5    Q Other than that, I mean, did you
6    get any independent information from anybody
7    that made you think that they were there?
8    A Well, the only one that said
9    anything to me was Mike Carresi said that the
10   gas inspector and plumbing inspector were
11   here and the fire inspector was here.
12   Q So Carresi told you they had
13   done the inspections?
14   A Yes. He's the one that has to
15   call for them. He has to be there.
16   Q Did you have any discussions
17   with Mrs. Pavia about any limitations on the
18   use of the fireplace?
19   A No.
20   Q Were you present for any
21   discussions that anyone had with Mrs. Pavia
22   about limitations on the use of the
23   fireplace?
24   A No.

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 126

1    A I got that from Julia.
2    Q Do you know where she got it
3  from?
4    A Well, they came in a cardboard
5  box. I'm sure she took it out of the box and
6  made copies of it.
7    Q When you say you're sure, is
8  that something that you're assuming or did
9  you actually discuss that with her?
10    A Well, no, I could see the box
11  that it came in. I'm sure instructions were
12  in the box.
13    Q Fair enough, but I meant her
14  having a copy of it after the fire. Do you
15  have any understanding where she got that
16  copy?
17    A No.
18    Q At any time before the
19  certificate of occupancy was obtained, did
20  you witness the gas fireplace log lit and
21  burning?
22    A Yes.
23    Q When was that?
24    A One day I went over there when

Page 127

1  Mike was showing her how to use the remote
2  control, how to work it off the remote
3  control.
4    Q Was anybody else there other
5  than you and Mr. Carresi and Miss Pavia?
6    A I think her husband was there.
7    Q Just the four of you?
8    A Yes.
9    Q Is that the only time you saw it
10  operating?
11    A Yes.
12    Q How long did you see it
13  operating on that day?
14    A Maybe five minutes.
15    Q After it was operating, did you
16  do any inspection of the area, of the attic
17  or any of the areas around the fireplace to
18  see what effects if any came from the
19  operation of the fireplace?
20    A No.
21    Q Did you ask Mr. Carresi whether
22  he had done that at any point?
23    A No.
24    Q To your knowledge, did -- was

Page 128

1  Mr. Carresi ever involved in any of the
2  discussions about using a prefabricated
3  insert fireplace as opposed to this gas log
4  assembly?
5    A Not that I'm aware of.
6    Q Would it be fair to say that to
7  your understanding, the question of using a
8  prefabricated insert ended when Mrs. Pavia
9  told you that she had checked it out and the
10  dimensions were too big?
11    A Yes.
12    Q So you don't have any knowledge
13  that she discussed it with anybody else but
14  you?
15    A No.
16    Q At any point did you tell her
17  that you had never been involved with
18  constructing a fireplace other than one that
19  had a prefabricated insert?
20    A I'm not sure if I had a
21  conversation with her or not. I don't think
22  so.
23    Q Between August of 2001 and
24  January of 2004, did you have any occasions

Page 129

1  to return to the Pavia house?
2    A Yes, for those -- that one Bat
3  Mitzvah.
4    Q That was at the house?
5    A Yes.
6    Q Did you go into the room where
7  the fireplace was?
8    A No.
9    Q So no occasions to come out to
10  do any further work?
11    A Yes, we did the bathroom in the
12  basement after the fact on a separate --
13  separate --
14    Q After the fire?
15    A Yes.
16    Q Between August of 2001 when the
17  CO was issued for this addition and the date
18  of the fire, you didn't go there to do any
19  work?
20    A Well, yeah, we maybe went to
21  adjust a kitchen cabinet, adjusted a door,
22  put a lock in, some small thing like that,
23  but nothing -- nothing of any size.
24    Q When did you first learn that

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 134

1  in the street.  Two fire trucks were out in
2  the front yard.  There was water pouring out
3  of the front of the house.  So I went in the
4  back door, came in and I said, what in the
5  hell is going on.
6      Q  Now, why were you going to the
7  house?
8      A  She called me.
9      Q  She called you and told you
10 there was a fire?
11     A  (Witness Nodding).
12     Q  That's a yes?
13     A  Yes.
14     Q  What time did she call you?
15     A  I think around six o'clock.
16     Q  And when you arrived, was the
17 fire department still applying water?
18     A  Yes.
19     Q  Were you able to see any flame?
20     A  No.
21     Q  Who else was there?
22     A  A guy that chases the fire
23 department.  He's Larry Berman is his name,
24 works for insurance -- I'm not sure what they

Page 135

1  call him.
2      Q  Public adjuster?
3      A  Public adjuster or something.
4  He was there before the fire trucks got there
5  because he knows the fire departments, he has
6  a radio in his house.  So he was there
7  checking over things that were wrong.
8      Q  Was he the only one?
9      A  Other than the fire department
10 and me, then the plumber showed up again.
11     Q  Who was it that called Mr.
12 Carresi?
13     A  I think Julia did.
14     Q  Did you do anything that day
15 other than just make observations of what was
16 going on?
17     A  No.
18     Q  Do you recall whether you had
19 any discussions with Mrs. Pavia that day
20 starting to set forth a plan basically of how
21 you were going to deal with this?
22     A  She just looked at me and said,
23 what am I going to do now.
24     Q  What did you say?

Page 136

1      A  That's when Larry Berman, the
2  fellow that was there, stepped in and said,
3  I'll take care of it.
4      Q  Did you know Mr. Berman from
5  before?
6      A  I had heard the name, but no, I
7  don't know him.
8      Q  You had never run into him?
9      A  No.
10     Q  To your knowledge, you hadn't
11 done any work on any projects that involved
12 insurance claims that he was involved in?
13     A  No.
14     Q  How long would you say you were
15 at the property that day after the fire?
16     A  Two or three hours.
17     Q  And other than talking with Mrs.
18 Pavia, did you do anything else?
19     A  No.
20     Q  Were you interviewed by any of
21 the investigators that day?
22     A  No, not that day.
23     Q  When's the next time you
24 returned to the house?

Page 137

1      A  The next day.
2      Q  What was the purpose of
3  returning to the house the next day?
4      A  Just to go back and see exactly
5  what was damaged and talk to her to see how
6  we were going to proceed from there.
7      Q  When you parted company with
8  Mrs. Pavia the day of the fire, had the two
9  of you discussed the fact that she wanted you
10 to help her do --
11     A  Yes.
12     Q  -- whatever repairs needed to be
13 done?
14     A  Yes.
15     Q  So the next day you were
16 returning to assess the damage?
17     A  Yes.
18     Q  Do you remember what if anything
19 you were able to accomplish in terms of
20 assessing the damage that day?
21     A  Other than water was frozen down
22 in the basement, frozen on the front porch,
23 it was a mess.  The fire department told us
24 to stay out of there.  They had to clean up

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 142

1   understanding that if you let this thing on
2   for more than a few hours, it was going to
3   burn through something?
4       A Just some observations that I've
5   had, people I've talked to in the past that
6   they're not supposed to be heat sources.
7       Q First of all, what are the
8   observations that you've had that they're not
9   supposed to be heat sources?
10      A Well, I've seen them in other
11  houses that people have put them in. They
12  turn it on for a couple of hours, turn it
13  off, go to bed.
14      Q Were you ever aware of any
15  occasions where a fireplace like that had
16  started --
17      A No.
18      Q -- a fire?
19      A No.
20      Q Did you have an understanding of
21  what precautions were to be put in place that
22  would prevent a fire -- fireplace like that
23  from starting a fire?
24      A No.

Page 143

1       Q Were you able to complete any
2   assessment of the damage that first day that
3   you were allowed in?
4       A No, because Larry Berman spoke
5   up and said, you wait until I get the list,
6   then I'll sit down and go over the list with
7   you.
8       Q So when's the next time you
9   returned to the property?
10      A Probably the next week.
11      Q What -- for what purpose?
12      A Larry called me, told me to meet
13  him out there.
14      Q And the two of you sat down and
15  did what?
16      A The three of us sat down.
17      Q You and Mrs. Pavia and Mr.
18  Berman?
19      A Yes.
20      Q And did what?
21      A Went over the list that he had
22  of everything that was wrong and damaged.
23      Q This was a list related to the
24  items in the building that needed to be

Page 144

1   repaired?
2       A Yes, from the fire.
3       Q That's what I was going to ask.
4   That's my next question. Was there any --
5   were there two separate lists, one for the
6   water damage, one for the fire?
7       A No, he incorporated it all in
8   one.
9       Q Was there any discussion that
10  day about separating it between the water
11  damage and the fire?
12      A No, he just told her and myself
13  he would take care of it.
14      Q The list that he showed you, was
15  it just -- was it a list that just included
16  the scope of the work that needed to be done
17  or was there pricing on it?
18      A At that time there was no
19  pricing. It was the scope of what was
20  damaged, what needed to be repaired.
21      Q Did you have any quarrel with
22  the scope that he had placed on the list?
23      A Yes. I said to him, I said,
24  have you covered everything here; it doesn't

Page 145

1   look like it. So at that time he said to me,
2   well, you take it and you go over it. I went
3   over it with her and gave it back to him,
4   then he put the new list together.
5       Q And when you gave it back to
6   him, was it just additional items of scope
7   that had been put on it?
8       A Yes.
9       Q No pricing?
10      A No.
11      Q How long did that process take
12  you?
13      A Three or four days.
14      Q So now you're delivering back to
15  Mr. Berman the scope of the repairs for both
16  the water damage and the fire?
17      A Yes.
18      Q Did you make any attempt to
19  separate between the two when you were doing
20  that reworking of the scope?
21      A No.
22      Q When's the next involvement that
23  you had?
24      A I'm not sure if she got rid of

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
# March 30, 2006

---

Page 150

1    A Yes.
2    Q Do you know what the total
3 amount was that you charged to do those
4 repairs?
5    A I think we have that in here,
6 400 -- what was that?
7    MR. CARPENTER: Do you mind if I
8 look through it? I think I can find it
9 pretty quickly.
10    MR. BLACKBURN: Sure.
11
12    (Exhibit Number 11, Bills,
13    marked for identification.)
14
15    Q Mr. Rothschild, I've had the
16 court reporter mark as Exhibit 11 a package
17 of or number of documents that came from your
18 production request or your response to
19 production request. Do I understand that
20 these are all of the bills that you provided
21 to Mrs. Pavia for the reconstruction work?
22    A Yes, I think so.
23    Q At any point, did you make an
24 attempt to separate the work that you were

---

Page 151

1 doing that was related to the water damage
2 versus the fire?
3    A No.
4    Q On a number of the documents
5 that are contained within Exhibit 11, someone
6 has written the word fire or water --
7    A I -- yes, I went through --
8    MR. BLACKBURN: Let me finish
9 the question, otherwise it's not going to
10 make any sense.
11    THE WITNESS: I'm sorry.
12    Q A number of the documents have
13 the word fire written next to it or water,
14 then others that have nothing at all?
15    A Uh-huh.
16    Q Is that you?
17    A Yes.
18    Q When did you do that?
19    A February.
20    Q Sometime this year?
21    A Yes, I had to -- I'm just trying
22 to think. I had to do that for Gordon &
23 Gordon, I think.
24    Q So somebody involved with the

---

Page 152

1 insurance claim asked you to do that?
2    A Yes.
3    Q And the bills that have no
4 designation --
5    A Yes.
6    Q -- why is that?
7    A I forget. He asked me a
8 question about -- this is the only part I
9 want is this. I went through those and tried
10 to figure out what he was asking me and did
11 those and faxed those over to him. What he
12 did with them, I don't know.
13    Q So someone at Gordon & Gordon
14 asked you to -- asked you questions about
15 separating out the fire damage repairs versus
16 the water damage repairs?
17    A Yes.
18    Q But only on specific invoices?
19    A Yes.
20    Q Not on all of your invoices?
21    A Yes.
22    Q Have you ever gone through the
23 exercise of going through your invoices and
24 your charges and separating them out between

---

Page 153

1 water damage and fire damage?
2    A No.
3    Q Do you think you would be able
4 to do that?
5    A Possibly.
6    Q Let me ask you this: What
7 sections of the home were damaged by the
8 water damage?
9    THE WITNESS: The first time.
10    Q The kitchen?
11    THE WITNESS: The first time,
12 water damage from the pipe?
13    MR. BLACKBURN: Yes, sir. As --
14 just so that I think I understand what you're
15 talking about, but as opposed to the water
16 damage --
17    THE WITNESS: Water damage from
18 the fire department is a separate thing.
19    MR. BLACKBURN: Yes, the water
20 damage from the pipe that predates the fire.
21    A That went into the kitchen, the
22 rooms adjacent to the kitchen, bathroom,
23 laundry room, down the steps, down into the
24 basement, the exercise room and the front,

---

# CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 158

1 material?
2     A Yes.
3     Q Plus 20 percent?
4     A Yes.
5     Q Did it change at any point
6 during the course of the project?
7     A It changed everyday, yes.
8     Q The scope of the project changed
9 everyday?
10     A Yes.
11     Q But your financial arrangement
12 did not?
13     A No.
14     Q I know you described the
15 difference in the kitchen moving the wall,
16 putting in a new window. Was there any
17 substantial difference between the house as
18 it was reconstructed afterwards other than
19 that?
20     A Yes. We took out the foyer
21 floor. It was a slate floor and really
22 wasn't damaged that much, could have been
23 repaired, but she wanted it out, so we took
24 it out.

Page 159

1     Q What was it replaced with?
2     A A new slate floor.
3     Q So other than your reservation
4 about the need for it to be replaced, you
5 went from slate floor to slate floor?
6     A Yes.
7     Q Any other substantial changes
8 during the reconstruction other than the ones
9 we've discussed?
10     A There was some smoke damage up
11 in the attic and now this attic been rebuilt.
12 It's -- the total attic is a cedar closet.
13     Q It wasn't before?
14     A No, it was an attic. Which
15 means all the framing, everything had to
16 change up there. We had to put lights,
17 flooring, walls and closets.
18     Q At any point have you made any
19 attempt to determine how much of your cost of
20 repairs was attributable to the changes to
21 that attic?
22     A I would estimate she spent
23 $50,000 in there.
24     Q Just to do that, just now?

Page 160

1     A (Witness Nodding).
2     Q Yes?
3     A Yes, in that attic.
4     Q Did you come up with that
5 %50,000 figure just now sitting here?
6     A Uh-huh.
7     Q That's a yes?
8     A Yes.
9     Q Have you ever gone through any
10 of your invoices or any of the time sheets to
11 try to evaluate what the cost of materials
12 and labor were in connection with rebuilding
13 the attic?
14     A Yes.
15     Q When did you do that?
16     A After we finished it, she said
17 to me, Julie said to me, how much do you
18 think that attic cost me? I said, well, let
19 me go through these bills and I'll tell you.
20 So I did.
21     Q You gave it back to her verbally
22 as opposed to in writing?
23     A Yes.
24     Q Did she say why she was asking

Page 161

1 you that?
2     A No.
3     Q Did you have any discussions
4 with anyone else about the attic other than
5 Miss Pavia on that occasion?
6     A Other than the plumber, it
7 involved Mike Carresi and it involved the
8 electrician and it involved my guys. She
9 paid the electrician and Mike separately from
10 me and my guys.
11     Q But my question was did you have
12 any discussions about the cost of the repairs
13 to the attic with anyone other than Mrs.
14 Pavia?
15     A Yes, I think I mentioned it to
16 Mike Carresi.
17     Q Why?
18     A That that's about what it cost
19 her to do that.
20     Q Why would that subject have come
21 up between the two of you?
22     A He asked me one day. Evidently,
23 he and her had had a conversation. He just
24 asked me what that cost. So I told him the

41 (Pages 158 to 161)

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA     Worcester, MA     Boston, MA     Lawrence, MA     Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 166

1    A On some of the things, yes.
2    Q What do you recall giving her an
3 opinion about that you felt --
4    A In particular, the windows in
5 the kitchen. I said, Julie, are you going to
6 spend seven or $8,000 to replace these
7 windows? I said, there's nothing wrong with
8 them. She said, well, I don't want them, I
9 want a bay window.
10    Q Anything else that you recall
11 giving her your opinion about?
12    A Some of the clothes, the items
13 up in the attic could have just been cleaned
14 off.
15    Q You told her that?
16    A Right. Some of the boxes,
17 because they had a little smoke on them, it
18 was all taken away and cleaned.
19    Q You gave her your opinion that
20 you didn't think that was necessary?
21    A I said, this is crazy, Julie, I
22 don't think you have to do all this. I'll
23 take care of it, she said. I said, okay. So
24 I kind of stayed out of it after that.

Page 167

1    Q Anything else that you can
2 recall giving her an opinion about with
3 respect to any of those issues?
4    A No. I think we went through it
5 all.
6    Q When's the first time that you
7 recall having a discussion with any
8 investigator about what had occurred during
9 the course of the constriction of the
10 addition?
11    A Larry Berman and I were just
12 talking the next day when I went back there,
13 just briefly. He said he needed to find out
14 what the fire inspector is going to say, so
15 on, so forth, before he makes any comment.
16 That was the only discussion I had with him.
17    Q At some point did someone from
18 the fire department or fire marshal's office
19 talk to you?
20    A No.
21    Q At any point were you questioned
22 by any investigator as to what you had done
23 during the course of the construction?
24    A No.

Page 168

1    Q Did you ever give a statement to
2 anybody in connection with the events that
3 occurred during the construction of the
4 addition?
5    A Not a written statement, no.
6    Q A recorded statement?
7    A Yes.
8    Q Have you ever seen a transcript
9 of that recorded statement?
10    A No, I have not.
11    Q Has it ever been played for you?
12    A No, it has not.
13    Q Do you recall how long after the
14 fire you gave that recorded statement?
15    A Five or six weeks after Larry
16 Berman was let go and Gordon & Gordon took
17 over.
18    Q And who was it that asked you if
19 they could record your statement?
20    A The owner of Gordon & Gordon,
21 Roger asked me.
22    Q And did he do it?
23    A Yes, he had a recorder in his
24 hand.

Page 169

1    Q And to your knowledge, have you
2 given a recorded statement to anyone else?
3    A No.
4    Q Well, what was the subject
5 matter of the statement?
6    A He just asked me a couple of
7 questions of what I thought happened and what
8 kind of damage we're talking about, so on, so
9 forth.
10    Q Do you recall at this point what
11 you told him you thought happened?
12    A I told him, I said, evidently
13 something happened at the fireplace.
14    Q That was as much as you knew?
15    A Right, that's as much as I knew
16 at that particular time.
17    Q At any point after that
18 conversation that you had with Mr. Berman
19 where he first alerted you that somebody was
20 implicating the fireplace, I'm not asking
21 about any discussions that you had with your
22 attorney, I don't want to know about any
23 discussions -- well, I do; but I'm not
24 allowed to know about any discussions you had

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 174

1    A Some of it is trim, yes.
2    Q In fact, I don't see anything on
3  that first page that is personal property; do
4  you?
5    A This is when Larry was involved.
6  They did this in February. We got this in
7  March.
8    Q What is your -- what is your
9  understanding of what it is?
10   A They were supposed to come in to
11 only do the personal, but they did the
12 breakfast room and kitchen and they got
13 involved in the painting.
14   Q Are any of the notations on that
15 exhibit your handwriting?
16   A Yes.
17   Q Are all of the notations or
18 handwritten items your handwriting?
19   A No. This is mine. That's mine.
20 That's mine. I can't read upside down. I'm
21 not sure what that says, but I don't think
22 so.
23
24          (Witness Indicating)

Page 175

1
2    Q Well, I certainly can understand
3  the pointing, but the record isn't going to
4  reflect it. So on the second page of the
5  exhibit, the words, see insulation, are
6  yours?
7    A Yes.
8    Q $3,500 extra is yours?
9    A (Witness Nodding).
10   Q Correct?
11   A Yes.
12   Q See painting is yours?
13   A Yes.
14   Q Enough footage 3,000; is that
15 yours?
16   A Yes.
17   Q When you told me before that you
18 were given a scope of work and then asked to
19 rework it and comment upon it --
20   A Yes.
21   Q -- was this the scope of work
22 you were referring to?
23   A This is what it ended up being,
24 yes.

Page 176

1    Q So these comments that you're
2  writing on the sides of this, you ultimately
3  returned back to Berman & Berman?
4    A Yes.
5    Q Is it Berman & Berman?
6    A No, Larry Berman and Gordon &
7  Gordon.
8    Q Exhibit 13 came from your
9  response to production request and as I
10 understand it, this is your job work sheet
11 for the work done post-fire, after the fire?
12   A Yes.
13   Q From February 9 of 2004 through
14 May 7th, 2004; correct?
15   A Yes.
16   Q First of all, was there any work
17 done by your company prior to February --
18   A Ninth.
19   Q -- 9th of 2004?
20   A Just by me going over there and
21 helping her clean up, stuff like that the
22 next day after the water damage.
23   Q Did you charge her for it?
24   A No.

Page 177

1    Q Was there work done by your
2  company after May 7th of 2004?
3    A Yes, punch list and things like
4  that.
5    Q Would there have been any
6  records kept of the time done in connection
7  with that?
8    A There should have been, yes.
9    Q Do you have any explanation as
10 you sit here today of where those time
11 records are?
12   A No, I do not.
13        MR. BLACKBURN: I don't have any
14 other questions for you, sir, but I'm going
15 to have a hunch that some of these other guys
16 might. Thank you.
17        THE WITNESS: You're welcome.
18        MR. TURNER: Let's go off the
19 record.
20
21        (Off The Record discussion)
22
23        (Recessed at 2:24 p.m.)
24

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 182

1 time period?
2     A Carpenter foreman.
3     Q How did you learn the carpentry
4 trade?
5     A As a boy growing up on the farm.
6     Q Self-taught?
7     A Yes.
8     Q Did you have to take any type of
9 review course before you took the Boston
10 builder's license exam?
11     A No, just OJT.
12     Q On-the-job training?
13     A Yes.
14     Q And when you started P & D
15 Builders, was it started as a general
16 contracting and carpentry outfit?
17     A Yes.
18     Q You indicated that your wife is
19 a shareholder in the company?
20     A Yes.
21     Q Does she do any of the actual
22 construction work?
23     A No.
24     Q Are you the sole officer of that

Page 183

1 corporation?
2     A No, it's the two of us, me and
3 my wife.
4     Q Are you related to Julia Pavia?
5     A Fourth or fifth cousin.
6     Q How did you determine that
7 relationship?
8     A When I first met her, she asked
9 me what my grandparents's names were. So I
10 told her, I said, I have the book on the
11 family. So I gave her the book to read.
12 Sure enough, her great grandparents are in
13 there along with my great grandparents.
14     Q So distant relatives?
15     A Yes, very distant, yes.
16     Q Does Miss Pavia have a business
17 that she runs?
18     A She's an interior designer.
19     Q Have you ever referred any
20 clients to Miss Pavia?
21     A Yes.
22     Q How many?
23     A I think maybe as many as three.
24     Q What work does Miss Pavia do as

Page 184

1 an interior designer?
2     A She'll do kitchens, bathrooms.
3 She's pick out fabrics, paint.
4     Q Is it similar to being an
5 interior decorator?
6     A Yes.
7     Q Has Miss Pavia referred you
8 clients?
9     A Yes.
10     Q Approximately how many?
11     A Probably six or seven.
12     Q Was that work to redo kitchens
13 and bathrooms?
14     A Yes.
15     Q Are you currently involved in
16 any businesses with Mr. Carresi?
17     A We just -- we're just getting
18 ready to start one. We just got our 04
19 number.
20     Q A tax identification number?
21     A Yes.
22     Q What is the name of the business
23 that you're starting?
24     A RC Kitchens and Baths, LLC.

Page 185

1     Q That will be a business separate
2 from P & D Builders?
3     A Yes.
4     Q What work do you intend to do as
5 RC Kitchens & Baths?
6     A Just strictly kitchens and
7 baths.
8     Q Is Mr. Carresi a licensed
9 plumber?
10     A Yes, master plumber.
11     Q Do you know what type of license
12 you need to install gas log fireplaces?
13     A I'm not sure if there is any
14 particular license for it. He has a gas and
15 plumbing license, which I think covers him on
16 all that.
17     Q As I understand it, prior to the
18 work at the Pavia house, the construction of
19 the addition, you had never been a general
20 contractor on a job where a solid fuel
21 burning fireplace was put in; is that
22 correct?
23     A Yes.
24     Q Do you understand what is meant

# CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 190

1    A Well, he was instructed what to
2 do by Julie, but I hired him to do the other
3 part of the work.  I don't know if you could
4 gel it together or what, but ...
5    Q The work that you hired Mr.
6 Falco to do was to put the brick on the
7 exterior of the property?
8    A Yes, and patch in the holes, the
9 windows and stuff that came out.
10    Q Somebody else hired him to do
11 the brick work for the fireplace?
12    A He was paid by me.  No one else
13 actually hired him to do that.  He just did
14 what she told him to do, she meaning Julie.
15 She designed it, gave it to him to build.
16    Q But you paid Mr. Falco for the
17 work?
18    A Yes.
19    Q Did you pay Mr. Falco in a lump
20 sum for the work that did he on the exterior
21 and the fireplace?
22    A I think -- no, I paid him
23 separate payments, I think three payments or
24 two payments; two payments.

Page 191

1    Q So the two payments you made to
2 Mr. Falco included the exterior work and the
3 interior work and the fireplace --
4    A Yes.
5    Q -- work?
6    A Yes.
7    Q Did you have an agreement with
8 Mr. Falco as to how much he would charge you
9 to do the fireplace work?
10    A Yes, he had given me a ball park
11 figure of what he thought it would be and I
12 told that to Julie.  I said, this is about
13 what he's going to charge for your fireplace.
14    Q Was the ball park figure that
15 Mr. Falco gave you based on a flat fee or
16 time and materials basis?
17    A The fireplace was on time and
18 material.
19    Q What about the exterior work?
20    A He gave me a price that he
21 almost lived up to.
22    Q Was that done on a time and
23 material basis also?
24    A No.

Page 192

1    Q That was a flat fee?
2    A Yes.
3    Q Did Mr. Falco have anybody
4 assist him with the fireplace work?
5    A Well, yes, his son.
6    Q What is his son's name?
7    A Joe Junior.
8    Q Other than Mr. Falco and Joe
9 Junior, did any other Falco employees work on
10 the Pavia job?
11    A Yes.
12    Q Who else did?
13    A His other son.
14    Q What is his name?
15    A Steve, I think.
16    Q Steven worked on the fireplace?
17    A No, he mixed all the mortar and
18 worked outside.
19    Q Before the fireplace was built,
20 did you go to the City of Newton building
21 inspector to amend the scope of the building
22 permit that you pulled?
23    A Yes.
24    Q If you weren't the general

Page 193

1 contractor for that work, why did you go to
2 the building department to amend the scope of
3 work for the project?
4    A Because the permit for that was
5 in my name.  The permit for the job was in my
6 name and Joe's not licensed.
7    Q And as I understand it, the
8 building inspector, Mr. O'Regan, responded to
9 that by saying, don't worry, you don't need
10 to amend the building, permit or words to
11 that affect?
12    A Yes.
13    Q And the reason Mr. O'Regan said
14 that was he was familiar with your work and
15 didn't think you needed to amend the building
16 permit?
17    A Yes.
18    Q At any point did you tell Mr.
19 O'Regan that you weren't the general
20 contractor from -- for that work and you
21 wanted to exclude that from the permit that
22 you pulled?
23    A No, I did not.
24    Q Do you know whether Mr. Carresi

49 (Pages 190 to 193)

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 198

1    Q The fireplace, the masonry work
2  that Mr. Falco did on the fireplace in the
3  addition, that was the construction of a
4  brick structure that was about four feet
5  tall, four feet across?
6    A Yeah, it was in an angle corner
7  like that, maybe three feet something tall,
8  four foot across, two walls this way.
9
10              (Witness Indicating)
11
12    A Then a facade on the front like
13  that.
14
15              (Witness Indicating)
16
17    Q Mr. Falco's son helped him do
18  that?
19    A Yes.
20    Q And you believe that that work
21  took Mr. Falco three or four days to do?
22    A Yes.
23    Q Do you know why it took him so
24  long?

Page 199

1    A Well, he had to wait until he --
2  he got to a point where he had to wait for us
3  to get that cap that we put on there, then he
4  came back to put the cap on, finished up his
5  mortar, then started working on his hearth.
6    Q So the three or four days that
7  Mr. Falco worked on the fireplace, he was not
8  working all day on that?
9    A No.
10    Q Was there any break in time
11  between the time Mr. Falco concluded the
12  exterior work and the beginning of the
13  fireplace inside?
14    A Yes, I think three or four days.
15  He had to block up a window first.
16    Q But he was still doing work at
17  the Pavia home?
18    A Yes.
19    Q Did you understand that the
20  fireplace Mr. Falco built was not a solid
21  fuel burning fireplace?
22    A Yes.
23    Q And the fireplace that Mr. Falco
24  built, it was never intended to be a solid

Page 200

1  fuel burning fireplace, was it?
2    A Not a wood burning fireplace,
3  no.
4    Q So that your framing carpenters
5  did not do anything to frame the addition so
6  as to allow for the construction of a solid
7  fuel burning fireplace?
8    A No.
9    Q You indicated earlier that you
10  had seen a sketch for the fireplace. Do you
11  recall that?
12    A Yes.
13    Q Who produced that sketch?
14    A Mrs. Pavia.
15    Q Do you know whether she had any
16  training as an architect?
17    A I'm not sure.
18    Q What did this sketch consist of?
19    A It showed him how she wanted to
20  do the corner, how far she wanted to come out
21  off the corners, how far she wanted to go in
22  the corner this way, bring the two wings out.
23  She gave him the size of the opening she
24  wanted from the width to the height, then the

Page 201

1  design of the floor in the hearth.
2    Q So that Miss Pavia decided what
3  the dimensions of the fireplace should be?
4    A Yes.
5    Q Did she base that on anything in
6  particular?
7    A Yes. After the fireplace was
8  built, we put some bookcases on the
9  right-hand side of it and the bookcases had
10  to be so big. So it was laid out in the
11  corner so the bookcases would fit.
12    Q Was there any discussion with
13  Miss Pavia about a mantel that was going to
14  go over the fireplace?
15    A Yes.
16    Q What were those discussions?
17    A It was a wood mantel that she
18  designed.
19    Q Did she want the dimensions of
20  the fireplace to fit within the confines of
21  that mantel?
22    A She did it in the reverse. She
23  laid out the fireplace first, then we built
24  the mantel to fit the fireplace.

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

### Page 206

1  area?
2      A No.
3      Q That work was done afterwards?
4      A Yes. The flue pipe was put in
5  after he brought the fireplace up so high.
6      Q Was there a plywood subfloor in
7  the area?
8      A Yes.
9      Q So is it fair to say that when
10 Mr. Falco began his work constructing the
11 fireplace, there was nothing to indicate that
12 a solid fuel burning fireplace was to be
13 built in that room?
14     A No.
15     Q Is that fair to say?
16     A Yes.
17     Q You mentioned earlier that Mr.
18 Gubbins worked as a foreman for P & D?
19     A Yes.
20     Q Did he have any supervisory
21 authority over the workers?
22     A I'm not sure what was said, but
23 he did make a comment -- he made an comment
24 to Chip one day or to Joe one day about the

### Page 207

1  hearth.
2      Q My question was did Mister --
3          MR. CROWLEY: Strike that.
4      Q My question was did Mr. Gubbins
5  have any supervisory authority over the other
6  workers at the project?
7      A Yes.
8      Q What was the nature of his
9  authority?
10     A Anybody that had a problem, if I
11 wasn't there, if they had a question or
12 anything, they would come to Chip and Chip
13 would answer it, show them what to do.
14     Q You mentioned that you're aware
15 of a discussion between Mr. Gubbins and Mr.
16 Falco regarding the hearth for the fireplace?
17     A Yes.
18     Q How did you become aware of that
19 discussion?
20     A Chip told me.
21     Q What did Chip tell you?
22     A He said Phil, he was just doing
23 this hearth. He said, I think it's wrong.
24 That's when I drove out there.

### Page 208

1      Q You drove out to see the hearth
2  after Mr. Gubbins told you he thought Mr.
3  Falco was constructing the hearth
4  incorrectly?
5      A Hearth meaning the brick
6  pattern.
7      Q So when Mr. Gubbins informed you
8  that Mr. Falco was constructing the hearth
9  wrong, he was referring to the fact that it
10 was not being done in a herring bone pattern?
11     A Yes.
12     Q Did Mr. Gubbins ever say
13 anything to you about the fact that Mr. Falco
14 was laying bricks for the fireplace directly
15 on the subfloor?
16     A He did mention that, but there
17 was Durarock against the wall that was
18 supposed to go down on that floor. I thought
19 it went down on the floor. You can see it
20 when it burnt through there.
21     Q So you understood that Durarock
22 was going to go on top of the subfloor and
23 the bricks on top of the Durarock?
24     A Yes.

### Page 209

1      Q Did you ever understand that
2  there was going to be cement put down and
3  then the bricks put on top of the cement?
4      A That's how you have to layer it.
5  It's a mortar bed.
6      Q Was it your understanding that
7  the fireplace was going to be constructed in
8  that manner?
9      A Yes, it was.
10     Q Who told you that?
11     A You could see it. When I went
12 in there one day, he had the -- you lay a
13 mortar bed, then lay the bricks in. Then the
14 hearth had a thicker mortar bed, so the
15 bricks lined up on the face and the top.
16     Q But you never saw any concrete
17 foundation being poured for the hearth?
18     A No.
19     Q Just mortar?
20     A Yes.
21     Q When you went out and inspected
22 the work that Mr. Falco was doing to see
23 whether the hearth was being put out in a
24 herring bone pattern, were you concerned

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 214

1    A Yes, to get the pipe up there.
2    Q Who did that?
3    A Chip.
4    Q And who put the pipe in?
5    A The pipe was put in with -- by
6 Jim Dusault.
7    Q Who hired Mr. Dusault to do that
8 work?
9    A I did.
10    Q Did you pay Mr. Dusault for the
11 work?
12    A Yes.
13    Q Who instructed Mr. Dusault to
14 put the pipe in?
15    A I told him we need to put it in,
16 get it all the way down to the fireplace,
17 seal it, get it ready to go so the roofers
18 could finish it; I did.
19    Q Before you had Mr. Dusault do
20 that work, did you tell him what type of
21 fireplace was going in?
22    A Yes.
23    Q What did you tell him?
24    A I told him it was a gas log in

Page 215

1 the fireplace. So he tells me what he needs
2 as far as pipe. But he needed to come out
3 and measure it so he could get the proper
4 pieces.
5    Q What type of piping did Mr.
6 Dusault say was required for the gas log?
7    A Metal B vent pipe, a double line
8 pipe.
9    Q Did someone make a connection
10 from the fireplace itself to the pipe that
11 Mr. Dusault put in?
12    A Mr. Dusault put the pipe right
13 down on top of that collar piece he had made
14 and sealed it.
15    Q The collar piece that was made
16 by Mr. Dusault, where did that go?
17    A On top of Joe Falco's brick.
18    Q What was the purpose of the
19 piece that Mr. Dusault manufactured or
20 purchased?
21    A He needed in a -- Joe Falco
22 needed it in there before he could finish his
23 facade that comes across the front.
24    Q Was Mr. Carresi working on the

Page 216

1 piping system inside the fireplace while Mr.
2 Falco was doing his work?
3    A They were just together for a
4 few minutes when he brought his gas pipe down
5 and in so Joe could brick around it, yes.
6    Q Where did Mr. Carresi bring the
7 pipe from to put into the fireplace?
8    A It was -- he came from the attic
9 down, came down and there was a big void in
10 the back of the fireplace. What he did, he
11 came down behind the void into the fireplace,
12 left it there until everyone was done, then
13 we brought it around down in the corner to
14 hook up the gas log.
15    Q Did Mr. Carresi complete his
16 piping work for the gas logs after Mr. Falco
17 had completed his masonry work on the
18 fireplace?
19    A Yes, after the mortar dried.
20    Q After Mr. Falco completed his
21 masonry work on the fireplace, did he leave
22 the project?
23    A Yes, I think at that time he was
24 all done.

Page 217

1    Q Did he ever return to the
2 project after he left?
3    A No.
4    Q Before Mr. Carresi put the gas
5 logs in the fireplace, did you ever discuss
6 with him the fact that this was not a solid
7 fuel burning fireplace?
8    A No.
9    Q Did you ever see Mr. Carresi
10 review the instructions for the gas logs that
11 were installed?
12    A The day I walked in he had them
13 in his pocket, but he was busy doing other
14 things. No, I did not see him.
15    Q The day you walked into the
16 office --
17    A When I walked into the office,
18 yes.
19    Q -- Mr. Carresi was there?
20    A Yes, he and Julie were talking
21 about something else and he had the
22 instructions in his pocket. I noticed that.
23 And then he left.
24    Q Were the gas logs in the office

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 222

1    Q But your impression is from your
2 prior experience that such an inspection must
3 be done prior to the issuance of that
4 certificate?
5    A Yes.
6    Q You testified earlier that you
7 received a call from Miss Pavia at about
8 three o'clock in the morning alerting you
9 that there was a flood at her home?
10    A Three thirty, four o'clock,
11 something like that.
12    Q Was that on a Saturday morning?
13    A Yes, the day before the fire.
14    Q She called you about three
15 o'clock in the morning?
16    A Yes.
17    Q She told you that the pipes had
18 burst in her kitchen?
19    A Yes. She had the water shut
20 off. It took her a while to move the stuff
21 down in the basement to get the water shut
22 off.
23    Q Did she advise you at that time
24 as to when the pipes burst?

Page 223

1    A No.
2    Q But it was some period of time
3 before she called you on the phone?
4    A Yes.
5    Q Did Miss Pavia turn the water
6 off at her house by herself?
7    A Yes, her and her two daughters
8 had to move a 300 pound safe away from the
9 wall to get to it, that's why it took them so
10 long, without calling me first.
11    Q Do you know whether the flood at
12 Miss Pavia's home from the burst pipes caused
13 the heat to go out at the residence?
14    A It got down into the electrical
15 box. That was the reason why it went out.
16    Q So that if there's no
17 electricity at the property, there is no
18 heat?
19    A Yes.
20    Q Is that one of the reasons that
21 Miss Pavia was running the gas logs to heat
22 her home, that the heating system was down?
23         MR. BLACKBURN: Object to the
24 form.

Page 224

1    A No, no.
2    Q She had been running it all week
3 just because of the unusually cold weather at
4 that time?
5    A Yes.
6    Q Do you know how long the heat
7 was out in Miss Pavia's home after the flood?
8    A We got it going that next
9 afternoon, after -- we got the water and
10 everything out of everything, dried it out a
11 little bit.
12    Q Mr. Carresi did that work?
13    A Yes.
14    Q So that the heat at the property
15 was out for at least a period of 12 hours
16 before it was put back on?
17    A Yes.
18    Q Since the fire, have you worked
19 on any projects involving the construction of
20 fireplaces?
21    A We put a gas log in another
22 already existing zero clearance fireplace;
23 same inspector, same town.
24    Q You said you put gas logs in an

Page 225

1 existing zero clearance fireplace?
2    A Wood burning fireplace, yes.
3    Q Is there such a thing as a zero
4 clearance wood burning fireplace?
5    A Yes.
6    Q What is that?
7    A It's the same as a gas
8 fireplace, only you open up the doors, put
9 wood in there and it works the same way.
10    Q It's a factory built unit?
11    A Yes. You can plaster right to
12 it.
13    Q So they're self-contained?
14    A Yes.
15    Q Who did that work; Mr. Carresi?
16    A Yes.
17    Q Now, after the fire, you were
18 hired to repair the addition and repair the
19 kitchen; is that correct?
20    A Yes.
21    Q You hired Mr. Roach to assist
22 you with that work?
23    A Yes.
24    Q And you hired other

57 (Pages 222 to 225)

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 230

1  from the burst pipes knocked out the heat at
2  the home?
3      A Yes, water got in the electrical
4  box, knocked it right out.
5      Q So that the February 9, 2004
6  invoice, the total of $13,347.48 was for work
7  done in connection with the burst pipes?
8      A Yes.
9          MR. CROWLEY: Let's go off the
10  record for a second.
11
12          (Off The Record Discussion)
13
14          MR. CROWLEY: Let's mark this.
15
16          (Exhibit Number 14, Undated
17          Letter, marked for
18          identification.)
19
20      Q Sir, after we discussed it off
21  the record, the February 9, 2004 P & D
22  Builders's invoice that we just talked about,
23  that has been previously marked as part of
24  Exhibit 11?

Page 231

1      A Yes.
2      Q Is that correct?
3      A Yes.
4      Q Sir, I'm going to show you what
5  has been marked as Exhibit 14, I believe, for
6  the deposition. It may be part of an exhibit
7  that we marked previously at the deposition,
8  but do you recognize Exhibit 14?
9      A Yes.
10      Q What is it?
11      A Well, it's Julie writing to Mr.
12  O'Regan what happened on Sunday morning or
13  Sunday -- Sunday morning at 11:38 when she
14  was sitting in the family room watching TV,
15  heard the cash. That's when the water broke.
16  The pipes are right above the kitchen table
17  in the kitchen.
18      Q Do you know why Miss Pavia sent
19  Exhibit 14 to Mr. O'Regan?
20      A No idea.
21      Q Did you ever discuss with Mr.
22  O'Regan anything about Exhibit 14?
23      A No.
24      Q Since the fire, have you ever

Page 232

1  spoken to Mr. O'Regan about what caused the
2  fire?
3      A No.
4      Q Did Mr. O'Regan ever approach
5  you after the fire to discuss the occurrence?
6      A No.
7      Q Has anybody from the Newton
8  building department ever approached you about
9  what caused the fire?
10      A No. I'm in there every other
11  week, too.
12      Q Has anybody ever questioned why
13  the fireplace that caused the fire is not
14  included in the building permit that you
15  pulled for the job?
16      A No.
17      Q Do you know who is responsible
18  for causing the fire in Miss Pavia's house?
19          MR. BLACKBURN: Object to the
20  form. You can answer.
21      A No, I do not know.
22          MR. CROWLEY: That's all the
23  questions I have for you.
24          MR. OBER: My name is Scott

Page 233

1  Ober. I represent the third-party defendant
2  in the case, Heatmaster Incorporated.
3
4
5          EXAMINATION BY MR. OBER:
6      Q Earlier you mentioned that the
7  first time that you saw the instructions for
8  the gas log appliance was at -- was sometime
9  after the fire?
10      A Yes.
11      Q You didn't read or see them
12  prior to the -- prior to their installation?
13      A Not after the fire. I saw them
14  after they put it in.
15      Q When was it that you first saw
16  the instructions or first read the
17  instructions?
18      A After the brick guy, Joe Falco,
19  had finished his brick work. We went to put
20  the gas log in so we could get it fired up
21  with the remote control, so she could learn
22  how to use it. That's when I read the part
23  of the instructions.
24      Q Who provided you the

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

| Page 238 |
|---|
| 1  line, install the gas log. |
| 2      Q Did he do that? |
| 3      A Yes. |
| 4      Q And were you satisfied with his |
| 5  work? |
| 6      A Yes. |
| 7      Q And by the way, there was no |
| 8  problem with the gas line, was there? |
| 9      A Not that I know of. |
| 10     Q When the Newton Fire Department |
| 11 came in and did their inspection and |
| 12 investigation, did they find that the gas |
| 13 line was fine? |
| 14     A Yes. |
| 15         MR. BLACKBURN: Object to the |
| 16 form. |
| 17     A Yes. |
| 18     Q I think you mentioned earlier |
| 19 today that you spoke to Mr. O'Regan at the |
| 20 Newton building department? |
| 21     A Yes. |
| 22     Q And you told him about the gas |
| 23 log fireplace? |
| 24     A Yes. |

| Page 240 |
|---|
| 1  happens before the building -- the building |
| 2  inspector will not come out until he looks at |
| 3  the cards in the office and sees everything |
| 4  else is signed off, then he comes out and |
| 5  does his rough. Then on the finish, it |
| 6  happens all over again. The gas inspector, |
| 7  plumbing inspector, electrical, fire |
| 8  inspector, then the building commissioner. |
| 9  But he overrides all of these guys. If he |
| 10 sees something that's not right, he will make |
| 11 you stop until he gets a hold of this other |
| 12 inspector and has him come back out. |
| 13     Q Is it your understanding that |
| 14 the City of Newton did all of those |
| 15 inspections? |
| 16     A Yes. |
| 17     Q And the work passed successfully |
| 18 through all of those inspections? |
| 19     A Yes. |
| 20     Q Who is it that would inspect a |
| 21 fireplace? |
| 22     A All they really look at is the |
| 23 gas, and the -- that's it, the gas. The |
| 24 building inspector just looks, glances at it. |

| Page 239 |
|---|
| 1      Q And you asked him if anyone |
| 2  needed to submit any further paperwork? |
| 3      A Yes, I asked him if I needed to |
| 4  change my paperwork. He said, no, I can |
| 5  trust you, you're going to do it right, go |
| 6  ahead and do it, I'll get it in the |
| 7  inspection. |
| 8      Q And did you tell this to Mike |
| 9  Carresi? |
| 10     A Yes. |
| 11     Q Ordinarily as a brick mason |
| 12 constructing a fireplace, is there a building |
| 13 inspector there to watch him do his work? |
| 14     A No. |
| 15     Q Do they just come by to inspect |
| 16 the finished product? |
| 17     A The only time they'll come by is |
| 18 when you call them for an inspection. |
| 19     Q When is that, sir? |
| 20     A When you're -- well, you have a |
| 21 framing inspection, insulation inspection and |
| 22 rough building inspection, then the plumber |
| 23 has his inspections, his rough inspection. |
| 24 The electrician has his rough inspection. It |

| Page 241 |
|---|
| 1  Really no one ever really just inspects |
| 2  strictly a fireplace, unless you're building |
| 3  a new house from scratch, then they come out |
| 4  and look at your foundation. |
| 5      Q I think you mentioned earlier |
| 6  that you had received a bill from Mr. Falco |
| 7  and it was on old fax paper? |
| 8      A Yes. |
| 9      Q Was that typed or handwritten? |
| 10     A Handwritten. |
| 11     Q Do you know whether or not Mr. |
| 12 Falco still has the original? |
| 13         MR. CROWLEY: Objection. |
| 14     A He might. |
| 15     Q Did it describe the fireplace? |
| 16     A No. It was just a bill for work |
| 17 that he had performed. He had material and |
| 18 labor in there. |
| 19     Q Do you -- |
| 20     A Material being brick, mortar, |
| 21 labor. |
| 22     Q Did he have any words before the |
| 23 word fireplace or did you even see THE word |
| 24 fireplace on that -- on your faxed copy? |

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 246

1    Q And you sent a bill to Miss
2 Pavia for that improvement work?
3        A Yes.
4        Q And did she in turn send that to
5 Fireman's Fund?
6             MR. BLACKBURN: Object to the
7 form.
8        A I think so. I would -- I --
9 yes, I would imagine.
10            MR. TURNER: Can I have the
11 first exhibits,
12       Q When you were going over the
13 first few exhibits, Mr. Rothschild, I was
14 down at the other end of the table and I'm
15 looking at Exhibit 1, your letterhead dated
16 July 11, 2000.
17       A Yes.
18       Q And was that created on July 11,
19 2000?
20       A Yes.
21       Q And you used the secretary to
22 type up the letter?
23       A Yes.
24       Q And who is CAM?

Page 247

1        A That's my secretary.
2        Q What's her name?
3        A It was -- at that time it was
4 Carmella Mahoney, I think it was.
5        Q Does she live in Weymouth?
6        A Yes.
7        Q Part time?
8        A Yes.
9        Q Then the second page of
10 Exhibit 1, was that originally part of
11 Exhibit 1 or were these together?
12       A Yes. This goes off to that
13 other -- that's a list. There's a list in
14 there.
15       Q Would that be Exhibit Number 2?
16            MR. BLACKBURN: Both two and
17 four.
18       A There's two, there's 2-A, B, C,
19 D. This corresponds with this or vice versa.
20
21            (Witness Indicating)
22
23       Q So you're referring to Exhibit
24 4 and the second page of Exhibit 1 correspond

Page 248

1 to each other?
2        A Yes.
3        Q And which one came into
4 existence first?
5        A This came from the Pavias.
6        Q Exhibit 4 came from the Pavias?
7        A To me.
8        Q What month and what year?
9        A Then -- before this, it was
10 before.
11       Q Before July 11?
12       A Yes.
13       Q So that --
14       A What I did, I tried to price it
15 out, then that's why I labeled them the way I
16 did, four pages of this, I think.
17       Q So after the Pavias prepared
18 Exhibit 4, you prepared the two pages of
19 Exhibit 1?
20       A Yes.
21       Q And under S, office, is that the
22 second floor study that we're talking about?
23       A Yes.
24       Q It says, plumber will get gas

Page 249

1 fireplace. What does that mean?
2        A Office, line one, what
3 fireplace, plumber will get gas fireplace,
4 using -- using the old ones that we're
5 talking about.
6        Q Mr. Rothschild, it looks like it
7 says, office dash, line one, what fireplace
8 dash plumber period?
9        A I didn't know anything about the
10 fireplace at the time I did this.
11       Q But it does say dash plumber
12 period?
13       A A Plumber will get the fireplace,
14 they're going to get one.
15       Q It doesn't exactly say plumber
16 will get gas fireplace. It says plumber
17 period, then there's a line below that with a
18 capital W on will and it says, will get gas
19 fireplace. Do you know who was supposed to
20 get the gas fireplace?
21       A She ended up getting it. But he
22 was -- I thought he was supposed to get it
23 right off the bat, but he turned that over to
24 her because she needed to get two of them.

63 (Pages 246 to 249)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 254

1    A I don't remember seeing it. It
2  could have been there, but I glanced right
3  through it, just picked out the remote
4  control thing.
5    Q And when I asked you before your
6  comment about the adequacy of the
7  instructions, do you recall that --
8    A Yes.
9    Q -- us talking about that?
10    A Yes.
11    Q In your mind, was there anything
12  ambiguous about the reference on this page
13  that this burner unit must be installed in a
14  fully vented solid fuel burning fireplace
15  with a working flue?
16    A What I was referring to is it
17  doesn't really give you any instructions on
18  what to do for floors, what to do for bricks,
19  what to use in there, after I got this after
20  the fact and read it again.
21    Q So just so that I'm clear, so
22  your feeling is that by making reference to a
23  fully vented solid fuel burning fireplace
24  with a working flue, that still didn't tell

Page 255

1  you enough?
2    A Right.
3        MR. BLACKBURN: Thank you.
4  Nothing further.
5        MR. CROWLEY: A few follow-up
6  questions.
7
8
9        EXAMINATION BY MR. CROWLEY:
10    Q You paid Mr. Falco for the work
11  on the fireplace?
12    A Yes.
13    Q Was that by check?
14    A Yes.
15    Q And in turn, were you paid by
16  Miss Pavia for the work on the fireplace?
17    A Yes.
18    Q Did you bill Miss Pavia for Mr.
19  Falco's work plus 20 percent profit on that
20  work?
21    A Yes, I think that's what it was.
22    Q So that you profited from the
23  work Mr. Falco did on the job?
24    A Yes.

Page 256

1    Q So with that in mind, do you
2  feel you had a responsibility to supervise
3  and inspect Mr. Falco's work on the
4  fireplace?
5    A Yes.
6    Q And did you do that?
7    A No, because I figured they're
8  all professionals, they know what they need
9  to do, they know how to do it. They've done
10  it for 20 some odd years. I shouldn't have
11  to -- if I have to stand over somebody, I
12  don't want them around.
13    Q As a general contractor, you
14  understood you were responsible ultimately
15  for the work your subcontractors did?
16    A Yes.
17    Q Correct?
18    A Yes.
19        MR. CROWLEY: I don't have
20  anything further.
21        MR. OBER: A couple quick
22  follow-ups.
23
24

Page 257

1        EXAMINATION BY MR. OBER:
2    Q Are you aware that there are
3  regulations in Massachusetts that deal with
4  the construction of solid fuel burning
5  fireplaces?
6    A Not really, no.
7    Q You don't know that there are
8  regulations that deal with that issue?
9    A I'm sure there are, but I've
10  never built one, so I've never paid any
11  attention to any of those.
12        MR. OBER: I have nothing
13  further.
14        MR. TURNER: I have no further
15  questions. Thank you.
16        MR. CARPENTER: No questions.
17        MR. BLACKBURN: Thank you very
18  much, Mr. Rothschild.
19        I'll take a regular transcript.
20        MR. OBER: I'll take a regular
21  and a mini.
22        MR. CROWLEY: Regular and mini,
23  please.
24        MR. TURNER: Regular and mini

65 (Pages 254 to 257)

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 262

```
 1          CORRECTION PAGE
 2     DEPONENT:  PHILLIP ROTHSCHILD
 3     DATE TAKEN: March 30, 3006
 4     CASE:     FIREMAN'S FUND vs. FALCO, et al
 5     *********************************************
 6     PAGE / LINE / SHOULD READ
 7     _____/_____/_____
 8     _____/_____/_____
 9     _____/_____/_____
10     _____/_____/_____
11     _____/_____/_____
12     _____/_____/_____
13     _____/_____/_____
14     _____/_____/_____
15     _____/_____/_____
16     _____/_____/_____
17     _____/_____/_____
18     _____/_____/_____
19     _____/_____/_____
20     _____/_____/_____
21     _____/_____/_____
22     _____/_____/_____
23     _____/_____/_____
24     _____/_____/_____
```

67 (Page 262)

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
        Plaintiff

    vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
        Defendants

    vs.

Heatmaster, Inc.,
        Third-Party Defendant

    **DEPOSITION OF JOSEPH FALCO, SR.**, a witness
called on behalf of the Plaintiff, pursuant to the
Federal Rules of Civil Procedure, before Jessica L.
Bisaillon, a Registered Professional Reporter,
Certified Shorthand Reporter, and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Toomey & Yudysky, LLP, 99 Summer Street,
Boston, Massachusetts 02110, on Friday,
March 3, 2006, commencing at 12:20 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

**A P P E A R A N C E S:**

The Law Offices of Stuart G. Blackburn
  BY:  Stuart G. Blackburn, Esquire
  Two Concorde Way
  Post Office Box 608
  Windsor Locks, Connecticut 06096
  Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
  BY:  David J. Crowley, Esquire
  99 Summer Street
  Boston, Massachusetts 02110
  Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
  BY:  Curtis L.S. Carpenter, Esquire
  250 Summer Street
  Boston, Massachusetts 02210
  Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
  BY:  Robert T. Turner, Esquire
  27B Midstate Drive, Suite 100
  Auburn, Massachusetts 01501
  Appearing on behalf of Michael Carresi,
  d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
  BY:  Scott T. Ober, Esquire
  484 Main Street, Suite 560
  Worcester, Massachusetts 01608
  Appearing on behalf of Heatmaster, Inc.

---

3

I N D E X

DEPOSITION OF:                  PAGE

JOSEPH FALCO, SR.

Examination by Mr. Blackburn        4
Examination by Mr. Turner           49
Examination by Mr. Ober            61
Examination by Mr. Carpenter       63
Reexamination by Mr. Blackburn    73
Reexamination by Mr. Turner      80

E X H I B I T S

EXHIBIT NO.                     PAGE
      (Plaintiff's)

1   Hand-drawn diagram; a total of one page.  25

2   Hand-drawn diagram; a total of one page.  40

---

4

1        **JOSEPH FALCO, SR.**, after having been

2  satisfactorily identified by the production of

3  his Massachusetts driver's license and having

4  been duly sworn by the Notary Public, was

5  examined and testified as follows:

6        MR. BLACKBURN:  And we'll have the

7  same stipulations that we've had for the last

8  deposition.  Is that fine with everybody?

9        MR. CROWLEY:  Yes.

10       MR. BLACKBURN:  You want him to read

11  and sign?

12       MR. CROWLEY:  Yes, please.

13       MR. BLACKBURN:  Okay.

14       **EXAMINATION BY MR. BLACKBURN:**

15  Q.  Good afternoon, Mr. Falco.  My name is Glenn

16    Blackburn.  I represent the Fireman's Fund

17    Insurance Company in this case.  They were the

18    insurance company for the Pavias.

19  A.  Right.

20  Q.  Have you ever had your deposition taken before?

21  A.  No.

22  Q.  Let me give you a few ground rules.  Some of

23    these you may have -- you may have heard before.

24        I'm going to ask you some questions today

6

1    about the work that you did out at the Pavia

2    residence prior to the fire.

3         If at any time I'm unclear to you or you

4    don't understand a word that I use or something

5    that I say, please stop me, ask me to repeat the

6    question, ask a different word.  I want to make

7    sure that you and I --

8    A.  Okay.  I understand you.

9    Q.  Yeah.  Fair enough.

10   A.  Okay.

11   Q.  The other instruction that I'll give you is that

12   the young lady is taking down everything that we

13   say.  While ordinarily you and I could sit here

14   and have a conversation that involved both words

15   and nods of the head and things like that, at

16   least while we're on the record, we need to

17   converse only with words.  All right?

18   A.  Okay.

19   Q.  I think what you'll find -- because my experience

20   is that when I question people, I have a tendency

21   to stutter a bit and draw out my questions.  I

22   think what you're going to find is that often

23   you're going to understand the question that I've

     asked you before I've finished asking it.

---

6

1    A.  That's okay.  I got a dialect too from the old

2    country.

3    Q.  And the tendency is that the witness starts

4    giving the answer before I've finished asking the

5    question.

6    A.  Right.

7    Q.  It's very difficult for the young lady to take us

8    both down speaking at the same time.  So try to

9    resist that urge to start answering my questions

10   before I'm done sputtering them out, and I'll

11   give you the same courtesy when you're giving

12   your answers.  All right?

13   A.  Okay.

14   Q.  What's your address, please?

15   A.  5 Coolidge Circle, South Easton, Mass.

16   Q.  And how long have you lived at that address?

17   A.  Oh, I would say about 24 years now.

18   Q.  You have a business; correct?

19   A.  Yes.

20   Q.  What is the name of the business?

21   A.  Falco Construction.

22   Q.  Is that business a corporation?

23   A.  No.  A company.

24   Q.  Have you ever had a corporation that you did

---

7

1    business under?

2    A.  Yes.  Years and years ago.

3    Q.  And what was the name of that corporation?

4    A.  Falco Construction.

5    Q.  Incorporated?

6    A.  Yeah.  At that time, yeah.

7    Q.  Okay.  How long ago did that corporation seek to

8    exist?

9    A.  Oh, God.  Years and years ago.  I would say about

10   25 years ago, because I was doing a lot of

11   commercial work, and I just didn't want to do

12   commercial work anymore and just went down just

13   to regular house -- you know, homeowners.

14   Q.  So at the time that you were doing this work at

15   Mrs. Pavia's house before the fire, you were

16   operating as a sole proprietor --

17   A.  Yes.

18   Q.  -- with a trade name of Falco Construction?

19   A.  Right.

20   Q.  And was that business just your business?

21   A.  Just my business.  Yeah.

22   Q.  Did you have any partners?

23   A.  No.  I just got -- I've had my two sons working

24   for me.

---

8

1    Q.  Okay.  But they did not have any ownership

2    interest in the business?

3    A.  No.

4    Q.  You're a mason; correct?

5    A.  Yes.

6    Q.  Do you do any work other than masonry work?

7    A.  That's all I know how to do.

8    Q.  How long have you been doing masonry work?

9    A.  Oh, God.  Forty-three years.

10   Q.  And how long have you been doing that masonry

11   work by yourself or with the company that you

12   owned?

13   A.  For 43 -- no.  I'm sorry.  I used to be in the

14   union for about seven years, and then I went on

15   my own.  So out of 43 years, deduct seven.

16   Q.  Okay.  So for the last 36 years, you've worked on

17   your own?

18   A.  Right.

19   Q.  You've been building fireplaces that whole time?

20   A.  I probably built about a million of them.

21   Stopped counting 25 years ago.

22   Q.  During the course of that time that you've been

23   building fireplaces, have the requirements

24   changed for the construction of the fireplaces

1     pursuant to the codes?
2 A.   Yes. Big time. Big time. Now you need -- you
3     need -- you need the rough inspection, finish
4     inspection, final inspection. Before, you just
5     build a chimney, and building inspectors weren't
6     even around. Now you can't breathe unless you
7     call the building inspector and -- for a rough
8     and finish.
9 Q.   And how did you learn about those changes in the
10     code?
11 A.   You learn by doing it for so many years. And you
12     got the code book, and you go according to the
13     code book. And that's how you build them.
14 Q.   So you have code books?
15 A.   Yes, I do.
16 Q.   You keep them on your truck?
17 A.   I don't need them anymore. They're all up here
18     after 45 years.
19 Q.   And "up here" means in your head?
20 A.   In my head, yeah.
21 Q.   When there are changes that occur with the code,
22     how do you learn about those?
23 A.   Usually if there is a change while I call for a
     rough inspection and -- the building inspector

1     says, oh, don't you know about this or don't you
2     know about that?
3       But they haven't changed for years now.
4     And I think the way you build them today, you
5     don't need to change them, because they're really
6     strict rules to a fireplace.
7 Q.   Do you hold any licenses?
8 A.   No. A mason -- a mason contractor does not
9     require to have a license. We usually work under
10     the general contractor's license, because he
11     pulls the permit, he calls for a rough inspection
12     and a finish, final inspection. I don't. I just
13     build it, and he's responsible by him calling
14     the -- the inspectors.
15 Q.   Are you a member of any associations about your
16     trade?
17 A.   No.
18 Q.   When is the first time that you met Phil
19     Rothschild?
20 A.   Oh, I think about a year -- about six months or
21     eight months before I did the -- the exterior
22     veneer for him, because he heard about me, and I
23     was very well referred. And I met him, and I did
24     a couple of jobs for him. Very, very pleased.

1     And that's it.
2 Q.   Do you know who it was that introduced you to
3     him?
4 A.   Oh, God. I don't know. I don't really remember.
5     You know, it just -- word travels. Oh, Joe
6     Falco. Call Joe Falco. He's good. This and
7     this and that, and word goes to word. I don't
8     advertise or anything like that. I just -- I
9     don't look for work. They -- believe me. They
10     come to me. After so many years, you earn that
11     right, I guess, if you're good.
12 Q.   Do you recall what the jobs were that you did for
13     Mr. Rothschild prior to the Pavia house?
14 A.   Yes. I did a little tiny addition in Newton
15     for -- for a psychiatrist. I forget her name.
16     As a matter of fact, she writes books too. She's
17     a Harvard -- Harvard graduate. Martha or
18     something. I did a job for her, a little tiny
     addition on her home that she was going to turn
21     into an office area for her patients, because she
22     worked out of the house, and then a walkway in
23     the back from the back to the -- to the driveway
24     so the people can go and use that exit in the
     back to go into the driveway. And that's it.

1       Then after that, Phil asked me to do the
2     exterior addition on Julia Pavia's house.
3 Q.   So there was one job before the Pavia house?
4 A.   Right.
5 Q.   In addition to doing the walkway at that other
6     job, what did the inside work entail?
7 A.   It was an outside little addition. Brick
8     veneered the outside. A little like a --
9     probably a 10-by-10 addition, because her house
10     was already exterior brickwork on the exterior,
11     so we matched the existing.
12 Q.   No fireplace?
13 A.   No fireplace, no.
14 Q.   Just a brick veneer and --
15 A.   Just a brick veneer.
16 Q.   And the outside walkway?
17 A.   And an outside walkway.
18 Q.   Other than your two sons, back at this time, did
19     you have anybody else that worked for you?
20 A.   No.
21 Q.   Through the course of doing the job at Mrs.
22     Pavia's house, did you have anybody else that
23     worked for you other than your two sons?
24 A.   No.

14

1   Q.   After the Pavia house, did you do any other work
2        with Mr. Rothschild's company?
3   A.   Nope.
    Q.   Why not?
5   A.   Because I didn't like his attitude, and I don't
6        like the way he tend business.
7   Q.   What was it about the manner in which he did
8        business that turned you off?
9   A.   He was very arrogant, and he thought he -- he's
10       Mister-know-it-all.
11  Q.   At the point where -- withdrawn.
12            Did he ask you to do any other jobs after
13       the Pavia house?
14  A.   Yes.
15  Q.   What did he ask you to do?
16  A.   Another job. I think it was in Needham. I says
17       no, thank you, good-bye. I do not want to do no
18       more work for you.
19  Q.   And at that point, had there been anybody that
20       had implicated you in causing the fire at the
21       Pavia house?
22  A.   First of all, this was way, way, way, way before
23       the fire. It didn't have nothing to do -- I
         didn't know until the -- the fire until about a

14

1        year later.
2   Q.   Okay.
3   A.   This was right after Julia's house, after I did
4        the exterior on Julia Pavia's house. And then he
5        asked me to do another job for him, and I said
6        no, thank you.
7   Q.   So your decision to stop doing work or any
8        further work with Mr. Rothschild predated the
9        fire?
10  A.   Yes. You mean before the fire?
11  Q.   That's -- yeah. Good for you. Good for you.
12       Yeah. Yes.
13  Q.   Okay.
14  Q.   Your decision to do any work for Mr. Rothschild
15       was before the fire; right?
16  A.   Right.
17  Q.   Okay. Who was it that contacted you to do the
18       work at the Pavia house?
19  A.   Phil.
20  Q.   Mr. Rothschild directly?
21  A.   Yeah.
22  Q.   What did he ask you to do?
23  A.   I got an exterior on an addition in Chestnut Hill
24       in Newton. I call it Newton, but I guess it's

15

1        Chestnut Hill/Newton. You know, so -- so right
2        after I was doing the brick -- I just finished
3        the brick for the psychiatrist, and then I went
4        from the psychiatrist to Chestnut Hill.
5   Q.   Did he ask you for a quote?
6   A.   For a price?
7   Q.   Yes, sir.
8   A.   Yes.
9   Q.   And did you give that to him in writing?
10  A.   No. It was all shake -- that's how I do my job.
11       Shake my hand, shake your hand, and that's it.
12  Q.   And how -- so you told him how much you were
13       going to charge him?
14  A.   Right.
15  Q.   And what was -- how was that based? Was it a
16       full price or was it so much for the time or
17       what?
18  A.   For -- I just look at the job, estimate how many
         bricks there are and what type of bricks they
20       are. And this happened to be a very difficult
21       job because it's a water-struck brick. And a
22       water-struck brick is a nightmare to lay because
23       it doesn't absorb the water like a regular porous
24       brick. So it would be like much more than laying

16

1        a regular brick.
2   Q.   So did you give him one price for the whole job?
3   A.   One price for the exterior.
4   Q.   Do you remember what that price was?
5   A.   I think it was like about -- I would say like
6        about 23, 24,000 with -- I'm pretty sure it was
7        also included with material. Don't quote me on
8        that. I'm not sure. Because like I said, I
9        forgot.
10  Q.   But do you have a recollection as you sit here
11       today that you purchased the materials?
12  A.   I'm pretty sure I did, because he doesn't know
13       supply yards. So I think I got the bricks out of
14       my supplier.
15  Q.   Okay. And what were the terms of payment?
16  A.   The terms were -- like if I says, hey, Phil, I
17       need five grand, the following week I would say,
18       hey, Phil, give me another seven or whatever, and
19       then the final payment.
20  Q.   Okay. So do you have a recollection of whether
21       you received any payment before you started the
22       job?
23  A.   I never ask for a payment up-front. My
24       reputation -- every time I do a job, I never ask

17

```
 1       for money up-front unless it's like -- unless
 2       it's like a -- like I got to get like 10 or
 3       $15,000 worth of material.  This was like
 4       probably about a couple of thousand dollars of
 5       material.  So I basically buy it myself.  And
 6       then the first payment, I says, give me such and
 7       such amount.
 8    Q. To do this job, did it require you and both of
 9       your sons to be there every day?
10    A. Yes.
11    Q. And when you went to do the job, what work had
12       been done before you started doing the brick
13       veneer?
14    A. The framing, framing out the addition, all wood
15       structure with plywood exterior.  And then I go
16       in there and put the Tyvak paper on and start
17       laying bricks.  And that's it.
18    Q. Okay.  Was the roof on?
19    A. Yes, it was.  Yeah.
20    Q. Was the slate on the roof yet?
21    A. Yeah -- no, I don't think so.
22    Q. Okay.  So everything was framed, the walls and
23       the roof?  True?
      A. Right.  Yeah.
```

18

```
 1    Q. And whatever plywood that would have been
 2       covering the walls and the roof was in place?
 3    A. Uh-huh.
 4    Q. That's a yes?
 5    A. Yes.
 6    Q. And -- but to your recollection, there was no
 7       finished roofing that was -- had been put on?
 8    A. No.  Because that was like an old slate roof, and
 9       it's pretty hard to get the company to do the --
10       that type of work to -- to match the existing
11       roof.  So, I mean, you just can't get a new roof
12       and match -- to blend in with the old, old roof.
13    Q. Do you know what the company was that eventually
14       put on the slate roof?
15    A. No, I don't.  There's not -- there's not too many
16       of them that's -- I know that for sure -- that
17       does that in that area, --
18    Q. You were gone --
19    A. -- I assume.
20    Q. You were gone by the time that --
21    A. Yeah.
22    Q. -- whoever came in to do it?
23    A. Oh, yeah.  I was all -- I was -- I was history.
24    Q. During the time that you were installing the
```

19

```
 1       brick on the exterior of the house, did you go
 2       inside at all?
 3    A. Well, the only time that we went inside was early
 4       in the morning.  Knocked at the door, and Julia
 5       let us in.  And that way I can go up -- upstairs
 6       or downstairs to turn the water on.  Or my son.
 7       But usually we would go in the backyard.  There's
 8       a driveway.  And that's where the addition was,
 9       where the driveway is.
10    Q. And where were you turning the water on?
11    A. I think it was like in the -- this -- the garage
12       were below the addition.  And right around the
13       corner, there would be a hose that we -- because
14       it was cold, and we would have to turn it off and
15       on every day.
16    Q. In the basement?
17    A. In the basement, yeah.
18    Q. And I guess that gets to my next question,
19       whether you recall what time of year it was that
20       you were doing this.  You said it was cold?
21    A. It was like -- that was a pretty mild winter.  I
22       was surprised that we were working.  I think it
23       was like in January or by the middle or -- or the
24       beginning of February.  And I was surprised,
```

20

```
 1       because I said, wow, this is good weather.  You
 2       know, just like this year.
 3    Q. You like that?
 4    A. Hey, we got to eat.  So, I mean, that's -- you --
 5       you get a cold winter, you can't lay bricks.  It
 6       just freezes.
 7    Q. On any of those occasions while you were doing
 8       the exterior brick and you entered the house, did
 9       you go into the addition area?
10    A. Well, if I -- the addition was right there.  So I
11       would walk up the stairs, and I would --
12       sometimes, because I didn't want to try -- I
13       didn't want to climb the scaffolding.  I would go
14       right through the window.  It's much easier.  You
15       know, I'm getting old.  I don't want to be
16       climbing morning, noon, and night, you know, up
17       and down.
18    Q. During the time that you were installing the
19       exterior brick, were there any stairways that had
20       been put in place?
21    A. Yeah.  There were the stairways to go up to
22       the -- from the first floor to the second floor.
23    Q. In the addition?
24    A. Yeah.
```

**22**

1  Q.  Okay.  Had -- had the subflooring been put down
2      in the addition by -- at the time that you were
3      doing the exterior brick?
4  A.  It's just the plywood.  Just -- just the
5      subfloor.  Yeah.  Got to walk on something.
6  Q.  Had there been any finished work done to any of
7      the floors or the walls at that point?
8  A.  No.  It wasn't -- it was -- it was -- it just
9      got -- it just got framed.  We were right on top
10     of the framers.  So as soon as they finished,
11     boom, and the windows were in, we would start
12     laying bricks.
13  Q.  At some point were you asked to do something else
14     at the property?
15  A.  Nope.  Not at all.
16  Q.  Were you ever asked to do any work on the
17     existing fireplace that was in the main portion
18     of the home, not the addition?
19  A.  Nope.
20  Q.  At some point did someone approach you to put
21     some type of fireplace structure into the
22     addition?
23  A.  The only time they approached me is the day that
24     I finished the exterior.  And Phil came up to me

1     and said, Joe, I need you to do a little job for
2     me up on the second floor.  Julia wants to
3     surprise her husband, because that was going to
4     be his office area, with a decorative fireplace.
5     I says, let's go look at it.
6        So he told me what -- we went up on the
7     second floor.  He says, this is what I want, a
8     decorative fireplace, just so it -- so Julia's
9     husband will have something to look at besides
10     the -- the -- the four walls.
11  Q.  Did he show you the location of where that was
12     going to be?
13  A.  Yes.
14  Q.  And what was the location?
15  A.  Right in the -- on the -- when you go upstairs,
16     right in this corner right here.  That would be a
17     corner one.
18  Q.  And the corner that you're referring to, where
19     was that in relationship to the main house?
20  A.  I don't get you.
21  Q.  Okay.
22  A.  It's the -- it would be the main house.  It would
23     be the back of the house.  And then the addition
24     is right here, and this is the back of the house.

**23**

1     And the back of the house is all ext -- it was --
2     it was an exterior wall with bricks -- brick
3     thing there.  Then they added on the addition.
4     And the unit that they wanted was right on the
5     corner.
6  Q.  Okay.  So the corner consisted of the brick --
7     the brick exterior wall of the main house?
8  A.  Right.
9  Q.  True?
10  A.  Yeah.
11  Q.  And the other side of the corner, was that new?
12  A.  Right.
13  Q.  A new wall?
14  A.  Yeah.
15  Q.  That had recently been framed?
16  A.  Right.
17  Q.  So when you're looking at this for the first time
18     with Mr. Rothschild, he's pointing to this
19     corner --
20  A.  Yeah.
21  Q.  -- of this room?
22        Would I be correct that one of the walls
23     that you're looking at of the corner was the old
24     exterior wall of the main house?

**24**

1  A.  Yes.
2  Q.  And the other wall that you're looking at was a
3     new wood-framed structure?
4  A.  Yeah.
5  Q.  Okay.  Had anything been put over that framing,
6     that interior framing on that new wall?
7  A.  No.  It was just exposed bricks.
8  Q.  Exposed bricks from where?
9  A.  From the old existing -- from the -- the original
10     house.  The upstairs was all exposed bricks on
11     the ext -- on the old exterior wall.
12  Q.  Right.  And then the second wall that --
13  A.  Then the second wall.  Then there's the
14     exterior -- this is the house.  That's the
15     exterior wall.  That was all brick.  And then
16     from there to here, this is the addition.  And I
17     would be working right on the other side of this
18     wall, on the outside exterior.
19  Q.  Okay.  I've just drawn a corner on this piece of
20     paper.  I put an X next to one of the lines
21     that's a corner.  Okay?  You with me?
22  A.  Yeah.  No.  Well...
23  Q.  But I'm wrong already, I can tell.
24  A.  Like you want me to do it?

25

| | |
|---|---|
| 1 Q. Yeah. I'll flip it over. You do it. | |
| 2 A. Okay. | |
| 3 Q. All right. | |
| A. This is the house. This is the addition. | |
| 5     MR. BLACKBURN: We'll go off the | |
| 6 record for a minute. | |
| 7     (Off the record.) | |
| 8     (Whereupon, Exhibit 1 was marked for | |
| 9 identification.) | |
| 10 Q. Mr. Falco, while we were off the record, the | |
| 11 drawing that you and I made together, which I | |
| 12 don't think is going to win us any awards, other | |
| 13 than -- | |
| 14 A. Not at all. I'm not an artist. I'm a | |
| 15 bricklayer. | |
| 16 Q. -- other than possibly at -- at some elementary | |
| 17 school. | |
| 18 A. Yeah. Right. | |
| 19 Q. But let me just try to explain what we drew just | |
| 20 so that it's clear on the record. | |
| 21     We have two boxes or two large boxes. As | |
| 22 you look at the exhibit with the exhibit sticker | |
| 23 facing the right way, the box on the right, you | |
| 24 have made a number of squiggly lines around three | |

26

1 sides of it?
2 A. Right.
3 Q. As I understand it, those lines are to represent
4 the area that you put up the brick on the
5 exterior of the building?
6 A. Right.
7 Q. Inside one of the boxes, there's a smaller box
8 that's put into the corner?
9 A. Right.
10 Q. And as I understand it, that's the area where the
11 decorative fireplace was built?
12 A. Right.
13 Q. I have put the number 1 with an arrow to one of
14 the walls and a number 2 with an arrow to another
15 wall; correct?
16 A. Yeah.
17 Q. As I understand it, the arrow that I have
18 driven or -- drawn and put the number 2 next to,
19 that was a brick wall that was originally the
20 rear wall to the house?
21 A. Right.
22 Q. The wall that I drew the number 1 with an arrow
23 to was a new wall; correct?
24 A. Right.

27

1 Q. So when you first went up there with Mr.
2 Rothschild and you were looking in that corner
3 where this decorative fireplace was going to be
4 put, --
5 A. Yes.
6 Q. -- one wall of the corner was the brick wall from
7 the existing house; correct?
8 A. Yes.
9 Q. And the other wall to the corner was newly
10 framed?
11 A. Yes. You got it.
12 Q. And at least when you first looked at it, what
13 you would have seen would have been the wall
14 framing and the backside of the plywood that
15 would have been installed on the exterior of the
16 house?
17 A. Yeah.
18 Q. Okay.
19 A. But if I remember correctly -- I mean, I just
20 drew a box here. Excuse me. From what I
21 remember correctly, this was the -- also the --
22 the old exterior brick. But then also on this
23 side here, it -- it was -- like the house went
24 kind of weird. I'm giving you a box.

28

1     So over here it also was bricks, but --
2 because I remember when I was bricking this,
3 there was only like a -- a 4-foot return from the
4 exterior all the way here and then the
5 addition -- like it was also like still the old
6 brick exterior here too. It wasn't like a box.
7 This was all jogged out. Like even on this side,
8 this would be the house, and like the addition
9 started over here like this, you know.
10 Q. Well, what I'm trying -- what I'm trying to
11 understand, sir, is that when you first went
12 there with Mr. Rothschild and he pointed to that
13 corner, --
14 A. Yeah.
15 Q. -- one wall of that corner was brick because it
16 was the old rear to the house; right?
17 A. Yes.
18 Q. The other wall to that corner was framed with
19 plywood?
20 A. But like I said, there were -- also a jog here
21 that was also bricks too. And then halfway,
22 the -- the new framing started from here all --
23 it -- it -- it was weird the way they did it,
24 because they went over the existing garage for

29

30

| | |
|---|---|
| 1 | this addition. So it was a weird-shaped |
| 2 | addition. |
| 3 | Q. That may be true. I'm just trying to -- I'm just |
| 4 | trying to get an understanding, sir, of before |
| 5 | you did any work whether there was brick on both |
| 6 | of the two walls that were in that corner. |
| 7 | A. Yes, there was. Yes. |
| 8 | Q. Okay. |
| 9 | A. That I will guarantee it, because if you go there |
| 10 | now, you'll still see it. |
| 11 | Q. Okay. So when you looked at that corner that he |
| 12 | pointed out to you, it was a corner that existed |
| 13 | of two brick walls? |
| 14 | A. Yes. |
| 15 | Q. And I'm probably beating this to death, but I |
| 16 | just want to make sure that I understand. |
| 17 | So going back to Pavia Exhibit 1, the |
| 18 | arrow with the number 1 that I drew, that was a |
| 19 | brick wall on the interior? |
| 20 | A. Yes. |
| 21 | Q. That day that you looked at that corner with Mr. |
| 22 | Rothschild, was Mrs. Pavia there? |
| 23 | A. No. |
| | Q. Did you ever talk to Mrs. Pavia about this |

1   fireplace directly?
2   A.  Not at all for the fireplace.  I only talked to
3       her, hi, how are you?  How's everything?
4           After Phil told me what to do, then she
5       came over, because I didn't take no orders from
6       Phil -- I mean from Mrs. Pavia.  Phil was my
7       boss.  Whatever he wanted done, he come to me,
8       and I would do it.
9   Q.  So let me make sure I understand.
10          Did you have any conversations with Mrs.
11      Pavia before you started doing any of the work on
12      that decorative fireplace?
13  A.  Yes.  Hi, Julia.  How are you?  How's everything?
14      Good morning.
15  Q.  Did you talk to her at all about the fireplace?
16  A.  No, I didn't.  There was no need of me talking to
17      her about the fireplace.
18  Q.  At any point before you left the job, did you
19      talk to her at all about the fireplace?
20  A.  No.
21  Q.  That day that Mr. Rothschild took you up there
22      and showed you where the fireplace was going to
23      go, --
24  A.  Uh-huh.  Yes.

31

1   Q.  -- did he explain to you about whether there was
2       going to be any type of a mantle or facade that
3       was going to be put around that fireplace?
4   A.  No, he didn't.  He just says he wants a
5       decorative-looking fireplace so -- to break up
6       the room, and that's it.
7   Q.  Did he give you dimensions?
8   A.  It was a little tiny thing.  It only took me
9       three and a half hours to do it, and I only
10      charged him 500 bucks for it.  And that was it.
11      Just a little tiny box with an opening, bricks on
12      the floor, and that's it.
13  Q.  Fair enough.  Did he tell you how big he wanted
14      it built, or did he leave that up to you?
15  A.  He just says, give me a little opening.  It was
16      about this big.  About -- I would say like a
17      2-foot opening.  It's like a miniature -- a
18      miniature fireplace.  It's -- it's not workable
19      if it's that small.
20  Q.  I'm just trying to understand whether --
21  A.  Yeah.
22  Q.  -- Mr. Rothschild told you it should be a 2-foot
23      opening.
24  A.  No.  He just says -- we just laid it out on the

32

1   floor.  He says, what do you -- what do you think
2   of this?  He says, great.  Go up so high.  He
3   didn't give me no specs on it.
4       Usually if you're building a chimney and
5   a fireplace, they give you specs.  And usually if
6   they -- if they want a chimney done afterthought,
7   you have to go back to the Building Department
8   and get another special permit just to do that.
9       MR. CROWLEY:  Just listen to the
10  counsel's question, please.
11      THE WITNESS:  Yeah.
12  Q.  Well, I just -- I just want to make sure that I
13  understand what instructions you were given by
14  Mr. Rothschild.
15      All right.  Did he tell you how high he
16  wanted the opening?
17  A.  We went over as we went along.  Like I would be
18  working there, and then he would say, well, go up
19  another higher or go down a little -- one lower.
20  It's -- it's whatever, you know, --
21  Q.  Okay.
22  A.  -- whatever made him happy.
23  Q.  Did you do the job that first day that he talked
24  to you about it?

**34**

1  A.  I was ready to leave.  I was done with the
2  exterior.  And he said, Joe, you got to do
3  something for me upstairs.  Julia wants to
4  surprise her husband with this.  And he took me
5  upstairs.  He told me what he wanted.  I built
6  it.  Three and a half hours later, I was gone.
7  Q.  All the same day?
8  A.  Same day.  Don't take that long for that.
9  Q.  Was Mr. Rothschild there the whole time?
10  A.  He was there, but I don't remember that he was
11  there all the time.  You know, it was -- he -- I
12  mean, he's not -- he -- he wasn't watching me.  I
13  just did the job, and that's it.
14  Q.  The -- at some point while you were doing it, he
15  came back and said, for example, put another row
16  of bricks on?  You recall that?
17  A.  I don't recall it.  But we already discussed it,
18  what we wanted.  I just did it, and that's it.  I
19  mean, he says, Joe, just build this, give me
20  this, give me that.  And that's it.  And then he
21  came in, and he says, beautiful, that's cute.
22  That's it.  I says, okay, good-bye.
23  Q.  Did he pay you that day?
    A.  Yes, he did.  He was a very good payer.

**35**

1  remember that, what -- you just go there and do
2  it.
3  Q.  There are some reports that indicate that
4  underneath the brick there was a half-inch of
5  some type of a masonry board or some type of
6  material.
7      Do you have any recollection of whether
8  you put down some type of a masonry board or a
9  fireboard, some type of material underneath your
10  bricks?
11  A.  I wouldn't do that, because it's not my job.  If
12  anybody is going to do that, that's a carpenter's
13  job, because he's got the screw -- he's got the
14  screw gun, and he would -- he would do it.
15  Q.  So do you have any recollection as you sit here
16  today about whether there was any type of masonry
17  board or fireboard in that corner before you
18  started laying brick?
19  A.  No, I don't.  No, I don't.
    Q.  Were there carpenters on-site?
21  A.  Yes.  There was -- I mean, like next to me --
22  Q.  No.
23  A.  -- or on the job?
24  Q.  There working.

**36**

1  A.  Yes, there were.  Yeah.  There were always
2  carpenters there.  But at one time -- one would
3  be there all the time.  That's this guy named
4  Chip.  And then if there's -- if they needed
5  another carpenter, you would pull him off another
6  job.
7  Q.  So all this happened the same day?
8  A.  Yeah.
9  Q.  At any point during that day, did you have any
10  discussions with Mr. Rothschild about whether
11  there was going to be any type of prefabricated
12  fireplace going into that structure that you were
13  building?
14  A.  No.
15  Q.  Did you have any discussions with Mr. Rothschild
16  about whether there was going to be any type of
17  gas log system that was going to be built into
18  that fireplace?
19  A.  No.  I didn't discuss anything with him.  He just
20  wanted a decorative-looking fireplace.
21  Q.  When is the first time that you learned that
22  somebody installed some type of a gas fireplace
23  into that structure that you built?
24  A.  The day that I got notified from -- from the

---

**(page 33)**

1  Q.  So did he pay you that day for the last payment
2  on the brick?
3  A.  Yes, he did.
4  Q.  Plus the 500 for the --
5  A.  Yes, he did.  Yeah.
6  Q.  -- for the small fireplace?
7  A.  Yeah.
8  Q.  All right.  So who -- who actually laid the
9  brick?
10  A.  I did.
11  Q.  Did your sons help you?
12  A.  Well, that was a small area, so there's no
13  reason.  One of them is -- my other son is a
14  bricklayer, and the other son is a tender.  That
15  was a small area.  You can't put two people there
16  to work.
17  Q.  Okay.  So you did the work yourself?
18  A.  Yes, I did.
19  Q.  There was subflooring going all the way into that
20  corner?  True?
21  A.  Yeah.  There was subflooring there, yeah.
22  Q.  Okay.  Did you put anything down over the
23  subflooring before you began doing the brick?
24  A.  I really don't remember that.  I really don't

38

1   insurance company saying that there's a lawsuit
2   on Julia Pavia's house, that they had a fire
3   there.  That's the day that I learned about it, a
    year and a half later.
5   Q.  Okay.  Now, take me through to the best of your
6   memory what you did to build that -- that
7   fireplace in that corner that day.
8   A.  What I did?
9   Q.  Yeah.
10  A.  I laid bricks.
11  Q.  Where?
12  A.  The sides, the floor, and not even on the top.
13  Just the -- just the two sides, the front, the
14  opening, and the floor.
15  Q.  One row of bricks each for -- for each wall?
16  A.  Yeah.  Just a -- two sidewalls and the front with
17  the opening and bricks on the floor.  That's it.
18  Q.  Was there any type of a ledge left between the
19  floor of the fireplace and the hearth area?
20  A.  I don't get that, what you're saying, ledge.
21  Q.  Was there any difference in height between any of
22  the bricks that you laid?
23  A.  Different in height?  No.
    Q.  They were all laid the same --

1   A.  Yeah.
2   Q.  -- level?
3   A.  One course after another.
4   Q.  Okay.  And were there bricks across the top?
5   A.  Well, when you get to a certain height, you put a
6   little angle iron there, a piece of steel, and
7   then you cross over to close in that opening so
8   it looks like a firebox.
9   Q.  Okay.  And how was -- how was the top course of
10  bricks left?  Did you finish it in any way, put
11  anything on top of it?
12  A.  No.  Just -- just a top course, and nothing was
13  put on the top.
14  Q.  When you got done, were there any openings in
15  that structure at all?
16  A.  On my -- on the -- the thing that I built?
17  Q.  Yes.
18  A.  Yes.  It was the opening, and then on -- you
19  know, the opening, and then on the top, because
20  it was just three walls.  And -- and there was
21  nothing put on the top.
22  Q.  Okay.  You didn't put anything on the top?
23  A.  No.
24  Q.  So if I'm looking at the top of this fireplace

39

1   that you built from inside the corner, what is
2   there, the metal piece that you put down to lay
3   your brick on top of?
4   A.  There's no metal piece there.  It's just -- you
5   see the floor -- you see the bricks on the floor.
6   No metal piece.  I just did the brickwork.
7   There's no metal piece involved in it, except the
8   angle irons that you put when the -- the top of
9   your opening.  Then you just probably cross it
10  over with two or three courses of brick so it's
11  closed in.  But not the top.  They're just -- an
12  angle iron they call it.
13  Q.  I'm just trying to get a picture of what's at the
14  top of the opening of the -- of the chimney
15  hearth after you get done.
16  A.  More bricks.
17  Q.  Okay.  So it's bricked at the top also?
18  A.  You mean to close in the -- to close in the top?
    Q.  Yes.
    A.  No.  The top was not closed.  They were supposed
21  to do some decorative mantles there or something
22  from what I understand.  It was just supposed to
23  be a decorative-looking fireplace.  That's all I
24  built them.

40

1   Q.  Once again, I'm going to have to have you draw it
2   for me.  I'm going to give you another piece of
3   paper.  I'll give you the pen back.
4   A.  You're a better drawer than me.  That's all --
5   that's all it was is a box.  Okay.  A box.  And
6   this is the opening.  And then you cross over
7   with an angle iron, and this is the opening right
8   here.  See, this is the piers.  Dah-dah-dah.  And
9   when you get to a certain height, you just put a
10  piece of metal from here to here, and then you
11  lay bricks until you reach a certain height,
12  whatever height he wanted.
13  Q.  All right.  Now, --
14  A.  But this is the opening right here.
15  Q.  And just so that I understand the picture that
16  you drew, this is if we're standing on the floor
17  looking at the front of the structure?
18  A.  Standing right here and looking at it right
19  there.
20      MR. BLACKBURN:  If you would mark
21  that, please.
22      (Whereupon, Exhibit 2 was marked for
23  identification.)
24  Q.  Okay.  Mr. Falco, I've had the court reporter put

42

1      Exhibit 2 on the drawing of the fireplace that

2      you made.

3            I'm going to draw an arrow, and I'm going

4      to put a number 1 next to it on Exhibit 2.  I've

5      drawn an arrow to this line that you've drawn on

6      the diagram.

7  A.  Yeah.

8  Q.  As -- after you finished your work, as you looked

9      up to the place where I drew the arrow, --

10  A.  Uh-huh.

11  Q.  -- what would you see?

12  A.  I would see an opening right here.

13  Q.  Was there any ceiling, if you will, to this -- to

14      this opening of the fireplace?

15  A.  No.  No ceiling.  It was only this high.

16  Q.  Okay.

17  A.  The unit -- the -- the unit was only about this

18      high.  That's it.

19  Q.  All right.  So there -- there would have been an

20      opening that would have continued behind the

21      bricks that you laid at -- in this area where

22      I've now put an X and then came out the top?

23  A.  That would be like the top of the fireplace --

24  Q.  Right.

---

43

1      like a hearth.  That's what makes it like a

2      decorative fireplace.

3  Q.  Okay.  That day when you built that -- that

4      fireplace on the second floor of the addition,

5      did you go into the first floor of the addition?

6  A.  I think you had to go in -- into the first-floor

7      addition to get to the second-floor staircase.

8  Q.  Did you look at the area on the -- in the first

9      floor underneath where you were building this

10      fireplace?

11  A.  No.  That's not my problem to look.  I just go

12      through and lay bricks.

13  Q.  Did you have any concern about whether the -- the

14      flooring on that second floor or the joists

15      underneath were going to be able to accommodate

16      whatever bricks you were putting in there?

17  A.  Mr. Rothschild told me, because we discussed that

18      too, that Mr. Rothschild told me that they're all

19      doubled up, the beams.  The floor joists are all

20      doubled up.  Because I says, you know, this is a

21      little bit of -- heavy, which it's not a lot of

22      brick.  It's -- a unit like that is not that --

23      and he says, no, don't you worry about that,

24      those are -- all the floor joists are all doubled

---

1  Q.  -- of the unit.  Right.

2  Q.  And that opening was all the way through?

3  A.  Yeah.

4  Q.  Okay.  Do you recall as you sit here today how

5      far you bricked out into the room away from the

6      mouth of this fireplace?

7  A.  I think it was like probably 8, 16 -- 24 inches,

8      or 20 inches the most.

9  Q.  And did the brick out in front extend beyond the

10      vertical portions of the fireplace that you had

11      built?

12  A.  What do you mean vertical?  Up and down?

13  Q.  You had a name for these.  What did you call

14      them?

15  A.  Piers.

16  Q.  Piers.  Okay.  So did the -- did the brick out in

17      front of the fireplace extend beyond the width of

18      the piers?

19  A.  You mean in front of the piers?

20  Q.  Yes, sir.

21  A.  Like -- like somewhere here?

22  Q.  Yes, sir.

23  A.  Yeah.  There was like a -- I think it was like

24      two courses of bricks in the front that looked

---

44

1      up.

2  Q.  Did he tell you why?

3  A.  I guess that's the way they framed it.  It's --

4      that's the way they framed it.  I mean, the --

5      the whole place was just a nice, nice building.

6      It's -- they -- why not?  If you're paying enough

7      money for it, why don't you just double up on

8      everything?

9  Q.  Do you recall when you were in that first-floor

10      area, in that corner underneath where you were

11      building it, whether there was any portion of the

12      ceiling that was in place at that point?

13  A.  I don't remember that, what was downstairs.  I

14      know the upstairs was still all opened up on

15      three sides, the both sides and the exterior, and

16      then that brick wall that's -- but, I mean, I

17      don't remember.  I -- I really didn't care about

18      looking up or anything else.  It's -- it's not my

19      responsibility.

20  Q.  So you don't recall whether the first floor had

21      been finished in any way?

22  A.  It couldn't have been finished, because it was an

23      addition.  It's -- it's -- it couldn't have.  It

24      had to -- it couldn't be finished.  Wait a

**46**

1  minute. Wait a minute. Wait a minute. Oh, God.
2  The downstairs was like -- no, it wasn't
3  finished. No, it wasn't.
Q.  Okay. So when you were downstairs looking up,
5  you would have seen the floor joists that had
6  been framed in and the underside of the
7  subflooring for the second floor?
8  A.  I guess so. I would have, yeah.
9      MR. CROWLEY: Don't guess. If you
10  remember, you remember. Don't guess.
11  A.  If I -- go ahead. Repeat the question again.
12  Q.  Let me ask it a different way.
13      Do you have any memory of what it looked
14  like in that corner underneath where you were
15  putting in this fireplace?
16  A.  No, no.
17  Q.  And would it be fair to say that you don't have
18  any memory of whether that had been finished in
19  any fashion before you started building the
20  fireplace?
21  A.  No.
22  Q.  Did you discuss with Mr. Rothschild whether there
23  had been any permits pulled to construct the
    fireplace that you were building?

**46** (right column)

1  A.  No. That's not my problem. If he's got to pull
2  any permits, that's his problem, not mine.
3  Q.  But you didn't ask him?
4  A.  No.
5  Q.  You ever been a party to a lawsuit before, Mr.
6  Falco?
7  A.  Never been in a lawsuit in my entire life.
8  Q.  On one side or the other?
9  A.  (Witness indicating.)
10  Q.  Never sued anybody either?
11  A.  Never sued anybody. Never.
12  Q.  I think you testified that before you left that
13  day, Mr. Rothschild came and looked at what you
14  had done?
15  A.  He had to in order for him to pay me.
16  Q.  Okay. And do you remember whether he made any
17  comment to you about it?
18  A.  No. He says, thank you, it looks good, and left.
19  Q.  Do you have any recollection about whether
20  anybody else came and looked at what you were
21  doing that day?
22  A.  No. No, I don't -- no.
23  Q.  After you learned of the fire -- withdrawn.
24      Did you learn of the fire before you

**47**

1  learned that somebody was blaming you for causing
2  the fire?
3  A.  I don't get that.
4  Q.  Okay. When is the first time that you were aware
5  that there was a fire at Mrs. Pavia's house?
6  A.  When I got notified from an insurance company or
7  from a lawyer. I forget.
8  Q.  And after you learned that, after you got notice
9  of that, did you talk to Mr. Rothschild?
10  A.  No.
11  Q.  Have you ever spoken to Mr. Rothschild about
12  this?
13  A.  Nope.
14  Q.  Have you ever spoken to Mr. Carresi about this?
15  A.  Not that I remember. I don't think so, no.
16  Q.  Have you done any other jobs that Mr. Carresi has
17  been on since this Pavia job?
18  A.  No, no. I know Carresi, but I never -- we're
    never in the same job except with -- for Mr.
    Rothschild. That's the only time I see Carresi,
21  is on -- on Phil Rothschild's job.
22  Q.  Well, let me make sure I understand.
23      Have you ever been on any of Phil
24  Rothschild's jobs after this Pavia job?

**48**

1  A.  Have I ever been on Phil Rothschild's after --
2  after Pavia's job, I was all done with Phil
3  Rothschild. I didn't do anything after that for
4  him.
5  Q.  Well -- and as I understand that testimony, there
6  only would have been two jobs that you did with
7  Mr. Rothschild; right?
8  A.  That's it. Two jobs.
9  Q.  So was Mr. Carresi on that job for the
10  psychiatrist?
11  A.  Yes, he was. Yeah.
12  Q.  Are those the only two jobs that you've ever
13  worked on that Mr. Carresi was on?
14  A.  Yes.
15  Q.  Have you seen Mr. Carresi since you learned of
16  the fire at the Pavia house?
17  A.  No.
18  Q.  Other than with your lawyer, have you discussed
19  the fire at the Pavia house with anybody else?
20  A.  No. There's no -- no. Just my lawyer.
21      MR. BLACKBURN: I don't have any other
22  questions for you, Mr. Falco. These other
23  lawyers might. Thank you.
24

49

**EXAMINATION BY MR. TURNER:**

2  Q.  My name is Robert Turner, and I represent Michael
3      Carresi.

           Sir, what was your date of birth and
5      place of birth?

6  A.  2/17/43.  Foggia, Italy.
7  Q.  And what year did you come to the United States?
8  A.  In 1954.
9  Q.  And so where did you go to school in the United
10     States?
11  A.  In Roxbury.  The Deerborne School.
12  Q.  And then where did you go after that?
13  A.  Go to work when I was 16.
14  Q.  Deerborne School was a high school?
15  A.  It was -- it's a long story.  Came over here when
16     I was nine years old, and I started off in the
17     first grade, because I didn't know how to speak
18     English.  The same year I got promoted to the
19     second grade.  Dropped out of school when I was
20     in the seventh.  By that time, I was 16 years old.
21  Q.  And how did you learn to be a mason?
22  A.  Self-taught.
23  Q.  Did you get a job as a tender and then --
    A.  Yes, yes.

50

1  Q.  I see.  Are you married?
2  A.  Was.
3  Q.  Divorced?
4  A.  Divorced, yeah.
5  Q.  Just once?
6  A.  Yeah.
7  Q.  And you have just two children?
8  A.  No.  I was -- well, the second one -- the second
9      one, I lived with her for ten years, and then she
10     talked -- conned me into getting married.  A year
11     and a half later, she was gone too.
12  Q.  Should we count that or not?
13  A.  No.  You don't count that.  She was -- she was
14     just a fun person to be with.  Believe me, she
15     was.  She made me forget the aggravation from the
16     first one.
17  Q.  But you actually did get legally married to her?
18  A.  Yeah.  And then -- then it didn't -- then it
19     didn't work out.  She was like a -- what do you
20     call those -- you can only stay with a guy for so
21     long.  You got to run to the next guy.  But she
22     was fun.  I didn't mind giving her some of my
23     money after that, a quarter of the house.
24  Q.  Oh, so you did go through a divorce, I guess?

51

1  A.  I got -- we got -- then we split up, and now I'm
2      on my own.
3  Q.  Sure.
4  A.  Can't go the third time.  That...
5  Q.  Usually when you do a fireplace, did you say that
6      you do some rough work, have it inspected, and do
7      some more work, have it inspected, and --
8  A.  Yes.
9  Q.  -- finish up and get it inspected again?
10  A.  Yes.  I did say that, yeah.
11  Q.  And in this job at Julia Pavia's house, did you
12     follow that procedure?
13  A.  There was no procedure to follow.  There was just
14     a decorative fireplace, looking -- a looking
15     fireplace.
16  Q.  Mr. Falco, did you consider the possibility that
17     someday someone might think that's a real
18     fireplace and put a fire in there?
19          MR. CROWLEY:  I object.
    A.  He object, I guess.
21          MR. CROWLEY:  You may answer.
22  A.  Did I consider it?
23  Q.  Yes.
24  A.  Because it's not a fireplace.  It's just a

52

1      decorative-looking unit, and it's not -- you got
2      to be -- excuse my language -- stupid in order to
3      think that it's a working fireplace.  That's it.
4  Q.  Did you make it look like it was a fireplace so
5      Mr. Pavia could enjoy it in his office?
6  A.  That's the way he wanted it.  Mr. Pavia didn't
7      even know nothing about it.  It was his wife that
8      wanted to surprise him.  A fireplace is different
9      from this.  A fireplace is supposed to start from
10     the cellar, blockwork, ash dumps, flue pipes,
11     firebox, rough opening, all firebricks, smoke
12     chamber.  You got to be an idiot in order to see
13     that this is not a fireplace.  Because you need a
14     smoke chamber.  You need a chimney on top of that
15     unit.
16  Q.  Was there a chimney up there?
17  A.  No.  Of course not.
18  Q.  At any time?
19  A.  No, no.  It would have been a fortune to build
20     that because of the tile roofs, and -- and you
21     had to go from downstairs all the way up through
22     the -- through the slate roof.  That would have
23     been like a $30,000 job.
24  Q.  Was there some kind of venting?

53

```
1   A.   Not when I did that unit, that decorative
2        fireplace.  There was no venting whatsoever.
3   Q.   Did you make it look like a real fireplace?
    A.   I -- it does look like a fireplace.  But -- but
5        you still have to have firebricks in there, and
6        you still have to have a smoke chamber.  This is
7        just a box.  I mean, you cannot light a fire in
8        there, because the smoke will go up in the room
9        instead of the chimney.  I mean, that's common
10       sense.  You need a chimney for the smoke to go
11       up.  Just like Santa Claus needs it to go down at
12       Christmastime.  Where is he going to go, through
13       a little vent?
14  Q.   Would most people know that you used some kind of
15       bricks that weren't firebricks?
16            MR. CROWLEY:  I object.  Go ahead.
17       You answer.
18  A.   Say that again.  Repeat that.
19  Q.   The bricks you used, do they look any different
20       from firebricks?
21  A.   Yes.
22  Q.   How so?
23  A.   A brick is a brick, and a firebrick -- a fire --
         a firebrick is a firebrick.  A firebrick -- a
```

54

```
1        firebrick is supposed to absorb the heat and
2        takes a lot of heat.  A brick doesn't.
3   Q.   But just the looks of those bricks, do they look
4        similar?
5   A.   No.  The firebrick is white or dark red.  They
6        got two colors, a white one and a dark one, a
7        dark red.  And they don't allow no bricks inside
8        of a firebox.  It's got to be firebricks.
9   Q.   And the bricks you used --
10  A.   Not a brick.
11  Q.   The bricks you used --
12  A.   It was a brick, not a firebrick.
13  Q.   You just call them a brick?
14  A.   Just a common --
15            MR. CROWLEY:  Wait.  Wait for a
16       question.
17  Q.   You just call them a brick?
18  A.   A brick, yeah.  I call it a brick, yeah.
19  Q.   And what color?
20  A.   It was like charcoal, because it was a
21       water-struck brick.
22  Q.   What's charcoal?  A dark gray?
23  A.   No.  It's like a brown.  Yeah.  It's like a -- a
24       brown.  Yeah.
```

55

```
1   Q.   Did you consider the possibility that someone
2        might mistake that for a conventional fireplace
3        and start a fire there?
4             MR. CROWLEY:  Objection.
5   A.   No.  I didn't consider it, because anybody could
6        see that it wasn't a chimney and a fireplace.
7             I mean, what do you want me to tell you?
8        This is the truth.  Anybody can see that -- I
9        mean, people that live in those type of
10       neighborhoods, don't tell me that they don't know
11       that this is not -- this is -- this is just a --
12       a box.  You got to have a chimney.
13  Q.   Did you have any warnings --
14  A.   Warnings?
15            MR. CROWLEY:  Objection.
16  Q.   Yeah.
17  A.   About what?
18  Q.   Don't put a fire in this.
              MR. CROWLEY:  Objection.
    A.   I wasn't told.  That's all I was told to do, was
21       build a decorative firebox, and that's it.  Just
22       for looks.  That's all.
23  Q.   Were you supposed to make it look like a real
24       fireplace?
```

56

```
1   A.   That's what he -- that's what they wanted.
2   Q.   Okay.
3   A.   Yeah.
4   Q.   Did you see any boxes around the house that
5        contained gas log fireplace equipment?
6   A.   I don't think --
7   Q.   Perhaps four of them?
8   A.   I'm not nosy enough to go poking through people's
9        houses.  I just go do -- over there, go do the
10       exterior brickwork, and that's it.
11  Q.   Did you see one in that second-floor office where
12       you were working?
13  A.   No, no.  Because that was new construction.  Why
14       would it be up there?
15  Q.   To go into the fireplace maybe.
16  A.   If they're stupid enough to put it in there.
17  Q.   Did you ever hear that there was one there --
18            MR. CROWLEY:  Objection.
19  Q.   -- in a box?
20  A.   Nope, nope.  Not until the lawsuit took effect.
21       Never heard of a fire log in there whatsoever.
22            Like I said, I went there, I did my job,
23       left.  And then all of a sudden, a year and a
24       half later, this happens.
```

57

1  Q.  Did you have any sketches or drawings or diagrams
2      to work by?
3  A.  No.
   Q.  When you were drawing your diagram, which is
5      Exhibit 2, what was the purpose of the metal or
6      steel that you mentioned --
7  A.  Oh, that's just an angle -- that's just an angle
8      iron to close the opening.  You don't want the
9      opening to go straight up.  It would look pretty
10     foolish.  So you got to close it somehow.  So you
11     use an angle iron, like a 3-by-4 angle iron, 3
12     feet this way -- 3 inches this way, 4 inches that
13     way, so it can carry a course of -- it could
14     carry brick across the opening.
15 Q.  Did the steel have any other purpose?
16 A.  No.  That's it.  Just to carry the brick or close
17     the opening in.
18 Q.  Did you do any work in installing plywood or
19     joists below the fireplace?
20 A.  None.  Didn't do nothing at all.
21 Q.  Did you use just brick?
22 A.  Just brick.
23 Q.  Brick and mortar?
   A.  Just brick and mortar.

58

1  Q.  Did you ever speak to Mr. Pavia?
2  A.  Mr.?
3  Q.  Yes.
4  A.  Oh, yeah.  He was a great guy.  When -- you see
5      him every once in a while.  See, that job took a
6      little -- a little longer to take -- to do,
7      because it was a winter condition.  So one day we
8      might work, the next day we -- it might be too
9      cold, because you can't lay bricks when it's cold
10     because the cement will freeze.
11         So we would go through like a period of
12     two or three days of nice warm weather.  Then we
13     would have a period of two or three days of cold
14     weather, so we wouldn't bother going in.  Then
15     when it gets warm again -- so actually, the
16     project took like, I would say, three, four weeks
17     and -- because it was pretty good weather, you
18     know.  In summer condition, that -- that addition
19     would have probably been done in about four
20     working days.  Four, five.
21 Q.  Did you ever talk to Mr. Pavia about that
22     second-floor office?
23 A.  No.  I only seen -- Mr. Pavia was just to say hi,
24     how are you, how you do, where you taking off to,

59

1      because I guess he was a traveler.  He was a --
2      some kind of -- he would go to China and stuff
3      like that.  So we don't -- we wouldn't see him
4      that often unless he came back, you know.  But he
5      was a great guy.  I didn't have a problem with
6      him at all.  I think I talked to him probably
7      twice or three times like for five minutes, you
8      know.
9  Q.  Had you ever constructed a decorative fireplace
10     before that day?
11 A.  Never.  Never.  And I'll never do it again.  This
12     decorative fireplace is getting to be a
13     nightmare.
14 Q.  If you knew that a gas log was going in there,
15     would you have built it the same way?
16 A.  It couldn't be built.  It couldn't.  Like I said,
17     in order to have something like that, you've got
18     to start from the cellar all the way up, because
19     you need to sit that gas log on top of a
20     concrete -- not on top of -- on top of bricks.
21     It's got to be a concrete base.
22 Q.  Would your work be the same if you were going to
23     build a fireplace with a gas log going in there?
24 A.  No.  It would be a regular -- a regular chimney

60

1      and firebox with firebricks in it.  With
2      firebricks not bricks.  They don't allow you to
3      put bricks on a firebox.
4  Q.  Do you usually do the venting work on a real
5      fireplace?
6  A.  Yeah.  The chimney with the clay liners and all
7      those.
8  Q.  You do that work?
9  A.  Yes.  The clay liners inside, the bricks.  It's
10     all clay, and it's all solid.
11 Q.  Did you ever go into the garage at this house?
12 A.  Yeah.  Because we got -- we kept like our tools
13     in there, like, you know, my level and tools.
14     And like the wheelbarrow, you know, we'd put in
15     there.
16 Q.  Did you see any gas log units?
17 A.  You know, you want to know the truth?
18 Q.  Why not.
19 A.  I don't even know what a gas log looks like.
20 Q.  Did you see any boxes that say gas log?
21 A.  They were loaded with boxes in there, but I never
22     just -- I didn't see one that says gas log for
23     Mr. Pavia -- Mr. Pavia's room.  No.
24         MR. TURNER:  Thanks.  That's all I

**61**

1  have.

2      **EXAMINATION BY MR. OBER:**

3  Q.  Good afternoon, Mr. Falco.  My name is Scott

   Ober.  I represent Heatmaster in this case.

5      The decorative fireplace that you built

6  had no venting?

7  A.  No venting, no.

8  Q.  It wasn't designed to be a solid fuel-burning

9  fireplace?

10 A.  No, of course not.

11 Q.  It didn't have any working flue when you did any

12 work?

13 A.  No.  No working flue.  That's why it took only

14 three and a half hours to build.

15 Q.  It didn't include any concrete or hearth slab,

16 the work that you did?

17 A.  There wasn't one there.

18 Q.  Is that -- when you build a regular fireplace and

19 chimney, would your work include installing a

20 concrete or a hearth slab?

21 A.  Oh, yes.  It's got to be all concrete through

22 the whole -- the hearth.  That's supposed to be

23 20 inches.  Like, you know, put a piece

   of bluestone for safety reasons through the

**62**

1  hearth and the -- the whole inside of the

2  firebox.

3      When you go up so high from the -- your

4  top of a foundation, you get to a certain height.

5  Then you got to pour all concrete in there for

6  the hearth plus the whole inside.  Put -- you got

7  to put steel rods in there so it will support --

8  it gets stronger, so -- and that's all solid with

9  concrete.  That's when you start doing your

10 firebox on top of your concrete.  Like a -- the

11 fireplace, you see those firebricks there.  And

12 it's -- all around there, it's all solid with

13 bricks behind the fire -- the fire -- firebricks.

14 So that's a solid unit.  And it goes all the way

15 up solid, 8 inches on the exterior and 8 inches

16 against the plywood until they call -- the smoke

17 chamber is done.  Then you go back and do a

18 4-inch in the front -- exterior and 4 inches

19 against the plywood.

20 Q.  And all those things you just talked about

21 are things that --

22 A.  Codes.

23 Q.  -- are dictated by the codes?

24 A.  They're all codes, yes.

**63**

1  Q.  And the decorative fireplace that you built

2  wasn't built according to those codes?

3  A.  Of course not.  It's just a decorative fireplace

4  with no flues, no nothing.  Just three walls.

5      MR. OBER:  That's all I have.  Thank

6  you.

7      THE WITNESS:  Thank you.

8      **EXAMINATION BY MR. CARPENTER:**

9  Q.  Mr. Falco, my name is Curtis Carpenter.  I

10 represent P. & D. Builders in this case.

11     You testified that you -- you were

12 instructed to build a decorative fireplace?

13 A.  Yes.

14 Q.  Okay.  You also stated that you've never built a

15 decorative fireplace before?

16 A.  Well, I can build anything if you tell me what

17 you want.

18 Q.  Well, --

   A.  Not necessarily a -- a decorative fireplace.  I

   could build you a chapel if you wanted out of

21 bricks, you know, with the -- you know, with

22 the -- what do you call it? -- the arches.

23 Q.  But --

24 A.  I was going to say Mary there.  That's my

**64**

1  girlfriend's name, St. Mary.  Okay.  Go ahead.

2  Q.  When you were told to build a decorative

3  fireplace, what did you understand decorative

4  fireplace to mean?

5  A.  Just to look at something to break up the look in

6  the room instead of looking at just his desk and

7  his computer, because he had the whole upstairs,

8  and there was just a desk there.  I suppose he

9  would put an office desk there, and that's it.

10 So just for looks, something to break up the

11 room.

12 Q.  Do you have any understanding as to whether a --

13 a zero clearance unit was going to go in that

14 decorative fireplace?

15 A.  If a zero clearance unit was going to go there,

16 it would be done before I -- I put up the walls,

17 because that unit fits inside the brick.

18 Q.  So no one -- no one ever suggested to you that

19 this was a decorative fireplace for a zero

20 clearance unit?

21 A.  Phil said something about that, but then I

22 couldn't figure it out, because there was no unit

23 there anyway.

24 Q.  So what did Phil say about a zero clearance?

**55**

1  A.  That we might put a unit in there.  But that type

2     of unit you're talking about, it don't give out

3     any heat.  You see -- you see those type of units

4     in every house they build now just for

5     decorative.  It's -- it shows a fire, but it

6     doesn't get hot like a gas log would.  A gas log

7     gets very, very hot.  This unit doesn't.  It's

8     all -- it's all contained.  And it doesn't even

9     get that hot when you turn it on.  Just for

10    beauty.  For romance only.

11  Q.  You didn't -- you didn't understand though that

12     this was going to be a decorative fireplace for a

13     zero clearance unit; is that correct?

14         MR. CROWLEY:  Objection.  Go ahead.

15  A.  He just told me to build this unit and leave it

16     up to me what I'm going to do with it.  I don't

17     know what he did after I left.  I just gave

18     him -- build him the unit, got my check, and said

19     good-bye, and that was the end of Phil

20     Rothschild.

21  Q.  Did you have any discussions with Mrs. Pavia

22     about the design of this decorative fireplace?

23  A.  No.  It was just a box.  Just two piers, the

      sides, the top of the opening, and that's it.

**66**

1  Q.  Did she ever suggest she wanted the bricks laid

2     out in like a herringbone pattern?

3  A.  Oh, yeah, she did.  Yeah.  And, you know, to be

4     honest with you, I don't remember if I did or not

5     a herringbone, because it was such a small area.

6     Herringbone is -- it's not -- you can't even see

7     it with such a small area.  Herringbone would

8     look good if you were doing like a patio, not a

9     little tiny area like that.  But I think I did

10    it.  I'm not sure.

11  Q.  Did you have any other discussion with Mrs. Pavia

12     about the design of this decorative fireplace?

13  A.  I didn't have much of a -- I didn't have much of

14     a conversation with Mrs. Pavia at all.  Only a

15     couple of times I talked to her.  Two or three

16     times.

17  Q.  Two or three times in the whole time you were

18     working at --

19  A.  That's it.  Yeah.  I was going through Phil.

20     Phil would tell me what to do or good morning,

21     until the last day, and he says, I need you to

22     build me something for Julie for her husband.

23     That's it.

24  Q.  Do you know Michael Conte?

**67**

1  A.  Yes, I do.

2  Q.  How do you know Michael?

3  A.  I've known him for years.  I do his work and -- I

4     do his work.  And he -- he was working with -- as

5     a matter of fact, I think either Michael Conte or

6     Mike Roach referred me to Phil Rothschild,

7     because Phil was looking for a bricklayer.

8  Q.  When was the last time you worked with Michael

9     Conte?

10  A.  I just did a job for him.  I think it was like in

11    November.  An extension to a chimney up in

12    Duxbury, I think.

13  Q.  How regularly do you work for Michael Conte?

14  A.  I probably do like maybe two or three little jobs

15    a year, because he does additions, and I extend

16    his chimneys.

17  Q.  Have you ever discussed the facts of this fire

18    with Michael Conte?

19  A.  Of course, after I found out when it happened.

20  Q.  When was -- when was that conversation?

21  A.  Hey, did you hear about Julia?  I says, you got

22    to be kidding.  Badda-badda-badda.  And nothing

23    who was right and who was wrong.  You know, it's

24    just, oh, wow, can't believe it, you know.  And

**68**

1     that was it.

2  Q.  When was the first time you learned that there

3     was actually -- that fire was caused by a gas log

4     appliance?

5  A.  When the insurance and the lawyer notified me a

6     year and a half later.

7  Q.  So is that before or after you spoke to Michael

8     Conte?

9  A.  Oh, I talked to Michael Conte way after.  I

10    mean -- no.  I mean, we -- when -- when I found

11    out, we did talk about it with Michael Conte and

12    Mike Roach and my kids and we're -- whoever it --

13    was involved in it.  But we didn't think nothing

14    of it.  I mean, just talk.  Hi, wow, that's too

15    bad, and this -- like that.

16  Q.  Did you learn about -- when did you first learn

17    about this fire?  Was it --

18  A.  A year and a half later.

19  Q.  Okay.

20  A.  Yeah.

21  Q.  All right.  And I assume you know Michael Roach;

22    correct?

23  A.  Yeah.

24  Q.  Okay.  And how do you know Michael Roach?

70

1  A.  For doing jobs, because Mike Roach and Mike Conte
2      used to be in business together.
3  Q.  When was the last time you met with Michael
4      Roach?
5  A.  I just saw him walking out of here.
6  Q.  Including that time.
7  A.  Well, I did a chimney -- I did a chimney for him,
8      I think it was two years ago, over his house.
9      And he put an addition on his house, and I did a
10     chimney.
11  Q.  Have you ever discussed this fire with him?
12  A.  Yeah.  We discussed it, but nothing to -- to
13     blame anybody who -- specifically who's to blame.
14     Wow, wow.  I can't believe this.  And then all of
15     a sudden we're going to -- with lawyers and this
16     and that.  And that's it really.  Nobody
17     badmouthed each other or who was responsible or
18     was not responsible.
19  Q.  Do you know Chip Gubbins?
20  A.  Yes.
21  Q.  How do you know Chip?
22  A.  He was the foreman on the job.  He was the
23     carpenter foreman on the job.  That -- he was
24     doing all the finish work.

1  Q.  Do you remember Mr. Gubbins ever questioning you
2      about why you were putting mortar down on
3      plywood?
4          MR. CROWLEY:  Objection.
5  A.  Can you take this off the record?
6          MR. CROWLEY:  No.  It's on the record.
7  A.  It's -- don't -- Chip was too busy fooling around
8      with Mrs. Pavia.  What the hell would he come to
9      me for and seeing what -- about anything?
10  Q.  Well, what do you mean by that?
11  A.  Oh, come on.  That's why they got divorced.
12  Q.  Well, what do you know about that anyways?
13  A.  That's what I hear and -- that's what I heard.
14  Q.  Who tells you -- who tells you that?
15  A.  Oh, it doesn't matter, does it?  But you know
16     that happened.
17  Q.  Well, are you suggesting that --
18  A.  No.  I'm not suggesting anything.  I'm just --
19     just saying I never seen Chip because he was too
20     busy.
21  Q.  He was too busy -- who was -- what was Chip too
22     busy with?
23  A.  Entertaining.  What do you -- what can I say?
24  Q.  I mean, what are you suggesting?  I mean, what

71

1      are you suggesting?  Are you suggesting that Chip
2      Gubbins was having an affair with Mrs. Pavia?
3  A.  I wouldn't be a bit surprised.
4  Q.  You wouldn't be a bit surprised?
5  A.  Yeah.  Oh, that's off the track anyway.  Go back
6      into the -- what we're supposed to do.
7          MR. CROWLEY:  Just answer his
8     questions.
9  Q.  Is that something you just -- you learned from
10     someone else, or is that something that you just
11     deduced from the situation, that Chip Gubbins was
12     having an affair with Mrs. Pavia?
13         THE WITNESS:  So I can ask these
14     questions -- I can answer them?
15         MR. CROWLEY:  Go ahead.
16  A.  Any idiot could see.  I mean, never -- the work
17     was never done there.  I mean, this was a
18     forever-ending banker in there, money just going
19     left and right.  Anybody can see that you don't
20     take two weeks to trim out a window.
21  Q.  What do you mean by two weeks trimming out a
22     window?  Was that --
23  A.  Because I think Chip was a lazy -- very, very
24     lazy person and bleeding the system when it came

72

1      to his work.  I don't know if it was -- if that
2      job was a cost-plus job or a contract job.  But I
3      know if it's a contract job, you get in and get
4      out.
5  Q.  Is it your suggestion that -- that -- that Chip
6      was -- was milking this for all the money he
7      could get?
8  A.  The whole system was being -- everybody was
9      milking him.  Me, I gave him a price.  The
10     quicker I get out of there, the quicker I get my
11     money.  But the whole system was being milked.
12        And the funny part about it, Julia Pavia
13     was supposed to be a general contractor herself
14     in Ohio.  Get two general contractors together,
15     boy, they could really screw up the system.
16  Q.  What was your understanding about what Mrs. Julia
17     Pavia's background in construction was?
18  A.  She was supposed to be a general contract -- the
19     whole family came from a -- contractors from Ohio
20     somewhere.  They were contractors over there, and
21     she specified that she was a general contractor.
22  Q.  Did she ever act as a general contractor on -- on
23     this project?
24  A.  No.  That was Phil's problem.  He just wanted --

73

1 she just wanted us to let -- know that she knows
2 what she's doing too. You know, that she knows
3 every phase of construction. Well, you could
4 have fooled me.
5 Q. Do you understand Ms. Pavia to be an interior
6 designer?
7 A. She's good on everything, I guess. What can I
8 say? Yeah. She's supposed to know everything of
9 everything. But she's stupid on others, because
10 I -- if I was Julia, I would never give up her
11 husband that's probably picking up a million or
12 two a year for -- for Chip.
13     At least we're having a few laughs out of
14 this deal.
15     MR. CARPENTER: I have no further
16 questions.
17     THE WITNESS: I don't blame you.
18     **REEXAMINATION BY MR. BLACKBURN:**
19 Q. Mr. Falco, was the brick that you used for the
20 fireplace the same brick that you were using for
21 the exterior?
22 A. Yes.
23 Q. Now, you mentioned that Phil had said something
24 about a zero clearance unit. I just want to

74

1 explore that a little bit.
2     That day when he was talking with you
3 about the fireplace, did he mention a zero
4 clearance unit?
5 A. Yeah. That he might do something after I build
6 it. But it doesn't make any sense to me to stick
7 the zero clearance unit after I built it, because
8 it -- it just won't fit. When you put in one of
9 those units, you got to build around it. You
10 don't --
11 Q. You've done that before?
12 A. Oh, sure. Many times.
13 Q. Yeah. You've bricked in a structure around a
14 zero clearance unit before?
15 A. Oh, yes. It has to be installed first with the
16 proper --
17 Q. Always when it's installed?
18 A. -- with the proper double-insulated pipes and
19 everything else.
20 Q. Let me ask you this. In those situations where
21 you bricked around a zero clearance unit, is it
22 required that there be anything underneath the
23 unit other than a layer of brick?
24 A. Not on -- not on those units. Because, you see,

75

1 what they do is they -- first a carpenter -- the
2 carpenter gives you a rough opening on the
3 zero, and then the unit is installed. So it's
4 actually encased by 2-by-4s, but -- the clearance
5 all the way around, then of course when they come
6 in and plaster it or plywood it. Then if they
7 want me to do a brick veneer around it, fine,
8 enclose the whole unit, or they want me to do
9 stones. I did one in Wellesley with all stones
10 against the zero clearance unit.
11 Q. So when Mr. Rothschild said to you something
12 about a zero clearance unit, did you ask him how
13 he intended to stick one in after you'd already
14 done the job?
15 A. I really didn't care. I really didn't care what.
16 Q. But did you ask him?
17 A. No, I didn't. No. I just said, okay, what do
18 you want? I do what you want me to. That's all.
19 Q. Is that the full extent of what you remember
20 about him saying a zero clearance unit?
21 A. Yeah. That's it.
22 Q. What did he say about a zero clearance unit?
23 A. He just says, we might -- or you just build me
24 this unit here, and we'll worry about it, what

76

1 we're going to do with it later.
2     And that day I walked out of there and
3 never seen him ever since. You just do what --
4 you just give me this opening, and I'll worry
5 about it, what we're going to do later, meaning
6 her -- him and Julia Pavia.
7 Q. I think you also testified when Mr. Carpenter was
8 questioning you about Mrs. Pavia asking you about
9 laying out the bricks in a herringbone fashion?
10 A. Yeah.
11 Q. You do remember that?
12 A. Yes. You know why? Because she wanted to match
13 the existing fireplaces that she had through the
14 whole house. I think she had about two or three
15 fireplaces in that house.
16 Q. Does thinking about that help you remember
17 whether you did any repair work on any of those
18 other fireplaces?
19 A. No. I -- she just asked me to look at them to
20 see if they were safe, and I would go inside the
21 firebox and just look to see if the firebricks
22 are cracked or -- or look at the damper and see
23 if that was good. But basically that's it and --
24 Q. When -- when did you do that?

77

1  A.  Oh, like -- like in the middle of the project.
2      Joe, would you mind if you look inside the
3      firebox to see?  Because, you know, it was an old
4      house, and it made her feel better by me looking
5      at it.  I said, oh, it looks pretty good to me.
6      You know, there's no cracks here, no
7      deterioration.  And that was the extent of that.
8  Q.  This conversation that you had with her about
9      laying out the bricks in a herringbone fashion,
10     when did you have that conversation?
11 A.  I don't even remember -- I don't even remember if
12     I talked to her about laying on a herringbone or
13     I discussed it with Phil about laying -- that --
14     I don't know which one I talked to, whether Phil
15     or Julia.
16 Q.  In any event, it would have had to have been that
17     same day that you built it; right?
18 A.  Yeah, yeah, yeah.
19 Q.  Because the only conversation --
20 A.  Early in the morning.
21 Q.  The only conversations you had with anybody about
22     this all occurred in the same day that you built
23     it?  True?
24 A.  I think maybe a day before -- whether one day or

78

1      a day and a half.  Not -- it wasn't like
2      discussed weeks before, because that was a
3      last-minute thing.
4          As a matter of fact, I think the house
5      was -- the addition was -- by the time we
6      finished the exterior work, I think the -- the
7      house was already plastered, because Chip was
8      ready to do all the trimwork around the windows.
9      That's how long it took us to do because of the
10     cold weather.  Not work today, take off tomorrow,
11     do this, then this and that.
12 Q.  So when I asked you before about the conditions
13     on the first floor and you thought it was still
14     rough-framed, now that you've had a chance to sit
15     here for a while and think about it, you believe
16     that that's not so, that it was plastered as
17     well?
18 A.  Well, at the -- at the beginning, because like I
19     said --
20 Q.  No, no.  I'm not asking about at the beginning.
21     I'm asking about the day that you built the
22     fireplace.
23 A.  It was plastered.
24 Q.  Okay.  Was it plastered on the second floor as

79

1      well?
2  A.  Yes, it was.  Yeah.
3  Q.  Was the hardwood floor in on the second floor?
4  A.  No, it wasn't.
5  Q.  So the walls were plastered?  True?
6  A.  Yeah.
7  Q.  Ceiling was plastered?
8  A.  Yes.
9  Q.  And that was -- the same was true on the first
10     floor?  The walls were plastered?
11 A.  Yes, it was.
12 Q.  And the ceiling was plastered?
13 A.  Yes, it was.  Because it was that period of --
14     because of the winter took so long, and they
15     still were working inside doing the wiring and
16     this and that, and they didn't need -- you could
17     still plaster even though it's --
18         MR. CROWLEY:  Wait for the next
19     question.
20 Q.  So let me make sure I understand.
21         Do you remember having any conversations
22     with Julia Pavia about this fireplace?
23 A.  No, no.
24         MR. BLACKBURN:  Okay.  No more

80

1      questions.  Thank you.
2          REEXAMINATION BY MR. TURNER:
3  Q.  Mr. Falco, when you told Attorney Carpenter that
4      Phil said something about that, but I didn't see
5      one there, you didn't look for anything; correct?
6  A.  No.  I mean...
7  Q.  You didn't ask any questions?
8  A.  No.
9  Q.  It wasn't your problem?
10 A.  It wasn't my problem.  He just told me -- he just
11     told me to do what he wanted me to do, and just
12     did it and got out.
13 Q.  But he did mention something, that he might do
14     something after I got through, you said; right?
15         MR. CROWLEY:  Objection.
16 A.  From what I see, that he was -- he wanted to -- a
17     zero clearance unit.  I --
18 Q.  Did he use those words?
19 A.  A unit that's -- that's -- don't give out heat
20     that's supposed to be for decoration.
21 Q.  What does that mean, zero clearance unit?
22 A.  Zero clearance.  That means you can -- you can
23     actually put your hands right on -- at the door
24     of the -- and you don't feel no heat whatsoever.

81

1    It's a self-contained unit, and it doesn't even

2    burn that hot.

3         It's -- it's -- it's in every house that

4    you build today.  They just -- instead of

5    chimneys, because they cost so much money, these

6    units are half the price, and then they put

7    marble around it.  And that's it.  It makes it

8    look beautiful.  But they don't give out no heat.

9    Just for decorative.  That's -- you sit next to

10   it, and it looks nice.

11   Q.   When you said that Mr. Rothschild said he might

12   do something after I got through, did he

13   elaborate on exactly what he had in mind?

14   A.   No.

15   Q.   Okay.

16   A.   It was -- it was his problem what they were going

17   to do after I left.  He just told me to build

18   this for me and leave it up to me what I'm going

19   to do afterwards.  That's all.  I don't know.

20   Q.   So do I have it right, he didn't actually say

21   anything about a zero clearance unit?

22   A.   No.  He did.

23        MR. CROWLEY:  Objection.

A.   He did say something about it.  But I didn't

82

1    think nothing of it, because like I said, a zero

2    clearance unit is no -- nothing to worry about.

3    Q.   Did he discuss any other possibilities?

4    A.   Nope.  Nope.  They weren't -- they didn't know

5    what they wanted.  They didn't know what they

6    wanted.  They didn't know.  I just said good-bye.

7    That's it.

8    Q.   You didn't like his attitude; right?

9    A.   No, I don't.  Well, I shouldn't -- I'm not going

10   to lie to you.  I didn't like his attitude at

11   all.  He thinks he's better than everybody else.

12   Q.   By the time --

13   A.   I'm glad that I don't do no work for him.

14   Q.   Before you started the fireplace, had you already

15   made up your mind you weren't going to do any

16   more work for him?

17   A.   I -- I was in my glory just to do this last job

18   and just say good-bye.

19   Q.   Had you already made up your mind, this is it?

20   A.   Yeah.  The only thing that I was being a

21   con-artist was that the nicer I am, the -- the --

22   the less problems I have to get my check at the

23   end.

24        MR. TURNER:  Thank you.  That's all I

83

1    have.

2         THE WITNESS:  Okay.

3         MR. BLACKBURN:  Nothing further.

4         (Deposition concluded at 1:57 p.m.)

84

1         COMMONWEALTH OF MASSACHUSETTS

3         BE IT KNOWN that I, Jessica L. Bisaillon,
4    Registered Professional Reporter, Certified
     Shorthand Reporter and Notary Public, reported
5    stenographically the foregoing deposition
     pursuant to notice at the time and place stated
6    in the caption hereof; that I was then and there
     a Notary Public in and for the Commonwealth of
7    Massachusetts; that by virtue thereof I was
     authorized to administer an oath; that the
8    witness before testifying was duly sworn to tell
     the truth, the whole truth and nothing but the
9    truth; that the testimony of said witness was
     reduced to typewriting under my direction; that
10   the foregoing pages contain a full, true and
     correct transcription of the notes of said
     deposition.

12        I FURTHER CERTIFY that I am not of counsel
     nor attorney for either or any of the parties to
13   said action or otherwise interested in the event
     thereof, and that I am not related to either or
14   any of the parties to said cause.

15        IN WITNESS WHEREOF I have hereunto subscribed
     my name and affixed my seal of office this 6th
16   day of March, 2006.

17        _____
                                  NOTARY PUBLIC

18   MY COMMISSION EXPIRES:
19   March 6, 2009

**$**

$15,000 - 17:3
$30,000 - 52:23

**0**

01501 - 2:13
01608 - 2:17
02109 - 1:24
02110 - 1:18, 2:7
02210 - 2:10
05-cv-10827-dpw - 1:3
06096 - 2:4

**1**

1 - 3:16, 25:8, 26:13, 26:22, 29:17, 29:18, 41:4
10 - 17:2
10-by-10 - 12:9
100 - 2:13
1150 - 1:23
12:20 - 1:19
16 - 42:7, 49:13, 49:20
1954 - 49:8
1:57 - 83:4

**2**

2 - 3:17, 26:14, 26:18, 40:22, 41:1, 41:4, 57:5
2-by-4s - 75:4
2-foot - 31:17, 31:22
2/17/43 - 49:6
20 - 42:8, 61:23
2006 - 1:19, 84:15
2009 - 84:19
23 - 16:6
24 - 6:17, 42:7
24,000 - 16:6
25 - 7:10, 8:21
250 - 2:10
27b - 2:13
29 - 3:16

**3**

3 - 1:19, 57:11, 57:12
3-by-4 - 57:11
36 - 8:16

**4**

4 - 3:5, 57:12, 62:18
4-foot - 28:3
4-inch - 62:18
40 - 3:17
43 - 8:13, 8:15
45 - 9:18
484 - 2:16
49 - 3:5

**5**

5 - 6:15
500 - 31:10, 34:4
560 - 2:16

**6**

6 - 84:19
608 - 2:4
61 - 3:6

617 - 1:24
63 - 3:6
6th - 84:15

**7**

73 - 3:7
742-6900 - 1:24
777 - 1:5

**8**

8 - 42:7, 62:15
80 - 3:7

**9**

99 - 1:18, 2:7

**A**

able - 43:15
absorb - 15:23, 54:1
accommodate - 43:15
according - 9:12, 63:2
act - 72:22
action - 84:12
added - 23:3
addition - 11:14, 11:19, 12:2, 12:5, 12:7, 12:9, 14:23, 17:14, 19:8, 19:12, 20:9, 20:10, 20:23, 21:2, 21:18, 21:22, 22:23, 23:3, 24:16, 25:4, 28:5, 28:8, 29:1, 29:2, 43:4, 43:5, 43:7, 44:23, 58:18, 69:9, 78:5
additions - 67:15
address - 6:14, 6:16
administer - 84:7
advertise - 11:8
affair - 71:2, 71:12
affixed - 84:15
afternoon - 4:15, 61:3
afterthought - 32:6
afterwards - 81:19
aggravation - 50:15
ago - 7:2, 7:7, 7:9, 7:10, 8:21, 69:8
ahead - 45:11, 53:16, 64:1, 65:14, 71:15
allow - 54:7, 60:2
amount - 17:7
angle - 38:6, 39:8, 39:12, 40:7, 57:7, 57:11
answer - 6:4, 51:21, 53:17, 71:7, 71:14
answering - 6:9
answers - 6:12
anyway - 64:23, 71:5
anyways - 70:12
Appearing - 2:5, 2:8, 2:11, 2:14, 2:17
appliance - 68:4
approach - 21:20
approached - 21:23
arches - 63:22
area - 11:20, 18:17, 20:9, 22:4, 26:4, 26:10, 34:12, 34:15, 37:19, 41:21, 43:8, 44:10, 66:5, 66:7,

66:9
arrogant - 13:9
arrow - 26:13, 26:14, 26:17, 26:22, 29:18, 41:3, 41:5, 41:9
artist - 25:14, 82:21
ash - 52:10
associations - 10:15
assume - 18:19, 68:21
attitude - 13:5, 82:8, 82:10
Attorney - 80:3
attorney - 84:12
Auburn - 2:13
authorized - 84:7
awards - 25:12
aware - 47:4

**B**

background - 72:17
backside - 27:14
backyard - 19:7
bad - 68:15
Badda - 67:22
badda - 67:22
Badda-badda-badda - 67:22
badmouthed - 69:17
banker - 71:18
base - 59:21
based - 15:15
basement - 19:16, 19:17
beams - 43:19
beating - 29:15
beautiful - 33:21, 81:8
beauty - 65:10
began - 34:23
beginning - 19:24, 78:18, 78:20
behalf - 1:15, 2:5, 2:8, 2:11, 2:14, 2:17
behind - 41:20, 62:13
below - 19:12, 57:19
best - 37:5
better - 40:4, 77:4, 82:11
between - 37:18, 37:21
beyond - 42:9, 42:17
Big - 9:2
big - 31:13, 31:16
birth - 49:4, 49:5
Bisaillon - 1:16, 84:3
bit - 5:21, 43:21, 71:3, 71:4, 74:1
Blackburn - 2:2, 2:3, 3:5, 3:7, 4:6, 4:10, 4:13, 4:14, 4:16, 25:5, 40:20, 48:21, 73:18, 79:24, 83:3
blame - 69:13, 73:17
blaming - 47:1
bleeding - 71:24
blend - 18:12
blockwork - 52:10
bluestone - 61:24
board - 35:5, 35:8, 35:17

book - 9:12, 9:13
books - 9:14, 11:16
boom - 21:11
boss - 30:7
Boston - 1:18, 1:24, 2:7, 2:10
bother - 58:14
box - 25:23, 26:7, 27:20, 27:24, 28:6, 31:11, 40:5, 53:7, 55:12, 56:19, 65:23
Box - 2:4
boxes - 25:21, 26:7, 56:4, 60:20, 60:21
boy - 72:15
break - 31:5, 64:5, 64:10
breathe - 9:6
Brick - 12:7, 57:23
brick - 12:14, 12:15, 15:2, 15:3, 15:21, 15:22, 15:24, 16:1, 17:12, 19:1, 20:8, 20:19, 21:3, 23:2, 23:6, 23:7, 24:15, 26:4, 26:19, 27:6, 27:22, 28:6, 28:15, 29:5, 29:13, 29:19, 34:2, 34:9, 34:23, 35:4, 35:18, 39:3, 39:10, 42:9, 42:16, 43:22, 44:16, 53:23, 54:2, 54:10, 54:12, 54:13, 54:17, 54:18, 54:21, 57:14, 57:16, 57:21, 57:22, 57:24, 64:17, 73:19, 73:20, 74:23, 75:7
bricked - 39:17, 42:5, 74:13, 74:21
bricking - 28:2
bricklayer - 25:15, 34:14, 67:7
bricks - 15:19, 16:13, 17:17, 20:5, 21:12, 23:2, 24:7, 24:8, 24:10, 28:1, 28:21, 31:11, 33:16, 35:10, 37:10, 37:15, 37:17, 37:22, 38:4, 38:10, 39:5, 39:16, 40:11, 41:21, 42:24, 43:12, 43:16, 53:15, 53:19, 54:3, 54:7, 54:9, 54:11, 58:9, 59:20, 60:2, 60:3, 60:9, 62:13, 63:21, 66:1, 76:9, 77:9
brickwork - 12:10, 39:6, 56:10
brown - 54:23, 54:24
Bruce - 2:12
bucks - 31:10
build - 9:5, 9:13, 10:4, 10:13, 33:19, 37:6, 52:19, 55:21, 59:23, 61:14, 61:18, 63:12, 63:16, 63:20, 64:2, 65:4, 65:15, 65:18, 66:22, 74:5, 74:9, 75:23, 81:4, 81:17
Builders - 1:9, 2:11, 63:10
Building - 32:7
building - 8:19, 8:23, 9:5, 9:7, 9:24, 26:5, 32:4, 36:13, 43:9, 44:5, 44:11,

45:19, 45:24
built - 8:20, 26:11, 31:14, 33:5, 36:17, 36:23, 38:16, 39:1, 39:24, 42:11, 43:3, 59:15, 59:16, 61:5, 63:1, 63:2, 63:14, 74:7, 77:17, 77:22, 78:21
burn - 81:2
burning - 61:8
business - 6:18, 6:20, 6:22, 7:1, 7:20, 7:21, 8:2, 13:6, 13:8, 69:2
busy - 70:7, 70:20, 70:21, 70:22
buy - 17:5
bye - 13:17, 33:22, 65:19, 82:6, 82:18

**C**

California - 1:6
cannot - 53:7
caption - 84:5
care - 44:17, 75:15
Carpenter - 2:9, 3:6, 63:8, 63:9, 73:15, 76:7, 80:3
carpenter - 36:5, 69:23, 75:1, 75:2
carpenter's - 35:12
carpenters - 35:20, 36:2
Carresi - 1:9, 2:14, 47:14, 47:16, 47:18, 47:20, 48:9, 48:13, 48:15, 49:3
carry - 57:13, 57:14, 57:16
case - 4:17, 61:4, 63:10
caused - 68:3
causing - 13:20, 47:1
ceiling - 41:13, 41:15, 44:12, 79:12
Ceiling - 79:7
cellar - 52:10, 59:18
cement - 58:10
certain - 38:5, 40:9, 40:11, 62:4
Certified - 1:17, 84:3
Certify - 84:11
chamber - 52:12, 52:14, 53:6, 62:17
chance - 78:14
change - 9:23, 10:5
changed - 8:24, 10:3
changes - 9:9, 9:21
chapel - 43:10
charcoal - 54:20, 54:22
charge - 15:13
charged - 31:10
check - 65:18, 82:22
Chestnut - 14:23, 15:1, 15:4
children - 50:7
chimney - 9:5, 32:4, 32:6, 39:14, 52:14, 52:16, 53:9, 53:10, 55:6, 55:12, 59:24, 60:6, 61:19, 67:11, 69:7, 69:10
chimneys - 67:16, 81:5

China - 59:2
Chip - 36:4, 69:19, 69:21, 70:7, 70:19, 70:21, 71:1, 71:11, 71:23, 72:5, 73:12, 78:7
Christmastime - 53:12
Circle - 6:15
Civil - 1:16
Claus - 53:11
clay - 60:6, 60:9, 60:10
clear - 25:20
clearance - 64:13, 64:15, 64:20, 64:24, 65:13, 73:24, 74:4, 74:7, 74:14, 74:21, 75:4, 75:10, 75:12, 75:20, 75:22, 80:17, 80:21, 80:22, 81:21, 82:2
climb - 20:13
climbing - 20:16
close - 38:7, 39:18, 57:8, 57:10, 57:16
closed - 39:11, 39:20
code - 9:10, 9:12, 9:13, 9:14, 9:21
Codes - 62:22
codes - 9:1, 62:23, 62:24, 63:2
cold - 19:14, 19:20, 20:5, 58:9, 58:13, 78:10
color - 54:19
colors - 54:6
commencing - 1:19
comment - 46:17
commercial - 7:11, 7:12
Commission - 84:18
common - 53:9, 54:14
Commonwealth - 1:17, 84:1, 84:6
company - 4:18, 6:23, 8:11, 13:2, 18:9, 18:13, 37:1, 47:6
Company - 1:5, 4:17
computer - 64:7
con - 82:21
con-artist - 82:21
concern - 43:13
concluded - 83:4
Concorde - 2:3
concrete - 59:20, 59:21, 61:15, 61:20, 61:21, 62:5, 62:9, 62:10
condition - 58:7, 58:18
conditions - 78:12
Connecticut - 2:4
conned - 50:10
consider - 51:16, 51:22, 55:1, 55:5
consisted - 23:6
construct - 45:23
constructed - 59:9
construction - 8:24, 56:13, 72:17, 73:3
Construction - 1:8, 2:8, 6:21, 7:4, 7:18
contacted - 14:17
contain - 84:9
contained - 56:5, 65:8, 81:1
Conte - 66:24, 67:5,

67:9, 67:13, 67:18, 68:8, 68:9, 68:11, 69:1
continued - 41:20
contract - 72:2, 72:3, 72:18
contractor - 10:8, 72:13, 72:21, 72:22
contractor's - 10:10
contractors - 72:14, 72:19, 72:20
conventional - 55:2
conversation - 5:14, 66:14, 67:20, 77:8, 77:10, 77:19
conversations - 30:10, 77:21, 79:21
converse - 5:17
Coolidge - 6:15
corner - 19:13, 22:16, 22:17, 22:18, 23:5, 23:6, 23:11, 23:19, 23:23, 24:19, 24:21, 26:8, 27:2, 27:6, 27:9, 28:13, 28:15, 28:18, 29:6, 29:11, 29:12, 29:21, 34:20, 35:17, 37:7, 39:1, 44:10, 45:14
Corp - 1:8, 2:8
corporation - 6:22, 6:24, 7:3, 7:7
correct - 6:18, 8:4, 23:22, 26:15, 26:23, 27:7, 65:13, 68:22, 80:5, 84:10
correctly - 27:19, 27:21
cost - 72:2, 81:5
cost-plus - 72:2
counsel - 84:11
counsel's - 32:10
count - 50:12, 50:13
counting - 8:7
country - 6:2
couple - 10:24, 17:4, 66:15
course - 8:22, 12:21, 38:3, 38:9, 38:12, 52:17, 57:13, 61:10, 63:3, 67:19, 75:5
courses - 39:10, 42:24
Court - 1:1, 1:23
court - 40:24
courtesy - 6:11
covering - 18:2
cracked - 76:22
cracks - 77:6
cross - 38:7, 39:9, 40:6
Crowley - 2:6, 4:9, 4:12, 32:9, 45:9, 51:19, 51:21, 53:16, 54:15, 55:4, 55:15, 55:19, 56:18, 65:14, 70:4, 70:6, 71:7, 71:15, 79:18, 80:15, 81:23
Curtis - 2:9, 63:9
cute - 33:21

**D**

d/b/a - 1:9, 2:14
Dah - 40:8
dah - 40:8
Dah-dah-dah - 40:8
damper - 76:22

dark - 54:5, 54:6, 54:7, 54:22
date - 49:4
David - 2:6
days - 58:12, 58:13, 58:20
deal - 73:14
death - 29:15
decision - 14:7, 14:14
decoration - 80:20
decorative - 22:4, 22:8, 26:11, 27:3, 30:12, 31:5, 36:20, 39:21, 39:23, 43:2, 51:14, 52:1, 53:1, 55:21, 59:9, 59:12, 61:5, 63:1, 63:3, 63:12, 63:15, 63:19, 64:2, 64:3, 64:14, 64:19, 65:5, 65:12, 65:22, 66:12, 81:9
decorative-looking - 31:6, 36:20, 39:23, 52:1
deduced - 71:11
deduct - 8:15
Deerborne - 49:11, 49:14
Defendant - 1:12
Defendants - 1:10
Department - 32:7
deposition - 4:8, 4:20, 84:4, 84:10
Deposition - 1:15, 3:2, 83:4
design - 65:22, 66:12
designed - 61:8
designer - 73:6
desk - 64:6, 64:8, 64:9
deterioration - 77:7
diagram - 3:16, 3:17, 41:6, 57:4
diagrams - 57:1
dialect - 5:1
dictated - 62:23
difference - 37:21
different - 5:6, 45:12, 52:8, 53:19
Different - 37:23
difficult - 6:7, 15:20
dimensions - 31:7
direction - 84:9
directly - 14:20, 30:1
discuss - 36:19, 45:22, 82:3
discussed - 33:17, 43:17, 48:18, 67:17, 69:11, 69:12, 77:13, 78:2
discussion - 66:11
discussions - 36:10, 36:15, 65:21
District - 1:1
divorce - 50:24
divorced - 70:11
Divorced - 50:3, 50:4
dollars - 17:4
done - 6:10, 17:12, 21:6, 30:7, 32:6, 33:1, 38:14, 39:15, 46:14, 47:16, 48:2, 58:19, 62:17, 64:16, 71:17, 74:11, 75:14
Donnelly - 2:15
door - 19:4, 80:23

double - 44:7, 74:18
double-insulated - 74:18
doubled - 43:19, 43:20, 43:24
down - 5:12, 6:8, 7:12, 20:17, 21:1, 32:19, 34:22, 35:8, 39:2, 42:12, 53:11, 70:2
downstairs - 19:6, 44:13, 45:2, 45:4, 52:21
draw - 5:21, 40:1, 41:3
drawer - 40:4
drawing - 25:11, 41:1, 57:4
drawings - 57:1
drawn - 3:16, 3:17, 24:19, 26:18, 41:5
drew - 25:19, 26:22, 27:20, 29:18, 40:16, 41:9
Drive - 1:5, 2:13
driven - 26:18
driver's - 4:3
driveway - 11:22, 11:24, 19:8, 19:9
Dropped - 49:19
duly - 4:4, 84:7
dumps - 52:10
Dunn - 1:23
during - 36:9
During - 8:22, 18:24, 20:18
Duxbury - 67:12

**E**

early - 19:3
Early - 77:20
earn - 11:10
easier - 20:14
Easton - 6:15
eat - 20:4
effect - 56:20
eight - 10:21
either - 46:10, 67:5, 84:12, 84:13
elaborate - 81:13
elementary - 55:16
encased - 75:4
enclose - 75:8
end - 65:19, 82:23
ending - 71:18
English - 49:18
enjoy - 52:5
entail - 12:6
entered - 70:23
Entertaining - 70:23
entire - 46:7
equipment - 56:5
Esquire - 2:3, 2:6, 2:9, 2:12, 2:16
estimate - 15:18
event - 77:16, 84:12
eventually - 18:13
exactly - 81:13
Examination - 3:5, 3:6, 4:14, 49:1, 61:2, 63:8
examined - 4:5
example - 33:15
except - 39:7, 47:19
Excuse - 27:20
excuse - 52:2
Exhibit - 3:14, 25:8, 29:17, 40:22, 41:1, 41:4, 57:5

exhibit - 25:22
exist - 7:8
existed - 29:12
existing - 12:11, 18:10, 21:17, 24:9, 27:7, 28:24, 76:13
exit - 11:23
experience - 5:19
Expires - 84:18
explain - 25:19, 31:1
explore - 74:1
exposed - 24:7, 24:10
Exposed - 24:8
ext - 23:1, 24:11
extend - 42:9, 42:17, 67:15
extension - 67:11
extent - 75:19, 77:7
exterior - 10:21, 12:2, 12:10, 14:4, 14:23, 16:3, 17:15, 19:1, 20:8, 20:19, 21:3, 21:24, 23:2, 23:7, 23:24, 24:11, 24:14, 24:15, 24:18, 26:5, 27:15, 27:22, 28:4, 28:6, 33:2, 44:15, 56:10, 62:15, 62:18, 73:21, 78:6

**F**

facade - 31:2
facing - 25:23
fact - 11:16, 67:5, 78:4
facts - 67:17
Fair- 5:9, 31:13
fair - 45:17
Falco- 1:8, 1:15, 2:8, 3:3, 4:1, 4:15, 6:21, 7:4, 7:18, 11:6, 25:10, 40:24, 46:6, 48:22, 5:116, 61:3, 63:9, 73:19, 80:3
family - 72:19
far - 42:5
fashion - 45:19, 76:9, 77:9
February- 19:24
Federal- 1:16
feet - 57:12
few - 4:22, 73:13
figure - 64:22
final - 9:4, 10:12, 16:19
fine - 4:8, 75:7
finish - 9:3, 9:8, 10:12, 38:10, 51:9, 69:24
finished - 5:24, 6:4, 15:2, 18:7, 21:6, 21:10, 21:24, 41:8, 44:21, 44:22, 44:24, 45:3, 45:18, 78:6
fire - 5:2, 7:15, 13:20, 13:23, 13:24, 14:9, 14:10, 14:15, 37:2, 46:23, 46:24, 47:2, 47:5, 48:16, 48:19, 51:18, 53:7, 53:23, 55:3, 55:18, 58:21, 62:13, 65:5, 67:17, 68:3, 68:17, 69:11
fireboard - 35:9, 35:17
firebox - 38:8,

52:11, 54:8, 55:21,
60:1, 60:3, 62:2,
62:10, 76:21, 77:3
 **firebrick** - 53:23,
53:24, 54:1, 54:5,
54:12
 **firebricks** - 52:11,
53:5, 53:15, 53:20,
54:8, 60:1, 60:2,
62:11, 62:13, 76:21
 **Fireman's** - 1:4, 4:16
 **fireplace** - 10:6,
12:12, 12:13, 21:17,
21:21, 22:4, 22:8,
26:11, 27:3, 30:1,
30:2, 30:12, 30:15,
30:17, 30:19, 30:22,
31:3, 31:5, 31:18,
32:5, 34:6, 36:12,
36:18, 36:20, 36:22,
37:7, 37:19, 38:24,
39:23, 41:1, 41:14,
41:23, 42:6, 42:10,
42:17, 43:2, 43:4,
43:10, 45:15, 45:20,
45:24, 51:5, 51:14,
51:15, 51:18, 51:24,
52:3, 52:4, 52:8, 52:9,
52:13, 53:2, 53:3,
53:4, 55:2, 55:6,
55:24, 56:5, 56:15,
57:19, 59:9, 59:12,
60:5, 61:8, 61:25,
61:9, 61:18, 62:11,
63:1, 63:3, 63:12,
63:15, 63:19, 64:3,
64:4, 64:14, 64:19,
65:12, 65:22, 66:12,
73:20, 74:3, 78:22,
79:22, 82:14
 **fireplaces** - 8:19,
8:23, 8:24, 76:13,
76:15, 76:18
 **first** - 10:18, 17:6,
20:22, 23:17, 27:1,
27:12, 28:11, 32:23,
36:21, 43:5, 43:6,
43:8, 44:9, 44:20,
47:4, 49:17, 50:16,
68:2, 68:16, 74:15,
75:1, 78:13, 79:9
 **First** - 13:22
 **first-floor** - 43:6,
44:9
 **fit** - 74:8
 **fits** - 64:17
 **five** - 16:17, 58:20,
59:7
 **flip** - 25:1
 **floor** - 20:22, 22:2,
22:7, 31:12, 32:1,
37:12, 37:14, 37:17,
37:19, 39:5, 40:16,
43:4, 43:5, 43:6, 43:7,
43:9, 43:14, 43:19,
43:24, 44:9, 44:20,
45:5, 45:7, 56:11,
58:22, 78:13, 78:24,
79:3, 79:10
 **flooring** - 43:14
 **floors** - 21:7
 **flue** - 52:10, 61:11,
61:13
 **flues** - 63:4
 **Foggia** - 49:6
 **follow** - 51:12,
51:13
 **following** - 16:17
 **follows** - 4:5
 **fooled** - 73:4

 **fooling** - 70:7
 **foolish** - 57:10
 **foregoing** - 84:4,
84:9
 **foreman** - 69:22,
69:23
 **forever** - 71:18
 **forever-ending** -
71:18
 **forget** - 11:15, 47:7,
50:15
 **forgot** - 16:9
 **fortune** - 52:19
 **Forty** - 8:9
 **Forty-three** - 8:9
 **foundation** - 62:4
 **four** - 22:10, 56:7,
58:16, 58:19
 **Four** - 58:20
 **Fox** - 2:12
 **framed** - 17:22,
21:9, 23:15, 24:3,
27:10, 28:18, 44:3,
44:4, 45:6, 78:14
 **framers** - 21:10
 **framing** - 17:14,
24:5, 24:6, 27:14,
28:22
 **freeze** - 58:10
 **freezes** - 20:6
 **Friday** - 1:18
 **front** - 16:23, 17:1,
37:13, 37:16, 40:17,
42:9, 42:17, 42:19,
42:24, 62:18
 **fuel** - 61:8
 **fuel-burning** - 61:8
 **full** - 15:16, 75:19,
84:9
 **fun** - 50:14, 50:22
 **Fund** - 1:4, 4:16
 **funny** - 72:12

**G**

 **garage** - 19:11,
28:24, 60:11
 **gas** - 36:17, 36:22,
56:5, 59:14, 59:19,
59:23, 60:16, 60:19,
60:20, 60:22, 65:6,
68:3
 **general** - 10:10,
72:13, 72:14, 72:18,
72:21, 72:22
 **girlfriend's** - 64:1
 **given** - 32:13
 **glad** - 82:13
 **Glenn** - 4:15
 **glory** - 82:17
 **God** - 7:9, 8:9, 11:4,
45:1
 **good-bye** - 13:17,
33:22, 65:19, 82:6,
82:18
 **Goudreau** - 1:23
 **grade** - 49:17, 49:19
 **graduate** - 11:17
 **grand** - 16:17
 **gray** - 54:22
 **great** - 32:2, 58:4,
59:5
 **ground** - 4:22
 **guarantee** - 29:9
 **Gubbins** - 69:19,
70:1, 71:2, 71:11
 **guess** - 11:11,
14:24, 19:18, 44:3,
45:8, 45:9, 45:10,
50:24, 51:20, 59:1,

73:7
 **gun** - 35:14
 **guy** - 36:3, 50:20,
50:21, 58:4, 59:5

**H**

 **half** - 31:9, 33:6,
35:4, 37:4, 50:11,
56:24, 61:14, 68:6,
68:18, 78:1, 81:6
 **half-inch** - 35:4
 **halfway** - 28:21
 **hand** - 15:11
 **Hand** - 3:16, 3:17
 **Hand-drawn** - 3:16,
3:17
 **hands** - 80:23
 **happy** - 32:22
 **hard** - 18:9
 **hardwood** - 79:3
 **Harvard** - 11:17
 **Hassett** - 2:15
 **head** - 5:15, 9:19,
9:20
 **hear** - 56:17, 67:21,
70:13
 **heard** - 4:23, 10:22,
56:21, 70:13
 **hearth** - 37:19,
39:15, 43:1, 61:15,
61:20, 61:22, 62:1,
62:6
 **heat** - 54:1, 54:2,
65:3, 80:19, 80:24,
81:8
 **Heating** - 1:9, 2:14
 **Heatmaster** - 1:12,
2:17, 61:4
 **heavy** - 43:21
 **height** - 37:21,
37:23, 38:5, 40:9,
40:11, 40:12, 62:4
 **hell** - 70:8
 **help** - 34:11, 76:16
 **hereof** - 84:5
 **hereunto** - 84:14
 **herringbone** - 66:2,
66:5, 76:9, 77:9,
77:12
 **Herringbone** - 66:6,
66:7
 **herself** - 72:13
 **hi** - 30:3, 58:23
 **Hi** - 30:13, 68:14
 **high** - 32:2, 32:15,
41:15, 41:18, 49:14,
62:3
 **higher** - 32:19
 **Hill** - 14:23, 15:4
 **Hill/newton** - 15:1
 **history** - 18:23
 **hold** - 10:7
 **home** - 11:19, 21:18
 **homeowners** - 7:13
 **honest** - 66:4
 **hose** - 19:13
 **hot** - 65:6, 65:7,
65:9, 81:2
 **hours** - 31:9, 33:6,
61:14
 **house** - 7:13, 7:15,
11:13, 11:21, 12:2,
12:3, 12:9, 12:22,
13:1, 13:13, 13:21,
14:3, 14:4, 14:18,
19:1, 20:8, 22:19,
22:22, 22:23, 22:24,
23:1, 23:7, 23:24,
24:10, 24:14, 25:4,

26:20, 27:7, 27:16,
27:23, 28:8, 28:16,
37:2, 47:5, 48:16,
48:19, 50:23, 51:11,
56:4, 60:11, 65:4,
69:8, 69:9, 76:14,
76:15, 77:4, 78:4,
78:7, 81:3
 **houses** - 56:9
 **husband** - 22:3,
22:9, 33:4, 66:22,
73:11

**I**

 **identification** -
25:9, 40:23
 **identified** - 4:2
 **idiot** - 52:12, 71:16
 **implicated** - 13:20
 **Inc** - 1:9, 1:12, 1:23,
2:11, 2:17
 **inch** - 35:4
 **inches** - 42:7, 42:8,
57:12, 61:23, 62:15,
62:18
 **include** - 61:15,
61:19
 **included** - 16:7
 **Including** - 69:6
 **Incorporated** - 7:5
 **indicate** - 35:3
 **indicating** - 46:9
 **Inside** - 26:7
 **inside** - 12:6, 19:2,
19:3, 39:1, 54:7, 60:9,
62:1, 62:6, 64:17,
76:20, 77:2, 79:15
 **inspected** - 51:6,
51:7, 51:9
 **inspection** - 9:3,
9:4, 9:24, 10:11,
10:12
 **inspector** - 9:7,
9:14
 **inspectors** - 9:5,
10:14
 **installed** - 21:15,
35:22, 74:15, 74:17,
75:3
 **installing** - 18:24,
20:18, 57:18, 61:19
 **instead** - 53:9, 64:6,
81:4
 **instructed** - 63:12
 **instruction** - 5:11
 **instructions** - 32:13
 **insulated** - 74:18
 **insurance** - 4:18,
37:1, 47:6, 68:5
 **Insurance** - 1:4,
4:17
 **intended** - 75:13
 **interest** - 8:2
 **interested** - 84:12
 **interior** - 24:6,
29:19, 73:5
 **introduced** - 11:2
 **involved** - 5:14,
39:7, 68:13
 **iron** - 38:6, 39:12,
40:7, 57:8, 57:11
 **irons** - 39:8
 **Italy** - 49:6

**J**

 **January** - 19:23
 **Jessica** - 1:16, 84:3
 **job** - 11:18, 12:3,

12:6, 12:21, 13:16,
14:5, 15:10, 15:18,
15:21, 16:2, 16:22,
16:24, 17:8, 17:11,
22:1, 30:18, 32:23,
33:13, 35:11, 35:13,
35:23, 36:6, 47:17,
47:19, 47:21, 47:24,
48:2, 48:9, 49:23,
51:11, 52:23, 56:22,
58:5, 67:10, 69:22,
69:23, 72:2, 72:3,
75:14, 82:17
 **jobs** - 10:24, 11:12,
13:12, 47:16, 47:24,
48:6, 48:8, 48:12,
67:14, 69:1
 **Joe** - 11:5, 11:6,
22:1, 33:2, 33:19,
77:2
 **jog** - 28:20
 **jogged** - 28:7
 **joists** - 43:14,
43:19, 43:24, 45:5,
57:19
 **Joseph** - 1:15, 3:3,
4:1
 **Julia** - 12:2, 14:4,
19:4, 22:2, 30:13,
33:3, 37:2, 51:11,
67:21, 72:12, 72:16,
73:10, 76:6, 77:15,
79:22
 **Julia's** - 14:3, 22:8
 **Julie** - 1:5, 66:22

**K**

 **keep** - 9:16
 **kept** - 60:12
 **kidding** - 67:22
 **kids** - 68:12
 **kind** - 27:24, 52:24,
53:14, 59:2
 **Knocked** - 19:4
 **known** - 67:3
 **Known** - 84:3
 **knows** - 73:1, 73:2

**L**

 **lady** - 5:12, 6:7
 **laid** - 31:24, 34:8,
37:10, 37:22, 37:24,
41:21, 66:1
 **language** - 52:2
 **large** - 25:21
 **last** - 4:7, 8:16,
34:1, 66:21, 67:8,
69:3, 78:3, 82:17
 **last-minute** - 78:3
 **laughs** - 73:13
 **Law** - 2:2, 2:12
 **lawsuit** - 37:1, 46:5,
46:7, 56:20
 **lawyer** - 47:7,
48:16, 48:20, 68:5
 **lawyers** - 48:23,
69:15
 **lay** - 15:22, 20:5,
39:2, 40:11, 43:12,
58:9
 **layer** - 74:23
 **laying** - 15:24,
17:17, 21:12, 35:18,
76:9, 77:9, 77:12,
77:13
 **lazy** - 71:23, 71:24
 **learn** - 9:9, 9:11,
9:22, 46:24, 49:21,

68:16
learned - 36:21, 37:3, 46:23, 47:1, 47:8, 48:15, 68:2, 71:9
least - 5:16, 27:12, 73:13
leave - 31:14, 33:1, 65:15, 81:18
ledge - 37:18, 37:20
left - 30:18, 37:18, 38:10, 46:12, 46:18, 56:23, 65:17, 71:19, 81:17
legally - 50:17
less - 82:22
level - 38:2, 60:13
license - 4:3, 10:9, 10:10
licenses - 10:7
lie - 82:10
life - 46:7
light - 53:7
line - 41:5
liners - 60:6, 60:9
lines - 24:20, 25:24, 26:3
listen - 32:9
live - 55:9
lived - 6:16, 50:19
Llp- 1:18, 2:6, 2:9
loaded - 60:21
location - 22:11, 22:14
Locks- 2:4
log - 36:17, 56:5, 56:21, 59:14, 59:19, 59:23, 60:16, 60:19, 60:20, 60:22, 65:6, 68:3
look - 11:9, 15:18, 22:5, 22:9, 25:22, 43:8, 43:11, 52:4, 53:3, 53:4, 53:19, 54:3, 55:23, 57:9, 64:5, 66:8, 76:19, 76:21, 76:22, 77:2, 80:5, 81:8
looked - 27:12, 29:11, 29:21, 41:8, 42:24, 45:13, 46:13, 46:20
looking - 23:17, 23:23, 24:2, 27:2, 31:5, 36:20, 38:24, 39:23, 40:17, 40:18, 44:18, 45:4, 51:14, 52:1, 64:6, 67:7, 77:4
looks - 38:8, 46:18, 54:3, 55:22, 60:19, 64:10, 77:5, 81:10
lower - 32:19
Ls- 2:9

## M

Mahoney - 2:9
main - 21:17, 22:19, 22:22, 23:7, 23:24
Main - 2:16
manner - 13:7
mantle - 31:2
mantles - 39:21
marble - 81:7
March - 1:19, 84:15, 84:19
Marin - 1:19
mark - 40:20
marked - 25:8, 40:22

married - 50:1, 50:10, 50:17
Martha - 11:17
Mary - 63:24, 64:1
mason - 8:4, 10:8, 49:21
masonry - 8:6, 8:8, 8:10, 35:5, 35:8, 35:16
Mass - 6:15
Massachusetts - 1:1, 1:17, 1:18, 1:24, 2:7, 2:10, 2:13, 2:17, 4:3, 84:1, 84:6
match - 18:10, 18:12, 76:12
matched - 12:11
material - 16:7, 17:3, 17:5, 35:6, 35:9
materials - 16:11
matter - 11:16, 67:5, 70:15, 78:4
mean - 14:10, 18:11, 20:4, 27:19, 30:6, 33:12, 33:19, 35:21, 39:18, 42:12, 42:19, 44:4, 44:16, 53:7, 53:9, 55:7, 55:9, 64:4, 68:10, 68:14, 70:10, 70:24, 71:16, 71:17, 71:21, 80:6, 80:21
meaning - 76:5
means - 9:19, 80:22
member - 10:15
memory - 37:6, 45:13, 45:18
mention - 74:3, 80:13
mentioned - 57:6, 73:23
met - 10:18, 10:23, 69:3
metal - 39:2, 39:4, 39:6, 39:7, 40:10, 57:5
Michael - 1:9, 2:14, 49:2, 66:24, 67:2, 67:5, 67:8, 67:13, 67:18, 68:7, 68:9, 68:11, 68:21, 68:24, 69:1
middle - 19:23, 77:1
Midstate - 2:13
might - 48:23, 51:17, 55:2, 58:8, 65:1, 74:5, 75:23, 80:13, 81:11
Mike - 67:6, 68:12, 69:1
mild - 19:21
milked - 72:11
milking - 72:6, 72:9
million - 8:20, 73:11
mind - 50:22, 77:2, 81:13, 82:15, 82:19
mine - 46:2
miniature - 31:17, 31:18
minute - 25:6, 45:1, 78:3
minutes - 59:7
mistake - 55:2
Mister - 13:10
Mister-know-it-all - 13:10
money - 17:1, 44:7, 50:23, 71:18, 72:6, 72:11, 81:5
months - 10:20,

10:21
morning - 19:4, 20:16, 30:14, 66:20, 77:20
Morrison - 2:9
mortar - 57:23, 57:24, 70:2
most - 42:8, 53:14
mouth - 42:6

## N

name - 4:15, 6:20, 7:3, 7:18, 11:15, 42:13, 49:2, 61:3, 63:9, 64:1, 84:15
named - 36:3
necessarily - 63:19
need - 5:16, 9:2, 9:3, 9:17, 10:5, 16:17, 22:1, 30:16, 52:13, 52:14, 53:10, 59:19, 66:21, 79:16
needed - 36:4
Needham - 13:16
needs - 53:11
neighborhoods - 55:10
never - 16:23, 16:24, 47:18, 47:19, 59:11, 60:21, 63:14, 70:19, 71:16, 71:17, 73:10, 76:3
Never- 46:7, 46:10, 46:11, 56:21, 59:11
new - 18:11, 23:11, 23:13, 24:3, 24:6, 26:23, 28:22, 56:13
newly - 27:9
Newton - 11:14, 14:24
next - 19:18, 24:20, 26:18, 35:21, 41:4, 50:21, 58:8, 79:18, 81:9
nice - 44:5, 58:12, 81:10
nicer - 82:21
night - 20:16
nightmare - 15:22, 59:13
nine - 49:16
Nobody - 69:16
None- 57:20
noon - 20:16
nosy - 56:8
Notary - 1:17, 4:4, 84:4, 84:6, 84:17
notes - 84:10
Nothing - 83:3
nothing - 13:23, 38:12, 38:21, 52:7, 57:20, 63:4, 67:22, 68:13, 69:12, 82:1, 82:2, 84:8
notice - 47:8, 84:5
notified - 36:24, 47:6, 68:5
Novato - 1:5
November - 67:11
number - 25:24, 26:13, 26:14, 26:18, 26:22, 29:18, 41:4

## O

oath - 84:7
Ober- 2:16, 3:6, 61:2, 61:4, 63:5
object - 51:19,

51:20, 53:16
Objection - 55:4, 55:15, 55:19, 56:18, 65:14, 70:4, 80:15, 81:23
occasions - 20:7
occur - 9:21
occurred - 77:22
Office- 2:4
office - 11:20, 22:4, 52:5, 56:11, 58:22, 64:9, 84:15
offices - 1:18
Offices- 2:2, 2:12
often - 5:22, 59:4
Ohio - 72:14, 72:19
old - 6:1, 18:8, 18:12, 20:15, 23:23, 24:9, 24:11, 27:22, 28:5, 28:16, 49:16, 49:20, 77:3
on-site - 35:20
Once- 40:1
once - 50:5, 58:5
One- 1:23, 16:3, 34:13, 37:15, 38:3
one - 3:16, 3:17, 12:3, 16:2, 22:17, 23:22, 24:20, 26:7, 26:13, 27:6, 28:15, 32:19, 36:2, 46:8, 50:8, 50:9, 50:16, 54:6, 56:11, 56:17, 58:7, 60:22, 61:17, 64:18, 74:8, 75:9, 75:13, 77:14, 77:24, 80:5
opened - 44:14
opening - 31:11, 31:15, 31:17, 31:23, 32:16, 37:14, 37:17, 38:7, 38:18, 38:19, 39:9, 39:14, 40:6, 40:7, 40:14, 41:12, 41:14, 41:20, 42:2, 52:11, 57:8, 57:9, 57:14, 57:17, 65:24, 75:2, 76:4
openings - 38:14
operating - 7:16
order - 46:15, 52:2, 52:12, 59:17
orders - 30:5
ordinarily - 5:13
original - 24:9
originally - 26:19
otherwise - 84:12
outside - 12:7, 12:8, 12:16, 12:17, 24:18
own - 8:15, 8:17, 51:2
owned - 8:12
ownership - 8:1

## P

Page - 3:2, 3:14
page - 3:16, 3:17
pages - 84:9
paper - 17:16, 24:20, 40:3
part - 72:12
parties - 84:12, 84:13
partners - 7:22
party - 1:12, 46:5
patients - 11:20
patio - 66:8
pattern - 66:2
Pavia - 1:5, 5:1,

11:13, 12:3, 13:1, 13:13, 13:21, 14:18, 29:17, 29:22, 29:24, 30:6, 30:11, 47:17, 47:24, 48:16, 48:19, 52:5, 52:6, 58:1, 58:21, 58:23, 60:23, 65:21, 66:11, 66:14, 70:8, 71:2, 71:12, 72:12, 73:5, 76:6, 76:8, 79:22
Pavia's - 7:15, 12:2, 12:22, 14:4, 37:2, 47:5, 48:2, 51:11, 60:23, 72:17
Pavias - 4:18
pay - 33:23, 34:1, 46:15
payer - 33:24
paying - 44:6
payment - 16:15, 16:19, 16:21, 16:23, 17:6, 34:1
Pc - 2:15
pen - 40:3
people - 5:20, 11:23, 34:15, 53:14, 55:9
people's - 56:8
Perhaps - 56:7
period - 58:11, 58:13, 79:13
permit - 10:11, 32:8
permits - 45:23, 46:2
person - 50:14, 71:24
phase - 73:3
Phil - 10:18, 12:1, 14:19, 16:16, 16:18, 21:24, 30:4, 30:6, 47:21, 47:23, 48:1, 48:2, 64:21, 64:24, 65:19, 66:19, 66:20, 67:6, 67:7, 73:23, 77:13, 77:14, 80:4
Phil's - 72:24
picking - 73:11
picture - 39:13, 40:15
piece - 24:19, 38:6, 39:2, 39:4, 39:6, 39:7, 40:2, 40:10, 61:23
piers - 40:8, 42:18, 42:19, 65:23
Piers - 42:15, 42:16
pipes - 52:10, 74:18
place - 18:2, 20:20, 41:9, 44:5, 44:12, 49:5, 84:5
Plaintiff - 1:6, 1:15, 2:5
Plaintiff's - 3:15
plaster - 75:6, 79:17
plastered - 78:7, 78:16, 78:23, 78:24, 79:5, 79:7, 79:10, 79:12
pleased - 10:24
Plumbing - 1:9, 2:14
plus - 62:6, 72:2
Plus- 34:4
plywood - 17:15, 18:1, 21:4, 27:14, 28:19, 57:18, 62:16, 62:19, 70:3, 75:6
Pm - 1:19, 83:4
point - 13:11, 13:19, 21:7, 21:13, 21:20,

30:18, 33:14, 36:9, 44:12
pointed - 28:12, 29:12
pointing - 23:18
poking - 56:8
porous - 15:23
portion - 21:17, 44:11
portions - 42:10
possibilities - 82:3
possibility - 51:16, 55:1
possibly - 25:16
Post - 2:4
pour - 62:5
predated - 14:8
prefabricated - 36:11
pretty - 16:6, 16:12, 18:9, 19:21, 57:9, 58:17, 77:5
price - 15:6, 15:16, 16:2, 16:3, 16:4, 72:9, 81:6
problem - 43:11, 46:1, 46:2, 59:5, 72:24, 80:9, 80:10, 81:16
problems - 82:22
Procedure - 1:16
procedure - 51:12, 51:13
production - 4:2
Professional - 1:16, 84:3
project - 58:16, 72:23, 77:1
promoted - 49:18
proper - 74:16, 74:18
property - 21:14
proprietor - 7:16
psychiatrist - 11:15, 15:3, 15:4, 48:10
Public - 1:17, 4:4, 84:4, 84:6, 84:17
pull - 36:5, 46:1
pulled - 45:23
pulls - 10:11
purchased - 16:11
purpose - 57:5, 57:15
pursuant - 1:15, 9:1, 84:5
put - 17:16, 18:7, 18:14, 20:20, 21:1, 21:20, 24:5, 24:20, 26:4, 26:8, 26:13, 26:18, 27:4, 31:3, 33:15, 34:15, 34:22, 35:8, 38:5, 38:10, 38:13, 38:21, 38:22, 39:2, 39:8, 40:9, 40:24, 41:4, 41:22, 51:18, 55:18, 56:16, 60:3, 60:14, 61:23, 62:7, 64:9, 64:16, 65:1, 69:9, 74:8, 80:23, 81:6
Put- 62:6
putting - 43:16, 45:15, 70:2

**Q**

quarter - 50:23
questioning - 70:1, 76:8

questions - 4:24, 5:21, 6:9, 48:22, 71:8, 71:14, 73:16, 80:1, 80:7
quicker - 72:10
quote - 15:5, 16:7

**R**

reach - 40:11
read - 4:10
ready - 33:1, 78:8
real - 51:17, 53:3, 55:23, 60:4
really - 10:5, 11:4, 34:24, 44:17, 69:16, 72:15, 75:15
rear - 26:20, 28:16
reason - 34:13
reasons - 61:24
received - 16:21
recently - 23:15
recollection - 16:10, 16:20, 18:6, 35:7, 35:15, 46:19
record - 5:16, 25:6, 25:7, 25:10, 25:20, 70:5, 70:6
red - 54:5, 54:7
reduced - 84:9
Reexamination- 3:7, 73:18, 80:2
referred - 10:23, 67:6
referring - 22:18
Registered - 1:16, 84:3
regular - 7:13, 15:23, 16:1, 59:24, 61:18
regularly - 67:13
related - 84:13
relationship - 22:19
remember - 11:4, 16:4, 27:19, 27:21, 28:2, 33:10, 34:24, 35:1, 44:13, 44:17, 45:10, 46:16, 47:15, 66:4, 70:1, 75:19, 76:11, 76:16, 77:11, 79:21
repair - 76:17
Repeat- 45:11, 53:18
repeat - 5:5
reported - 84:4
reporter - 40:24
Reporter- 1:16, 1:17, 84:3, 84:4
Reporting- 1:23
reports - 35:3
represent - 4:16, 26:3, 49:2, 61:4, 63:10
reputation - 16:24
require - 10:9, 17:8
required - 74:22
requirements - 8:23
residence - 5:2
resist - 6:9
responsibility - 44:19
responsible - 10:13, 69:17, 69:18
return - 28:3
Roach- 67:6, 68:12, 68:21, 68:24, 69:1, 69:4
Robert- 2:12, 49:2
rods - 62:7

romance - 65:10
roof - 17:18, 17:20, 17:23, 18:2, 18:8, 18:11, 18:12, 18:14, 52:22
roofing - 18:7
roofs - 52:20
room - 23:21, 31:6, 42:5, 53:8, 60:23, 64:6, 64:11
Rothschild- 10:19, 11:13, 14:8, 14:14, 14:20, 23:18, 27:2, 28:12, 29:22, 30:21, 31:22, 32:14, 33:9, 36:10, 36:15, 43:17, 43:18, 45:22, 46:13, 47:9, 47:11, 47:20, 48:3, 48:7, 65:20, 67:6, 75:11, 81:11
Rothschild's- 13:2, 47:21, 47:24, 48:1
rough - 9:3, 9:7, 9:24, 10:11, 51:6, 52:11, 75:2, 78:14
rough-framed - 78:14
row - 33:15, 37:15
Roxbury- 49:11
rules - 4:22, 10:6
Rules- 1:16
run - 50:21

**S**

safe - 76:20
safety - 61:24
San- 1:5
Santa- 53:11
satisfactorily - 4:2
saw - 69:5
scaffolding - 20:13
School- 49:11, 49:14
school - 25:17, 49:9, 49:14, 49:19
Scott - 2:16, 61:3
screw - 35:13, 35:14, 72:15
seal - 84:15
second - 20:22, 22:2, 22:7, 24:12, 24:13, 43:4, 43:7, 43:14, 45:7, 49:19, 50:8, 56:11, 58:22, 78:24, 79:3
second-floor - 43:7, 56:11, 58:22
see - 29:10, 39:5, 41:11, 41:12, 47:20, 50:1, 52:12, 55:6, 55:8, 56:4, 56:11, 58:4, 59:3, 60:16, 60:20, 60:22, 62:11, 65:3, 66:6, 71:16, 71:19, 74:24, 76:20, 76:21, 76:22, 77:3, 80:4, 80:16
See- 40:8, 58:5
seeing - 70:9
seek - 7:7
Self- 49:22
self - 81:1
self-contained - 81:1
Self-taught - 49:22
sense - 53:10, 74:6
Service - 1:23
seven - 8:14, 8:15, 16:18

seventh - 49:20
shake - 15:10, 15:11
Shake- 15:11
shaped - 29:1
Shorthand - 1:17, 84:4
show - 22:11
showed - 30:22
shows - 65:5
side - 23:11, 24:17, 27:23, 28:7, 46:8
sides - 26:1, 37:12, 37:13, 44:15, 65:24
sidewalks - 37:16
sign - 4:11
similar - 54:4
sit - 5:13, 16:10, 35:15, 42:4, 59:19, 78:14, 81:9
site - 35:20
situation - 71:11
situations - 74:20
six - 10:20
sketches - 57:1
slab - 61:15, 61:20
slate - 17:20, 18:8, 18:14, 52:22
small - 31:19, 34:6, 34:12, 34:15, 66:5, 66:7
smaller - 26:7
smoke - 52:11, 52:14, 53:6, 53:8, 53:10, 62:16
sole - 7:16
solid - 60:10, 61:8, 62:8, 62:12, 62:14, 62:15
someday - 51:17
someone - 21:20, 51:17, 55:1, 71:10
sometimes - 20:12
somewhere - 42:21, 72:20
son - 19:6, 34:13, 34:14
sons - 7:23, 12:18, 12:23, 17:9, 34:11
soon - 21:10
sorry - 8:13
South - 6:15
speaking - 6:8
special - 32:8
specifically - 69:13
specified - 72:21
specs - 32:3, 32:5
split - 51:1
spoken - 47:11, 47:14
sputtering - 6:10
squiggly - 25:24
Sr- 1:15, 3:3, 4:1
St- 64:1
staircase - 43:7
stairs - 20:11
stairways - 20:19, 20:21
standing - 40:16
Standing- 40:18
start - 6:9, 17:16, 21:11, 52:9, 55:3, 59:18, 62:9
started - 16:21, 17:12, 28:9, 28:22, 30:11, 35:18, 45:19, 49:16, 82:14
starts - 6:3
State - 1:23
States- 1:1, 49:7,

49:10
stay - 50:20
steel - 38:6, 57:6, 57:15, 62:7
stenographically - 84:4
stick - 74:6, 75:13
sticker - 25:22
still - 28:5, 29:10, 44:14, 53:5, 53:6, 78:13, 79:15, 79:17
stipulations - 4:7
stones - 75:9
stop - 5:5, 14:7
Stopped- 8:21
story - 57:9
straight - 57:9
Street - 1:18, 1:23, 2:7, 2:10, 2:16
strict - 10:6
stronger - 62:8
struck - 15:21, 15:22, 54:21
structure - 17:15, 21:21, 24:3, 36:12, 36:23, 38:15, 40:17, 74:13
Stuart - 2:2, 2:3
stuff - 59:2
stupid - 52:2, 56:16, 73:9
stutter - 5:21
subfloor - 21:5
subflooring - 21:1, 34:19, 34:21, 34:23, 45:7
subrogee - 1:5
subscribed - 84:14
sudden - 56:23, 69:15
sued - 46:10, 46:11
suggest - 66:1
suggested - 64:18
suggesting - 70:17, 70:18, 70:24, 71:1
suggestion - 72:5
Suite - 1:23, 2:13, 2:16
summer - 58:18
Summer - 1:18, 2:7, 2:10
supplier - 16:14
supply - 16:13
support - 62:7
suppose - 64:8
supposed - 39:20, 39:22, 52:9, 54:1, 55:23, 61:22, 71:6, 72:13, 72:18, 73:8, 80:20
surprise - 22:3, 33:4, 52:8
surprised - 19:22, 19:24, 71:3, 71:4
sworn - 4:4, 84:7
system - 36:17, 71:24, 72:8, 72:11, 72:15

**T**

taught - 49:22
ten - 50:9
tend - 13:6
tendency - 5:20, 6:3
tender - 34:14, 49:23
terms - 16:15, 16:16
testified - 4:5, 46:12, 63:11, 76:7

6

testifying - 84:7
testimony - 48:5, 84:8
thereof - 84:6, 84:13
thinking - 76:16
thinks - 82:11
Third- 1:12
third - 51:4
Third-party- 1:12
thousand - 17:4
three - 8:9, 25:24, 31:9, 38:20, 39:10, 44:15, 58:12, 58:13, 58:16, 59:7, 61:14, 63:4, 66:15, 66:17, 67:14, 76:14
Three- 33:6
tile - 52:20
tiny - 11:14, 11:18, 31:8, 31:11, 66:9
today - 4:24, 10:4, 16:11, 35:16, 42:4, 78:10, 81:4
together - 25:11, 69:2, 72:14
tomorrow - 78:10
took - 30:21, 31:8, 33:4, 56:20, 58:5, 58:16, 61:13, 78:9, 79:14
tools - 60:12, 60:13
Toomey- 1:18, 2:6
top - 21:9, 37:12, 38:4, 38:9, 38:11, 38:12, 38:13, 38:19, 38:21, 38:22, 38:24, 39:3, 39:8, 39:11, 39:14, 39:17, 39:18, 39:20, 41:22, 41:23, 52:14, 59:19, 59:20, 62:4, 62:10, 65:24
total - 3:16, 3:17
track - 71:5
trade - 7:18, 10:16
transcription - 84:10
traveler - 59:1
travels - 11:5
trim - 71:20
trimming - 71:21
trimwork - 78:8
truck - 9:16
True- 17:23, 23:9, 34:20, 77:23, 79:5
true - 29:3, 79:9, 84:9
truth - 55:8, 60:17, 84:8
try - 6:8, 20:12, 25:19
trying - 28:10, 29:3, 29:4, 31:20, 39:13
turn - 11:19, 19:6, 19:14, 65:9
turned - 13:8
Turner- 2:12, 3:5, 3:7, 49:1, 49:2, 60:24, 80:2, 82:24
turning - 19:10
twice - 59:7
two - 7:23, 12:18, 12:23, 25:21, 29:6, 29:13, 34:15, 37:13, 37:16, 39:10, 42:24, 48:6, 48:12, 50:7, 54:6, 58:12, 58:13, 65:23, 67:14, 69:8, 71:20, 71:21, 72:14, 73:12, 76:14

Two- 2:3, 48:8, 66:15, 66:17
type - 15:19, 18:10, 21:21, 31:2, 35:5, 35:8, 35:9, 35:16, 36:11, 36:16, 36:22, 37:18, 55:9, 65:1, 65:3
typewriting - 84:9
Tyvak- 17:16

**U**

unclear - 5:3
under - 7:1, 10:9, 84:9
underneath - 35:4, 35:9, 43:9, 43:15, 44:10, 45:14, 74:22
underside - 45:6
union - 8:14
unit - 23:4, 41:17, 42:1, 43:22, 52:1, 52:15, 53:1, 62:14, 64:13, 64:15, 64:17, 64:20, 64:22, 65:1, 65:2, 65:7, 65:13, 65:15, 65:18, 73:24, 74:4, 74:7, 74:14, 74:21, 74:23, 75:3, 75:8, 75:10, 75:12, 75:20, 75:22, 75:24, 80:17, 80:19, 80:21, 81:1, 81:21, 82:2
United - 1:1, 49:7, 49:9
units - 60:16, 65:3, 74:9, 74:24, 81:6
unless - 9:6, 17:1, 59:4
Up- 42:12
up - 9:17, 9:19, 16:23, 17:1, 19:5, 20:11, 20:16, 20:21, 21:24, 22:2, 22:6, 26:4, 27:1, 30:21, 31:5, 31:14, 32:2, 32:18, 41:9, 43:19, 43:20, 44:1, 44:7, 44:14, 44:18, 45:4, 51:1, 51:9, 52:16, 52:21, 53:8, 53:11, 56:14, 57:9, 59:18, 62:3, 62:15, 64:5, 64:10, 64:16, 65:16, 67:11, 72:15, 73:10, 73:11, 81:18, 82:15, 82:19
up-front - 16:23, 17:1
upstairs - 19:5, 22:15, 24:10, 33:3, 33:5, 44:14, 64:7
urge - 6:9

**V**

veneer - 10:22, 12:14, 12:15, 17:13, 75:7
veneered - 12:8
vent - 53:13
venting - 52:24, 53:2, 60:4, 61:6, 61:7
vertical - 42:10, 42:12
virtue - 84:6
vs - 1:7, 1:11

**W**

Wait - 44:24, 45:1, 54:15, 79:18
walk - 20:11, 21:5
walked - 76:2
walking - 69:5
walkway - 11:21, 12:5, 12:16, 12:17
wall - 23:2, 23:7, 23:13, 23:24, 24:2, 24:6, 24:11, 24:12, 24:13, 24:15, 24:18, 26:15, 26:19, 26:20, 26:22, 26:23, 27:6, 27:9, 27:13, 28:15, 28:18, 29:19, 37:15, 44:16
walls - 17:22, 18:2, 21:7, 22:10, 23:22, 26:14, 29:6, 29:13, 38:20, 63:4, 64:16, 79:5, 79:10
wants - 22:2, 31:4, 33:3
warm - 58:12, 58:15
warnings - 55:13
Warnings - 55:14
watching - 33:12
water - 15:21, 15:22, 15:23, 19:6, 19:10, 54:21
water-struck - 15:21, 15:22, 54:21
weather - 20:1, 58:12, 58:14, 58:17, 78:10
week - 16:17
weeks - 58:16, 71:20, 71:21, 78:2
weird - 27:24, 28:23, 29:1
weird-shaped - 29:1
Wellesley - 75:9
whatsoever - 53:2, 56:21, 80:24
wheelbarrow - 60:14
Whereof - 84:14
white - 54:5, 54:6
whole - 8:19, 16:2, 33:9, 44:5, 61:22, 62:1, 62:6, 64:7, 66:17, 72:8, 72:11, 72:19, 75:8, 76:14, 84:8
width - 42:17
wife - 52:7
win - 25:12
window - 20:14, 71:20, 71:22
windows - 21:11, 78:8
Windsor- 2:4
winter - 19:21, 20:5, 58:7, 79:14
wiring - 79:15
withdrawn - 13:11, 46:23
Witness - 32:11, 46:9, 63:7, 71:13, 73:17, 83:2, 84:14
witness - 1:15, 6:3, 84:7, 84:8
wood - 17:14, 24:3
wood-framed - 24:3
Worcester- 2:17
word - 5:4, 5:6, 11:5, 11:7
words - 5:14, 5:17,

80:18
workable - 31:18
worry - 43:23, 75:24, 76:4, 82:2
worth - 17:3
Wow- 69:14
wow - 20:1, 67:24, 68:14, 69:14
writes - 11:16
writing - 15:9

**Y**

yards - 16:13
year - 10:20, 14:1, 19:19, 20:2, 37:4, 49:7, 49:18, 50:10, 56:23, 67:15, 68:6, 68:18, 73:12
years - 6:17, 7:2, 7:9, 7:10, 8:9, 8:14, 8:15, 8:16, 8:21, 9:11, 9:18, 10:3, 11:10, 49:16, 49:20, 50:9, 67:3, 69:8
Years - 7:2, 7:9
young - 5:12, 6:7
yourself - 8:11, 34:17
Yudysky- 1:18, 2:6

**Z**

zero - 64:13, 64:15, 64:19, 64:24, 65:13, 73:24, 74:3, 74:7, 74:14, 74:21, 75:3, 75:10, 75:12, 75:20, 75:22, 80:17, 80:21, 81:21, 82:1
Zero- 80:22

EXHIBIT 5

MICHAEL CARRESI
March 31, 2006

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*********************************

THE FIREMAN'S FUND INSURANCE

COMPANY as subrogee of JULIA PAVIA,

               Plaintiff

vs.

FALCO CONSTRUCTION CORP., P&DK

BUILDERS, INC. and MICHAEL

CARRESI d/b/a CARRESI PLUMBING &

HEATING,              C.A. 05-10827DPW

              Defendants

vs.

HEATMASTER, INC.,

              Third-party Defendant

*********************************

**MICHAEL CARRESI**
**March 31, 2006**

|  | Page 2 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 |  |
| 5 |  |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 | DEPOSITION OF: MICHAEL CARRESI |
| 12 | THE LAW OFFICES OF BRUCE R. FOX |
| 13 | 27B Midstate Drive |
| 14 | Suite 100 |
| 15 | Auburn, Massachusetts |
| 16 | March 31, 2006        10:20 a.m. |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 | Darlene M. Coppola |
| 23 | Registered Professional Reporter |
| 24 | Certified Professional Reporter |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Michael Carresi d/b/a Carresi |
| 3 | Plumbing & Heating: |
| 4 |   THE LAW OFFICES OF BRUCE R. FOX |
| 5 |   27B Midstate Drive |
| 6 |   Suite 100 |
| 7 |   Auburn, MA  01501 |
| 8 |   BY:  ROBERT P. TURNER, ESQ. |
| 9 |   866.290.7435 |
| 10 |   fax 508.832.5716 |
| 11 |  |
| 12 | Representing Heatmaster, Inc.: |
| 13 |   HASSETT & DONNELL, PC |
| 14 |   484 Main Street |
| 15 |   Suite 560 |
| 16 |   Worcester, MA  01608 |
| 17 |   BY:  SCOTT T. OBER, ESQ. |
| 18 |   508.791.6287 |
| 19 |   fax 508.791.2652 |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 |   LAW OFFICES OF STUART G. BLACKBURN |
| 4 |   Two Concord Way |
| 5 |   P.O. Box 608 |
| 6 |   Windsor Locks, CT  06096 |
| 7 |   BY:  STUART G. BLACKBURN, ESQ. |
| 8 |   860.292.1116 |
| 9 |   fax 860.292.1221 |
| 10 |  |
| 11 | Representing P & D Builders: |
| 12 |   MORRISON, MAHONEY, LLP |
| 13 |   250 Summer Street |
| 14 |   Boston, MA  02210 |
| 15 |   BY:  CURTIS L.S. CARPENTER, ESQ. |
| 16 |   617.439.7589 |
| 17 |   fax 617.342.4841 |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 5 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Falco Construction Corp.: |
| 3 |   TOOMEY & YUDYSKY, LLP |
| 4 |   99 Summer Street |
| 5 |   Boston, MA  02110 |
| 6 |   BY:  DAVID J. CROWLEY, ESQ. |
| 7 |   617.946.0930 |
| 8 |   fax 617.946.0989 |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

2  (Pages 2 to 5)

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 6

I N D E X

WITNESS:    MICHAEL CARRESI

Examination by Mr. Blackburn . . . . . .  7
Examination by Mr. Crowley . . . . . . . 110
Examination by Mr. Blackburn . . . . . . 137
Examination by Mr. Carpenter . . . . . . 139
Examination by Mr. Ober . . . . . . . . 139

EXHIBIT                     PAGE
1  Warranty                 140

** Exhibit retained by counsel.

---

Page 7

MR. BLACKBURN: Swear the witness in, please.

MICHAEL CARRESI, Witness, first having been satisfactorily identified and having been duly sworn, deposes and states as follows:

MR. TURNER: Usual stipulations?
MR. BLACKBURN: That's fine. Read and sign?
MR. TURNER: We'll read and sign the transcript.

EXAMINATION BY MR. BLACKBURN:
MR. BLACKBURN: Good morning, Mr. Carresi. My name is Glenn Blackburn. We've just met. I represent Fireman's Fund Insurance Company in this case.

---

Page 8

Q Have you ever had your deposition taken before?
A I was in arbitration once which was similar to this.
Q I'm going to ask you some questions today about the work that you did at the Pavia property.
A Uh-huh.
Q If at any time you don't understand any of my questions, if I'm not clear, please ask me to repeat it or rephrase it. I want to make sure you and I understand each other when I'm asking you the questions.
     The other instruction that I will give you is that -- as you can see, this young lady is taking down everything that we say. It's very difficult for her to take down nods of the head or shrugs of the shoulders. So ordinarily you and I can sit and have a conversation that would include both words and nods of the head. At least while we're on the record, you need to communicate only with words.
A All right.

---

Page 9

Q I think what you'll find is that I have a tendency to draw out my questions. Sometimes my experience is that the witness understands the point of the question that I'm asking before I finish asking it. In order for her to get us down accurately, let me finish asking my question completely before you start giving your answer; all right?
A Fair enough.
Q Are you under any medication today or are you suffering from any type of illness that would prevent you from giving accurate answers to my questions?
A No.
Q What is your address, please?
A 513 Bird Road, Mansfield, Massachusetts.
Q What is your relationship to Carresi Plumbing & Heating Company?
A I'm the owner.
Q Is Carresi Plumbing & Heating a corporation?
A Now it is.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 10

1    Q At the time the work was being
2  done in late 99 and 2000, was it a
3  corporation?
4    A No.
5    Q So it was a sole proprietorship?
6    A Yes.
7    Q With you as the sole proprietor?
8    A Yes.
9    Q When did you incorporate?
10    A The beginning of this year.
11    Q Back at that time, late 99,
12  2000, how many employees did you have?
13    A None.
14    Q Did you use any employees to
15  work on the property or work on any work that
16  you did at the Pavia home in building the
17  addition or working on the kitchen?
18    A I had a subcontractor to do the
19  HVAC work, who did just some duct work for
20  me.
21    Q But no other people that you
22  worked with, otherwise you were just working
23  by yourself?
24    A Pretty much.

Page 11

1    Q When did you first go into
2  business by yourself?
3    A 1987.
4    Q Prior to that, did you work for
5  anybody else?
6    A Yes, I did.
7    Q Who did you work for?
8    A Prior to that was Trethewey,
9  T-r-e-t-h-e-w-e-y, Brothers.
10    Q Where were they located?
11    A Roslindale, Massachusetts.
12    Q How many years did you work for
13  them?
14    A Three.
15    Q How old are you?
16    THE WITNESS: Now?
17    MR. BLACKBURN: Yes.
18    A Forty-one.
19    Q Are you licensed -- do you carry
20  any licenses from the Commonwealth of
21  Massachusetts?
22    A Yes, I have a journeyman's
23  license and a master's license in plumbing.
24    Q When did you get your

Page 12

1  journeyman's license?
2    A 86.
3    Q About how about the master's
4  license?
5    A 87.
6    Q Did both of those requires
7  tests?
8    A Yes.
9    Q Is there any additional testing
10  that is done once you received your masters
11  license?
12    A No.
13    Q Do you have any type of
14  continuing education requirements?
15    A Not yet.
16    Q It's being talked about?
17    A Uh-huh.
18    Q Yes?
19    A Yes.
20    Q Before the work on the addition
21  that was 99, 2000, had you met Julia Pavia?
22    A Yes.
23    Q Under what circumstances?
24    A We remodeled her previous two

Page 13

1  bathrooms.
2    Q At another home?
3    A Yes.
4    Q Do you recall how long before
5  the building of the addition that was?
6    A Maybe two years.
7    Q In between or during that
8  two-year period, did you have any contact
9  with her?
10    A Not that I recall.
11    Q Do you remember working on any
12  jobs that she was involved in in any
13  capacity?
14    THE WITNESS: In what time
15  frame?
16    MR. BLACKBURN: Again, in that
17  two-year time period.
18    A Not that I recall.
19    Q Did you have any contact with
20  her whatsoever?
21    A Unless -- not that I know -- not
22  that I remember.
23    Q How long -- when's the first
24  time you did any work for P & D Builders?

4 (Pages 10 to 13)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# MICHAEL CARRESI
# March 31, 2006

**Page 14**

1    A Maybe nine years ago. It was
2   just prior to her first job that we did for
3   her.
4        Q How was it that you came to
5   begin doing some work with Mr. Rothschild or
6   P & D Builders?
7        A I worked for a contractor that
8   he knew and he got my name from them.
9        Q Another general contractor?
10       A Yes.
11       Q As of the time that you were
12  doing the job building the addition at the
13  Pavia home, were you working for any other
14  contractors on a regular basis other than
15  P & D Builders?
16       A Yes.
17       Q Would you be able to estimate
18  what percentage of your work was done as a
19  subcontractor for P & D Builders at that
20  time, say early 2000?
21       A Maybe 30 percent.
22       Q Prior to say January of 2000,
23  had you ever installed a gas log fireplace
24  assembly?

**Page 15**

1        A Yes.
2        Q Would you be able to tell me how
3   many occasions?
4        A No; half a dozen.
5        Q Out of those approximately six
6   times, were any of them involved in a
7   fireplace that had been newly constructed?
8        A I couldn't recall. I couldn't
9   recall. Most of the time it was an existing
10  fireplace.
11       Q So as you sit here right now,
12  again, prior to January of 2000, do you have
13  any recollection of installing one of those
14  fireplace -- gas log fireplace assemblies in
15  a newly constructed fireplace?
16       A I don't recall.
17       Q Again that same time period,
18  prior to January of 2000, did you have any
19  experience in installing any prefabricated
20  fireplace inserts?
21       THE WITNESS: You're referring
22  to a zero clearance?
23       MR. BLACKBURN: Yes.
24       A Yes.

**Page 16**

1        Q How many occasions? More than
2   six?
3        A A couple; maybe two, three.
4        Q Were all of those, those two or
5   three where you were putting in a zero
6   clearance prefabricated insert in new
7   construction?
8        A In a new renovation or new
9   construction.
10       Q But a newly constructed --
11       A Space.
12       Q -- fireplace?
13       A Yes. Well, there's no fireplace
14  per se. It's a free-standing unit. So you
15  don't build a fireplace around it. That's
16  self-contained.
17       Q Prior to January of 2000, had
18  you reviewed the building code in order to
19  determine what was necessary to build a -- to
20  properly build a fireplace, a solid burning
21  fireplace?
22       A No.
23       Q Have you ever done that?
24       A No. It's not under my license.

**Page 17**

1   It's a builder's license.
2        MR. BLACKBURN: No, I understand
3   that.
4        Q I just didn't know whether you
5   had ever taken the time to go through and
6   review the code to determine what is
7   necessary in order to construct a
8   conventional solid burning fireplace.
9        THE WITNESS: Prior to 2000?
10       MR. BLACKBURN: Yes.
11       A No.
12       Q How about since then?
13       A You learn -- after 20 years of
14  doing this, you learn not by code book or
15  just you see trade practices or something.
16       Q As of January 2000, had you seen
17  a conventional solid burning fuel fireplace
18  constructed? Have you been on job sites
19  where they were being constructed?
20       A Well, yeah, I have been on job
21  sites where they were constructed. If I
22  inspected or analyzed it, I did not. If
23  you're working in a job site, someone's
24  building a fireplace, but you're doing your

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 18

1  own job, so you really don't -- I couldn't
2  tell you exactly how it was built.
3      Q Did you have an understanding
4  that any type of a concrete base was
5  necessary underneath a conventional solid
6  fuel burning fireplace --
7      A Yes.
8      Q -- prior to January of 2000?
9      A I couldn't say.
10     Q You couldn't say when you
11 learned that?
12     A Right, right; I know that now,
13 only because of jobs that I've seen.
14     Q Did you have some understanding
15 that a conventional solid burning fireplace
16 would have some type of combustion chamber?
17     A Rephrase that.
18     Q Is combustion chamber the thing
19 you're having trouble with?
20     A Yeah.
21         MR. BLACKBURN: Let me work
22 around it.
23     Q How about a damper?
24     A Yes.

Page 19

1      Q Can you describe for me the
2  damper that you're talking about?
3      A The damper that opens and closes
4  to block off the flue is what a damper is.
5      Q Other than the zero clearance
6  fireplaces that you had worked on, had you
7  ever seen a fireplace that did not have some
8  form of a chimney as its flue?
9      A They have metal, metal chimneys,
10 you know, like metal pipe.
11     Q You've seen that in a solid
12 burning conventional type of fireplace?
13     A Uh-huh.
14     Q Yes?
15     A Yes.
16     Q Did you have any understanding
17 as to the type of brick that was necessary in
18 order to build a fireplace?
19     A No.
20     Q How was it that -- what's the
21 first memory that you have about being
22 contacted to work at the Pavia home on the
23 addition?
24     A Phil told me that Julie sold her

Page 20

1  house that we had previously remodeled and
2  she was buying a new house, she wanted to
3  renovate it. So Phil told me that and we
4  were supposed to meet at the house and walk
5  through it.
6      Q And did you?
7      A Yes, uh-huh.
8      Q Who was there?
9      A I couldn't -- I can't recall
10 exactly. I know Phil Rothschild and myself.
11 I think there was an electrician there.
12     Q Mr. or Mrs. Pavia or both?
13     A Yes, one of them. I'm not sure
14 if both of them were there. Julie was there.
15 I'm not sure if her husband was there. I
16 don't remember.
17     Q When you came away from that
18 meeting, did you have some understanding of
19 whether you had a job?
20     A We were to put some prices
21 together. It wasn't a definite job. We had
22 to put some numbers together to see how much
23 it would cost to do the work.
24     Q Was the fireplace in the office

Page 21

1  mentioned during that first meeting?
2      A I don't recall.
3      Q Do you still have any of your
4  records regarding this project?
5      A No, unfortunately, I don't.
6      Q What happened to them?
7      A They got thrown away.
8      Q Do you know when?
9      A No.
10     Q Do you have any recollection
11 about whether you still had the records at
12 the time that the fire took place?
13     A No, I did not.
14     Q Do you recall during that first
15 meeting any discussion about any fireplace
16 inserts in existing fireplaces or otherwise?
17     A Julie I think mentioned that she
18 wanted to put fireplaces -- gas logs and --
19 but I know when I wrote my proposal that on
20 the bottom of my proposal, we were installing
21 four gas logs.
22     Q So even though you don't have a
23 copy of the proposal any more, you recall --
24     A Yeah.

6 (Pages 18 to 21)

**MICHAEL CARRESI**
**March 31, 2006**

Page 22

1    Q -- that in --
2    A It exists.
3    Q What do you mean it exists?
4    A A copy of that proposal.
5 Somebody -- Phil probably has it. I'm not
6 sure exactly, I'm just speculating.
7    Q Who did you give the proposal
8 to?
9    A Phil.
10    Q Did you ever give a copy of the
11 proposal directly to Mrs. Pavia?
12    A I think so. I think she has a
13 copy.
14    Q The same one that you gave to
15 Phil?
16    A Correct.
17    Q Was the proposal actually
18 addressed to Phil as a general contractor?
19    A Yes.
20    Q By Phil, we're referring to Mr.
21 Rothschild; correct?
22    A Yes, correct.
23    Q Your recollection is that that
24 proposal called for four gas burning

Page 23

1 fireplace log assemblies?
2    A Yes.
3    Q Did you have someone -- do you
4 have some recollection of where those four
5 were going to go?
6    A Well, I knew there was one going
7 out in the new addition. She wanted one in
8 the living room, one in the basement. She
9 had bought four because she wanted to put one
10 in her bedroom, but I told her that wasn't
11 code, we couldn't install it in there. So we
12 did not install that one.
13    Q Why couldn't you install the one
14 in the bedroom?
15    A Because that's -- the code says
16 you cannot install a gas log in a bedroom or
17 bathroom.
18    Q Do you know why that is?
19    A Combustion air. The gas log
20 takes the air from the room for combustion
21 and they're afraid that people sleeping in
22 the room and if that's no other air,
23 something, something like that.
24    Q So did you include it in your

Page 24

1 proposal originally --
2    A Yes.
3    Q -- the one for the bedroom?
4    A Yeah, I put four and not
5 realizing where they were going to go. I
6 didn't know if there was two on the first
7 floor, one on the second floor. I was not
8 clear on where they were going specifically
9 until after.
10    Q So at least as of the time that
11 you did your proposal, you were aware that
12 there was going to be one fireplace in the
13 new addition?
14    A Uh-huh.
15    Q Yes?
16    A Yes.
17    Q Do you recall any conversations
18 during that initial meeting about who was
19 going to build that fireplace --
20    A No.
21    Q -- or how it was going to be
22 built?
23    A No.
24    Q Did you have any discussions

Page 25

1 about the type of gas log assembly that was
2 going to be purchased?
3    A No. Julie was buying it
4 herself.
5    Q Was there any discussions about
6 a zero clearance insert?
7    A Not that I know about.
8    Q At any time?
9    A Not that I know about, no. I
10 never heard anything about a zero clearance.
11    Q So for the life of the project,
12 as far as you're concerned, no one ever
13 discussed with you the possibility of
14 installing a zero clearance fireplace insert?
15    A Nobody discussed it with me, no.
16    Q Did you hear anybody else
17 talking about a zero clearance --
18    A No.
19    Q -- fireplace?
20    A No.
21    Q Never?
22    A No.
23    Q Did your -- did you get any
24 feedback from your proposal after you gave it

7 (Pages 22 to 25)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 26

1  to Mr. Rothschild?
2      A Well, eventually, I was told
3  that we were going to be doing the job.
4      Q And when you were told that you
5  were going to be doing the job, did he tell
6  you that the full scope of your proposal had
7  been accepted?
8      A To the best of my knowledge,
9  yes.
10      Q In between the time that you had
11  that meeting, the first meeting --
12      A Uh-huh.
13      Q -- and when you were told by Mr.
14  Rothschild that you were going to be getting
15  the job --
16      A Uh-huh.
17      Q -- do you recall having any
18  further meetings that involved Mrs. Pavia?
19      A I went to her house and sat down
20  with them, just went through the work that I
21  was going to be doing.
22      Q Before you were told that it was
23  accepted?
24      A Yes.

Page 27

1      Q Did you have any further
2  discussions with Mr. Rothschild about the
3  work that you had proposed; pricing, anything
4  like that?
5      A Not really.
6      Q During the time that you sat
7  down with them to go over your proposal, by
8  them I mean the Pavias, was there any further
9  discussion about fireplace inserts?
10      A No.
11      Q What's the first thing you
12  remember doing at the property?
13      A Demolition, removing plumbing
14  fixtures.
15      Q From where?
16      A Bathrooms, kitchen -- not
17  kitchen; bathrooms.
18      Q Now, were there renovations done
19  to bathrooms in the existing home during this
20  project when the addition was built?
21      THE WITNESS: Which home? The
22  home that
23      MR. BLACKBURN: The one that
24  we're talking about where the fire was, yes.

Page 28

1      A We were remodeling all the
2  bathrooms.
3      Q So the project included building
4  an addition --
5      A Yes.
6      Q -- on the home?
7      A Yes.
8      Q And remodeling the kitchen, is
9  that right?
10      A I'm not sure if the kitchen was
11  under the original scope of work. I don't
12  recall. I know that it was four bathrooms
13  and a heating system, I know the gas logs.
14      Q So the bathrooms in the existing
15  home were being remodeled in addition to
16  building the addition?
17      A Right. The addition really had
18  nothing to do with me because the only thing
19  that I had to do in there is put -- well,
20  besides the gas logs was some heat work, duct
21  work and that was it.
22      Q No bathrooms in the addition?
23      A No.
24      Q So the first thing you recall

Page 29

1  doing is demoing out the plumbing in the
2  bathrooms in the main home?
3      A Yes.
4      Q What's the next thing you did?
5      A I think I did the boiler next.
6      Q What did you do in connection
7  with the boiler?
8      A Removed the existing and
9  installed a new one.
10      Q You mentioned before that you
11  had hired a sub for something related to the
12  boiler. What did the sub do?
13      A It wasn't related to the boiler.
14  It was duct work.
15      Q So the boiler work you did by
16  yourself?
17      A Uh-huh.
18      Q That's a yes?
19      A Yes.
20      Q Was the duct work laid out first
21  before you put the boiler in?
22      A I think it was the same time,
23  roughly.
24      Q Who was the gentleman that you

8 (Pages 26 to 29)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 30

1  used to do the duct work?
2      A Bob Occapucci (phonetic).
3      Q Did he have a company?
4      A He was a sole proprietor.
5      Q Did he go by a company name,
6  though?
7      A I think Bob Occapucci Plumbing,
8  something like that, Heating, HVAC maybe.
9      Q Where was he located?
10     A North Shore, somewhere near New
11 Hampshire.
12     Q When's the last time you saw
13 him?
14     A I haven't seen him in years;
15 years, maybe, I don't know, say maybe five
16 years ago, four years ago, five years ago,
17 maybe.
18     Q So this wasn't the last job that
19 you worked with him on?
20     A No, no, I have seen him at
21 meetings, association meetings, things like
22 that.
23     Q So he's still around as far as
24 you know?

Page 31

1      A As far as I know.
2      Q After the boiler was installed,
3  what was the next part of the work that you
4  did?
5      A Rough plumbing.
6      Q And then what?
7      A Rough plumbing, rough gas work,
8  finish the heating system, install radiant
9  heating, do the finish plumbing, install the
10 gas log.
11     Q Was -- was there gas -- where
12 were there gas lines -- where did the gas
13 lines need to be run to?
14     A The new fireplace in the
15 addition.
16     Q And did you also install one of
17 the gas log assemblies in an existing
18 fireplace in the home?
19     A Yes.
20     Q Did you need to run gas lines to
21 that?
22     A Yes, but that was done at the
23 end because you didn't have to install the
24 gas line prior.

Page 32

1      Q You tapped into another one that
2  was there?
3      A Uh-huh.
4      Q Yes?
5      A Yes.
6      Q Was there already gas coming
7  into the house?
8      A Yes.
9      Q Did you need to do anything to
10 change the service as it came into the
11 house --
12     A No.
13     Q -- in order to accommodate the
14 work that you were doing?
15     A No.
16     Q So tell me what process you went
17 through to bring the gas line into that room
18 that was ultimately to be the office where
19 this new fireplace was being built?
20     A A gas line was ran up into the
21 attic.
22     Q From the basement?
23     A From the basement. It was left
24 coiled up in the ceiling of the office, then

Page 33

1  I brought down behind some bookshelves into
2  the top of this steel plate. There was a
3  hole there and they brought it through there
4  and made the connection then ran it to the
5  gas log.
6      Q When you say it was coiled up,
7  what type of material was the gas line made
8  out of?
9      A Corrugated stainless steel.
10     Q Flexible?
11     A Yes.
12     Q And was that what was used
13 running it from the basement up to the attic
14 as well?
15     A Yes.
16     Q And that corrugated stainless
17 steel piping, was that ultimately brought
18 through the ceiling of the office down into
19 the area where the fireplace was?
20     A Yes.
21     Q Within the fireplace itself, did
22 you use the same type of piping?
23     A No.
24     Q What type of piping did you use

9 (Pages 30 to 33)

**MICHAEL CARRESI**
**March 31, 2006**

Page 34

1  there?
2      A Black iron.
3      Q Why?
4      A I thought cosmetically it would
5  look better.
6      Q So the use of the black iron
7  piping you didn't feel was any type of
8  requirement from the code?
9      A No.
10      Q Do you recall whether you
11  believed that it was a requirement based upon
12  the manufacturer's instructions of the gas
13  log assembly?
14      A It was not.
15      Q Within -- sticking with that
16  piping that came into the fireplace, were
17  there any provisions of the code that
18  addressed how that piping was to be installed
19  within the chamber of a fireplace that was
20  going to be working?
21      A No.
22      Q Did you install it in the same
23  fashion as you had done on other fireplaces,
24  what I'll refer to as conventional fireplaces

Page 35

1  where you had been installing a gas log
2  assembly?
3      A Yes.
4      Q Was there any connection within
5  the piping that was actually within the
6  fireplace itself?
7      A Yes.
8      Q And how were those connections
9  made, by screwing the pipe --
10      A Threaded --
11      Q A threaded connection?
12      A Threaded or flared.
13      Q Do you recall whether they were
14  threaded --
15      A Both.
16      Q They were both in this instance?
17      A Yes, in all instances, in all
18  the gas log fireplace installations that I've
19  done.
20      Q Is there any type of material
21  that you apply over the connections within
22  that piping that's in the fireplace in order
23  to prevent any gas leak?
24      A Compound.

Page 36

1      Q What type of compound?
2      A Thread compound.
3      Q Anything else?
4      A No.
5      Q Do you recall when it was --
6          MR. BLACKBURN: Withdrawn.
7      Q Did you actually make the hole
8  in the ceiling so that your -- so that your
9  flexible piping could come down into the
10  room?
11      A No.
12      Q Do you know who did?
13      A There was a wide -- a wide
14  opening there. There wasn't a hole for a gas
15  line. The plaster didn't go into the corner.
16  As I recall, it was left open because of the
17  bookshelves that were being constructed. So
18  there was a big opening for the flue and
19  coiled up was my gas line. It was --
20      Q So by the time -- by the time
21  you actually brought the gas line down into
22  the fireplace, had the ceiling already been
23  plastered?
24      A Yes.

Page 37

1      Q But just not -- there was an
2  area in the corner where it had been left
3  open to accommodate the gas line in the flue?
4      A Yes.
5      Q How big of an opening, could you
6  estimate?
7      A It was in a corner.
8      Q So it was a triangular?
9      A A triangle, approximately 30
10  inches off each corner, 30, maybe 3 feet.
11      Q Ultimately did anything else run
12  through that opening other than the flue from
13  the fireplace and the gas line?
14      A Not that I'm aware of.
15      Q When you actually uncoiled your
16  pipe to bring it down into the fireplace, had
17  the structure of the fireplace already been
18  built?
19      A Yes.
20      Q Had Mr. Falco left the job?
21      A Yes. I don't recall if he was
22  finished, but he wasn't there when I was
23  working there.
24      Q To your knowledge, does Mr.

10 (Pages 34 to 37)

**MICHAEL CARRESI**
**March 31, 2006**

Page 38

1  Falco -- was Mr. Falco present when the gas
2  line that you were bringing into the
3  fireplace there, actually running from
4  the ceiling down into the fireplace?
5      A I don't recall. I don't recall
6  if he was totally done when I did my work. I
7  don't remember.
8      Q As I understand it --
9          MR. BLACKBURN: Withdrawn.
10     Q By the time you brought the line
11 down into that corner into the fireplace,
12 were the bookshelves already constructed?
13     A No.
14     Q So would I be correct that
15 wherever the top of the fireplace -- wherever
16 the top of the brick was that Mr. Falco had
17 made from there up to the ceiling was just
18 still open?
19     A Yeah, I think so.
20     Q So -- was there at least a
21 period of time when the pipe that you -- the
22 gas pipe that you were bringing down from the
23 attic into the fireplace was open and exposed
24 above the top of the fireplace?

Page 39

1      A Yes.
2      Q What ultimately covered it was
3  the bookshelves?
4      A Correct.
5      Q But they had not been built --
6      A Correct.
7          MR. BLACKBURN: Withdrawn. Let
8  me ask you this question. Maybe it's a
9  better one.
10     Q Were the bookshelves built after
11 you installed the gas log assembly in that
12 fireplace?
13     A To the best of my knowledge,
14 I -- as I remember.
15     Q One of the last things that was
16 done was the bookshelves --
17     A Yes.
18     Q -- and some other finish trim?
19     A Yes.
20     Q So that would also be true then
21 that whatever flue piping had been run out of
22 that fireplace up into the attic was also
23 installed before the bookcases were installed
24 to cover it?

Page 40

1      A Correct.
2      Q Did you do anything with respect
3  to that flue pipe, sir?
4      A No, sir.
5      Q Who did?
6      A I didn't -- I was not there. I
7  don't know who actually did it until a couple
8  of days ago, I found out who did it.
9      Q What did you --
10         MR. BLACKBURN: Withdrawn.
11     Q Did you find out from your
12 attorney a couple of days ago?
13     A No, Phil told me.
14     Q So who did you find out did it?
15     A A gentleman Jim Dusault.
16     Q Had you worked with Mr. Dusault
17 before?
18     A Yes.
19     Q Do you work with him -- have you
20 worked with him after the fact?
21         THE WITNESS: After what?
22         MR. BLACKBURN: After the fire.
23     A No, I haven't seen him in years.
24     Q So would it be fair to say --

Page 41

1          MR. BLACKBURN: Withdrawn.
2      Q Did you actually see him at the
3  Pavia house?
4      A No.
5      Q Do you know what he was doing at
6  the Pavia house other than running this flue,
7  if anything?
8      A To my knowledge, he wasn't even
9  there. I didn't know he did the flue and
10 there was nothing else for him to do because
11 I -- my guy was doing the duct work.
12     Q What is Mr. Dusault's business?
13     A HVAC work.
14     Q Why is it that you didn't run
15 the flue from the fireplace?
16     A I don't do work like that. I
17 don't run flue pipes for a fireplace. I
18 don't build fireplaces. I wasn't hired to do
19 any of that work. My job -- my scope of work
20 consisted of running a gas line and tying in
21 a gas log that Julie Pavia was to purchase.
22     Q Going back, there was -- those
23 times that you installed a zero clearance
24 insert --

11 (Pages 38 to 41)

**MICHAEL CARRESI**
**March 31, 2006**

Page 42

1    A Uh-huh.
2    Q -- in a new construction --
3    A Yes.
4    Q -- did you build the flue piping
5    for those zero clearance inserts?
6    A No, I did not.
7    Q So what did you do when -- on
8    those occasions?
9    A Tied the gas line to the burner.
10   Q Period?
11   A That's it.
12   Q Would you actually install the
13   insert itself or would someone else do that?
14        THE WITNESS: On a prefab --
15        MR. BLACKBURN: Yes.
16        THE WITNESS: -- zero clearance?
17        MR. BLACKBURN: Yes.
18   A In a zero clearance fireplace,
19   that is altogether. There's only one
20   connection that has to be made. That's what
21   I do.
22   Q But my question is would you
23   actually put the or had you actually put
24   those inserts in place?

Page 43

1    A No.
2    Q Somebody else had done that?
3    A Yes.
4    Q Your work was strictly limited
5    to getting the gas line there and connecting
6    it?
7    A Correct.
8    Q Does having this discussion
9    about running a flue pipe help refresh your
10   recollection about whether you installed a
11   gas log burning assembly in any new
12   fireplaces at any time prior to January 2000?
13   A No, it does not.
14   Q Which gas log assembly did you
15   install first, the one in the addition or the
16   one in the house?
17   A I don't recall. I think we did
18   them all at once.
19   Q And when you refer to we --
20   A Well --
21   Q -- you're talking about
22   yourself?
23   A Yeah.
24   Q I just want to make sure?

Page 44

1    A I have a we now. It's just
2    automatic.
3    Q What was the process of actually
4    installing the gas log system, the assembly?
5    A Placing it into the fire box and
6    then connecting my gas pipe.
7    Q Was there any assembly required?
8    A The only assembly on the gas
9    logs are just putting the -- there's like a
10   sand type of material and then the logs, just
11   placing the logs; that's it. There's no
12   assembly to the burner, everything comes like
13   that.
14   Q Had you ever worked with a
15   Heatmaster assembly before?
16   A I don't recall, but it wouldn't
17   surprise me because they're a fairly known
18   company.
19   Q Do you have a recollection of
20   when you opened this thing and took it out of
21   the box, whether it looked any different than
22   other gas log burning assemblies that you had
23   installed prior to that?
24   A No.

Page 45

1    Q Did you read the instructions?
2    A I reviewed them with the gas
3    log. They're all the same as far as like
4    when you first put them in, yeah, you read
5    every page, but then they're all the same.
6    The only thing you have to check is the
7    placement of the logs because they show
8    pictures of how you're supposed to set them
9    up.
10   Q And why -- what affect does the
11   placement of the log have on the operation of
12   it?
13   A I don't know, probably cosmetic,
14   the way the flames come out of the top of it.
15   He probably knows.
16
17        (Witness Indicating)
18
19        MR. BLACKBURN: You know what,
20   I'll bet he does.
21   Q Prior to your doing the work to
22   run the gas line into the fireplace, do you
23   recall having discussions with anyone about
24   where the fireplace was going to be located?

12 (Pages 42 to 45)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 46

1    A No.
2    Q Do you recall overhearing any
3    discussions between anyone about where the
4    fireplace was going to be located?
5    A No. The only thing I knew was
6    that it was going up on the second floor,
7    that's why I ran the gas pipe to the second
8    floor and then like it's going to go in this
9    corner somewhere. I ran it there, just left
10   it. I left plenty of material so if it was
11   here, there, there, I was safe. I left it
12   there, then off I go.
13   Q When you ran the gas line up
14   into the attic, what was the condition of the
15   addition?
16   A It was framed. It wasn't
17   plastered or anything.
18   Q Rough framed, correct?
19   A Yes.
20   Q Was the subflooring in place?
21   A Yeah.
22   Q Did you notice anything in any
23   area of the second floor of the addition
24   where it appeared to you that any

Page 47

1    accommodation had made for the installation
2    of a fireplace?
3    A No.
4    Q Did you see any concrete pad
5    that was installed?
6    A No.
7    Q Any location where a concrete
8    pad was to be installed?
9    A No.
10   Q Did you ask anybody as to
11   whether there was going to be any type of a
12   concrete pad placed underneath the fireplace?
13   A No, I wasn't involved in the
14   construction of the fireplace.
15   Q You never asked anybody about
16   it?
17   A It wasn't my job.
18   Q Do you recall seeing any type of
19   material? Do you know what Durarock is?
20   A Yes, I do.
21   Q Do you recall seeing any
22   Durarock that was installed over the
23   subflooring at any time?
24   A No.

Page 48

1    Q Did you see any part of the
2    process of Mr. Falco constructing the
3    fireplace?
4    A I don't recall.
5    Q You don't have any recollection
6    of seeing him lay a single brick for that?
7    A No, I don't.
8    Q Did you know Mr. Falco --
9    A Yes.
10   Q -- from before?
11   A Yes.
12   Q How did you know him?
13   A I've known him actually
14   personally for many years. My family are
15   friends with his brother and I met him when I
16   was very young. So I've known him for a long
17   time; nice guy.
18   Q Had you worked on other jobs
19   with him prior to the Pavia house?
20   A Yes. But 90 percent of the
21   time, he would be gone. His job would be
22   finished before I would ever come in. So it
23   wasn't common for us to be on the same job at
24   the same time.

Page 49

1    Q Did you have any discussions
2    with Mr. Falco during the course of the Pavia
3    job about this fireplace?
4    A No.
5    Q Did you have any discussions
6    with Mrs. Pavia at any point prior to the
7    completion of the job about the fireplace?
8    A No.
9    Q The gas line that you installed,
10   ultimately as it came into the fireplace, did
11   it have to pass through some type of a metal
12   plate?
13   A Yes.
14   Q Do you recall anything about the
15   metal plate, what it was made of, its
16   dimensions?
17   A It was a steel plate. It was a
18   triangle because it was in the corner. It
19   had a big hole in the middle of it for the
20   flue. It had a small hole for my gas pipe.
21   Q The first time you saw the
22   plate, it had those two holes already in it?
23   A Yeah, it was installed.
24   Q Did you have any discussions

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 50

1  with anyone about that plate before it was
2  fabricated?
3      A No.
4      Q Do you recall having a
5  discussion or discussions with Mr. Rothschild
6  where you said to him, hey, I'm going to need
7  a hole in this plate to accommodate my gas
8  line?
9      A No.
10     Q Do you know who fabricated the
11 plate?
12     A No.
13     Q Did you ask anybody to fabricate
14 the plate?
15     A No.
16     Q Did you hear Mr. Falco talking
17 with anybody about the fabrication of the
18 plate?
19     A No.
20     Q Did you ever discuss the
21 fabrication of the plate with Mr. Falco?
22     A No.
23     Q Had you ever seen a
24 configuration like that before on any

---

Page 51

1  fireplace that you were installing a gas log
2  assembly?
3      A No.
4      Q Did you install all of the gas
5  piping and the gas log assembly the same
6  day -- the gas piping within the fireplace
7  unit and the gas log assembly the same day?
8      A I think so.
9      Q Was anybody there while you were
10 doing it?
11     A Julie.
12     Q Did you have any discussion with
13 her about it?
14     A No.
15     Q Was she watching you?
16     A She might have been in the room
17 periodically.
18     Q Do you have any recollection
19 about any discussions that the two of you had
20 about the fireplace on that day?
21     A No.
22     Q When you did that installation
23 of the gas log assembly, was the flue in
24 place yet?

---

Page 52

1      A Yes.
2      Q Were you at the job everyday?
3      A No.
4      Q So was it a situation where you
5  showed up one day, knew that you had to
6  complete the termination of your gas line,
7  install the gas logs, then you showed up just
8  for that purpose?
9      A Yes.
10     Q And at that point somebody had
11 already installed the flue work?
12     A Yes.
13     Q Did you check to see how far --
14         MR. BLACKBURN: Withdrawn.
15     Q Did you check to see whether the
16 flue from the gas --
17         MR. BLACKBURN: Let me start
18 again.
19     Q Did you check to see whether the
20 flue from the fireplace had exited the roof
21 at that point?
22     A I don't recall.
23     Q Do you recall whether you went
24 up into the attic to look at the flue at all?

---

Page 53

1      A I went up to get my gas line to
2  drop it down and as I recall, I think it was
3  through the roof, I think.
4      Q Did you examine any of the areas
5  where the flue pipe was going through the
6  roof --
7      A No.
8      Q -- to see whether there had been
9  any type of shields or protection given for
10 the area that it was going through the roof?
11     A No, I don't recall.
12     Q Did you examine the way that the
13 flue pipe ran, the turns that it made?
14     A No.
15     Q You are aware of code
16 requirements for the number of turns that a
17 flue pipe like that is permitted to make?
18     A No.
19     Q You're not?
20     A No.
21     Q To your knowledge, does the
22 plumbing code address that?
23     A No.
24     Q After you installed the gas log

---

14 (Pages 50 to 53)

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 54

1  assembly, did you light it?
2      A Yeah.
3      Q That day?
4      A Yes.
5      Q Who was present?
6      A Julie.
7      Q Anybody else?
8      A Not that I recall.
9      Q Is that the only day you lit it?
10     A I don't recall.
11     Q Were there any problems when you
12  lit it?
13     A No.
14     Q Did you have any discussions
15  with Mrs. Pavia about limitations on the use
16  of it?
17     A No.
18     Q Were you aware of any
19  limitations on the use of that gas log
20  assembly?
21     A I think there is, as far as like
22  how much time you can actually run it; but
23  I'm not -- I'm not certain. I thought I read
24  something about a certain amount of hours you

---

Page 55

1  can actually have it running, but I don't
2  remember. It's been six years.
3      Q And where you would have read
4  that would have been in the manufacturer's
5  information --
6      A Yes.
7      Q -- as opposed to some codes or
8  something like that?
9      A Oh, yeah, yeah. The code always
10  refers back to the manufacturer's
11  specifications.
12     MR. TURNER: When you say
13  limitations on the use, are you including
14  maintenance?
15     MR. BLACKBURN: No, I was just
16  talking about how long you should run it.
17     Q Is that the way you took the
18  question?
19     THE WITNESS: How long I should
20  run it?
21     MR. BLACKBURN: Yes.
22     A How long it should be run, yes.
23     Q Or somebody should run it --
24     A Right.

---

Page 56

1      Q -- whatever the proper grammar
2  is?
3      A Correct.
4      Q Did you have any discussions
5  about the maintenance of the unit with Mrs.
6  Pavia?
7      A No.
8      Q Did it have a remote control?
9      A Yes.
10     Q Did you operate the remote
11  control that day?
12     A Yes, I think so.
13     Q Did you pull a permit for this
14  job in the City of Newton?
15     A If you asked me a week ago, I
16  would have said absolutely, and then I saw a
17  permit that had my boiler on it, Bob showed
18  me. Then I'm like, well, maybe I filed a
19  separate permit, but I didn't -- I haven't
20  had a chance to go down to the town hall and
21  inquire about that.
22     Q Let me do this, we've got
23  Rothschild Exhibit 5 that we marked at Mr.
24  Rothschild's deposition yesterday.

---

Page 57

1      A Okay.
2      Q Within Rothschild Exhibit 5
3  there are a number of materials that came as
4  a result of a subpoena that I think it was
5  Mr. Carpenter filed with the City of
6  Newton --
7      A Uh-huh.
8      Q -- with the building department.
9      A Uh-huh.
10     Q I'm going to show you that.
11     A Uh-huh.
12     Q I'm also going to give you a
13  copy of the other materials that
14  Mr. Carpenter received from the building
15  department, which I understand include any
16  records that they may have had concerning
17  this Pavia property.
18     A Uh-huh.
19     Q We'll go off the record for a
20  second and have you look through there and as
21  you go through them, please don't do anything
22  with Exhibit 5, but these other documents, as
23  you go through there, if you see anything
24  that you believe was something that you filed

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# MICHAEL CARRESI
# March 31, 2006

---

Page 58

1  or prepared and I'm talking prefire, okay?
2      A Yeah.
3          MR. BLACKBURN:  This is before
4  the fire and anything you submitted to the
5  building department, let's put it aside and
6  we'll talk about it.  So we'll go off the
7  record.
8
9
10          (Off The Record Discussion)
11
12      Q Mr. Carresi, have you had an
13  opportunity to look through the documents
14  that we have from the building department?
15      A Yes.
16      Q And were you able to find any
17  documents in there that were permits or any
18  type of certificates that related to your
19  work?
20      A No -- well, yes.
21      Q What were you able to find?
22      A I have a plumbing and gas
23  permit.
24      Q And that was contained within

---

Page 59

1  the documents that were previously marked as
2  Rothschild Exhibit 5, is that right?
3      A Yes.
4      Q It appears that it's two
5  different permits both done the same day; one
6  for the heating boiler and then one for the
7  bathrooms?
8      A Correct.
9      Q Your signature appears on both
10  of them?
11      A Yes.
12      Q At any point, did anyone from
13  the City of Newton come in and inspect any of
14  the work that you did?
15      A Yes.
16      Q How many times?
17      A Three.
18      Q What was the first time?
19      A Two or three.  The -- I had a
20  rough inspection for all the plumbing work,
21  an inspection for the boiler and a final
22  inspection for the whole property for the
23  work that I had done.
24      Q So the first inspection that you

---

Page 60

1  recall would have been on the rough plumbing
2  for the changes you were doing to the
3  bathrooms?
4      A Correct.
5      Q Who would have done that
6  inspection?
7      A The Newton plumbing inspector.
8      Q Do you recall his name?
9      A There's several.
10      Q You don't recall who it was that
11  came on that occasion?
12      A It was either -- I don't know,
13  Bob or Russ, I believe.
14      Q Are both of them still with the
15  City of Newton?
16      A Yes.
17      Q Both in the same capacity as
18  plumbing inspectors?
19      A Yes.
20      Q Do you recall any problems that
21  they noted during their -- during that first
22  inspection?
23      A No.
24      Q And then the next one would have

---

Page 61

1  been an inspection of the boiler?
2      A Yes, but what I don't remember
3  is if it was all done in one day or not.
4      Q At the time that these
5  inspections were done, was the gas line
6  already running up into the attic?
7      A Yes.
8      Q Had it been run from the attic
9  down into the office?
10      A No.
11      Q So the first two inspections,
12  whether they took place on the same day or
13  different days, would have occurred after the
14  gas line was run up into the attic but before
15  the gas line was brought into the room where
16  it was eventually going to terminate?
17      A Correct.
18      Q Did they inspect the gas line?
19      A I believe they did because it
20  was there.  I walked them through the house.
21  We went through the whole job.  The fact that
22  it's not on the permit was strictly an
23  oversight.  There was nothing to hide.  I
24  knew those -- the fireplace was going in, the

---

16 (Pages 58 to 61)

**MICHAEL CARRESI**
**March 31, 2006**

Page 62

1  gas log was going in from day one. It was
2  tested. It was properly under pressure,
3  everything.
4      Q Do you recall any discussions
5  that you had with the plumbing inspector
6  about the gas line?
7      A No. I do a lot of work in
8  Newton and I don't recall that specific
9  inspection.
10     Q Do you recall having any
11 discussions with the plumbing inspector about
12 the fireplace?
13     A No.
14     Q After the fire, when you learned
15 that there were allegations that you were
16 somehow responsible for it, did you have any
17 discussions with anybody at the Newton
18 building department about this fireplace?
19     A No.
20     Q So up to this day, you haven't?
21     A Yes.
22     Q Who did you have a discussion
23 with?
24     A Bob, Bob the --

Page 63

1      Q Bob the plumber?
2      A Bob McGuire, I think that's his
3  name.
4      Q He's the Bob that you mentioned
5  before that's one of the inspectors?
6      A Correct.
7      Q When did you have a discussion
8  with him?
9      A I would say within six months of
10 the fire.
11     Q Was it after you had learned
12 that somebody was making a claim against your
13 company for the damage that resulted from the
14 fire?
15         THE WITNESS: Was it after?
16         MR. BLACKBURN: Yes, sir.
17     A Yeah.
18     Q Tell me the substance of your
19 conversation with him?
20     A We were -- we were discussing
21 the fact that there was a fire on the job and
22 I said, yeah, do you know what happened. He
23 goes, yeah, wasn't the plumber there the day
24 before, not realizing it was me. I'm like,

Page 64

1  yeah. He goes, oh, he must have lit --
2  sparked up a flame with his torch. I'm like,
3  no. I said, Bob, I was there the day before,
4  it wasn't that. It was the fact that the
5  fireplace was not constructed to code, that's
6  why there was the fire.
7      Q Did he have seem to have any
8  knowledge about the fireplace at that point?
9      A No.
10     Q Is that the only discussion that
11 you've had with him?
12     A Yes.
13     Q Did you ever have any discussion
14 with Mr. Rothschild about whether his permit
15 mentioned the fireplace?
16     A No.
17     Q Did he, Mr. Rothschild, ever
18 tell you up to today about his conversations
19 with the City of Newton building inspector
20 about the fireplace?
21     A No.
22     Q The third inspection that you
23 mentioned, you referred to as a -- that the
24 City of Newton would have done with respect

Page 65

1  to your work you mentioned as a final
2  inspection?
3      A Yes.
4      Q Who would have done that?
5      A The plumbing inspector.
6      Q So one of those two gentlemen
7  that you mentioned?
8      A Correct.
9      Q Do you recall which one as you
10 sit here today?
11     A I'm sorry, I don't.
12     Q Were you there?
13     A Yes.
14     Q Was anybody else there?
15     A I don't remember.
16     Q What was the condition of the
17 property when they did their final
18 inspection?
19     A I would say 95 percent of the
20 place was finished, but there was a lot of
21 details that weren't finished; trim, I think
22 those bookcases. I don't know if those
23 bookcases were finished or not because a lot
24 of little stuff, but they wanted to get their

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 66

1  certificate so they could move in and they'd
2  finish it as they were living there. So my
3  inspector came in and I took him to all the
4  places -- we went into that office because we
5  had to get there. We went through the
6  bathrooms. But I don't recall specific
7  conversations that took place.
8      Q Do you recall whether you
9  specifically took him to the gas log
10  assembly?
11      A I don't recall. I don't recall.
12      Q Do you recall whether he
13  specifically examined any portion of the gas
14  line that you had run from the basement
15  through the attic into the office?
16      A Well, as I stated before, I
17  thought we did -- he checked the gas that --
18      Q I'm taking on that occasion.
19      A On that occasion, I don't
20  recall.
21      Q At that point was your work done
22  at the property, even though there may have
23  been trim left and things like that, was all
24  of your work done?

Page 67

1      A I believe so.
2      Q I know you mentioned to me that
3  you operated the gas log assembly that first
4  day that you installed it.
5      A Yeah.
6      Q Do you have a recollection of
7  whether you operated it again on any other
8  occasions?
9      A I don't recall.
10      Q Do you have any recollection of
11  operating it in Mr. Rothschild's presence?
12      A I don't have any, no.
13      Q Do you have any recollection of
14  whether Mr. Falco was at the property at any
15  time after the gas log assembly had been
16  installed?
17      A Not while I was there.
18      Q Within Rothschild Exhibit 5 is
19  the CO for this project. It's dated August
20  24 of 2001. Do you have any recollection of
21  how long before the certificate of occupancy
22  was issued that that inspection, the final
23  inspection that you just referred to
24  occurred?

Page 68

1      A No, I don't.
2      Q After that final inspection, did
3  you have any occasion to return to the house?
4      A I don't recall if I had to do
5  any -- any little stuff over there. I don't
6  remember exactly. I mean, if you want to get
7  right to the day of the weekend that the fire
8  took place --
9          MR. BLACKBURN: Not yet, but
10  we're almost there.
11          THE WITNESS: Good.
12      Q In between when you completed
13  any work on the addition and that weekend
14  where there was the water damage and the
15  fire, did you have any contact with Mrs.
16  Pavia?
17      A Probably.
18      Q Why do you say that?
19      A Because there's always some
20  little thing that has to be done over there,
21  just something little.
22      Q Did you have any occasions --
23          MR. BLACKBURN: Withdrawn.
24      Q Did you know whether Mrs. Pavia

Page 69

1  worked?
2      A No. She was on the job
3  everyday.
4      Q Do you know whether she
5  fashioned herself as some type of interior
6  designer?
7      A Yes, that's the title, yes.
8      Q Did she frequently speak to you
9  and act like she knew something about
10  construction?
11      A I think frequently is not the
12  word to use.
13      Q Always?
14      A Always.
15      Q Did --
16      A Her family has been in the
17  construction business forever.
18      Q Based on your experience with
19  her during the course of this project --
20      A Yes.
21      Q -- did you feel that she did
22  know anything about construction?
23      A She was an interior designer.
24      Q So would it be fair to say that

18 (Pages 66 to 69)

**MICHAEL CARRESI**
**March 31, 2006**

Page 70

1  she knew less about construction than she
2  thought that she knew?
3      A Well, put it this way, I
4  think -- I think her knowledge of the code is
5  limited.
6      Q If it exists at all?
7      A Yeah.
8      Q Did you work on any jobs --
9  after the completion of the addition, did you
10  work on any jobs that she was involved in as
11  an interior designer?
12          THE WITNESS: At what time
13  frame?
14          MR. BLACKBURN: Any time after
15  you did the addition.
16      A Yes.
17      Q How many?
18          THE WITNESS: To what date? To
19  now?
20          MR. BLACKBURN: Yes.
21      A Two, I believe; good guess.
22      Q Were both of those after the
23  fire?
24      A I think one was and one wasn't.

Page 71

1      Q Was Mr. Rothschild involved in
2  both of those?
3      A On one job, yes, one job in a
4  minimal capacity.
5      Q Did both of them have to do with
6  remodeling bathrooms --
7      A Yes.
8      Q -- or kitchens?
9      A Yes.
10      Q When's the first time that you
11  learned of the fact that there had been a
12  water leak, for lack of a better word, at the
13  Pavia house?
14      A Sunday the -- I don't know the
15  date, but the Sunday prior to -- the fire
16  happened on a Sunday night or something. So
17  that Sunday she called me. She had a frozen
18  pipe. It broke, flooded her kitchen. I went
19  out there, capped off the pipes that were
20  frozen so that she can have water in the rest
21  of the house.
22      Q Do you recall what time of day
23  it was that she called you?
24      A It was in the afternoon.

Page 72

1      Q So sometime Sunday afternoon?
2      A Yes.
3      Q Did you receive a call from Mr.
4  Rothschild at all that day?
5          THE WITNESS: That day?
6          MR. BLACKBURN: Yes.
7      A No, I don't -- I don't recall.
8  I might have called him and said, oh, guess
9  what.
10      Q Do you recall whether Mr.
11  Rothschild was at the property that day when
12  you went to cap the pipes?
13      A Not that I'm aware of or not
14  that I can recall.
15      Q Other than going in -- was the
16  water already shut off by the time you got
17  there?
18      A Yes.
19      Q Did you find out who shut it
20  off?
21      A She did.
22      Q Did she tell you anything about
23  the procedure that she had gone through to
24  shut it off?

Page 73

1      A Yes.
2      Q What did she tell you?
3      A She had to move all the
4  furniture or things that her brother put in
5  the garage that were blocking the water main
6  before she could actually get to it then she
7  shut it off, but it was quite a procedure to
8  get there, I guess is what I was told.
9      Q And the water was running while
10  she was trying to get the pipe shut off?
11      A It sounds like that's what
12  happened.
13      Q Did you go through the house to
14  make observations of where the water had gone
15  to?
16      A No. It was confined pretty much
17  to the kitchen.
18      Q Did you go in the basement at
19  all that day?
20      A I think I walked -- because I
21  think I parked in the backyard, I might have
22  walked through the finished room in the
23  basement.
24      Q Was it --

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 74

1    A I saw some water coming out of
2    the ceiling, lights, stuff.
3        Q Did you do anything that day to
4    clean up the water?
5        A I don't think so.
6        Q Did you notice whether anyone
7    was in there that day cleaning up the water?
8        A I don't recall if there was a
9    company there doing that. I don't remember.
10   I don't think so because I think I got there
11   before them, but I'm not sure.
12       Q So how long would you say you
13   were there that day?
14       A An hour.
15       Q And how was it left? Was --
16   were you to come back?
17       A Well, I knew I would be back
18   eventually.
19           MR. BLACKBURN: I understand.
20       Q Did you have a specific
21   discussion about it?
22       A No, no.
23       Q So you left there just thinking,
24   I'll wait for the phone call from somebody --

Page 75

1        A Yeah.
2        Q -- that I know is going to
3    happen?
4        A Right.
5        Q But you had no specific
6    discussion with Mrs. Pavia, please come back
7    tomorrow --
8        A No.
9        Q -- and start working on this --
10       A No.
11       Q -- or anything like that?
12       A No.
13       Q After having a chance to talk
14   about the day a little bit, do you have any
15   recollection of speaking with Mr. Rothschild
16   at all about anything that happened with that
17   water leak that day?
18       A I don't recall; sorry.
19       Q When's the first time you
20   learned of the fire?
21       A I got a call from Phil on that
22   morning, maybe seven o'clock. He said, did
23   you hear. And I said, hear what. There was
24   a fire at Julie's house. I said, I was just

Page 76

1    there, what do you mean there was a was fire.
2    He explained to me there was a fire. I got
3    off the line with him, called over to Julie's
4    house and I said, what happened, and she told
5    me there was a fire from the fireplace. She
6    goes, there's somebody here that wants to
7    talk to you. So as you can imagine, my heart
8    was beating like a rabbit and the fire
9    investigator got on the phone and he asked me
10   what my job was, what did I have to do with
11   the -- with that fireplace. I said, well, I
12   ran the gas line. I hooked up the gas log.
13   He said, well, we tested the gas, we checked
14   the gas, there was nothing wrong with the
15   gas. I said, so what caused the fire? He
16   said, well, the fireplace wasn't constructed
17   properly, and I guess there was no air gap.
18   There was -- what happened was that over a
19   three-year period or something, the subfloor
20   was dried out and it -- he said that it
21   lowered the kindling point of the wood and it
22   ignited; that's what happened. That's what
23   he told me that morning.
24       Q This is Monday morning?

Page 77

1        A Yes.
2        Q To your knowledge, the fire was
3    Sunday night or early Monday morning?
4        A Yes.
5        Q And the investigator that you're
6    referring to, was it your understanding that
7    he was somebody from the City of Newton?
8        A Yes.
9        Q Do you know his name as you sit
10   here today?
11       A I wish I did, but I don't.
12       Q Was that the only discussion you
13   ever had with that gentleman?
14       A Yes.
15       Q Did you go to the house that
16   day?
17       A I think it was the day -- I
18   think I did go there that day. It was either
19   that day or the following day, but I think it
20   was the day, towards the end of the day.
21       Q Why?
22       A Well, I was curious to see the
23   damage.
24       Q I was just curious whether

20 (Pages 74 to 77)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# MICHAEL CARRESI
# March 31, 2006

<table>
<tr><td>

Page 78

1   somebody had asked you to come. Do you think
2   you just went on your own?
3      A I don't remember. I probably
4   talked to Phil and he probably said he was
5   going to go over. I probably said, yeah, I'm
6   going to swing by, take a look.
7      Q Ultimately you were involved in
8   the reconstruction of the house?
9      A Yes.
10     Q When did you first have an
11   understanding that you were going to be
12   involved in that job?
13     A Pretty much immediately.
14     Q What did you do in preparation
15   for that?
16     A Specifically what do you mean?
17     Q Did you give any thought to what
18   needed to be done, what it was going to cost
19   to do it, what you were going to charge to do
20   it, anything like that?
21     A No, because I didn't have a
22   scope of work. I had no idea what needed to
23   be done.
24     Q So when's the first time that

</td><td>

Page 80

1   break it down a little bit.
2      THE WITNESS: I'll do my best.
3     Q Did you -- do you have any of
4   the records of what you charged her?
5     A Oh, god, I don't know. I didn't
6   even look for them.
7     Q And --
8     A She -- well, I mean I submitted
9   everything to her. She probably has it, has
10   copies of that stuff.
11     Q So did you do your billing
12   directly to her or through Mr. Rothschild?
13      THE WITNESS: For the
14   reconstruction?
15      MR. BLACKBURN: Yes, sir.
16     A Yes, through her.
17     Q Directly to her?
18     A Yes.
19     Q Any written proposals or
20   communications that would have been between
21   you and her?
22     A Correct.
23     Q Do you recall what work had to
24   be done in the kitchen by you?

</td></tr>
<tr><td>

Page 79

1   you did anything in terms of developing a
2   scope of the work that you were going to do
3   in connection with the rebuild?
4     A Julie provided me, I don't have
5   it, but she told me what needed to be done
6   and she said, how much is it going to cost to
7   do this, this, you know, that stuff.
8     Q Generally what were the things
9   that she was asking you to do?
10     A Generally, replace duct work
11   because of smoke or something. What else? I
12   think that was the biggest part of that when
13   we first talked about it. When we first, you
14   know, when the fire happened, you know, she
15   had somebody come in to evaluate the job. So
16   she said specifically -- actually, okay, this
17   is what happened. As the job -- as the
18   reconstruction process took place, I was
19   asked several times during that time, oh, we
20   got to do this, how much is that going to
21   cost; we're going to do this, how much is
22   that going to cost. That's how it went from
23   there on in.
24      MR. BLACKBURN: Let's try to

</td><td>

Page 81

1     A Work in the kitchen; what did we
2   do? We did -- we did a new kitchen sink, I
3   believe. We put new -- yeah, just the
4   kitchen basically, the kitchen sink,
5   dishwasher. We put floor heating. She
6   wanted floor heating in the kitchen. I think
7   that's the extent of my work there.
8     Q How about with respect to the
9   pipes?
10     A Oh, yeah, we repiped them; we
11   repaired them.
12     Q In any different configuration
13   or just new pipes?
14     A Well, the problem -- actually,
15   the reason why those broke was really not the
16   location of them, it was the fact that there
17   was no insulation and in that ceiling of this
18   little jet, it jetted off the back of the
19   house and there was no insulation. So I
20   can't believe that it took 20 years for these
21   to break, but it was the coldest winter that
22   anybody can remember. What happened is the
23   wind just got up in there, froze the pipes.
24   So it was really an insulation issue rather

</td></tr>
</table>

21 (Pages 78 to 81)

# MICHAEL CARRESI
## March 31, 2006

---

Page 82

1  than the location of the pipes.
2      Q So your recollection is that you
3  didn't make any special accommodations on
4  putting the pipes back in other than just to
5  make sure they were or recommend that it be
6  insulated?
7      A I might have put some pipe
8  insulation, I don't remember; but pipe
9  insulation really isn't going to do it if
10  it's not insulated properly.
11      Q Did you do any work in the
12  basement of the house after the fire?
13      A I don't think so. Oh, well,
14  yeah, I did. I -- we had to relocate a stack
15  pipe that was going up to the second floor
16  bathroom. So I had to take that, relocate it
17  down into the basement.
18      Q Why is that?
19      A Why did I relocate it? It was
20  in the way of something, the configuration of
21  the kitchen or something.
22      Q Did you do any work to the
23  bathrooms in the house after the fire?
24      A No.

---

Page 84

1      Q Do you remember as you sit here
2  today what the total charges were?
3      A No.
4      Q Do you remember as you sit here
5  today whether your bill had been itemized in
6  any way with respect to the work you were
7  doing?
8      A Probably the way I normally do
9  it would be, with her especially, it would be
10  because she kept -- today we have to do this,
11  tomorrow we have to do this, you never know
12  down the line. So probably individual
13  projects, little projects, you know, duct
14  work, you know, was like the first thing,
15  okay, how much is that going to cost; do
16  that. The kitchen, how much is that going to
17  cost; we'll do that. That's how the billing
18  probably took place.
19      Q So if we had your invoices, it
20  would --
21      A It would be --
22      Q -- most likely identify the work
23  you had done in the kitchen, for example?
24      A Sure.

---

Page 83

1      Q Did you do any work to the
2  heating system?
3      A Just the duct work had to be
4  replaced.
5      Q That would have been the duct
6  work in the new addition or elsewhere in the
7  house as well?
8      A Throughout the whole house, I
9  believe, yeah, yeah, we did the whole house.
10      Q Why was it necessary in order
11  to -- or to replace the duct work throughout
12  the whole house?
13      A She -- I mean, it -- I didn't
14  recommend it. She said she -- she said the
15  smoke got into the duct work, every time it
16  comes on, she would smell smoke. She's like,
17  all this has to come out.
18      Q That's what you did?
19      A That's what I did. She told me;
20  I did it.
21      Q Anything else that did you at
22  the house other than what we've already
23  talked about?
24      A I don't think so.

---

Page 85

1      Q Actually, it reminds me, I
2  didn't ask you before, during the
3  construction of the addition, did you submit
4  your bills through Mr. Rothschild or directly
5  to Mrs. Pavia?
6      A That went through Phil.
7      Q All of them?
8      A The invoices did. Once in a
9  while I would get a check from her.
10      Q Directly?
11      A Directly, you know, the bill
12  would be made out to P & D Builders. I would
13  receive -- sometimes the check would come
14  right from her account.
15      Q So would it be true that any
16  work that you did in assembling the gas log
17  fireplace assembly that you put into the
18  office in the addition, your bill for that
19  would have been directed to P & D Builders?
20      A Probably, yes, yes, I'm pretty
21  confident because it was the original scope
22  of work. It was not an extra in any case or
23  anything, you know what I mean. It was --
24  that was what I was hired for. That was --

---

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**MICHAEL CARRESI**
**March 31, 2006**

Page 86

1  should have been; but then again, you know
2  what, that's not necessarily true because I
3  remember one of the first checks I got from
4  that job that Phil was going to give me, she
5  ended up opening her checkbook and just
6  giving it to me. So you know, you never knew
7  where exactly the money was going to come
8  from but you know, it always came.
9      Q But your billing was always to
10  Mr. Rothschild --
11      A Yeah.
12      Q -- on that original project?
13      A Yes.
14      Q I'm not talking about after the
15  fire.
16      A Correct.
17      Q I'm talking about on the --
18      A There's times when there might
19  have been some extra stuff, you know, while
20  you're here, can you do this, you know. I
21  think she would pay me for that, but I don't
22  recall specifically.
23      Q You considered yourself to be a
24  subcontractor of P & D Builders for any of

Page 87

1  the work that you did during the -- during
2  the building of the addition?
3      A Yes.
4      Q And that's why your invoices
5  went to him?
6      A Yes.
7      Q Did you have any discussions
8  with Mrs. Pavia after the fire about her
9  insurance company?
10      A She was always complaining about
11  the insurance company and this and that, but
12  that was the extent of that.
13      Q But other than listening to her
14  complain about the claim process, did you
15  have any specific discussions with her about
16  things that were going to be claimed, things
17  that weren't going to be claimed?
18      A Oh, no, no, I didn't want to get
19  involved with that.
20      Q Did you have any discussions
21  with any of the public adjusters that she
22  hired --
23      A No.
24      Q -- at any time?

Page 88

1      A No.
2      Q Did you have any discussions
3  with anybody from the insurance company at
4  any time?
5      A No.
6      Q Did you and Mr. Rothschild
7  discuss the work that you were doing after
8  the fire?
9      A Well, yeah, he was involved
10  also, so yeah.
11      Q Did you have any discussions
12  with him about the insurance claim?
13      A No.
14      Q When was the first time that you
15  learned that somebody was claiming that your
16  company had something to do with this fire?
17      A Oh, I don't know. I don't
18  recall. I don't recall exactly when the date
19  was, maybe a year ago or something.
20      Q When did you first notify your
21  insurance company about this fire --
22      A When I was notified.
23      Q So would you say it was more
24  than a year after the fire?

Page 89

1      A Yeah -- well, no. The fire took
2  place what, three years after we finished the
3  work?
4      MR. BLACKBURN: January of 04.
5      THE WITNESS: So yeah, so three
6  years after the construction, the fire took
7  place?
8      MR. BLACKBURN: Uh-huh.
9      A Then maybe a year after that,
10  then all the legal stuff started happening.
11  At that time I notified my insurance company.
12      Q So for example, you don't have
13  any recollection of notifying your insurance
14  company within a couple of months let's say
15  of the fire?
16      A No, no, I honestly didn't think
17  I had anything to be concerned about.
18      Q Did you attend any meetings at
19  the Pavia property where there were
20  investigators present looking at the
21  fireplace?
22      A No.
23      Q Did you ever give a statement to
24  anyone about what you had done, a written

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 90

1  statement?
2     A No.
3     Q Did anyone ever record a
4  statement from you about what you had done at
5  the Pavia property?
6     A Yes.
7        THE WITNESS: Is that okay?
8        MR. TURNER: Yes.
9        MR. TURNER: I was about to
10 suggest that I think you did and the next
11 question was very much more precisely worded
12 and you answered it absolutely correctly.
13    Q Do you recall who it was that
14 took that recorded statement from you?
15    A Hold on, hold on, I know his
16 name. I met him here the other day. Dennis
17 O'Neill.
18    Q Somebody from National Grange
19 Insurance Company?
20    A Yes.
21    Q When's the last time you looked
22 at that statement?
23    A I don't think I ever did. I
24 don't think I ever seen it.

---

Page 91

1     Q Let me show you what was marked
2  as Rothschild Exhibit 15 at Mr. Rothschild's
3  deposition.
4     A Yes.
5     Q Have you seen that before, sir?
6     A Yes, sir.
7     Q When's the last time you saw it?
8     A I have a copy of this, actually.
9     Q When's the last time you looked
10 at it?
11    A Maybe a month ago I got it in
12 the mail.
13    Q Did you have a copy of the
14 instructions that you kept after the job?
15    A No, the -- when I finished, this
16 was on the job. This was left for her
17 because there are things in there that she --
18 plus she bought it, so we left it.
19    Q Does Rothschild Exhibit 15
20 appear to you to be the installation and
21 operating instructions that came with the gas
22 log assembly that you installed --
23    A Uh-huh.
24    Q -- in that office at the Pavia

---

Page 92

1  home?
2     A Uh-huh.
3     Q Yes?
4     A Yes.
5     Q Did you determine whether you
6  were installing a burner assembly in a fully
7  vented solid fuel burning fireplace with a
8  working flue?
9     A Say that again.
10       MR. BLACKBURN: Sure.
11    Q Did you determine whether you
12 were installing that burner assembly in a
13 fully vented solid fuel burning fireplace
14 with a working flue?
15    A Did I determine? Can you
16 rephrase that.
17       MR. BLACKBURN: I don't know.
18    A Determine, I don't understand
19 what you mean by the word determine, did I
20 determine.
21       MR. BLACKBURN: Let me break it
22 down a little bit more.
23       THE WITNESS: Thank you.
24    Q Do you know whether the

---

Page 93

1  fireplace within the office in the addition
2  at the Pavia home where you installed the gas
3  log assembly was a fully vented solid fuel
4  burning fireplace with a working flue?
5     A Okay, that's better.
6  Aesthetically, yes, it looked like any other
7  fireplace would look.
8     Q Did you make any attempt to
9  investigate whether it was a fully vented
10 solid fuel burning fireplace with a working
11 flue?
12    A Well, there was a hole cut in
13 next to the plate that we talked about.
14 There was a vent up through the roof. So
15 it's vented. Is it working? It's through
16 the roof, it's working. There's no damper to
17 worry about. So, I would say looking at it,
18 it looked fine.
19    Q Did it have a damper?
20    A No.
21    Q No?
22    A No.
23       MR. BLACKBURN: I don't have any
24 other questions for you, sir. I'm sure these

---

24 (Pages 90 to 93)

# MICHAEL CARRESI
# March 31, 2006

---

Page 94

1  other gentlemen have some questions for you.
2       MR. CARPENTER: Let's take a
3  quick break.
4
5       (Recessed at 11:45 a.m.)
6
7       (Resumed at 11:48 a.m.)
8
9       MR. CARPENTER: Good morning,
10 Mr. Carresi. My name is Curtis Carpenter.
11 I'm the attorney for P & D Builders in this
12 case.
13       Just first I would just like to start
14 off with your educational background.
15    Q Could you briefly go over what
16 your educational background is?
17    A High school, trade -- well, I
18 went to college for a semester.
19    Q Where did you go to high school?
20    A West Roxbury High School.
21    Q Did you take vocational courses
22 at West Roxbury?
23    A No.
24    Q And you said you attended

---

Page 95

1  college for a semester?
2     A Yes.
3     Q Where was that?
4     A Framingham State College.
5     Q Any other education?
6     A Plumbing school.
7     Q When did you attend plumbing
8  school?
9     A 84, 84 through 87.
10    Q 84 through 87?
11    A Yeah.
12    Q And any other educational
13 training?
14    A Just seminars, things like that.
15    Q You stated that during the
16 original construction job at the Pavia
17 residence that you sometimes received checks
18 directly from Miss Pavia, is that correct?
19    A Yes.
20    Q Do you have any knowledge as to
21 why it was you were receiving a check from
22 Julie Pavia rather than P & D and Phil
23 Rothschild?
24    A No.

---

Page 96

1     Q Were you privy to any
2  understanding that Mr. Rothschild may have
3  had with Julie Pavia as to whether or not he
4  was going to receive his traditional 20
5  percent mark up on your --
6     A I wasn't aware of any kind of
7  conditions they had between each other; no
8  idea.
9     Q I think you also stated that
10 from -- since you said from day one you knew
11 there was a gas log appliance going in the
12 addition --
13    A Yes.
14    Q -- was the only question about
15 that gas log appliance where in the room it
16 was going to go; is that the only issue?
17    A Yes.
18    Q It was no question of whether or
19 not -- whether it was going to be a zero
20 clearance unit? The gas log was always going
21 to be a gas log?
22    A Always a gas log. The gas log
23 was purchased by Julie. It was on the job
24 prior to construction.

---

Page 97

1     Q How much prior to your
2  installation do you believe that gas log was
3  on the site?
4     A I wouldn't know, but I would --
5  it would be six months, that wouldn't
6  surprise me.
7     Q To your knowledge would that gas
8  log appliance have been on the job site at
9  the time Joseph Falco did his work?
10    A Yes, that was -- she brought
11 those back from North Carolina or something
12 prior to the completion of the framing, I
13 believe, of that addition.
14    Q So they were there when Joe
15 Falco was building the fireplace?
16    A Yeah.
17       MR. CROWLEY: Objection.
18    A Yes.
19    Q Yes?
20    A Yes.
21    Q Did you ever have any discussion
22 with Joe Falco about the nature of the
23 fireplace that he was building?
24    A No.

---

25  (Pages 94 to 97)

# MICHAEL CARRESI
# March 31, 2006

---

Page 98

1  Q Did you have any conversation
2  with him as to the fact that there was, in
3  fact, a gas log that was going to go in that
4  fireplace?
5  A No.
6  Q And throughout the process of
7  you installing the gas log, were you taking
8  directions from Phil and P & D Builders or
9  were you dealing directly with Julia Pavia?
10  A Both.
11  Q Both meaning --
12  A I took instructions from both,
13  mostly Julia, though.
14  Q What kind of things was Julie
15  instructing you --
16  A Well, she would come in with a
17  layout. Here, this is the way the bathroom's
18  going to be configured, the toilet goes
19  there, the shower goes there.
20  Q Do you know if --
21      MR. CARPENTER: Strike that.
22  Q Do you know who designed the
23  fireplace itself?
24  A I don't know, but I can

---

Page 99

1  speculate Julie probably did.
2  Q Do you know if Julie produced
3  any sketches of the fireplace?
4  A No.
5  Q I'm sorry, you don't know or --
6  A I don't know if she produced any
7  sketches for the fireplace.
8  Q And you testified that during
9  the reconstruction that you billed Miss Pavia
10  directly rather than going through Phil
11  Rothschild?
12  A I did.
13  Q With the work that you performed
14  in the reconstruction, was it simply a matter
15  of restoring it to its original condition or
16  were there additional changes made to the
17  property?
18  A There was a change -- there were
19  changes made to the property.
20  Q Can you just explain as to what
21  was different about the way it was put back
22  as opposed to what was there prior to the
23  fire and the flood?
24  A Well, I can give you a few items

---

Page 100

1  that I was involved in.
2      MR. CARPENTER: Okay.
3  A We put radiant floor heating in
4  the living room where it wasn't before. We
5  installed a new bathroom in the basement
6  where there wasn't one before.
7  Q A new bathroom in the basement?
8  A A new bathroom in the basement,
9  yes. We relocated some piping that was in
10  the way of construction. I think generally
11  that's about all.
12  Q Do you have any knowledge as to
13  whether or not Julie Pavia submitted your
14  invoices for this work to her insurance
15  company for reimbursement?
16  A I have no knowledge of what she
17  did with those invoices, nor was it my place
18  to ask.
19      MR. CARPENTER: Sure.
20  Q Other than the things that you
21  were directly involved with, did you notice
22  other things that were going on with work
23  that you're not necessarily involved with but
24  other work that you noticed was being done

---

Page 101

1  differently than the way it was originally
2  before the fire -- before the damage
3  occurred?
4      THE WITNESS: Are we talking for
5  the fire or the flood?
6      MR. CARPENTER: Just either,
7  either.
8  A See, I couldn't say like if the
9  kitchen cabinets, if they were damaged or
10  not. I don't know. There was -- she had a
11  wood floor in the kitchen prior to the fire
12  and then she installed a granite floor in the
13  kitchen with radiant heat. She put a new
14  floor in the foyer. I can't remember
15  anything else that we did over there.
16  Q You don't know whether or not
17  those items actually required replacement,
18  though?
19  A Oh, I have no idea. I have no
20  idea as far as who was paying for it,
21  anything like that.
22  Q You said you replaced the duct
23  work?
24  A Yes.

---

26 (Pages 98 to 101)

# MICHAEL CARRESI
# March 31, 2006

Page 102

1    Q In your opinion, was it
2    necessary to replace that duct work?
3            MR. BLACKBURN: Object to the
4    form.
5    A I don't know. I mean, if
6    it's -- if it smelled, we replaced the duct
7    work and it doesn't smell. I guess that was
8    the case. I mean, once we put -- once we put
9    the new duct work in, she told me the odor
10   was pretty much gone. So I imagine that did
11   contribute to the smoke smell in the house.
12   Q Did you ever notice any smoke
13   smell emanating from the duct work prior
14   to --
15   A Well, when you go into a house
16   that has had a fire, you can always smell it,
17   even, you know, a year down the line, you can
18   smell it. Because we were in there right
19   after the fire, I don't know where that odor
20   was coming from; if it was coming from the
21   duct work or if it was coming from just the
22   fact that, you know, it was opened up. You
23   could see charred wood.
24   Q Did -- during the time you

Page 103

1    worked on the reconstruction, was Julie Pavia
2    living in the house?
3    A Pretty much, I believe she was.
4    I mean, she might have been. I don't know.
5    I really didn't keep track of her, but --
6            MR. CARPENTER: Sure, sure.
7    A -- but for the most part, I
8    think so.
9    Q What portions of the house were
10   still livable at that time?
11   A Livable? Well, I mean,
12   everybody has a definition of livable.
13           MR. CARPENTER: True, true.
14   Q Undamaged, let's say.
15   A Undamaged, undamaged; the
16   bedrooms with the exception of the odor,
17   that's the only thing that could have been an
18   issue upstairs. The kitchen, that had the
19   water damage. The bathrooms, I don't know,
20   she has like seven of them. I mean, the
21   living room was okay.
22   Q Did you ever work with Michael
23   Roach?
24   A Mike Roach, yes, I have.

Page 104

1    Q And how do you know Michael
2    Roach?
3    A Through working with Phil.
4    Q And how often have you worked
5    with him in the past?
6    A Well, I would -- I couldn't tell
7    you how often. I would say he was on
8    maybe -- he didn't do every job that Phil was
9    doing, but he did -- he was around; so it was
10   often, it was often.
11   Q Did you ever have any
12   discussions with him about the fire at the
13   Pavia house?
14   A Not that I recall.
15   Q And Michael Conti, do you know
16   Michael Conti?
17   A Yes, I do.
18   Q And do you know him from work?
19   A Yes.
20   Q How often do you work with
21   Michael Conti?
22   A Less than Mike Roach.
23   Q When's the last time you worked
24   with him?

Page 105

1    A Julie's house, I guess.
2    Q Julie's house the first time or
3    the second time?
4    A The first time. I don't
5    think -- Mike Conti didn't work there the
6    second time I don't think.
7    Q Did you ever have any
8    discussions with Michael Conti about this
9    fire?
10   A Not that I can recall.
11   Q I assume you know Chip Gubbins;
12   correct?
13   A Yes.
14   Q Do you know if Chip had any work
15   or did any work in regards to this fireplace?
16   A I think to my best knowledge
17   that he did do the bookshelves and that
18   miscellaneous trim work that needed to be
19   done after they moved in.
20           MR. CARPENTER: That's all I
21   have.
22
23
24

27 (Pages 102 to 105)

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# MICHAEL CARRESI
# March 31, 2006

## Page 106

1    EXAMINATION BY MR. OBER:
2         MR. OBER: Good morning again.
3    My name is Scott Ober. I represent
4    Heatmaster in this case.
5         Q If you can just for a moment
6    take a look at what was marked as Exhibit 15
7    at Mr. Rothschild's deposition yesterday. I
8    believe you said before that those were the
9    installation and operating instructions that
10   came with the gas log appliances that you
11   installed at the Pavia house?
12        A Correct.
13        Q Were -- you ultimately ended
14   installing three of them?
15        A Yes.
16        Q The one in the bedroom never got
17   installed?
18        A Right.
19        Q Were each of those gas log
20   appliances that you installed identical,
21   identical in terms of models?
22        A Yes.
23        Q So that there was a copy of
24   those instructions that came with each of the

## Page 107

1    three units that you installed?
2         A Correct.
3         Q And you said that you reviewed
4    those in connection with your installation of
5    those units?
6         A Yes, sir.
7         Q Was there anything about the
8    instructions that you didn't understand?
9         A No.
10        Q Was there anything that you
11   found ambiguous in the instructions?
12        A No.
13        Q When you installed the unit in
14   the second floor office that was part of the
15   addition --
16        A Yes.
17        Q -- was it your understanding
18   that that fireplace was a solid fuel burning
19   fireplace?
20             THE WITNESS: Was it my
21   understanding that it was?
22             MR. OBER: Yes.
23        A Yes.
24        Q It was your understanding that

## Page 108

1    that fireplace had been built according to
2    the Massachusetts regulations of the building
3    code?
4         A Yes; and also these instructions
5    because that gas log was on the job prior to
6    the construction.
7         Q So that when you went to install
8    the unit on the -- in the second floor
9    office, it was your understanding that the
10   fireplace had been built according to the
11   Massachusetts regulations?
12        A Yes.
13        Q Was it your understanding that
14   that fireplace on the second floor also had a
15   working flue?
16        A Yes.
17        Q And was it your understanding
18   that that fireplace on the second floor was
19   also vented in accordance with the
20   Massachusetts regulations?
21        A Yes.
22        Q When you installed the gas log
23   unit, was there a permanent vent opening to
24   the outside?

## Page 109

1         A Yes.
2         Q At any point during your
3    installation of gas log unit, did you have
4    any question that the fireplace in the second
5    floor office was a solid fuel burning
6    fireplace?
7              THE WITNESS: Was there any
8    question?
9              MR. OBER: Yes.
10        A No, there wasn't.
11        Q Did you ever have any discussion
12   about whether it was built to code, whether
13   it was a solid wood burning fireplace?
14        A No, I assumed that it was.
15        Q The other two units that you
16   installed in the house, were those installed
17   in existing fireplaces?
18        A Yes.
19        Q And one was downstairs in the
20   living room?
21        A Yes.
22        Q And the other one was in the
23   basement?
24        A Correct.

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**MICHAEL CARRESI**
**March 31, 2006**

Page 110

1      MR. OBER: That's all I have.
2  Thank you.
3      THE WITNESS: Thank you.
4
5
6      EXAMINATION BY  MR. CROWLEY:
7      MR. CROWLEY: Good afternoon,
8  sir. My name is David Crowley. As I
9  introduced myself earlier, I represent Joseph
10  Falco in this case.
11     Q What is your date of birth?
12     A 9/14/64.
13     Q And as I understand it, you are
14  a master plumber?
15     A Correct.
16     Q Do you have any other
17  construction related licenses?
18     A No.
19     Q In order to obtain your master
20  plumbing license, did you have to take a test
21  involving the building code?
22     A No.
23     Q How did you obtain that license?
24     A I obtained my plumbing license,

Page 111

1  I took a test on the plumbing code.
2      Q Just the plumbing code?
3      THE WITNESS: As opposed to?
4      MR. CROWLEY: The building code
5  in general.
6      A No.
7      Q Do you own a copy of the
8  Massachusetts building code?
9      A No.
10     Q Before you worked at the Pavia
11  house during the addition work, were you
12  familiar with the requirements for a solid
13  fuel burning fireplace?
14     A No.
15     Q Did you understand what was
16  meant by the term solid fuel burning
17  fireplace prior to your work installing the
18  gas logs in the addition?
19     A I think so.
20     Q How did you understand that
21  term?
22     A That the fireplace is equipped
23  to handle logs or regular wood logs for
24  burning and/or gas logs.

Page 112

1      Q Did you understand how a
2  fireplace had to be built in order to be a
3  solid fuel burning fireplace?
4      A No.
5      Q Prior to your installation of
6  the gas logs at the Pavia addition, had you
7  ever seen a fireplace built as small as the
8  one that was built in the office there?
9      THE WITNESS: Have I ever seen
10  one as small as that?
11     MR. CROWLEY: Yes.
12     A Yes.
13     Q And the fireplaces that you saw
14  that were as small as the one at the Pavia
15  house, were those for wood burning?
16     A I think it was, yes. Well, it
17  was all masonry that had a vent, had a
18  flue.
19     Q There was no masonry chimney on
20  the Pavia fireplace, was there?
21     A No.
22     Q And approximately how big was
23  the opening to that fireplace?
24     THE WITNESS: Which opening are

Page 113

1  we referring to? The box? The fire box?
2      MR. CROWLEY: Let me rephrase
3  the question.
4      Q The masonry opening to the
5  fireplace where you put the logs in,
6  approximately how big was that opening?
7      A Thirty inches.
8      Q And when you installed the gas
9  logs in the fireplace, was there a hearth
10  there?
11     A Yes, it was brick.
12     Q Approximately how long and wide
13  was the hearth?
14     A Well, it was in a corner, so it
15  was pretty long because it went from corner
16  to corner. If I remember correctly, it's
17  been a long time, but maybe a foot and a half
18  maybe. I honestly don't remember visually
19  exactly what it looked like.
20     Q So you can't estimate for me how
21  wide the hearth was?
22     A No. Well, four feet, maybe five
23  feet.
24     Q Can you estimate for me how much

29 (Pages 110 to 113)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# MICHAEL CARRESI
## March 31, 2006

### Page 114

1 space there was from the end of the fireplace
2 to the end of the hearth?
3     A I couldn't. I would just be
4 guessing if I told you.
5     Q Did you examine the hearth at
6 all prior to putting the gas logs in the
7 fireplace?
8     A I looked at it. I mean, it was
9 all brick. It was brick. It was a brick
10 hearth. It was brick. Everything was brick.
11     Q The brick hearth, was that laid
12 into the floor?
13     A I don't remember if it was
14 above. It might have been above. I don't
15 remember exactly. I think it was above the
16 floor. The subfloor are you referring to or
17 the finished floor?
18         MR. CROWLEY: The finished
19 floor.
20     A I think it was above.
21     Q So your memory is that the brick
22 hearth was not built into the finished floor?
23         THE WITNESS: Built into, down
24 into it?

### Page 115

1         MR. CROWLEY: Yes.
2     A Oh, I wouldn't know that because
3 visually looking at it, it just comes down
4 then goes down into the floor. So you can't
5 see what's underneath it from the room. You
6 can't see how it was constructed.
7     Q Looking at the hearth, could you
8 see whether it was raised up out of the
9 finished floor?
10     A It was -- it looked like it was
11 above the finished floor.
12     Q Approximately how much above the
13 finished floor was the hearth?
14     A It looked like one brick maybe,
15 one brick height, maybe, three, four, five;
16 four inches maybe.
17     Q Approximately four inches?
18     A Yes.
19     Q Before you installed the gas
20 logs in the fireplace in the office, did you
21 ever see any plans or specifications in
22 writing for that work?
23     A No.
24     Q Before you installed the gas

### Page 116

1 logs, did you ever discuss with Mr.
2 Rothschild whether a building permit needed
3 to be obtained for that fireplace?
4     A No.
5     Q Did you ever discuss with Mr.
6 Rothschild whether you needed to obtain a gas
7 permit for the installation of the gas logs?
8     A Did I ever have a conversation
9 regarding the gas permit? No.
10     Q So you never spoke to Mr.
11 Rothschild about obtaining a gas permit for
12 the fireplace?
13     A The gas permit in place, not
14 having the gas log checked off on the permit
15 was strictly an oversight. I assumed, and
16 I'm sure he did also, that there was a permit
17 on the job -- gas permits on the job.
18     Q When did you install the gas
19 logs in the fireplace?
20     A It was at the end of the job.
21     Q What year?
22         THE WITNESS: What's the
23 certificate of occupancy?
24         MR. CROWLEY: August of 2001.

### Page 117

1     A It was probably September of
2 2001.
3     Q So you --
4     A It was before the occupancy
5 permit.
6         MR. TURNER: Before wouldn't be
7 September then, right? The occupancy permit
8 was August of 2001.
9         THE WITNESS: Oh, I'm sorry, I'm
10 sorry. Thank you. Prior to that, so it was
11 prior to that, so maybe over the summer,
12 June, July maybe. I don't know when they got
13 the occupancy permit, but I know my work had
14 to be done before they could get that, so
15 obviously, it was done before the occupancy
16 permit.
17     Q Do you recall installing gas
18 logs in the office during the summer months?
19     A Yeah, I -- I'm just guessing.
20 I'm pretty sure it was.
21     Q Your best estimate would be that
22 you did that work in the summer of 2001?
23     A Yes.
24     Q Does your plumbing license

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 118

1  qualify you to install gas logs?
2      A  Sure, it's a gas appliance.
3      Q  So you don't need a separate gas
4  fitting license to put in gas logs?
5      A  No, it falls under the plumbing
6  license.
7      Q  Prior to the installation of the
8  gas log fireplace on the addition, had you
9  ever had any specific training regarding the
10  installation of Heatmaster products?
11      A  Specific training on Heatmaster
12  products?  No, they're the same as all the
13  gas logs pretty much.
14      Q  Was it your understanding that
15  all gas logs need to be installed in solid
16  fuel burning fireplaces?
17      A  Yes.
18      Q  Did you ever work on the
19  fireplace in the addition when Mr. Falco was
20  present?
21      A  I don't recall.  No, probably
22  not.
23      Q  Had you ever been in the
24  addition while it was framed prior to the

---

Page 119

1  finish carpentry work?
2      A  Probably.
3      Q  Did you ever see any holes cut
4  out in the plywood floor in the office to
5  accommodate a hearth or other portions of the
6  fireplace?
7      A  I don't recall seeing anything
8  like that.
9      Q  Do you recall that somebody put
10  down Dura Board or Durarock underneath the
11  fireplace?
12      A  I wasn't there during the
13  construction of the fireplace.
14      Q  So you don't know either way?
15      A  No.
16      Q  Do you know how much you charged
17  Mr. Rothschild to install the gas logs in the
18  office?
19      A  No, because it was part of the
20  original contract.
21      Q  Was your original contract with
22  Mr. Rothschild for a sum certain, flat fee?
23      A  Yes.
24      Q  How were you paid by Mr.

---

Page 120

1  Rothschild?  Was it in installments?
2      A  Yes.
3      Q  How much was your original
4  contract with Mr. Rothschild for that job?
5      A  I don't recall exactly, but it
6  was around 100, $100,000 approximately.
7      Q  And did that price change at all
8  during the course of your work?
9      A  I think so.  I think there was
10  some extras and things like that that she
11  added.
12      Q  You mentioned earlier that the
13  gas logs were stored on the property?
14      A  Yes.
15      Q  Do you recall that?
16      A  Yes.
17      Q  And that was during the
18  construction of the addition?
19      A  Yes.
20      Q  Where were they stored?
21      A  Well, I know for most of the
22  time, for the longest time they were in the
23  garage.
24      Q  Did you see them in the garage?

---

Page 121

1      A  Yes.
2      Q  Do you know whether they were
3  stored at any point in any other location on
4  the property?
5      A  Not that I'm aware of.  The only
6  two places I've ever seen them was the garage
7  then up in the room, the office.
8      Q  When you went to install the gas
9  logs in the office, did you bring the gas
10  logs with you?
11      A  No, they were up there.
12      Q  Do you know who put them there?
13      A  No, I do not.
14      Q  Do you know how long the gas
15  logs had been in the office prior to you
16  installing them?
17      A  No, I do not.
18      Q  Your understanding is that Mr.
19  Dusault installed the vent for the fireplace?
20      A  Yes.
21      Q  Do you know when that work was
22  done?
23      A  No.
24      Q  Do you know --

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 122

1        MR. CROWLEY:  Strike that.
2        Q Did you see Mr. Falco doing any
3    of his work on the fireplace?
4        A No.
5        Q Do you know whether Mr. Dusault
6    was present at the project while Mr. Falco
7    was doing his work?
8        A I wouldn't know.
9        Q During the construction of the
10   addition, did you have several projects going
11   on at that time?
12       A Probably.
13       Q Do you recall any of the other
14   projects you had going on during the
15   addition?
16       A At that time we were working
17   for -- well, you got the big projects, then
18   you've got all the little jobs.  So I mean,
19   another big project that we were working on
20   was down in Marion, then another one in
21   Newton, then you know, I know I had other
22   jobs going on at the same time, but I
23   couldn't tell you what they were.
24       Q So you weren't at the Pavia

Page 123

1    house everyday?
2        A Oh, no.
3        Q How often would you be there?
4        A Only when I needed to be, when
5    it was time for my scope of work, things that
6    I had to do, rough plumbing, you know, then
7    come back at the end, do your finish work.
8    So there was a big gap, you know.  I had work
9    to do in the basement.  But between the time
10   you actually do the rough plumbing and the
11   time that they put the tile in is a big gap
12   there, so there wasn't a need for me to be
13   there.
14       Q Would Mr. Rothschild get in
15   touch with you and coordinate your work with
16   the other subcontractors's work?
17       A Yes, him or Julie would
18   sometimes call me.
19       Q They would say, we're ready for
20   you to do the plumbing at a certain location?
21       A Correct.
22       Q And as far as installing the gas
23   log in the addition, did somebody call you
24   and tell you that they were ready to do that?

Page 124

1        A Yeah, and I couldn't tell you if
2    it was Julie or Phil, but I'm sure it was one
3    of them.
4        Q It was either Mr. Rothschild or
5    Miss Pavia?
6        A Correct.
7        Q Mr. Falco never called you and
8    said, we're ready for you to put the gas log
9    in?
10       A Oh, no.
11       Q In fact, you never spoke with
12   Mr. Falco about the fireplace and the gas
13   logs?
14       A Correct.
15       Q How did you obtain the
16   instructions for the installation of the gas
17   logs?
18       A Well, they were in the box.
19   They were in the box that was there on the
20   ground open; everything was right there.
21       Q When you came in the office to
22   install the gas logs, was the box there?
23       A Yes, it was there.  It was open.
24       Q Where were the instructions?

Page 125

1        A Inside the box.  I don't
2    remember if they were on the top, the bottom,
3    the sides, but they were there.
4        Q You indicated earlier that you
5    believed the fire was caused by the improper
6    installation or construction of the
7    fireplace.  Do you recall that?
8        A Yes.
9        Q How do you know that?
10       A How do I know that?  I was told
11   by the fire investigator that day, that
12   morning of the fire and then, obviously,
13   after that, you know, curiosity, I talked to
14   another builder and I said, well, I said,
15   this is what they did and they explained to
16   me the proper way to do it and I said, oh, I
17   didn't know, but that's -- that was the
18   problem.  The problem was there was no air
19   gap or no cement.  I guess it needed an air
20   gap and some cement or something underneath
21   the fire box.  That's what was explained to
22   me.
23       Q Who explained that to you?
24       A Another builder.

32  (Pages 122 to 125)

**MICHAEL CARRESI**
**March 31, 2006**

Page 126

1    Q Who is that?
2    A Jay Knightenson (phonetic).
3    Q Did the builder explain to you
4    that the fireplace needed to have a masonry
5    chimney?
6    A No, we never talked about the
7    chimney because that was -- that wasn't ever
8    an issue.
9    Q Did the builder explain to you
10   that there needed to be framing work done to
11   accommodate a cement pad below the fireplace?
12   A Well, he didn't get specific as
13   far as like exactly how it's supposed to be
14   framed; but he did mention it's supposed to
15   be a slab underneath it because the issue was
16   the bottom of the fire box, not the flue or
17   anything, but the bottom of the fire box
18   wasn't built properly and that's what caused
19   it, unfortunately.
20   Q But you're not aware of any
21   other requirements, codes, requirements for
22   the construction of fireplaces?
23   A No, no, it was just a vague
24   conversation that we had. It wasn't really

Page 127

1    detailed.
2    Q When you installed the gas logs
3    in the fireplace, did you understand that the
4    insertion of a gas log fireplace in that
5    structure violated the Massachusetts building
6    code?
7    A No idea.
8    Q Were you ever present at the
9    Pavia home for any inspections performed by
10   the Newton building inspector?
11   A No.
12   Q Who handled those inspections?
13   A I can only assume it was Phil
14   Rothschild because it was his building
15   permit.
16   Q Mr. Rothschild was the builder
17   of record on that job?
18   A Yes.
19   Q Prior to the Pavia job, did you
20   know anything about Mr. Falco's experience in
21   constructing fireplaces?
22   A I've known Joe for a long, long
23   time. I knew he was a mason. I knew he
24   built fireplaces. That's basically all I

Page 128

1    knew. I knew him kind of personally, you
2    know, and I knew his sons. But I really
3    didn't know like really technical, you know
4    what I mean, work stuff. It was more of a
5    friendly basis.
6    Q So you didn't know whether he
7    was licensed?
8    A No. I mean, I didn't know if
9    he -- I assumed he was because he's been
10   doing this work forever.
11   Q Did you rely on Mr. Rothschild
12   to insure that the fireplace in this office
13   was constructed properly?
14   A I relied on -- yeah, I relied on
15   the people who built that, the people who
16   built it. I assumed that everybody there
17   was, you know, doing the right thing.
18   Q The builder of record for that
19   fireplace was Mr. Rothschild in your mind?
20   A The builder of the fireplace? I
21   mean, the builder, I mean, the guy who
22   actually puts it together is what, I mean,
23   it's the builder, right? It would be -- if
24   Joe's the builder of fireplace, Phil's the

Page 129

1    contractor of the whole job.
2    Q Including the fireplace?
3    A Well, including everything on
4    the job.
5    Q That would include the
6    fireplace?
7    A Yeah.
8    Q The day before the fire, you
9    were at the Pavia residence for the flood?
10   A Yes.
11   Q Was there any issue with the
12   heat as a result of the flood?
13   A Not that I was aware of.
14   Q Was the heat on in the building
15   when you went there?
16   A Yes.
17   Q Was the electricity on?
18   A Yes, maybe not in the kitchen
19   because of the lights. The water was coming
20   through the lights. I'm not sure if she shut
21   the breakers off. I don't know about that,
22   but there was power in the house.
23   Q Did you ever have any
24   conversation with Miss Pavia about her use of

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# MICHAEL CARRESI
# March 31, 2006

<table>
<tr><td colspan="2">Page 130</td></tr>
</table>

Page 130

1  the fireplace in the office in the days
2  before the fire?
3      A No.
4      Q Were you ever present for any
5  discussions between Mr. Falco and Mr.
6  Rothschild concerning what Mr. Falco was to
7  build --
8      A No.
9      Q -- with respect to the
10  fireplace?
11      A No.
12      Q So you don't know whether Mr.
13  Falco was ever told to build a solid fuel
14  burning fireplace in the office?
15      A No, but it was pretty, you know,
16  known.
17      Q How was it known?
18      A Well, you know that steel plate
19  that we referred to, the steel plate that
20  goes on top of the fire box there, the steel
21  plate and a hole cut out in it?  That's the
22  flue, the flue for the fireplace.  You
23  wouldn't have that.  If it wasn't a working
24  fireplace, you wouldn't have a flue.

Page 131

1      Q Have you ever seen flue pipes on
2  any zero clearance units?
3      A Oh, yeah.  Well, yeah, vents,
4  it's a vent actually.
5      Q A vent pipe similar to the vent
6  pipe that you saw at the Pavia residence?
7      A Yeah, but they're a lot smaller.
8      Q Similar, though?
9      A Similar; it's duct work.
10      Q There's duct work for zero
11  clearance fireplaces?
12      A Yeah.
13      Q There are?
14      A Yes.
15      Q So you don't have any knowledge
16  or information from any source that Mr. Falco
17  was ever told to build a solid fuel burning
18  fireplace in the office on the second floor?
19      A No.
20      Q Have you ever had any
21  conversation with Mr. Rothschild as to who he
22  believes caused the fire?
23      A No.
24      Q Are you currently in business

Page 132

1  with Mr. Rothschild?
2      A We just started trying to put a
3  company together, yes.
4      Q RC Kitchens & Baths?
5      A Uh-huh.
6      Q Is that correct?
7      A Yes.
8      Q Is that a corporation?
9      A It's going to be.
10      Q Have you spoken with Mr. Falco
11  at all since the time of the fire?
12      A No.  I drove by him yesterday.
13      Q But you didn't speak to him?
14      A No.  I would have if I saw -- if
15  I had a chance, but we were going in the
16  wrong direction.
17      Q Do you have any documents
18  relating to the work you did at the Pavia
19  residence prior to the fire?
20      A No, sir.
21      Q You threw those away?
22      A Unfortunately.
23      Q Why did you throw them away?
24      A Well, because all the paperwork

Page 133

1  that comes with being in business, I'm like,
2  well, that job's all done, it's all said and
3  done.  It's been a couple of years.  I'm
4  like, okay, I don't need that any more, you
5  know, my tax records are all done.
6      Q So just in the usual course of
7  business, you thought you would throw those
8  documents away?
9      A Yes.
10      Q As you sit here today, do you
11  know whether you ever pulled a gas permit for
12  the installation of gas logs at the Pavia
13  residence?
14      A I honestly thought it was on
15  that permit and if it's not and if there's
16  not another one that exists, it was a
17  complete oversight.  I had all intentions of
18  installing the gas log always, and I filed my
19  permits like I always do.
20      Q Do you have a specific memory
21  that the gas log fireplace in the office was
22  ever inspected by the gas inspector?
23      A I don't have a specific memory,
24  but I remember walking him through the house,

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

Page 134

1  showing him everything that we did. I can't
2  specifically recall like, okay, here's the
3  fireplace. You know what I mean? We did a
4  lot of things in that house.
5      Q Do gas log fireplaces need to be
6  inspected by a fire inspector as well?
7      A I don't know. I don't know. I
8  know the building -- the building inspector
9  inspects it. I'm not sure about the fire
10  inspector.
11      Q The information that you
12  received on the fireplace, you received that
13  information from Mr. Rothschild and Miss
14  Pavia?
15      A What information?
16      Q The information as to what they
17  wanted installed on that fireplace.
18      A The information, are you talk --
19  are you referring to the gas log itself?
20      Q Well, did somebody tell you to
21  put a gas log in that fireplace?
22      A Yeah.
23      Q Who was that?
24      A Julie always said she was going

Page 135

1  to have a gas log in that fireplace.
2      Q So Julie told you that?
3      A Yeah, I mean, it was on my
4  proposal.
5      Q Did you maintain any type of a
6  journal or work log for this project?
7      A I had time and material slips
8  when I had done the job for any extra work
9  that had been done, but not like -- the work
10  that was under proposal with Phil, I didn't
11  keep track on how many days I spent there
12  really, only like additional work that needed
13  to be done for billing purposes.
14      Q Any paperwork that you generated
15  on the job, did you give that to Mr.
16  Rothschild?
17      A Yeah. You mean like bills?
18  Yeah, it would go to him. Sometimes he'd say
19  just give it to her.
20      Q During your work on the addition
21  at the Pavia residence, did Mr. Rothschild
22  ever say to you that he was not going to be
23  involved with the construction of the
24  fireplace and the gas logs?

Page 136

1      A Did he ever say that? No, not
2  that -- no.
3      Q Did Mr. Rothschild ever say
4  anything to you about the fact that he was
5  going to exclude that work from his scope of
6  work on the job?
7      A I never had a conversation that
8  I recall that was like that.
9      Q And you don't know whether Mr.
10  Rothschild received any type of profit for
11  the work you did on the fireplaces,
12  installing the gas logs?
13      A No. I mean, I give him the
14  bills. You know, if he marks it up, he marks
15  it up, you know, that's not my business.
16      Q Typically in the construction
17  industry, when you're there as a
18  subcontractor, do you expect the general
19  contractor to take a profit on the work
20  you're doing?
21      A Yes.
22      Q You were doing the work on the
23  gas log fireplace for Mr. Rothschild?
24      A Yes.

Page 137

1      Q Do you know what existed in the
2  office when Mr. Falco began his work
3  constructing the fireplace?
4      A No.
5          MR. CROWLEY: Thank you. That's
6  all the questions I have for you.
7
8
9          EXAMINATION BY MR. BLACKBURN:
10      Q Mr. Carresi, when you put the
11  gas log assembly into the fireplace, were the
12  hardwood floors already installed in the
13  room?
14      A I don't remember. I don't
15  remember that.
16      Q I think in response to one of
17  the questions from one of the other attorneys
18  you said that there was no question in your
19  mind that you were installing the gas log
20  assembly into a solid fuel burning fireplace;
21  right?
22      A Yes.
23      Q What did you base that belief
24  upon at the time that you were doing that

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**MICHAEL CARRESI**
**March 31, 2006**

---

Page 138

1  installation?
2       A Well, the gas log was there.
3  The fireplace was built for the gas log. I'm
4  assuming that everything looked normal
5  from -- to visually look at it, okay, looks
6  fine to me, you know, put it in. So you
7  count on the people prior, before you to
8  build an adequate fireplace.
9       Q Who would have been those people
10  that you were relying upon to build an
11  adequate fireplace?
12       A It would be -- it would be
13  between the mason, the contractor.
14       Q So Mr. Falco and Mr. Rothschild,
15  P & D Construction?
16       A Yes.
17       Q Anything else that you base that
18  belief upon other than what you've just
19  described?
20       A No.
21       Q At the time that you installed
22  the assembly -- the log assembly into the
23  fireplace in the office, was the first floor
24  ceiling plastered?

---

Page 139

1       A Yes, yes.
2            MR. BLACKBURN: I have nothing
3  else. Thank you.
4
5
6       EXAMINATION BY  MR. CARPENTER:
7            MR. CARPENTER: Just one
8  question.
9       Q Do you remember ever
10  participating in any conversation,
11  overhearing a conversation concerning how
12  long Julie Pavia had left that gas log on
13  prior to the fire?
14       A No.
15            MR. CARPENTER: Thank you.
16
17
18       EXAMINATION BY MR. OBER:
19       Q When you went to install the gas
20  log fireplace in the second floor office, you
21  said that the box was already up there?
22       A Yes.
23       Q And was -- it was already open?
24       A Yes.

---

Page 140

1            Q The instructions were still in
2  there, though, you said?
3       A Yes.
4       Q Do you remember seeing warranty
5  information in there as well?
6       A It was within the paperwork, I
7  believe.
8       Q I'm going to show you that.
9  Does that appear to be the warranty
10  information that was also in the box along
11  with the --
12       A Probably.
13       Q -- instructions?
14            THE WITNESS: Is it like a card?
15            MR. OBER: Yes.
16       A Yes, it was probably up there.
17            MR. OBER: Can we have that
18  marked as an exhibit.
19
20            (Exhibit Number 1, Warranty,
21            marked for identification.)
22
23       Q At the conclusion of your work,
24  you said you provided or you left the

---

Page 141

1  instructions and operating manual with Julie?
2       A Yes.
3       Q Did you also leave the warranty
4  information with her as well?
5       A Oh, yeah.
6            MR. OBER: That's all I have.
7  Thank you.
8            MR. CROWLEY: I don't have any
9  other questions.
10            MR. TURNER: Thank you.
11
12            (Deposition Concluded at 12:41 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

---

36 (Pages 138 to 141)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# MICHAEL CARRESI
# March 31, 2006

Page 142

```
 1              CERTIFICATION
 2       I, Darlene Coppola, a Notary Public, do
 3  hereby certify that MICHAEL CARRESI, after
 4  having satisfactorily identifying himself,  came
 5  before me on the 31st day of March, 2006 in
 6  Auburn, Massachusetts, and was by me duly sworn
 7  to testify to the truth and nothing but the
 8  truth as to his knowledge touching and
 9  concerning the matters in controversy in this
10  cause; that he was thereupon examined upon his
11  oath and said examination reduced to writing by
12  me; and that the statement is a true record of
13  the testimony given by the witness, to the best
14  of my knowledge and ability.
15       I further certify that I am not a relative
16  or employee of counsel/attorney for any of the
17  parties, nor a relative or employee of such
18  parties, nor am I financially interested in the
19  outcome of the action.
20       WITNESS MY HAND THIS 10th day of April,
21  2006.
22  DARLENE M. COPPOLA
23  NOTARY PUBLIC
24  REGISTERED PROFESSIONAL REPORTER
```

Page 144

```
 1        UNITED STATES DISTRICT COURT
 2       FOR THE DISTRICT OF MASSACHUSETTS
 3
 4
 5
 6
 7  *********************************
 8  THE FIREMAN'S FUND INSURANCE
 9  COMPANY as subrogee of JULIA PAVIA,
10             Plaintiff
11  vs.
12  FALCO CONSTRUCTION CORP., P&DK
13  BUILDERS, INC. and MICHAEL
14  CARRESI d/b/a CARRESI PLUMBING &
15  HEATING,          C.A. 05-10827DPW
16             Defendants
17  vs.
18  HEATMASTER, INC.,
19             Third-party Defendant
20  *********************************
21
22
23
24
```

Page 143

```
 1  Today's Date:    April 10, 2006
 2  To:       Robert Turner, Esq.
 3  Copied to:    Stuart Blackburn, Esq.
 4             Curtis Carpenter, Esq.
 5             David Crowley, Esq.
 6             Scott Ober, Esq.
 7  From:    Darlene M. Coppola, RPR
 8  Deposition of:   Michael Carresi
 9  Taken:      March 31, 2006
10  Action:      FIREMAN'S FUND Vs. FALCO
11  _____
12       Enclosed is a copy of Mr. Carresi's
13  deposition. Pursuant to the Rules of Civil
14  Procedure, Mr. Carresi has thirty days to sign
15  the deposition from today's date.
16       Please have Mr. Carresi sign the enclosed
17  signature page.  If there are any errors, please
18  have him mark the page, line and error on the
19  enclosed correction sheet.  He should not mark
20  the transcript itself.  This addendum should be
21  forwarded to all interested parties.
22       Thank you for your cooperation in this
23  matter.
24
```

Page 145

```
 1
 2       I, MICHAEL CARRESI, say that I have read
 3  the foregoing deposition and hereby declare
 4  under penalty of perjury the foregoing is true
 5  and correct.
 6       Executed this _____ day of
 7  _____, 2006, at _____,
 8  _____.
 9
10
11
12
13
14  _____
15  MICHAEL CARRESI
16  DC
17
18
19
20
21
22
23
24
```

# CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**MICHAEL CARRESI**
**March 31, 2006**

Page 146

```
 1            CORRECTION PAGE
 2     DEPONENT:  MICHAEL CARRESI
 3     DATE TAKEN: March 31, 3006
 4     CASE:      FIREMAN'S FUND vs. FALCO, et al
 5     ************************************************
 6     PAGE / LINE / SHOULD READ
 7     _____/_____/_____
 8     _____/_____/_____
 9     _____/_____/_____
10     _____/_____/_____
11     _____/_____/_____
12     _____/_____/_____
13     _____/_____/_____
14     _____/_____/_____
15     _____/_____/_____
16     _____/_____/_____
17     _____/_____/_____
18     _____/_____/_____
19     _____/_____/_____
20     _____/_____/_____
21     _____/_____/_____
22     _____/_____/_____
23     _____/_____/_____
24     _____/_____/_____
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

EXHIBIT 6

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,

    Plaintiff

    vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
    Defendants

    vs.

Heatmaster, Inc.,
    Third-Party Defendant

    **DEPOSITION OF MICHAEL J. ROACH,** a witness
called on behalf of the Defendant Falco Construction
Corp., pursuant to the Federal Rules of Civil
Procedure, before Jessica L. Bisaillon, a Registered
Professional Reporter, Certified Shorthand Reporter,
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Toomey & Yudysky,
LLP, 99 Summer Street, Boston, Massachusetts
02110, on Friday, March 3, 2006, commencing at
10:05 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

---

The Law Offices of Stuart G. Blackburn
    BY:   Stuart G. Blackburn, Esquire
    Two Concorde Way
    Post Office Box 608
    Windsor Locks, Connecticut 06096
    Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
    BY:   David J. Crowley, Esquire
    99 Summer Street
    Boston, Massachusetts 02110
    Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
    BY:   Curtis L.S. Carpenter, Esquire
    250 Summer Street
    Boston, Massachusetts 02210
    Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
    BY:   Robert T. Turner, Esquire
    27B Midstate Drive, Suite 100
    Auburn, Massachusetts 01501
    Appearing on behalf of Michael Carresi,
    d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
    BY:   Scott T. Ober, Esquire
    484 Main Street, Suite 560
    Worcester, Massachusetts 01608
    Appearing on behalf of Heatmaster, Inc.

---

3

I N D E X

DEPOSITION OF:                 PAGE

MICHAEL J. ROACH

Examination by Mr. Crowley     4
Examination by Mr. Turner     58
Examination by Mr. Blackburn    70
Examination by Mr. Ober      89
Examination by Mr. Carpenter    91
Reexamination by Mr. Turner    92

E X H I B I T S

EXHIBIT NO.                  PAGE

* * * * *

---

4

1        MR. CROWLEY:  All right.  So now the

2  matter at hand.  We want to agree to the usual

3  stipulations, the same ones we've been using all

4  along, reserving all objections except as to the

5  form of the question until the time of trial,

6  reserving all motions to strike until the time

7  of trial.  And will you swear in the witness,

8  please.

9        **MICHAEL J. ROACH,** after having been

10  satisfactorily identified by the production of

11  his Massachusetts driver's license and having

12  been duly sworn by the Notary Public, was

13  examined and testified as follows:

14        **EXAMINATION BY MR. CROWLEY:**

15  Q.  Sir, would you please state your full name?

16  A.  Michael John Roach.

17  Q.  Mr. Roach, my name is David Crowley, and I

18  represent Joseph Falco in this case.

19  A.  Uh-huh.

20  Q.  Have you ever been to a deposition before?

21  A.  Yes.

22  Q.  How many times?

23  A.  Once.

24  Q.  Are you represented by counsel today?

6

1  A.  No.

2  Q.  So you're somewhat familiar with the ground rules

3      for depositions.  The most important thing to

4      remember is it's question and answer format with

5      the stenographer recording your testimony.  So

6      you have to keep in mind to respond verbally to

7      my questions.

8  A.  Okay.

9  Q.  Before we get started, I have to tell you that

10     you have the right to receive a copy of the

11     deposition transcript and to review it for

12     accuracy.

13  A.  Yes.  Send me one, please.

14  Q.  You'd like to receive it.  Along with the

15     transcript, you'll receive what is called an

16     errata sheet, and that is a piece of paper where

17     you can make corrections or changes to your

18     testimony.

19  A.  Okay.

20  Q.  You'll have 30 days from receipt of the

21     transcript and the errata sheet to make any

22     necessary changes to your transcript --

23  A.  Okay.

   Q.  -- and to return it to my office.  Do you

---

1     understand that?

2  A.  Yes, I do.

3  Q.  If for some reason you can't do that within 30

4     days or you don't do that within 30 days, the

5     transcript will be deemed accurate as recorded.

6  A.  Okay.

7  Q.  Do you understand?

8  A.  Yes.

9  Q.  What is your date of birth, sir?

10  A.  6/30/59.

11  Q.  Where do you live?

12  A.  162 Rockland Street, Easton, Mass.

13  Q.  How long have you lived at that address?

14  A.  Eleven years.

15  Q.  Whom do you live with?

16  A.  My fam -- my wife and my children.

17  Q.  What is your wife's name?

18  A.  Kathleen.

19  Q.  Same last name?

20  A.  Yes.

21  Q.  Do you have any plans to move from that address?

22  A.  No, I don't.

23  Q.  And from our prior telephone conversation, I

24     understand you received a subpoena to testify

---

7

1     today?

2  A.  Yes.

3  Q.  Are you aware that this case involves a fire at

4     the Pavia home?

5  A.  Yes.

6  Q.  And do you know when that fire occurred?

7  A.  Let's see.  2002.

8  Q.  If I told you that my records indicate that the

9     fire occurred in January of 2004, would that help

10     your memory?

11  A.  Yeah.  The date -- the jobs are all the same.

12     They blur together.

13  Q.  They start blending together after a while?

14  A.  Yep.

15  Q.  Would you briefly describe your educational

16     background for me?

17  A.  I have a B.S. in civil engineering.

18  Q.  When did you receive the B.S. in civil

      engineering?

   A.  December of 2005.

21  Q.  What college did you attend?

22  A.  Northeastern.

23  Q.  How long did you study at Northeastern

24     University?

---

8

1  A.  In four years I got an associate's in civil

2     environmental technologies.  And then I switched

3     into engineering, and it took another six years

4     to get my civil degree.

5  Q.  You also hold an associate's degree from

6     Northeastern University?

7  A.  Yes.

8  Q.  When did you receive that?

9  A.  2000.

10  Q.  What subject matter was that in?

11  A.  Environmental engineering technology.  It's under

12     the civil cap.

13  Q.  And then after 2000, you began taking classes in

14     civil engineering?

15  A.  Yes.

16  Q.  And you completed that degree in 2005?

17  A.  Yes.

18  Q.  Did you have any education beyond high school

19     other than the associate's degree from

20     Northeastern and the B.S. in civil engineering?

21  A.  Just -- just certificate courses for -- for

22     construction.  Nothing much.

23  Q.  Where did you go to high school?

24  A.  Randolph High.

**10**

1  Q.  Did you take vocational training at Randolph
2      High?
3  A.  No.
   Q.  Do you hold any construction-related licenses?
5  A.  I have a supervisor's license and a Massachusetts
6      remodeler's license.
7  Q.  You are a registered remodeling contractor
8      through the Commonwealth?
9  A.  Yes.
10 Q.  Yes?
11 A.  Yes.
12 Q.  And you have a construction supervisor's license?
13 A.  Yes.
14 Q.  Who issued that?
15 A.  The -- the Commonwealth issued both of them, of
16     Massachusetts.
17 Q.  What does the construction supervisor's license
18     allow you to do?
19 A.  To -- to build anything up to 30 -- 30,000 cubic
20     feet of space.
21 Q.  When did you obtain your construction
22     supervisor's license?
23 A.  I got -- my first one I got like 1990.  And I
24     moved once, and I -- they didn't forward the

**11**

1  A.  I first -- I first met Phil about 15 years ago,
2      and I've been working pretty steady with him for
3      about the past eight.
4  Q.  When you refer to Phil, do you mean Mr.
5      Rothschild?
6  A.  Yes.
7  Q.  And who is Mr. Rothschild?
8  A.  He's the owner of P. & D. Builders.
9  Q.  What type of work do you do for P. & D. Builders?
10 A.  Remodeling.  We frame additions, put in kitchens,
11     bathrooms, strictly on residential work, rehab
12     work.
13 Q.  What is your trade?
14 A.  I'm a carpenter.
15 Q.  How long have you been working as a carpenter?
16 A.  Thirty years.
17 Q.  You mentioned a minute ago that you have taken
18     some certificate classes for construction?
   A.  Yes.
   Q.  What types of classes did you take?
21 A.  Blueprint reading in Blue Hill Regional, and
22     Wentworth Institute offered a carpentry course.
23 Q.  Were those continuing education type of courses?
24 A.  Yes.

**10** (right column)

1      mail, so it expired.  And I just recently got it
2      about two or three years ago.
3  Q.  Was there a written examination for that?
4  A.  Multiple-choice.
5  Q.  The subject matter of that multiple-choice test
6      was the Massachusetts Building Code?
7  A.  Yes.
8  Q.  Are you employed in the construction industry?
9  A.  Yes.
10 Q.  How long have you been employed in that industry?
11 A.  Thirty years.  Since I was about 14.
12 Q.  Where are you working now?
13 A.  20 Oxford Road, Westwood.
14 Q.  What is the name of the company you work for?
15 A.  P. & D. Builders.
16 Q.  Are you an employee of P. & D.?
17 A.  Subcontractor.
18 Q.  Are you a self-employed subcontractor?
19 A.  Yes.
20 Q.  Do you work as a subcontractor to any other
21     construction companies?
22 A.  No.
23 Q.  How long have you been working as a subcontractor
24     to P. & D. Builders?

**12**

1  Q.  Have you ever worked as a mason?
2  A.  No.
3  Q.  Have you ever worked for yourself building new
4      construction homes?
5  A.  Yes.
6  Q.  Was that under a particular business name?
7  A.  I worked under M.R. Construction.  I also worked
8      with Mike Conte under -- we had a company called
9      ROCON.  That was about -- yeah.  That's about the
10     two, the two companies.
11 Q.  What did M.R. Construction do?
12 A.  Frame houses.  And I've built houses start to
13     finish.  I worked as a subcontractor and a
14     contractor.
15 Q.  So at M.R. Construction, you worked as a
16     contractor and subcontractor --
17 A.  Uh-huh.
18 Q.  -- framing new construction homes?
19 A.  Yes.
20 Q.  What was the name of the second business you --
21 A.  ROCON.  It was Mike Roach and Mike Conte, and we
22     did the same thing.  We -- we framed houses, and
23     we -- we generally -- we also built new houses
24     start to finish.

14

1  Q.  Did you act as a general contractor for some of
2      that work?
3  A.  Yes.
   Q.  You hired various subcontractors to do the work
5      for you?
6  A.  Yeah.
7  Q.  Are you familiar with a gentleman by the name of
8      Joseph Falco?
9  A.  Yeah.
10 Q.  How do you know Mr. Falco?
11 A.  He worked for me when I was building houses
12     before.
13 Q.  When you were acting as the general contractor?
14 A.  Yes.
15 Q.  What was the name of the company that Mr. Falco
16     did work for?
17 A.  It was ROCON.
18 Q.  When was that work done?
19 A.  '86, '87.
20 Q.  Is that when you first met Mr. Falco?
21 A.  Yeah.
22 Q.  What type of work did Mr. Falco do for you?
23 A.  Chimneys and -- and front steps.
   Q.  Were those chimneys and front steps

14

1      construction -- strike that.
2          Were those chimneys and front steps
3      constructed in new construction homes?
4  A.  Yes.
5  Q.  Did Mr. Falco ever build any fireplaces for you?
6  A.  Yes.
7  Q.  When you refer to the construction of chimneys,
8      are you referring to the construction of
9      fireplaces and chimneys?
10 A.  Yes.
11 Q.  What types of fireplaces did Mr. Falco build for
12     you?
13 A.  They were just your typical fireplace.  A chimney
14     on the outside.  I would handle the wood logs
15     that he put in it and had it meet all
16     Massachusetts building codes.
17 Q.  So those would be conventional wood-burning --
18 A.  Yes.
19 Q.  -- chimneys and fireplaces; --
20 A.  Yes.
21 Q.  -- is that correct?
22 A.  Yes.
23 Q.  Approximately how many fireplaces and chimneys
24     did Mr. Falco work on for you?

15

1  A.  I think he did four -- four that year.
2  Q.  Four back in 1986, 1987?
3  A.  Yes.  And then he -- he just recently -- he did
4      mine about -- my -- my own house three years ago.
5  Q.  What work did Mr. Falco do in your home three
6      years ago?
7  A.  He built a chimney and fireplace.
8  Q.  Was that in a new construction home?
9  A.  Rehab.
10 Q.  Was there an existing fireplace in the home?
11 A.  No.
12 Q.  Other than the work that Mr. Falco did at your
13     home and the work that he did for you back in
14     1986, has Mr. Falco ever built any other
15     fireplaces for you?
16 A.  No.
17 Q.  The fireplace that Mr. Falco built in your home,
18     was that a conventional wood-burning fireplace?
19 A.  Yes.
   Q.  Did you assist Mr. Falco in performing that work
21     at your home?
22 A.  No.
23 Q.  Do you recall how much Mr. Falco charged you to
24     construct the fireplace in your home?

16

1  A.  It was about $10,000.
2  Q.  How long did that work take him?
3  A.  About a week total.  Maybe a little bit longer.
4  Q.  Did you have to do any work in preparation for
5      Mr. Falco building the fireplace in your home?
6  A.  Yeah.  Well, I had to make sure that the -- the
7      foundation was in for him and he had a flue vent
8      that went -- so he could put a chimney that --
9      that was going to handle the -- the furnace.
10 Q.  Was there any type of carpentry work that had to
11     be done before Mr. Falco began his work on your
12     home?
13 A.  Yes.  I had -- I had to cut the opening for him
14     and prepare the siding and cut the overhangs so
15     he can run his chimney up.  I had to frame the
16     floor for him so he can put his hearth in.
17     That's about it.
18 Q.  When Mr. Falco constructed the fireplace in your
19     home, did the chimney run from your basement up
20     to the roof?
21 A.  The foundation started at the basement, and then
22     the chimney actually started at the top of the
23     foundation and goes up.  The only part that
24     was -- that he had to work on in the cellar was

1   just making sure that a flue was put -- put in
2   below the grade to handle the furnace exhaust.
3   Q.  Did the foundation for the fireplace begin in
4       your basement and extend up to the roof?
5   A.  Yes.
6   Q.  Did Mr. Falco do that work alone?
7   A.  He had his two sons that worked with him.
8   Q.  Did you obtain the permits for Mr. Falco to do
9       that work?
10  A.  Yes.
11  Q.  What permits were necessary to perform that work
12      at your home?
13  A.  I needed a building permit.
14  Q.  Was Mr. Falco's work at your home inspected by
15      anybody?
16  A.  It was inspected by the Easton Building
17      Department.
18  Q.  What phase of the work was inspected by the
19      Building Department?
20  A.  When -- when they came in for the rough
21      inspection for the frame, the inspector just
22      looked to make sure that the smoke shelf was
23      adequate on the Massachusetts Building Code.
24  Q.  So was that prior to Mr. Falco completing the

1   fireplace and chimney?
2   A.  Yes.
3   Q.  After the fireplace and chimney was completed,
4       did the inspector come back to --
5   A.  No.
6   Q.  It's not necessary?
7   A.  No.
8   Q.  Before Mr. Falco started his work at your home,
9       did you describe for him what you wanted built
10      there?
11  A.  Yeah.  I told him what type of chimney I wanted.
12      I told him what I wanted to use for the brick
13      veneer inside.  But that was -- but that was it.
14      It's a -- it's a typical chimney.
15  Q.  Did you explain to Mr. Falco that you wanted a
16      conventional wood-burning fireplace and chimney?
17  A.  Yes.
18  Q.  The work that Mr. Falco did for you back in 1986,
19      1987, are you aware of any problems with the
20      chimneys that he built for you?
21  A.  Yeah.  We had no problem with them.  And we built
22      in the Town of Hull.  And the inspector they had
23      back then, he was -- one of his pet peeves were
24      fireplaces and making sure that they were

1   constructed correctly.  He used to have pictures
2   in his -- in the office about poorly constructed
3   chimneys and what happened with them, such as
4   fires and...
5   Q.  So you're not aware of any problems with those
6       fireplaces?
7   A.  No.  The inspector wouldn't have any of it.
8   Q.  I take it that you haven't had any problems with
9       the fireplace at your home?
10  A.  No.
11  Q.  Did Mr. Falco perform some work at the Pavia
12      residence?
13  A.  Yes.
14  Q.  Had you ever worked on any P. & D. jobs where Mr.
15      Falco did masonry work prior to the work at the
16      Pavia home?
17  A.  No.
18  Q.  Did you introduce Mr. Falco to Mr. Rothschild?
19  A.  No.
20  Q.  Do you know who did?
21  A.  Michael Conte.
22  Q.  When did you work at the Pavia house for the
23      first time?
24  A.  I worked with -- on Julie's house, her first

1   house, which was -- I think it was
2   Oxmoor (phonetic) -- Oxmoor Lane in Newton.  I'm
3   not sure of the -- it was the house that she
4   owned before this -- this one.  And that was a
5   long time ago.
6   Q.  The fire, that occurred at 104 Hammondswood Road?
7   A.  Yes.
8   Q.  When was the first time you worked at 104
9       Hammondswood Road?
10  A.  Maybe that was 2002.  That was what -- when we
11      put the addition on for -- for Julie.
12  Q.  So the first work you did at Hammondswood Road
13      was the construction of an addition?
14  A.  Yes.
15  Q.  Who was the general contractor for that work?
16  A.  P. & D. Builders.
17  Q.  Was there somebody who ran that job for P. & D.?
18  A.  No.
19  Q.  What work did you do on the addition?
20  A.  I -- I tore down the original structure, and then
21      I -- I built the addition.
22  Q.  Did you work as a framing carpenter?
23  A.  Yes.
24  Q.  Were there other framing carpenters on that job?

21

1  A.  Michael Conte and Chuck Burr.

2  Q.  How do you spell Chuck's last name?

3  A.  B-u-r-r.

Q.  Does Mr. Burr continue to work for P. & D.
5      Builders?

6  A.  No.

7  Q.  When did he stop working at P. & D.?

8  A.  During that job.

9  Q.  Do you recall what the phase of the work was when

10     Mr. Burr left the job?

11 A.  We had the roof on.  So it was -- the framing was

12     pretty much completed.

13 Q.  Do you know where Mr. Burr lived?

14 A.  Where he -- where he lived?  He lived in East

15     Bridgewater then, and I think he lives in

16     Bridgewater now.

17 Q.  Do you know his current residential address?

18 A.  I know about where he -- I --

19 Q.  If you know.

20 A.  I -- I know what street it is if I was driving

21     down it.  I don't know the name of it.

22 Q.  Somewhere in Bridgewater?

23 A.  Yes.

Q.  Do you know where Mr. Burr works now?

22

1  A.  He's self-employed.

2  Q.  Does his business have a name?

3  A.  I forget what he calls himself, what he goes

4      under right now.

5  Q.  I may have asked you this before, but does your

6      self-employed business have a name?

7  A.  It's M.R. Construction.

8  Q.  The framing work that you did at 104 Hammondswood

9      Road, were there plans that you followed for that

10     framing work?

11 A.  No.

12 Q.  How did you know what to do?

13 A.  Sort of description -- someone would describe

14     what they want, Julie and Phil.

15 Q.  Mr. Rothschild and Ms. Pavia would describe what

16     they wanted, and you would build it?

17 A.  Yes.

18 Q.  When you started work framing the addition, did

19     somebody describe for you what they intended the

20     addition to look like when it was completed?

21 A.  It's -- the best that they could, yes.

22 Q.  How did they do that?

23 A.  I want -- I want three windows in this wall, and

24     I want -- I want an L-shaped staircase, and

23

1      then -- or a straight staircase.  I want the

2      rooflines to match if -- if possible so it

3      wouldn't look as much like an addition, it would

4      look like it was always there.

5  Q.  So that Mr. Rothschild and Ms. Pavia verbally

6      told you what they wanted?

7  A.  Yes.

8  Q.  When you first started work framing the addition,

9      was there any discussion about fireplaces in the

10     addition?

11 A.  Oh, yeah.

12 Q.  Who did you talk to about fireplaces?

13 A.  Phil and Julie.

14 Q.  When you first started work on the addition, what

15     did Mr. Rothschild say about fireplaces being

16     built into the addition?

17 A.  That there's going to be a fireplace for the

18     addition, and they didn't know the location yet.

19 Q.  So Mr. Rothschild just gave you some general

20     information that a fireplace was going to be

21     built somewhere in the addition?

22 A.  Yes.

23 Q.  Did Ms. Pavia say anything to you at that time

24     about constructing a fireplace in the addition?

24

1  A.  Yes.  We had many conversations with Julie about

2      where the fireplace was going to go, and it

3      would -- it would change every day.  And at the

4      beginning, it wasn't a big deal, because we

5      weren't to the second floor of the addition, so

6      we didn't have to worry about the framing.

7          And when we got to the second floor,

8      she -- the fire -- the conventional fireplaces --

9      the fireplace wasn't going to work in -- in her

10     house.  It was going to take up too much space.

11     You had to support it, and she didn't want it.

12     So -- so she wasn't going to go with the

13     conventional fireplace.

14 Q.  From the beginning, did Ms. Pavia indicate that

15     the fireplace would be going in on the second

16     floor?

17 A.  That fireplace was moved all over the addition.

18     I don't know if they started in the cellar and

19     they brought it up to the second floor or what,

20     but it was an ongoing discussion.

21 Q.  As a framing carpenter, why would you need to

22     have information about where the fireplace was

23     going?

24 A.  Just to prepare the framing for it so Joey

1    could -- so the mason could put his hearth in.
2    We'd just have to frame for it.
3  Q.  And what work would you need to do as a framing
      carpenter to prepare for the construction of a
5    hearth?
6  A.  In that particular job, where she was going to
7    put it, what -- well, in all -- all jobs like
8    that, we'd have to leave a -- leave an opening
9    roughly on 2 feet off the face of the fireplace,
10   5 feet wide, or however wide they wanted it.  And
11   Joey would then have to pour a -- pour a cement
12   pad in that opening for -- for the firebrick.
13   And then in back of that, the fireplace would be
14   built.  And if she wanted that, then we had to do
15   more work inside the house, because that -- that
16   was the wall that abutted the house, and so we
17   would have had to do some rehab in there.
18  Q.  You would have had to do some work on the
19   exterior wall?
20  A.  It would have -- it would have went all the way
21   into her master bedroom.
22  Q.  Ms. Pavia's master bedroom adjoins the addition
23   where the fireplace was going to go?
  A.  Yes.

1  Q.  And what do you mean that the fireplace would go
2   into Ms. Pavia's master bedroom?
3  A.  You see the face -- like in a typical house, you
4   see the face of the fireplace.  But in back of
5   it, it -- it extends another 18 inches to 2 feet.
6         And so -- so we'd have to also build that
7   part of the framing for the fireplace, plus you
8   would also need to support that structure all the
9   way down to the basement.  And so that would not
10   only go through her master bedroom but into the
11   formal living room down below and then into her
12   garage.
13  Q.  So that if a conventional fireplace was to be
14   built in the addition, you would have to frame it
15   from the basement up to the second floor?
16  A.  Oh, yeah.  Yes.
17  Q.  Is that correct?
18  A.  That's correct.
19  Q.  And you testified a little earlier that a
20   decision was made that a conventional fireplace
21   was not going to be put in there?
22  A.  No, it wasn't.  She didn't want it.  It was
23   taking up too much space.  It wasn't going to
24   work for her.

---

27

1  Q.  What was the status of your work when Ms. Pavia
2   decided not to go with a conventional fireplace?
3  A.  Continue -- continue the framing, and we'll do
4   something different.
5  Q.  Did you actually have a conversation with Ms.
6   Pavia where she decided not to go with a
7   conventional fireplace?
8  A.  I remember I did.  But can I remember what --
9   what was said?  No.  I mean, we were talking.
10   Me -- me and Julie and Phil were talking always
11   about the job, what's going on that day, what's
12   to be done.
13         So if that fireplace didn't go in, it was
14   because Julie didn't want it to be put in, and it
15   was -- and she told me not to put it in.
16  Q.  Before you started your work every day, did you
17   speak to Ms. Pavia about the work you were doing?
18  A.  No, not every day.  It wasn't -- it wasn't -- we
      didn't need to talk every day, because the work
21   wasn't progressing at such a fast pace that she
22   needed to be involved.  It was only until we --
23   we needed to ask her for her input or her
24   decisions.  So every couple days or so we'd touch
    base.

28

1  Q.  Whenever the work was going to move to a new
2   level?
3  A.  Yeah.
4  Q.  During the discussions that you had with Mr.
5   Rothschild and Ms. Pavia about the conventional
6   fireplace, did anybody ever draw anything or make
7   a sketch of a proposed conventional fireplace?
8  A.  No.
9  Q.  After you were informed that a conventional
10   fireplace was not going in the addition, how did
11   you proceed with your framing?
12  A.  We finished the job.  We brought the wall -- we
13   put the roof on, just completed our framing.
14  Q.  Did you finish your framing as if no fireplace
15   was being built?
16  A.  Yes.
17  Q.  Did you build the floors for the addition?
18  A.  Yes.
19  Q.  What were the floors constructed out of?
20  A.  I forget.  We -- we had to double up our -- our
21   floor joists.  It was like a 2-by-8 and a 2-by-10
22   put together on top of each other to make up 18
23   inches.  And I can't remember why we did that
24   right now.  It was to flush up floors.  I know

29

1    that.  But I don't -- I don't particularly
2    remember why we had to go so deep with them.  But
3    it was -- I don't know.  We -- it was just a
4    typical -- it was still typical framing.  We just
5    made extra-deep floor joists.
6    Q.    So when you completed your framing of the
7          addition, there was nothing to indicate that a
8          fireplace was to be built?
9    A.    No.
10   Q.    So I'm correct in stating that when you finished
11         your framing of the addition, there was nothing
12         to indicate that a fireplace was to be built on
13         the second floor of the addition?
14   A.    There was -- other than I knew there was
15         something going to be done.  I know that
16         something else was going to happen.  But there
17         was no -- no conventional fireplace framing for
18         that.  They were going to move to -- to another
19         solution.
20   Q.    How did you know that something was going to be
21         done there?
22   A.    Well, when they decided not to have a fireplace,
23         they -- they wanted a zero clearance.
24   Q.    What is a zero clearance?

30

1    A.    You can -- you just -- you can put them anywhere
2          in the house, sit -- and they -- they don't need
3          any special preparation for them.  They're --
4          they don't need to have any firewalls or anything
5          around them.
6    Q.    Is a zero clearance a type of fireplace?
7    A.    It's a gas fireplace.
8    Q.    Why is it called a zero clearance fireplace?
9    A.    I'm going to assume that it -- that you can just
10         install it directly against the wall where you
11         don't need any -- leave any airspace as like you
12         would if it was a -- a masonry fireplace.
13   Q.    Do zero clearance fireplaces give off any heat?
14   A.    Yes.
15   Q.    Do you know why zero clearance fireplaces don't
16         require the same clearance that conventional
17         fireplaces do?
18   A.    It would just be the manufacturing design of it,
19         the special insulation.  They already have a --
20         an airspace built into it.
21   Q.    Is the zero clearance fireplace a type of
22         self-contained unit?
23   A.    Yes, yes.
24   Q.    Who told you that the solution to the issue was a

31

1    zero clearance fireplace?
2    A.    Phil and Julie.
3    Q.    What was the status of your framing work when the
4          zero clearance fireplace idea came about?
5    A.    We were probably just -- we were probably at the
6          second floor, and they said go ahead, fin --
7          frame the whole thing.  We're just going to go
8          with a zero clearance.  So we were about halfway
9          through the job.
10   Q.    When you were working framing the addition, was
11         that the only job you were working on at the
12         time?
13   A.    Yes.
14   Q.    And did you stay at the job from the time you
15         started framing until the time the framing was
16         complete?
17   A.    Yes.
18   Q.    Did you remain at the Pavia residence to do work
19         after the framing of the addition was done?
20   A.    Yeah.  I went back and forth when Phil needed me
21         to go back to do whatever he might want to be
22         done.  Anything from cleaning to -- to additional
23         carpentry work.  Anything.
24   Q.    So that after the addition was completed, you

32

1    continued to work at the Pavia residence?
2    A.    Yes.
3    Q.    And what other work was going on there after the
4          addition was framed, work you were involved in?
5    A.    That I was involved with?  Nothing worth
6          mentioning.  I kind of -- I was just going
7          back to maybe -- to help unload materials, to --
8          maybe to -- to haul trash from the job.  I -- I
9          went back and forth.  I just don't remember
10         exactly what -- why I was sent there.
11   Q.    Okay.  While the addition was being built at the
12         Pavia residence, was P. & D. doing any work in
13         any other area of the house?
14   A.    I think Julie had work going on in her kitchen
15         and -- oh, she had a master -- her master bath
16         done over then.  She had -- her house was being
17         painted.  It was -- it was a lot of rehab work
18         going on there.
19   Q.    Did you build the roof onto the addition?
20   A.    I framed it, yes.
21   Q.    What type of roof was going on the addition?
22   A.    It was a hip roof with a flat -- with a flat
23         section up above.
24   Q.    Was a slate roof subsequently put on top of that?

1   A.   Yes.
2.  Q.   Who did the roofing work?
3   A.   I don't know the company's name.
    Q.   When you framed the roof, did you cut out any
5        holes for a chimney or a pipe coming from the
6        second floor?
7   A.   No.
8   Q.   Mr. Falco did some work on the exterior of the
9        property?
10  A.   Yeah.  The -- the house had a brick veneer
11       siding, and so the addition -- so they -- they
12       had the addition match the house.  So he did all
13       the brickwork on -- on the outside.
14  Q.   Was Mr. Falco's work on the exterior of the
15       property ongoing when you were doing the framing
16       work?
17  A.   Yes.
18  Q.   Was there anybody assisting Mr. Falco in doing
19       the work on the exterior of the building?
20  A.   His two sons.
21  Q.   What are their names?
22  A.   Joe and Anthony.
23  Q.   Do you know how long Mr. Falco was at the job
         doing the exterior work?

35

1        a mantle that Ms. Pavia had?
2   A.   Yes.
3   Q.   Were you present for any discussions between Mr.
4        Falco and Mr. Rothschild as to what was to be
5        built on the second floor of the addition?
6   A.   I was there.  I -- I can't honestly say -- I
7        can't recall the conversation.  I -- I just know
8        what was going on on the job.
9   Q.   So you recall that you were present for a
10       conversation --
11  A.   Yeah.
12  Q.   -- between Mr. Falco --
13  A.   Yeah.
14  Q.   -- and Mr. Rothschild concerning the opening?
15  A.   It was -- it wasn't just Phil.  It was Julie.  It
16       was all of us.  It was -- it's work.  You're
17       talking.  You know, we're going to put a -- we're
18       going to put an opening here, and it's going to
         be for this.  Was it -- it wasn't directed at me.
         It was -- you know, it was -- it was talk to --
21       talk to Joey.  Phil was talking.  Julie was
22       talking.  I was there.  We're all talking.  It
23       wasn't a one-day conversation.  This went on.
24       This went on, you know, as you talk and work.

34

1   A.   No.
2   Q.   Do you recall what time of year it was when Mr.
3        Falco was there?
4   A.   It was in the fall, going into winter.
5   Q.   Did you ever see Mr. Falco do any work on the
6        interior of the addition?
7   A.   Yes.  He -- he repaired Julie's fireplace in her
8        formal living room, and he also did work in the
9        addition part itself, replacing brick.  And he
10       built an opening for -- for the -- what they were
11       going to put in there, for a zero clearance.
12  Q.   When you say that Mr. Falco built an opening, did
13       he build a masonry structure that resembled a
14       fireplace?
15  A.   No.  He just -- he built an opening to -- he just
16       built an opening for them for what they wanted to
17       use -- to put in there.
18  Q.   What was that opening made out of?
19  A.   Just -- just regular brick, regular masonry
20       brick.  And the opening had a -- it was
21       determined by -- Julie had an antique mantle that
22       she wanted to use, so it -- so it had to fit that
23       piece of furniture.
24  Q.   The dimensions of the opening were determined by

36

1        You know, days.  You know, you just -- you bring
2        it up.  You know, this is what we're going to be
3        doing.
4   Q.   So there were informal-type meetings as to what
5        work was going to happen --
6   A.   Yeah.
7   Q.   -- and who was going to do it?
8   A.   Yes.
9   Q.   And at some point was a decision made as to what
10       fireplace was going to go in on the second floor
11       of the addition?
12  A.   It was supposed to be the zero clearance.
13  Q.   And after that was decided, Mr. Falco built this
14       opening as you've described it?
15  A.   Yes.
16  Q.   Were you present when Mr. Falco did that work?
17  A.   I was on the job, yeah.
18  Q.   Do you know how long it took him to do that work?
19  A.   A short time.  Like -- I don't know -- a day, two
20       days maybe.  Not -- not very long.
21  Q.   When Mr. Falco built this opening, what phase of
22       the addition -- how much work had been completed
23       on the addition?
24  A.   The roof was framed.  The roof was framed and the

38

1  siding was done, the brick veneer was done.
2  Q.  Were there any other trades working on the
3      addition when Mr. Falco did his work?
4  A.  Yeah.  The plumber was there.  The electrician
5      was there.  And he -- and -- and the carpenters
6      were there.  And I think they had an HVAC
7      contractor on that job.
8  Q.  Who was the HVAC contractor?
9  A.  Jim -- Jim Dussault, I think.  I think he was --
10     I think he did the air-conditioning for that job.
11 Q.  When you refer to the plumber, is that Mr.
12     Carresi?
13 A.  Yes.
14 Q.  Was Mr. Gubbins there when Mr. Falco was working?
15 A.  Yep.
16 Q.  Was Mr. Rothschild on-site when Mr. Falco was
17     building this opening?
18 A.  He -- Phil's all -- he shows up and leaves.
19 Q.  He periodically inspects the work?
20 A.  Yeah.
21 Q.  Was Mr. Rothschild your supervisor for that job?
22 A.  Yes.
23 Q.  Did Mr. Gubbins have any supervisory
24     responsibility for that work?

---

1  A.  No.
2  Q.  While Mr. Falco was constructing this opening as
3      you've described it, did you ever see a gas fire
4      log unit on-site?
5  A.  No.
6  Q.  While Mr. Falco was constructing this opening,
7      were you ever told that there was a gas fireplace
8      unit on-site?
9  A.  Not when Joey was there.
10         MR. BLACKBURN:  I'm sorry.  I didn't
11     hear the last answer.
12         THE WITNESS:  No.  I didn't -- while
13     Joey was on the job, there was no -- no gas fire
14     log or discussion of a -- a gas fire log.
15         MR. BLACKBURN:  Thank you.
16 Q.  When Mr. Falco began his work on the opening, had
17     he completed the work on the exterior of the
18     building?
19 A.  I -- yes.
20 Q.  Do you recall seeing Mr. Falco doing any work at
21     the Pavia home after he completed the opening?
22 A.  No.
23 Q.  Did Mr. Falco leave the job after he completed
24     the opening?

---

39

1  A.  Yes.
2  Q.  After Mr. Falco left the job, did you ever see
3      him return to the Pavia home for any reason?
4  A.  No.
5  Q.  Is that a no?
6  A.  No.
7  Q.  While you were working at the Pavia home, was
8      something installed in that opening that Mr.
9      Falco built?
10 A.  Yes.  The gas fire log.
11 Q.  Who did that work?
12 A.  Mike Carresi.
13 Q.  When Mr. Falco built the opening, had the walls
14     been plastered for the addition?
15 A.  No.
16 Q.  It was still rough carpentry?
17 A.  Yes.  I'm -- excuse me.  I'm going to say I'm not
18     sure on that.  I'm -- I just think that it was --
       that it was like that.
20 Q.  During the deposition, if you don't know the
21     answer to a question, we're not looking for you
22     to guess about anything.
23 A.  Okay.
24 Q.  If you know the answer, let us know.  If you're

---

40

1      guessing, I want you to let me know.
2  A.  Okay.
3  Q.  So you're not certain as to what the status of
4      the interior of the addition was?
5  A.  Right.
6  Q.  Do you know when the decision was made to put a
7      gas log fireplace in the opening that Mr. Falco
8      built?
9  A.  No.
10 Q.  Were you present for any discussions involving a
11     gas log fireplace?
12 A.  Again, it was the type of discussions where
13     you're on the job and you know what's going on.
14     People -- the plumber is talking about it.  Julie
15     is talking about it.  Phil is talking about it.
16     I'm there.  I can't remember the exact
17     conversations.  All I know is that it's -- it's
18     going in.  And then Mike -- you know, Mike drills
19     the hole to go through -- through the brick,
20     and -- and he puts a gas log in.
21 Q.  Did you observe Mr. Carresi drill a hole in the
22     brick?
23 A.  I didn't observe him, but I know he did it.
24 Q.  You saw that a hole had been drilled in the

42

1    brick?
2.   A.   Yeah, yeah.  Yes.
3    Q.   And what was that for?
     A.   For the gas line for the fire -- for the gas fire
5         log.
6    Q.   Okay.  Does the gas line for the fire log run
7         from the inside of the house outside?
8    A.   It -- it runs from inside the house to inside the
9         house.  It's -- it's -- oh, it comes from the
10        street.  Is that --
11   Q.   Okay.  So that the gas line is in the street, and
12        somebody has to make a connection from the gas
13        line in the street to the interior?
14   A.   I think the house -- I think the house has gas
15        anyways, so I think it's -- so they already had
16        the gas in the house.  He just had to run the
17        line.
18   Q.   So to install a gas log fireplace, Mr. Carresi
19        had to connect the gas log fireplace to the
20        source of gas in the home?
21   A.   Yes.
22   Q.   Was there any type of venting system that was
23        built for that gas fireplace?
24   A.   After they put the log in, they had to run -- run

---

43

1    A.   Yes.
2    Q.   What work as far as carpentry was ongoing at that
3         time?
4    A.   Excuse me.  What was the question?
5    Q.   When the gas log fireplace was installed, --
6    A.   Yep.
7    Q.   -- what carpentry work was ongoing in the
8         addition?
9    A.   I don't know.
10   Q.   Is it that you don't remember?
11   A.   I don't remember.  There was a lot of work going
12        on.  I --
13   Q.   Let me ask you this.  Did you keep any written
14        log or journal of your work at the Pavia home?
15   A.   No.
16   Q.   Do you know anybody who maintained daily
17        construction logs or reports for that job?
18   A.   No.
     Q.   Were you a subcontractor to P. & D. at that time?
     A.   The same.  A subcontractor, mainly working for
21        Phil.
22   Q.   And did you have to submit any paperwork to Mr.
23        Rothschild in order to get paid for the job?
24   A.   Yes.  I'd just -- I'd give him an hourly account

---

42

1    a flue, a chimney flue, and -- which it would
2    just go up through the roof.
3    Q.   Who constructed the chimney flue?
4    A.   It would have had to have been Jimmy Dussault.  I
5         don't know for certain, but I'm just guessing on
6         that one, because he's -- he was doing the HVAC
7         work there.
8    A.   A chimney flue is consistent with work that's
9         done by an HVAC contractor?
10   A.   Yes.  It could have also been -- Michael could
11        have also done it also, but I'm not sure.  I
12        don't think he did.  I think Jimmy did it.
13             MR. TURNER:  Michael being who?
14             THE WITNESS:  Mike Carresi.
15   Q.   But in any event, a flue was installed there?
16   A.   Yes.
17   Q.   And that was done after Mr. Falco left the site?
18   A.   Yes.
19   Q.   Do you know how long after Mr. Falco left the
20        site that Mr. Carresi began installing the gas
21        log fireplace?
22   A.   No.
23   Q.   When the gas log fireplace was installed, had all
24        the framing work for the addition been completed?

---

44

1    of what I worked that week.
2    Q.   How would you --
3    A.   I'd just present it on a -- just a piece of paper
4         with my heading on it, 40 hours at Hammondswood
5         Road.  And that's what it would consist of.  And
6         if I worked someplace else, I'd just list that
7         also.
8    Q.   So there wouldn't be any detail as to the type of
9         work that you did?
10   A.   No.
11   Q.   Had you ever worked with a gas log fireplace
12        prior to the Pavia residence?
13   A.   No.
14   Q.   You weren't familiar with the requirements for a
15        fireplace as far as brick -- strike that.
16             Were you familiar with the requirements
17        for a gas log fireplace?
18   A.   No, I wasn't.
19   Q.   Did you ever see a gas log fireplace on-site at
20        the Pavia residence?
21   A.   No, no.
22   Q.   Did you ever see the gas line that was built for
23        the gas log fireplace at the Pavia residence?
24   A.   Only when it was installed.

45

| | |
|---|---|
| 1 | Q. Did you see the gas log fireplace at the Pavia |
| 2 | residence after it was installed? |
| 3 | A. I seen it. I can't remember what it -- what it |
| | looked like. I was there. |
| 5 | Q. Did you perform any work at the Pavia residence |
| 6 | after the fire? |
| 7 | A. Yeah. I did all the rehab work in the house. I |
| 8 | tore apart all the damage that the fire created. |
| 9 | And there was -- she had -- she also had a -- a |
| 10 | water problem at the same week. And I -- and it |
| 11 | destroyed her kitchen, and I -- and I had to -- I |
| 12 | had to work on that area also. |
| 13 | Q. When did you first enter the Pavia home after the |
| 14 | fire? |
| 15 | A. That -- I think it was that morning or the -- or |
| 16 | the next morning. It was -- I was like the -- |
| 17 | one of the first carpenters there. |
| 18 | Q. And you were aware that there was a flood at the |
| 19 | home prior to the fire? |
| 20 | A. No. I -- I -- I think Phil called me and said |
| 21 | all this happened in a weekend, I believe. |
| 22 | Q. Both the flood and the fire? |
| 23 | A. Yes. |
| | Q. And when you got to the property, you understood |

46

| | |
|---|---|
| 1 | that there were two separate events? |
| 2 | A. Yes. |
| 3 | Q. Do you know which one occurred first, the fire or |
| 4 | the flood? |
| 5 | A. The flood. |
| 6 | Q. Do you know what caused the flood? |
| 7 | A. It was that -- that winter that was really cold |
| 8 | and all the pipes were freezing around |
| 9 | Massachusetts. A couple of her pipes froze in |
| 10 | her kitchen, and it -- I believe she wasn't home |
| 11 | when it happened. And the pipes burst, and it |
| 12 | just flooded and destroyed her cabinets and her |
| 13 | flooring and her ceiling, and her cellar was a |
| 14 | mess. |
| 15 | Q. Do you know where the pipes were located in the |
| 16 | home? |
| 17 | A. They were in the kitchen ceiling. |
| 18 | Q. The ceiling above the kitchen? |
| 19 | A. Yes. |
| 20 | Q. Did you do any work on those pipes? |
| 21 | A. Afterwards, I -- I demo'd the ceiling and exposed |
| 22 | the pipes, and we found -- you know, we found the |
| 23 | places where they split from being exposed to the |
| 24 | cold. |

47

| | |
|---|---|
| 1 | Q. How many pipes burst? |
| 2 | A. At least three. |
| 3 | Q. What types of pipes are we talking about? |
| 4 | A. Half-inch copper pipes. |
| 5 | Q. Do you know what caused the pipes to freeze? |
| 6 | A. Yeah. The wind -- the windchill would just get |
| 7 | in through the overhang and just freeze -- you |
| 8 | know, just freeze the pipe from the force of the |
| 9 | wind, the constant temperature. |
| 10 | Q. When you opened up the ceilings to look at the |
| 11 | pipes, was there any insulation in the ceiling? |
| 12 | A. There was old -- the house is very old, and so it |
| 13 | was just old insulation. |
| 14 | Q. Were those old pipes that were in there? |
| 15 | A. They were copper pipes. I don't know if -- if |
| 16 | they were old. |
| 17 | Q. There hadn't been any recent work done in that |
| 18 | area? |
| | A. There was, but I don't know if they were the same |
| | pipes. |
| 21 | Q. And what areas of the home were damaged by the |
| 22 | flood? |
| 23 | A. The kitchen and the cellar. She had a finished |
| 24 | room down her cellar. |

48

| | |
|---|---|
| 1 | Q. Did you observe any flood damage to any rooms |
| 2 | that were next to the kitchen? |
| 3 | A. Next to the kitchen, she has another room. It's |
| 4 | sort of like a large pantry -- pantry room of |
| 5 | some kind. |
| 6 | The -- the flood went out -- she -- she |
| 7 | had hardwood flooring, so the flood went out |
| 8 | there and it -- and it buckled the flooring. And |
| 9 | I'm not -- and just the kitchen and the cellar. |
| 10 | Yes. |
| 11 | Q. And I take it that's the area of the cellar |
| 12 | directly below the kitchen? |
| 13 | A. It's directly below -- there's two areas. |
| 14 | There's one -- she has like an exercise room |
| 15 | directly below. She has an entranceway to -- |
| 16 | it's sort of a big space against the exercise |
| 17 | room, and then she has a finished part of the |
| 18 | cellar which is -- she has a painted mural along |
| 19 | the walls that -- the water damaged it. |
| 20 | Q. Water from the flood? |
| 21 | A. From both. From the flood and from the fire. |
| 22 | That's my guess. |
| 23 | Q. You don't know? |
| 24 | A. There was water damage down there. |

49

1  Q.  And that was in the finished area of the cellar?

2  A.  Yes.

3  Q.  Is there any structure that separates the

   finished area of the cellar from the exercise

5  room area of the cellar?

6  A.  Yes.

7  Q.  What is that?

8  A.  In between those two areas, her heating system, a

9     Viessman heating boiler is in between.  She also

10    has a couple partition -- a partition wall that

11    separates them.

12 Q.  When you arrived at the Pavia home on the day

13    after the fire, do you know whether the heat was

14    working in the home?

15 A.  I don't know if the heat was working or not,

16    because when I went in there, when I first walked

17    in, there was ice, an ice sheet that went from

18    the addition out the front door from the -- when

19    the firefighters put the fire out, they just

20    glazed the place over.  And so I -- I don't know

21    if the heat was on, because it was still ice in

22    that area in the house.

23 Q.  So it was very cold in the home?

   A.  Yes.

50

1  Q.  Was there anybody working on the heat when you

2     arrived?

3  A.  No.  I -- no.  I don't remember if Mike was there

4     or not.

5  Q.  And you observed ice on the front hallway?

6  A.  Yeah.  There was -- again, I guess the

7     firefighters, when they were putting out the

8     fire, they just -- they took the hose and just

9     put it down a bay in between the two joists to

10    put the fire out.  And it just -- so it traveled

11    the bay, and it -- and it went out the front

12    wall.  And Julie has like an entranceway

13    vestibule.  And that whole place, when I first

14    walked in was -- down the brick siding was all --

15    all ice.

16 Q.  Did you see ice anywhere else other than the

17    vestibule and the front hallway?

18 A.  It went out into the walkway.  It was so bad that

19    I -- I -- that morning I went out -- once I got

20    there, I went out and got rock salt to -- so no

21    one would fall.  There was that much ice.

22 Q.  Did you have to use the rock salt in the inside

23    of the home?

24 A.  I just put it on from the front door out to the

51

1     walkway.  I didn't put it on the inside.

2  Q.  The day that you went into the Pavia home after

3     the fire, was anybody taking photographs?

4  A.  She had some -- the claims adjusters or the

5     insurance companies there.  I don't know if they

6     were taking photographs or not.

7  Q.  What work were you doing that day?

8  A.  That day, we just showed up just to see what was

9     happening.  And she had, I think, Service

10    Merchant -- ServiceMasters doing the cleanup.

11        And that very first day, I don't know if

12    I did any physical work other than put down the

13    rock salt, see what had to be done.  I can't

14    remember if I did -- did anything that

15    particular -- that one day.  We were probably

16    just looking at the job to see what we had to do

17    to get -- get going on it.

18 Q.  ServiceMaster was there?

    A.  Yes.

20 Q.  Do you know where their office is located?

21 A.  No.

22 Q.  Is there a room that separates the addition from

23    the kitchen?

24 A.  The dining room.  The addition is -- is -- is

52

1     built -- is off the house.  So you have the

2     kitchen, you have the dining room, and then you

3     have the living room.  And then to get to the

4     addition, you'd -- you'd have to take a left to

5     go out into it.  So it -- so it is...

6  Q.  Did you ever see any ice in the dining room?

7  A.  No.

8  Q.  Did you ever see any water damage in the dining

9     room?

10 A.  I can't remember.

11 Q.  Okay.  And after the fire, you worked on

12    rehabbing the kitchen and the addition?

13 A.  Yes.

14 Q.  Did you do anything to keep a record of the work

15    you did for the kitchen as opposed to the work

16    you did on the addition?

17 A.  No.

18 Q.  You just billed Phil for the work?

19 A.  Yes.

20 Q.  Did you -- strike that question.

21        Did you or anybody else from P. & D. ever

22    keep any records to distinguish the work that you

23    did on the kitchen from the work that you did on

24    the addition?

54

1  A.  No.

2         MR. BLACKBURN:  Object to the form.

3  Q.  After the fire, did Mr. Rothschild keep any daily

4      reports of the work activities at the home?

5         MR. BLACKBURN:  Object to the form.

6  A.  I don't -- I don't know what he keeps for

7      records.

8  Q.  You don't have any knowledge of that?

9  A.  No.

10  Q.  What other P. & D. employees worked at the home

11     after the fire?

12  A.  Chip Gubbins worked there.  I don't know if

13     Frankie McTigh worked there or not.  He's another

14     employee.  I'm not sure.  I have two -- two

15     people that work for me.

16  Q.  Who are they?

17  A.  One was Enrique Pena (phonetic).  He lived -- he

18     no longer lives here.  He lives in Florida.  And

19     Pedro DePina.

20  Q.  Where does Mr. DePina live?

21  A.  Dorchester.

22  Q.  Do you know his street address?

23  A.  I can get it.  I -- I don't know it off the top

24     of my head.

---

1  Q.  Did Mr. DePina work at Ms. Pavia's house prior to

2     the fire?

3  A.  No.

4  Q.  How do you spell Mr. DePina's last name?

5  A.  D-e-P-i-n-a.

6  Q.  And his first name again?

7  A.  Pedro.

8  Q.  Mr. DePina worked directly for you?

9  A.  Yes.

10  Q.  After the fire, what work was done to the

11     kitchen?

12  A.  We repaired the -- the floor and the cabinets,

13     the walls and the ceiling.  That's what -- that's

14     what I was involved in.

15  Q.  When you say you repaired it, do you mean that

16     you demolished the kitchen and rebuilt it?

17  A.  Pretty much, yes.  We -- we took the floor right

18     out, and we took the walls down.  We -- we

19     dropped the floor -- we dropped the floor down

20     and just prepped out for a new floor to be put

21     in.

22  Q.  What work did you do in the basement, the

23     exercise area of the basement?

24  A.  They had -- we were -- they had a floor that we

---

55

1     had to repair down there.  And that's all that I

2     was involved in down there was the floor.

3  Q.  What work did you do in the addition after the

4     fire?

5  A.  I had to replace the -- the joists that were

6     burnt.  The fire damage also went into the

7     hallway of the house.  I had to expose all that

8     area, repair any -- any damaged wood, clean up --

9     clean up the fire -- the cinders on the wood.

10        Same thing in the -- in the second part

11     of the addition.  Just clean out any -- any

12     burnt-up wood and replace it and -- and all smoke

13     damaged -- any wood that was smoke damaged also.

14  Q.  Where was the wood smoke damaged in the house?

15  A.  In the attic.

16  Q.  How extensive was the smoke damage in the attic?

17  A.  It was pretty extensive.  I imagine the smell is

18     still there, even they -- you know, though

19     they -- they whitewashed it down.

20  Q.  Was the attic finished?

21  A.  No.

22  Q.  Was it more storage space up in the attic?

23  A.  (Witness indicating.)

24  Q.  You have to answer.

---

56

1  A.  Yes.  I'm sorry.  Yes.

2  Q.  Was the physical damage from the fire confined to

3     the ceiling between the first and second floor of

4     the addition and into the hallway?

5        MR. BLACKBURN:  Object to the form.

6  A.  Yes.

7  Q.  Did you see any other fire damage in the home?

8  A.  No.

9  Q.  How long did you work at the Pavia residence

10     after the fire?

11  A.  About five months.

12  Q.  Were you working every day there?

13  A.  Yes.

14  Q.  The opening that Mr. Falco built in the second

15     floor of the addition, did they keep that there?

16  A.  No.  We -- I -- I demo'd it and then -- I forget

17     what -- this -- they still have a -- something

18     there.  I forget.  They -- they have a fake

19     fireplace there now.  I think she has candles in

20     it or something decorative.  It's not a

21     fireplace.

22  Q.  You demolished the work that Joe Falco did?

23  A.  Yes.  I -- the area -- he had the bricks on the

24     floor.  I took them up to expose the floor.

58

```
1    The -- they had an insert in the chimney for the
2    flue.  I tore that out.  I can't remember -- I
3    can't remember if we took the -- the bricks down
     or not that -- for the opening, because I
4    think -- I think she just took the mantle out to
5    be cleaned or something.
6
7 Q. Do you know who built the structure that went in
8    place of the opening built by Mr. Falco?
9 A. Who built the structure?  What do you mean?
10 Q. Did something go in after you demolished Mr.
11   Falco's work?
12 A. No.  I -- I think they just cleaned up the area,
13   because it was brick on the -- on the two --
14   on -- behind it.  It was -- it was an exterior
15   wall to begin with, so they had brick there.  So
16   they cleaned up that brick, and they -- they put
17   down another hearth.  And I don't know what
18   kind.  It might have been tile.  And Julie just
19   put a decorative candlepiece in there or
20   something.
21 Q. And do you know who did the work that you just
22   described?
23 A. Oh, Al Kennedy.
   Q. Of the total work that you did at the Pavia
```

59

```
1    second-floor office; is that correct?
2 A. Yes.
3 Q. And was there an architect involved in this work?
4 A. No, sir.
5 Q. There was no architect involved in any of the
6    work at the house?
7 A. No.
8 Q. Who designed the fireplace in the second-floor
9    office?
10 A. Julie and Phil.
11 Q. And the design, in what form did that take?
12 A. It all centered around the mantle that Julie --
13   it had -- I don't know if it -- if it was a
14   family piece or whatever.  But she wanted this
15   mantlepiece, and she wanted to use it on her
16   fireplace that she wanted to -- in this room.
17   And so that was where the opening came from, to
18   fit this.
   Q. Did they have any drawings?  Sketches?  Anything
     in writing?
21 A. No.
22 Q. Was Mr. Pavia living in the home at this time?
23 A. Yes.
24 Q. Did he have any input on the fireplace?
```

60

```
1    residence after the fire, can you estimate for me
2    what percentage of the work you did in the
3    kitchen?
4         MR. BLACKBURN:  Object to the form.
5 A. No.  I couldn't estimate a percentage either way,
6    because I was -- I was all over the job.  Both --
7    both were my -- my responsibilities to get them
8    both done.  I didn't -- they -- they were just
9    part of my day.
10 Q. Were you working on both areas of the house at
11   the same time?
12 A. No.  First we did the kitchen.  And after we got
13   the kitchen pretty -- so the -- I guess to the
14   point where other subs can come in, then I went
15   and I did -- handled the fireplace -- excuse
16   me -- the fire.
17        MR. CROWLEY:  Thank you, sir.  That is
18   all the questions I have for you right now.
19        THE WITNESS:  Thanks.
20        (Brief recess.)
21        EXAMINATION BY MR. TURNER:
22 Q. Mr. Roach, good morning.  My name is Robert
23   Turner, and I represent Michael Carresi.
24        The gas log fireplace was installed in a
```

61

```
1 A. No.  Not -- not in front of me, but I -- I don't
2    know for sure.
3 Q. Was he involved in the remodeling or the
4    addition?
5 A. Just Julie.
6 Q. Could you tell us what was done in the
7    construction of the fireplace in the second-floor
8    office?
9 A. The addition was built along the back of the
10   house, which was all brick, and then it also had
11   maybe a 6-foot return wall, so -- so it was
12   L-shaped, part of the original exterior of the
13   house.  And so they just wanted to -- they just
14   wanted to use -- make like a corner fireplace, so
15   they just made a triangle in the corner and --
16   and used that for the opening.
17 Q. And who did the work?
18 A. Joey Falco.
19 Q. And in constructing that fireplace, what did he
20   do, step-by-step, if you could run it through for
21   us?
22 A. Well, the two -- the two back walls were
23   already -- were already -- already built.
24 Q. And what were they made of?
```

62

1  A.  Just regular brick, exterior brick.  And then
2      he -- he was given an -- an opening, and he
3      just -- so he just built up two sides and a top.
4      It didn't -- it didn't extend up to the ceiling.
5      It was just two sides and a top.  And it was --
6      it was -- I believe like 10 inches on each side
7      were brick to the walls, and then he -- and then
8      he also had to put down a fake hearth.
9  Q.  And how was that constructed?
10  A.  Just out of the same brick.  Just a -- just
11     outside brick.
12  Q.  Was there a plywood used?
13  A.  Yes.  Oh, I -- no.  Excuse me.  I -- I used the
14     plywood.  He -- it was built on top of the -- the
15     floor that I built.
16  Q.  So could you tell us in detail what you did?
17  A.  Well, I framed a typical floor.  It was just out
18     of joists and three-quarter plywood.  And Joey
19     put just regular brick on top of that.  And he
20     built the face of the fireplace.  He built the
21     hearth.  And -- and he was -- and there was
22     supposed to be an insert for zero clearance,
23     because anything else would have meant that I
24     would have had to frame for a -- for a hearth.

63

1  Q.  And then on top of the plywood, what?
2  A.  The cement -- excuse me.  The brick.
3  Q.  Who installed the brick?
4  A.  Joey Falco.
5  Q.  And what were the dimensions of the brick?
6  A.  They were 2 -- 2 inches by 2 inches by 6, 8
7     inches.
8  Q.  2 inches by 2 inches by what?
9  A.  2 inches thick by -- by -- 2 inches by 4 inches
10     by 6 inches.
11  Q.  One level of brick?
12  A.  Yes.
13  Q.  And then what's on top of the brick?
14  A.  Nothing.  It was just -- it was just a
15     decorative...
16  Q.  So, Mr. Roach, was the top of the brick higher
17     than the level of the floor?
18  A.  Yes.  By the 2 inches.
19  Q.  Just by the 2 inches?
20  A.  Yes.
21  Q.  So the materials that you installed were below
22     what would originally have been the floor level?
23  A.  The materials I installed -- this is the
24     three-quarter plywood right there.  The brick was

62

1     If I would have had to -- like I was
2     explaining to Dave, that I would have had to make
3     it so that you could put a cement slab in there.
4     And so -- you know, so Joey just -- they built
5     the fireplace just for decorative purposes only.
6  Q.  So who did some work on the fireplace first, you
7     or Mr. Falco?
8  A.  Oh, it was all -- it was all Joey, other than the
9     fact that I just built the addition and -- and
10     where -- the fireplace had nothing to do with the
11     addition, where the fireplace was located.
12  Q.  Did you say that you installed the plywood?
13  A.  Yes.
14  Q.  Did you install anything else in the fireplace?
15  A.  I didn't, no.
16  Q.  Who installed the joists?
17  A.  I did.
18  Q.  And what material was used?
19  KD.  Kiln-dried 2-by-8s and 2-by-10s.
20  Q.  Wood?
21  A.  Yes.
22  Q.  So at the bottom you installed joists, then on
23     top of that, plywood?
24  A.  Yes.

64

1     sitting on top of that.
2  Q.  Okay.  Was it three-quarter plywood or
3     one-quarter plywood?
4  A.  Three-quarter.
5  Q.  Where had you got the plywood?
6  A.  I don't know where it was got, where -- where we
7     bought it.  It's just -- it's just typical
8     tongue-and-groove plywood.
9  Q.  Oh.  Or was it half-inch plywood?
10  A.  No.  It was -- it was -- it was for flooring.  It
11     was -- excuse me.  It was part of Mass. -- Mass.
12     Building Code.
13  Q.  The Mass. Building Code, in your viewpoint,
14     requires three-quarter-inch plywood?
15  A.  Yes.
16  Q.  For...
17  A.  Subflooring.
18  Q.  And does the Mass. Building Code have any special
19     requirements for subflooring around fireplaces?
20  A.  For the -- for -- you don't put them underneath
21     the fireplace.
22  Q.  Did you put some below the fireplace in this
23     house?
24  A.  I -- I built my flooring before the fireplace was

66

| | |
|---|---|
| 1 A. | determined. And that wasn't a fireplace. |
| 2 Q. | When you did your work? |
| 3 A. | Ever. That was never considered a fireplace. |
| Q. | Would you consider a gas log fireplace a |
| 5 | fireplace? |
| 6 A. | I wouldn't consider it a conventional fireplace. |
| 7 Q. | Would it make any difference if you would have |
| 8 | installed one-half-inch plywood instead of |
| 9 | three-quarter-inch plywood? |
| 10 A. | No. |
| 11 Q. | Is one more or less flammable than the other? |
| 12 A. | No. |
| 13 Q. | Is thicker better? |
| 14 A. | It burns longer. |
| 15 Q. | Then thinner is better? |
| 16 A. | No. It depends what you want to use it for. |
| 17 | Fire -- fire will burn through the thin stuff |
| 18 | quicker and get to the other side. |
| 19 Q. | Do you know who installed the heat exhaust vent? |
| 20 A. | No. |
| 21 Q. | Did you ever give any statements to anyone |
| 22 | regarding this fire? |
| 23 A. | Yes. |
| Q. | And to whom? |

66

| | |
|---|---|
| 1 A. | I don't know his name. |
| 2 Q. | How did that come about? |
| 3 A. | He called me. |
| 4 Q. | Someone called you on the phone? |
| 5 A. | Yes. |
| 6 Q. | Do you have any idea who he was? |
| 7 A. | Nope. |
| 8 Q. | Did he record the conversation? |
| 9 A. | Yes. |
| 10 Q. | Did you get a copy? |
| 11 A. | Nope. |
| 12 Q. | Would you have any objection if we got a copy of |
| 13 | it? |
| 14 A. | Should I? |
| 15 Q. | I think we can get it anyways, but I -- |
| 16 A. | Okay. Then that's fine. That's fine. |
| 17 Q. | But I cannot advise you. |
| 18 | Then no, I don't have an objection. |
| 19 Q. | Did you ever talk to Mr. Pavia? |
| 20 A. | No. |
| 21 Q. | Mr. Roach, did you do anything to prepare for the |
| 22 | deposition today? |
| 23 A. | No. |
| 24 Q. | You don't have any notes or -- |

67

| | |
|---|---|
| 1 A. | I haven't talked to anybody. |
| 2 Q. | And you've never seen your own statement? |
| 3 A. | No. |
| 4 Q. | You didn't look at any photographs? |
| 5 A. | Nothing. |
| 6 Q. | What is Joseph Falco's fields of expertise? |
| 7 | MR. CROWLEY: I object. |
| 8 A. | Masonry. |
| 9 Q. | Anything else? |
| 10 A. | No. |
| 11 Q. | Have you ever been to his house? |
| 12 A. | Yes. |
| 13 Q. | On social occasions? |
| 14 A. | No. He -- he asked me to look at an addition |
| 15 | that he was going to build. |
| 16 Q. | All right. And you did some work over there? |
| 17 A. | No. He never went ahead and did the addition. |
| 18 Q. | Do you have a good relationship with him? |
| A. | Yes. |
| Q. | Would you say he's a friend of yours? |
| 21 A. | Yes. An acquaintance. I -- I have good |
| 22 | relationships with everybody I work with. |
| 23 Q. | Sure. Would you see Mr. Falco socially? |
| 24 A. | No. |

68

| | |
|---|---|
| 1 Q. | Go out for a few beers with him? |
| 2 A. | If he called me, I would. But -- |
| 3 Q. | Still waiting? |
| 4 A. | Yeah. |
| 5 Q. | Do you carry insurance? |
| 6 A. | I carry insurance, yes. |
| 7 Q. | And who are you insured with? |
| 8 A. | I don't know. Through my broker. |
| 9 Q. | Who's that? |
| 10 A. | Easton Insurance. |
| 11 Q. | In Easton, Mass.? |
| 12 A. | Yes. |
| 13 Q. | Did anybody supervise Mr. Falco in his work, to |
| 14 | your knowledge? |
| 15 A. | Well, we're all -- we're all given the -- the job |
| 16 | from the same person, so from -- from Phil. So |
| 17 | he -- he tells us what to do. |
| 18 Q. | Was Mr. Carresi at the Pavia home at the same |
| 19 | time that Mr. Falco was installing the fireplace? |
| 20 A. | I don't know if he was there the exact day. |
| 21 Q. | Did you ever speak with Mr. Carresi about the |
| 22 | fire? |
| 23 A. | About the fire itself? |
| 24 Q. | Yes. |

69

1   A.   Yes.

2   Q.   About what caused the fire?

3   A.   Yes.

4   Q.   And how did that conversation go?

5   A.   Mike said it wasn't his fault, and I said I

6        thought it was pretty much.

7   Q.   Was that the full extent of the conversation?

8   A.   Yeah.  I didn't -- we didn't really -- we don't

9        really talk about it a lot.  It was just in

10       pass -- it was a quick conversation, because it

11       was going to go nowhere.

12  Q.   Mr. Roach, do you have any expertise in plumbing?

13  A.   None.

14  Q.   And you don't have any expertise in masonry work,

15       do you?

16  A.   Nope.

17  Q.   Do you have any expertise in investigating

18       origins of fires?

19  A.   Nope.

20  Q.   Have ever worked with gas logs?

21  A.   No.

22  Q.   Have you ever worked with Heatmaster products?

23  A.   No.

     Q.   Did Mr. Carresi say anything else about the work

70

1        that he did?

2   A.   No.

3             MR. TURNER:  Thank you.  That's all I

4        have.

5        EXAMINATION BY MR. BLACKBURN:

6   Q.   Good morning, Mr. Roach.

7   A.   Good morning.

8   Q.   My name is Glenn Blackburn, and I represent the

9        Fireman's Fund Insurance Company.  They were the

10       Pavias' insurance company.

11  A.   Okay.

12  Q.   Have you had other jobs that you worked on where

13       there was a zero clearance fireplace installed?

14  A.   Yes.  But I wasn't there for when they were

15       installed.  I -- I was framing houses,

16       subcontracting, and would build the -- the

17       openings for them, and I was gone.

18  Q.   And when you testified that you build the

19       openings for them, would you also put down the

20       brick?

21  A.   No.

22  Q.   That would -- okay.  So that would always be done

23       by a mason?

24  A.   Yes.

71

1   Q.   Are you aware from those circumstances where a

2        zero clearance fireplace was going to be

3        installed in some other project that you were

4        going to do whether there was any special

5        requirements that you had to arrange with respect

6        to the subflooring or -- or the framing to

7        accommodate the zero clearance?

8   A.   None.  I was just given a dimension.

9   Q.   Is it necessary for the -- to leave any holes in

10       the framing for the flue or the chimney for the

11       zero clearance fireplace?

12  A.   No.  When I -- what I built was -- we built wood

13       chimneys on the outside, and they just -- they

14       sided around them.  So...

15  Q.   Okay.  So on the occasions where you were

16       involved in a project where a zero clearance

17       fireplace was installed, the chimney was on the

18       exterior of the building?

19  A.   Yes.

20  Q.   Are you aware of whether there are zero clearance

21       fireplaces that accommodate both gas and wood?

22  A.   No.

23  Q.   Did you observe Mr. Falco do any part of the

24       construction of the -- I know you don't like the

72

1        term "fireplace," but of the structure that he

2        was building that looked like a fireplace in the

3        corner of that room?

4   A.   I was there a lot.  I can't remember if I -- I

5        actually seen him laying the bricks that day.

6   Q.   Fair enough.  But you did do the demo work --

7   A.   Yes.  Yeah.

8   Q.   -- after the fire --

9   A.   Yeah.

10  Q.   -- taking apart what had been done?  True?

11  A.   Okay.  Yes.

12  Q.   When you were doing that, when you were taking

13       out the bricks that form the base of that

14       structure, for lack of a better word, --

15  A.   Uh-huh.  Uh-huh.

16  Q.   -- do you recall whether there was any type of

17       fireboard or masonry board that you took out from

18       underneath the bricks but that was above the

19       subflooring?

20  A.   I don't remember.

21  Q.   Do you recall, after me having asked that

22       question, whether you --

23  A.   I'm thinking back now.

24  Q.   -- whether you saw Mr. Falco construct that

74

1   structure with any type of masonry board or
2   fireboard beneath the subflooring -- excuse me --
3   above the subflooring but beneath the brick?
   A.   I don't -- I can't remember.
5   Q.   Fair enough.  Did you put in the hardwood floor?
6   A.   No, I didn't.
7   Q.   Do you recall who did?
8   A.   They were called Philips Flooring.  And I
9        don't -- they're out of Dorchester.  I don't know
10       where they are now.
11  Q.   Another subcontractor?
12  A.   Yes.
13  Q.   And it seems to me that there was kind of two
14       types of subcontractors working on this job, some
15       that more regularly work with P. & D. and some
16       that I guess we would consider to be --
17  A.   Service industry.
18  Q.   Yeah.
19  A.   We work -- work piecemeal, whatever.
20  Q.   Okay.  And that hardwood floor contractor, was
21       that one of those types, the second type of
22       subcontractor?
23  A.   Yes.  He was -- yeah.  He was definitely a strict
24       subcontractor where he worked for Phil, and then

74

1        he was gone to work for someone else, where
2        people like me and a couple of the other
3        contractors were strictly working for Phil.
4   Q.   Do you recall whether the hardwood flooring was
5        in place before Mr. Carresi installed the gas
6        log?
7   A.   I can't -- can't remember.
8   Q.   Do you recall whether the plaster on the walls
9        was in place before he installed the gas log?
10  A.   I can't remember.
11  Q.   There was some special insulation sprayed in
12       above the ceiling of the first floor on the
13       addition?  You recall that?
14  A.   Yes.
15  Q.   Do you have a recollection about whether that
16       insulation had been sprayed in prior, first of
17       all, to Mr. Falco doing any of his work?
18  A.   It was -- I can't remember if it was done before
19       or after Joey.  But the special insulation was
20       just Icynene.  It had -- it was just typical
21       insulation.  It wasn't a -- a -- I don't believe
22       it was a fire-rated insulation.
23  Q.   Okay.  Do you have any recollection of whether
24       the insulation was installed to provide more

75

1        soundproofing for the room below?
2   A.   Yes.  That rings a bell.
3   Q.   And it was sprayed?
4   A.   Yes.
5   Q.   So you don't recall whether that insulation was
6        in place before Mr. Falco did his work?
7   A.   No.
8   Q.   Is that fair?
9   A.   That's fair.
10  Q.   Do you recall whether it was in place before Mr.
11       Carresi installed the gas log?
12  A.   I can't remember now.
13  Q.   Okay.  As I understand your testimony, while you
14       can't pinpoint the exact time or what was said,
15       the progression went like this:  There's going to
16       be a fireplace someplace in the addition;
17       correct?
18  A.   Yes.
    Q.   I don't know where?
    A.   Yes.
21  Q.   All right.  Then you located a place where it was
22       going to be; --
23  A.   Yes.
24  Q.   -- correct?  But no one had decided yet whether

76

1        it was going to be conventional or an insert?
2   A.   No.  No one -- it went from not conventional to
3        an insert, because if it was going to be
4        conventional, we would have had to frame for it.
5             And so next -- next it was going to be an
6        insert.  And even when they decided it was going
7        to be that zero clearance, there was questions of
8        where in the room it was going to go.
9   Q.   Okay.  So the location came after the decision of
10       it not being conventional?
11  A.   Yes.
12  Q.   Do you recall having specific conversations with
13       Julie Pavia about what would be necessary in
14       order to -- for you to do in order to accommodate
15       a conventional fireplace?
16  A.   I -- I remember talking to her about it, telling
17       her what has to be done to put it in.  And that
18       was -- sort of made up her mind, because she
19       didn't want to intrude into the bedroom, and she
20       didn't want to take -- take up any more -- any
21       more space in the -- in the addition.
22            And then there was even talk about
23       putting it on the outside wall.  But again, it
24       would have had to go down from the second floor

78

1   all the way down in -- to the driveway.  And it

2   would interfere with her -- the garage doors.

3   So...

Q.   When you had these conversations with her, was

5   Mr. Rothschild present?

6   A.   Again, he -- I wasn't, I talked to him about

7   it.  If -- if he wasn't there, I talked to Phil

8   about it to let him know what was being done.

9   Q.   As I understand your testimony, there may have

10   been more than one conversation that Mrs. Pavia

11   was part of about that issue?

12   A.   Yes.

13   Q.   And would it be fair to say that Mr. Rothschild

14   was at least involved in some of those

15   conversations?

16   A.   Yes.

17   Q.   And even those that he was not involved with, you

18   would report back to him what your conversation

19   was?

20   A.   Yes.

21   Q.   Other than the other work that you had done on

22   her house, her prior house, had you done any jobs

23   that Mrs. Pavia was involved in at other

24   properties?

---

1   A.   No.

2   Q.   So your dealings with her would have been limited

3   to the work done at the house where the fire was

4   and to her prior home?

5   A.   Yes.

6   Q.   Were you aware of what she did for a living?

7   A.   Nothing.  I don't know.

8   Q.   Were you aware of her background at all?

9   A.   She comes from the Midwest.  Her family owns a

10   couple banks supposedly.  I don't know.

11   Q.   Do you know whether she had any type of a

12   background in construction?

13   A.   Oh, she talks about her family being in the

14   business, some sort of construction business.

15   That's all I got out of her.

16   Q.   Well, let me ask you this.  During the course of

17   your construction and -- or excuse me.  During

18   the course of your conversations with her, did

19   she demonstrate to you that she knew anything

20   about construction?

21   A.   She told me she did.

22   Q.   But did she -- but was it evident to you that she

23   didn't?

24   A.   Yes.

---

79

1   Q.   Okay.  Fair enough.  She -- she thought she knew

2   more than she did?

3   A.   Yes.

4   Q.   Okay.

5   A.   I'm under oath; right?

6   Q.   Excuse me?  You're under oath, and I'm not going

7   to pick up the phone and call her and tell her

8   what you said, at least not right away.  I

9   can't -- I can't keep her from reading your

10   deposition.

11        When there came that point in time --

12   withdrawn.  At some point in time -- withdrawn.

13        The -- the gas log that went into that

14   fireplace, did you understand that to be a zero

15   clearance fireplace insert?

16   A.   The gas fire log came in after -- it was

17   originally supposed to be for the zero clearance,

18   and then it was a gas log.

19   Q.   Right.

A.   Is that your question?

21   Q.   Well -- and I guess -- I guess my question is,

22   did you understand that there is distinction

23   between the two?

24   A.   Oh, no, no.  As far as -- I didn't know what had

---

80

1   to be prepped out for a gas log, no.

2   Q.   But you understood that that gas log wasn't a

3   zero clearance fireplace, at least as you

4   envisioned that?

5   A.   I -- yes.  I knew -- I knew that was not a zero

6   clearance and -- but I didn't know about the gas

7   log until after the fact, until after Joey has

8   already put the opening in.  And so we weren't

9   concerned about the -- the preparation for it.

10   Q.   Well, that's what I'm trying to explore a little

11   bit.

12        As I understand the progression, we went

13   from maybe a conventional fireplace to a zero

14   clearance insert of some type.  We're not sure

15   where.  Then the next step is now we know where?

16   A.   Uh-huh.

17   Q.   Correct?

18   A.   Yes.

19   Q.   And that's where Mr. Falco does his work?

20   A.   Yes.

21   Q.   Had Mr. Falco already installed whatever brick he

22   was going to install, to your understanding,

23   before there was a decision that there was going

24   to be a gas log as opposed to a zero clearance

82

1  fireplace?

2  A.  Yes.

3  Q.  So at some point after this structure in the

4      corner of brick has been made -- you can see I'm

5      not trying to use the word "fireplace," because

6      I'm --

7  A.  Uh-huh.

8  Q.  After the structure has been made, you come to an

9      understanding that we're going to put a gas log

10     in there?

11 A.  Yes.

12 Q.  When you first heard that, did you ask whether

13     there was any special preparation that was going

14     to be necessary in order to accommodate that gas

15     log?

16 A.  No.  I was gone.  At that point they said they're

17     going to do this, and I didn't give it much

18     thought.  I was looking down the road.

19 Q.  Never asked the question?

20 A.  Never asked the question.

21 Q.  At any point prior to the fire, do you recall

22     hearing any conversations about what

23     accommodations were necessary in order for that

24     gas log insert to be installed?

83

1      approached you to discuss with you what had gone

2      on during the course of the construction prior to

3      the fire?

4  A.  Do you mean other than the workers?  Are you

5      talking about investigators and stuff?

6  Q.  Yes.

7  A.  It was months after the fire.  I don't remember

8      when.

9  Q.  And do you remember who it was?

10 A.  I don't remember his name.

11 Q.  Same guy that took the statement?

12 A.  Yes.

13 Q.  If I said the name Steve Tower, would that help

14     you or --

15 A.  Yes.  That was --

16 Q.  That was the guy?

17 A.  Yes.

18 Q.  Okay.  And you met him face-to-face?

19 A.  Yes.

20 Q.  And did he take a recorded statement from you?

21 A.  Yes.

22 Q.  On the spot right there, he pulled out a recorder

23     and --

24 A.  Yes.

1  A.  No.

2  Q.  Do you recall having any conversations yourself

3      with Julie Pavia about the gas log insert?

4  A.  No.  But the -- I was -- what happened is that

5      they make up their mind they want something, and

6      we -- and it was supposed to be the -- the

7      insert.  I built the insert.  What they did --

8      what she wanted afterwards, you know, it was

9      strictly after the fact.

10 Q.  But my question is whether you had any

11     conversations with her about the gas log insert

12     as opposed to zero clearance.

13 A.  No.

14 Q.  Were you present for any conversations that Mrs.

15     Pavia was part of where the gas log insert was

16     discussed?

17 A.  Again, I'm just going to just say I was on the

18     job, and decisions were being made.  And I just

19     know that they were -- I know the decisions were

20     made.  Was I actually right there in the

21     conversation?  I can't say if I was there.  You

22     know, I wasn't -- but I was -- you know, I was --

23     I was on the job.

24 Q.  After the fire, when is the first time anyone

84

1  Q.  Yes.  Okay.  I meant as opposed to going back to

2      his office and calling you or something like

3      that.

4          All right.  Is that the only time you met

5      with him?

6  A.  Yes.

7  Q.  Is that the only time you talked to him?

8  A.  Yes.

9  Q.  Other than Mr. Tower, do you have a recollection

10     of speaking to any other investigators about,

11     again, the circumstances of what had gone on

12     during the course of the construction?

13 A.  When I was at the job, I'm not sure if someone

14     asked me a question right after the fire, because

15     it was -- some claims adjusters.  I'm not sure if

16     someone asked me a question then.  But that would

17     be the only other time that someone might have

18     asked me a question.

19 Q.  Okay.  There were some occasions I know after the

20     fire when possibly even groups of investigators

21     were coming in and looking at and taking pictures

22     and everything.

23 A.  Yes.

24 Q.  Were you around then?

85

| | |
|---|---|
| 1 | A. For a couple of them I were, yes. |
| 2 | Q. So it's possible that during that time someone |
| 3 | may have asked you a question? |
| 4 | A. Yes. |
| 5 | Q. All right. After all that, -- |
| 6 | A. Uh-huh. |
| 7 | Q. -- and after Mr. Tower took his statement from |
| 8 | you, have you spoken to anyone else, first of |
| 9 | all, someone who wasn't involved in the |
| 10 | construction about what went on -- |
| 11 | A. No. |
| 12 | Q. -- during the construction? Did you ever speak |
| 13 | to anybody in this room before today? |
| 14 | A. I -- I called Dave the other day just to cancel. |
| 15 | Q. Okay. Cancel for today? |
| 16 | A. Yeah. |
| 17 | Q. Okay. We appreciate you coming. |
| 18 | A. Okay. |
| 19 | Q. I drove up from Connecticut, so I'm the one that |
| 20 | appreciates it the most. |
| 21 | A. Okay. |
| 22 | Q. When you spoke to him the other day, that was the |
| 23 | first time you spoke to him? |
| 24 | A. Yes. |

86

| | |
|---|---|
| 1 | Q. Did you talk about anything other than just the |
| 2 | time to schedule your deposition? |
| 3 | A. Nope. |
| 4 | Q. Prior to today, have you spoken to Mr. Falco |
| 5 | about this whole mess? |
| 6 | A. Yeah. I spoke to him a couple times. |
| 7 | Q. When was the first time after the fire? |
| 8 | A. Probably when I ran into him maybe at a -- at the |
| 9 | coffee shop or something. |
| 10 | Q. And at that point, was he aware that somebody was |
| 11 | blaming him for doing something wrong? |
| 12 | A. Oh, no. |
| 13 | Q. So when is the first time after the fire that you |
| 14 | can recall having a discussion with Mr. Falco |
| 15 | where you were aware that somebody was blaming |
| 16 | him for having done something wrong? |
| 17 | A. I think it was -- I don't know the time frame, |
| 18 | but I guess it was a meeting at Julie's house |
| 19 | where they had some -- some representatives of -- |
| 20 | of the insurance companies and maybe the -- the |
| 21 | town and a couple lawyers there. And Joey walked |
| 22 | in there without representation, and that was the |
| 23 | first time he found out that he was being accused |
| 24 | of the fire. |

87

| | |
|---|---|
| 1 | Q. Did you have any discussions with him privately |
| 2 | after that, just the two of you, about what had |
| 3 | gone on? |
| 4 | A. Yeah. We talked about the fire, yes. |
| 5 | Q. So how many times after that meeting would you |
| 6 | say that you and Mr. Falco talked about it? |
| 7 | A. Whenever I see him. |
| 8 | Q. Okay. He tells you what goes on? |
| 9 | A. Well, yeah. It's gossip. It's an ongoing thing. |
| 10 | You got a fire, and that son of a bitch did this |
| 11 | and whatever. Who knows? |
| 12 | Q. Okay. How about with Mr. Rothschild? Same |
| 13 | thing? |
| 14 | A. Oh, no, no. He's my employer. |
| 15 | Q. So the two of you haven't talked about it? |
| 16 | A. No. |
| 17 | Q. Really? Not at all? |
| 18 | A. Not at all. He -- we -- we haven't had any |
| 19 | conversation about it. |
| 20 | Q. No kidding? |
| 21 | A. Yeah. |
| 22 | Q. Was he at that meeting at the house that you're |
| 23 | talking about? |
| 24 | A. He talks about it, but he doesn't talk to me |

88

| | |
|---|---|
| 1 | about it. |
| 2 | Q. So you overhear him talking to people? |
| 3 | A. I'm -- I'm right there. Yeah. He -- we don't |
| 4 | have a one-on-one conversation about it. |
| 5 | Q. How about with Mr. Carresi? I know that you |
| 6 | mentioned to Attorney Turner that you had that |
| 7 | one conversation with him. |
| 8 | A. Yeah. That's -- |
| 9 | Q. That one conversation that you had with him |
| 10 | where, at least from your perspective, you agreed |
| 11 | to disagree about what happened, -- |
| 12 | A. Yeah. |
| 13 | Q. -- did that occur before or after that meeting |
| 14 | that you were telling me about at the Pavia |
| 15 | house? |
| 16 | A. Maybe after. |
| 17 | Q. Was Mr. Carresi at that meeting at the Pavia |
| 18 | house that -- where everybody else was there and |
| 19 | Mr. Falco came unrepresented? |
| 20 | A. I don't know. |
| 21 | Q. You don't recall? |
| 22 | A. No. |
| 23 | Q. So at some point after that, you had one |
| 24 | conversation with him about it? |

90

```
1    A.   Yes.
2    Q.   Have you seen him on other jobs since?
3    A.   Oh, yeah.  I work with Mike regularly.
     Q.   Okay.  And you just don't talk -- bring it up?
5    A.   We don't bring it up.
6    Q.   Have you ever heard -- ever overheard any
7         conversations between Mr. Rothschild and Mr.
8         Carresi about the fire?
9    A.   No.  Only -- only if they happen to be in the
10        same group and they're -- and they're talking
11        about it and we're all around.  But did I
12        overhear a private conversation?  No.
13            MR. BLACKBURN:  I don't have any other
14        questions for you.  Thank you, sir.
15            EXAMINATION BY MR. OBER:
16   Q.   Good afternoon.  My name is Scott Ober.  I
17        represent Heatmaster.
18            The gas log that was installed into that
19        opening on the second floor, did you ever see any
20        paperwork or operating or installation
21        instructions relating to that?
22   A.   No.
23   Q.   Have you ever heard the term "solid fuel-burning
          fireplace"?
```

```
1    A.   Nope.
2    Q.   And you talked before about a zero clearance unit
3         being installed at one point, there being a
4         discussion about that?
5    A.   Yes.
6    Q.   And you -- as I understand it, you distinguished
7         there's a difference between a zero clearance
8         unit and a gas log unit?
9    A.   I don't know -- I don't know the difference.
10   Q.   Okay.
11   A.   The reason being, I never dealt with a gas log
12        before.  I didn't have any prior knowledge of it.
13   Q.   And I -- you said you had one conversation with
14        Mr. Carresi after the fire?
15   A.   Yeah.  We talked about the fire.
16   Q.   I missed that.  What was the conversation that
17        you had with him?
18   A.   It was just he was saying how it was -- it was
19        Joey's fault, and I -- I didn't think it was.
20   Q.   Did you say whose fault you thought it was?
21   A.   I might have mentioned that, yes.
22   Q.   What did you -- what did you say?
23   A.   I thought it was -- I thought it was Mike's.
24   Q.   Mr. Carresi?
```

91

```
1    A.   Yes.  I thought he was responsible for the -- for
2         the gas log.
3            MR. OBER:  That's all the questions I
4         have.  Thank you.
5            EXAMINATION BY MR. CARPENTER:
6    Q.   Mr. Roach, my name is Curtis Carpenter.  I
7         represent P. & D. Builders in this case.  I just
8         have a couple questions for you.
9    A.   Uh-huh.
10   Q.   Are you aware that Julie Pavia considered herself
11        an interior designer?
12   A.   Yes.
13   Q.   Did you actually -- other than projects involving
14        homes in which she's lived, have you ever worked
15        on projects in which she was an interior
16        designer?
17   A.   No.
18   Q.   Okay.  Do you know if P. & D. Builders has
          had projects in which she was the interior
          designer?
21   A.   I don't know.
22   Q.   Did you ever have any conversations with Julia
23        Pavia after the fire as to how this fire
24        occurred?
```

92

```
1    A.   I don't think she asked me directly.  I've talked
2         about the fire, but I don't think she asked me
3         directly why the fire occurred.
4    Q.   Well, not -- not asking you why the fire
5         occurred.  But, I mean, just did you ever discuss
6         the facts and circumstances of the fire actually
7         occurring?
8    A.   Again, it would be in a group conversation and
9         people are talking about -- depending who's
10        talking -- who's -- who's at fault.
11   Q.   Sure.  Did you ever have any -- hear Julie Pavia
12        ever tell you or anyone else how long she had
13        left the gas log appliance on before the fire?
14   A.   No.
15            MR. CARPENTER:  Okay.  I have no other
16        questions.
17            MR. CROWLEY:  All set.
18            MR. TURNER:  Mr. Roach, just a couple
19        questions.
20            REEXAMINATION BY MR. TURNER:
21   Q.   I think, paraphrasing your earlier testimony, you
22        talked about your understanding of zero clearance
23        fireplaces, that you could put them anywhere,
24        that you don't need firewalls.  Where did you get
```

94

1    that information?

2    A.    I'm not an expert on it at all.

3    Q.    I understand.  But where did you get that

      information that you testified to?

5    A.    I don't recall.  Just -- maybe just hearsay.

6          Where about the -- about -- maybe someone told it

7          to me.  I didn't read any --

8    Q.    Who told you --

9    A.    I didn't read any literature on it.  I don't --

10         I'm not sure.

11   Q.    I think we can rule out Mr. Carresi, because you

12         already said what your conversation with him was;

13         correct?

14   A.    Rule him out for what?

15   Q.    The conversation regarding the so-called zero

16         clearance.

17   A.    No.  If I -- any information I had, it would have

18         been prior to this.

19   Q.    Prior to the Julia Pavia work altogether?

20   A.    Yeah.  About -- about the zero clearance

21         fireplaces, that you could put them anywhere

22         pretty much.  You don't -- you don't -- it's not

23         like the conventional fireplaces.

24   Q.    So am I inferring correctly that on a

1    conventional fireplace, your understanding is

2    that you would need a firewall?

3    A.    Oh, yes.  On -- on a conventional fireplace, you

4          would need firebrick.  You would need to space

5          your framing.  You'd need -- you'd need a hearth,

6          a cement hearth.  You'd need the correct smoke

7          shelf.

8    Q.    And where did you get that information?

9    A.    Just through the trades.

10   Q.    What does that mean?

11   A.    You just learn it as you go.

12   Q.    From people?

13   A.    From people.

14   Q.    Okay.  Any -- any names on that?

15   A.    No.

16              MR. TURNER:  Thanks.  That's all I

17         have.

18              MR. BLACKBURN:  All set.  Thank you.

19         (Deposition concluded at 12:10 p.m.)

95

COMMONWEALTH OF MASSACHUSETTS

BE IT KNOWN that I, Jessica L. Bisaillon,
Registered Professional Reporter, Certified
Shorthand Reporter and Notary Public, reported
stenographically the foregoing deposition
pursuant to notice at the time and place stated
in the caption hereof; that I was then and there
a Notary Public in and for the Commonwealth of
Massachusetts; that by virtue thereof I was
authorized to administer an oath; that the
witness before testifying was duly sworn to tell
the truth, the whole truth and nothing but the
truth; that the testimony of said witness was
reduced to typewriting under my direction; that
the foregoing pages contain a full, true and
correct transcription of the notes of said
deposition.

I FURTHER CERTIFY that I am not of counsel
nor attorney for either or any of the parties to
said action or otherwise interested in the event
thereof, and that I am not related to either or
any of the parties to said cause.

IN WITNESS WHEREOF I have hereunto subscribed
my name and affixed my seal of office this 6th
day of March, 2006.


_____
                    NOTARY PUBLIC

MY COMMISSION EXPIRES:
March 6, 2009

**$**

$10,000 - 16:1

'86 - 13:19
'87 - 13:19

**0**

01501 - 2:13
01608 - 2:17
02109 - 1:24
02110 - 1:19, 2:7
02210 - 2:10
05-cv-10827-dpw - 1:3
06096 - 2:4

**1**

10 - 61:6
100 - 2:13
104 - 20:6, 20:8, 22:8
10:05 - 1:19
1150 - 1:23
12:10 - 94:19
14 - 10:11
15 - 11:1
162 - 6:12
18 - 26:5, 28:22
1986 - 15:2, 15:14, 18:18
1987 - 15:2, 18:19
1990 - 9:23

**2**

2 - 25:9, 26:5, 63:6, 63:8, 63:9, 63:18, 63:19
2-by-10 - 28:21
2-by-10s - 62:19
2-by-8 - 28:21
2-by-8s - 62:19
20 - 10:13
2000 - 8:9, 8:13
2002 - 7:7, 20:10
2004 - 7:9
2005 - 7:20, 8:16
2006 - 1:19, 95:15
2009 - 95:19
250 - 2:10
27b - 2:13

**3**

3 - 1:19
30 - 5:20, 6:3, 6:4, 9:19
30,000 - 9:19

**4**

4 - 3:5, 63:9
40 - 44:4
484 - 2:16

**5**

5 - 25:10
560 - 2:16
58 - 3:5

**6**

6 - 63:6, 63:10,
95:19
6-foot - 60:11
6/30/59 - 6:10
608 - 2:4
617 - 1:24
6th - 95:15

**7**

70 - 3:6
742-6900 - 1:24
777 - 1:5

**8**

8 - 63:6
89 - 3:6

**9**

91 - 3:7
92 - 3:7
99 - 1:18, 2:7

**A**

abutted - 25:16
accommodate -
71:7, 71:21, 76:14, 81:14
accommodations -
81:23
account - 43:24
accuracy - 5:12
accurate - 6:5
accused - 86:23
acquaintance -
67:21
act - 13:1
acting - 13:13
action - 95:12
activities - 53:4
addition - 20:11, 20:13, 20:19, 20:21, 22:18, 22:20, 23:3, 23:8, 23:10, 23:14, 23:16, 23:18, 23:21, 23:24, 24:5, 24:17, 25:22, 26:14, 28:10, 28:17, 29:7, 29:11, 29:13, 31:10, 31:19, 31:24, 32:4, 32:11, 33:12, 34:6, 34:9, 35:5, 36:11, 36:22, 36:23, 37:3, 39:14, 40:4, 42:24, 43:8, 49:18, 51:22, 51:24, 52:4, 52:12, 52:16, 52:24, 55:3, 55:11, 56:4, 56:15, 60:4, 60:9, 62:9, 62:11, 67:14, 67:17, 74:13, 75:16, 76:21
additional - 31:22
additions - 11:10
address - 6:13, 6:21, 21:17, 53:22
adequate - 17:23
adjoins - 25:22
adjusters - 51:4, 84:15
administer - 95:7
advise - 66:17
affixed - 95:15
afternoon - 89:16
afterwards - 82:8
Afterwards - 46:21
ago - 10:2, 11:1, 11:17, 15:4, 15:6,

20:5
agree - 4:2
agreed - 88:10
ahead - 31:6, 67:17
air - 37:10
air-conditioning -
37:10
airspace - 30:11, 30:20
AI- 57:23
allow - 9:18
alone - 17:6
altogether - 93:19
answer - 5:4, 38:11, 39:21, 39:24, 55:24
Anthony - 33:22
antique - 34:21
anyways - 41:15, 66:15
apart - 45:8, 72:10
Appearing- 2:5, 2:8, 2:11, 2:14, 2:17
appliance - 92:13
appreciate - 85:17
appreciates - 85:20
approached - 83:1
architect - 59:3, 59:5
area - 32:13, 45:12, 47:18, 48:11, 49:1, 49:4, 49:5, 49:22, 54:23, 55:8, 56:23, 57:12
areas - 47:21, 48:13, 49:8, 58:10
arrange - 71:5
arrived - 49:12, 50:2
assist - 15:20
assisting - 33:18
associate's - 8:1, 8:5, 8:19
assume - 30:9
attend - 7:21
attic - 55:15, 55:16, 55:20, 55:22
attorney - 86:17
Attorney - 88:6
Auburn - 2:13
authorized - 95:7
aware - 7:3, 18:19, 19:5, 45:18, 71:1, 71:20, 78:6, 78:8, 86:10, 86:15, 91:10

**B**

background - 7:16, 78:8, 78:12
bad - 50:18
banks - 78:10
base - 27:24, 72:13
basement - 16:19, 16:21, 17:4, 26:9, 26:15, 54:22, 54:23
bath - 32:15
bathrooms - 11:11
bay - 50:9, 50:11
bedroom - 25:21, 25:22, 26:2, 26:10, 76:19
beers - 68:1
began - 8:13, 16:11, 38:16, 42:20
begin - 17:3, 57:15
beginning - 24:4, 24:14
behalf - 1:15, 2:5, 2:8, 2:11, 2:14, 2:17
behind - 57:14
bell - 75:2

below - 17:2, 26:11, 48:12, 48:13, 48:15, 63:21, 64:22, 75:1
beneath - 73:2, 73:3
best - 22:21
better - 65:13, 65:15, 72:14
between - 35:3, 35:12, 49:8, 49:9, 50:9, 56:3, 79:23, 89:7, 90:7
beyond - 8:18
big - 24:4, 48:16
billed - 52:18
birth - 6:9
Bisaillon - 1:16, 95:3
bit - 16:3, 80:11
bitch - 87:10
Blackburn - 2:2, 2:3, 3:6, 38:10, 38:15, 53:2, 53:5, 56:5, 58:4, 70:5, 70:8, 89:13, 94:18
blaming - 86:11, 86:15
blending - 7:13
Blue - 11:21
Blueprint - 11:21
blur - 7:12
board - 72:17, 73:1
boiler - 49:9
Boston - 1:18, 1:24, 2:7, 2:10
bottom - 62:22
bought - 64:7
Box - 2:4
brick - 18:12, 33:10, 34:9, 34:19, 34:20, 37:1, 40:19, 40:22, 41:1, 44:15, 50:14, 57:13, 57:15, 57:16, 60:10, 61:1, 61:7, 61:10, 61:11, 61:19, 63:2, 63:3, 63:5, 63:11, 63:13, 63:16, 63:24, 70:20, 73:3, 80:21, 81:4
bricks - 56:23, 57:3, 72:5, 72:13, 72:18
brickwork - 33:13
Bridgewater -
21:15, 21:16, 21:22
Brief- 58:20
briefly - 7:15
bring - 36:1, 89:4, 89:5
broker - 68:8
brought - 24:19, 28:12
Bruce - 2:12
Bs - 7:17, 7:18, 8:20
buckled - 48:8
build - 9:19, 14:5, 14:11, 22:16, 26:6, 28:17, 32:19, 34:13, 67:15, 70:16, 70:18
Builders - 1:9, 2:11, 10:15, 10:24, 11:8, 11:9, 20:16, 21:5, 91:7, 91:18
Building - 10:6, 17:16, 17:19, 17:23, 64:12, 64:13, 64:18
building - 12:3, 13:11, 14:16, 16:5, 17:13, 33:19, 37:17, 38:18, 71:18, 72:2
built - 12:12, 12:23, 15:7, 15:14, 15:17,

18:9, 18:20, 18:21, 20:21, 23:16, 23:21, 25:14, 26:14, 28:15, 29:8, 29:12, 30:20, 32:11, 34:10, 34:12, 34:15, 34:16, 35:5, 36:13, 36:21, 39:9, 39:13, 40:8, 41:23, 44:22, 52:1, 56:14, 57:7, 57:8, 57:9, 60:9, 60:23, 61:3, 61:14, 61:15, 61:20, 62:4, 62:9, 64:24, 71:12, 82:7
burn - 65:17
burning - 14:17, 15:18, 18:16, 89:23
burns - 65:14
burnt - 55:6, 55:12
burnt-up - 55:12
Burr- 21:1, 21:3, 21:4, 21:10, 21:13, 21:24
burst - 46:11, 47:1
business - 12:6, 12:20, 22:2, 22:6, 78:14

**C**

cabinets - 46:12, 54:12
California - 1:6
cancel - 85:14
Cancel- 85:15
candlepiece - 57:19
candles - 56:19
cannot - 66:17
cap - 8:12
caption - 95:5
Carpenter - 2:9, 3:7, 91:5, 91:6, 92:15
carpenter - 11:14, 11:15, 20:22, 24:21, 25:4
carpenters - 20:24, 37:5, 45:17
carpentry - 11:22, 16:10, 31:23, 39:16, 43:2, 43:7
Carresi - 1:9, 2:14, 37:12, 39:12, 40:21, 41:18, 42:14, 42:20, 58:23, 68:18, 68:21, 69:24, 74:5, 75:11, 88:5, 88:17, 89:8, 90:14, 90:24, 93:11
carry - 68:5, 68:6
case - 4:18, 7:3, 91:7
caused - 46:6, 47:5, 69:2
ceiling - 46:13, 46:17, 46:18, 46:21, 47:11, 54:13, 56:3, 61:4, 74:12
ceilings - 47:10
cellar - 16:24, 24:18, 46:13, 47:23, 47:24, 48:9, 48:11, 48:18, 49:1, 49:4, 49:5
cement - 25:11, 62:3, 63:2, 94:6
centered - 59:12
certain - 40:3, 42:5
certificate - 8:21, 11:18
Certified - 1:17, 95:3
Certify - 95:11

change - 24:3
changes - 5:17, 5:22
charged - 15:23
children - 6:16
chimney - 14:13, 15:7, 16:8, 16:15, 16:19, 16:22, 18:1, 18:3, 18:11, 18:14, 18:16, 33:5, 42:1, 42:3, 42:8, 57:1, 71:10, 71:17
Chimneys - 13:23
chimneys - 13:24, 14:2, 14:7, 14:9, 14:19, 14:23, 18:20, 19:3, 71:13
Chip - 53:12
choice - 10:4, 10:5
Chuck's - 21:2
Chuck's - 55:9
circumstances - 71:1, 84:11, 92:6
Civil - 1:16
civil - 7:17, 7:18, 8:1, 8:4, 8:12, 8:14, 8:20
claims - 51:4, 84:15
classes - 8:13, 11:18, 11:20
clean - 55:8, 55:9, 55:11
cleaned - 57:6, 57:12, 57:16
cleaning - 31:22
cleanup - 51:10
clearance - 29:23, 29:24, 30:6, 30:8, 30:13, 30:15, 30:16, 30:21, 31:1, 31:4, 31:8, 34:11, 36:12, 61:22, 70:13, 71:2, 71:7, 71:11, 71:16, 71:20, 76:7, 79:15, 79:17, 80:3, 80:6, 80:14, 80:24, 82:12, 90:2, 90:7, 92:22, 93:16, 93:20
Code - 10:6, 17:23, 64:12, 64:13, 64:18
codes - 14:16
coffee - 86:9
cold - 46:7, 46:24, 49:23
college - 7:21
coming - 33:5, 84:21, 85:17
commencing - 1:19
Commission - 95:18
Commonwealth - 1:17, 9:8, 9:15, 95:1, 95:6
companies - 10:21, 12:10, 51:5, 86:20
Company - 1:5, 70:9
company - 10:14, 12:8, 13:15, 70:10
company's - 33:3
complete - 31:16
completed - 8:16, 18:3, 21:12, 22:20, 28:13, 29:6, 31:24, 36:22, 38:17, 38:21, 38:23, 42:24
completing - 17:24
concerned - 80:9
concerning - 35:14
concluded - 94:19
Concorde - 2:3

conditioning - 37:10
confined - 56:2
connect - 41:19
Connecticut - 2:4, 85:19
connection - 41:12
considered - 65:4, 65:6, 73:16
considered - 65:3, 91:10
consist - 44:5
consistent - 42:8
constant - 47:9
construct - 15:24, 72:24
constructed - 14:3, 16:18, 19:1, 19:2, 28:19, 42:3, 61:9
constructing - 23:24, 38:2, 38:6, 60:19
Construction - 1:8, 1:15, 2:8, 12:7, 12:11, 12:15, 22:7
construction - 8:22, 9:4, 9:12, 9:17, 9:21, 10:8, 10:21, 11:18, 12:4, 12:18, 14:1, 14:3, 14:7, 14:8, 15:8, 20:13, 25:4, 43:17, 60:7, 71:24, 78:12, 78:14, 78:17, 78:20, 83:2, 84:12, 85:10, 85:12
construction-related - 9:4
contain - 95:9
contained - 30:22
Conte - 12:8, 12:21, 19:21, 21:1
continue - 21:4, 27:3
Continue - 27:3
continued - 32:1
continuing - 11:23
contractor - 9:7, 12:14, 12:16, 13:1, 13:13, 20:15, 37:7, 37:8, 42:9, 73:20
contractors - 74:3
conventional - 14:17, 15:18, 18:16, 24:8, 24:13, 26:13, 26:20, 27:2, 27:7, 28:5, 28:7, 28:9, 29:17, 30:16, 65:6, 76:1, 76:2, 76:4, 76:10, 76:15, 80:13, 93:23, 94:1, 94:3
conversation - 6:23, 27:5, 35:7, 35:10, 35:23, 66:8, 69:4, 69:7, 69:10, 77:10, 77:18, 82:21, 87:19, 88:4, 88:7, 88:9, 88:24, 89:12, 90:13, 90:16, 92:8, 93:12, 93:15
conversations - 24:1, 40:17, 76:12, 77:4, 77:15, 78:18, 81:22, 82:2, 82:11, 82:14, 89:7, 91:22
copper - 47:4, 47:15
copy - 5:10, 66:10, 66:12
corner - 60:14, 60:15, 72:3, 81:4
Corp - 1:8, 1:16, 2:8

Correct - 80:17
correct - 14:21, 26:17, 26:18, 29:10, 59:1, 75:17, 75:24, 93:13, 94:6, 95:10
corrections - 5:17
correctly - 19:1, 93:24
counsel - 4:24, 95:11
couple - 27:23, 46:9, 49:10, 74:2, 78:10, 85:1, 86:6, 86:21, 91:8, 92:18
course - 11:22, 78:16, 78:18, 83:2, 84:12
courses - 8:21, 11:23
Court - 1:1, 1:23
created - 45:8
Crowley - 2:6, 3:5, 4:1, 4:14, 4:17, 58:17, 67:7, 92:17
cubic - 9:19
current - 21:17
Curtis - 2:9, 91:6
cut - 16:13, 16:14, 33:4

D

d/b/a - 1:9, 2:14
daily - 43:16, 53:3
damage - 45:8, 48:1, 48:24, 52:8, 55:6, 55:16, 56:2, 56:7
damaged - 47:21, 48:19, 55:8, 55:13, 55:14
date - 6:9, 7:11
Dave - 62:2, 85:14
David - 2:6, 4:17
days - 5:20, 6:4, 27:23, 36:1, 36:20
deal - 24:4
dealings - 78:2
dealt - 90:11
Defendant - 1:12, 1:15
Defendants - 1:10
definitely - 73:23
degree - 8:4, 8:5, 8:16, 8:19
demo - 72:6
demo'd - 46:21, 56:16
demolished - 54:16, 56:22, 57:10
demonstrate - 78:19
Department - 17:17, 17:19
Depina - 53:19, 53:20, 54:1, 54:5, 54:8

Depina's - 54:4
deposition - 4:20, 5:11, 39:20, 66:22, 79:10, 86:2, 95:4, 95:10
Deposition - 1:15, 3:2, 94:19
depositions - 5:3
describe - 7:15, 18:12, 22:13, 22:15, 22:19
described - 36:14, 38:3, 57:22
description - 22:13
design - 30:18, 59:11
designed - 59:8
designer - 91:11, 91:16, 91:20
destroyed - 45:11, 46:12
detail - 44:8, 61:16
determined - 34:21, 34:24, 65:1
difference - 65:7, 90:7, 90:9
different - 27:4
dimension - 71:8
dimensions - 34:24, 63:5
dining - 51:24, 52:2, 52:6, 52:8
directed - 35:19
direction - 95:9
directly - 30:10, 48:12, 48:13, 48:15, 54:8, 92:1, 92:3
disagree - 88:11
discuss - 83:1, 92:5
discussed - 82:16
discussion - 23:9, 24:20, 38:14, 86:14, 90:4
discussions - 28:4, 35:3, 40:10, 40:12, 87:1
distinction - 79:22
distinguish - 52:22
distinguished - 90:6
District - 1:1, 1:2
done - 13:18, 16:11, 27:12, 29:15, 29:21, 31:19, 31:22, 32:16, 37:1, 42:9, 42:11, 42:17, 47:17, 51:13, 54:10, 58:8, 60:6, 70:22, 72:10, 74:18, 76:17, 77:8, 77:21, 77:22, 78:3, 86:16
Donnelly - 2:15
door - 49:18, 50:24
doors - 77:2
Dorchester - 53:21, 73:9
double - 28:20
down - 20:20, 21:21, 26:9, 26:11, 47:24, 48:24, 50:9, 50:14, 51:12, 54:18, 54:19, 55:1, 55:2, 55:19, 57:3, 57:17, 61:8, 70:19, 76:24, 77:1, 81:18
draw - 28:6
drawings - 59:19
dried - 62:19
drill - 40:21
drilled - 40:24
drills - 40:18

Drive - 1:5, 2:13
driver's - 4:11
driveway - 77:1
driving - 21:20
dropped - 54:19
drove - 85:19
duly - 4:12, 95:7
Dunn - 1:23
During - 21:8, 28:4, 39:20, 78:16, 78:17
during - 83:2, 84:12, 85:2, 85:12
Dussault - 37:9, 42:4

E

East - 21:14
Easton - 6:12, 17:16, 68:10, 68:11
education - 8:18, 11:23
educational - 7:15
eight - 11:3
either - 58:5, 95:12, 95:13
electrician - 37:4
Eleven - 6:14
employed - 10:8, 10:10, 10:18, 22:1, 22:6
employee - 10:16, 53:14
employees - 53:10
employer - 87:14
engineering - 7:17, 7:19, 8:3, 8:11, 8:14, 8:20
Enrique - 53:17
enter - 45:13
entranceway - 48:15, 50:12
environmental - 8:2
Environmental - 8:11
envisioned - 80:4
errata - 5:16, 5:21
Esquire - 2:3, 2:6, 2:9, 2:12, 2:16
estimate - 58:1, 58:5
event - 42:15, 95:12
events - 46:1
evident - 78:22
exact - 40:16, 68:20, 75:14
exactly - 32:10
Examination - 3:5, 3:6, 3:7, 4:14, 58:21, 70:5, 89:15, 91:5
examination - 10:3
examined - 4:13
except - 4:4
Excuse - 43:4, 61:13, 79:6
excuse - 39:17, 58:15, 63:12, 64:11, 73:2, 78:17
exercise - 48:14, 48:16, 49:4, 54:23
exhaust - 17:2, 65:19
Exhibit - 3:15
existing - 15:10
expert - 93:2
expertise - 67:6, 69:12, 69:14, 69:17
expired - 10:1
Expires - 95:18
explain - 18:15

explaining - 62:2
explore - 80:10
expose - 55:7, 56:24
exposed - 46:21, 46:23
extend - 17:4, 61:4
extends - 26:5
extensive - 55:16, 55:17
extent - 69:7
exterior - 25:19, 33:8, 33:14, 33:19, 33:24, 38:17, 57:14, 60:12, 61:1, 71:18
extra - 29:5
extra-deep - 29:5

**F**

face - 25:9, 26:3, 26:4, 61:20, 83:18
face-to-face - 83:18
fact - 62:9, 80:7, 82:9
facts - 92:6
Fair- 72:6, 73:5, 79:1
fair - 75:8, 75:9, 77:13
fake - 56:18, 61:8
Falco- 1:8, 1:15, 2:8, 4:18, 13:8, 13:10, 13:15, 13:20, 13:22, 14:5, 14:11, 14:24, 15:5, 15:12, 15:14, 15:17, 15:20, 15:23, 16:5, 16:11, 16:18, 17:6, 17:8, 17:24, 18:8, 18:15, 18:18, 19:11, 19:15, 19:18, 33:8, 33:18, 33:23, 34:3, 34:5, 34:12, 35:4, 35:12, 36:13, 36:16, 36:21, 37:3, 37:14, 37:16, 38:2, 38:6, 38:16, 38:20, 38:23, 39:2, 39:9, 39:13, 40:7, 42:17, 42:19, 56:14, 56:22, 57:8, 60:18, 62:7, 63:4, 67:23, 68:13, 68:19, 71:23, 72:24, 74:17, 75:6, 80:19, 80:21, 86:4, 86:14, 87:6, 88:19
Falco's- 17:14, 33:14, 57:11, 67:6
fall - 34:4, 50:21
fam - 6:16
familiar - 5:2, 13:7, 44:14, 44:16
family - 59:14, 78:9, 78:13
far - 43:2, 44:15, 79:24
fast - 27:20
fault - 69:5, 90:19, 90:20, 92:10
Federal- 1:16
feet - 24:9, 25:9, 25:10, 26:5
few - 68:1
fields - 67:6
fin - 31:6
fine - 66:16
finish - 12:13, 12:24, 28:14
finished - 28:12, 29:10, 47:23, 48:17,

49:1, 49:4, 55:20
fire - 7:3, 7:6, 7:9, 20:6, 24:8, 38:3, 38:13, 38:14, 39:10, 41:4, 41:6, 45:6, 45:8, 45:14, 45:19, 48:3, 46:3, 48:21, 49:13, 49:19, 50:8, 50:10, 51:3, 52:11, 53:3, 53:11, 54:2, 54:10, 55:4, 55:6, 55:9, 56:2, 56:7, 56:10, 58:1, 58:16, 65:17, 65:22, 68:22, 68:23, 69:2, 72:8, 74:22, 78:3, 79:16, 81:21, 82:24, 83:3, 83:7, 84:14, 84:20, 86:7, 86:13, 86:24, 87:4, 87:10, 89:8, 90:14, 90:15, 91:23, 92:2, 92:3, 92:4, 92:6, 92:13
Fire- 65:17
fire-rated - 74:22
fireboard - 72:17, 73:2
firebrick - 25:12, 94:4
firefighters - 49:19, 50:7
Fireman's- 1:4, 70:9
fireplace - 14:13, 15:7, 15:10, 15:17, 15:18, 15:24, 16:5, 16:18, 17:3, 18:1, 18:3, 18:16, 19:9, 23:17, 23:20, 23:24, 24:2, 24:9, 24:13, 24:15, 24:17, 24:22, 25:9, 25:13, 25:23, 26:1, 26:4, 26:7, 26:13, 26:20, 27:2, 27:7, 27:13, 28:6, 28:7, 28:10, 28:14, 29:8, 29:12, 29:17, 29:22, 30:6, 30:7, 30:8, 30:12, 30:21, 31:1, 31:4, 34:7, 34:14, 36:10, 38:7, 40:7, 40:11, 41:18, 41:19, 41:23, 42:21, 42:23, 43:5, 44:11, 44:15, 44:17, 44:19, 44:23, 45:1, 56:19, 56:21, 58:15, 58:24, 59:8, 59:16, 59:24, 60:7, 60:14, 60:19, 61:20, 62:5, 62:6, 62:10, 62:11, 62:14, 64:21, 64:22, 64:24, 65:1, 65:3, 65:4, 65:5, 65:6, 68:19, 70:13, 71:2, 71:11, 71:17, 72:1, 72:2, 75:16, 76:15, 79:14, 79:15, 80:3, 80:13, 81:1, 81:5, 89:24, 94:1, 94:3
fireplaces - 14:5, 14:9, 14:11, 14:19, 14:23, 15:15, 18:24, 19:6, 23:9, 23:12, 23:15, 24:8, 30:13, 30:15, 30:17, 64:19, 71:21, 92:23, 93:21, 93:23
fires - 19:4, 69:18
firewall - 94:2
firewalls - 30:4, 92:24

First- 58:12
first - 9:23, 11:1, 13:20, 19:23, 19:24, 20:8, 20:12, 23:8, 23:14, 45:13, 45:17, 46:3, 49:16, 50:13, 51:11, 54:6, 56:3, 62:6, 74:12, 74:16, 81:12, 82:24, 85:8, 85:23, 86:7, 86:13, 86:23
fit - 34:22, 59:18
five - 56:11
flammable - 65:11
flat - 32:22
flood - 45:18, 45:22, 46:4, 46:5, 46:6, 47:22, 48:1, 48:6, 48:7, 48:20, 48:21
flooded - 46:12
floor - 16:16, 24:5, 24:7, 24:16, 24:19, 26:15, 28:21, 29:5, 29:13, 31:6, 33:6, 35:5, 36:10, 54:12, 54:17, 54:19, 54:20, 54:24, 55:2, 56:3, 56:15, 56:24, 59:1, 59:8, 60:7, 61:15, 61:17, 63:17, 63:22, 73:5, 73:20, 74:12, 76:24, 89:19
Flooring- 73:8
flooring - 46:13, 48:7, 48:8, 64:10, 64:24, 74:4
floors - 28:17, 28:19, 28:24
Florida- 53:18
flue - 16:7, 17:1, 42:1, 42:3, 42:8, 42:15, 57:2, 71:10
flush - 28:24
followed - 22:9
follows - 4:13
force - 47:8
foregoing - 95:4, 95:9
forget - 22:3, 28:20, 56:16, 56:18
form - 4:5, 53:2, 53:5, 56:5, 58:4, 59:11, 72:13
formal - 26:11, 34:8
format - 5:4
forth - 31:20, 32:9
forward - 9:24
foundation - 16:7, 16:21, 16:23, 17:3
Four- 15:2
four - 8:1, 15:1
Fox- 2:12
Frame- 12:12
frame - 11:10, 16:15, 17:21, 25:2, 26:14, 31:7, 61:24, 76:4, 86:17
framed - 12:22, 32:4, 32:20, 33:4, 36:24, 61:17
framing - 12:18, 20:22, 20:24, 21:11, 22:8, 22:10, 22:18, 23:8, 24:6, 24:21, 24:24, 25:3, 26:9, 27:3, 28:11, 28:13, 28:14, 29:4, 29:6, 29:11, 29:17, 31:3, 31:10, 31:15, 31:19, 33:15, 42:24, 70:15,

71:6, 71:10, 94:5
Frankie- 53:13
freeze - 47:5, 47:7, 47:8
freezing - 46:8
Friday- 1:19
friend - 67:20
front - 13:23, 13:24, 14:2, 49:18, 50:5, 50:11, 50:17, 50:24, 60:1
froze - 46:9
fuel - 89:23
fuel-burning - 89:23
full - 4:15, 69:7, 95:9
Fund- 1:4, 70:9
furnace - 16:9, 17:2
furniture - 34:23

**G**

garage - 26:12, 77:2
gas - 30:7, 38:3, 38:7, 38:13, 38:14, 39:10, 40:7, 40:11, 40:20, 41:4, 41:6, 41:11, 41:12, 41:14, 41:16, 41:18, 41:19, 41:20, 41:23, 42:20, 42:23, 43:5, 44:11, 44:17, 44:19, 44:22, 44:23, 45:1, 58:24, 65:4, 69:20, 71:21, 74:5, 74:9, 75:11, 79:13, 79:16, 79:18, 80:1, 80:2, 80:6, 80:24, 81:9, 81:14, 81:24, 82:3, 82:11, 82:15, 89:18, 90:8, 90:11, 91:2, 92:13
general - 13:1, 13:13, 20:15, 23:19
generally - 12:23
gentleman - 13:7
given - 61:2, 68:15, 71:8
glazed - 49:20
Glenn- 70:8
gossip - 87:9
Goudreau- 1:23
grade - 17:2
groove - 64:8
ground - 5:2
group - 89:10, 92:8
groups - 84:20
Gubbins- 37:14, 37:23, 53:12
guess - 39:22, 48:22, 50:6, 58:13, 73:16, 79:21, 86:18
guessing - 40:1, 42:5
guy - 83:11, 83:16

**H**

Half- 47:4
half - 64:9, 65:8
Half-inch - 47:4
half-inch - 64:9
halfway - 31:8
hallway - 50:5, 50:17, 55:7, 74:4
Hammondswood- 20:6, 20:9, 20:12, 22:8, 44:4
hand - 4:2
handle - 14:14,

16:9, 17:2
handled - 58:15
hardwood - 48:7, 73:5, 73:20, 74:4
Hassett- 2:15
haul - 32:8
head - 53:24
heading - 44:4
hear - 38:11, 92:11
heard - 81:12, 89:6, 89:23
hearing - 81:22
hearsay - 93:5
hearth - 16:16, 25:1, 25:5, 57:17, 61:8, 61:21, 61:24, 94:5, 94:6
heat - 30:13, 49:13, 49:15, 49:21, 50:1, 65:19
Heating - 1:9, 2:14
heating - 49:8, 49:9
Heatmaster - 1:12, 2:17, 69:22, 89:17
help - 7:9, 32:7, 83:13
hereof - 95:5
hereunto - 95:14
herself - 91:10
high - 8:18, 8:23
High - 8:24, 9:2
higher - 63:16
Hill - 11:21
himself - 22:3
hip - 32:22
hired - 13:4
hold - 8:5, 9:4
hole - 40:19, 40:21, 40:24
holes - 33:5, 71:9
home - 7:4, 15:5, 15:8, 15:10, 15:13, 15:17, 15:21, 15:24, 16:5, 16:12, 16:19, 17:12, 17:14, 18:8, 19:9, 19:16, 38:21, 39:3, 39:7, 41:20, 43:14, 45:13, 45:19, 46:10, 46:16, 47:21, 49:12, 49:14, 49:23, 50:23, 51:2, 53:4, 53:10, 56:7, 59:22, 68:18, 78:4
homes - 12:4, 12:18, 14:3, 91:14
honestly - 35:6
hose - 50:8
hourly - 43:24
hours - 44:4
house - 15:4, 19:22, 19:24, 20:1, 20:3, 24:10, 25:16, 25:16, 26:3, 30:2, 32:13, 32:16, 33:10, 33:12, 41:7, 41:8, 41:9, 41:14, 41:16, 45:7, 47:12, 49:22, 52:1, 54:1, 55:7, 55:14, 58:10, 59:6, 60:10, 60:13, 64:23, 67:11, 77:22, 78:3, 86:18, 87:22, 88:15, 88:18
houses - 12:12, 12:22, 12:23, 13:11, 70:15
Hull - 18:22
Hvac - 37:6, 37:8, 42:6, 42:9

ice - 49:17, 49:21, 50:5, 50:15, 50:16, 50:21, 52:6
Icynene - 74:20
idea - 31:4, 66:6
identified - 4:10
imagine - 55:17
important - 5:3
Inc - 1:9, 1:12, 1:23, 2:11, 2:17
inch - 47:4, 64:9, 64:14, 65:8, 65:9
inches - 26:5, 28:23, 61:6, 63:6, 63:7, 63:8, 63:9, 63:10, 63:18, 63:19
indicate - 7:8, 24:14, 29:7, 29:12
indicating - 55:23
industry - 10:8, 10:10, 73:17
inferring - 93:24
informal - 36:4
informal-type - 36:4
information - 23:20, 24:22, 93:1, 93:4, 93:17, 94:8
informed - 28:9
input - 27:22, 59:24
insert - 57:1, 61:22, 76:1, 76:3, 76:6, 79:15, 80:14, 81:24, 82:3, 82:7, 82:11, 82:15
inside - 18:13, 25:15, 41:7, 41:8, 50:22, 51:1
inspected - 17:14, 17:16, 17:18
inspection - 17:21
inspector - 17:21, 18:4, 18:22, 19:7
inspects - 37:19
install - 30:10, 41:18, 62:14, 80:22
installation - 89:20
installed - 39:8, 42:15, 42:23, 43:5, 44:24, 45:2, 58:24, 62:12, 62:16, 62:22, 63:3, 63:21, 63:23, 65:8, 65:19, 70:13, 70:15, 71:3, 71:17, 74:5, 74:9, 74:24, 75:11, 80:21, 81:24, 89:18, 90:3
installing - 42:20, 68:19
instead - 65:8
Institute - 11:22
instructions - 89:21
insulation - 30:19, 47:11, 47:13, 74:11, 74:16, 74:19, 74:21, 74:22, 74:24, 75:5
Insurance - 1:4, 68:10, 70:9
insurance - 51:5, 68:5, 68:6, 70:10, 86:20
insured - 68:7
intended - 22:19
interested - 95:12
interfere - 77:2
interior - 34:6, 40:4, 41:13, 91:11, 91:15, 91:19
introduce - 19:18
intrude - 76:19
investigating - 69:17
investigators - 83:5, 84:10, 84:20
involved - 27:21, 32:4, 32:5, 54:14, 55:2, 59:3, 59:5, 60:3, 71:16, 77:14, 77:17, 77:23, 85:9
involves - 7:3
involving - 40:10, 91:13
issue - 30:24, 77:11
issued - 9:14, 9:15
itself - 34:9, 68:23

**J**

January- 7:9
Jessica- 1:16, 95:3
Jim- 37:9
Jimmy- 42:4, 42:12
job - 20:17, 20:24, 21:8, 21:10, 25:6, 27:11, 28:12, 31:9, 31:11, 31:14, 32:8, 33:23, 35:8, 36:17, 37:7, 37:10, 37:21, 38:13, 38:23, 39:2, 40:13, 43:17, 43:23, 51:16, 58:6, 68:15, 73:14, 82:18, 82:23, 84:13
jobs - 7:11, 19:14, 25:7, 70:12, 77:22, 89:2
Joe- 33:22, 56:22
Joey- 24:24, 25:11, 35:21, 38:9, 38:13, 60:18, 61:18, 62:4, 62:8, 63:4, 74:19, 80:7, 86:21
Joey's- 90:19
John- 4:16
joists - 28:21, 29:5, 50:9, 55:5, 61:18, 62:16, 62:22
Joseph- 4:18, 13:8, 67:6
journal - 43:14
Julia- 91:22, 93:19
Julie- 1:5, 20:11, 22:14, 23:13, 24:1, 27:10, 27:14, 31:2, 32:14, 34:21, 35:15, 35:21, 40:14, 50:12, 57:18, 59:10, 59:12, 60:5, 76:13, 82:3, 91:10, 92:11
Julie's- 19:24, 34:7, 86:18

**K**

Kathleen- 6:18
Kd- 62:19
keep - 5:6, 43:13, 52:14, 52:22, 53:3, 56:15, 79:9
keeps - 53:6
Kennedy- 57:23
kidding - 87:20
Kiln- 62:19
Kiln-dried- 62:19
kind - 32:6, 48:5, 57:18, 73:13
kitchen - 32:14, 45:11, 46:10, 46:17, 46:18, 47:23, 48:2, 48:3, 48:9, 48:12, 51:23, 52:2, 52:12, 52:15, 52:23, 54:11, 54:16, 58:3, 58:12, 58:13
kitchens - 11:10
knowledge - 53:8, 68:14, 90:12
Known- 95:3
knows - 87:11

**L**

L-shaped- 22:24, 60:12
lack - 72:14
Lane- 20:2
large - 48:4
last - 6:19, 21:2, 38:11, 54:4
Law- 2:2, 2:12
lawyers - 86:21
laying - 72:5
learn - 94:11
least - 47:2, 77:14, 79:8, 80:3, 88:10
leave - 25:8, 30:11, 38:23, 71:9
leaves - 37:18
left - 21:10, 39:2, 42:17, 42:19, 52:4, 92:13
less - 65:11
level - 28:2, 63:11, 63:17, 63:22
license - 4:11, 9:5, 9:6, 9:12, 9:17, 9:22
licenses - 9:4
limited - 78:2
line - 41:4, 41:6, 41:11, 41:13, 41:17, 44:22
list - 44:6
literature - 93:9
live - 6:11, 6:15, 53:20
lived - 6:13, 21:13, 21:14, 53:17, 91:14
lives - 21:15, 53:18
living - 26:11, 34:8, 52:3, 59:22, 78:6
Llp- 1:18, 2:6, 2:9
located - 46:15, 51:20, 62:11, 75:21
location - 23:18, 76:9
Locks- 2:4
log - 38:4, 38:14, 39:10, 40:7, 40:11, 40:20, 41:5, 41:6, 41:18, 41:19, 41:24, 42:21, 42:23, 43:5, 43:14, 44:11, 44:17, 44:19, 44:23, 45:1, 58:24, 65:4, 74:6, 74:9, 75:11, 79:13, 79:16, 79:18, 80:1, 80:2, 80:7, 80:24, 81:9, 81:15, 81:24, 82:3, 82:11, 82:15, 89:18, 90:8, 90:11, 91:2, 92:13
logs - 14:14, 43:17, 69:20
look - 22:20, 23:3, 23:4, 47:10, 67:4, 67:14
looked - 17:22, 45:4, 72:2
looking - 39:21, 51:16, 81:18, 84:21
Ls- 2:9

**M**

Mahoney - 2:9
mail - 10:1
Main - 2:16
maintained - 43:16
mantle - 34:21, 35:1, 57:5, 59:12
mantlepiece - 59:15
manufacturing - 30:18
March - 1:19, 95:15, 95:19
Marin - 1:5
mason - 12:1, 25:1, 70:23
masonry - 19:15, 30:12, 34:13, 34:19, 69:14, 72:17, 73:1
Masonry - 67:8
Mass - 6:12, 64:11, 64:13, 64:18, 68:11
Massachusetts - 1:1, 1:18, 1:24, 2:7, 2:10, 2:13, 2:17, 4:11, 9:5, 9:16, 10:6, 14:16, 17:23, 46:9, 95:1, 95:6
master - 25:21, 25:22, 26:2, 26:10, 32:15
match - 23:2, 33:12
material - 62:18
materials - 32:7, 63:21, 63:23
matter - 4:2, 8:10, 10:5
Mctigh - 53:13
mean - 11:4, 26:1, 27:9, 54:15, 57:9, 83:4, 92:5, 94:10
meant - 61:23, 84:1
meet - 14:15
meeting - 86:18, 87:5, 87:22, 88:13, 88:17
meetings - 36:4
memory - 7:10
mentioned - 11:17, 88:6, 90:21
mentioning - 32:6
Merchant - 51:10
mess - 46:14, 86:5
met - 11:1, 13:20, 83:18, 84:4
Michael - 1:9, 1:15, 2:14, 3:3, 4:9, 4:16, 19:21, 21:1, 42:10, 42:13, 58:23
Midstate - 2:13
Midwest - 78:9
might - 31:21, 57:18, 84:17, 90:21
Mike - 12:8, 12:21, 39:12, 40:18, 42:14, 50:3, 69:5, 89:3
Mike's - 90:23
mind - 5:6, 76:18, 82:5
mine - 15:4
minute - 11:17
missed - 90:16
months - 56:11, 83:7
morning - 45:15, 45:16, 50:19, 58:22, 70:6, 70:7
Morrison - 2:9
most - 5:3, 85:20
motions - 4:6
move - 6:21, 28:1, 29:18
moved - 9:24, 24:17
Multiple - 10:4
multiple - 10:5
Multiple-choice - 10:4
multiple-choice - 10:5
mural - 48:18

**N**

name - 4:15, 4:17, 6:17, 6:19, 10:14, 12:6, 12:20, 13:7, 13:15, 21:2, 21:21, 22:2, 22:6, 33:3, 54:4, 54:6, 58:22, 66:1, 70:8, 83:10, 83:13, 89:16, 91:6, 95:15
names - 33:21, 94:14
necessary - 5:22, 17:11, 18:6, 71:9, 76:13, 81:14, 81:23
need - 24:21, 25:3, 26:8, 27:19, 30:2, 30:4, 30:11, 92:24, 94:2, 94:4, 94:5, 94:6
needed - 17:13, 27:21, 27:22, 31:20
Never - 81:19, 81:20
never - 65:3, 67:2, 67:17, 90:11
new - 12:3, 12:18, 12:23, 14:3, 15:8, 28:1, 54:20
Newton - 20:2
next - 45:16, 48:2, 76:5, 80:15
Next - 48:3
None - 69:13, 71:8
Northeastern - 7:22, 7:23, 8:6, 8:20
Notary - 1:17, 4:12, 95:4, 95:6, 95:17
notes - 66:24, 95:10
nothing - 29:7, 29:11, 62:10, 95:8
Nothing - 8:22, 32:5, 63:14, 67:5, 78:7
notice - 95:5
Novato - 1:5
nowhere - 69:11

**O**

oath - 79:5, 79:6, 95:7
Ober- 2:16, 3:6, 89:15, 89:16, 91:3
Object- 53:2, 53:5, 56:5, 58:4
object - 67:7
objection - 66:12, 66:18
objections - 4:4
observe - 40:21, 40:23, 48:1, 71:23
observed - 50:5
obtain - 9:21, 17:8
occasions - 67:13, 71:15, 84:19
occur - 88:13
occurred - 7:6, 7:9, 20:6, 46:3, 91:24,

92:3, 92:5
occurring - 92:7
offered - 11:22
Office - 2:4
office - 5:24, 19:2,
51:20, 59:1, 59:9,
60:8, 84:2, 95:15
offices - 1:18
Offices - 2:2, 2:12
old - 47:12, 47:13,
47:14, 47:16
on-site - 37:16,
38:4, 38:8, 44:19
once - 9:24, 50:19
Once- 4:23
one - 5:13, 9:23,
18:23, 20:4, 35:23,
42:6, 45:17, 46:3,
48:14, 50:21, 51:15,
64:3, 65:8, 65:11,
73:21, 75:24, 76:2,
77:10, 85:19, 88:4,
88:7, 88:9, 88:23,
90:3, 90:13
One- 1:23, 53:17,
63:11
one-day - 35:23
one-half-inch - 65:8
one-on-one - 88:4
one-quarter - 64:3
ones - 4:3
ongoing - 24:20,
33:15, 43:2, 43:7,
87:9
opened - 47:10
opening - 16:13,
25:8, 25:12, 34:10,
34:12, 34:15, 34:16,
34:18, 34:20, 34:24,
35:14, 35:18, 36:14,
36:21, 37:17, 38:2,
38:6, 38:16, 38:21,
38:24, 39:8, 39:13,
40:7, 56:14, 57:4,
57:8, 59:17, 60:16,
61:2, 80:8, 89:19
openings - 70:17,
70:19
operating - 89:20
opposed - 52:15,
80:24, 82:12, 84:11
order - 43:23,
76:14, 81:14, 81:23
original - 20:20,
60:12
originally - 63:22,
79:17
origins - 69:18
otherwise - 95:12
outside - 14:14,
33:13, 41:7, 61:11,
71:13, 76:23
overhang - 47:7
overhangs - 16:14
overhear - 88:2,
89:12
overheard - 89:6
own - 15:4, 67:2
owned - 20:4
owner - 11:8
owns - 78:9
Oxford - 10:13
Oxmoor- 20:2

**P**

pace - 27:20
pad - 25:12
Page - 3:2, 3:15
pages - 95:9

paid - 43:23
painted - 32:17,
48:18
pantry - 48:4
paper - 5:16, 44:3
paperwork - 43:22,
89:20
paraphrasing -
92:21
part - 16:23, 26:7,
34:9, 48:17, 55:10,
58:9, 60:12, 64:11,
71:23, 77:11, 82:15
particular - 12:6,
25:6, 51:15
particularly - 29:1
parties - 95:12,
95:13
partition - 49:10
party - 1:12
pass - 69:10
past - 11:3
Pavia - 1:5, 7:4,
19:11, 19:16, 19:22,
22:15, 23:5, 23:23,
24:14, 27:1, 27:6,
27:17, 28:5, 31:18,
32:1, 32:12, 35:1,
38:21, 39:3, 39:7,
43:14, 44:12, 44:20,
44:23, 45:1, 45:5,
45:13, 49:12, 51:2,
56:9, 57:24, 59:22,
66:19, 68:18, 76:13,
77:10, 77:23, 82:3,
82:15, 88:14, 88:17,
91:10, 91:23, 92:11,
93:19
Pavia's - 25:22,
26:2, 54:11
Pavias' - 70:10
Pc - 2:15
Pedro - 53:19, 54:7
peeves - 18:23
Pena - 53:17
People - 40:14
people - 53:15,
74:2, 88:2, 92:9,
94:12, 94:13
percentage - 58:2,
58:5
perform - 17:11,
19:11, 45:5
performing - 15:20
periodically - 37:19
permit - 17:13
permits - 17:8,
17:11
person - 68:16
perspective - 88:10
pet - 18:23
phase - 17:18, 21:9,
36:21
Phil - 11:1, 11:4,
22:14, 23:13, 27:10,
31:2, 31:20, 35:15,
35:21, 40:15, 43:21,
45:20, 52:18, 59:10,
68:16, 73:24, 74:3,
77:7
Phil's - 37:18
Philips - 73:8
phone - 66:4, 79:7
phonetic - 20:2,
53:17
photographs -
51:3, 51:6, 67:4
physical - 51:12,
56:2
pick - 79:7

pictures - 19:1,
84:21
piece - 5:16, 34:23,
44:3, 59:14
piecemeal - 73:19
pinpoint - 75:14
pipe - 33:5, 47:8
place - 33:5, 47:8
45:6:8, 46:9,
46:11, 46:15, 46:20,
46:22, 47:1, 47:3,
47:4, 47:5, 47:11,
47:14, 47:15, 47:20
place - 40:20,
50:13, 57:8, 74:5,
74:9, 75:6, 75:10,
75:21, 95:5
places - 46:23
Plaintiff - 1:6, 2:5
plan - 6:21, 22:9
plans - 6:21, 22:9
plaster - 74:8
plastered - 39:14
plumber - 37:4,
37:11, 40:14
Plumbing - 1:9,
2:14
plumbing - 69:12
plus - 26:7
plywood - 61:12,
61:14, 61:18, 62:12,
62:23, 63:1, 63:24,
64:2, 64:3, 64:5, 64:8,
64:9, 64:14, 65:8,
65:9
Pm - 94:19
point - 36:9, 58:14,
79:11, 79:12, 81:3,
81:16, 81:21, 86:10,
88:23, 90:3
poorly - 19:2
possible - 23:2,
85:2
possibly - 84:20
Post - 2:4
pour - 25:11
preparation - 16:4,
30:3, 80:9, 81:13
prepare - 16:14,
24:24, 25:4, 66:21
prepped - 54:20,
80:1
present - 35:3, 35:9,
36:16, 40:10, 44:3,
77:5, 82:14
Pretty - 54:17
pretty - 11:2, 21:12,
55:17, 58:13, 69:6,
93:22
private - 89:12
privately - 87:1
problem - 18:21,
45:10
problems - 18:19,
19:5, 19:8
Procedure - 1:16
proceed - 28:11
production - 4:10
products - 69:22
Professional - 1:17,
95:3
progressing - 27:20
progression -
75:15, 80:12
project - 71:3, 71:16
projects - 91:13,
91:15, 91:19
properties - 77:24
property - 33:9,
33:15, 45:24
proposed - 28:7
provide - 74:24

Public - 1:17, 4:12,
95:4, 95:6, 95:17
pulled - 83:22
purposes - 62:5
pursuant - 1:16,
95:5
put - 11:10, 14:15,
16:8, 16:16, 17:1,
20:11, 25:1, 25:7,
26:21, 27:14, 27:15,
28:13, 28:22, 30:1,
32:24, 34:11, 34:17,
35:17, 35:18, 40:6,
41:24, 49:19, 50:9,
50:10, 50:24, 51:1,
51:12, 54:20, 57:16,
57:19, 61:8, 61:19,
62:3, 64:20, 64:22,
70:19, 73:5, 76:17,
80:8, 81:9, 92:23,
93:21
puts - 40:20
putting - 50:7,
76:23

**Q**

quarter - 61:18,
63:24, 64:2, 64:3,
64:4, 64:14, 65:9
questions - 5:7,
58:18, 76:7, 89:14,
91:3, 91:8, 92:16,
92:19
quick - 69:10
quicker - 65:18

**R**

ran - 20:17, 86:8
Randolph- 8:24, 9:1
rated - 74:22
read - 93:7, 93:9
reading - 11:21,
79:9
really - 46:7, 69:8,
69:9
Really- 87:17
reason - 6:3, 39:3,
90:11
rebuilt - 54:16
receipt - 5:20
receive - 5:10, 5:14,
5:15, 7:18, 8:8
received - 6:24
recent - 47:17
recently - 10:1, 15:3
recess - 58:20
recollection -
74:15, 74:23, 84:9
record - 52:14, 66:8
recorded - 6:5,
83:20
recorder - 83:22
recording - 5:5
records - 7:8,
52:22, 53:7
reduced - 95:9
Reexamination-
3:7, 92:20
refer - 11:4, 14:7,
37:11
referring - 14:8
regarding - 65:22,
93:15
Regional- 11:21
Registered- 1:16,
95:3
registered - 9:7
regular - 34:19,

61:1, 61:19
regularly - 73:15,
89:3
rehab - 11:11,
25:17, 32:17, 45:7
Rehab- 15:9
rehabbing - 52:12
related - 9:4, 95:13
relating - 89:21
relationship - 67:18
relationships -
67:22
remain - 31:18
remember - 5:4,
27:8, 28:23, 29:2,
32:9, 40:16, 43:10,
43:11, 45:3, 50:3,
51:14, 52:10, 57:2,
57:3, 72:4, 72:20,
73:4, 74:7, 74:10,
74:18, 75:12, 76:16,
83:7, 83:9, 83:10
remodeler's - 9:6
Remodeling- 11:10
remodeling - 9:7,
60:3
repair - 55:1, 55:8
repaired - 34:7,
54:12, 54:15
replace - 55:5,
55:12
replacing - 34:9
report - 77:18
reported - 95:4
Reporter- 1:17,
95:3, 95:4
Reporting- 1:23
reports - 43:17,
53:4
represent - 4:18,
58:23, 70:8, 89:17,
91:7
representation-
86:22
representatives -
86:19
represented - 4:24
require - 30:16
requirements -
44:14, 44:16, 64:19,
71:5
requires - 64:14
resembled - 34:13
reserving - 4:4, 4:6
residence - 19:12,
31:18, 32:1, 32:12,
44:12, 44:20, 44:23,
45:2, 45:5, 56:9, 58:1
residential - 11:11,
21:17
respect - 71:5
respond - 5:6
responsibilities -
58:7
responsibility -
37:24
responsible - 91:1
return - 5:24, 39:3,
60:11
review - 5:11
rings - 75:2
Roach- 1:15, 3:3,
4:9, 4:16, 4:17, 12:21,
58:22, 63:16, 66:21,
69:12, 70:6, 91:6,
92:18
road - 81:18
Road- 10:13, 20:6,
20:9, 20:12, 22:9,
44:5

Robert- 2:12, 58:22
rock - 50:20, 50:22, 51:13
Rockland- 6:12
Rocon- 12:9, 12:21, 13:17
roof - 16:20, 17:4, 21:11, 28:13, 32:19, 32:21, 32:22, 32:24, 33:4, 36:24, 42:2
roofing - 33:2
rooflines - 23:2
room - 26:11, 34:8, 47:24, 48:3, 48:4, 48:14, 48:17, 49:5, 51:22, 51:24, 52:2, 52:3, 52:6, 52:9, 59:16, 72:3, 75:1, 76:8, 85:13
rooms - 48:1
Rothschild- 11:5, 11:7, 19:18, 22:15, 23:5, 23:15, 23:19, 28:5, 35:4, 35:14, 37:16, 37:21, 43:23, 53:3, 77:5, 77:13, 87:12, 89:7
rough - 17:20, 39:16
roughly - 25:9
rule - 93:11
Rule- 93:14
Rules- 1:16
rules - 5:2
run - 16:15, 16:19, 41:6, 41:16, 41:24, 60:20
runs - 41:8

## S

salt - 50:20, 50:22, 51:13
San - 1:5
satisfactorily - 4:10
saw - 40:24, 72:24
schedule - 86:2
school - 8:18, 8:23
Scott - 2:16, 89:16
seal - 95:15
second - 12:20, 24:5, 24:7, 24:15, 24:19, 26:15, 29:13, 31:6, 33:6, 35:5, 36:10, 55:10, 56:3, 56:14, 59:1, 59:8, 60:7, 73:21, 76:24, 89:19
second-floor - 59:1, 59:8, 60:7
section - 32:23
see - 7:7, 26:3, 26:4, 34:5, 38:3, 39:2, 44:19, 44:22, 45:1, 50:16, 51:8, 51:13, 51:16, 52:6, 52:8, 56:7, 67:23, 81:4, 87:7, 89:19
seeing - 38:20
self - 10:18, 22:1, 22:6, 30:22
self-contained - 30:22
self-employed - 10:18, 22:1, 22:6
Send - 5:13
sent - 32:10
separate - 46:1
separates - 49:3, 49:11, 51:22

Service - 1:23, 51:9, 73:17
Servicemaster- 51:18
Servicemasters- 51:10
set - 92:17, 94:18
shaped - 22:24, 60:12
sheet - 5:16, 5:21, 49:17
shelf - 17:22, 94:7
shop - 86:9
short - 36:19
Shorthand - 1:17, 95:4
showed - 51:8
shows - 37:18
side - 61:6, 65:18
sided - 71:14
sides - 61:3, 61:5
siding - 16:14, 33:11, 37:1, 50:14
sit - 30:2
site - 37:16, 38:4, 38:8, 42:17, 42:20, 44:19
sitting - 64:1
six - 8:3
sketch - 28:7
Sketches - 59:19
slab - 62:3
slate - 32:24
smell - 55:17
smoke - 17:22, 55:12, 55:13, 55:14, 55:16, 94:6
so-called - 93:15
social - 87:13
socially - 67:23
solid - 89:23
solution - 29:19, 30:24
someone - 22:13, 74:1, 84:13, 84:16, 84:17, 85:2, 85:9, 93:6
Someone - 66:4
someplace - 44:6, 75:16
somewhat - 5:2
Somewhere - 21:22
somewhere - 23:21
son - 87:10
sons - 17:7, 33:20
sorry - 38:10, 56:1
sort - 48:4, 48:16, 76:18, 78:14
Sort - 22:13
soundproofing - 75:1
source - 41:20
space - 9:20, 24:10, 26:23, 48:16, 55:22, 76:21, 94:4
speaking - 84:10
special - 30:3, 30:19, 64:18, 71:4, 74:11, 74:19, 81:13
specific - 76:12
spell - 21:2, 54:4
split - 46:23
spoken - 85:8, 86:4
spot - 83:22
sprayed - 74:11, 74:16, 75:3
staircase - 22:24, 23:1
start - 7:13, 12:12, 12:24

started - 5:9, 16:21, 16:22, 18:8, 22:18, 23:8, 23:14, 24:18, 27:16, 31:15
State - 1:23
state - 4:15
statement - 67:2, 83:11, 83:20, 85:7
statements - 65:21
States - 1:1
stating - 29:10
status - 27:1, 31:3, 40:3
stay - 31:14
steady - 11:2
stenographer - 5:5
stenographically - 95:4
step - 60:20, 80:15
step-by-step - 60:20
steps - 13:23, 13:24, 14:2
Steve - 83:13
Still - 68:3
still - 29:4, 39:16, 49:21, 55:18, 56:17
stipulations - 4:3
stop - 21:7
storage - 55:22
straight - 23:1
Street - 1:18, 1:23, 2:7, 2:10, 2:16, 6:12
street - 21:20, 41:10, 41:11, 41:13, 53:22
strict - 73:23
strictly - 11:11, 74:3, 82:9
strike - 4:6, 14:1, 44:15, 52:20
structure - 20:20, 26:8, 34:13, 49:3, 57:7, 57:9, 72:1, 72:14, 73:1, 81:3, 81:8
Stuart - 2:2, 2:3
study - 7:23
stuff - 65:17, 83:5
subcontracting - 70:16
Subcontractor - 10:17
subcontractor - 10:18, 10:20, 10:23, 12:13, 12:16, 43:19, 43:20, 73:11, 73:22, 73:24
subcontractors - 13:4, 73:14
Subflooring - 64:17
subflooring - 64:19, 71:6, 72:19, 73:2, 73:3
subject - 8:10, 10:5
submit - 43:22
subpoena - 6:24
subrogee - 1:5
subs - 58:14
subscribed - 95:14
subsequently - 32:24
Suite - 1:23, 2:13, 2:16
Summer - 1:18, 2:7, 2:10
supervise - 68:13
supervisor - 37:21
supervisor's - 9:5, 9:12, 9:17, 9:22

supervisory - 37:23
support - 24:11, 26:8
supposed - 56:12, 61:22, 79:17, 82:6
supposedly - 78:10
swear - 4:7
switched - 8:2
sworn - 4:12, 95:7
system - 41:22, 49:8

## T

talks - 78:13, 87:24
technologies - 8:2
technology - 8:11
telephone - 6:23
temperature - 47:9
term - 72:1, 89:23
test - 10:5
testified - 4:13, 26:19, 70:18, 93:4
testify - 6:24
testifying - 95:7
testimony - 5:5, 5:18, 75:13, 77:9, 92:21, 95:8
thereof - 95:6, 95:13
thick - 65:19
thicker - 65:13
thin - 65:17
thinking - 72:23
thinner - 65:15
Third- 1:12
Third-party - 1:12
Thirty- 10:11, 11:16
Three- 64:4
three - 10:2, 15:4, 15:5, 22:23, 47:2, 61:18, 63:24, 64:2, 64:14, 65:9
three-quarter - 61:18, 63:24, 64:2
Three-quarter- 64:4
three-quarter-inch - 64:14, 65:9
tile - 57:18
today - 4:24, 7:1, 66:22, 85:13, 85:15, 86:4
together - 7:12, 7:13, 28:22
tongue - 64:8
tongue-and-groove - 64:8
took - 8:3, 36:18, 50:8, 54:17, 54:18, 56:24, 57:3, 57:5, 72:17, 83:11, 85:7
Toomey- 1:18, 2:6
top - 16:22, 28:22, 32:24, 53:23, 61:3, 61:5, 61:14, 61:19, 62:23, 63:1, 63:13, 63:16, 64:1
tore - 20:20, 45:8, 57:2
total - 16:3, 57:24
touch - 27:23
Tower- 83:13, 84:9, 85:7
Town- 18:22
town - 86:21
trade - 11:13
trades - 37:3, 94:9
training - 9:1
transcript - 5:11, 5:15, 5:21, 5:22, 6:5

transcription - 95:10
trash - 32:8
traveled - 50:10
trial - 4:5, 4:7
triangle - 60:15
true - 95:9
True- 72:10
truth - 95:8
trying - 80:10, 81:5
Turner- 2:12, 2:3, 3:7, 42:13, 58:21, 58:23, 70:3, 88:6, 92:18, 92:20, 94:16
two - 10:2, 12:10, 17:7, 33:20, 36:19, 46:1, 48:13, 49:8, 50:9, 53:14, 57:13, 60:22, 61:3, 61:5, 73:13, 79:23, 87:2, 87:15
Two- 2:3
type - 11:9, 11:23, 13:22, 16:10, 18:11, 30:6, 30:21, 32:21, 36:4, 40:12, 41:22, 44:8, 72:16, 73:1, 73:21, 78:11, 80:14
types - 11:20, 14:11, 47:3, 73:14, 73:21
typewriting - 95:9
typical - 14:13, 18:14, 26:3, 29:4, 61:17, 64:7, 74:20

## U

under - 8:11, 12:6, 12:7, 12:8, 22:4, 79:5, 79:6, 95:9
underneath - 64:20, 72:18
understood - 45:24, 80:2
unit - 30:22, 38:4, 38:8, 90:2, 90:8
United - 1:1
University - 7:24, 8:6
unload - 32:7
unrepresented - 88:19
up - 9:19, 16:15, 16:19, 16:23, 17:4, 24:10, 24:19, 26:15, 26:23, 28:20, 28:22, 28:24, 32:23, 36:2, 37:18, 42:2, 47:10, 51:8, 55:8, 55:9, 55:12, 55:22, 56:24, 57:12, 57:16, 61:3, 61:4, 76:18, 76:20, 79:7, 82:5, 85:19, 89:4, 89:5
usual - 4:2

## V

various - 13:4
veneer - 18:13, 33:10, 37:1
vent - 16:7, 65:19
venting - 41:22
verbally - 5:6, 23:5
vestibule - 50:13, 50:17
Viessman - 49:9
viewpoint - 64:13
virtue - 95:6

vocational - 9:1
vs - 1:7, 1:11

80:5, 80:13, 80:24,
82:12, 90:2, 90:7,
92:22, 93:15, 93:20

## W

waiting - 68:3
walked - 49:16,
50:14, 86:21
walkway - 50:18,
51:1
wall - 22:23, 25:16,
25:19, 28:12, 30:10,
49:10, 50:12, 57:15,
60:11, 76:23
walls - 39:13, 48:19,
54:13, 54:18, 60:22,
61:7, 74:8
water - 45:10,
48:19, 48:24, 52:8
Water - 48:20
week - 16:3, 44:1,
45:10
weekend - 45:21
Wentworth - 11:22
Westwood - 10:13
Whereof - 95:14
whitewashed -
55:19
whole - 31:7, 50:13,
86:5, 95:8
wide - 25:10
wife - 6:16
wife's - 6:17
wind - 47:6, 47:9
windchill - 47:6
windows - 22:23
Windsor - 2:4
winter - 34:4, 46:7
withdrawn - 79:12
witness - 1:15, 4:7,
95:7, 95:8
Witness - 38:12,
42:14, 55:23, 58:19,
95:14
Wood - 62:20
wood - 14:14,
14:17, 15:18, 18:16,
55:8, 55:9, 56:12,
55:13, 55:14, 71:12,
71:21
wood-burning -
14:17, 15:18, 18:16
Worcester - 2:17
word - 72:14, 81:5
workers - 83:4
works - 21:24
worry - 24:6
worth - 32:5
writing - 59:20
written - 10:3, 43:13

## Y

year - 15:1, 34:2
years - 6:14, 8:1,
8:3, 10:2, 10:11, 11:1,
11:16, 15:4, 15:6
yourself - 12:3, 82:2
Yudysky - 1:18, 2:6

## Z

zero - 29:23, 29:24,
30:6, 30:8, 30:13,
30:15, 30:21, 31:1,
31:4, 31:8, 34:11,
36:12, 61:22, 70:13,
71:2, 71:7, 71:11,
71:16, 71:20, 76:7,
79:14, 79:17, 80:3,

EXHIBIT 7

**[Page 1]**

```
                            1
                    VOL. I
                    PAGES 1-61
                    EXHIBITS NONE


           UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS

           C.A. NO.:  05-CV-10827-DPW

* * * * * * * * * * * * * * *
THE FIREMAN'S FUND INSURANCE
COMPANY AS SUBROGEE OF JULIA
PAVIA 77 SAN MARIN DRIVE
NOVADO, CALIFORNIA,
    PLAINTIFF,

VS

ALCO CONSTRUCTION CORP.,
P&D BUILDERS, INC. AND
MICHAEL CARRESI D/B/A
CARRESI PLUMBING & HEATING,
            DEFENDANTS,
VS
HEATMASTER, INC.,
    THIRD-PARTY DEFENDANT
* * * * * * * * * * * * * * *
```

        DEPOSITION OF MICHAEL CONTE, taken on

behalf of the Plaintiff, pursuant to the

provisions of the Massachusetts Rules of Civil

Procedure, before Bernadette J. D'Alelio,

Notary Public and Court Reporter within and for

the Commonwealth of Massachusetts, at the

Offices of Toomey & Yudysky, LLP, 99 Summer

Street, Boston, Massachusetts, on February 23,

2006, at 10:00 a.m., as follows:

**[Page 2]**

APPEARANCES:

**ON BEHALF OF PLAINTIFF:**
ERIC LOFTUS, ESQ.
Law Offices of Stuart G. Blackburn
Two Concorde Way
Windsor Locks, Connecticut 06096
(860) 292-1116

**ON BEHALF OF HEATMASTER:**
SCOTT T. OBER, ESQ.
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, Massachusetts 01608
(508) 791-6287

**ON BEHALF OF MICHAEL CARRESI:**
NICHOLLE R. PROULX, ESQ.
Law Offices of Bruce R. Fox
27B Midstate Drive, Suite 100
Auburn, Massachusetts 01501
(866) 290-7435

**ON BEHALF OF P&D BUILDERS, INC.:**
CURTIS L.S. CARPENTER, ESQ.
Morrison Mahoney, LLP
250 Summer Street
Boston, Massachusetts 02210
(617) 439-7589

**ON BEHALF OF JOSEPH FALCO:**
DAVID J. CROWLEY, ESQ.
Toomey & Yudysky, LLP
99 Summer Street
Boston, Massachusetts 02110
(617) 946-0930

**[Page 3]**

                    EXAMINATION INDEX

DEPOSITION OF:               MICHAEL CONTE

DIRECT BY MR. CROWLEY:                 4

CROSS BY MR. OBER:                    55

CROSS BY MR. CARPENTER:               57


                    EXHIBIT INDEX
                        NONE

**[Page 4]**

        P R O C E E D I N G S

        MICHAEL CONTE, the deponent,

having been satisfactorily identified and duly

sworn by the Notary Public, was examined and

testified as follows:

        MR. CROWLEY:  Usual

stipulations.  Saving all objections, except as

to the form of the question, until the time of

trial.  Save all motions to strike until the

time of trial.

        DIRECT EXAMINATION

        BY MR. CROWLEY:

    Q.  Sir, would you please state your full

name?

    A.  Michael Wayne Conte.

    Q.  How do you spell your last name?

    A.  C-O-N-T-E.

    Q.  Sir, my name is David Crowley.  I

represent Joseph Falco in this matter.  Do you

understand you are here for your deposition

today?

    A.  Yes, I do.

    Q.  Have you ever been to a deposition

prior to today?

5

1    A. Nope.

2    Q. Before we get started, I need to

3 explain to you that you have the right to

4 receive a copy of the deposition transcript

5 after it is put together to review it for

6 accuracy and to make any changes that you think

7 are necessary before we get started.  Do you

8 want to receive a copy of the deposition

9 transcript?

10    A. Sure.

11    Q. What is your home address?

12    A. 61 Pond Street, Halifax, Mass, 02338.

13    Q. I will make arrangements for you to

14 receive a copy of the deposition transcript.

15 You will have 30 days from receipt of the

16 deposition transcript to make any changes on

17 what lawyers call an errata sheet.  If you fail

18 to return the errata sheet with the changes

19 within 30 days, then it is deemed accurate, the

20 transcript.  Do you understand that?

21    A. Yes, I do.

22    Q. Also, there are some ground rules to

23 the deposition.  As you can see, there is a

24 court reporter here to record your testimony.

6

1 It is a question and answer format, so I need

2 you to make verbal responses to my questions so

3 that we have an accurate transcript.  Do you

4 understand?

5    A. Yes, I do.

6    Q. Likewise, I need you to remember to

7 let me finish asking my question before you

8 start to answer so that we are not talking over

9 each other.  Do you understand?

10    A. Yes.

11    Q. You also understand that your

12 testimony today is under oath?

13    A. Yes.

14    Q. If you need to take a break during the

15 deposition, let me know and we will accommodate

16 you.

17    A. Okay.

18    Q. During the deposition, you may not

19 know the answer to a question or may not

20 recall.  During the deposition, we don't want

21 you to speculate or guess about anything.  If

22 you are guessing or you are speculating, we

23 would ask that you let us know that you are

24 doing so.  Do you understand?

7

1    A. Yes.

2    Q. Sir, have you ever been known by any

3 other name?

4    A. No.

5    Q. What is your date of birth?

6    A. 5/2/62.

7    Q. And the address in Halifax, how long

8 have you lived there?

9    A. I moved in in 1991.

10    Q. Who do you live with?

11    A. My wife, Sherry Conte, and my two sons

12 Wyatt and Adam.

13    Q. Do you have any plans to move from

14 that address?

15    A. Not in the near future.

16    Q. No specific plans at this time?

17    A. I plan on staying put.

18    Q. You received a subpoena to compel you

19 to testify today?

20    A. Yes, I did.  I brought it with me.

21    Q. And you are aware that this case

22 involves a fire at the Pavia residence in

23 January of 2004?

24    A. Yes.

8

1    Q. And for the record, the Pavia

2 residence is at 104 Hammonds Wood Road in

3 Newton?

4    A. Yes.

5    Q. Did you do anything to prepare for

6 today's deposition?

7    A. Nope.

8    Q. Did you look at any documents before

9 coming today?

10    A. Nope.

11    Q. Did you discuss your testimony with

12 anybody?

13    A. No, I did not.

14    Q. Have you taken any prescription

15 medication today?

16    A. Yes.

17    Q. What have you taken?

18    A. Lomotil.

19    Q. Do you know how to spell that?

20    A. Nope.

21    Q. What is that for?

22    A. Stomach -- To keep my stomach from

23 getting upset.  I believe that is the

24 terminology I use for it.

9

1    Q. Have you taken any other medication
2 prescription?
3    A. Yeah.  I take several medications for
4 my stomach due to stress-related reasons.
5    Q. Do you have any side effects from that
6 medication?
7    A. No.  I have been taking it for, I
8 think, three years.
9    Q. Do you have any reason to believe that
10 the medication would interfere with your
11 ability to understand my questions and testify
12 truthfully today?
13    A. No, no problem.
14    Q. Sir, would you briefly describe your
15 educational background?
16    A. I graduated high school in 1981 and at
17 the same time I graduated from Weymouth
18 vocational school.
19    Q. Was that a combined course of study,
20 high school and vocational school?
21    A. Yes.
22    Q. Did you have any specific course of
23 study at the vocational school?
24    A. Construction.

10

1    Q. Do you have any schooling beyond high
2 school?
3    A. No.
4    Q. Was there a particular aspect of
5 construction that you studied at the vocational
6 school?
7    A. It was a basic carpentry course.
8    Q. Have you had any vocational training
9 since high school?
10    A. No.  The vocational training ranked
11 consecutive with the high school grades 10, 11,
12 and 12.
13    Q. Do you hold any construction-related
14 licenses?
15    A. Yes, I have a construction
16 supervisor's license.
17    Q. Was that issued by the Commonwealth?
18    A. Yes.
19    Q. What did you do to obtain that
20 license?
21    A. You filled out the appropriate forms,
22 and took a test.
23    Q. What was the subject matter of that
24 test?

11

1    A. It is on the Mass. building code.
2    Q. How long have you held the
3 construction supervisor's license?
4    A. I believe mid-'80s.
5    Q. Have you held that license for the
6 entire period of time from the mid-'80s to the
7 present?
8    A. Yes.  Same license, same number.
9    Q. What does the construction
10 supervisor's license permit you to do?
11    A. It permits me to pull building
12 permits.  It gives -- basically says that I
13 have passed a course given by the Commonwealth
14 and they give me permission to build or run a
15 business.  I don't know where the line is
16 between business and what they deem as being
17 allowed to do.
18    Q. Is your construction supervisor's
19 license limited to noncommercial construction?
20    A. Yes, it is restricted.  It is for one
21 or two-family homes.
22    Q. Is that considered residential
23 construction?
24    A. Yes.

12

1    Q. Do you hold any other construction-
2 related licenses?
3    A. I have a hoisting license.
4    Q. Does that license permit you to
5 operate certain heavy equipment?
6    A. Yes.
7    Q. Did you have to take a written exam
8 for that license?
9    A. Yes, it was -- I believe it was a
10 one-page written exam with some oral questions
11 also.
12    Q. Do you hold any other licenses?
13    A. Just a driver's license.
14    Q. Are you currently employed?
15    A. I'm self-employed.
16    Q. What is the name of that business?
17    A. Right now it is MW Conte Corp.
18    Q. And where is that business located?
19    A. 61 Pond Street, Halifax, Mass.
20    Q. How long have you operated MW Conte
21 Corp.?
22    A. I believe it has been about a year and
23 a half.
24    Q. What is that business?  What does it

DUNN & GOUDREAU

13

1  do?
2      A. Basically it is a small general
3  contracting residential company, additions,
4  things like that.
5      Q. Where did you work prior to MW Conte?
6      A. I worked, again self-employed, for
7  Conte Construction.
8      Q. Was that operated out of your home?
9      A. Yes.
10     Q. How long did you operate Conte
11 Construction?
12     A. Probably 17 years.
13     Q. Was that a general contracting firm?
14     A. Same.
15     Q. Back in 2000, you were operating Conte
16 Construction?
17     A. Yes.
18     Q. Did you do work for P&D Builders at
19 that time?
20     A. If that is when the job in question
21 was going on, yes.  I did several jobs for P&D
22 Builders back around that time frame because my
23 own work was slow.
24     Q. Let me ask you this.  Do you have a

14

1  recollection as to when you performed work at
2  104 Hammonds Wood Road in Newton?
3      A. I do not have a specific time line,
4  no.
5      Q. But if I represented to you that the
6  work in question happened on or around 2000,
7  would that be consistent with your memory?
8      A. Yes.  When the addition to their house
9  was being built, I did work there.
10     Q. Prior to the work at the Pavia
11 residence, had you done any work for P&D
12 Builders?
13     A. I have done work for Phil, P&D
14 Builders, prior to that, and I believe one job
15 after that.
16     Q. Were you a subcontractor to P&D
17 Builders at the Pavia job?
18     A. Yes.
19     Q. On the jobs that you worked for P&D
20 Builders, before the Pavia job, were you a
21 subcontractor?
22     A. Yes.  He lists everybody as a
23 subcontractor and requires them to give him
24 certificates of insurance.

15

1      Q. When you refer to he --
2      A. Phil.
3      Q. Is that Phillip Rothchild?
4      A. Yes.
5      Q. Is he the owner of P&D Builders?
6      A. At the time I believe he was the sole
7  owner.
8      Q. Focusing on the jobs that you did for
9  P&D Builders before the Pavia job,
10 approximately how many of those jobs did you
11 do?
12     A. There might have been half a dozen.
13     Q. What did those jobs involve?
14     A. Mostly same, residential additions,
15 remodeling.
16     Q. Was the Pavia job the largest job that
17 you did for P&D?
18     A. I didn't have a big part in that job.
19 I was there just to frame the back addition.
20     Q. You mentioned a minute ago that you
21 did one job for P&D Builders after the Pavia
22 job.
23     A. Yeah, I believe it was the same time
24 we were doing a job down in Marion.

16

1      Q. The job in Marion was going on at the
2  same time as the Pavia job?
3      A. I believe it was -- I know it was at
4  the same time.  I just don't remember which was
5  finished first and -- because we were jumping
6  back and forth.
7      Q. Meaning that there were periods of
8  time where you left the Pavia job and went to
9  other jobs to work?
10     A. Yes, I would go to a Marion job.
11     Q. Do you know where that job was in
12 Marion?
13     A. The exact address, I'm not recalling
14 at this moment.
15     Q. Was P&D Builders the general
16 contractor for that job?
17     A. Yes.
18     Q. Do you recall the name of the owner?
19     A. Yes, it was Dr. Martha Stark.
20     Q. Did you work with other P&D
21 subcontractors at the Martha Stark job?
22     A. Yes.  I worked with Mike Roach and
23 Chip.  I don't recall his last name at this
24 time.

17

1    Q. Are you familiar with the name
2 Gubbins?
3    A. That's Chip's last name.
4    Q. Did Mr. Roach and Mr. Gubbins also
5 work at the Pavia job?
6    A. Yes.
7    Q. Was Mr. Gubbins the foreman at those
8 jobs?
9    A. Mr. Gubbins was at the Pavia job
10 mainly. He was there for, I believe, a solid
11 at least four months just doing interior work.
12    Q. So when you worked at the Stark job,
13 it was mainly with Mr. Roach?
14    A. Yes, most of the time. Chip would
15 come down to help out every so often.
16    Q. Is it fair to say that you haven't
17 done any work for P&D Builders since you
18 finished up the job in Marion?
19    A. I believe that was the last job.
20 There might have been one that I -- he needed
21 some framers for another job. I forget the
22 address. I believe it was in Wellesley. I got
23 him some framers. I don't think I've worked
24 for him since.

18

1    Q. Has Mr. Rothchild referred you any
2 work since you finished the Marion job?
3    A. No.
4    Q. Are you familiar with a gentleman by
5 the name of Michael Carresi?
6    A. Yes. Michael Carresi was Phil's
7 plumber.
8    Q. Have you worked on any jobs for
9 Mr. Carresi since the Pavia project?
10    A. No. I never did any jobs for Mike
11 Carresi. They were always for Phil Rothchild.
12    Q. Was Mr. Carresi Mr. Rothchild's
13 plumber on those jobs?
14    A. At that time Mr. Carresi, Mike
15 Carresi, was just the plumber. I heard that
16 now Mike has moved up and is doing work with
17 Phil.
18    Q. Does that mean that you understand
19 that Mr. Carresi and Mr. Rothchild are in
20 business together?
21    A. I do not know it for a fact because I
22 haven't talked to either of them. I just heard
23 that Mike was doing more with Phil in a more of
24 a partner basis. I don't know what is involved

19

1 in it. I haven't talked to either of them.
2    Q. Who told you that Mr. Carresi and
3 Mr. Rothchild are working closely together?
4    A. I believe it was Joe Falco and I think
5 Chip might have mentioned it at one time. I
6 saw him at a lumberyard.
7    Q. You ran into Mr. Gubbins at a
8 lumberyard?
9    A. Yeah, I think it was Hingham Lumber
10 maybe nine months, a year ago. It was just in
11 quick passing.
12    Q. I take it that you're familiar with
13 Joseph Falco?
14    A. I knew Joe before I knew Phil.
15    Q. How long have you known Mr. Falco?
16    A. I have known Joe, I think, since '83
17 maybe.
18    Q. How did you meet Mr. Falco?
19    A. Through Mike Roach.
20    Q. Did you meet him through business?
21    A. Yes.
22    Q. Did Mr. Falco ever do any work for you
23 prior to the Pavia job?
24    A. Yes.

20

1    Q. What type of work did Mr. Falco do?
2    A. Masonry.
3    Q. Approximately how many jobs did
4 Mr. Falco do for you before the Pavia job?
5    A. On the Pavia job, I didn't hire Joe,
6 P&D Builders did. Joe had probably done eight
7 jobs prior to that.
8    Q. When you refer to the eight jobs, are
9 you referring to jobs that you hired Mr. Falco
10 to do?
11    A. Yes.
12    Q. On any of those eight jobs, did
13 Mr. Falco install a fireplace?
14    A. Yes. He did several fireplaces and
15 chimneys on houses we were building down in
16 Hull, Mass.
17    Q. Were those wood burning fireplaces?
18    A. No. They were regular -- excuse me.
19 They were regular wood burning where you throw
20 the log in on a residential home.
21    Q. Would you refer to those as
22 conventional fireplaces?
23    A. Yes.
24    Q. Approximately how many wood burning

21

1  conventional fireplaces did Mr. Falco install
2  for you?
3      A. I believe three, maybe four.
4      Q. Were those conventional fireplaces
5  built in new construction homes?
6      A. Yes.
7      Q. Were you the general contractor for
8  the construction of those homes?
9      A. At the time it was Mike Roach and
10  myself.
11      Q. Did you design those fireplaces?
12      A. No.  They were like basic standard
13  fireplaces.
14      Q. So they were built without any
15  drawings or design work?
16      A. They were built under the Mass.
17  code.  They have to be inspected by the
18  building inspector.
19      Q. Was Mr. Falco hired as a masonry
20  subcontractor to install those fireplaces?
21      A. Yes.
22      Q. And did you supervise that work?
23      A. I supervised it to a point that I made
24  sure it got done.  My expertise isn't masonry;

22

1  that is Joe's.
2      Q. The fireplaces that Mr. Falco
3  installed for you in the new construction
4  homes, are you aware of any problems with those
5  fireplaces concerning ignition of fires in
6  those homes?
7      A. I have never heard of a problem.
8  Nobody has ever contacted me about a problem.
9      Q. Were the fireplaces that Mr. Falco
10  installed in the new construction homes built
11  according to the fire code?
12      A. Yes.
13      Q. What does the fire code require for
14  the construction of conventional fireplaces?
15      A. Some of the points being the cement
16  hearths, the size and diameter of the fire box,
17  proper clay line flues.  When you do a
18  fireplace and chimney, you do the fire box
19  area, set the damper, and the building
20  inspector has to come down and inspect that
21  before you can proceed to finish.
22      Q. When you refer to a cement hearth, is
23  that the foundation for the fireplace?
24      A. It's not the foundation.  It is the

23

1  area adjacent with the living space floor.
2  Usually there is a foundation underneath the
3  chimney that attaches to the foundation of the
4  house in new construction.
5      Q. And what is the hearth?
6      A. It is the area in front of the fire
7  box.
8      Q. Does the hearth separate the fireplace
9  from the wood or other materials surrounding
10  the fireplace?
11      A. Yes.  The ones that we did had, I
12  believe, a four-inch raised hearth and then the
13  finished flooring would abut to that.  But
14  under the hearth, you have to have poured
15  cement for heat.
16      Q. The poured cement separates the heat
17  from the fireplace from combustible materials
18  around the fireplace?
19      A. Yes.  There is a diagram in the Mass.
20  building code of what they require.
21      Q. Other than the case that brings us
22  here today, are you aware of any allegations
23  against Mr. Falco regarding improper or
24  defective construction practices?

24

1      A. As far as I know, I have not heard of
2  any other problems being fire, things falling
3  down.  I haven't heard anything bad about any
4  of his workmanship.
5      Q. Did you recommend Mr. Falco for the
6  Pavia job?
7      A. I recommended, along with Mike Roach,
8  for, I forget which job, prior to this job to
9  P&D Builders.  Falco Masonry had done a couple
10  of jobs before this for Phil.
11      Q. Had you worked on any of those jobs?
12      A. At this time, I can't recall.  I was
13  jumping around from job to job for him.
14      Q. Your memory is that prior to the Pavia
15  job, you recommended Mr. Falco to
16  Mr. Rothchild?
17      A. P&D Builders, Phil, asked me if I had
18  a mason.  I told him I had Joe Falco, and I
19  gave him his phone number.  At this time I just
20  forget how many jobs prior to the Pavia job it
21  was.
22      Q. Mr. Falco had worked for you before
23  you gave Phil Mr. Falco's number?
24      A. Yes.  Joe had been working, like I

25

1  said before, from the mid-'80s for me.
2      Q. And you thought he had a good
3  reputation?
4      A. I've never had a problem with any of
5  his work.
6      Q. Has Mr. Falco done any work for you
7  since January of 2004?
8      A. Yes.
9      Q. What work has he done for you?
10     A. He has extended, I believe, two
11 chimneys for second floors and additions that I
12 put on.
13     Q. Has he installed any fireplaces for
14 you since January of 2004?
15     A. No.
16     Q. After the fire at the Pavia residence,
17 did you ever speak to Mr. Rothchild about the
18 fire?
19     A. The only thing that I know about that
20 -- or how I come to know about that, I believe
21 Phil called me up and told me about it.
22     Q. When was that?
23     A. I'm not sure.  It was maybe a week or
24 a month after the fire.

26

1      Q. Mr. Rothchild called you to tell you
2  about the fire?
3      A. I believe so.
4      Q. Do you recall what Mr. Rothchild said
5  to you during that conversation?
6      A. Not per word, no.
7      Q. Do you recall the substance of what
8  Mr. Rothchild said to you during that phone
9  call?
10     A. He just mentioned that there was a
11 fire and that it's going to be a lot of work to
12 redo it.
13     Q. Did Mr. Rothchild say anything else to
14 you during that conversation?
15     A. Specifically I don't remember exactly
16 what he said.  He just told me that there was a
17 fire.  There was X amount of dollars in damage
18 and that he is going to have to redo most of
19 what he had already done.
20     Q. Did Mr. Rothchild ask you to come back
21 to the Pavia residence to do some work?
22     A. No.  I told him that I was too busy
23 with my own projects.
24     Q. Was that the purpose of

27

1  Mr. Rothchild's call, to inquire whether you
2  could come back to work at the Pavia residence?
3      A. At this time, I'm not sure if he asked
4  me or not.
5      Q. Is it that you don't remember?
6      A. That's it, I don't remember.
7      Q. Was that the first and only
8  conversation that you had with Mr. Rothchild
9  about the fire?
10     A. I think I talked to him maybe six
11 months to a year later.
12     Q. Did that conversation concern the
13 fire?
14     A. I'm not really sure.
15     Q. Are those the only two times that you
16 have spoken to Mr. Rothchild since the time of
17 the fire?
18     A. No, he has called me several times.
19 He saw me driving down the street, just called
20 to say hi, see what is going on.  He invites me
21 every year to his company Christmas party which
22 is in Weymouth.  He has called me for those
23 reasons.  The last two years, I believe, I
24 haven't made it.

28

1      Q. Just friendly conversations?
2      A. Yes.
3      Q. The conversation that you had with
4  Mr. Rothchild approximately a month or so after
5  the fire, do you recall that conversation?
6      A. Like I said, I just remember him
7  telling me that there was a fire, that there
8  was -- I forget the number he used, but there
9  was a lot of damage, and that he has a big job
10 now to fix the damage.
11     Q. During the conversation that happened
12 approximately a month after the fire, did
13 Mr. Rothchild reprimand you at all for
14 recommending Joe Falco as a mason?
15     A. Nope.  It wasn't my responsibility.
16 Joe was there.  Phil made the phone call.  Phil
17 hired him.
18     Q. So that issue never came up between
19 you and Mr. Rothchild?
20     A. No.  Phil would say once in a while
21 that mason of yours, he's a character.  I don't
22 know what was said but Phil and Joe didn't see
23 eye to eye.  Phil would want him there at a
24 certain time, Joe would say I'm busy.  I will

29

1  do what I can, things like that.
2      Q. Did Mr. Rothchild ever have any
3  complaints about the quality of Mr. Falco's
4  work?
5      A. I don't know if it was comments about
6  the quality.  I think it was more about Joe's
7  personality.
8      Q. Their styles clashed?
9      A. Pretty much.  Joe is, I guess you
10  would call it, old school mason.  He comes in
11  and does his work and wants to get paid.
12      Q. Not uncommon in the construction
13  industry?
14      A. Not uncommon at all.  Everybody likes
15  to get paid when they do a job.  I'm not saying
16  that Phil didn't pay.  Phil does pay.
17      Q. Has Mr. Rothchild ever blamed Joe
18  Falco for the fire at the Pavia residence, to
19  the best of your knowledge?
20      A. I have never heard Phil personally
21  blame Joe, at least to me.  He might have
22  blamed Joe to someone else.  I have heard that
23  Phil blames the mason.  I have heard the mason
24  say he built what he was told.  I was just

30

1  trying to stay neutral.
2      Q. When you refer to "the mason," you are
3  talking about Mr. Falco?
4      A. Yes.
5      Q. Are you familiar with Julie Pavia?
6      A. Yes.
7      Q. Have you ever done any work for her?
8      A. The only work that I did for her was
9  through P&D Builders.
10      Q. Do you recall when you started working
11  at the Pavia house?
12      A. Not the exact date, no.
13      Q. What was the status of the project
14  when you started working there?
15      A. Again, I'm not the general contractor
16  on the job.  I don't know what the contract
17  read, what the scope of the work was.  Phil,
18  P&D Builders, asked me to come in there and
19  frame a one-story addition on the back of the
20  existing house.  When we opened up the roof, I
21  believe it was, there was a lot of ant damage
22  to the first floor.  So we had to tear the
23  first floor addition down and rebuild that
24  also.

31

1      Q. Initially the project was to build a
2  one-story addition onto the first floor to the
3  rear of the residence?
4      A. Yes.  It was to tear off an existing
5  walk-out porch on top of the back and then just
6  go up one story with the roof.  But, again,
7  because of the ant damage, we had to tear down
8  the first floor and rebuild that.
9      Q. When you worked as a subcontractor to
10  P&D on the job, did you have a written
11  subcontract with them?
12      A. I did not have a contract with Phil at
13  any time for any job.  I would work by the
14  hour.  I would give him an invoice for an
15  hourly wage.
16      Q. Did you keep a log or journal at that
17  job?
18      A. No.
19      Q. How did you keep track of your hours?
20      A. They were written down on an invoice
21  every week and I would give him that invoice at
22  the end of the week or every two weeks,
23  whenever I saw him.
24      Q. Were you hired to install the roof on

32

1  the addition?
2      A. Yes.  It was to frame the roof, not to
3  do the slate roofing.  It was mainly frame,
4  install windows and doors.
5      Q. Did you perform the demolition work on
6  the first floor?
7      A. I believe we did most of it, meaning
8  myself and Mike Roach.
9      Q. Were you and Mr. Roach the framing
10  crew for that job?
11      A. That's what you would call us.  We
12  framed it and then everybody else comes in and
13  does their part.
14      Q. While you were doing your framing work
15  at the Pavia house, were there other P&D
16  employees or subcontractors on the job?
17      A. Yes.
18      Q. Who were they?
19      A. He had hired an electrician.  I do not
20  know him.  I believe his name was Frank.  Mike
21  Carresi was there doing -- I believe it was
22  heat and central air.
23      Q. Were there other carpenters on the
24  job?

33

1    A. I know Chip was there, and I'm just
2  trying to remember who else was working for him
3  at the time.  He had a carpenter named Dave.
4  As soon as you say his last name, I will
5  remember it.
6    Q. Any other P&D workers that you can
7  recall?
8    A. Prior to the demolition, I'm not
9  sure.  After the demolition, he would have
10 sheetrockers, plasterers, then the masons came
11 in.  They started by doing the exterior brick.
12 The whole house was brick.
13   Q. Mr. Falco installed the exterior
14 brick?
15   A. Yes.  It had a brick facade over the
16 brick frame.
17   Q. Had you completed your framing work
18 when Mr. Falco started the brick facade work?
19   A. We might have been doing a little bit
20 of interior frame as far as stairs go but
21 nothing major.  We did see Joe outside.  He had
22 started.  I remember the temperature was cold,
23 so we could only do so much.  We would have to
24 cover it up and try to heat things and keep

34

1  them from freezing.
2    Q. So you were present at the job for
3  some of the exterior work that Mr. Falco did?
4    A. I saw a lot of the exterior work that
5  Joe did, probably most of it.
6    Q. Did Mr. Falco work alone?
7    A. No.  He had his two sons with him.
8    Q. Do you know approximately how long
9  Mr. Falco was working on the exterior of the
10 residence?
11   A. I do not remember exactly.  I'm
12 assuming or calculating at least a couple of
13 weeks.
14   Q. When you describe your work as framing
15 the addition, does that include the
16 construction of the floor?
17   A. Yes.
18   Q. And you also constructed the wood
19 frame for the interior walls of the addition?
20   A. Yes.  I'm just trying to remember what
21 it had for interior walls.  I think the only
22 interior walls were for the stairway going to
23 the second floor.  I think the second floor was
24 an office and the first floor was a TV room.  I

35

1  really don't recall any interior walls.
2    Q. Were they brick, the walls?
3    A. The wall against the house was brick.
4  I remember it was brick on the second floor and
5  I'm not sure about the first.  I'm not
6  recalling what was on the first.
7    Q. While you were doing the framing work
8  with Mr. Roach, were there finished carpenters
9  doing interior work?
10   A. I do not recall what was being done,
11 if anything.  Like I said, I know the heating
12 system and AC were being worked on.  I know
13 Chip was doing several things here and there.
14 I do not know what he was doing.  I know after
15 I left he was there for a long time doing all
16 the interior finish of the addition.
17   Q. What type of heating system was there
18 for the addition?
19   A. There was forced hot water, I believe,
20 with a special, fancy boiler.  I think he
21 called it a Viessman, and there was high output
22 central AC.
23   Q. Were you present when the roof was put
24 on the addition?

36

1    A. The roof meaning the framing?
2    Q. The roof itself.  You referred to a
3  slate roof, I think.
4    A. I was wrapping things up.  When we
5  framed the roof, we put what's called ice and
6  water shield over it to keep the water out
7  temporarily until the roofers could get the
8  slate down.  I saw some of the slate going up.
9  I don't know if I ever saw the finished
10 product.
11   Q. The framing work that you did on the
12 addition, was that from a set of plans that you
13 were given?
14   A. Yes.  The plans -- I do not know who
15 supplied the plans.  Phil did give me a set of
16 plans and we stayed pretty close, I believe, to
17 what was on the print.  I think the roof
18 framing as far as the design or the look got
19 changed a little bit to go with the house
20 better.
21   Q. During your framing operations, were
22 you advised that there was to be a fireplace
23 installed on the second floor?
24   A. No.  I did not frame for a fireplace

37

1  existing or future.  I framed everything 16
2  inches or 12 inches on center, whatever we
3  needed to do per code, and we did not allow for
4  any chases, chimneys.  I wasn't told of any
5  protrusions coming through the roof.
6      Q. Typically when a fireplace is intended
7  to be installed in an addition, would the
8  framers be advised that a fireplace was being
9  built so that they could frame it accordingly?
10     A. Yes.
11     Q. On the Pavia job, if you knew that a
12  fireplace was to be installed on the second
13  floor, would you have framed that job
14  differently?
15     A. I would have framed the roof -- If it
16  was going to be a conventional fireplace, I
17  would have framed a whole new roof for the
18  chimney to go through, and I would have framed
19  the floor for a cement hearth.
20     Q. And how would that have been different
21  from the framing that you actually did at the
22  Pavia job?
23     A. It would have allowed for a masonry
24  chimney.  The print that I had didn't show a

38

1  chimney or a fireplace.  I framed a flat
2  floor.  I framed a regular, like I said, 16 on
3  center roof with no penetrations for a chimney.
4      Q. If you had been told that a fireplace
5  was being built at the Pavia residence, what
6  allowances would you have made for the hearth?
7      A. I would have framed -- Typically a
8  hearth you need, I believe, a two foot deep by
9  the width of the fireplace that has to be
10  framed with double members all the way around
11  so your joists can abut into them.  So there is
12  actually a hole in the floor and then the
13  masonry work comes out through that.  Then you
14  would be told what was being done for the flue,
15  either to leave a hole in the ceiling and roof
16  or if it was being vented some other way, you
17  would be told so you could allow for it.  I was
18  never told there was a fireplace or chimney of
19  any kind.  So I didn't make any arrangements
20  for it.
21     Q. And the framing work that you did for
22  the roof, you put up an ice and water shield on
23  the roof?
24     A. Yes.  You put your framing members up,

39

1  your plywood up and then the ice and water to
2  keep out the rain until a finished product goes
3  over it.
4      Q. Would there have been a layer of
5  plywood on the roof for the finished product?
6      A. No.  The finished product being the
7  slate.  Its framing members which support the
8  plywood, then you put the plywood on the
9  framing members, then you put the rubber ice
10  and water shield on the plywood to keep the
11  rain out until the slate goes down.
12     Q. Would the slate roof go directly over
13  the ice and water shield?
14     A. Yes.
15     Q. So that when you framed the roof for
16  the Pavia job, you did not leave an opening for
17  any type of ventilation for a fireplace?
18     A. Correct.
19     Q. And when you built the -- strike that.
20        When you installed the floor in the
21  second floor addition, you didn't make any
22  allowances for a hearth for the fireplace?
23     A. Correct, because I wasn't told that
24  there was going to be one.  The print didn't

40

1  show one that I can recall.
2      Q. And you recall that the framing that
3  you did was not consistent with a fireplace
4  being installed in that second floor office?
5      A. It was definitely not consistent with
6  the fireplace.
7      Q. Did you leave that job before any talk
8  about a fireplace being installed?
9      A. I left the job and occasionally I
10  would come back in for a day here and there.
11  And I heard talk that Julie wanted some kind of
12  a -- The word I heard was a decorative
13  fireplace on the second floor.  She wasn't sure
14  what she wanted and that's the extent of what I
15  heard.  The conversation was between her and
16  Phil mainly.
17     Q. When you speak about Julie, are you
18  referring to Ms. Pavia?
19     A. Yes.
20     Q. How did you hear that Ms. Pavia wanted
21  a decorative fireplace on the second floor?
22     A. I'm not sure if I just overheard their
23  conversation or if Phil mentioned it, that she
24  wanted something upstairs.  It was basically at

41

1 that point just talk of she wanted something
2 upstairs in the form of a fireplace.  It had
3 nothing to do with the work that I was doing so
4 I didn't pay any attention.
5     Q. Your impression was that it was a
6 decorative fireplace?
7     A. Like I said, I just heard this
8 hearsay.  If I overheard them or if someone
9 mentioned it, I do not recall.  But as far as a
10 working fireplace goes, I was never told there
11 was going to be one.  In my framing end, I did
12 not allow for one.
13     Q. Any discussion of a decorative
14 fireplace in that location would have been
15 consistent with the framing work that you did?
16     A. If I was told there was going to be a
17 decorative fireplace or a working fireplace, I
18 would have made sure that the proper
19 accommodations were made for it, but no one
20 ever talked to me personally about a decorative
21 or a working fireplace.
22     Q. If a working fireplace was being put
23 in on the second floor, would you have expected
24 somebody to contact you to make changes to the

42

1 framing work that you did?
2     A. If anybody told me that she was going
3 to add a working fireplace, I would have told
4 Phil or made it aware to Phil that changes
5 would have had to have been made in the framing
6 but nobody asked me or told me that a fireplace
7 was going in there.  I just heard she wanted
8 something.
9     Q. When you worked framing the addition
10 at the Pavia residence, were you there on a
11 daily basis?
12     A. For approximately two months, I was
13 there every day.  It might have been a week
14 shorter or longer.  I know it took a while
15 especially when we found out there was all the
16 rot on the first floor and had to tear it down
17 and start from the first floor up.  The roof
18 was kind of difficult to frame.
19     Q. So your best estimate would be that
20 you were there for about two months framing the
21 job?
22     A. Yes.  It might have been longer but
23 right now I know it took at least two months.
24     Q. And if the building permit was issued

43

1 during the year 2000, would you have started
2 your work sometime after the building permit
3 was issued?
4     A. That is usually rule of thumb.  I
5 wasn't involved in getting the permit, applying
6 for the permit.  My job, like I said, I was
7 just a framer.  I was doing what Bill asked me
8 to do.  He handed me a set of prints and said
9 do this.  I said, okay.
10     Q. Do you recall what month it was when
11 you started the framing work?
12     A. Right now I do not recall.  I know
13 when Joe was there it was cold so I'm assuming
14 it was late spring, early fall.
15     Q. Had you completed a substantial
16 portion of the framing work when Mr. Falco came
17 to start the exterior brick work?
18     A. Yes.  We had all the exterior walls
19 up.  I'm not exactly sure if the whole roof was
20 done but it might have been, because when he is
21 doing his brick, he has to brick around the
22 windows, so they would have had to have been
23 installed.
24     Q. Would you have any paperwork

44

1 indicating when you worked at the Pavia
2 residence framing the addition?
3     A. I don't believe so.  I could look but
4 where it wasn't my job, I really didn't have
5 any bills, I wouldn't have any invoices.  The
6 only thing I might have is copies of the
7 invoices I gave to P&D, and where it was around
8 2000, I probably don't have those.
9     Q. Would you have any paperwork at home
10 indicating when you started work at the job
11 down in Marion, Massachusetts?
12     A. That was around the same time.  Again,
13 Phil, P&D Builders was the general contractor.
14 I paid no bills for materials or subs.  I was
15 just a subcontract framer, slash, carpenter.  I
16 would have W-2s that he sent me for the year.
17 He would have my invoices or canceled checks
18 that he paid me, but I really had no need to
19 keep track of what he was paying me because he
20 was going to send me a W-2 at the end of the
21 year anyway.
22     Q. Did Mr. Rothchild send you a W-2 for
23 that work?
24     A. Yes, he did.

45

1    Q. Meaning that you were an employee of
2  his on the job?
3    A. Not meaning that I was an employee
4  because he lists everybody at that time as
5  subcontractors.  So he would say and ask for
6  insurance certificates for comp and liability
7  and you knew that you were going to get a W-2
8  at the end of the year.
9    Q. Would Mr. Rothchild withhold taxes on
10 that?
11   A. No.  As a subcontractor, you are
12 responsible for your own taxes.
13   Q. Would it refresh your memory that he
14 sent you a 1099 tax form at the end of the
15 year?
16   A. All the 1099 states is the amount for
17 the whole year.  It doesn't tell you what job
18 when.  So the only record -- I have no records
19 of his checks.  If you pulled his checks, his
20 checks would line up with invoices that I gave
21 him.
22   Q. My question is if I told you that a
23 subcontractor typically is paid by way of or
24 receives a tax form known as a 1099?  Would

46

1  that help your memory as to what kind of tax
2  form you received from Mr. Rothchild for the
3  year that you did the work for at the Pavia
4  residence?
5    A. I believe it was always just a 1099.
6  A little slip of paper about 3 by 5 and it says
7  P&D Builders has paid Mike Conte X amount of
8  dollars and you are supposed to file that with
9  your taxes.
10   Q. So there would be no indication as to
11 when you worked?
12   A. Correct.  It was just for that year.
13   Q. After you stopped working at the Pavia
14 residence, on a daily basis doing the framing
15 work, you indicated that you had to go back
16 there from time to time?
17   A. We would go back for either a change
18 or somebody needed a hand doing something but
19 it wasn't on a steady basis that we would go
20 back for a long time.
21   Q. When you refer to "a change," would
22 that be a change to the framing work that you
23 did?
24   A. No, I don't think anything really got

47

1  changed, because once the windows and doors
2  were installed, there was pretty much nothing
3  you could do because the exterior was brick.
4  It might have been in the stairway, there was a
5  closet underneath the stairs.  It might have
6  been there was a platform with two steps going
7  on the first floor.  Nothing major.
8    Q. When you worked doing the framing job
9  at the Pavia residence, was there a supervisor
10 from P&D who supervised your work?
11   A. I don't know if you would call it a
12 supervisor.  Phil was pretty much the guy in
13 charge.  He would usually show up every day, if
14 not every day, maybe every other day to see how
15 things were going because he also had several
16 jobs going on.
17   Q. So Mr. Rothchild would come by
18 periodically to check on the progress of your
19 work?
20   A. Yes.
21   Q. While you were working there, there
22 were other subcontractors working on the
23 addition as well?
24   A. Yes.  Like I stated, there was

48

1  probably the electrician doing things.  Mike
2  Carresi was doing heat and AC.
3    Q. Would Mr. Rothchild coordinate the
4  work of the subcontractors?
5    A. Yes.  That was basically Phil's job.
6  As a general contractor, he is in charge of
7  telling who to do what and what not to do and
8  try to schedule everything so it kind of
9  coincides with what has to be done next.
10   Q. When you left the Pavia job, stopped
11 working there on a daily basis, had any work
12 been done on an interior fireplace?
13   A. I came back one time and the addition
14 was just about 80 percent done, 90 percent done
15 as far as all the interior trim was up, and
16 there was some brick fireplace, I think, in the
17 corner on an angle but I can't be 100 percent
18 sure.  I know there was something on the second
19 floor.  I believe it was in -- if you look at
20 the back of the house, I believe it was in the
21 right corner.
22   Q. We will get to that.  My question was
23 when you stopped working at the Pavia job on a
24 daily basis when your framing work was done,

49

1  had any work been started on an interior
2  fireplace on the second floor?
3      A. Not that I recall.
4      Q. When you returned to that job
5  periodically to make a change to your work, did
6  you ever see anybody doing any work on a
7  fireplace on the second floor?
8      A. I might have. I just didn't pay any
9  attention to it. It might have been there. I
10 know it went in sometime. I'm just not sure
11 exactly when. That was between the masons and
12 Joe and Julie Pavia. When I would go back
13 there, it would be mainly for other things.
14 Again, I have no idea what was being -- At
15 sometime there was, I guess you could call it,
16 a fireplace. I don't know when exactly it was
17 installed or built.
18     Q. Did you ever see Mr. Falco doing any
19 work on that fireplace on the second floor?
20     A. I think I did one time. I mean, Joe
21 would be working on several things inside with
22 bricks. He was replacing bricks, filling in
23 holes in the bricks, changing some other brick,
24 I believe, on the first floor. So he was

50

1  there. I don't know when he started working on
2  that. I know it is made out of brick so I'm
3  assuming that Joe made it.
4      Q. You have no specific recollection of
5  seeing him do any of the work?
6      A. Right. I didn't watch him do the
7  work. It wasn't my job to watch him. It
8  wasn't any of my business. Who knows what he
9  was doing.
10     Q. You never saw the sequence of
11 construction for that fireplace?
12     A. Right. I might have seen him working
13 on it, but I don't know when it was started. I
14 don't know when it was finished.
15     Q. Were you ever present for any
16 discussions between Mr. Rothchild and Mr. Falco
17 as to what type of fireplace was to be built
18 there?
19     A. No, I was never involved in any
20 conversations between the two or the three
21 including the homeowner.
22     Q. But you have some recollection of
23 being at the job and seeing a fireplace or some
24 type of masonry structure on the second floor?

51

1      A. Yes, there was definitely -- I just
2  don't recall if it was in the corner or angled
3  in the corner. There was something on the
4  second floor. There was something similar to a
5  fireplace in the corner on the second floor.
6      Q. Do you know whether there was any type
7  of gas log in that structure when you saw it?
8      A. When I saw it, there was definitely no
9  gas log, there was no indication of what it was
10 going to be.
11     Q. You remember specifically that there
12 was no gas log?
13     A. There was nothing in it when I saw
14 it. It was just a hole. I didn't look up to
15 see if there was a flue or any type of
16 ventilation. I just kind of walked by, noticed
17 it and kept walking. I didn't do any
18 inspections or any of that.
19     Q. Did you inquire as to what was going
20 to go into the fireplace?
21     A. No.
22     Q. When you saw the structure, did you
23 assume that it was a decorative unit?
24     A. I don't know if I assumed. Like I

52

1  said before, I kind of heard a conversation
2  that Julie Pavia wanted something up there.
3  And all I remember is someone saying it might
4  be decorative, it might be -- she doesn't
5  know -- What I heard is she doesn't know what
6  she wants are the words that I recall. So I
7  don't know. It wasn't a conversation with me.
8      Q. Your impression was that it was a
9  decorative --
10     A. That's what I heard. I was under the
11 assumption that is what it was going to be used
12 for.
13     Q. Do you recall why you went back to the
14 Pavia home on the day that you saw the
15 fireplace structure on the second floor?
16     A. Exactly why I was there I do not
17 recall.
18     Q. At the time that you saw the fireplace
19 structure on the second floor, was that the
20 last time you went to the residence?
21     A. Probably, but I think I was there
22 another time to do something outside, and I
23 never even went inside.
24     Q. The time that you saw the fireplace on

53

1 the second floor, that was the last time you
2 were on the second floor?
3   A. Yeah.  The reason I think we were in
4 there is because Chip Gubbins had been there
5 for so long.  I heard that he had done some
6 great trim work going up the stairs that were a
7 raised panel on an angle and I wanted to take a
8 look at them.  We walked up the stairs and
9 looked at them.  I was really looking at the
10 woodwork, not the brick work.
11   Q. Was there any woodwork surrounding the
12 -- was the fireplace made out of brick?
13   A. Yes.
14   Q. Was there any woodwork surrounding the
15 woodwork for the fireplace?
16   A. I do not recall.  Right now I couldn't
17 tell you what that thing looked like.  If you
18 had a picture, I would say, yup, that was it.
19 I can't remember if it was on an angle or if it
20 was sitting square.  Like I said, it didn't
21 have anything to do with me.  I wanted to look
22 at the woodwork.
23   Q. Just a general memory that there was
24 some type of structure there?

54

1   A. There was definitely something and I
2 believe, like I said, back right corner.
3   Q. Was the floor that you installed
4 between the first and second floor on the
5 addition made out of wood?
6   A. Yes.  I believe it was 2-by-12 floor
7 joists with three-quarter ton plywood over it.
8   Q. If you had been aware that a fireplace
9 was going to be built on the second floor,
10 would you have notched the floor joists in the
11 area where the fireplace was to be built?
12   A. I would have either notched them or
13 cut them out and allowed for a hearth.
14   Q. What does it mean to notch a floor
15 joist?
16   A. It means to cut out either a top or
17 bottom portion, to cut out a piece of it, to
18 allow for either a pipe or an obstruction of
19 some sort.
20   Q. Why would you have notched the floor
21 joists or cut them out if a fireplace was to be
22 built in that area?
23   A. If I knew a fireplace was going to be
24 built in that area, they would have to either

55

1 been notched or taken right out for fire code.
2   Q. Because the wood joists would have
3 been made out of wood, a combustible?
4   A. Right.  When you do a fireplace, again
5 there are Mass. regulations and laws governing
6 how things are built.  One of them is directly
7 related to the hearth.
8   Q. And the reason that there are those
9 regulations is to separate the radiant heat
10 from the fireplace from surrounding combustible
11 materials?
12   A. Yes.  You need air spaces, you need
13 heat dissipation.
14       MR. CROWLEY:  Thank you, sir.
15 That is all the questions I have for you right
16 now.
17       MS. PROULX:  I don't have any.
18       MR. LOFTUS:  I'm all set.
19   CROSS-EXAMINATION
20   BY MR. OBER:
21   Q. My name is Scott Ober.  I represent
22 Heatmaster.  Have you ever heard of the company
23 Heatmaster?
24   A. No, sir.

56

1   Q. One thing I just had a question
2 about.  You mentioned that you heard talk about
3 Julie wanting this fireplace on the second
4 floor.  Do you remember when you heard those
5 conversations?
6   A. As far as the exact day, no.  We were
7 working, you know, say on the frame, and I just
8 heard talk about she wanted something on the
9 second floor.  I don't know what it was -- I
10 knew it was going to be some kind of a brick
11 fireplace.  I don't know if there was going to
12 be a mantle on it.  I just heard she wanted
13 something upstairs.
14   Q. Was this time period during roughly
15 the two months you were there on a daily basis
16 or sometime after that?
17   A. It was near the end of when I was
18 there because Joe was working on the exterior
19 brick work and had probably moved inside
20 repairing the interior brick work.  So it was
21 near the end of the period that I was there.
22   Q. And when you talk about a conventional
23 fireplace is that a solid fuel burning
24 fireplace?

57

1    A. Well, a conventional fireplace for new
2 construction is when you throw split logs into
3 it on a metal tray to burn it.  You open up
4 your damper and the smoke goes out.
5        MR. OBER:  That's all the
6 questions I have.
7      CROSS-EXAMINATION
8      BY MR. CARPENTER:
9    Q. My name is Curtis Carpenter.  I
10 represent P&D Builders in this case.  During
11 the time you were on the job, how directly
12 involved in this project was the homeowner
13 Julia Pavia?
14    A. Julie liked to get her fingers right
15 in the middle of it.
16    Q. Exactly what do you mean by getting
17 her fingers right in the middle of it?
18    A. She would talk a lot with Phil about
19 what she wanted, what she liked and what she
20 expected.
21    Q. Would she ever communicate what she
22 liked and what she wanted directly to the
23 subcontractors that were working on the job or
24 would she deal primarily or exclusively with

59

1 as far as the look.  And she -- I remember she
2 agreed with us that it would look nice.
3    Q. When the final decision was made about
4 the design of the roof, was that decision that
5 was made between you, Mike and Julia or how was
6 Phil involved in that decision?
7    A. After we talked to Julie, we would
8 tell Phil what she wanted and he would say if
9 that is what she wants, give it to her because
10 that was just basically just an appearance
11 issue.  Instead of having a gable, we put a
12 little mansard on it.  We just changed the look
13 of it.  It still had to be framed structurally
14 safe especially where there is a slate roof;
15 there is a lot of weight up there.
16        MR. CARPENTER:  I have no further
17 questions.
18
19        MR. CROWLEY:  Nothing further.
20        (Deposition of Michael Conte
21 concluded at 12:24 p.m.)
22
23
24

58

1 Phil?
2    A. She would talk to the subcontractors
3 asking questions and trying to design as you
4 go, what she was looking for.
5    Q. Are you aware of the fact that Julia
6 Pavia is an interior designer?
7    A. I heard she was some kind of a
8 designer or she wanted to be a designer.
9    Q. And I think you just said a second ago
10 she was kind of designing as she goes; is that
11 correct?
12    A. I don't know if you call it designing
13 as she goes or trying to get a certain look of
14 what she wanted.  We had -- Mike Roach and I
15 and Julie had several conversations on, again,
16 the design of the roof, the look of the roof
17 and going with the design of the house.
18    Q. Did she ever give you instructions as
19 to change design as part of your work?
20    A. She didn't give me instructions to do
21 it.  She would ask questions and make
22 suggestions on what things would look like and
23 what we could do.  The final design of the roof
24 is actually something Mike and I came up with

60

1        C E R T I F I C A T E
2    I, MICHAEL CONTE, hereby certify under
3 the pains and penalties of perjury that I have
4 read the foregoing transcript of my testimony,
5 and further certify that said transcript is a
6 true and accurate record of my testimony (with
7 the exception of the corrections noted below.)
8 PAGE LINE    CORRECTIONS AND/OR DELETIONS
9 ___  ___    _____
10 ___  ___    _____
11 ___  ___    _____
12 ___  ___    _____
13 ___  ___    _____
14 ___  ___    _____
15 ___  ___    _____
16 ___  ___    _____
17 ___  ___    _____
18 ___  ___    _____
19    Signed under the pains and penalties
20 of perjury this    day of         , 2006.
21
22
23        _____
24              MICHAEL CONTE

61

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF MIDDLESEX

I, Bernadette J. D'Alelio, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition was taken before me on the 23rd day of February, 2006;

That the witness named in the deposition, prior to being examined, was by me first duly sworn;

That said deposition was taken before me at the time and place herein set forth, and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 13th day of March, 2006.

_____
Bernadette J. D'Alelio
Notary Public
Massachusetts
My Commission Expires:
December 12, 2010

PLEASE NOTE:
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS, UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.
 start 167

MICHAEL DAVIS                                                                FEBRUARY 23, 2006

|  |  |  |  |
|---|---|---|---|
| * |  |  | changed |

* | (9:5) (9:9) (9:22) (10:1) | (40:24) (48:5) (59:10) | **brought** (7:20)
**\*** (1:6) (1:15) | (10:8) (10:13) (12:1) | **basis** (18:24) (42:11) | **build** (11:14) (31:1)
**\* \*** (1:6) (1:15) | (12:12) (14:11) (17:17) | (46:14) (46:19) (48:11) | **builders** (1:11) (2:13)
**\* \* \*** (1:6) (1:15) | (18:1) (18:8) (18:10) | (48:24) (56:15) | (13:18) (13:22) (14:12)

### A
 | (19:22) (20:12) (21:14) | **because** (13:22) (16:5) | (14:14) (14:17) (14:20)
**ability** (9:11) | (22:4) (23:22) (24:2) | (18:21) (31:7) (39:23) | (15:5) (15:9) (15:21)
**abut** (23:13) (38:11) | (24:3) (24:11) (25:4) | (40:3) (40:19) (45:4) | (16:15) (17:17) (20:6)
**accommodate** (6:15) | (25:6) (25:13) (29:2) | (47:1) (47:3) (47:15) | (24:9) (24:17) (30:9)
**accommodations** (41:19) | (30:7) (31:13) (33:6) | (53:4) (55:2) (56:18) (59:9) | (30:18) (44:13) (46:7)
**according** (22:11) | (35:1) (37:4) (38:19) | **been** (4:3) (4:23) (7:2) | (57:10)
**accordingly** (37:9) | (39:17) (39:21) (40:7) | (9:7) (12:22) (15:12) | **building** (11:1) (11:11)
**accuracy** (5:6) | (41:4) (41:13) (43:24) | (17:20) (24:24) (33:19) | (20:15) (21:18) (22:19)
**accurate** (5:19) (6:3) | (44:5) (44:9) (48:11) | (37:20) (38:4) (39:4) | (23:20) (42:24) (43:2)
(60:6) | (49:1) (49:6) (49:8) | (41:14) (42:5) (42:13) | **built** (14:9) (21:5)
**action** (61:14) | (49:18) (50:5) (50:8) | (43:2) (43:20) (43:22) | (21:14) (21:16) (22:10)
**actually** (37:21) (38:12) | (50:15) (50:19) (51:6) | (47:4) (47:6) (48:12) | (29:24) (37:9) (38:5)
(58:24) | (51:15) (51:17) (51:18) | (49:1) (49:9) (53:4) (54:8) | (39:19) (49:17) (50:17)
**adam** (7:12) | (53:11) (53:14) (55:17) | (55:1) (55:3) | (54:9) (54:11) (54:22)
**add** (42:3) | (61:14) (61:22) | **before** (1:19) (5:2) (5:7) | (54:24) (55:6)
**addition** (14:8) (15:19) | **anybody** (8:12) (42:2) | (6:7) (8:8) (14:20) (15:9) | **burn** (57:3)
(30:19) (30:23) (31:2) | (49:6) | (19:14) (20:4) (22:21) | **burning** (20:17) (20:19)
(32:1) (34:15) (34:19) | **anything** (6:21) (8:5) | (24:10) (24:22) (25:1) | (20:24) (56:23)
(35:16) (35:18) (35:24) | (24:3) (26:13) (35:11) | (40:7) (52:1) (61:5) (61:8) | **business** (11:15) (11:16)
(36:12) (37:7) (39:21) | (46:24) (53:21) | **behalf** (1:17) (2:2) (2:5) | (12:16) (12:18) (12:24)
(42:9) (44:2) (47:23) | **anyway** (44:21) | (2:9) (2:13) (2:16) | (18:20) (19:20) (59:20)
(48:13) (54:5) | **appearance** (59:10) | **being** (11:16) (14:9) | **busy** (26:22) (28:24)
**additions** (13:3) (15:14) | **appearances** (2:1) | (22:15) (24:2) (35:10) | **but** (14:5) (23:13) (28:8)
(25:11) | **apply** (61:22) | (35:12) (37:8) (38:5) | (28:22) (31:6) (33:20)
**address** (5:11) (7:7) | **applying** (43:5) | (38:14) (38:16) (39:6) | (41:9) (41:19) (42:6)
(7:14) (16:13) (17:22) | **appropriate** (10:21) | (40:4) (40:8) (41:22) | (42:22) (43:20) (44:3)
**adjacent** (23:1) | **approximately** (15:10) | (49:14) (50:23) (61:6) | (44:18) (46:18) (48:17)
**advised** (36:22) (37:8) | (20:3) (20:24) (28:4) | **believe** (8:23) (9:9) | (50:13) (50:22) (52:21)
**affixed** (61:16) | (28:12) (34:8) (42:12) | (11:4) (12:9) (12:22) |
**after** (5:5) (14:15) | **are** (4:20) (5:7) (5:22) | (14:14) (15:6) (15:23) | ### C
(15:21) (25:16) (25:24) | (6:8) (6:22) (6:23) (7:21) | (16:3) (17:10) (17:19) | **calculating at** (34:12)
(28:4) (28:12) (33:9) | (12:14) (17:1) (18:4) | (17:22) (19:4) (21:3) | **california** (1:8)
(35:14) (43:2) (46:13) | (18:19) (19:3) (20:8) | (23:12) (25:10) (25:20) | **call** (5:17) (26:9) (27:1)
(56:16) (59:7) | (22:4) (23:22) (27:15) | (26:3) (27:23) (30:21) | (28:16) (29:10) (32:11)
**again** (13:6) (30:15) | (30:2) (30:5) (40:17) | (32:7) (32:20) (32:21) | (47:11) (49:15) (58:12)
(31:6) (44:12) (49:14) | (45:11) (46:8) (52:6) | (35:19) (36:16) (38:8) | **called** (25:21) (26:1)
(55:4) (58:15) | (55:5) (55:6) (55:8) (58:5) | (44:3) (46:5) (48:19) | (27:18) (27:19) (27:22)
**against** (23:23) (35:3) | **area** (22:19) (23:1) | (48:20) (49:24) (54:2) | (35:21) (36:5)
**ago** (15:20) (19:10) (58:9) | (23:6) (54:11) (54:22) | (54:6) | **came** (28:18) (33:10)
**agreed** (59:2) | (54:24) | **below** (60:7) | (43:16) (48:13) (58:24)
**air** (32:22) (55:12) | **around** (13:22) (14:6) | **bernadette** (1:19) (61:3) | **can** (5:23) (22:2) (29:1)
**alco** (1:11) | (23:18) (24:13) (38:10) | (61:18) | (33:6) (38:11) (40:1)
**all** (4:7) (4:9) (28:13) | (43:21) (44:7) (44:12) | **best** (29:19) (42:19) | **canceled** (44:17)
(29:14) (35:15) (38:10) | **arrangements** (5:13) | **better** (36:20) | **can't** (24:12) (48:17)
(42:15) (43:18) (45:16) | (38:19) | **between** (11:16) (28:18) | (53:19)
(48:15) (52:3) (55:15) | **ask** (6:23) (13:24) | (40:15) (49:11) (50:16) | **carpenter** (2:13) (3:5)
(55:18) (57:5) (61:12) | (26:20) (45:5) (58:21) | (50:20) (54:4) (59:5) | (33:3) (44:15) (57:8)
**allegations** (23:22) | **asked** (24:17) (27:3) | **beyond** (10:1) | (57:9) (59:16)
**allow** (37:3) (38:17) | (30:18) (42:6) (43:7) | **big** (15:18) (28:9) | **carpenters** (32:23) (35:8)
(41:12) (54:18) | **asking** (6:7) (58:3) | **bill** (43:7) | **carpentry** (10:7)
**allowances** (38:6) (39:22) | **aspect** (10:4) | **bills** (44:5) (44:14) | **carresi** (1:12) (2:9)
**allowed** (11:17) (37:23) | **assume** (51:23) | **birth** (7:5) | (18:5) (18:6) (18:9)
(54:13) | **assumed** (51:24) | **bit** (13:6) (36:19) | (18:11) (18:12) (18:14)
**alone** (34:6) | **assuming** (34:12) (43:13) | **blackburn** (2:3) | (18:15) (18:19) (19:2)
**along** (24:7) | (50:3) | **blame** (29:21) | (32:21) (48:2)
**already** (26:19) | **assumption** (52:11) | **blamed** (29:17) (29:22) | **case** (7:21) (23:21)
**also** (5:22) (6:11) | **attaches** (23:3) | **blames** (29:22) | (57:10)
(12:11) (17:4) (30:24) | **attention** (41:4) (49:9) | **boiler** (35:20) | **ceiling** (38:15)
(34:18) (47:15) | **auburn** (1:5) | **boston** (1:23) (2:15) | **cement** (22:15) (22:22)
**always** (18:11) (46:5) | **aware** (7:21) (22:4) | (2:18) | (23:15) (23:16) (37:19)
**amount** (26:17) (45:16) | (23:22) (42:4) (54:8) (58:5) | **bottom** (54:11) | **center** (37:2) (38:3)
(46:7) |  | **box** (22:16) (22:18) (23:7) | **central** (32:22) (35:22)
**and/or** (46:8) (61:23) | ### B | **break** (6:14) | **certain** (12:5) (28:24)
**angle** (48:17) (53:7) | **back** (13:15) (13:22) | **brick** (33:11) (33:12) | (58:13)
(53:19) | (15:19) (16:6) (26:20) | (33:14) (33:15) (33:16) | **certificates** (14:24)
**angled** (51:2) | (27:2) (30:19) (31:5) | (33:18) (35:2) (35:3) | (45:6)
**another** (17:21) (52:22) | (40:10) (46:15) (46:17) | (35:4) (43:17) (43:21) | **certification** (61:21)
**answer** (6:1) (6:8) (6:19) | (46:20) (48:13) (48:20) | (47:3) (48:16) (49:23) | **certify** (60:2) (60:5)
**ant** (30:21) (31:7) | (49:12) (52:13) (54:2) | (50:2) (53:10) (53:12) | (61:4) (61:13)
**any** (5:6) (5:16) (7:2) | **background** (9:15) | (56:10) (56:19) (56:20) | **certifying** (61:23)
(7:13) (8:8) (8:14) (9:1) | **bad** (24:3) | **bricks** (49:22) (49:23) | **change** (46:17) (46:21)
 | **basic** (51:7) (21:12) | **briefly** (9:14) | (46:22) (49:5) (58:19)
 | **basically** (11:12) (13:2) | **brings** (23:21) | **changed** (36:19) (47:1)

changes                                                                      esq

(59:12)
**changes** (5:6) (5:16) (5:18) (41:24) (42:4)
**changing** (49:23)
**character** (28:21)
**charge** (47:13) (48:6)
**chases** (37:4)
**check** (47:18)
**checks** (44:17) (45:19) (45:20)
**chimney** (22:18) (23:3) (37:18) (37:24) (38:1) (38:3) (38:18)
**chimneys** (20:15) (25:11) (37:4)
**chip** (16:23) (17:14) (19:5) (33:1) (35:13) (53:4)
**chip's** (17:3)
**christmas** (27:21)
**civil** (1:18)
**clashed** (29:8)
**clay** (22:17)
**close** (36:16)
**closely** (19:3)
**closet** (47:5)
**code** (11:1) (21:17) (22:11) (22:13) (23:20) (37:3) (55:1)
**coincides** (48:9)
**cold** (33:22) (43:13)
**combined** (9:19)
**combustible** (23:17) (55:3) (55:10)
**come** (17:15) (22:20) (25:20) (26:20) (27:2) (30:18) (40:10) (47:17)
**comes** (29:10) (32:12) (38:13)
**coming** (8:9) (37:5)
**comments** (29:5)
**commission** (61:20)
**commonwealth** (1:21) (10:17) (11:13) (61:1) (61:4)
**communicate** (57:21)
**comp** (45:6)
**company** (1:7) (2:10) (13:3) (27:21) (55:22)
**compel** (7:18)
**complaints** (29:3)
**completed** (33:17) (43:15)
**concern** (27:12)
**concerning** (22:5)
**concluded** (59:21)
**concorde** (2:3)
**connecticut** (2:4)
**consecutive** (10:11)
**considered** (11:22)
**consistent** (14:7) (40:3) (40:5) (41:15)
**constructed** (34:18)
**construction** (1:11) (9:24) (10:5) (10:15) (11:3) (11:9) (11:18) (11:19) (11:23) (13:7) (13:11) (13:16) (21:5) (21:8) (22:3) (22:10) (22:14) (23:4) (23:24) (29:12) (34:16) (50:11) (57:2)
**construction-related**
**contact** (41:24)
**contacted** (22:8)
**conte** (1:16) (3:2) (4:2) (4:15) (7:11) (12:17) (12:20) (13:5) (13:7) (13:10) (13:15) (46:7)

(59:20) (60:2) (60:23)
**c-o-n-t-e** (4:17)
**contract** (30:16) (31:12)
**contracting** (13:3) (13:13)
**contractor** (16:16) (21:7) (30:15) (44:13) (48:6)
**control** (61:22)
**conventional** (20:22) (21:1) (21:4) (22:14) (37:16) (56:22) (57:1)
**conversation** (26:5) (26:14) (27:8) (27:12) (28:3) (28:5) (28:11) (40:15) (40:23) (52:1) (52:7)
**conversations** (28:1) (50:20) (56:5) (58:15)
**coordinate** (48:3)
**copies** (44:6)
**copy** (5:4) (5:8) (5:14)
**corner** (48:17) (48:21) (51:2) (51:3) (51:5) (54:2)
**corp** (1:11) (12:17) (12:21)
**correct** (39:18) (39:23) (46:12) (58:11)
**corrections** (60:7) (60:8)
**could** (27:2) (33:23) (36:7) (37:9) (38:17) (44:3) (47:3) (49:15) (58:23)
**couldn't** (53:16)
**counsel** (61:14)
**county** (61:2)
**couple** (24:9) (34:12)
**course** (9:19) (9:22) (10:7) (11:13)
**court** (1:3) (1:20) (5:24) (61:3)
**cover** (33:24)
**crew** (33:21)
**cross** (3:4) (3:5)
**cross-examination**
**crowley** (2:17) (3:3) (4:6) (4:12) (4:18) (55:14) (59:19)
**currently** (12:14)
**curtis** (2:13) (57:9)
**cut** (54:13) (54:16) (54:17) (54:21)

## D

**d/b/a** (4:12)
**daily** (42:11) (46:14) (48:11) (48:24) (56:15)
**d'alelio** (1:19) (61:3) (61:18)
**damage** (26:17) (28:9) (28:10) (30:21) (31:7)
**damper** (22:19) (57:4)
**date** (5:7) (30:12)
**dave** (33:3)
**david** (2:17) (4:18)
**day** (40:10) (42:13) (47:13) (47:14) (52:14) (56:6) (60:20) (61:5) (61:16)
**days** (5:15) (5:19)
**deal** (57:24)
**december** (61:20)
**decision** (59:3) (59:4) (59:6)
**decorative** (40:12) (40:21) (41:6) (41:13) (41:17) (41:20) (51:23)

(52:4) (52:9)
**deem** (11:16)
**deemed** (5:19)
**deep** (38:8)
**defective** (23:24)
**defendant** (1:14)
**defendants** (1:13)
**definitely** (40:5) (51:1) (51:8) (54:1)
**deletions** (60:8)
**demolition** (32:5) (33:8) (33:9)
**deponent** (4:2)
**deposition** (1:16) (3:2) (4:20) (4:23) (5:4) (5:8) (5:14) (5:16) (5:23) (6:15) (6:18) (6:20) (8:6) (59:20) (61:4) (61:6) (61:8) (61:11)
**describe** (9:14) (34:14)
**design** (21:11) (21:15) (36:18) (58:3) (58:16) (58:17) (58:19) (58:23) (59:4)
**designer** (58:6) (58:8)
**designing** (58:10) (58:12)
**diagram** (23:19)
**diameter** (22:16)
**did** (7:20) (8:5) (8:8) (8:11) (8:13) (9:22) (10:19) (12:7) (13:5) (13:10) (13:18) (13:21) (14:9) (15:8) (15:10) (15:13) (15:17) (15:21) (16:20) (17:4) (18:10) (19:18) (19:20) (19:22) (20:1) (20:3) (20:6) (20:12) (20:14) (21:1) (21:11) (21:22) (23:11) (24:5) (25:17) (26:13) (26:20) (27:12) (28:12) (29:2) (30:8) (31:10) (31:12) (31:16) (31:19) (32:5) (32:7) (33:21) (34:3) (34:5) (34:6) (36:11) (36:15) (36:24) (37:3) (37:21) (38:21) (39:16) (40:3) (40:7) (40:20) (41:11) (41:15) (42:1) (44:22) (44:24) (46:3) (46:23) (49:5) (49:18) (49:20) (51:19) (51:22) (58:18)
**didn't** (15:18) (20:5) (28:22) (29:16) (37:24) (38:19) (39:21) (39:24) (41:4) (44:4) (49:8) (50:6) (51:14) (51:17) (53:20) (58:20)
**different** (37:20)
**differently** (37:14)
**difficult** (42:18)
**direct** (3:3) (4:11) (61:22)
**direction** (61:10) (61:23)
**directly** (39:12) (55:6) (57:11) (57:22)
**discuss** (8:11)
**discussion** (41:13)
**discussions** (50:16)
**dissipation** (55:13)
**district** (1:3) (1:4)
**documents** (8:8)
**does** (11:9) (12:14) (12:24) (18:18) (22:13) (23:8) (29:11) (29:16) (32:13) (34:15) (54:14) (61:22)

**doesn't** (45:17) (52:4) (52:5)
**doing** (6:24) (15:24) (17:11) (18:16) (18:23) (32:14) (32:21) (33:11) (33:19) (35:7) (35:9) (35:13) (35:14) (35:15) (41:3) (43:7) (43:21) (46:14) (46:18) (47:8) (48:1) (48:2) (49:6) (49:18) (50:9)
**dollars** (26:17) (46:8)
**done** (14:11) (14:13) (17:17) (20:6) (21:24) (24:9) (25:6) (25:9) (26:19) (30:7) (35:10) (38:14) (43:20) (48:9) (48:12) (48:14) (48:24) (53:5)
**donnelly** (2:6)
**don't** (6:20) (11:15) (16:4) (16:23) (17:23) (18:24) (26:15) (27:5) (27:6) (28:21) (29:5) (30:16) (35:1) (36:9) (44:3) (44:8) (46:24) (47:11) (49:16) (50:1) (50:13) (50:14) (51:2) (51:24) (52:7) (55:17) (56:9) (56:11) (58:12)
**doors** (32:4) (47:1)
**double** (38:10)
**down** (15:24) (17:15) (20:15) (22:20) (24:3) (27:19) (30:23) (31:7) (31:20) (36:8) (39:11) (42:16) (44:11) (61:9)
**dozen** (15:12)
**drawings** (21:15)
**drive** (1:8) (2:10)
**driver's** (12:13)
**driving** (27:19)
**due** (9:4)
**duly** (4:3) (61:7)
**during** (6:14) (6:18) (6:20) (26:5) (26:8) (26:14) (28:11) (36:21) (43:1) (56:14) (57:10)

## E

**each** (6:9)
**early** (43:14)
**educational** (9:15)
**effects** (9:5)
**eight** (20:6) (20:8) (20:12)
**either** (18:22) (19:1) (38:15) (46:17) (54:12) (54:16) (54:18) (54:24)
**electrician** (32:19) (48:1)
**else** (26:13) (29:22) (32:12) (33:2)
**employed** (12:14)
**employee** (45:1) (45:3)
**employees** (32:16)
**end** (31:22) (41:11) (44:20) (45:8) (45:14) (56:17) (56:21)
**entire** (11:6)
**equipment** (12:5)
**eric** (2:2)
**errata** (5:17) (5:18)
**especially** (42:15) (59:14)
**esq** (2:2) (2:6) (2:9) (2:13) (2:17)

estimate

halifax

estimate (42:19)
even (52:23)
ever (4:23)(7:2)(19:22)
(22:8)(25:17)(29:2)
(29:17)(30:7)(36:9)
(41:20)(49:6)(49:18)
(50:15)(55:22)(57:21)
(58:18)
every (17:15)(27:21)
(31:21)(31:22)(42:13)
(47:13)(47:14)
everybody (14:22)
(29:14)(32:12)(45:4)
everything (37:1)(48:8)
exact (16:13)(30:12)
(56:6)
exactly (26:15)(34:11)
(43:19)(49:11)(49:16)
(52:16)(57:16)
exam (12:7)(12:10)
examination (3:1)(4:11)
(61:12)
examined (4:4)(61:6)
except (4:7)
exception (60:7)
exclusively (57:24)
excuse (20:18)
exhibit (3:7)
exhibits (1:2)
existing (30:20)(31:4)
(37:1)
expected (41:23)(57:20)
expertise (21:24)
expires (61:20)
explain (5:3)
extended (25:10)
extent (40:14)
exterior (33:11)(33:13)
(34:3)(34:4)(34:9)
(43:17)(43:18)(47:3)
(56:18)
eye (28:23)

## F

facade (33:15)(33:18)
fact (18:21)(58:5)
fail (5:17)
fair (17:16)
falco (2:16)(4:19)
(19:4)(19:13)(19:15)
(19:18)(19:22)(20:1)
(20:4)(20:9)(20:13)
(21:1)(21:19)(22:2)
(22:9)(23:23)(24:5)
(24:9)(24:15)(24:18)
(24:22)(25:6)(28:14)
(29:18)(30:3)(33:13)
(33:18)(34:3)(34:6)
(34:9)(43:16)(49:18)
(50:16)
falco's (24:23)(29:3)
fall (43:14)
falling (24:2)
familiar (17:1)(18:4)
(19:12)(30:5)
fancy (35:20)
far (24:1)(33:20)
(36:18)(41:9)(48:15)
(56:6)(59:1)
february (1:23)(61:5)
file (46:8)
filled (10:21)
filling (49:22)
final (58:23)(59:3)
fingers (57:14)(57:17)
finish (6:7)(12:21)
(35:16)

finished (16:5)(17:18)
(18:2)(23:13)(35:8)
(36:9)(39:2)(39:5)(39:6)
(50:14)
fire (7:22)(22:11)
(22:13)(22:16)(22:18)
(23:6)(24:2)(25:16)
(25:18)(25:24)(26:2)
(26:11)(26:17)(27:9)
(27:13)(27:17)(28:5)
(28:7)(28:12)(29:18)
(55:1)
fireman's (1:7)
fireplace (20:13)
(22:18)(22:23)(23:8)
(23:10)(23:17)(23:18)
(36:22)(36:24)(37:6)
(37:8)(37:12)(37:16)
(38:1)(38:4)(38:9)
(38:18)(39:17)(39:22)
(40:3)(40:6)(40:8)
(40:13)(40:21)(41:2)
(41:6)(41:10)(41:14)
(41:17)(41:21)(41:22)
(42:3)(42:6)(48:12)
(48:16)(49:2)(49:7)
(49:16)(49:19)(50:11)
(50:17)(50:23)(51:5)
(51:20)(52:15)(52:18)
(52:24)(53:12)(53:15)
(54:8)(54:11)(54:21)
(54:23)(55:4)(55:10)
(56:3)(56:11)(56:23)
(56:24)(57:1)
fireplaces (20:14)
(20:17)(20:22)(21:1)
(21:4)(21:11)(21:13)
(21:20)(22:2)(22:5)
(22:9)(22:14)(25:13)
fires (22:5)
firm (13:13)
first (16:5)(27:7)
(30:22)(30:23)(31:2)
(31:8)(32:6)(34:24)
(35:5)(35:6)(42:16)
(42:17)(47:7)(49:24)
(54:4)(61:7)
fix (28:10)
flat (38:1)
floor (23:1)(30:22)
(30:23)(31:2)(31:8)
(32:6)(34:16)(34:23)
(34:24)(35:4)(36:23)
(37:13)(37:19)(38:2)
(38:12)(39:20)(39:21)
(40:4)(40:13)(40:21)
(41:23)(42:16)(42:17)
(47:7)(48:19)(49:2)
(49:7)(49:19)(49:24)
(50:24)(51:4)(51:5)
(52:15)(52:19)(53:1)
(53:2)(54:3)(54:4)(54:6)
(54:9)(54:10)(54:14)
(54:20)(56:4)(56:9)
flooring (23:13)
floors (25:11)
flue (38:14)(51:15)
flues (22:17)
focusing (15:8)
follows (1:24)(4:5)
foot (38:8)
for (1:20)(4:20)(5:5)
(5:13)(8:1)(8:5)(8:21)
(8:24)(9:3)(9:7)(11:5)
(11:20)(12:8)(13:6)
(13:18)(13:21)(14:11)
(14:13)(14:19)(15:8)

(15:17)(15:21)(16:16)
(17:10)(17:17)(17:21)
(17:24)(18:8)(18:10)
(18:11)(18:21)(19:22)
(20:4)(21:2)(21:7)(22:3)
(22:13)(22:23)(23:15)
(24:5)(24:8)(24:10)
(24:13)(24:22)(25:1)
(25:6)(25:9)(25:11)
(25:13)(27:22)(28:13)
(29:18)(30:7)(30:8)
(31:13)(31:14)(32:10)
(33:2)(34:2)(34:19)
(34:21)(34:22)(35:15)
(35:18)(36:24)(37:3)
(37:17)(37:19)(37:23)
(38:3)(38:6)(38:14)
(38:17)(38:20)(38:21)
(39:5)(39:15)(39:16)
(39:17)(39:22)(40:10)
(41:12)(41:19)(42:12)
(42:20)(43:6)(44:14)
(44:16)(44:22)(45:5)
(45:6)(45:12)(45:16)
(46:2)(46:3)(46:12)
(46:17)(46:20)(49:13)
(50:11)(50:15)(52:12)
(53:5)(53:15)(54:13)
(54:18)(55:1)(55:19)
(57:1)(58:4)(61:3)(61:14)
forced (35:19)
foregoing (60:4)(61:4)
(61:21)
foreman (17:7)
forget (17:21)(24:8)
(24:20)(28:8)
form (4:8)(41:2)(45:14)
(45:24)(46:2)
format (6:1)
forms (10:21)
forth (16:6)(61:8)
found (42:15)
foundation (22:23)
(22:24)(23:2)(23:3)
four (17:11)(21:3)
four-inch (23:12)
frame (13:22)(15:19)
(30:19)(32:2)(32:3)
(33:16)(33:20)(34:19)
(36:24)(37:9)(42:18)
(56:7)
framed (32:12)(36:5)
(37:1)(37:13)(37:15)
(37:17)(37:18)(38:1)
(38:2)(38:7)(38:10)
(39:15)(59:13)
framer (43:7)(44:15)
framers (17:21)(17:23)
(37:8)
framing (32:9)(32:14)
(33:17)(34:14)(35:7)
(36:1)(36:11)(36:18)
(36:21)(37:21)(38:21)
(38:24)(39:7)(39:9)
(40:2)(41:11)(41:15)
(42:1)(42:5)(42:9)
(42:20)(43:11)(43:16)
(44:2)(46:14)(46:22)
(47:8)(48:24)
frank (32:20)
freezing (34:1)
friendly (28:1)
from (5:15)(7:13)(8:22)
(9:5)(9:17)(11:6)(23:9)
(23:17)(24:13)(25:1)
(34:1)(36:12)(37:21)
(42:17)(46:2)(46:16)

(47:10)(55:10)
front (23:6)
fuel (56:23)
full (4:13)
fund (1:7)
further (59:16)(59:19)
(60:5)(61:13)
future (7:15)(37:1)

## G

gable (59:11)
gas (51:7)(51:9)(51:12)
gave (19:24)(24:23)
(44:7)(45:20)
general (13:2)(13:13)
(16:15)(21:7)(30:15)
(44:13)(48:6)(53:23)
gentleman (18:4)
get (5:2)(5:7)(29:11)
(29:15)(36:7)(45:7)
(48:22)(57:14)(58:13)
getting (8:23)(43:5)
(57:16)
give (11:14)(14:23)
(31:14)(31:21)(36:15)
(58:18)(58:20)(59:9)
given (11:13)(36:13)
(61:11)
gives (11:12)
goes (39:2)(39:11)
(41:10)(57:4)(58:10)
(58:13)
going (13:21)(16:1)
(26:11)(26:18)(27:20)
(34:22)(36:8)(37:16)
(39:24)(41:11)(41:16)
(42:2)(42:7)(44:20)
(45:7)(47:6)(47:15)
(47:16)(51:10)(51:19)
(52:11)(53:6)(54:9)
(54:23)(56:10)(56:11)
(58:17)
good (55:2)
got (17:22)(21:24)
(36:18)(46:24)
governing (55:5)
grades (10:11)
graduated (9:16)(9:17)
grange (2:10)
great (53:6)
ground (5:22)
gubbins (17:2)(17:4)
(17:7)(17:9)(19:7)(53:4)
guess (6:21)(29:9)
(49:15)
guessing (6:22)
guy (47:12)

## H

had (10:8)(14:11)(20:6)
(23:11)(24:9)(24:11)
(24:17)(24:18)(24:22)
(24:24)(25:2)(25:4)
(26:19)(27:8)(28:3)
(30:22)(31:7)(32:19)
(33:3)(33:15)(33:17)
(33:21)(34:7)(34:21)
(37:24)(38:4)(41:2)
(42:5)(42:16)(43:15)
(43:18)(43:22)(44:18)
(46:15)(47:15)(48:11)
(49:1)(53:4)(53:5)
(53:18)(54:8)(56:1)
(56:19)(58:14)(58:15)
(59:13)
half (12:23)(15:12)
halifax (5:12)(7:7)

MICHAEL CONTE                                FEBRUARY 23, 2006

hammonds                                                                              layer

(12:19)
**hammonds** (8:2) (14:2)
**hand** (46:18)
**handed** (43:8)
**happened** (14:6) (28:11)
**has** (12:22) (18:1)
(18:16) (22:8) (22:20)
(25:6) (25:9) (25:10)
(25:13) (27:18) (27:22)
(28:9) (29:17) (38:9)
(43:21) (46:7) (48:9)
**hassett** (2:6)
**have** (4:23) (5:3) (5:15)
(6:3) (7:2) (7:8) (7:13)
(8:14) (8:17) (9:1) (9:5)
(9:7) (9:9) (9:22) (10:1)
(10:8) (10:15) (11:2)
(11:5) (11:13) (12:3)
(12:7) (12:20) (13:24)
(14:3) (14:13) (15:12)
(15:18) (17:20) (18:8)
(19:5) (19:15) (19:16)
(21:17) (22:7) (23:14)
(24:1) (26:18) (27:16)
(29:2) (29:20) (29:21)
(29:22) (29:23) (30:7)
(31:10) (31:12) (33:9)
(33:19) (33:23) (37:13)
(37:15) (37:17) (37:18)
(37:20) (37:23) (38:6)
(38:7) (39:4) (41:14)
(41:18) (41:23) (42:3)
(42:5) (42:13) (42:22)
(43:1) (43:20) (43:22)
(43:24) (44:4) (44:5)
(44:6) (44:8) (44:9)
(44:16) (44:17) (45:18)
(47:4) (47:5) (49:8) (49:9)
(49:14) (50:4) (50:12)
(50:22) (53:21) (54:10)
(54:12) (54:20) (54:24)
(55:2) (55:15) (55:17)
(55:22) (57:6) (59:16)
(60:3) (61:16)
**haven't** (17:16) (18:22)
(19:1) (24:3) (27:24)
**having** (4:3) (59:11)
**hear** (40:20)
**heard** (18:15) (18:22)
(22:7) (24:1) (24:3)
(29:20) (29:22) (29:23)
(40:11) (40:12) (40:15)
(41:7) (42:7) (52:1) (52:5)
(52:10) (53:5) (55:22)
(56:2) (56:4) (56:8)
(56:12) (58:7)
**hearsay** (41:8)
**hearth** (22:22) (23:5)
(23:8) (23:12) (23:14)
(37:19) (38:6) (38:8)
(39:22) (54:13) (55:7)
**hearths** (22:16)
**heat** (23:15) (23:16)
(32:22) (33:24) (48:2)
(55:9) (55:13)
**heating** (1:12) (35:11)
(35:17)
**heatmaster** (1:14) (2:5)
(55:22) (55:23)
**heavy** (12:5)
**held** (11:2) (11:5)
**help** (17:15) (46:1)
**her** (30:7) (30:8) (40:15)
(57:14) (57:17) (59:9)
**here** (4:20) (5:24)
(23:22) (35:13) (40:10)
**hereby** (60:2) (61:4)

**herein** (61:8)
**he's** (28:21)
**high** (9:16) (9:20) (10:1)
(10:9) (10:11) (35:21)
**him** (14:23) (17:23)
(17:24) (19:6) (19:20)
(24:13) (24:18) (24:19)
(26:22) (27:10) (28:6)
(28:17) (28:23) (31:14)
(31:21) (31:23) (32:20)
(33:2) (34:7) (45:21)
(50:5) (50:6) (50:7) (50:12)
**hingham** (19:9)
**hire** (20:5)
**hired** (20:9) (21:19)
(28:17) (31:24) (32:19)
**his** (16:23) (24:4)
(24:19) (25:5) (27:21)
(29:11) (32:20) (33:4)
(34:7) (43:21) (45:2)
(45:19)
**hoisting** (12:3)
**hold** (10:13) (12:1)
(12:12)
**hole** (38:12) (38:15)
(51:14)
**holes** (49:23)
**home** (5:11) (13:8)
(20:20) (44:9) (52:14)
**homeowner** (50:21) (57:12)
**homes** (11:21) (21:5)
(21:8) (22:4) (22:6) (22:10)
**hot** (35:19)
**hour** (31:14)
**hourly** (31:15)
**hours** (31:19)
**house** (14:8) (23:4)
(30:11) (30:20) (32:15)
(33:12) (35:3) (36:19)
(48:20) (58:17)
**houses** (20:15)
**how** (4:16) (7:7) (8:19)
(11:2) (12:20) (13:10)
(15:10) (19:15) (19:18)
(20:3) (20:24) (24:20)
(25:20) (31:19) (34:8)
(37:20) (40:20) (47:14)
(55:6) (57:11) (59:5)
**hull** (20:16)

I

**ice** (36:5) (38:22) (39:1)
(39:9) (39:13)
**idea** (49:14)
**identified** (4:3)
**ignition** (22:5)
**i'm** (12:15) (16:13)
(25:23) (27:3) (27:14)
(28:24) (29:15) (30:15)
(33:1) (33:8) (34:11)
(34:20) (35:5) (40:22)
(43:13) (43:19) (49:10)
(50:2) (55:18)
**impression** (41:5) (52:8)
**improper** (23:23)
**inc** (1:11) (1:14) (2:13)
**inches** (37:2)
**include** (34:15)
**including** (50:21)
**index** (3:1) (3:7)
**indicated** (46:15)
**indicating** (44:1) (44:10)
**indication** (46:10) (51:9)
**industry** (29:13)
**initially** (31:1)
**inquire** (27:1) (51:19)
**inside** (49:21) (52:23)

(56:19)
**inspect** (22:20)
**inspected** (21:17)
**inspections** (51:18)
**inspector** (21:18) (22:20)
**install** (20:13) (21:1)
(21:20) (31:24) (32:4)
**installed** (22:3) (22:10)
(25:13) (33:13) (36:23)
(37:7) (37:12) (39:20)
(40:4) (40:8) (43:23)
(47:2) (49:17) (54:3)
**instead** (59:11)
**instructions** (58:18)
(58:20)
**insurance** (1:7) (2:10)
(14:24) (45:6)
**intended** (37:6)
**interested** (61:14)
**interfere** (9:10)
**interior** (17:11) (33:20)
(34:19) (34:21) (34:22)
(35:1) (35:9) (35:16)
(48:12) (48:15) (49:1)
(56:20) (58:6)
**into** (19:7) (38:11)
(51:20) (57:2) (61:9)
**invites** (27:20)
**invoice** (31:14) (31:20)
(31:21)
**invoices** (44:5) (44:7)
(44:17) (45:20)
**involve** (15:13)
**involved** (18:24) (43:5)
(50:19) (57:12) (59:6)
**involves** (7:22)
**isn't** (21:24)
**issue** (28:18) (59:11)
**issued** (10:17) (42:24)
(43:3)
**its** (39:7)
**it's** (22:24) (26:11)
**itself** (36:2)
**i've** (17:23) (25:4)

J

**january** (7:23) (25:7)
(25:14)
**job** (13:20) (14:14)
(14:17) (14:20) (15:9)
(15:16) (15:18) (15:21)
(15:22) (15:24) (16:1)
(16:2) (16:8) (16:10)
(16:11) (16:16) (16:21)
(17:5) (17:9) (17:12)
(17:18) (17:19) (17:21)
(18:2) (19:23) (20:4)
(20:5) (24:6) (24:8)
(24:13) (24:15) (24:20)
(28:9) (29:15) (30:16)
(31:10) (31:13) (31:17)
(32:10) (32:16) (32:24)
(34:2) (37:11) (37:13)
(37:22) (39:16) (40:7)
(40:9) (42:21) (43:6)
(44:4) (44:10) (45:2)
(45:17) (47:8) (48:5)
(48:10) (48:23) (49:4)
(50:7) (50:23) (57:11)
(57:23)
**jobs** (13:21) (14:19)
(15:8) (15:10) (15:13)
(16:9) (17:8) (18:8)
(18:10) (18:13) (20:3)
(20:7) (20:8) (20:9)
(20:12) (24:10) (24:11)
(24:20) (47:16)

**joe** (19:4) (19:14)
(19:16) (20:5) (20:6)
(28:14) (28:24) (28:14)
(28:16) (28:22) (28:24)
(29:9) (29:17) (29:21)
(29:22) (33:21) (34:5)
(43:13) (49:12) (49:20)
(50:3) (56:18)
**joe's** (22:1) (29:6)
**joist** (54:15)
**joists** (38:11) (54:7)
(54:10) (54:21) (55:2)
**joseph** (2:16) (4:19)
(19:13)
**journal** (31:16)
**julia** (1:7) (57:13)
(58:5) (59:5)
**julie** (30:5) (40:11)
(40:17) (49:12) (52:2)
(56:3) (57:14) (58:15)
(59:7)
**jumping** (16:5) (24:13)
**just** (12:13) (15:19)
(16:4) (17:11) (18:15)
(18:22) (19:10) (24:19)
(26:10) (26:16) (27:19)
(28:1) (28:6) (29:24)
(31:5) (33:1) (34:20)
(40:22) (41:1) (41:7)
(42:7) (43:7) (44:15)
(46:5) (46:12) (48:14)
(49:8) (49:10) (51:1)
(51:14) (51:16) (53:23)
(56:1) (56:7) (56:12)
(58:9) (59:10) (59:12)

K

**keep** (8:22) (31:16)
(31:19) (33:24) (36:6)
(39:2) (39:10) (44:19)
**kept** (31:17)
**kind** (38:19) (40:11)
(42:18) (46:1) (48:8)
(51:16) (52:1) (56:10)
(58:7) (58:10)
**knew** (19:14) (37:11)
(45:7) (54:23) (56:10)
**know** (6:15) (6:19) (6:23)
(8:19) (11:15) (16:3)
(16:11) (18:21) (18:24)
(24:1) (25:19) (25:20)
(28:22) (29:5) (30:16)
(32:20) (33:1) (34:8)
(35:11) (35:12) (35:14)
(36:9) (36:14) (42:14)
(42:23) (43:12) (47:11)
(48:18) (49:10) (49:16)
(50:1) (50:2) (50:13)
(50:14) (51:6) (51:24)
(52:5) (52:7) (56:7) (56:9)
(56:11) (58:12)
**knowledge** (29:19)
**known** (7:2) (19:15)
(19:16) (45:24)
**knows** (50:8)

L

**largest** (15:16)
**last** (4:16) (16:23)
(17:3) (17:19) (27:23)
(33:4) (52:20) (53:1)
**late** (43:14)
**later** (27:11)
**law** (2:3)
**laws** (55:5)
**lawyers** (5:17)
**layer** (39:4)

least                                                                                          passing

| | | | |
|---|---|---|---|
| **least** (17:11) (29:21) (34:12) (42:23) | **many** (15:10) (20:3) (20:24) (24:20) | **motions** (4:9) | **O** |
| **leave** (38:15) (39:16) (40:7) | **march** (61:17) | **move** (7:13) | **oath** (6:12) |
| **left** (16:8) (35:15) (40:9) (48:10) | **marin** (1:8) | **moved** (7:9) (18:16) (56:19) | **ober** (2:6) (3:4) (55:20) (55:21) (57:5) |
| **let** (6:7) (6:15) (6:23) (13:24) | **marion** (15:24) (16:1) (16:10) (16:12) (17:18) (18:2) (44:11) | **much** (29:9) (33:23) (47:2) (47:12) | **objections** (4:7) (61:12) |
| **liability** (45:6) | **martha** (16:19) (16:21) | **mutual** (2:10) | **obstruction** (54:18) |
| **license** (10:16) (10:20) (11:3) (11:5) (11:8) (11:10) (11:19) (12:3) (12:4) (12:8) (12:13) | **mason** (24:18) (28:14) (28:21) (29:10) (29:23) (30:2) | **myself** (21:10) (32:8) | **obtain** (10:19) |
| **licenses** (10:14) (12:2) (12:12) | **masonry** (20:2) (21:19) (21:24) (24:9) (37:23) (38:13) (50:24) | **N** | **occasionally** (40:9) |
| **like** (13:4) (21:12) (24:24) (28:6) (29:1) (35:11) (38:2) (41:7) (43:6) (47:24) (51:24) (53:17) (53:20) (54:2) (58:22) | **masons** (33:10) (49:11) | **name** (4:14) (4:16) (4:18) (7:3) (12:16) (16:18) (18:6) (17:1) (17:3) (18:5) (32:20) (33:4) (55:21) (57:9) (61:16) | **off** (31:4) |
| | **mass** (5:12) (11:1) (12:19) (20:16) (21:16) (23:19) (55:5) | | **office** (34:24) (40:4) |
| **liked** (57:14) (57:19) (57:22) | **massachusetts** (1:4) (1:18) (1:21) (1:23) (2:7) (2:11) (2:15) (2:18) (44:11) (61:1) (61:4) (61:19) | **named** (33:3) (61:6) | **offices** (1:22) (2:3) |
| **likes** (29:14) | | **national** (2:10) | **often** (17:15) |
| **likewise** (6:6) | | **near** (7:15) (56:17) (56:21) | **okay** (6:17) (43:9) |
| **limited** (11:19) | **materials** (23:9) (23:17) (44:14) (55:11) | **necessary** (5:7) | **old** (29:10) |
| **line** (11:15) (14:3) (22:17) (45:20) (60:8) | **matter** (4:19) (10:23) | **need** (5:2) (6:1) (6:6) (6:14) (38:8) (44:18) (55:12) | **once** (28:20) (47:1) |
| **lists** (14:22) (45:4) | **may** (6:18) (6:19) | | **one** (11:20) (14:14) (15:21) (17:20) (19:5) (31:6) (39:24) (40:1) (41:11) (41:12) (41:19) (48:13) (49:20) (55:6) (56:1) |
| **little** (33:19) (36:19) (46:6) (59:12) | **maybe** (19:10) (19:17) (21:3) (25:23) (27:10) (47:14) | **needed** (17:20) (37:3) (46:18) | |
| **live** (7:10) | **mean** (18:18) (49:20) (54:14) (57:16) | **neither** (61:13) | |
| **lived** (7:8) | **meaning** (16:7) (32:7) (36:1) (45:1) (45:3) | **neutral** (30:1) | **one-page** (12:10) |
| **living** (23:1) | **means** (54:16) (61:22) | **never** (18:10) (22:7) (28:18) (29:20) (38:18) (41:10) (50:10) (50:19) (52:23) | **ones** (23:11) |
| **llp** (1:22) (2:14) (2:17) | **medication** (8:15) (9:1) (9:6) (9:10) | | **one-story** (30:19) (31:2) |
| **located** (12:18) | **medications** (9:3) | **new** (21:5) (22:3) (22:10) (23:4) (37:17) (57:1) | **only** (25:19) (27:7) (27:15) (30:8) (33:23) (34:21) (44:6) (45:18) |
| **location** (41:14) | **meet** (19:18) (19:20) | **newton** (8:3) (14:2) | **onto** (31:2) |
| **locks** (2:4) | **members** (38:10) (38:24) (39:7) (39:9) | **next** (48:9) | **open** (57:3) |
| **loftus** (2:2) (55:18) | **memory** (14:7) (24:14) (45:13) (46:1) (53:23) | **nice** (59:2) | **opened** (30:20) |
| **log** (20:20) (31:16) (51:7) (51:9) (51:12) | **mentioned** (15:20) (19:5) (26:10) (40:23) (41:9) (56:2) | **nicholle** (2:9) | **opening** (39:16) |
| **logs** (57:2) | | **nine** (19:10) | **operate** (12:5) (13:10) |
| **lomotil** (8:18) | **metal** (57:3) | **nobody** (22:8) (42:6) | **operated** (12:20) (13:8) |
| **long** (7:7) (11:2) (12:20) (13:10) (19:15) (34:8) (35:15) (46:20) (53:5) | **michael** (1:12) (1:16) (2:9) (3:2) (4:2) (4:15) (18:5) (18:6) (59:20) (60:2) (60:23) | **noncommercial** (11:19) | **operating** (13:15) |
| | | **none** (1:2) (3:8) | **operations** (36:21) |
| **longer** (42:14) (42:22) | **middle** (57:15) (57:17) | **nope** (5:1) (8:7) (8:10) (8:20) (28:15) | **oral** (5:12) |
| **look** (8:8) (36:18) (44:3) (48:19) (51:14) (53:8) (53:21) (58:13) (58:16) (58:22) (59:1) (59:2) (59:12) | **middlesex** (61:2) | **nor** (61:14) | **other** (6:9) (7:3) (9:1) (12:1) (12:12) (16:9) (16:20) (23:9) (23:21) (24:2) (32:15) (32:23) (33:6) (38:16) (47:14) (47:22) (49:13) (49:23) |
| | **midstate** (2:10) | **not** (6:8) (6:18) (6:19) (7:15) (8:13) (14:3) (16:13) (18:21) (22:24) (24:1) (25:23) (26:6) (27:3) (27:4) (27:14) (29:12) (29:14) (29:15) (30:12) (30:15) (31:12) (32:2) (32:19) (33:8) (34:11) (35:5) (35:10) (35:14) (36:14) (36:24) (37:3) (39:16) (40:3) (40:5) (40:22) (41:9) (41:12) (43:12) (43:19) (45:3) (47:14) (48:7) (49:3) (49:10) (52:16) (53:10) (53:16) (61:22) | |
| | **might** (15:12) (17:20) (19:5) (29:21) (33:19) (42:13) (42:22) (43:20) (44:6) (47:4) (47:5) (49:8) (49:19) (50:2) (52:4) | | |
| **looked** (53:9) (53:17) | | | **out** (10:21) (13:8) (17:15) (36:6) (38:13) (39:2) (39:11) (42:15) (50:2) (53:12) (54:5) (54:13) (54:16) (54:17) (54:21) (55:1) (55:3) (55:7) (57:4) |
| **looking** (53:9) (58:4) | | | |
| **lot** (26:11) (28:9) (30:21) (34:4) (57:18) (59:15) | **mike** (16:22) (18:10) (18:14) (18:16) (18:23) (19:19) (21:9) (24:7) (32:8) (32:20) (46:7) (48:1) (58:14) (58:21) (59:5) | | |
| **lumber** (19:9) | | **notary** (1:20) (4:4) (61:3) (61:19) | **outcome** (61:15) |
| **lumberyard** (19:6) (19:8) | **minute** (15:20) | **notch** (54:14) | **output** (35:21) |
| | **moment** (16:14) | **notched** (54:10) (54:12) (54:20) (55:1) | **outside** (33:21) (52:22) |
| **M** | **month** (25:24) (28:4) (28:12) (43:10) | **note** (61:21) | **over** (6:8) (33:15) (36:6) (39:3) (39:12) (54:7) |
| **made** (21:23) (27:24) (28:16) (38:6) (41:18) (41:19) (42:4) (42:5) (50:2) (50:3) (53:12) (54:5) (55:3) (59:3) (59:5) (61:12) | **months** (17:11) (19:10) (27:11) (42:12) (42:20) (42:23) (56:15) | **noted** (60:7) | **overheard** (40:22) (41:8) (45:12) |
| | | **nothing** (33:21) (41:3) (47:2) (47:7) (51:13) (59:19) | **own** (13:23) (26:23) |
| | **more** (18:23) (29:6) | | |
| | **morrison** (2:14) | **noticed** (51:16) | **owner** (15:5) (15:7) (16:18) |
| **mahoney** (2:14) | **most** (17:14) (26:18) (32:7) (34:5) | **novado** (1:8) | |
| **main** (2:7) | **mostly** (15:14) | **now** (12:17) (18:16) (28:10) (42:23) (43:12) (53:16) (55:16) | **P** |
| **mainly** (17:10) (17:13) (32:3) (40:16) (49:13) | | **number** (11:24) (19:6) (24:23) (28:8) | **page** (60:8) |
| **major** (33:21) (47:7) | | **notary** | **pages** (1:1) |
| **make** (5:6) (5:13) (5:16) (6:2) (38:19) (39:21) (41:24) (49:5) (58:21) | | | **paid** (29:11) (29:15) (44:14) (44:18) (45:23) (46:7) |
| **mansard** (59:12) | | | **pains** (60:3) (60:19) |
| **mantle** (56:12) | | | **panel** (46:6) |
| | | | **paper** (46:6) |
| | | | **paperwork** (43:24) (44:9) |
| | | | **part** (15:18) (32:13) (58:19) |
| | | | **particular** (10:4) |
| | | | **partner** (18:24) |
| | | | **party** (27:21) (61:14) |
| | | | **passed** (11:13) |
| | | | **passing** (19:11) |

pavia                                                                                        set

**pavia** (1:8) (7:22) (8:1)
(14:10) (14:17) (14:20)
(15:9) (15:16) (15:21)
(16:2) (16:8) (17:5) (17:9)
(18:9) (19:23) (20:4)
(20:5) (24:6) (24:14)
(24:20) (25:16) (26:21)
(27:2) (29:18) (30:5)
(30:11) (32:15) (37:11)
(37:22) (38:5) (39:16)
(40:18) (40:20) (42:10)
(44:1) (46:3) (46:13)
(47:9) (48:10) (48:23)
(49:12) (52:2) (52:14)
(57:13) (58:6)
**pay** (29:16) (41:4) (49:8)
**paying** (44:19)
**penalties** (60:3) (60:19)
**penetrations** (38:3)
**per** (26:6) (37:3)
**percent** (48:14) (48:17)
**perform** (32:5)
**performed** (14:1)
**period** (11:6) (56:14)
(56:21)
**periodically** (47:18)
(49:5)
**periods** (16:7)
**perjury** (60:3) (60:20)
**permission** (11:14)
**permit** (11:10) (12:4)
(42:24) (43:2) (43:5) (43:6)
**permits** (11:11) (11:12)
**personality** (29:7)
**personally** (29:20)
(41:20)
**phil** (14:13) (15:2)
(18:11) (18:17) (18:23)
(19:14) (24:10) (24:17)
(24:23) (25:21) (28:16)
(28:20) (28:22) (28:23)
(29:16) (29:20) (29:23)
(30:17) (31:12) (36:15)
(40:16) (40:23) (42:4)
(44:13) (47:12) (57:18)
(58:1) (59:6) (59:8)
**phillip** (15:3)
**phil's** (18:6) (48:5)
**phone** (24:19) (26:8)
(28:16)
**picture** (53:18)
**piece** (54:17)
**pipe** (54:18)
**place** (61:8)
**plaintiff** (1:9) (1:17)
(2:2)
**plan** (7:17)
**plans** (7:13) (7:16)
(36:12) (36:14) (36:15)
(36:16)
**plasterers** (33:10)
**platform** (47:6)
**please** (4:13) (61:21)
**plumber** (18:7) (18:13)
(18:15)
**plumbing** (1:12)
**plywood** (39:1) (39:5)
(39:8) (39:10) (54:7)
**point** (21:23) (41:1)
**points** (22:15)
**pond** (5:12) (12:19)
**porch** (31:5)
**portion** (43:16) (54:17)
**poured** (23:14) (23:16)
**practices** (23:24)
**prepare** (8:5)
**prescription** (8:14) (9:2)

**present** (11:7) (34:2)
(35:23) (50:15)
**pretty** (29:9) (36:16)
(47:2) (47:12)
**primarily** (57:24)
**print** (36:17) (37:24)
(39:24)
**prints** (43:8)
**prior** (4:24) (13:5)
(14:10) (14:14) (19:23)
(20:7) (24:8) (24:14)
(24:20) (33:8) (61:6)
**probably** (13:12) (20:6)
(34:5) (44:8) (48:1)
(52:21) (56:19)
**problem** (9:13) (22:7)
(22:8) (25:4)
**problems** (22:4) (24:2)
**procedure** (22:21)
**proceed** (22:21)
**product** (36:10) (39:2)
(39:5) (39:6)
**progress** (47:18)
**project** (18:9) (30:13)
(31:1) (57:12)
**projects** (26:23)
**proper** (22:17) (41:18)
**protrusions** (37:5)
**proulx** (2:9) (55:17)
**provisions** (1:18)
**public** (1:20) (4:4)
(61:3) (61:19)
**pull** (11:11)
**pulled** (45:19)
**purpose** (26:24)
**pursuant** (1:17)
**put** (5:5) (7:17) (25:12)
(35:23) (36:5) (38:22)
(38:24) (39:8) (39:9)
(41:22) (59:11)

## Q

**quality** (29:3) (29:6)
**question** (4:8) (6:1)
(6:7) (6:19) (13:20) (14:6)
(45:22) (48:22) (56:1)
**questions** (6:2) (9:11)
(12:10) (55:15) (57:6)
(58:3) (58:21) (59:17)
**quick** (19:11)

## R

**radiant** (55:9)
**rain** (39:2) (39:11)
**raised** (23:12) (53:7)
**ran** (19:7)
**ranked** (10:10)
**read** (30:17) (60:4)
**really** (27:14) (35:1)
(44:4) (44:18) (46:24)
(53:9)
**rear** (31:3)
**reason** (9:9) (53:3) (55:8)
**reasons** (9:4) (27:23)
**rebuild** (30:23) (31:8)
**recall** (6:20) (16:18)
(16:23) (24:12) (26:4)
(26:7) (28:5) (30:10)
(33:7) (35:1) (35:10)
(40:1) (40:2) (41:9)
(43:10) (43:12) (49:3)
(51:2) (52:6) (52:13)
(52:17) (53:16)
**recalling** (16:13) (35:6)
**receipt** (5:15)
**receive** (4:5) (5:8) (5:14)
**received** (7:18) (46:2)

**receives** (45:24)
**recollection** (14:1)
(50:4) (50:22)
**recommend** (24:5)
**recommended** (24:7)
(24:15)
**recommending** (28:14)
**record** (5:24) (8:1)
(45:18) (60:6) (61:11)
**records** (45:18)
**redo** (26:12) (26:18)
**refer** (15:1) (20:8)
(20:21) (22:22) (30:2)
(46:21)
**referred** (18:1) (36:2)
**referring** (20:9) (40:18)
**refresh** (45:13)
**regarding** (23:23)
**regular** (20:18) (20:19)
(38:2)
**regulations** (55:5) (55:9)
**related** (55:7) (61:14)
**remember** (6:6) (16:4)
(26:15) (27:5) (27:6)
(28:6) (33:2) (33:5)
(33:22) (34:11) (34:20)
(35:4) (51:11) (52:3)
(53:19) (56:4) (59:1)
**remodeling** (15:15)
**repairing** (56:20)
**replacing** (49:22)
**reporter** (1:20) (5:24)
(61:3) (61:23)
**represent** (4:19) (55:21)
(57:10)
**represented** (14:5)
**reprimand** (28:13)
**reproduction** (61:22)
**reputation** (25:3)
**require** (22:13) (23:20)
**requires** (14:23)
**residence** (7:22) (8:2)
(14:11) (25:16) (26:21)
(27:2) (29:18) (31:3)
(34:10) (38:5) (42:10)
(44:2) (46:4) (46:14)
(47:9) (52:20)
**residential** (11:22)
(13:3) (15:14) (20:20)
**responses** (6:2)
**responsibility** (28:15)
**responsible** (45:12)
**restricted** (11:20)
**return** (5:18)
**returned** (49:4)
**review** (5:5)
**right** (5:3) (12:17)
(42:23) (43:12) (48:21)
(50:6) (50:12) (53:16)
(54:2) (55:1) (55:4)
(55:15) (57:14) (57:17)
**roach** (16:22) (17:4)
(17:13) (19:19) (21:9)
(24:7) (32:8) (32:9) (35:8)
(58:14)
**road** (8:2) (14:2)
**roof** (30:20) (31:6)
(31:24) (32:2) (35:23)
(36:1) (36:2) (36:3) (36:5)
(36:17) (37:5) (37:15)
(37:17) (38:3) (38:15)
(38:22) (38:23) (39:5)
(39:12) (39:15) (42:17)
(43:19) (58:16) (58:23)
(59:4) (59:14)
**roofers** (19:7)
**roofing** (32:3)

**room** (34:24)
**rot** (42:16)
**rothchild** (15:3) (18:1)
(18:11) (18:19) (19:3)
(24:16) (25:17) (26:1)
(26:4) (26:8) (26:13)
(26:20) (27:8) (27:16)
(28:4) (28:13) (28:19)
(29:2) (29:17) (44:22)
(45:9) (46:2) (47:17)
(48:3) (50:16)
**rothchild's** (18:12)
(27:1)
**roughly** (56:14)
**rubber** (39:9)
**rule** (43:4)
**rules** (1:18) (5:22)
**run** (11:14)

## S

**safe** (59:14)
**said** (25:1) (26:4) (26:8)
(26:16) (28:6) (28:22)
(35:11) (38:2) (41:7)
(43:6) (43:8) (43:9) (52:1)
(53:20) (54:2) (58:9)
(60:5) (61:8) (61:11)
(61:14)
**same** (9:17) (11:8)
(13:14) (15:14) (15:23)
(16:2) (16:4) (44:12)
(61:22)
**san** (1:8)
**satisfactorily** (4:3)
**save** (4:9)
**saving** (4:7)
**saw** (19:6) (27:19)
(31:23) (34:4) (36:8)
(36:9) (50:10) (51:7)
(51:8) (51:13) (51:22)
(52:14) (52:18) (52:24)
**say** (17:16) (26:13)
(27:20) (28:20) (28:24)
(29:24) (33:4) (45:5)
(53:18) (56:7) (59:8)
**saying** (29:15) (52:3)
**says** (11:12) (46:6)
**schedule** (48:8)
**school** (9:16) (9:18)
(9:20) (9:23) (10:2) (10:6)
(10:9) (10:11) (29:10)
**schooling** (10:1)
**scope** (30:17)
**scott** (2:6) (55:21)
**seal** (61:16)
**second** (25:11) (34:23)
(35:4) (36:23) (37:12)
(39:21) (40:4) (40:13)
(40:21) (41:23) (48:18)
(49:2) (49:7) (49:19)
(50:24) (51:4) (51:5)
(52:15) (52:19) (53:1)
(53:2) (54:4) (54:9) (56:3)
(56:9) (58:9)
**see** (5:23) (27:20)
(28:22) (33:21) (47:14)
(49:6) (49:18) (51:15)
**seeing** (50:5) (50:23)
**seen** (50:12)
**self-employed** (12:15)
(13:6)
**send** (44:20) (44:22)
**sent** (44:16) (45:14)
**separate** (23:8) (55:9)
**separates** (23:16)
**sequence** (50:10)
**set** (22:19) (36:12)

MICHAEL KETTENBACH                                    FEBRUARY 28, 2006

several                                                                    the

(36:15) (43:8) (55:18)
(61:8)

several  (9:3) (13:21)
(20:14) (27:18) (35:13)
(47:15) (49:21) (58:15)
she  (40:13) (40:14)
(40:23) (41:1) (42:2)
(42:7) (52:4) (52:5) (52:6)
(56:8) (56:12) (57:18)
(57:19) (57:21) (57:22)
(57:24) (58:2) (58:4)
(58:7) (58:8) (58:10)
(58:13) (58:14) (58:18)
(58:20) (58:21) (59:1)
(59:8) (59:9)
sheet  (5:17) (5:18)
sheetrockers  (33:10)
sherry  (7:11)
shield  (36:6) (38:22)
(39:10) (39:13)
shorter  (42:14)
shorthand  (61:9)
show  (37:24) (40:1)
(47:13)
side  (9:5)
signed  (60:19)
similar  (51:4)
since  (10:9) (17:17)
(17:24) (18:2) (18:9)
(19:16) (25:7) (25:14)
(27:16)
sir  (4:13) (4:18) (7:2)
(9:14) (55:14) (55:24)
sitting  (53:20)
six  (27:10)
size  (22:16)
slash  (44:15)
slate  (32:3) (36:3)
(36:8) (39:7) (39:11)
(39:12) (59:14)
slip  (46:6)
slow  (13:23)
small  (13:2)
smoke  (57:4)
sole  (15:6)
solid  (17:10) (56:23)
some  (5:22) (12:10)
(17:21) (17:23) (22:15)
(26:21) (34:3) (36:8)
(38:16) (40:11) (48:16)
(49:23) (50:22) (50:23)
(53:5) (53:24) (54:19)
(56:10) (58:7)
somebody  (41:24) (46:18)
someone  (29:22) (41:8)
(52:3)
something  (40:24) (41:1)
(42:8) (46:18) (48:18)
(51:3) (51:4) (52:2)
(52:22) (54:1) (56:8)
(56:13) (58:24)
sometime  (43:2) (49:10)
(49:15) (56:16)
sons  (7:11) (34:7)
soon  (33:4)
sort  (54:19)
space  (23:1)
spaces  (55:12)
speak  (25:17) (40:17)
special  (35:20)
specific  (7:16) (9:22)
(14:3) (50:4)
specifically  (26:15)
(51:11)
speculate  (6:21)
speculating  (6:22)
spell  (4:16) (8:19)

split  (57:2)
spoken  (27:16)
spring  (43:14)
square  (53:20)
stairs  (33:20) (47:5)
(53:6) (53:8)
stairway  (34:22) (47:4)
standard  (21:12)
stark  (16:19) (16:21)
(17:12)
start  (6:8) (42:17)
(43:17) (61:23)
started  (5:2) (5:7)
(30:10) (30:14) (33:11)
(33:18) (33:22) (43:1)
(43:11) (44:10) (49:1)
(50:1) (50:13)
state  (4:13)
stated  (47:24)
states  (1:3) (45:16)
status  (30:13)
stay  (30:1)
stayed  (36:16)
staying  (7:17)
steady  (46:19)
steps  (47:6)
still  (59:13)
stipulations  (4:7)
stomach  (8:22) (9:4)
stopped  (46:13) (48:10)
(48:23)
story  (31:6)
street  (1:23) (2:7)
(2:14) (2:18) (5:12)
(12:19) (27:19)
stress-related  (9:4)
strike  (4:9) (39:19)
structurally  (59:13)
structure  (50:24) (51:7)
(51:22) (52:15) (52:19)
(53:24)
stuart  (2:3)
studied  (10:5)
study  (9:19) (9:23)
styles  (29:8)
subcontract  (31:11)
(44:15)
subcontractor  (14:16)
(14:21) (14:23) (21:20)
(31:9) (45:11) (45:23)
subcontractors  (16:21)
(32:16) (45:5) (47:22)
(48:4) (57:23) (58:2)
subject  (10:23)
subpoena  (7:18)
subrogee  (1:7)
subs  (44:14)
subscribed  (61:16)
substance  (26:7)
substantial  (43:15)
suggestions  (58:22)
suite  (2:7) (2:10)
summer  (1:22) (2:14)
(2:18)
supervise  (21:22)
supervised  (21:23)
(47:10)
supervision  (61:10)
supervisor  (47:9) (47:12)
supervisor's  (10:16)
(11:3) (11:10) (11:18)
supplied  (36:15)
support  (39:7)
supposed  (46:8)
sure  (5:10) (21:24)
(25:23) (27:3) (27:14)
(33:9) (35:5) (40:13)

(40:22) (41:18) (43:19)
(48:18) (49:10)
surrounding  (23:9)
(53:11) (53:14) (55:10)
sworn  (4:4) (61:7)
system  (35:12) (35:17)

                T

take  (6:14) (9:3) (12:7)
(19:12) (53:7)
taken  (1:16) (8:14)
(8:17) (9:1) (55:1) (61:4)
(61:8) (61:9)
taking  (9:7)
talk  (40:7) (40:11)
(41:1) (56:2) (56:8)
(56:22) (57:18) (58:2)
talked  (18:22) (19:1)
(27:10) (41:20) (59:7)
talking  (6:8) (30:3)
tax  (45:14) (45:24) (46:1)
(46:9)
taxes  (45:9) (45:12)
tear  (30:22) (31:4)
(31:7) (42:16)
tell  (26:1) (45:17)
(53:17) (59:8)
telling  (28:7) (48:7)
temperature  (33:22)
temporarily  (36:7)
terminology  (8:24)
test  (10:22) (10:24)
testified  (4:5)
testify  (7:19) (9:11)
testimony  (3:24) (6:12)
(8:11) (60:4) (60:6) (61:11)
than  (23:21)
thank  (55:14)
that  (5:3) (5:6) (5:20)
(6:3) (6:8) (6:11) (6:23)
(7:14) (7:21) (8:19) (8:21)
(8:23) (9:5) (9:9) (9:19)
(10:5) (10:17) (10:19)
(10:23) (11:5) (11:12)
(11:22) (12:4) (12:8)
(12:16) (12:18) (12:24)
(13:4) (13:8) (13:13)
(13:19) (13:20) (13:22)
(14:5) (14:7) (14:14)
(14:15) (14:19) (15:3)
(15:8) (15:16) (15:18)
(15:20) (16:7) (16:11)
(16:16) (17:16) (17:19)
(17:20) (18:14) (18:15)
(18:18) (18:19) (18:23)
(19:2) (19:12) (20:7)
(20:9) (21:2) (21:23)
(22:1) (22:2) (22:9)
(22:20) (22:23) (23:3)
(23:11) (23:13) (23:21)
(24:14) (25:11) (25:19)
(25:20) (25:22) (26:5)
(26:8) (26:10) (26:11)
(26:14) (26:16) (26:18)
(26:22) (26:24) (27:5)
(27:7) (27:8) (27:12)
(27:15) (28:3) (28:5)
(28:7) (28:9) (28:11)
(28:18) (28:21) (29:1)
(29:16) (29:22) (30:8)
(30:23) (31:8) (31:16)
(31:21) (32:10) (33:6)
(34:3) (34:4) (34:15)
(36:11) (36:12) (36:22)
(37:8) (37:9) (37:11)
(37:13) (37:20) (37:21)
(37:24) (38:4) (38:9)

(38:13) (38:21) (39:15)
(39:19) (39:23) (40:1)
(40:2) (40:4) (40:7)
(40:11) (40:20) (40:23)
(41:1) (41:3) (41:5)
(41:14) (41:15) (41:18)
(42:1) (42:2) (42:4) (42:6)
(42:19) (43:4) (44:12)
(44:16) (44:18) (44:23)
(45:1) (45:3) (45:4) (45:7)
(45:10) (45:13) (45:20)
(45:22) (46:1) (46:3)
(46:19) (46:22) (48:5)
(48:22) (49:3) (49:4)
(49:11) (49:19) (50:2)
(50:3) (50:11) (51:7)
(51:11) (51:18) (51:23)
(52:2) (52:6) (52:8)
(52:11) (52:14) (52:18)
(52:19) (52:24) (53:1)
(53:5) (53:6) (53:17)
(53:18) (53:23) (54:3)
(54:8) (54:22) (54:24)
(55:8) (55:15) (56:2)
(56:16) (56:21) (56:23)
(57:23) (58:5) (58:10)
(59:2) (59:4) (59:6) (59:9)
(59:10) (60:3) (60:5)
(61:4) (61:6) (61:8)
(61:11) (61:13)
that's  (17:3) (27:6)
(32:11) (40:14) (52:10)
(57:5)
the  (1:7) (1:17) (1:18)
(1:21) (4:2) (4:4) (4:8)
(4:9) (5:3) (5:4) (5:8)
(5:14) (5:15) (5:18) (5:19)
(5:23) (6:14) (6:18) (6:19)
(6:20) (7:7) (7:15) (7:22)
(8:1) (8:23) (9:10) (9:17)
(9:23) (10:5) (10:10)
(10:11) (10:17) (10:21)
(10:23) (11:1) (11:2)
(11:5) (11:6) (11:9)
(11:13) (11:15) (12:16)
(13:20) (14:5) (14:8)
(14:10) (14:17) (14:19)
(14:20) (15:5) (15:6)
(15:8) (15:9) (15:16)
(15:19) (15:21) (15:23)
(16:1) (16:2) (16:4) (16:8)
(16:13) (16:15) (16:18)
(16:21) (17:1) (17:5)
(17:7) (17:9) (17:12)
(17:14) (17:18) (17:19)
(17:21) (18:2) (18:5)
(18:9) (18:15) (19:23)
(20:4) (20:5) (20:8)
(20:20) (21:7) (21:8)
(21:9) (21:16) (21:17)
(22:2) (22:3) (22:9)
(22:10) (22:11) (22:13)
(22:14) (22:15) (22:16)
(22:18) (22:19) (22:23)
(22:24) (23:1) (23:2)
(23:3) (23:5) (23:6) (23:8)
(23:9) (23:10) (23:11)
(23:12) (23:14) (23:16)
(23:17) (23:18) (23:19)
(23:21) (24:5) (24:14)
(24:20) (25:1) (25:16)
(25:17) (25:19) (25:24)
(26:2) (26:7) (26:21)
(26:24) (27:2) (27:7)
(27:9) (27:12) (27:15)
(27:16) (27:17) (27:19)

MICHAEL CONTE                                                    FEBRUARY 23, 2006

their                                                                          was

| | | | |
|---|---|---|---|
| (27:23) (28:3) (28:5) | (53:22) (54:3) (54:4) | (34:23) (35:20) (36:3) | (42:20) (42:23) (47:6) |
| (28:8) (28:10) (28:11) | (54:9) (54:10) (54:11) | (36:17) (46:24) (48:16) | (50:20) (56:15) |
| (28:12) (28:16) (29:3) | (54:20) (55:2) (55:7) | (49:20) (52:21) (53:3) | **two-family** (11:21) |
| (29:6) (29:12) (29:18) | (55:8) (55:9) (55:10) | (58:9) | **type** (20:1) (35:17) |
| (29:19) (29:23) (30:2) | (55:15) (55:22) (56:3) | **third-party** (1:14) | (39:17) (50:17) (50:24) |
| (30:8) (30:11) (30:12) | (56:6) (56:7) (56:8) | **this** (4:19) (7:16) (7:21) | (51:6) (51:15) (53:24) |
| (30:13) (30:15) (30:16) | (56:15) (56:17) (56:18) | (13:24) (16:14) (16:23) | **typewriting** (61:9) |
| (30:17) (30:19) (30:20) | (56:20) (56:21) (57:4) | (24:8) (24:10) (24:12) | **typically** (37:6) (38:7) |
| (30:22) (31:1) (31:2) | (57:5) (57:11) (57:12) | (24:19) (27:3) (41:7) | (45:23) |
| (31:3) (31:5) (31:6) (31:7) | (57:15) (57:17) (57:22) | (43:9) (56:3) (56:14) | |
| (31:8) (31:10) (31:13) | (57:23) (58:2) (58:5) | (57:10) (57:12) (60:20) | **U** |
| (31:22) (31:24) (32:1) | (58:16) (58:17) (58:23) | (61:16) (61:21) | |
| (32:2) (32:3) (32:5) (32:6) | (59:1) (59:3) (59:4) | **those** (15:10) (15:13) | **uncommon** (29:12) (29:14) |
| (32:9) (32:15) (32:16) | (59:12) (60:3) (60:4) | (17:7) (18:13) (20:12) | **under** (6:12) (21:16) |
| (32:23) (33:3) (33:8) | (60:7) (60:19) (61:3) | (20:17) (20:21) (21:4) | (23:14) (52:10) (60:2) |
| (33:9) (33:10) (33:11) | (61:4) (61:5) (61:6) (61:8) | (21:8) (21:11) (21:20) | (60:19) (61:9) (61:22) |
| (33:12) (33:13) (33:15) | (61:11) (61:12) (61:14) | (22:4) (22:6) (24:11) | **underneath** (23:2) (47:5) |
| (33:18) (33:22) (34:2) | (61:21) (61:22) (61:23) | (27:15) (27:22) (44:8) | **understand** (4:20) (5:20) |
| (34:3) (34:4) (34:9) | **their** (14:8) (29:8) | (55:8) (59:7) | (6:4) (6:9) (6:11) (6:24) |
| (34:15) (34:16) (34:18) | (32:13) (40:22) | **thought** (25:2) | (9:11) (18:18) |
| (34:19) (34:21) (34:22) | **them** (14:23) (18:22) | **three** (9:8) (21:3) (50:20) | **unit** (51:23) |
| (34:23) (34:24) (35:2) | (19:1) (31:11) (34:1) | **three-quarter** (54:7) | **united** (1:3) |
| (35:3) (35:4) (35:5) (35:6) | (38:11) (41:8) (53:8) | **through** (19:19) (19:20) | **unless** (61:22) |
| (35:7) (35:11) (35:16) | (53:9) (54:12) (54:13) | (30:9) (37:5) (37:18) | **until** (4:8) (4:9) (36:7) |
| (35:18) (35:23) (35:24) | (54:21) (55:6) | (38:13) | (39:2) (39:11) |
| (36:1) (36:2) (36:5) (36:6) | **then** (5:19) (23:12) | **throw** (20:19) (57:2) | **upset** (8:23) |
| (36:7) (36:8) (36:9) | (31:5) (32:12) (33:10) | **thumb** (43:4) | **upstairs** (40:24) (41:2) |
| (36:11) (36:14) (36:15) | (38:12) (38:13) (39:1) | **time** (4:8) (4:10) (7:16) | (56:13) |
| (36:17) (36:18) (36:19) | (39:8) (39:9) | (9:17) (11:6) (13:19) | **use** (8:24) |
| (36:23) (37:5) (37:7) | **there** (5:22) (5:23) (7:8) | (13:22) (14:3) (15:6) | **used** (28:8) (52:11) |
| (37:11) (37:12) (37:15) | (10:4) (14:9) (15:12) | (15:23) (16:2) (16:4) | **usual** (4:6) |
| (37:17) (37:19) (37:21) | (15:19) (16:7) (17:10) | (16:8) (16:24) (17:14) | **usually** (23:2) (43:4) |
| (37:24) (38:5) (38:6) | (17:20) (23:2) (23:19) | (18:14) (19:5) (21:9) | (47:13) |
| (38:9) (38:10) (38:12) | (26:10) (26:16) (26:17) | (24:12) (24:19) (27:3) | |
| (38:14) (38:15) (38:21) | (28:7) (28:8) (28:16) | (27:16) (28:24) (31:13) | **V** |
| (38:22) (38:23) (39:1) | (28:23) (30:14) (30:18) | (33:3) (35:15) (44:12) | |
| (39:2) (39:5) (39:6) (39:7) | (30:21) (32:15) (32:21) | (45:4) (46:16) (46:20) | **vented** (38:16) |
| (39:8) (39:9) (39:10) | (32:23) (33:1) (35:8) | (48:13) (49:20) (52:18) | **ventilation** (39:17) |
| (39:11) (39:12) (39:13) | (35:13) (35:15) (35:17) | (52:20) (52:22) (52:24) | (51:16) |
| (39:15) (39:16) (39:19) | (35:19) (35:21) (36:22) | (53:1) (56:14) (57:11) | **verbal** (6:2) |
| (39:20) (39:22) (39:24) | (38:11) (38:18) (39:4) | (61:8) (61:12) | **viessman** (35:21) |
| (40:2) (40:6) (40:9) | (39:24) (40:10) (41:10) | **times** (27:15) (27:18) | **vocational** (9:18) (9:20) |
| (40:12) (40:13) (40:14) | (41:16) (42:7) (42:10) | **today** (4:21) (4:24) | (9:23) (10:5) (10:8) (10:10) |
| (40:15) (40:21) (41:2) | (42:13) (42:15) (42:20) | (6:12) (7:19) (8:9) (8:15) | **vol** (1:1) |
| (41:3) (41:15) (41:18) | (43:13) (46:10) (46:16) | (9:12) (23:22) | |
| (41:23) (41:24) (42:5) | (47:2) (47:4) (47:6) (47:9) | **today's** (8:6) | **W** |
| (42:9) (42:10) (42:15) | (47:21) (47:24) (48:11) | **together** (5:5) (18:20) | |
| (42:16) (42:17) (42:20) | (48:16) (48:18) (49:9) | (19:3) | **wage** (31:15) |
| (42:24) (43:1) (43:2) | (49:13) (49:15) (50:1) | **told** (19:2) (24:18) | **walked** (51:16) (53:8) |
| (43:5) (43:6) (43:11) | (50:18) (51:1) (51:3) | (25:21) (26:16) (26:22) | **walking** (51:17) |
| (43:16) (43:17) (43:18) | (51:4) (51:6) (51:8) (51:9) | (29:24) (37:4) (38:4) | **walk-out** (31:5) |
| (43:19) (43:21) (44:1) | (51:11) (51:13) (51:15) | (38:14) (38:17) (38:18) | **wall** (35:3) |
| (44:2) (44:5) (44:6) | (52:2) (52:16) (52:21) | (39:23) (41:10) (41:16) | **walls** (34:19) (34:21) |
| (44:10) (44:12) (44:13) | (53:4) (53:11) (53:14) | (42:2) (42:3) (42:6) (45:22) | (34:22) (35:1) (35:2) |
| (44:16) (44:20) (45:2) | (53:23) (53:24) (54:1) | **ton** (54:7) | (43:18) |
| (45:8) (45:14) (45:16) | (55:5) (55:8) (56:11) | **too** (26:22) | **want** (5:8) (6:20) (28:23) |
| (45:17) (45:18) (46:2) | (59:14) (59:15) | **took** (10:22) (42:14) | **wanted** (40:11) (40:14) |
| (46:3) (46:13) (46:14) | **thereafter** (61:9) | (42:23) | (40:20) (40:24) (41:1) |
| (46:22) (47:1) (47:3) | **thereof** (61:15) | **toomey** (1:22) (2:17) | (42:7) (52:2) (53:7) |
| (47:4) (47:5) (47:7) (47:8) | **they** (11:14) (11:16) | **top** (31:5) (54:16) | (53:21) (56:8) (56:12) |
| (47:9) (47:12) (47:18) | (18:11) (20:18) (20:19) | **track** (31:19) (44:19) | (57:19) (57:22) (58:8) |
| (47:22) (48:1) (48:3) | (21:12) (21:14) (21:16) | **training** (10:8) (10:10) | (58:14) (59:8) |
| (48:4) (48:10) (48:13) | (21:17) (23:20) (29:15) | **transcribed** (61:9) | **wanting** (56:3) |
| (48:15) (48:16) (48:18) | (31:20) (32:18) (33:11) | **transcript** (5:4) (5:9) | **wants** (29:11) (52:6) |
| (48:20) (48:23) (49:2) | (35:2) (37:9) (43:22) | (5:14) (5:16) (5:20) (6:3) | (59:9) |
| (49:7) (49:11) (49:19) | (54:24) | (60:4) (60:5) (61:21) | **was** (4:4) (9:19) (10:4) |
| (49:23) (49:24) (50:5) | **thing** (25:19) (44:6) | **tray** (57:3) | (10:7) (10:17) (10:23) |
| (50:6) (50:10) (50:20) | (53:17) (56:1) | **trial** (4:9) (4:10) | (12:9) (13:8) (13:13) |
| (50:21) (50:23) (50:24) | **things** (13:4) (24:2) | **trim** (48:15) (53:6) | (13:21) (13:23) (14:9) |
| (51:2) (51:3) (51:5) | (29:1) (33:24) (35:13) | **true** (60:6) (61:11) | (15:6) (15:16) (15:19) |
| (51:20) (51:22) (52:6) | (36:4) (47:15) (48:1) | **truthfully** (9:12) | (15:23) (16:1) (16:3) |
| (52:10) (52:13) (52:14) | (49:13) (49:21) (55:6) | **try** (33:24) (48:8) | (16:4) (16:11) (16:15) |
| (52:15) (52:18) (52:19) | (58:22) | **trying** (30:1) (33:2) | (16:19) (17:7) (17:9) |
| (52:20) (52:24) (53:1) | **think** (5:6) (9:8) (17:23) | (34:20) (58:3) (58:13) | (17:10) (17:13) (17:19) |
| (53:2) (53:3) (53:6) (53:8) | (19:4) (19:9) (19:16) | **two** (2:3) (7:11) (25:10) | (17:22) (18:6) (18:12) |
| (53:9) (53:10) (53:11) | (27:10) (29:6) (34:21) | (27:15) (27:23) (31:22) | (18:15) (18:23) (19:4) |
| (53:12) (53:14) (53:15) | | (34:7) (38:8) (42:12) | (19:9) (19:10) (21:9) |
| | | | (21:19) (24:12) (24:21) |
| | | | (25:22) (25:23) (26:10) |
| | | | (26:16) (26:17) (26:22) |

wasn't                                                                you

| | | | |
|---|---|---|---|
| (26:24) (27:7) (28:7) | (20:17) (20:18) (20:19) | **width** (38:9) | **would** (4:13) (6:23) |
| (28:8) (28:9) (28:16) | (21:4) (21:7) (21:12) | **wife** (7:11) | (9:10) (9:14) (14:7) |
| (28:22) (29:5) (29:6) | (21:14) (21:16) (22:9) | **will** (5:13) (5:15) (6:15) | (16:10) (17:14) (20:21) |
| (29:24) (30:8) (30:13) | (31:20) (31:24) (32:9) | (28:24) (33:4) (48:22) | (23:13) (28:20) (28:23) |
| (30:17) (30:21) (31:1) | (32:14) (32:15) (32:18) | **windows** (32:4) (43:22) | (28:24) (29:10) (31:13) |
| (31:4) (32:2) (32:3) | (32:23) (34:2) (34:22) | (47:1) | (31:14) (31:21) (32:11) |
| (32:20) (32:21) (33:1) | (35:2) (35:7) (35:8) | **windsor** (2:4) | (33:9) (33:23) (37:7) |
| (33:2) (33:12) (33:22) | (35:12) (35:23) (36:13) | **with** (5:18) (7:10) (7:20) | (37:13) (37:15) (37:17) |
| (34:9) (34:23) (34:24) | (36:21) (41:19) (42:10) | (12:10) (14:7) (16:20) | (37:18) (37:20) (38:2) |
| (35:3) (35:4) (35:6) | (42:20) (45:1) (45:7) | (16:22) (17:1) (17:13) | (38:6) (38:7) (38:14) |
| (35:10) (35:13) (35:14) | (47:2) (47:15) (47:21) | (18:4) (18:16) (18:23) | (38:17) (39:4) (39:12) |
| (35:15) (35:17) (35:19) | (47:22) (50:15) (53:2) | (19:12) (22:4) (23:1) | (40:10) (41:14) (41:18) |
| (35:21) (35:23) (36:4) | (53:3) (53:6) (56:6) | (24:7) (25:4) (26:23) | (42:3) (42:3) (42:5) |
| (36:12) (36:17) (36:22) | (56:15) (57:11) (57:23) | (27:8) (28:3) (30:5) (31:6) | (42:19) (43:1) (43:22) |
| (37:8) (37:12) (37:16) | **weymouth** (9:17) (27:22) | (31:11) (31:12) (34:7) | (44:24) (44:9) (44:16) |
| (38:5) (38:14) (38:16) | **what** (5:11) (5:17) (7:5) | (35:8) (35:20) (36:19) | (44:17) (45:5) (45:9) |
| (38:17) (38:18) (39:24) | (8:17) (8:21) (10:19) | (38:3) (38:10) (40:3) | (46:10) (46:17) (46:19) |
| (40:3) (40:5) (40:12) | (10:23) (11:9) (11:16) | (40:5) (41:3) (41:15) | (46:21) (47:11) (47:13) |
| (40:15) (40:24) (41:3) | (12:16) (12:24) (15:13) | (45:20) (46:8) (47:6) | (47:17) (48:3) (49:12) |
| (41:5) (41:10) (41:11) | (18:24) (20:1) (22:13) | (48:9) (49:21) (52:7) | (49:13) (49:21) (53:18) |
| (41:16) (41:22) (42:2) | (23:5) (23:20) (25:9) | (53:21) (54:7) (57:18) | (54:10) (54:12) (54:20) |
| (42:7) (42:12) (42:15) | (26:4) (26:7) (26:16) | (57:24) (58:17) (58:24) | (54:24) (55:2) (57:18) |
| (42:18) (42:24) (43:3) | (26:19) (27:20) (28:22) | (59:2) (60:6) | (57:21) (57:24) (58:2) |
| (43:6) (43:7) (43:10) | (29:1) (29:24) (30:13) | **withhold** (45:9) | (58:21) (58:22) (59:2) |
| (43:13) (43:14) (43:19) | (30:16) (30:17) (32:11) | **within** (1:20) (5:19) | (59:7) (59:8) |
| (44:7) (44:12) (44:13) | (34:20) (35:6) (35:10) | **without** (21:14) | **wouldn't** (44:5) |
| (44:14) (44:19) (44:20) | (35:14) (35:17) (36:17) | **witness** (61:6) (61:11) | **wrapping** (36:4) |
| (45:3) (46:5) (46:12) | (38:5) (38:14) (40:14) | (61:16) | **written** (12:7) (12:10) |
| (47:2) (47:3) (47:4) (47:6) | (43:7) (43:10) (44:19) | **wood** (8:2) (14:2) (20:17) | (31:10) (31:20) |
| (47:9) (47:12) (47:24) | (45:17) (46:1) (48:7) | (20:19) (20:24) (23:9) | **wyatt** (7:12) |
| (48:2) (48:5) (48:14) | (48:9) (49:14) (50:8) | (34:18) (54:5) (55:2) (55:3) | |
| (48:15) (48:16) (48:18) | (50:17) (51:9) (51:19) | **woodwork** (53:10) (53:11) | **Y** |
| (48:19) (48:20) (48:22) | (52:5) (52:10) (52:11) | (53:14) (53:15) (53:22) | |
| (48:24) (49:11) (49:14) | (53:17) (54:14) (56:9) | **worcester** (2:7) | **yeah** (9:3) (15:23) (19:9) |
| (49:15) (49:16) (49:22) | (57:16) (57:19) (57:21) | **word** (26:6) (40:12) | (53:3) |
| (49:24) (50:9) (50:13) | (57:22) (58:4) (58:14) | **words** (52:6) | **year** (12:22) (19:10) |
| (50:14) (50:17) (50:19) | (59:9) | **work** (13:5) (13:18) | (27:11) (27:21) (43:1) |
| (51:1) (51:2) (51:3) (51:4) | **whatever** (37:2) | (13:23) (14:1) (14:6) | (44:16) (44:21) (45:8) |
| (51:6) (51:8) (51:9) | **what's** (36:5) | (14:9) (14:10) (14:11) | (45:15) (45:17) (46:3) |
| (51:12) (51:13) (51:14) | **when** (13:20) (14:1) | (14:13) (16:9) (16:20) | (46:12) |
| (51:15) (51:19) (51:23) | (14:8) (15:1) (17:12) | (17:5) (17:11) (17:17) | **years** (9:8) (13:12) |
| (52:8) (52:10) (52:11) | (20:8) (22:17) (22:22) | (18:2) (18:16) (19:22) | (27:23) |
| (52:16) (52:19) (52:21) | (25:22) (29:15) (30:2) | (20:1) (21:15) (21:22) | **yes** (4:22) (5:21) (6:5) |
| (53:1) (53:9) (53:11) | (30:10) (30:14) (30:20) | (25:5) (25:6) (25:9) | (6:10) (6:13) (7:1) (7:20) |
| (53:12) (53:14) (53:18) | (31:9) (33:18) (34:14) | (26:11) (26:21) (27:2) | (7:24) (8:4) (8:16) (9:21) |
| (53:19) (53:20) (53:23) | (35:23) (36:4) (37:6) | (29:4) (29:11) (30:7) | (10:15) (10:18) (11:8) |
| (54:1) (54:3) (54:6) (54:9) | (39:15) (39:19) (39:20) | (30:8) (30:17) (31:13) | (11:20) (11:24) (12:6) |
| (54:11) (54:21) (54:23) | (40:17) (42:9) (42:15) | (32:5) (32:14) (33:17) | (12:9) (13:9) (13:17) |
| (56:9) (56:10) (56:11) | (43:10) (43:13) (43:16) | (33:18) (34:3) (34:4) | (13:21) (14:8) (14:18) |
| (56:14) (56:17) (56:18) | (43:20) (44:1) (44:10) | (34:6) (34:14) (35:7) | (14:22) (15:4) (16:10) |
| (56:20) (56:21) (57:12) | (45:18) (46:11) (46:21) | (35:9) (36:11) (38:13) | (16:17) (16:19) (16:22) |
| (58:4) (58:7) (58:10) | (47:8) (48:10) (48:23) | (38:21) (41:3) (41:15) | (17:6) (17:14) (18:6) |
| (59:3) (59:4) (59:5) | (48:24) (49:4) (49:11) | (42:1) (43:2) (43:11) | (19:21) (19:24) (20:11) |
| (59:10) (61:4) (61:6) | (49:12) (49:16) (50:1) | (43:16) (43:17) (44:10) | (21:21) (22:12) (23:11) |
| (61:8) (61:9) | (50:13) (50:14) (51:7) | (44:23) (46:3) (46:15) | (23:19) (24:24) (25:8) |
| **wasn't** (28:15) (37:4) | (51:8) (51:13) (51:22) | (46:22) (47:10) (47:19) | (28:2) (30:4) (30:6) (31:4) |
| (39:23) (40:13) (43:5) | (55:4) (56:4) (56:17) | (48:4) (48:11) (48:24) | (32:2) (32:17) (33:15) |
| (44:4) (46:19) (50:7) | (56:22) (57:2) (59:3) | (49:1) (49:5) (49:6) | (34:17) (34:20) (36:14) |
| (50:8) (52:7) | **whenever** (31:23) | (49:19) (50:5) (50:7) | (40:19) (42:22) (43:18) |
| **watch** (50:6) (50:7) | **where** (11:15) (12:18) | (53:6) (53:10) (56:19) | (44:24) (47:20) (47:24) |
| **water** (35:19) (36:6) | (13:5) (16:8) (16:11) | (56:20) (58:19) | (48:5) (51:1) (53:13) |
| (38:22) (39:1) (39:10) | (20:19) (44:4) (44:7) | **worked** (14:6) (14:19) | (54:6) (55:12) |
| (39:13) | (54:11) (59:14) | (16:22) (17:12) (17:23) | **you** (4:13) (4:16) (4:19) |
| **way** (2:3) (38:10) (38:16) | **whereof** (61:16) | (18:8) (24:11) (24:22) | (4:20) (4:23) (5:3) (5:6) |
| (45:23) (61:14) | **whether** (27:1) (51:6) | (31:9) (35:12) (42:9) | (5:7) (5:13) (5:15) (5:17) |
| **wayne** (4:15) | **which** (16:4) (24:8) | (44:1) (46:11) (47:8) | (5:20) (5:23) (6:2) (6:3) |
| **week** (25:23) (31:21) | (27:21) (39:7) | **workers** (33:6) | (6:6) (6:7) (6:9) (6:11) |
| (31:22) (42:13) | **while** (28:20) (32:14) | **working** (19:3) (24:24) | (6:14) (6:16) (6:18) (6:21) |
| **weeks** (31:22) (34:13) | (35:7) (42:14) (47:21) | (30:10) (30:14) (33:2) | (6:22) (6:23) (6:24) (7:2) |
| **weight** (59:15) | **who** (7:10) (19:2) (32:18) | (34:9) (41:10) (41:17) | (7:8) (7:10) (7:13) (7:18) |
| **well** (47:23) (57:1) | (33:2) (36:14) (47:10) | (41:21) (41:22) (42:3) | (7:21) (8:5) (8:8) (8:11) |
| **wellesley** (17:22) | (48:7) (50:8) | (46:13) (47:21) (47:22) | (8:14) (8:17) (8:19) (9:1) |
| **went** (16:8) (49:10) | **whole** (33:12) (37:17) | (48:11) (48:23) (49:21) | (9:5) (9:9) (9:14) (9:22) |
| (52:13) (52:20) (52:23) | (43:19) (45:17) | (50:1) (50:12) (56:7) | (10:1) (10:6) (10:8) |
| **were** (13:15) (14:16) | **why** (52:13) (52:16) | (56:18) (57:23) | (10:13) (10:19) (10:21) |
| (14:20) (15:24) (16:5) | (54:20) | **workmanship** (24:4) | |
| (16:7) (18:11) (20:15) | | | |

your                                                                    yup

```
(11:2) (11:5) (11:10)          (24:14) (29:19) (31:19)
(12:1) (12:4) (12:7)           (32:14) (33:17) (34:14)
(12:12) (12:14) (12:20)        (36:21) (38:11) (38:24)
(13:5) (13:10) (13:15)         (39:1) (41:5) (42:19)
(13:18) (13:24) (14:1)         (43:2) (45:12) (45:13)
(14:5) (14:11) (14:16)         (46:1) (46:9) (47:10)
(14:19) (14:20) (15:1)         (47:18) (48:24) (49:5)
(15:8) (15:10) (15:17)         (52:8) (57:4) (58:19)
(15:20) (16:8) (16:11)         you're  (19:12)
(16:18) (16:20) (17:1)         yours   (28:21)
(17:12) (17:16) (17:17)        yudysky  (1:22) (2:17)
(18:1) (18:2) (18:4) (18:8)    yup  (53:18)
(18:18) (19:2) (19:7)
(19:15) (19:18) (19:20)
(19:22) (20:4) (20:8)
(20:9) (20:19) (20:21)
(21:2) (21:7) (21:11)
(21:22) (22:3) (22:4)
(22:17) (22:18) (22:21)
(22:22) (23:14) (23:22)
(24:5) (24:11) (24:15)
(24:22) (24:23) (25:2)
(25:6) (25:9) (25:14)
(25:17) (26:1) (26:4)
(26:5) (26:7) (26:8)
(26:14) (26:20) (27:1)
(27:5) (27:8) (27:15)
(28:3) (28:5) (28:13)
(28:19) (29:9) (30:2)
(30:5) (30:7) (30:10)
(30:14) (31:9) (31:10)
(31:16) (31:19) (31:24)
(32:5) (32:9) (32:11)
(32:14) (33:4) (33:6)
(33:17) (34:2) (34:8)
(34:14) (34:18) (35:7)
(35:23) (36:2) (36:11)
(36:12) (36:22) (37:11)
(37:13) (37:21) (38:4)
(38:6) (38:8) (38:13)
(38:16) (38:17) (38:21)
(38:22) (38:24) (39:8)
(39:9) (39:15) (39:16)
(39:19) (39:20) (39:21)
(40:2) (40:3) (40:7)
(40:17) (40:20) (41:15)
(41:23) (41:24) (42:1)
(42:9) (42:10) (42:20)
(43:1) (43:10) (43:11)
(43:15) (43:24) (44:1)
(44:9) (44:10) (44:22)
(45:1) (45:7) (45:11)
(45:14) (45:17) (45:19)
(45:22) (46:2) (46:3)
(46:8) (46:11) (46:13)
(46:15) (46:21) (46:22)
(47:3) (47:8) (47:11)
(47:21) (48:10) (48:19)
(48:23) (49:4) (49:6)
(49:15) (49:18) (50:4)
(50:10) (50:15) (50:22)
(51:6) (51:7) (51:11)
(51:19) (51:22) (52:13)
(52:14) (52:18) (52:20)
(52:24) (53:1) (53:17)
(54:3) (54:8) (54:10)
(54:20) (55:4) (55:12)
(55:14) (55:15) (55:22)
(56:2) (56:4) (56:7)
(56:15) (56:22) (57:2)
(57:3) (57:11) (57:16)
(58:3) (58:5) (58:9)
(58:12) (58:18) (59:5)
your  (4:13) (4:16) (4:20)
(5:11) (5:24) (6:11) (7:5)
(8:11) (9:10) (9:14)
(11:18) (13:8) (14:7)
```

EXHIBIT 8

District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,

      Plaintiff

        vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,

      Defendants

        vs.

Heatmaster, Inc.,

      Third-Party Defendant

**DEPOSITION OF JULIE A. PAVIA,** a witness called on behalf of the Defendant Falco Construction Corp., pursuant to the Federal Rules of Civil Procedure, before Jessica L. Bisaillon, a Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Morrison Mahoney, LLP, 250 Summer Street, Boston, Massachusetts 02210, on Thursday, February 16, 2006, commencing at 11:30 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

2

A P P E A R A N C E S :

The Law Offices of Stuart G. Blackburn
   BY:  Erik Loftus, Esquire
   Two Concorde Way
   Post Office Box 608
   Windsor Locks, Connecticut 06096
   Appearing on behalf of the Plaintiff and
   the deponent

Toomey & Yudysky, LLP
   BY:  David J. Crowley, Esquire
   99 Summer Street
   Boston, Massachusetts 02110
   Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
   BY:  Curtis L.S. Carpenter, Esquire
   250 Summer Street
   Boston, Massachusetts 02210
   Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
   BY:  Robert T. Turner, Esquire
   27B Midstate Drive, Suite 100
   Auburn, Massachusetts 01501
   Appearing on behalf of Michael Carresi,
   d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
   BY:  Scott T. Ober, Esquire
   484 Main Street, Suite 560
   Worcester, Massachusetts 01608
   Appearing on behalf of Heatmaster, Inc.

---

3

I N D E X

DEPOSITION OF:             PAGE

JULIE A. PAVIA

Examination by Mr. Crowley      4
Examination by Mr. Ober       103
Examination by Mr. Turner     110
Examination by Mr. Carpenter   122
Reexamination by Mr. Crowley   127

E X H I B I T S

EXHIBIT NO.               PAGE

(Falco Construction Corp.)

1  Correspondence dated 7/11/00 from   16
   P. & D. Builders, Inc., Page 1; a total
   of one page.

2  Correspondence dated 7/11/00 from   19
   P. & D. Builders, Inc., Page 2; a total
   of one page.

3  Correspondence dated 12/17/01 from  23
   P. & D. Builders, Inc.; a total of two
   pages.

4  proposal dated 8/28/00 from      38
   P. & D. Builders, Inc.; a total
   of one page.

5  Typewritten letter; a total of one page.  93

** The original exhibits were retained by the stenographer and have been attached hereto.

---

4

1             **JULIE A. PAVIA,** after having been

2  satisfactorily identified by the production of a

3  Massachusetts driver's license and having been

4  duly sworn by the Notary Public, was examined

5  and testified as follows:

6          MR. CROWLEY:  Want to have the usual

7  stipulations for objections?

8          MR. LOFTUS:  Yes.

9          MR. CROWLEY:  So counsel have agreed

10  to save all objections except as to the form of

11  the question until the time of trial, save all

12  motions to strike until the time of trial.

13         **EXAMINATION BY MR. CROWLEY:**

14  Q.  Ma'am, would you please state your full name?

15  A.  Julie Ann Pavia.

16  Q.  As you know, my name is David Crowley, and I

17      represent Joseph Falco in this case.  Are you

18      being represented by counsel today?

19  A.  Yes.

20  Q.  And who is representing you?

21  A.  Erik.

22         MR. LOFTUS:  Loftus.

23  A.  Loftus.

24  Q.  And when did you retain Mr. Loftus to represent

5

```
1       you in this case?
2   A.  Mr. Loftus works for Fireman's Fund, who is my
3       insurance company.
4   Q.  And your insurer has agreed to provide you with
5       counsel today?
6   A.  Yes.
7   Q.  Have you ever been to a deposition before?
8   A.  Yes.
9   Q.  How many times?
10  A.  Once.
11  Q.  Are you familiar with the ground rules for
12      depositions?
13  A.  I think so.
14  Q.  Just to remind you, your testimony today is under
15      oath, and it will be question and answer format.
16      So if you would respond verbally so that the
17      record is clear, that would be helpful.
18          Also, if you could, remember to wait for
19      me to finish my question before you start to
20      answer so the record is clear, we're not talking
21      over one another.
22          If at any time you need to take a break
23      or you want to consult with your lawyer, please
        let us know.
```

6

```
1   Q.  Do you understand the ground rules?
2   A.  Yes.
3   Q.  Also, if during the deposition you don't know the
4       answer to a question, please let me know.  We
5       don't want you to speculate, we don't want you to
6       guess.  So that if you answer my question, I'm
7       going to assume that you aren't guessing or
8       speculating unless you tell us that you are.
9   A.  Okay.
10  Q.  And if you don't remember something but you can
11      give me your best estimate or your best memory of
12      the event, I would ask you to do that.  Do you
13      understand?
14  A.  Yes.
15          MR. CROWLEY:  And, Mr. Loftus, since
16      you're representing her, I'll ask you.  Does the
17      deponent want to read and sign her deposition?
18          MR. LOFTUS:  She'll waive the reading.
19          MR. CROWLEY:  Okay.
20  Q.  Ma'am, have you ever been known by any other
21      name?
22  A.  Julie Ann Penfil.  My maiden name.
23  Q.  And how do you spell your last name, maiden name?
24  A.  Current -- maiden?  P, as in Peter, e-n, f as in
```

7

```
1       Frank, i-l.
2   Q.  Where do you live?
3   A.  At 104 Hammondswood Road, Chestnut Hill,
4       Massachusetts.
5           MR. CROWLEY:  Off the record.
6           (Off the record.)
7           (Attorney Turner enters the
8       proceedings.)
9           MR. CROWLEY:  We're ready to go back
10      on the record.
11  Q.  How long have you lived at that address?
12  A.  It will be six years on July 5th.
13  Q.  Whom do you live with?
14  A.  My two daughters.
15  Q.  And what are their names and ages?
16  A.  Rachel is 18.  Same last name as mine.  And Mara,
17      M-a-r-a, is 16.  Same last name.
18  Q.  And you received a subpoena to require you to
        testify here today?
19  A.  Yes.
20  Q.  And do you understand that this matter involves a
21      fire at your home in January of 2004?
22  A.  Yes.  2004?  Yes.
23  Q.  Did the fire occur at your home in January of
```

8

```
1       2004?
2   A.  Yes.  Yes, it did.
3   Q.  Do you have any agreements with Fireman's Fund,
4       your insurer, to cooperate with the litigation in
5       this case?
6   A.  I don't understand the question.
7   Q.  Well, do you have any agreement, any written
8       agreement with Fireman's Fund Insurance Company
9       about cooperating with their claim?
10  A.  No.
11  Q.  Before today, have you ever given a written
12      statement to anybody concerning the fire at your
13      home?
14  A.  Again, I don't -- can you specify?
15  Q.  Well, --
16  A.  I mean, I have written down things that I've
17      given to Fireman's Fund in order to get money,
18      but I don't have any agreement signed with them.
19  Q.  My question is a little different.
20          Have you ever given Fireman's Fund a
21      written statement about the fire at your home in
22      January of 2004?
23  A.  No.
24  Q.  Have you ever given a recorded statement, an oral
```

**9**

1      statement that was recorded, --
2 A. No.
3 Q. -- to Fireman's Fund Insurance Company?
   A. No.
5 Q. Have you taken any prescription medication today?
6 A. Mind enhancers? No.
7 Q. Any prescription medication?
8 A. For my thyroid, yes.
9 Q. Do you have any reason to believe that that
10      medication will impair your ability to recall or
11      testify today?
12 A. No.
13 Q. Are you aware of any reason that you cannot
14      understand my questions and testify truthfully
15      today?
16 A. No.
17 Q. Are you presently employed?
18 A. Yes.
19 Q. Where do you work?
20 A. For myself. I'm an interior designer.
21 Q. Does it have a business name?
22 A. Yes. Architectural Interiors Groups,
23      Incorporated.
   Q. Where is that business located?

**10**

1 A. At my home address.
2 Q. How long have you been operating that business?
3 A. Twelve years.
4 Q. Were you operating the business out of your home
5      at the time of the fire?
6 A. Yes.
7 Q. Are you claiming any loss to your business as a
8      result of the fire at your home?
9 A. No.
10 Q. Who lived at your home when P. & D. Builders
11      performed work at the property?
12 A. The first time? Before the fire?
13 Q. Prior to the fire.
14 A. Myself, my two children, and my ex-husband.
15 Q. And what is your ex-husband's name?
16 A. Michael Pavia.
17 Q. And where does Mr. Pavia live?
18 A. I could give you what I think is his current
19      address in Boston. I know that right now he's at
20      his home in Tortola.
21 Q. He has an address here in Boston?
22 A. Yes.
23 Q. And what is that address?
24 A. 154 West Canton Street, and that's in Boston.

**11**

1      And I can't guarantee that he still owns that
2      home. He may have sold it. And I don't know the
3      new address.
4 Q. That is Mr. Pavia's last known address?
5 A. Yes.
6 Q. Is that -- was that his primary residence, the
7      address in Boston?
8 A. I would love to tell you yes, but I don't really
9      know.
10 Q. Where does Mr. Pavia work?
11 A. Oxford Bioscience.
12 Q. And where is that located?
13 A. In Boston.
14 Q. Do you know Paul Rothschild?
15 A. No.
16 Q. Are you familiar with a company known as P. & D.
17      Builders?
18 A. Yes. But his name is Phillip.
19 Q. Oh. Are you familiar with Phillip Rothschild?
   A. Absolutely.
21 Q. And how do you know him?
22 A. He has been my contractor for 11 years, and I
23      work with him at -- doing design work.
24 Q. You work with Mr. Rothschild as part of your

**12**

1      business?
2 A. Yes.
3 Q. How long have you had a business relationship
4      with him?
5 A. Eleven years. As long as I've known him.
6 Q. Are you related to Mr. Rothschild?
7 A. Thirteen generations ago.
8 Q. What do you mean by that?
9 A. His great-great-grandfather was cousins with my
10      great-great-grandmother's father. Somewhere way
11      back there.
12 Q. How did you discover that familial relationship?
13 A. He brought over his family tree.
14 Q. And coincidentally you were related 13
15      generations ago?
16 A. Yes.
17 Q. Do you continue to do business with Mr.
18      Rothschild?
19 A. Absolutely.
20 Q. And do you refer him work?
21 A. Yes.
22 Q. Are you working on any project with Mr.
23      Rothschild at this time?
24 A. Yes.

13

1  Q. What project is that?

2  A. Bathrooms at one of my design client's house.

3  Q. Are you working on more than one project with

4     him?

5  A. Currently, no.

6  Q. Approximately how many projects have you referred

7     to Mr. Rothschild over the past 11 years?

8  A. A dozen. I'm not really sure how many.

9  Q. Would your best estimate be 12?

10 A. Yeah.

11 Q. When did you purchase the property that you live

12    in now?

13 A. The closing date was six years ago, July 5th.

14 Q. Did you have any contractors work at the property

15    between the time that you purchased it and the

16    first time that P. & D. Builders began its work

17    at the property?

18 A. No.

19 Q. When did you first hire P. & D. Builders to work

20    there?

21 A. Probably the middle of June. Same year.

22 Q. Would that have been June of 2000?

23 A. Yes.

    Q. And how did you decide to hire P. & D.?

14

1  A. He worked for me previously.

2  Q. Through your business relationship?

3  A. No. On a personal level, and then through

4     business.

5  Q. What work had P. & D. Builders done for you

6     personally prior to June of 2000?

7  A. In our last house, they redid two bathrooms.

8  Q. Was that the property that you moved from --

9  A. Yes.

10 Q. -- prior to purchasing this property?

11 A. Yes.

12 Q. And where was that located?

13 A. 8 Exmoor Road, Newton Center.

14 Q. Did you have any other contractors look at the

15    property before you hired P. & D. to do the work?

16 A. The current property or the past property?

17 Q. The current property at 104 Hammondswood.

18 A. No.

19 Q. What work did you hire P. & D. Builders to do at

20    104 Hammondswood in June of 2000?

21 A. Total remodel of the house. Let's see. Four and

22    a half bathrooms, living room, family room, which

23    we built from the ground up, dining room,

24    bedrooms.

15

1  Q. Was there an addition to be built on the house as

2     well?

3  A. Yes.

4  Q. What rooms were part of that addition?

5  A. The family room and the office.

6  Q. When you hired P. & D. to do the work in June of

7     2000, was there any electrical work as part of

8     that?

9  A. Yes.

10 Q. What electrical work was scheduled to be done?

11 A. Well, we needed all the electric brought up in

12    the addition.

13 Q. You needed to update the electrical wiring in the

14    house?

15 A. No. If we opened walls, yes. We didn't open any

16    walls in any of the other rooms other than the

17    bathrooms, and the electrical was replaced in

18    there.

    Q. The addition to the home, was there something

       demolished to --

21 A. Yes.

22 Q. If you'll let me finish my question, please.

23       Was there something demolished so that

24    the addition could be built onto the home?

16

1  A. Yes.

2  Q. What was that?

3  A. It was -- in the '40s, a Florida room was put in.

4     And the prior owners had gotten water damage to

5     the roof, and in doing so, we had carpenter ants

6     that had eaten out the side of the structure. So

7     that had to be razed to ground level and built

8     back up.

9        (Whereupon, Exhibit 1 was marked for

10    identification.)

11 Q. I show you what's marked as Exhibit 1 for the

12    deposition. Do you recognize that document?

13 A. Okay.

14 Q. Are you familiar with Exhibit 1?

15 A. Yes, I'm familiar with it.

16 Q. And what is it?

17 A. This is an original layout of work to be done.

18 Q. Is it fair to refer to Exhibit 1 as P. & D.'s

19    original estimate for the work to be done --

20 A. Yes.

21 Q. -- in 2000 at your property?

22 A. Yes.

23 Q. If you look on Exhibit 1, toward the bottom of

24    the page there's a section entitled "Work Not

**17**

1       Covered."  Do you see that?

2 A.   Yes.

3 Q.   And one of the items, No. 4, states "No

4       fireplaces."  Do you see that?

5 A.   Yes.

6 Q.   What does that refer to?

7 A.   That refers to the existing fireplaces in the

8       house, which were one in the living room and one

9       in the basement and one in the bedroom.

10 Q.   So that excluded from P. & D.'s scope of work was

11      the work on the fireplaces at the property?

12 A.   At this point.

13 Q.   When it was the original estimate?

14 A.   Yes.

15 Q.   When you hired P. & D. Builders, did you have any

16      discussion with Mr. Rothschild about the

17      subcontractors he was going to use on the job?

18 A.   I knew most of them.

19 Q.   Had you ever dealt with Joseph Falco prior to

20      this job?

21 A.   No.

22 Q.   What subcontractors that Mr. Rothschild intended

23      to hire had you dealt with prior to this project?

24 A.   The electrician, the plumber and heating, the

**18**

1       carpenters, tile.

2 Q.   Who was the electrician?

3 A.   It was Michael Mahoney (phonetic).  I think

4       that's his last name.

5 Q.   Had you dealt with Mr. Mahoney professionally

6       before this project?

7 A.   Yes.

8 Q.   And who was the plumber?

9 A.   Michael Carresi.

10 Q.   Had you ever dealt with Mr. Carresi

11      professionally before this project?

12 A.   Yes.

13 Q.   Did P. & D. Builders hire the subcontractors to

14      work at the project?

15 A.   Yes.

16 Q.   Did you hire any of your subcontractors to work

17      at the project?

18 A.   No.

19 Q.   Had Mr. Carresi ever performed any work for you

20      at your home prior to June of 2000?

21 A.   At the Exmoor address?  Yes.

22 Q.   Had Mr. Carresi performed work at any of your

23      homes prior to June of 2000?

24 A.   Yes, yes.

**19**

1 Q.   He had worked at the Exmoor address?

2 A.   Yes.

3 Q.   And what work had he done there?

4 A.   I redid two bathrooms.

5 Q.   And he was the plumber for that?

6 A.   Yes.

7          (Whereupon, Exhibit 2 was marked for

8      identification.)

9 Q.   Ma'am, I show you what has been marked as

10      Exhibit 2.  Do you recognize that document?

11 A.   I don't remember this, but I'm sure that it was

12      somewhere.  There's a lot that has happened in my

13      life since I've seen these papers.

14 Q.   Exhibit 2 is a list of items from Mr. Rothschild?

15 A.   Uh-huh.

16 Q.   Is that fair to say?

17 A.   Yes.

18 Q.   And you believe that you've seen it before; --

19 A.   Yes.

20 Q.   -- is that correct?

21          Do you know when Exhibit 2 was created?

22 A.   No.

23 Q.   Okay.  Is it fair to say that it was created

24      sometime after the work at your property at 104

**20**

1       Hammondswood Road was started?

2 A.   Yes.

3 Q.   If during the deposition today I refer to 104

4       Hammondswood Road as the subject property, will

5       you understand what I'm talking about?

6 A.   Yes.

7 Q.   If you look on Exhibit No. 2, down at letter "S,"

8       it states "Office - Line 1, what fireplace -

9       plumber."  Do you see that?

10 A.   Uh-huh.  Yes.

11 Q.   Do you know what that refers to?

12 A.   My ex-husband decided he wanted a fireplace put

13       in.

14 Q.   Where did your ex-husband want the fireplace to

15       go?

16 A.   In a corner.

17 Q.   Would that be in the addition?

18 A.   Yes.

19 Q.   What --

20 A.   The second floor of the addition.

21 Q.   What room is located on the second floor of the

22      addition?

23 A.   The office was located on the second floor of the

24      addition.

21

1  Q.  Okay.  And when did your husband decide that he
2      wanted a fireplace put in in the second floor of
3      the addition?
4  A.  Long after construction for that room had
5      started.
6  Q.  Was the construction of the office almost
7      completed when your husband wanted the second
8      floor --
9  A.  No.
10 Q.  Let me finish my question.
11 A.  The exterior was completed.
12 Q.  The exterior of the addition was completed when
13     your husband decided that he wanted a fireplace
14     put in in the office?
15 A.  Yes.
16 Q.  Had the construction of the interior of the
17     office been started when your husband decided
18     that he wanted a fireplace put in?
19 A.  No.
20 Q.  And what type of fireplace did your husband want
21     put in?
22 A.  We got an antique mantle.  And because the
23     second-floor addition was on an exterior wall, he
        wanted the antique wood fireplace and brick

22

1      surrounding it, but he wanted gas logs.
2  Q.  And that was your husband's request?
3  A.  Yes.
4  Q.  When you had a conversation with your husband
5      about the gas fireplace, did you go to Mr.
6      Rothschild about having it installed?
7  A.  Yes.
8  Q.  And do you recall when that occurred, when you
9      first went to Mr. Rothschild to discuss having a
10     gas fireplace put in the office?
11 A.  Are you talking time line?
12 Q.  Approximate date.
13 A.  No, I don't remember.
14 Q.  Was it sometime during 2000?
15 A.  Yes.
16 Q.  And how do you know that?
17 A.  Because that's when the majority of the
18     construction in the house was being done.
19 Q.  Do you recall when the construction of the
20     addition was completed?
21 A.  No.
22 Q.  Do you know the year that it was completed?
23 A.  No.
24 Q.  After Mr. Rothschild sent you Exhibit 1, his

23

1      original estimate for the work at the property,
2      was the scope of the work there expanded?
3  A.  Yes.
4  Q.  So there was additional work that you wanted to
5      have done at the subject property?
6  A.  Yes.
7  Q.  Okay.  What additional work did you want done?
8  A.  We put an exercise room in on one side of the
9      basement with a sauna.
10 Q.  What other work?
11 A.  I think that's it.
12            (Whereupon, Exhibit 3 was marked for
13     identification.)
14 Q.  I'm going to show you what has been marked as
15     Exhibit 3 for the deposition.  Do you recognize
16     that document?
17 A.  Yes.
18 Q.  Is that P. & D. Builders' final invoice to you
       for the initial project that was done at the
       subject property?
21 A.  Probably not.
22 Q.  Why do you say probably not?
23 A.  Maybe it was.  I don't remember.  Okay.  Yes.
24     I -- I needed to look at the final numbers.

24

1  Q.  Have you had an opportunity to review Exhibit 3?
2  A.  Yes.
3  Q.  And it's a two-page document?
4  A.  Yes.
5  Q.  It's dated December 17th, 2001?
6  A.  Yes.
7  Q.  And the first page is a letter from P. & D.
8      Builders to Michael and Julie Pavia; is that
9      correct?
10 A.  Yes.
11 Q.  And the first line of the first page, it states,
12     "The following final figures are for the end of
13     your long project from 7/6/00 through 12/14/01."
14     Did I read that correctly?
15 A.  Yes.
16 Q.  After reviewing the first page of Exhibit 3, does
17     it help your memory as to when the project at the
18     subject property began?
19 A.  I knew when this property -- when the -- at the
20     subject property when the project began.
21 Q.  So you recall that it was July the 6th of 2000?
22 A.  Yes.
23 Q.  And does reviewing Exhibit 3 refresh your memory
24     as to when that project ended?

25

1  A.  I guess.

2  Q.  I don't want you to guess.

3  A.  I -- this is what it says, so I'm assuming that

4      that's correct.

5  Q.  Do you have any memory that it went beyond

6      12/14/01?

7  A.  Yeah.  I thought it went until October of '01.

8  Q.  So that your memory is that the project ended

9      prior to December of 2001?

10 A.  No.  This is correct.  This is correct.  I'm

11     getting my time lines a little messed up here,

12     so...

13 Q.  I just want you to give me your best memory.  And

14     my question was, after reviewing Exhibit 3, does

15     it refresh your memory --

16 A.  Yes.

17 Q.  -- as to when the project ended?

18 A.  Yes.

19 Q.  And is your memory consistent with the

20     information in Exhibit 3?

21 A.  Yes.

22 Q.  The project ended in December of 2001?

23 A.  Yes.

24 Q.  And after looking at Exhibit 3, does it help your

26

1      memory as to when the gas log fireplace was

2      installed in the office at the property?

3  A.  No.

4  Q.  But it would be fair to say that it was done

5      sometime prior to December of 2001?

6  A.  Yes.

7  Q.  Do you know how much time prior to December 2001

8      it was when the gas log was installed at the

9      property?

10 A.  Probably close to a year.

11 Q.  So that your best estimate would be that the gas

12     log was installed at the property sometime during

13     December of 2000?

14 A.  Sometime between December of 2000 and March or

15     April or May of 2001.

16 Q.  Sometime during that --

17 A.  Yes.

18 Q.  -- time period?

19        And on the second page of Exhibit 3,

20     there are some numbers for the project; is that

21     correct?

22 A.  Yes.

23 Q.  And the final total for the work that P. & D.

24     Builders did on the first project was

27

1      $508,999.44?

2  A.  Yes.

3  Q.  Was that substantially more than the original

4      estimate that P. & D. had given you?

5  A.  Yes.

6  Q.  And the increase was due to the installation of

7      the gym in the basement at the house?

8  A.  I don't know how many of you know construction

9      well, but you can be given an initial cost, and

10     you always have to add at least a third onto that

11     to come up with something more realistic.

12        I think it was due to the time frame and

13     the finished product more than just the gym.

14 Q.  What do you mean by the time frame and the

15     finished product?

16 A.  Well, it took a year and a half.  Labor costs go

17     up, materials costs go up.

18 Q.  When the work began at the project, was there an

19     estimate given as to how long it would take?

20 A.  No.

21 Q.  Did you expect the work to be completed in a

22     shorter period of time --

23 A.  No.

24 Q.  -- than 18 months?

28

1        Is it fair to say the gas log fireplace

2      that was installed was not part of the original

3      scope of work for that job?

4  A.  According to the document, yes.

5  Q.  Is that consistent with your memory?

6  A.  Sure.

7  Q.  Is that a yes?

8  A.  Yes.

9  Q.  Did P. & D. Builders actually do any of the

10     construction work at the project?

11 A.  They did all of the construction work at the

12     project.

13 Q.  They self-performed some of the work?

14 A.  Their carpenters, his subcontractors.

15 Q.  Are you familiar with the term "general

16     contractor"?

17 A.  Yes.

18 Q.  What is your understanding of that term?

19 A.  I, as a designer, am usually the general

20     contractor on the jobs that I do, so I'm very

21     familiar with the term.  It's somebody who runs

22     the job.

23 Q.  Somebody who supervises the work of the

24     subcontractors?

29

```
1  A.  Yes.
2  Q.  And coordinates the work with the subcontractors?
3  A.  Yes.
   Q.  And as I understand it, P. & D. Builders did more
5      than act as the general contractor on this job?
6  A.  Yes.
7  Q.  They actually did some of the carpentry work?
8  A.  Yes.
9  Q.  Did they do any other work at the project?
10 A.  Are you defining his subcontractors as working
11     for P. & D., or are you defining them as having
12     their own businesses?
13 Q.  That's a good question.  The subcontractors, as
14     you call them, they didn't work directly for
15     P. & D., did they?
16 A.  I paid P. & D. Builders, and the money was
17     disbursed through P. & D. Builders.
18 Q.  When you typically act as a general contractor in
19     your business, do the subcontractors work for
20     you?
21 A.  On my design jobs, yes, the subcontractors work
22     for me.
23 Q.  And you're responsible for supervising their
      work?
```

30

```
1  A.  Yes.
2  Q.  I think my question was, other than the carpentry
3      work at the project, did P. & D. self-perform any
4      of the construction work?
5  A.  And again, I ask you, does that mean Phil
6      Rothschild himself, or does that mean the
7      subcontractors?  It's a difficult question to
8      answer when it's being asked that way.
9  Q.  Well, did Mr. Rothschild, P. & D. Builders, have
10     employees that worked at the jobsite?
11 A.  I am thinking that only the carpenters are his
12     employees, so therefore I would assume it not on
13     that question, did P. & D. --
14 Q.  Your understanding is that the carpenters worked
15     as employees for P. & D. Builders?
16 A.  Yes.
17 Q.  And who were the carpenters at the project?
18 A.  For the most part it was David Petronelli and
19     Charles Gubbins.  They were the finish
20     carpenters.  Mike Roach, Mike Conte, and Jim
21     O'Connell were rough carpenters.
22 Q.  Mike Roach, Mike Conte, and Jim O'Connell also
23     worked at the project?
24 A.  Yes.
```

31

```
1  Q.  Were there any other carpenters who worked at the
2      project?
3  A.  No.
4  Q.  And P. & D. Builders hired the subcontractors to
5      work at the project?
6  A.  Yes.
7  Q.  Did you have to approve the subcontractors before
8      they were allowed to work at the project?
9  A.  No.
10 Q.  Did you have any role at all in hiring any of the
11     subcontractors to work at the subject property?
12 A.  The painters, yes.
13 Q.  What company did the painters work for?
14 A.  Folan.
15 Q.  F-o-l-e-n?
16 A.  F-o-l-a-n.
17 Q.  Did you hire any of the other subcontractors at
18     the project?
   A.  No.
   Q.  You relied on P. & D. Builders to do that for
21     you?
22 A.  Yes.
23 Q.  Okay.  After the addition was built onto your
24     home, were you able to access the addition from
```

32

```
1      inside the house?
2  A.  Yes.
3  Q.  What room would you have to walk through to
4      access the first-floor addition?
5  A.  The front hall.
6  Q.  Where was the kitchen located in reference to the
7      new addition?
8  A.  There's the hall and the living room between.
9      They're on separate sides of the house.
10 Q.  There was the front hall and living room
11     between the kitchen --
12 A.  And dining room.  Excuse me.
13 Q.  There was the front hall and dining room between
14     the addition to the home and the kitchen?
15 A.  Yes.
16 Q.  The addition to the home was put on the rear of
17     the house?
18 A.  Yes.
19 Q.  Did the addition that was put on take up the
20     entire rear portion of the house?
21 A.  No.
22 Q.  Was the kitchen also located at the rear of the
23     house?
24 A.  The front and rear.  But the addition doesn't
```

33

1    touch the kitchen.

2    Q.   You indicated that the kitchen and the addition
3         were at opposite --

4    A.   Opposite sides of the house.

5    Q.   As you're facing the subject property, what side
6         of the rear of the home was the addition on?

7    A.   From the front or the back?  As I'm facing the
8         house from the --

9    Q.   Facing toward the front of the house.

10   A.   The -- the addition was put onto the right-hand
11        side.

12   Q.   So if you're facing the front of the house, the
13        kitchen runs from the front of the house to the
14        back of the house on the left-hand side?

15   A.   Correct.

16   Q.   Did you have any role in supervising the progress
17        of the work during P. & D.'s job back in 2000,
18        2001?

19   A.   If you mean spurring it on, yes.

20   Q.   What do you mean by spurring it on?

21   A.   Asking them to get things done faster.

22   Q.   And how would you do that?

23   A.   By calling them and nagging them.

24   Q.   Did you have a specific contact person that you

34

1    would nag?

2    A.   Phil.

3    Q.   Mr. Rothschild?

4    A.   Yes.

5    Q.   Were you working out of your home during 2000,
6         2001?

7    A.   Yes.

8    Q.   So you were at home most days when the
9         construction work was ongoing?

10   A.   Some -- some days.

11   Q.   Did you have work that required you to be out of
12        the house during that time period, 2000, 2001?

13   A.   Yes.

14   Q.   What type of work would that be?

15   A.   Design and children.

16   Q.   You would have to go to your clients' homes to
17        design things?

18   A.   Yes.

19   Q.   Did you keep any type of journal or written log
20        as to the progress of the work --

21   A.   No.

22   Q.   -- that P. & D. did?

23        The nagging that you referred to, did you
24        ever do that in writing?

35

1    A.   No.

2    Q.   Those were phone calls?

3    A.   Yes.

4    Q.   Did you ever require Mr. Rothschild to give you
5         written updates as to the status of the progress
6         of the work?

7    A.   No.

8    Q.   Back in 2000, 2001, would you inspect the
9         progress of the work that was being done on a
10        daily basis?

11   A.   Can you give me a definition of inspect?  Part of
12        it was design work.  So there were areas that I
13        was working with them as far as design went.  But
14        inspecting as far as what they had accomplished,
15        no.

16   Q.   Did you do some design work for that project?

17   A.   Absolutely.

18   Q.   What design work did you do?

19   A.   The entire project.

20   Q.   Did you produce any drawings to Mr. Rothschild?

21   A.   No.

22   Q.   When you say that you designed the entire
23        project, what did you do to design?

24   A.   I've worked with all these guys before.  I picked

36

1    out the marble that was going in the bathrooms or
2    granite that was going in the bathrooms.  I chose
3    the granite that was going on the counters in the
4    kitchen, which is the only work that was done in
5    the kitchen at the time.  I decided which pieces
6    of wood needed to go as mouldings so that they
7    matched the original moulding to the house.

8    Q.   So you picked out the materials for the project?

9    A.   Yes.

10   Q.   Did you have to do any type of design work
11        relating to the construction of the addition?

12   A.   Yes.  We -- I designed the staircase going up to
13        the second floor and the staircase going down to
14        the first floor of the addition.

15   Q.   What was the exterior of the addition made out
16        of?

17   A.   When it was built or previously?

18   Q.   After the addition was built.

19   A.   Brick.

20   Q.   Did you specify what type of brick you wanted
21        used on the exterior of the house?

22   A.   Something that would match 80-year-old brick that
23        was already on the house.

24   Q.   And who purchased the materials, the bricks that

37

```
 1      were used on the exterior of the building?
 2  A.  I don't know.  I don't know if it was P. & D. or
 3      Joe Falco.
 4  Q.  It wasn't you?
 5  A.  No.
 6  Q.  Going back to the layout of your home, can you
 7      estimate for me how much distance there is in
 8      terms of feet between the addition to your home
 9      and the kitchen to your home?
10  A.  Probably 20.
11  Q.  Would that be your best estimate?
12  A.  That's linear.  But you have to turn corners to
13      get there.
14  Q.  So as the crow flies, so to speak, it's about 20
15      feet between the addition to your home and the
16      kitchen?
17  A.  Yes.
18  Q.  But there is no direct-line access from the
19      addition to the kitchen?
20  A.  No.
21  Q.  Did you ever sign any type of agreement with
22      P. & D. Builders, a written contract for the
23      construction of the home and the addition back in
24      2000, 2001?
```

38

```
 1  A.  Not that I'm aware of.
 2              (Whereupon, Exhibit 4 was marked for
 3      identification.)
 4  Q.  Ma'am, I'm going to show you what's been marked
 5      as Exhibit 4 to the deposition.  It appears to be
 6      a proposal from P. & D. Builders, Inc. dated --
 7  A.  Right.
 8  Q.  -- August 28th, 2000.  Do you recognize that?
 9  A.  Yes.
10  Q.  What does the Exhibit 4 relate to?
11  A.  I -- you're saying it's a contract.
12  Q.  No.  I'm not saying it's anything.  I'm asking
13      you what you recognize it as.
14  A.  I recognize it as a demand from my ex-husband
15      that there be something in writing that we
16      signed.
17  Q.  Your husband wanted a written contract for the
18      work?
19  A.  Yes.
20  Q.  And Exhibit 4 is what you came up with?
21  A.  I assume so.
22  Q.  What work is involved with Exhibit 4?
23  A.  New bathroom, remodel small bathroom No. 1 and 2,
24      large bathroom No. 3, fixtures by owner, because
```

39

```
 1      I supplied the toilet, sinks, and electrical
 2      fixtures.  Addition, remove part of wood wall,
 3      part of deck down to concrete, and frame three
 4      walls and roof as drawings show.  Tie into
 5      existing slate roof and install copper roof.
 6      This will be an office space.
 7  Q.  So that Exhibit 4 relates to the rough carpentry
 8      work for the addition to the home?
 9  A.  Yes.
10  Q.  And do you know when that rough carpentry work
11      was completed?
12  A.  No.
13  Q.  As I understand it, Mr. Falco, Joseph Falco,
14      performed some work at the property?
15  A.  Yes.
16  Q.  What work did he do?
17  A.  He bricked the outside of the house and bricked
18      the surround, the hearth, and the interior of the
19      fireplace and the addition.
20  Q.  When did Mr. Falco do the work on the exterior of
21      the property?
22  A.  Prior to the work on the interior.  I can't give
23      you dates.  I don't remember.
24  Q.  Do you know whether Mr. Falco was performing work
```

40

```
 1      on the exterior of the property during the year
 2      2000?
 3  A.  Yes.
 4  Q.  Did Mr. Falco complete his work on the exterior
 5      of the property before he began work on the
 6      interior?
 7  A.  Yes.
 8  Q.  Do you know how much time elapsed between Mr.
 9      Falco completing the work on the exterior of the
10      property and beginning the work on the interior
11      of the property?
12  A.  No.
13  Q.  Can you give me any type of estimate?
14  A.  No.
15  Q.  As I understand it, your husband moved out of the
16      property at some point?
17  A.  Yes.
18  Q.  When was that?
19  A.  October 3rd, 2001.
20  Q.  So it was -- strike that.
21          Your husband moved out of the property
22      prior to the completion of P. & D.'s work there?
23  A.  Yes.
24  Q.  When your husband moved out of the property, had
```

41

1   the exterior brickwork at the project been
2   completed?
3 A.  Yes.
    Q.  When your husband moved out of the house, had the
5   interior masonry work been performed?
6 A.  Yes.
7 Q.  Can you estimate for me how long the interior
8   masonry work had been done when your husband
9   moved out in October of 2001?
10 A.  No.
11 Q.  I believe your testimony is that your husband
12  requested a gas fireplace be installed in the
13  study at the property?
14 A.  Yes.
15 Q.  The office?  An office?
16 A.  The study/office.
17 Q.  Was that space intended to be your home office?
18 A.  No.
19 Q.  Whose office was it?
20 A.  My ex-husband's.
21 Q.  Did your ex-husband have any expertise in the
22  construction field?
23 A.  No.
    Q.  What type of work is he involved in?

42

1 A.  He's a Ph.D. chemist, and he's doing venture
2   capital work.
3 Q.  I believe it was your testimony that at some
4   point your husband brought up the idea of having
5   a gas log fireplace installed?
6 A.  Yes.
7 Q.  You don't recall when that was?
8 A.  When he decided the layout of his office.
9 Q.  Your husband decided on the layout of his office?
10 A.  When I say layout, I'm talking about furniture
11  and where things should be.  Yes.
12 Q.  When your husband decided to have some input into
13  the layout of the office, had the exterior of the
14  addition been completed?
15 A.  No.
16 Q.  Was that work ongoing?
17 A.  Yes.
18 Q.  What did your husband do to come up with the
19  layout of his office?
20 A.  We went and bought furniture.  He already had a
21  very large desk, and he went on-line and bought a
22  fireplace mantle.
23 Q.  Where did you purchase furniture for the office?
24 A.  Furniture Warehouse in Natick.

43

1 Q.  And where did you purchase the fireplace mantle?
2 A.  He purchased it on-line.  I don't really know.
3 Q.  I assume that your husband had already decided on
4   a fireplace when he purchased the fireplace
5   mantle?
6 A.  Yes.
7 Q.  Had he decided to install a fireplace when he
8   purchased the furniture for the office?
9 A.  Yes.
10 Q.  Had any work on the interior of the addition been
11  started when your husband purchased the furniture
12  for the office?
13 A.  No.
14 Q.  Did your husband ever draw any sketches or submit
15  anything to you in writing about the layout of
16  his office?
17 A.  No.
18 Q.  When your husband decided that he wanted a
    fireplace, did he specify a gas log fireplace?
    A.  Yes.
21 Q.  Why did he specify a gas log fireplace?
22 A.  No mess.
23 Q.  He didn't want any wood burning?
24 A.  Right.

44

1 Q.  Had you ever owned a gas log fireplace prior to
2   the addition being constructed?
3 A.  In our last house.
4 Q.  What type of gas log fireplace was that?
5 A.  I don't remember.
6 Q.  Did you install that gas log fireplace?
7 A.  We had Michael Carresi come and install that gas
8   log fireplace.
9 Q.  And when did Mr. Carresi do that?
10 A.  Probably in October of '99.
11 Q.  And where did he install that gas log fireplace?
12 A.  In the living room.  And I don't think it exists
13  anymore.  I think the people who moved in took it
14  out.
15 Q.  Was Mr. Carresi's installation of the gas log
16  fireplace part of the work that you hired P. & D.
17  Builders to do?
18 A.  No.
19 Q.  Did you hire Mr. Carresi directly to do that
20  work?
21 A.  Yes.
22 Q.  Did you purchase that gas-fired log that
23  Mr. Carresi installed at your --
24 A.  My --

45

1   Q.   -- prior residence?
2   A.   My ex-husband did.
3   Q.   Do you know where he purchased that?
     A.   No.
5   Q.   How long did you live at the property after
6        Mr. Carresi installed the gas log at your prior
7        residence?
8   A.   Seven or eight months.
9   Q.   Did you use the gas fireplace during that time
10       period?
11  A.   Yes.
12  Q.   How often?
13  A.   Maybe two or three times.
14  Q.   Did you ever have any problem with it?
15  A.   No.
16  Q.   When Mr. Carresi installed the gas log fireplace
17       at your prior residence, was there already a
18       fireplace there?
19  A.   Yes.
20  Q.   Was that a wood-burning fireplace?
21  A.   Yes.
22  Q.   What specifically did Mr. Carresi do to install
23       the gas log fireplace there?
     A.   I really couldn't tell you.  I know that there

46

1        was a gas line beneath it in the basement that he
2        brought up.  Other than that, I...
3   Q.   You don't know?
4   A.   No, I don't know.
5   Q.   You mentioned that the people who moved in after
6        you removed the gas fireplace?
7   A.   They're from Europe.  They also removed all the
8        screens from the windows and the
9        air-conditioners, and they open the windows
10       during the summer.
11  Q.   How do you know that?
12  A.   It's not far from my house, and I still have
13       friends in the neighborhood and drive by there.
14  Q.   How do you know that they removed the gas
15       fireplace?
16  A.   I don't, other than that some of the neighbors
17       had been in there.
18  Q.   Someone told you that it had been removed?
19  A.   Yes.
20  Q.   Who was that?
21  A.   Lenny and Amy Chen.
22  Q.   Do you know why the gas fireplace was removed?
23  A.   As I said before, they're from Europe.  They like
24       real wood fires.

47

1   Q.   Was the gas fireplace that Mr. Carresi installed
2        at your prior residence the same type of gas log
3        fireplace that was installed in the addition at
4        the subject property?
5   A.   I don't know.
6   Q.   Who did P. & D. Builders hire to build the
7        fireplace in the office at the subject property?
8   A.   To build the fireplace?  Could you specify what
9        part of that you're talking about?
10  Q.   There was more than one subcontractor that worked
11       on the fireplace?
12  A.   Well, the carpenters worked on the exterior and
13       to put a framework up.  I'm not sure who built
14       the metal hood.  And Joe Falco to do the masonry.
15  Q.   Did any other subcontractors work on the
16       fireplace?
17  A.   Well, Michael Carresi put the gas logs in.
18  Q.   What work did the carpenters have to do to the
     exterior?
     A.   They had to build a framework and put the mantle
         on.
22  Q.   Do you recall the names of the carpenters that
23       worked on the exterior of the --
24  A.   Charles Gubbins.

48

1   Q.   Any other carpenters work on that?
2   A.   No.
3   Q.   When did Mr. Gubbins build the framework for the
4        fireplace?  Was it before Mr. Falco began his
5        work?
6   A.   Yes.
7   Q.   Are you certain of that?
8   A.   I'm thinking logically.  And I am thinking that
9        logically you build the framework before you know
10       where to put everything else.
11  Q.   But do you have a specific memory as you sit here
12       today that Mr. Gubbins built the framework for
13       the fireplace before Mr. Falco began his work on
14       the fireplace?
15  A.   Yes.
16  Q.   And did Mr. Gubbins build the mantle for the
17       fireplace before Mr. Falco began his work on it?
18  A.   The mantle was already there.  It was in one
19       piece.  Mr. Gubbins didn't build the mantle.
20  Q.   What did Mr. Gubbins do with the mantle?  Did he
21       install it?
22  A.   He installed it.
23  Q.   Did Mr. Gubbins install the mantle for the
24       fireplace before Mr. Falco began his work there?

49

1  A.  I don't remember.

2  Q.  What is the framework for the fireplace?  What

3      does that consist of?

   A.  They had to put up rough wood as -- for

5      parameters for where the bed of the fireplace

6      would be.  And I may be incorrect in thinking

7      that he built that framework.  They probably put

8      down chalk lines.  I don't remember exactly the

9      order.

10 Q.  So is it your memory -- strike that.

11          Is it your testimony that you're not

12     certain whether Mr. Gubbins built the framework

13     for the fireplace before Mr. Falco began his

14     masonry work on it?

15 A.  Yes.

16 Q.  Let me ask you this.  Do you recall what work had

17     been performed on the fireplace before Mr. Falco

18     began his work?

19 A.  No.

20 Q.  Was Mr. Falco continuing his work on the exterior

21     of the property when he began working on the

22     fireplace?

23 A.  I don't remember.

   Q.  Before Mr. Falco began his work on the fireplace,

51

1  Q.  Did anybody ever submit a drawing or sketch to

2      you concerning the fireplace before it was built?

3  A.  No.

4  Q.  Did you ever have any conversation with Mr.

5      Rothschild or anybody else about the materials

6      that were going to be used to construct the

7      fireplace?

8  A.  With Phil Rothschild, yes.  And I'm talking about

9      the facade, because I don't really know what goes

10     on on the inside.

11 Q.  Your discussion with Mr. Rothschild concerning

12     materials to be used on the fireplace was

13     relegated to discussing the facade of the

14     fireplace?

15 A.  The facade exterior.

16 Q.  And you had a specific request for the exterior?

17 A.  Yes.

18 Q.  What was that?

   A.  We needed wood shelves and a panel in the front

20     on top of the mantle and that the mantle that my

21     ex-husband had ordered to be used.

22 Q.  Were you present when Mr. Falco began his work on

23     the fireplace?

24 A.  Was I present in the house?  Yes, I was present

50

1      did you ever speak to him about construction of

2      the fireplace?

3  A.  No.  I know Phil Rothschild had talked to him

4      about it.

5  Q.  Were you present for any of the conversations

6      between Mr. Falco and Mr. Rothschild prior to Mr.

7      Falco's work on the fireplace?

8  A.  No.

9  Q.  After your ex-husband communicated his desire to

10     have a gas fireplace in the office, did you speak

11     to Mr. Rothschild about that?

12 A.  Yes.

13 Q.  And you communicated all of your wishes and

14     advised him about wanting to build that

15     fireplace?

16 A.  Yes.

17 Q.  And you believe that in turn Mr. Rothschild spoke

18     to Mr. Falco and the other subcontractors about

19     constructing it?

20 A.  Yes.

21 Q.  Did you have any role in designing the fireplace?

22 A.  The only design that I did on the fireplace was

23     to make sure that there was a herringbone pattern

24     set on the hearth outside of the fireplace.

52

1      in the house.

2  Q.  Were you inside the office when Mr. Falco began

3      his work on the fireplace?

4  A.  No.

5  Q.  Do you recall your most recent visit to the

6      office prior to Mr. Falco beginning his work on

7      the fireplace?

8  A.  Well, we were living in the house, so I was

9      probably in and out of there every day.

10 Q.  Even during the construction of the interior of

11     the office?

12 A.  Yes.

13 Q.  But as you sit here today, you don't have any

14     specific memory as to what work had been done on

15     the fireplace prior to Mr. Falco beginning his

16     work?

17 A.  No.  As I said, I've been through a lot in the

18     last several years.

19 Q.  You mentioned that you know that Mr. Rothschild

20     had spoken to Mr. Falco about the fireplace

21     before it was constructed?

22 A.  Yes.

23 Q.  How do you know that?

24 A.  Because he spoke to everybody about the fact that

53

1  it was going to be constructed, that I had
2  brought the gas logs on-site, and to make sure
3  that everybody was doing everything to code.
4  Q. How do you know that Mr. Rothschild communicated
5  these items to the subcontractors?
6  A. Because he's kind of neurotic about making sure
7  that everything's to code on all of his jobs.
8  Q. That is his habit?
9  A. Yes.
10 Q. But you weren't present for any of these
11 conversations between Mr. Rothschild and the
12 subcontractors; is that correct?
13 A. The only one that I may have been present for
14 would be the plumber.
15 Q. You believe that you were present for a
16 conversation between Mr. Rothschild and Mr.
17 Carresi regarding construction of the fireplace?
18 A. Yes.
19 Q. Where did that conversation take place?
20 A. At the house somewhere.
21 Q. Inside the house?
22 A. Yes.
23 Q. Do you recall when it occurred?
   A. No.

54

1  Q. Do you recall the substance of the conversation
2  between Mr. Rothschild and Mr. Carresi regarding
3  construction of the fireplace?
4  A. Just that they had to make sure the gas line was
5  in the right place according to code, according
6  to the directions from Heatmaster.
7  Q. Was Mr. Carresi working to install the fireplace
8  when the conversation occurred?
9  A. No.
10 Q. Did Mr. Carresi say anything to Mr. Rothschild
11 when he gave him the instructions?
12 A. "Okay."
13 Q. Do you recall anything else about that
14 conversation?
15 A. No.
16 Q. You indicated earlier that you didn't know who
17 installed the metal hood on the fireplace?
18 A. I did -- what I said earlier is I didn't know who
19 fabricated the metal hood.
20 Q. Do you know who installed it?
21 A. No.
22 Q. Did you purchase the fireplace from Heatmaster?
23 A. Yes.
24 Q. Was that the item that Mr. Carresi installed?

55

1  A. Yes.  I actually purchased four from Heatmaster.
2  There is one in my living room, there is one in
3  my basement, there was the one in the office, and
4  I had purchased one for the bedroom not knowing
5  that by code you're not allowed to have one in
6  the bedroom.  So that never got put in.
7  Q. So you purchased four fireplaces from Heatmaster?
8  A. Yes.
9  Q. Would you have any paperwork indicating as to
10 when that -- or when those fireplaces were
11 purchased by you?
12 A. No.
13 Q. Do you have two functioning gas fireplaces in
14 your home now?
15 A. Yes.
16 Q. Who installed those?
17 A. Michael Carresi.
18 Q. Were those units installed into existing
19 fireplaces?
   A. Yes.
21 Q. Were those units installed at the same time as
22 the unit that was installed in the office?
23 A. Around the same time.
24 Q. Do you know whether the gas fireplace unit was

56

1  on-site when Mr. Falco began his work?
2  A. Yes.
3  Q. It was?
4  A. Yes.
5  Q. And how do you know that?
6  A. Because I brought them back from a trip to visit
7  my brother in North Carolina.
8  Q. Where did you store them?
9  A. The one for the office was right next to where
10 the fireplace was going to be.
11 Q. How was the fireplace stored?  Was it in the box?
12 A. Yes.
13 Q. Who brought the box up to the office?
14 A. Charles Gubbins.
15 Q. Do you know whether the construction of the
16 fireplace had begun prior to Mr. Gubbins bringing
17 the gas unit up to the office?
18 A. No, it had not.
19 Q. Was there a fireplace in your bedroom that you
20 intended to have the gas log unit installed into?
21 A. Yes.
22 Q. That was an existing fireplace?
23 A. Yes.  But as I stated before, that I did not know
24 that code said you cannot have gas logs in

57

1  fire -- in fireplaces in bedrooms, so it was
2  never installed.  It still exists as a
3  wood-burning fireplace.
4  Q.  What did you do with the unit that you didn't
5  install?
6  A.  Put it in the garage.
7  Q.  Were the four units that you purchased from
8  Heatmaster all the same make and model?
9  A.  Yes.
10 Q.  How did you decide to purchase that particular
11     make and model?
12 A.  The logs looked real.
13         MR. TURNER:  Pardon me.  What did you
14     say?
15         THE WITNESS:  The logs looked real.
16 Q.  Did you have any work done in the area of the
17     fireplace in the office between the time that the
18     fireplace was constructed and the time of the
19     fire?
20 A.  I'm assuming the finishing of the entire office.
21 Q.  The construction of the office was ongoing when
22     the fireplace was installed?
23 A.  Yes.
   Q.  Do you know what work remained?

58

1  A.  Wood paneling needed to be put up.  The ceiling
2      needed to be put up.  The floor, I think, needed
3      to be put in.
4  Q.  Any other work you can think of?
5  A.  Painting.  Electrical.
6  Q.  Was painting the last item on that interior
7      portion of the project?
8  A.  Yes.  I think in the beginning I gave you the
9      electrician's name as -- I think I gave it to you
10     wrong.  It was Mike Monaghan (phonetic).
11 Q.  And who was the painter?
12 A.  Folan's Contracting.
13 Q.  Was there some insulation installed in the office
14     after the fireplace was built?
15 A.  In the office itself?  In the walls?
16 Q.  Yes.
17 A.  No.  Not that I know of.  I mean, the insulation
18     in the exterior walls would have been put on
19     before the walls were put up.
20 Q.  And the walls were put up before the fireplace
21     work began?
22 A.  Yes.  One thing really had nothing to do with the
23     other.  The fireplace was cornered in two
24     exterior walls that were brick.

59

1  Q.  You don't recall any soundproof insulation being
2      put in the office after the fireplace was built?
3  A.  That's underneath the floor.
4  Q.  Underneath the floor between the first and second
5      floor of the addition?
6  A.  Yes.
7  Q.  When was that work done?
8  A.  I don't remember.
9  Q.  But it was done after the fireplace was built?
10 A.  I don't remember.  I don't remember the order.
11 Q.  Who performed the soundproof insulation work?
12 A.  Someone Phil hired.  I don't know the name.
13 Q.  If I told you that the fire occurred on
14     January 26th, 2004, would that be consistent with
15     your memory?
16 A.  Yes.
17 Q.  And I understand that you had another problem at
18     the property on January 25th, 2004; is that
19     correct?
   A.  Yes.
21 Q.  What happened the day before?
22 A.  I had pipes burst in the kitchen.
23 Q.  Do you recall specifically where the pipes that
24     burst were located?

60

1  A.  In the ceiling in two different parts of the
2      kitchen.  The people who had owned the house
3      before us had redone the kitchen and taken out
4      the insulation.  And it was extremely cold, and
5      the pipes froze and burst.  And I didn't know
6      they took out the insulation until we had to gut
7      the kitchen.
8  Q.  Whom did you purchase the property from?
9  A.  Robert and Sylvia Kupferman.
10 Q.  How do you know that they removed the insulation?
11 A.  Because there was no insulation there when we
12     opened up the ceiling.
13 Q.  There were two different locations where the
14     pipes burst?
15 A.  Yes.
16 Q.  Can you tell me specifically where in the
17     kitchen?
18 A.  One is over a breakfast nook.  And there are
19     eaves, and the cold wind was blowing in and froze
20     the pipes.  And the other one was located by the
21     back door underneath the bathroom.  And with the
22     way the house is constructed, I'm assuming that
23     there must have been insulation in the ceiling
24     until the Kupfermans did the kitchen.

61

1  Q.  Had the kitchen been recently renovated before
2      you purchased the property?
3  A.  Thirteen years before.  Or thirteen years before
4      everything happened.  So ten years before we
5      bought the property.
6  Q.  Was it two pipes that burst?
7  A.  Either two or three.
8  Q.  Those were water pipes?
9  A.  Yes.  And one incident has nothing to do with the
10     other.
11 Q.  Approximately what time did the water pipes burst
12     in your kitchen?
13 A.  About 11:00 a.m.
14 Q.  How did you become aware of that?
15 A.  I heard a loud crash and thought that my dogs had
16     knocked a vase off of the counter.  And when we
17     went into the kitchen, there was water pouring
18     out of all the light fixtures.
19 Q.  What did you do when you found the water coming
20     out of the light fixtures?
21 A.  Ran and turned off as much water as I possibly
22     could to stop the water from flowing.
23 Q.  Were you able to stop the water from flowing?
   A.  Eventually.

62

1  Q.  Approximately how long did that take?
2  A.  The entire process took about an hour and a half
3      before Michael Carresi arrived.
4  Q.  You called Michael Carresi to help you?
5  A.  Immediately.
6  Q.  And Mr. Carresi arrived about an hour and a half
7      later?
8  A.  Yes.  He lives about an hour from the house.
9  Q.  And was there water flowing out of the pipes when
10     Mr. Carresi arrived?
11     I think that we had gotten everything turned off
12     by that point.
13 Q.  Was there standing water in your kitchen after
14     the water was turned off?
15 A.  After the water was turned off, yes.  But it
16     actually went down into the basement, so there
17     was water standing in the basement, which we
18     cleaned up.
19 Q.  Was there any standing water in your kitchen when
20     you turned the water off?
21 A.  When we turned the water off, yes.
22 Q.  How much?
23 A.  About six inches.
24 Q.  And after you turned the water off, was there

63

1      standing water in your basement?
2  A.  Yes.
3  Q.  Approximately how much?
4  A.  About six inches.
5  Q.  Other than the kitchen and the basement below the
6      kitchen, were any other rooms affected by the
7      burst pipes?
8  A.  It's an area that's attached to the kitchen
9      that's called my studio, but it's really part of
10     the kitchen.
11 Q.  Is it separated from the kitchen in any way?
12 A.  There's a wall, and there's stairs down to that
13     side of the basement and another wall.
14 Q.  The portion of the basement that was directly
15     below the kitchen, what rooms were in that area?
16 A.  The exercise room, the regular part of the
17     basement, and it's -- there's two different
18     basements, because the house is built on rock
       ledge.  And part of the mural on one side of the
       basement, the other side of the basement.
21 Q.  Are the two sides of the basement separated by a
22     wall?
23 A.  They're separated by a block wall on two sides,
24     and you can't get to one from the other.

64

1  Q.  There are separate entrances to the basement?
2  A.  Yes.
3  Q.  Did the burst pipe cause any problems with the
4      electricity in your house?
5  A.  In the kitchen, in the -- the basement.
6  Q.  It knocked out power to those two rooms?
7  A.  It knocked out power to those two rooms.  It
8      knocked out the telephones, thus knocking out my
9      alarm.
10 Q.  Did the burst pipe cause any problems with the
11     heat in your home?
12 A.  No.  That's why Michael Carresi was there.  He
13     made sure that the furnace was working before he
14     left.
15 Q.  Did you have oil heat in the house?
16 A.  No.
17 Q.  What was it?
18 A.  It's gas-forced air.
19 Q.  Before Mr. Carresi came to the property, was the
20     heat off for a period of time?
21 A.  I couldn't really tell you.
22 Q.  Why is that?
23 A.  Because things were happening a little quickly.
24     When you've got water coming out of your ceiling,

65

1  you're very busy trying to get -- make sure that
2  you get things turned off and things cleaned up.
3  You're not concentrating on whether the heat is
4  working or not.
5  Q. Between the time that the pipes burst and the
6     time that Mr. Carresi came to the property, did
7     you notice any difference in temperature in your
8     home?
9  A. Once again, no.
10 Q. You testified previously that Mr. Carresi made
11    sure that the furnace was working before he left
12    the property that day. Do you recall that?
13 A. Yes.
14 Q. And how do you remember that?
15 A. Because I know that he went downstairs to make
16    sure that the furnace was working. That's the
17    side of the basement that the water would go in.
18 Q. So did you have some conversation with Mr.
19    Carresi about the furnace?
20 A. Other than he told me that he made sure that
21    everything was working, no.
22 Q. Approximately how long was Mr. Carresi at your
23    property on the day that the pipe burst?
24 A. I don't remember.

66

1  Q. Was it more than an hour?
2  A. I don't remember.
3  Q. Did Mr. Carresi ever give you a bill for the work
4     that he did?
5  A. Yes.
6  Q. Do you have a copy of that bill?
7  A. I don't know. Believe me, he didn't give it to
8     me immediately.
9  Q. What do you mean by that?
10 A. There was a lot going on. Sixteen hours after my
11    pipes burst, I had a fire in the house. I don't
12    think anybody was concentrating on getting money
13    immediately.
14 Q. So at some point after the work he did?
15 A. Yes.
16 Q. After the pipes burst in your house, did you call
17    any other contractors to come over to work on the
18    property that day?
19 A. No.
20 Q. Was there anybody else at your house on the day
21    that the pipes burst?
22 A. A girlfriend of mine, Ellen Garfield.
23 Q. How do you spell her last name?
24 A. Just like the cat. G-a-r-f-i-e-l-d.

67

1  Q. Was Ms. Garfield present when the pipes burst?
2  A. Yes.
3  Q. Where does she live?
4  A. In Lynn.
5  Q. Do you know the street address?
6  A. No. I know how to get there.
7  Q. Were your daughters home at that time?
8  A. Yes. And three dogs and a cat.
9  Q. We'll just go with the people that were there.
10    Okay?
11 A. Okay.
12 Q. On the day that the pipes burst, were you using
13    the fireplace in the office?
14 A. No, not until later. Occasionally when I would
15    sit up there, I would turn the fireplace on. It
16    had a soothing effect.
17 Q. At some point after the pipes burst, you did use
18    the gas log fireplace in the addition?
19 A. Yes.
20 Q. What time did you put it on?
21 A. Probably at about 10:00 at night. Then I turned
22    it off at 11 before I went to sleep.
23 Q. The control for the gas log fireplace, does it
24    have different settings?

68

1  A. No. There was on and off.
2  Q. Had you used the gas log fireplace the day before
3     the pipes burst at your house?
4  A. No.
5  Q. Do you know when you had most recently used the
6     fireplace prior to the day the pipes burst?
7  A. Probably two or three weeks before that.
8  Q. On the day the pipes burst, did you shut the
9     fireplace off before you went to bed?
10 A. Yes.
11 Q. While you were using the fireplace that day, did
12    you notice any unusual odors coming from the
13    fireplace?
14 A. No.
15 Q. While you were using the fireplace that day, did
16    you or do you recall any unusual sounds coming
17    from the fireplace?
18 A. No.
19 Q. While you were using the fireplace that day, do
20    you recall feeling any unusual heat coming from
21    that area?
22 A. No.
23 Q. And did you go to bed at 11 p.m. that night?
24 A. Yes.

69

1  Q.  When did you become aware that there was a fire
2      in your home?
3  A.  At 2:00.  Actually, I woke up coughing, and I
4      went and I opened windows down the hall and in
5      the office and got back in bed and started to
6      fall back asleep at about 2:40 when I realized
7      there must be a fire in my house.
8  Q.  You woke up at 2:00 in the morning?
9  A.  Coughing.
10 Q.  Was there smoke in your room?
11 A.  Yes.
12 Q.  Can you describe how much smoke there was?
13 A.  A lot of smoke.
14 Q.  Did you open up the windows to your bedroom?
15 A.  No.  I opened one in the office and then went
16     down the hall to the guest bedroom all the way at
17     the other end of the house and opened a window.
18 Q.  Did that clear up the smoke?
19 A.  No.
20 Q.  Did you have to enter the office to open the
21     window?
22 A.  Yes.
23 Q.  When you entered the office, did you see whether
24     the gas log fireplace was on?

70

1  A.  No, it was not on.  I was doing all of this in
2      the dark.
3  Q.  Did you hear any unusual sounds when you entered
4      the office to open the window?
5  A.  No.
6  Q.  Could you smell smoke in that room?
7  A.  Yeah.  It was filled with smoke.
8  Q.  Did you have trouble breathing in that room?
9  A.  I was so busy coughing.  I don't remember.  It
10     was -- my bedroom is attached to the office.
11     They were both filled with smoke.
12 Q.  After you opened the windows, you went back to
13     bed for a period of time?
14 A.  I went back to bed and just started to fall back
15     asleep when I realized there must be a fire in
16     the house and to get up and get everybody out of
17     there.
18 Q.  And that was at approximately 2:40 a.m.?
19 A.  Yes.
20 Q.  Why did you suddenly think there was a fire in
21     your house?
22 A.  Why would there be smoke in my house?  But when
23     you're -- when you're woken from a sound sleep
24     coughing, you go back to sleep, and it takes a

71

1      little time for things to register.
2  Q.  So at approximately 2:40 you became concerned
3      there was a fire in your house?
4  A.  Yes.
5  Q.  What did you do then?
6  A.  I went and woke my children up and told them to
7      get dressed and get all the animals so that we
8      could get out of the house.
9  Q.  After you woke up your children and gave them
10     those instructions, did you look around to see
11     whether there was a fire in your house?
12 A.  I walked downstairs, and I could hear crackling
13     in the wall between the front hall and the family
14     room.
15 Q.  What did you do after that?
16 A.  Got my kids ready and left the house.  Went
17     downstairs.  The alarm finally did go off at
18     about 3:40.  And the phone rang, and it was the
19     alarm company.  My daughter told them that the
20     house was filled with smoke and to have the
21     firemen come.
22         We went and stood in the driveway, and I
23     called Phil Rothschild and said to him on his
24     answering machine that I knew that -- he knew

72

1      that there had been pipes that had burst in the
2      house earlier in the day, but there was a fire in
3      the house and could he get there as soon as
4      possible, and got in my car and -- with my kids
5      and my dogs and went and sat on the street where
6      the firemen told me to go sit.
7  Q.  Had you reported the burst pipes to Mr.
8      Rothschild earlier that day.
9  A.  I assumed that Michael Carresi had.
10 Q.  Before the fire, had you reported the burst pipes
11     to your insurance company or insurance broker?
12 A.  No.  It was Sunday.  I figured I'd be able to do
13     that on Monday when everybody would be there.
14 Q.  At approximately 2:40 a.m. when you suspected
15     there was a fire in your house, did you call the
16     Newton Fire Department?
17 A.  I couldn't call the Newton Fire Department.  My
18     phone lines were down from the burst pipes.
19 Q.  Did you attempt to use the phone?
20 A.  Yes.
21 Q.  Did you have a cell phone at that time?
22 A.  The cell phone didn't work in the house.  I
23     thought I was going to have to get about two
24     blocks away before I could use my cell phone.

73

1  Q.  And I believe you testified that you left the
2      house at approximately 3:40 a.m. that night?
3  A.  Yes.
4  Q.  Between 2:40 a.m. and 3:40 a.m., did you do
5      anything to attempt to notify the Newton Fire
6      Department about the fire in your home?
7  A.  I couldn't.
8  Q.  So is that no, you didn't do anything to attempt
9      to --
10 A.  I picked up the phone, but --
11 Q.  Let me finish my question.  Is that no, you did
12     not do anything to attempt to alert the Newton
13     Fire Department that there was a fire in your
14     home during that time period, 2:40 a.m. to
15     3:40 a.m.?
16 A.  Correct.
17 Q.  And you believe that there was nothing that you
18     could do to alert the fire department about the
19     problem?
20 A.  Until I left the house and went two blocks away,
21     yes.  I needed cell phone service in order to do
22     it.
23 Q.  Were there neighbors on either side of that
       house?

74

1  A.  Yes.  And no, they didn't hear the fire engines
2      or anything else.
3  Q.  The alarm went off in the house?
4  A.  Finally, yes, at 3:40.
5  Q.  Did that fire alarm go directly to the Newton
6      Fire Department?
7  A.  Yes.
8  Q.  At any point did you call the Newton Fire
9      Department to report the fire?
10 A.  No.
11 Q.  Had you exited the home before the Newton Fire
12     Department arrived at the scene?
13 A.  I had not.  My children had.
14 Q.  What were you doing when the fire department
15     came?
16 A.  Waiting to open the door.
17 Q.  Waiting for their arrival?
18 A.  Yes.
19 Q.  Between 2:40 a.m. and 3:40 a.m., what did you do?
20 A.  Woke my children up, had them get dressed, get
21     all the animals together, got myself dressed,
22     went downstairs with the kids, had them get into
23     the car with the animals.
24 Q.  When you refer to the animals, are you referring

75

1      to the three dogs and two cats?
2  A.  Three dogs and one cat.  We had only had one cat
3      at the time.
4  Q.  Were those the only four animals that you owned?
5  A.  Yes.  That I know of.
6  Q.  And approximately what time did the Newton Fire
7      Department arrive at the scene?
8  A.  3:42.
9  Q.  You let the firefighters in the home?
10 A.  Yes, I did.
11 Q.  After you let the firefighters in the home, what
12     did you do?
13 A.  They told me please to exit the house and to take
14     the car and drive down the street, because they
15     didn't know how bad the fire was going to be, and
16     they didn't want me in the garage with the kids
17     in a car with gasoline.
18 Q.  Your children were in the garage inside your
       vehicle?
   A.  Yes.
21 Q.  Did you move the vehicle out of the garage?
22 A.  Yes.
23 Q.  Where did you go?
24 A.  Down the street.

76

1  Q.  On Hammondswood Road?
2  A.  No.
3  Q.  What street did you go on?
4  A.  I think it's Edge Hill.
5  Q.  Were you able to see your home from --
6  A.  Yes.
7  Q.  -- the spot where you parked the car?
8  A.  Yes.
9  Q.  Do you know how long the firefighters were in the
10     home?
11 A.  Until 7:00.
12 Q.  Did you enter the home again prior to 7:00 in the
13     morning?
14 A.  At 6:30.
15 Q.  How did you know it was safe to enter the home at
16     6:30?
17 A.  The firemen came and told me it was okay to come
18     back in.
19 Q.  Did you speak to any of the firefighters at the
20     scene?
21 A.  Yes.
22 Q.  Who did you speak to?
23 A.  I don't remember their names.
24 Q.  Was there somebody in charge of that operation?

77

1  A.  The first man who came in I think was in charge.
2      I told him where I thought the fire was by the
3      sounds in the wall.
4  Q.  And when you returned to the home, did you have
5      any conversation with the Newton Fire Department?
6  A.  I really don't remember.  There was some man in
7      my house, and I didn't know who he was.  And he
8      turned out to be a PA.  I was trying to find out
9      who he was.  That -- there was a lot going on.
10 Q.  There was a man in your home that you were
11     unfamiliar with?
12 A.  Yes.
13 Q.  And he was a PA?  What do you mean by that?
14 A.  Public adjuster.
15 Q.  So that when you returned to your home at 6:30 in
16     the morning, there were members of the Newton
17     Fire Department in your home and a public
18     adjuster?
19 A.  A public adjuster.  Mike Roach was there,
20     because Phil could get him there faster than Phil
21     could get there, and then Phil was there.
22 Q.  What was Mr. Roach doing when you entered the
23     home?
24 A.  He may have gotten there shortly after.  He went

78

1      and got salt or whatever it's called, Icy Hot,
2      because from the hoses hitting the front porch,
3      it was a solid sheet of ice.  And he had some in
4      his truck, and he put it down so that nobody
5      killed themselves either walking into the house
6      or walking out of the house.  These are my go-to
7      guys when there's a problem.
8  Q.  Do you know the name of the public adjuster who
9      was present?
10 A.  Larry Berman.
11 Q.  I take it that you did not call Mr. Berman?
12 A.  No.
13 Q.  Do you know who did?
14 A.  My understanding is that he has some kind of
15     connection with the Newton Fire Department.
16 Q.  And how did you become aware of that?
17 A.  I was told that by other sources.
18 Q.  Do you recall who told you?
19 A.  No.
20 Q.  At some point did Mr. Rothschild arrive at the
21     scene?
22 A.  Yes.
23 Q.  What time was that?
24 A.  About 7.

79

1  Q.  What did Mr. Rothschild do when he came?
2  A.  Consoled me.
3  Q.  You were upset?
4  A.  Well, my house was on fire.  My kids and I were
5      outside in the freezing cold.  And yeah, I was
6      upset.
7  Q.  Approximately what time did the Newton Fire
8      Department leave?
9  A.  I don't really know.  I know that the fire and
10     everything had been taken care of by that point.
11 Q.  Did you ever have any conversation with anybody
12     from the Newton Fire Department as to the cause
13     of the fire?
14 A.  No, not that I'm aware of.
15 Q.  On the morning of the fire, did you have any
16     conversation with Mr. Berman?
17 A.  I had many conversations with Mr. Berman.  The
18     first was who are you and why are you in my
       house.
       As far as the cause of the fire, at that
21     point I don't think anybody really knew.  They
22     knew that it happened somewhere with the
23     fireplace, something with the fireplace, but
24     nobody was aware of in detail what the problem

80

1      was.
2  Q.  On the morning of the fire, did Mr. Berman offer
3      his services to you?
4  A.  Yes.
5  Q.  What did he say?
6  A.  When he finally explained to me that he was a
7      public adjuster, I think it was about 10 or
8      11:00, and that he was there to help me.  And
9      that's what public adjusters did, they were there
10     to make sure that you could collect from the
11     insurance company.
12 Q.  Did Mr. Berman explain to you what his role was?
13 A.  Yes.
14 Q.  And what is that?
15 A.  He's the intermediary between the person with the
16     problem and the insurance company.
17 Q.  Did you subsequently hire Mr. Berman --
18 A.  Yes.
19 Q.  -- to represent you?
20 A.  Yes.
21 Q.  Did you have to pay Mr. Berman for his services?
22 A.  When money was collected from the insurance
23     company, yes.
24 Q.  Did he work on a so-called contingent fee?

**81**

1 A. Yes.
2 Q. And that means he, Mr. Berman, would receive a
3 percentage of whatever you collected from the
   insurance company?
5 A. Correct.
6 Q. How much did Mr. Berman charge you?
7 A. 10 percent.
8 Q. Does Mr. Berman continue to represent you?
9 A. No.
10 Q. At some point did you request that he stop
11 representing you?
12 A. Yes.
13 Q. When was that?
14 A. I think in April of '04.
15 Q. Why did Mr. Ber -- strike that.
16    Why did you request that Mr. Berman stop
17 representing you at that time?
18 A. I wasn't getting money fast enough.
19 Q. Did you hire another public adjuster after Mr.
20 Berman?
21 A. Oh, yeah.
22 Q. Who is that?
23 A. Gordon & Gordon.
   Q. And do Gordon & Gordon represent you at this

**82**

1 time?
2 A. Nope.
3 Q. When did they stop representing you?
4 A. September of '05.
5 Q. Why did Gordon & Gordon stop representing you in
6 September of '05?
7 A. They were less effectual than Larry Berman.
8 Q. You were dissatisfied with their work?
9 A. Yes.
10 Q. After Gordon & Gordon, did you hire any other
11 public adjusters?
12 A. No.
13 Q. Did you handle the matter yourself?
14 A. Yes.
15 Q. When did your insurance company appoint counsel
16 to represent you at the deposition today?
17 A. As soon as I got the summons.
18 Q. The subpoena to testify?
19 A. Yes.
20 Q. What did you do when you received the subpoena?
21 A. Called the insurance agent.
22 Q. Your insurance agent?
23 A. No.  Fireman's Fund Insurance adjuster.
24 Q. Who was that?

**83**

1 A. Eric Schwalbach.
2 Q. And what did Mr. Schwalbach say to you?
3 A. Well, first he told me that I didn't have to come
4 today if I didn't want to.
5 Q. Well, Mr. Schwalbach is not a member of the bar.
6 A. And then he told me that he would call the
7 insurance company's lawyers, and they -- he would
8 have them call me.
9 Q. Had you ever spoken to Mr. Schwalbach prior to
10 receiving the subpoena?
11 A. Yes.
12 Q. Was that during your efforts to obtain money from
13 the insurance company?
14 A. Yes.
15 Q. And subsequent to your conversation with Mr.
16 Schwalbach, did you receive a call from Mr.
17 Loftus's office?
18 A. Yes, I did.
   Q. Is that when you retained them as your counsel?
   A. That's when I asked if they were going to be here
21 to represent me.
22    MR. LOFTUS:  Off the record.
23    (Off the record.)
24 Q. But your understanding is that Mr. Loftus is here

**84**

1 to act as your legal counsel today?
2 A. Yes.
3 Q. During your conversations with Mr. -- Schwalbach,
4 is it?
5 A. Schwalbach, yes.
6 Q. Did you ever speak to him about the fact that you
7 were going to have to testify at some point
8 during the litigation?
9 A. Only when I called him when I got the subpoena.
10 Q. That was the first and only time?
11 A. Yes.
12 Q. Why did Mr. Schwalbach say that you didn't have
13 to show up if you didn't want to?
14 A. Because the subpoena actually wasn't handed to me
15 directly.
16 Q. He might be a member of the bar.
17    Did you feel that Mr. Schwalbach was
18 attempting to discourage you from attending the
19 deposition?
20 A. Not at all.
21 Q. Going back to the day -- the morning of the fire,
22 after the fire, Mr. Berman was at your house for
23 an extended period of time?
24 A. I don't know how long he was there when I came

85

1      back in the house. All I know is there was some
2      unknown man moving things around in my house, and
3      I kept asking him who he was. And he really
4      didn't respond until Phil Rothschild came in and
5      said who the hell are you and what are you doing
6      here.
7  Q.  So you don't know how long he'd been there before
8      you got there?
9  A.  I have no idea.
10  Q.  But he was there for a period of time thereafter;
11      is that correct?
12  A.  Yes.
13  Q.  And during the time that Mr. Berman was present,
14      did you see him take any photographs of the
15      house?
16  A.  No, not that morning.
17  Q.  On the morning after the fire, did you see
18      anybody photograph the house?
19  A.  I don't remember.
20  Q.  At some point after the morning of the fire, Mr.
21      Berman photographed the house?
22  A.  Mr. Berman, several other people.
23  Q.  Who else was present when Mr. Berman photographed
24      the house?

86

1  A.  I'm sure I was. But other than that, I -- I
2      don't remember.
3  Q.  What areas of the house were photographed?
4  A.  I would assume the kitchen, the damage that had
5      been done from the firemen and the fire.
6  Q.  Were there any photographs taken to your
7      knowledge of the front entrance to the property?
8  A.  I -- not to my knowledge.
9  Q.  Do you know whether anybody photographed the
10      sheet of ice that you described in the front
11      entryway to the home?
12  A.  I don't think so, unfortunately. It would make
13      some things easier for me right now.
14  Q.  What do you mean by that?
15  A.  From the firemen's hose and the water freezing
16      directly on impact to the outside, it is forcing
17      the front portico of my house off of my house so
18      that it's falling forward.
19  Q.  You allege that there was damage to the front
20      portico of your home as a result of the fire?
21  A.  Yes.
22  Q.  Has that damage been repaired?
23  A.  No.
24  Q.  Why not?

87

1  A.  Because until the insurance company and I can
2      come to an agreeable amount, I'm not starting
3      work.
4  Q.  Is it fair to say that the insurance company
5      disputes that the damage to the front portico is
6      related to the fire?
7  A.  No, not any longer.
8  Q.  At some point did the insurance company dispute
9      that the damage was related to the fire?
10  A.  Based on what Larry Berman's contractor said,
11      yes.
12  Q.  The insurer has now accepted that as part of the
13      claim?
14  A.  They had a structural engineer come out and go
15      over the original house plans with me and have
16      agreed that yes, it is indeed due to the fire.
17  Q.  Who was the structural engineer?
18  A.  I don't remember his name.
19  Q.  Do you have the original plans to the home?
20  A.  Yes, I do.
21  Q.  When did you review those plans with the
22      structural engineer?
23  A.  I think two months ago.
24  Q.  When did the insurance company accept the damage

88

1      to the portico as related to the fire?
2  A.  After the structural engineer was there and made
3      his report.
4  Q.  What is the issue now with the work to the
5      portico?
6  A.  They were trying to come to a reasonable
7      understanding on how much money it's going to
8      take to take it down piece by piece and put in
9      new footings and rebuild it with the same pieces
10      that were taken down.
11  Q.  Have you received an estimate from anybody to do
12      that work?
13  A.  Yes.
14  Q.  Who provided the estimate?
15  A.  Mike Cleary.
16  Q.  How much was the estimate?
17  A.  I think $88,000.
18  Q.  Has the insurance company offered you any money?
19  A.  Well, when we were originally doing the -- come
20      to agreement terms and -- we took it off the
21      table. And since then, no, they haven't offered
22      me any money.
23  Q.  So it's your understanding that the insurance
24      company has accepted it as part of the loss but

89

```
1       has not made you any offer?
2   A.  Correct.
3   Q.  Is there any other physical damage to the subject
4       property that has not been repaired since the
5       time of the fire?
6   A.  No.
7   Q.  Was the physical damage from the burning of the
8       fire confined to the ceiling between the first
9       floor and the second floor on the addition?
10  A.  Not on the addition.  It started to -- it -- it
11      went through the wall and got to a chase between
12      two of the struts so that it hit oxygen and it
13      started going towards the front door.  It melted
14      pipes in my bathroom above it.
15  Q.  So that the fire started to burn from the
16      addition into the main portion of the house?
17  A.  Uh-huh.
18  Q.  Is that correct?
19  A.  Yes.
20  Q.  And what room did the fire burn into?
21  A.  The front hall.
22  Q.  How far into the front hall did the fire burn?
23  A.  Probably about eight or nine feet.
24  Q.  Other than the damage to the addition, the front
```

90

```
1       hall, and the melted pipes in your bathroom above
2       the front hall, was there any other portion of
3       your home damaged due to the burning of the fire?
4   A.  Can we clarify that that's not what the firemen
5       did?  Just due to the burning of the fire?
6   Q.  That is my question.
7   A.  No, there was no other damage.  I mean, there was
8       smoke that went upstairs.  Are we talking about
9       smoke?
10  Q.  My question was confined to the burning of the
11      fire.
12  A.  Okay.  No.
13  Q.  Was there anything above the addition to your
14      home, any part of the structure above the
15      addition?
16  A.  An attic.  Above the addition is a small attic.
17      It's a crawlspace, but it's attached to the rest
18      of the attic.
19  Q.  Do you claim that the water from the firefighters
20      damaged a portion of your home?
21  A.  It damaged a large portion of my home.
22  Q.  What areas of your home were affected by the
23      water used by the fire department?
24  A.  All of the water in the front hall, the floor in
```

91

```
1       the front hall, the floor in the living room, the
2       floor in the family room, the furniture that was
3       in the basement below there, all of the furniture
4       in the house -- well, in that -- in the second
5       and -- or in that first and basement portion of
6       the house, and the front portico.
7   Q.  Did you see the hoses that the Newton Fire
8       Department ran into your home?
9   A.  Did I see?  Yeah.  There's -- the big three-inch
10      or whatever it is hoses they use.
11  Q.  And the Newton Fire Department ran those in
12      through the front door?
13  A.  Yes.
14  Q.  And the hoses went into the home down the hallway
15      into the addition?
16  A.  Yes.
17  Q.  Do you know why there was water damage to other
18      rooms at the home other than the addition and the
19      front hall?
20  A.  The water went all over everywhere.  The living
21      room and the family room are on the same level,
22      so any water that went into the floor in the
23      family room was going to go into the living room
24      as well.  And in the basement it went through the
```

92

```
1       floors.
2   Q.  Did the water from the firefighting effort go
3       into the basement on the opposite side from where
4       the kitchen water had gone?
5   A.  Yes.  But there's a demarkation down there.
6       There's a metal I-beam that cuts off part of that
7       basement from the other part, so that the water
8       damage from the firefighters stayed on one side
9       of the I-beam and the water from the kitchen pipe
10      burst stayed on the other side of the I-beam.
11  Q.  Do you know whether the Newton Fire Department
12      sprayed any water into the ceiling of the
13      addition?
14  A.  You couldn't really spray water into the ceiling
15      of the addition because there was Icynene in
16      there, and the water wasn't going to go in there.
17      They sprayed water where the fireplace was, and
18      then they sprayed it into the front hall.  I'm
19      assuming they sprayed a fair amount into the
20      portion where the fireplace was because there was
21      a big hole there, but...
22  Q.  Is it your testimony that none of the adjoining
23      rooms to the kitchen were affected by the burst
24      pipe water the day before the fire?
```

93

1 A. Yes. It's my testimony that there was nothing --
2 none of the adjoining rooms were damaged. I
3 mean, down in the basement. But if we're talking
about the dining room, no, that wasn't damaged.
5 (Whereupon, Exhibit 5 was marked for
6 identification.)
7 Q. Ms. Pavia, I show you what's been marked as
8 Exhibit 5 for the deposition. Do you recognize
9 that document?
10 A. Yes. I remember this.
11 Q. It's addressed to a Mr. O'Regan?
12 A. O'Regan. Rick O'Regan. He --
13 Q. Who is Rick O'Regan?
14 A. He is the building inspector for Newton.
15 Q. And do you recall when you --
16 A. Sent this?
17 Q. Withdraw that question.
18 Did you type up the information in
19 Exhibit 5?
20 A. Yes.
21 Q. And you sent it to Mr. O'Regan?
22 A. Uh-huh.
23 Q. Is that correct?
A. Yes.

94

1 Q. Do you recall when you produced this document?
2 A. No, I don't.
3 Q. Was it close in time to the fire?
4 A. I would assume so.
5 Q. Did you write this -- how would you describe
6 Exhibit 5? What is it? A letter to Mr. O'Regan?
7 A. It's a letter to Mr. O'Regan.
8 Q. Did you speak to Mr. O'Regan before you sent him
9 this letter?
10 A. Not that I remember. But I really have blocked a
11 lot of this out of my mind. It was an extremely
12 unpleasant situation.
13 Q. Well, is it fair to assume that -- that there was
14 some reason you sent Mr. O'Regan a letter
15 concerning the water damage and the fire at your
16 home?
17 A. It's fair to assume that.
18 Q. But you don't recall specifically that Mr.
19 O'Regan requested that you send him this letter?
20 A. No, I don't.
21 Q. Have you had an opportunity to read through
22 Exhibit 5?
23 A. Yes.
24 Q. And is the information contained in Exhibit 5

95

1 true and accurate to the best of your knowledge?
2 A. Yes.
3 Q. And you believe that it was done close in time to
4 the fire?
5 A. Yes.
6 Q. Do you know why Mr. O'Regan was interested in the
7 fire at your home?
8 A. No.
9 Q. After you sent Mr. O'Regan this -- a letter, did
10 you have any further conversation with him?
11 A. I don't remember.
12 Q. Do you recall whether Mr. O'Regan came to your
13 home to inspect it after the fire?
14 A. I don't remember. I know he was there before the
15 fire with the last construction.
16 Q. You had met Mr. O'Regan prior to sending him this
17 letter?
18 A. Yes. I'd met Mr. O'Regan prior to sending him
this letter.
Q. Where did you meet him?
21 A. Newton Town Hall and in my home.
22 Q. Why did you meet with Mr. O'Regan at Newton Town
23 Hall?
24 A. To get permits.

96

1 Q. For what work?
2 A. The construction on the house prior to the fire.
3 Q. The home that you lived in prior to the fire?
4 A. No.
5 Q. Did you pull the permits for the work at the
6 subject property that was done in 2000, 2001?
7 A. No. I didn't pull the permits, but I did go with
8 Mr. Rothschild to City Hall to meet Mr. O'Regan.
9 Q. Was Mr. Rothschild the builder of record on those
10 permits?
11 A. Yes.
12 Q. Why did you go with Mr. Rothschild to meet Mr.
13 O'Regan?
14 A. Considering that we do business back and forth,
15 he thought that it would be a good idea for me to
16 know the building inspectors.
17 Q. A social visit?
18 A. Per se.
19 Q. Okay. And did you speak to Mr. O'Regan when he
20 came to inspect your home?
21 A. Yes.
22 Q. Was that during the construction back in 2000,
23 2001?
24 A. Yes.

97

1  Q.  What was Mr. O'Regan doing at your home?
2  A.  Inspecting the construction that was going on.
3  Q.  Was that after the work was completed?
   A.  Before, during, and after.
5  Q.  Do you know whether Mr. O'Regan ever inspected
6      the fireplace after it was completed?
7  A.  Yes.
8  Q.  Did you see him inspect it?
9  A.  Yes.
10 Q.  Did Mr. O'Regan approve the work that was done?
11 A.  Yes.  He signed off on the permit.
12 Q.  Did he sign off on the work after it was
13     completed?
14 A.  Yes.
15 Q.  Do you have any photographs of physical damage to
16     the subject property?
17 A.  Not on me.  But yes, I do.
18 Q.  Did you take those photographs yourself?
19 A.  No.  My daughter did.
20 Q.  What is your daughter's name?
21 A.  Rachel.
22 Q.  When did Rachel take the photographs?
23 A.  Before there was any construction done for
24     photography class.

98

1  Q.  Were Rachel's photographs taken after the fire?
2  A.  After the damage, but before construction
3      started.
4  Q.  Do Rachel's photographs show areas of the subject
5      property that were damaged by water?
6  A.  No.
7  Q.  What do Rachel's photographs show?
8  A.  The hole from the fireplace.
9  Q.  Physical damage to the property?
10 A.  Yes.
11 Q.  Are you aware of any photographs that were taken
12     which show water damage to the property after the
13     fire department left?
14 A.  No.  But I'm sure there were plenty taken.
15 Q.  Do you know who would have taken those
16     photographs?
17 A.  Larry Berman.
18 Q.  Anybody else?
19 A.  Stuart Garfield.
20 Q.  Is that Ms. Garfield's husband?
21 A.  Yes.
22 Q.  He lives in Lynn as well?
23 A.  Yes.  At the same address that I don't know.
24 Q.  Why did Mr. Garfield photograph the home?

99

1  A.  He's a professional photographer.
2  Q.  Did Mr. Garfield ever give you photographs?
3  A.  No.  But he did supply Larry Berman and Fireman's
4      Fund with disks that have the photos on them.
5  Q.  Were there ever any photographs taken of the
6      water damage to your home from the burst pipes?
7  A.  Yes.
8  Q.  When were those photographs taken?
9  A.  Probably shortly thereafter by Larry Berman.
10 Q.  After the fire?
11 A.  Oh, after the fire?  Yes.  Everything was done
12     after the fire.
13 Q.  Let me ask you this.  Did you or anybody else
14     take any photographs of the damage from the burst
15     pipes between the time the pipes burst and the
16     time of the fire?
17 A.  No.
18 Q.  Were there periods of time that you had to move
19     out of your home as a result of the damage from
20     the fire?
21 A.  Yes.
22 Q.  How long a period of time was that?
23 A.  I think one time was three weeks, and I know that
24     there was a weekend here and a weekend there.

100

1  Q.  What work was being done on your property that
2      required you to vacate it for three weeks?
3  A.  Floors were being done, rooms were being rebuilt.
4  Q.  Was there a -- withdraw that question.
5          The three-week period where you couldn't
6      live in your home, approximately when was that?
7  A.  I think in April.
8  Q.  April of '04?
9  A.  Yes.  I'm not sure of the dates exactly.
10 Q.  Was there a period of time after the pipes burst
11     where you had to vacate your home because of
12     damage from the burst pipes?
13 A.  No.  When something happens within 16 hours of
14     each other and -- the burst pipes had no effect
15     on the bedrooms.
16 Q.  It did affect the kitchen though?
17 A.  Yes.  I was without a kitchen for 11 months.
18 Q.  But you continued to live at the home?
19 A.  Yes.  With three dogs and a cat, where am I
20     supposed to go?
21 Q.  Do you recall staying down at the Beekman Tower
22     Hotel in --
23 A.  In New York.
24 Q.  -- New York?

101

1   A.  Yes.

2   Q.  That was in February of '04?

3   A.  It could have been.

4   Q.  Was that one of the periods of time where you had

5       to leave your home?

6   A.  Yes.

7   Q.  Why did you have to leave the home at that time?

8   A.  To get away from the smoke.  We weren't allowed

9       to touch the fire damage for three months.

10  Q.  And you went to New York for a period of time?

11  A.  Yes.  A weekend.

12  Q.  Were you there on business?

13  A.  I was there to get away from my house.

14  Q.  And you stayed at the Benjamin Hotel in New York

15      in April of 2004?

16  A.  Uh-huh.  That was when they were doing the

17      floors.

18  Q.  And is there any particular reason that you went

19      to New York during that time period?

20  A.  To get away from everything that was going on

21      here.

22  Q.  Are you familiar with an outfit -- strike that

23      question.

        Has all the damage to your home from the

102

1       burst pipes been repaired?

2   A.  Yes.

3   Q.  When was that completed?

4   A.  I think by August of '05.

5   Q.  Who repaired the damage to your home from the

6       fire?

7   A.  The company, P. & D. Builders.

8   Q.  They're a defendant in this case?

9   A.  That's who was the contractor on the job.

10  Q.  And they have done the repair work --

11  A.  Yes.

12  Q.  -- to your home?

13  A.  Yes.

14  Q.  Is P. & D. Builders involved in the repair work

15      that you have planned for the front entryway to

16      your home?

17  A.  I don't really know yet.  Until I know what the

18      insurance company is going to settle, I don't

19      know who's -- who's doing it or if anybody's

20      doing it.

21  Q.  Has P. & D. Builders given you an estimate for

22      that work?

23  A.  No.  Mike Cleary gave me an estimate for that

24      work.  I mean, it may have come on P. & D. -- I

103

1       don't remember who gave me that initial proposal.

2       But until everything is said and done with the

3       insurance company, nothing is happening.

4            MR. CROWLEY:  Thank you, Mrs. Pavia.

5       That's all the questions I have for you right

6       now.

7            EXAMINATION BY MR. OBER:

8   Q.  Good afternoon.  Again, my name is Scott Ober.  I

9       represent Heatmaster.

10           Where in North Carolina did you purchase

11      the gas fireplace?

12  A.  I was staying in Salisbury.  I don't know where

13      my brother took me.

14  Q.  Was it a store?

15  A.  I, again, don't remember.

16  Q.  Do you remember, were there -- where you

17      purchased the log units, were there units

18      manufactured by companies other than Heatmaster?

19  A.  I don't remember.

20  Q.  But you did go to some physical location to look

21      at the units?

22  A.  Yes.

23  Q.  What discussions did you have -- or strike that.

24           Did you speak with someone at that

104

1       location where you purchased the units?

2   A.  I would assume so.  A salesperson.

3   Q.  Do you remember anything that you discussed with

4       the salesperson that you dealt with?

5   A.  The size of the fireplaces.

6   Q.  And what did you tell the salesperson about the

7       size of the fireplace in the study or the office?

8   A.  What size it was going to be.

9   Q.  And what was your understanding as to the size?

10  A.  My understanding is that we could put -- I think

11      it's 18-inch logs in all the fireplaces in the

12      house.

13  Q.  Do you remember anything else that you discussed

14      with the salesperson?

15  A.  No.

16  Q.  The units came in boxes?

17  A.  Yes.

18  Q.  How many boxes did you receive when you purchased

19      the four units?

20  A.  Eight boxes.

21  Q.  Was it your understanding that each unit came in

22      two separate boxes?

23  A.  Yes.

24  Q.  Did you open the boxes at any time between the

105

1   time you purchased it and the time that you
2   brought it home back to Newton?
3   A.  No.  They were shipped back to Newton.
4   Q.  So you merely ordered them when you went and
5       purchased them, and then they were later --
6   A.  I went and I purchased them, and then they
7       shipped them with whoever their shipper is.
8   Q.  So they were shipped directly to your house in
9       Newton?
10  A.  Yes.  No.  They were shipped to Porier Appliances
11      in Newton, and Charles Gubbins picked them up
12      from there and brought them to the house.
13  Q.  And why were the units shipped to Porier
14      Appliances?
15  A.  Because they would only ship to a commercial
16      vendor.
17  Q.  To your knowledge, did Porier Appliances sell
18      Heatmaster units at that time?
19  A.  No, they don't sell.  That was the connection
20      through P. & D. Builders.
21  Q.  Were you provided any paperwork at the time that
22      you purchased the units?
23  A.  I would assume so.
24  Q.  Other than a -- other than a sales receipt, were

106

1       you given anything relating to the use or
2       operation of the units?
3   A.  No.  The instructions and everything were sent
4       inside of the boxes.
5   Q.  At some point were you provided a copy of the
6       instructions or -- that were in the boxes?
7   A.  As soon as the boxes were opened.
8   Q.  And who gave those to you?
9   A.  No.  Nobody gave them to me.  The contractors --
10      all of the contractors were giving them back and
11      forth to make sure that they were doing
12      everything to code.
13  Q.  Did you ever review those -- well, the paperwork
14      that was in those boxes?
15  A.  No.
16  Q.  Was it ever given to you at the conclusion of the
17      work?
18  A.  Yes.
19  Q.  Do you still have that?
20  A.  No.
21  Q.  What was done with that paperwork?
22  A.  I was in the process of going through a divorce.
23      I'm not quite sure what happened to a lot of my
24      paperwork.

107

1           MR. TURNER:  Can you pass down the
2       next two exhibits, by the way?  Thanks.
3   Q.  After the fireplace unit was completed, did you
4       have any -- did you receive any instruction from
5       any of the contractors on using the fireplace?
6   A.  No.  It was pretty self-explanatory.  You turned
7       the button on, or you turned the button off.
8   Q.  Did you ever read any manuals or written --
9   A.  No.
10  Q.  -- documents relating to the operation of the
11      unit?
12  A.  No.
13  Q.  From the time it was -- the installation of the
14      fireplace was completed until the time of the
15      fire, can you estimate for me how many times you
16      used the fireplace in the -- the one in the
17      study?
18  A.  That year it was really, really cold, so I
19      probably used the fireplace maybe -- maybe six
20      times total.  And the fireplace, usually I only
21      had it on from a half an hour to an hour, tops.
22      And prior to that, the winters weren't exactly
23      cold, so maybe two or three times a winter.
24  Q.  And the other two units that were actually

108

1       installed were identical to the one that was
2       installed in the study?
3   A.  Yes.
4   Q.  And do you still have the box unit that was
5       intended for your bedroom but not eventually
6       installed?
7   A.  No.
8   Q.  What was done with that?
9   A.  I -- I think I just got rid of it.  I don't like
10      clutter.
11  Q.  When is the last time that you remember seeing
12      it?
13  A.  I have some empty boxes still, but that one I
14      would have to say probably about five or six
15      months after everything was finished the first
16      time.
17  Q.  So at some time roughly in 2001 or 2002?
18  A.  Yes.
19  Q.  Prior to purchasing these units, were you
20      familiar with Heatmaster?
21  A.  No.  I'm really not up on gas fireplaces.
22  Q.  Either before or after the fire, have you ever
23      had any conversations with anybody from
24      Heatmaster relating to the fireplaces in any way?

**109**

1  A.  No.

2  Q.  Did you ever have any problems prior to this fire

3      using any of the fireplaces that had been

4      installed during the construction?

5  A.  No.

6  Q.  How did you locate the -- the purchase place that

7      you got the units from?

8  A.  My brother is a designer in North Carolina, in

9      Salisbury, North Carolina, and that's who he uses

10     when he's doing design work and people want gas

11     logs.

12  Q.  He uses Heatmaster --

13  A.  Yes.

14  Q.  -- products?

15        When your brother suggested Heatmaster --

16     the Heatmaster product, is that the first time

17     that you heard of that --

18  A.  He suggested the place where we got it.

19  Q.  Okay.  He suggested the place as opposed to the

20     specific product?

21  A.  Yes.

22  Q.  Did the fireplace in the study have any doors to

23     it?

24  A.  No.

**110**

1  Q.  Did Mr. Rothschild ever indicate to you whether

2     he had dealt with Heatmaster products prior to

3     the log units being installed at your house?

4  A.  No.

5  Q.  And it was Mr. Carresi who actually installed the

6     log units?

7  A.  Mr. Carresi, yes.

8  Q.  Did you ever have any discussions with him about

9     whether he had installed Heatmaster products

10     prior to your house?

11  A.  No.

12        MR. OBER:  That's all I have.  Thank

13     you.

14     **EXAMINATION BY MR. TURNER:**

15  Q.  Ms. Pavia, since the fire, what type of work has

16     Michael Carresi done at your house?

17  A.  Since the fire?

18  Q.  Yes.

19  A.  He had to replace all of the HVAC system, any

20     plumbing that needed to be done.  The radiant

21     floors in the family room had to be replaced

22     because of mold.  Anything plumbing-related.

23  Q.  And you've been satisfied with his work?

24  A.  Absolutely.

**111**

1  Q.  Were you satisfied with his work in installing

2     the gas log?

3  A.  Yes.

4  Q.  Had your husband ever activated the gas log?

5  A.  Yes.  But rarely.

6  Q.  Did you say he left the house in the fall of

7     2001?

8  A.  Yes.  There wasn't a lot of time between the

9     gas -- between the time the log went in and him

10     moving out.

11  Q.  Had there been any indication of a problem with

12     the gas log before the day of the fire?

13  A.  No.

14  Q.  When the gas log was functioning, did it -- did

15     it have a smell?

16  A.  No.

17  Q.  It obviously radiated heat; correct?

18  A.  Yes.  But not -- it didn't feel like a huge

19     amount.

20  Q.  And it glowed?

21  A.  Yeah.  I mean, that -- whatever they are, the

22     embers or whatever they're called underneath

23     glowed, yeah.  The logs themselves don't glow.

24  Q.  What material are the logs?

**112**

1  A.  Ceramic, I think.  He would be able to tell you

2     better than I would.

3  Q.  At your prior house on -- I think you said

4     Exmoor, was that a Heatmaster product?

5  A.  I really don't know what it was.

6  Q.  Did someone pull a permit for the installation of

7     the gas log?

8  A.  On Exmoor?

9  Q.  On Hammondswood.

10  A.  I think there was just a permit pulled for the

11     entire job.

12  Q.  And that was pulled by...

13  A.  P. & D. Builders.

14  Q.  Had you told P. & D. Builders that one of the

15     elements of the job was the fire log?

16  A.  Yes.

17  Q.  And had P. & D. Builders indicated that they

18     would be responsible for pulling the permits?

19  A.  I -- yeah.  I mean, they just pulled the permit

20     on the whole job.  I don't think there's a

21     specific separate permit for gas logs.

22  Q.  Is that how it usually works?

23  A.  Yes.

24  Q.  Okay.  P. & D. Builders would pull the permits

113

1   for all --
2   A.   Yeah.  The builder, the contractor who has a
3        contractor's license pulls a permit for whatever
         job they're doing.
5   Q.   And at any rate, you recall that Mr. O'Regan
6        inspected and approved the gas log?
7   A.   Yes.
8   Q.   In terms of the pipes bursting several hours
9        before the fire loss, had there been any prior
10       problems with pipes bursting in your house?
11  A.   No.
12  Q.   Do you know why the prior owner would have
13       removed the insulation?
14  A.   They liked to do things very cheaply.  When we
15       moved into the house, they had installed 150
16       separate phone lines that they had done
17       themselves, plus computers in every room that
18       they had done themselves.  And we had to replace
19       the heater for the pool, because they nursed it
20       along for two years knowing that it was broken
21       until they sold the house.  They just liked to do
22       things cheap.
23  Q.   Do you remember what the temperature was on the
24       day that the pipes burst?

114

1   A.   Outside?
2   Q.   Yes.
3   A.   Twelve below.
4   Q.   Was there a claim by you against anyone as a
5        result of the pipes bursting?
6   A.   No.
7   Q.   Was there a claim by Fireman's Fund against
8        anyone?
9   A.   I -- I don't know.
10  Q.   They didn't have a claim against, for instance,
11       the prior owner or any insulation company or
12       anyone like that?
13  A.   I -- I don't know.
14  Q.   When you bought that house, did you have the
15       house inspected?
16  A.   Yes.
17  Q.   By a professional home inspector?
18  A.   Yes.
19  Q.   Did they mention anything about the insulation on
20       the pipes?
21  A.   You can't see what's behind the walls.
22  Q.   So I'll put you down for no on that one?
23  A.   Yes.
24  Q.   When the pipes burst, it affected the kitchen and

115

1   the room below the kitchen is my understanding?
2   A.   One basement totally and a portion of another
3        basement, yes.
4   Q.   And were any other rooms affected in any way?
5   A.   No.
6   Q.   Were some of the furnishings affected?
7   A.   Yes.
8   Q.   And were any of the furnishings outside of those
9        rooms that you just mentioned affected by the
10       pipe burst damage?
11  A.   No.
12  Q.   By the way, did you have an insurance policy with
13       Fireman's Fund which meant that you were paid for
14       your furnishings at replacement cost with no
15       depreciation?
16  A.   Yes.
17  Q.   All right.  No one took photos of the damage
18       after the pipe burst and before the fire damage;
         correct?
    A.   No.  Correct.
21  Q.   How old was your daughter when she took the
22       photos?
23  A.   That's two years ago.  She was 16.
24  Q.   And what high school does she go to?

116

1   A.   Commonwealth.
2   Q.   Is she in college now?
3   A.   No.  She'll be going in September.  She's a
4        senior.  She just turned 18.
5   Q.   Do you hold any licenses other than, you know, a
6        driver's license?
7   A.   No.
8   Q.   You don't have a contractor's license or anything
9        like that?
10  A.   No.
11  Q.   To do interior design, do you have to have a
12       license?
13  A.   No.
14  Q.   Have you ever been deposed before, Mrs. Pavia?
15  A.   Yes.  You missed that part.
16  Q.   All right.
17  A.   Once.
18  Q.   In regards to the divorce?
19  A.   No.  Oh, no.  I wasn't deposed for the divorce.
20  Q.   Have you ever been used as an expert witness in a
21       case?
22  A.   No.
23  Q.   Was the gas log itself damaged in this fire?
24  A.   I don't know.

117

| | |
|---|---|
| 1 | Q. Is there a gas log now in the office? |
| 2 | A. No. And never will be again. |
| 3 | Q. And why is that? |
| 4 | A. Because while I own the house, I've done it as a |
| 5 | purely decorative space so that no one will ever |
| 6 | have to worry about it again. |
| 7 | Q. Do you know why gas logs aren't permitted in a |
| 8 | bedroom? |
| 9 | A. There's something about loss of oxygen. |
| 10 | Q. Did you have a carbon monoxide detector in your |
| 11 | house? |
| 12 | A. No. |
| 13 | Q. Do you know why the smoke alarm did not go off |
| 14 | until -- I think you said sometime like 3:20? |
| 15 | A. My bedroom door was closed, because I had the |
| 16 | dogs in my room from the pipes bursting, and |
| 17 | there wasn't a smoke detector in my room. There |
| 18 | is now in every room in the house. |
| 19 | Q. So at the time of the fire loss, did you have |
| 20 | just one smoke detector? |
| 21 | A. No. There was several smoke detectors, but they |
| 22 | were in the hall, downstairs, in the attic. |
| 23 | Q. Did Fireman's Fund cancel you as an insured after |
| 24 | these two losses? |

118

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And did they tell you why? |
| 3 | A. I think it was kind of self-explanatory. |
| 4 | Q. Did you have any litigation between yourself and |
| 5 | Fireman's Fund? |
| 6 | A. No. |
| 7 | Q. Did you send them any Chapter 93A letters at any |
| 8 | time? |
| 9 | A. No. |
| 10 | Q. Did you have an attorney representing you at any |
| 11 | time? |
| 12 | A. No. |
| 13 | Q. Did you have any conversation with Joe Falco |
| 14 | about the cause of the fire? |
| 15 | A. No. |
| 16 | Q. Did you have any conversation with Mr. Carresi |
| 17 | about the cause of the fire? |
| 18 | A. Probably. |
| 19 | Q. Do you recall what was said? |
| 20 | A. That I couldn't believe that nobody had put a |
| 21 | cement slab between the firebricks and the |
| 22 | subflooring. |
| 23 | Q. And what did Mr. Carresi say, if anything? |
| 24 | A. I don't remember. I've kind of been in shock |

119

| | |
|---|---|
| 1 | over that and not really listening to what |
| 2 | anybody else responds. |
| 3 | Q. When did you first discover that condition? |
| 4 | A. After the fire when -- and I think the guy was |
| 5 | from Fireman's Fund. His first name is Jeff, and |
| 6 | I think his second -- his last name is Noonan -- |
| 7 | had come to the house and pointed it out to me. |
| 8 | He's somebody's expert witness. I don't really |
| 9 | know whose. |
| 10 | Q. Prior to that moment, did you have any idea that |
| 11 | there should be a cement slab? |
| 12 | A. Yes. But I was not aware of the fact that there |
| 13 | wasn't one. |
| 14 | Q. Who would be responsible for installing a cement |
| 15 | slab? |
| 16 | MR. CROWLEY: Objection. |
| 17 | MR. LOFTUS: You can answer if you |
| 18 | know. |
| 19 | A. Joe Falco. |
| 20 | Q. Did Joe Falco know that you were going to be |
| 21 | using a fire log? |
| 22 | MR. CROWLEY: Objection. |
| 23 | A. Yes, he did. You guys have about five more |
| 24 | minutes. |

120

| | |
|---|---|
| 1 | Q. Okay. Ms. Pavia, were the issues between |
| 2 | yourself and Fireman's Fund in differentiating |
| 3 | the burst water pipe damage from the fire, smoke, |
| 4 | and water damage? |
| 5 | A. There wasn't between myself and Fireman's Fund. |
| 6 | I know that the PAs were having difficulty |
| 7 | separating it, but Eric Schwalbach and I worked |
| 8 | it out where there weren't any issues. |
| 9 | Q. And that would be both Mr. Berman and Gordon & |
| 10 | Gordon were having problems? |
| 11 | A. They were having trouble separating it out, yes. |
| 12 | Q. Did it make any difference to you to what damage |
| 13 | it was attributed -- to what cause it was |
| 14 | attributed? |
| 15 | A. No, no. I didn't care so long as I got money so |
| 16 | that I could repair my house and repair my life. |
| 17 | MR. TURNER: Off the record just for a |
| 18 | moment. |
| 19 | (Off the record.) |
| 20 | Q. Can you tell me about your educational |
| 21 | background, ma'am? |
| 22 | A. I have a BFA from the University of Michigan. |
| 23 | Q. And where did you go to high school? |
| 24 | A. West Bloomfield High School in Michigan. |

**121**

1  Q.  What was your degree in?

2  A.  It's a bachelor of fine arts, but majoring in

3  industrial design.

4  Q.  Did the use of antique wood around the fireplace

5  have any effect on the cause of the fire?

6  A.  No.  In fact, I still have that mantle.  It was

7  cleaned and ozoned and sealed, and it's back in

8  that office.

9  Q.  Do you still have directions from Heatmaster?

10  A.  I don't know where the directions are.  I know

11  that this Jeff Noonan, I think, found some in one

12  of the boxes that was in the garage.  And no, I

13  don't have directions.

14  Q.  Do you know the name of that structural engineer

15  that Fireman's Fund sent to look at the portico?

16  A.  I don't remember his name.  I mean, I can

17  certainly call Eric and give you his name, and

18  you can give it everybody.  I've got his card at

19  home, but I don't remember his name.  It was Len

20  something, and I...

21       MR. TURNER:  Thank you, Mrs. Pavia.

22       THE WITNESS:  You're welcome.

23       MR. CARPENTER:  Well, off the record

24  for just a second.

**122**

1       (Off the record.)

2       **EXAMINATION BY MR. CARPENTER:**

3  Q.  Ms. Pavia, I -- again, we've already been

4  introduced earlier.  My name is Curtis Carpenter,

5  and I represent P. & D. Builders in this case.

6       Ms. Pavia, how did you prepare for this

7  deposition today?

8  A.  I came to it, and I talked to Erik and Stuart two

9  days ago.

10  Q.  Did you review any documents in preparation for

11  this deposition?

12  A.  No.

13  Q.  Back at the beginning of this deposition, you

14  indicated the name of -- the name under which you

15  do business, which was --

16  A.  Architectural Interiors Groups, Incorporated.

17  Q.  Is that an incorporated business?

18  A.  Yes.

19  Q.  When the decision was made to install the

20  fireplace in the office that was part of the

21  addition, was it your understanding that that was

22  going to be an ornamental fireplace, or was it

23  your understanding that it was going to be a full

24  fireplace that was fully functional in all

**123**

1  respects?

2  A.  No.  It was going --

3       MR. CROWLEY:  Objection.

4  A.  It was going to be a working fireplace.

5  Otherwise there's no need to put gas logs in it.

6  Q.  I'm sorry.  What was that last part?

7  A.  Otherwise there's no need to put gas logs in.

8  Q.  Okay.  And with the gas logs, is it your

9  understanding from them they were meant to be

10  primarily for aesthetic purposes, or do you

11  actual -- can you actually heat a room with them?

12  A.  It was my understanding they were for aesthetic

13  purposes.

14  Q.  In the addition, and specifically in the office

15  to the addition, what -- leaving aside the

16  fireplace and the gas log, what other sources of

17  heat were there for that portion of the building?

18  A.  I put in, when we first bought the house, a

19  Viessman heater.  It's, I want to say, gas-forced

20  air, but it's actually gas water-forced air,

21  because there's water coils that go around the

22  air ducts, and those -- those heat up.  And it's

23  warm air that comes out because those are heating

24  up.

**124**

1  Q.  That was installed prior to the building of this

2  addition?

3  A.  Yeah.  Well, yes.

4  Q.  It may have --

5  A.  That was the first thing that went into the

6  house.

7  Q.  Okay.  And this was tied into the addition after?

8  A.  Absolutely.

9  Q.  Okay.  I believe -- what was your -- earlier you

10  testified that you had turned the gas log on

11  sometime prior -- excuse me -- sometime

12  subsequent to the pipes bursting; is that

13  correct?

14  A.  Yes.

15  Q.  And had you turned off the pipes at the time you

16  went to bed that night?

17  A.  The fire, yes.

18  Q.  Okay.  You had turned off the gas logs by the

19  time you went to bed?

20  A.  Absolutely.

21  Q.  Okay.  Did you ever use the gas log as a means of

22  generating heat --

23  A.  No.

24  Q.  -- in the building?

125

1 A. No. The heat from gas logs is about a foot away
2 from the fireplace. It -- it doesn't heat a
3 whole room.
4 Q. Were you ever warned not to run the gas log for
5 extended periods of time?
6 A. No.
7 Q. What was the longest time you feel you ever let
8 that gas log run at one time?
9 A. I'm going to say at the very most any gas log in
10 my house has ever run is two hours. At the very
11 most.
12 Q. I think you also testified that the time at which
13 these -- both these incidents happened, the pipe
14 burst and the fire, there was -- you were
15 undergoing a cold-spell; is that right?
16 A. Yes.
17 Q. Okay. So you -- during that time, you were
18 not -- were you doing anything other than running
19 your regular furnace to heat the home?
20 A. No.
21 Q. Okay. Did you -- strike that.
22    Was the office capable of being sealed
23 off from the rest of the house?
24 A. Yes.

126

1 Q. Okay. Did you seal it off from the rest of the
2 house to save on heating?
3 A. No.
4 Q. Okay. You testified earlier that the kitchen
5 was -- the damage to the kitchen was exclusively
6 related to the bursting pipes; correct?
7 A. Correct.
8 Q. Okay. Now, you submitted a number of expenses to
9 Fireman's Fund in this case that related to
10 essentially eating expenses; correct?
11 A. Yes.
12 Q. Would you say that those relate to the fire or
13 they relate to the pipe bursting incident?
14 A. Pipes bursting.
15 Q. Okay.
16 A. Unless you consider when we moved out of the
17 house.
18 Q. Sure. But those eating expenses that are
19 strictly related to the fact that you didn't have
20 a kitchen, those are not related to the fire?
21 Those are related to the pipe bursting in the
22 kitchen?
23 A. Correct.
24 Q. Okay. You may have already answered this, but is

127

1 the only outstanding claim you have with
2 Fireman's Fund related to the portico?
3 A. Yes.
4 Q. Did you hesitate at all to retain my client, Mr.
5 Rothschild of P. & D. Builders, after these
6 events to do the reconstruction?
7 A. No.
8 Q. You've continued to have confidence in his
9 ability to perform as a general contractor?
10 A. 110 percent.
11    MR. CARPENTER: That's all I have.
12    MR. CROWLEY: I have just a very brief
13 couple of questions for you.
14    REEXAMINATION BY MR. CROWLEY:
15 Q. Who do you believe is responsible for causing the
16 fire?
17    THE WITNESS: And I have to answer
18 that one?
19 A. Joe Falco.
20 Q. Why do you blame Mr. Falco for the fire?
21 A. Because he knew after being in the mason business
22 for as many years as he's been in that you put a
23 cement slab between a subfloor and firebrick.
24 You don't ever put firebrick directly on the

128

1 floor.
2 Q. How are you familiar with Mr. Falco's work
3 experience?
4 A. I was told by Phil Rothschild that he'd been in
5 the business -- it was either 25 or 30 years.
6 Q. Okay. Is it fair to say that P. & D. Builders as
7 the general contractor was responsible for
8 inspecting and approving Mr. Falco's work?
9 A. No. It's not fair to say that.
10 Q. Why not?
11 A. Because when you have experts on the job who have
12 been in a business for a certain amount of years,
13 you usually trust what they do and trust their
14 knowledge.
15 Q. So that when you act as the general contractor,
16 you do not inspect the subcontractor's work?
17    MR. CARPENTER: Objection.
18 A. Do I inspect their work? Yes. I inspect their
19 work, but it's more of a detail-oriented thing
20 than it is their competency.
21 Q. How do you know that Mr. Falco was aware that the
22 fireplace was built to house a fire log unit?
23 A. Because he was told that before it started, and
24 the log sat right next to him in the room next to

129

```
1    where the fireplace was going so that he could
2    open it up and read the instruction manual.
3  Q. Well, did you ever tell Mr. Falco that a gas log
4    unit was going to go in that fireplace?
5  A. Yes.  And I know that Phil Rothschild did too.
6  Q. You told Mr. Falco that information?
7  A. I sad the gas logs that are going in there are
8    sitting next to you in that box there.
9  Q. When did this conversation take place?
10 A. Before he was finishing construction on the job.
11   Before he was starting construction on the job.
12 Q. Who else was present for that conversation with
13   Mr. Falco?
14 A. I'm not sure anybody else was in the room.  That
15   may have been one of my wanderings through the
16   office.
17 Q. And this conversation occurred before Mr. Falco
18   started his work on the fireplace?
19 A. Yes.
20 Q. And do you recall whether Mr. Carresi had been to
21   the property to do his work on the fireplace
22   before you had the conversation with Mr. Falco?
23 A. No, I don't recall that.  I know that he was in
     and out of that place constantly, because there
```

130

```
1    was a lot of plumbing going on, but I'm not sure
2    what process, as I stated before, the actual work
3    to the fireplace was being done.
4  Q. So do you believe that P. & D. Builders is
5    responsible in any way for causing the fire?
6  A. No.
7  Q. Do you believe that Mr. Carresi is responsible in
8    any way for causing the fire?
9  A. No.
10 Q. Do you believe that Mr. Rothschild is responsible
11   for causing the fire in any way?
12 A. Well, he's P. & D. Builders, so no.
13 Q. Okay.  So Mr. Falco in your mind is the only
14   person to blame for this fire?
15 A. Yes.
16 Q. Have you worked with Mr. Falco since the time of
17   the fire?
18 A. No.
19 Q. Will you ever work with him again?
20 A. No.
21 Q. Do you have anything personal against Mr. Falco?
22 A. Other than the fact that my house burned down,
23   no.
24 Q. Did your house burn down?
```

131

```
1  A. Pretty close.
2  Q. And what did you say specifically to Mr. Falco
3    when you pointed out there were gas logs in the
4    room before he started the work on the fireplace?
5  A. Those are the gas logs that are going to go in
6    the fireplace when it's finished.
7  Q. And did Mr. Falco say anything in response to
8    that?
9  A. No.
10 Q. Do you know whether Mr. Falco had any prior
11   experience with this type of gas fireplace?
12 A. No, I don't know that.
13 Q. Do you know whether Mr. Falco ever read the
14   directions for installing that gas fireplace?
15 A. No, I don't.
16 Q. And Mr. Falco was not responsible for installing
17   the gas fireplace into the unit that he
18   constructed?
   A. No.
          MR. CROWLEY:  Thank you.  That's all
21   the questions I have.
22          (Deposition concluded at 2:43 p.m.)
23
24
```

132

```
1        COMMONWEALTH OF MASSACHUSETTS.
2
3        BE IT KNOWN that I, Jessica L. Bisaillon,
   Shorthand Reporter and Notary Public, reported
4  stenographically the foregoing deposition
   pursuant to notice at the time and place stated
5  in the caption hereof; that I was then and there
   a Notary Public in and for the Commonwealth of
6  Massachusetts; that by virtue thereof I was
   authorized to administer an oath; that the
7  witness before testifying was duly sworn to tell
   the truth, the whole truth and nothing but the
8  truth; that the testimony of said witness was
   reduced to typewriting under my direction; that
9  the foregoing pages contain a full, true and
   correct transcription of the notes of said
10 deposition.

11     I FURTHER CERTIFY that I am not of counsel
   nor attorney for either or any of the parties to
12 said action or otherwise interested in the event
   thereof, and that I am not related to either or
13 any of the parties to said cause.

14     IN WITNESS WHEREOF I have hereunto subscribed
   my name and affixed my seal of office this 24th
15 day of February, 2006.

16

17 _____
                NOTARY PUBLIC
18 MY COMMISSION EXPIRES:
   March 6, 2009
19
20
21
22
23
24
```

## $

**$508,999.44** - 27:1
**$88,000** - 88:17

## '

**'01** - 25:7
**'04** - 81:14, 100:8, 101:2
**'05** - 82:4, 82:6, 102:4
**'40s** - 16:3
**'99** - 44:10

## 0

**01501** - 2:14
**01608** - 2:17
**02109** - 1:24
**02110** - 2:8
**02210** - 1:19, 2:11
**05-cv-10827-dpw** - 1:3
**06096** - 2:4

## 1

**1** - 3:14, 16:9, 16:11, 16:14, 16:18, 16:23, 20:8, 22:24, 38:23
**10** - 80:7, 81:7
**100** - 2:13
**103** - 3:5
**104** - 7:3, 14:17, 14:20, 19:24, 20:3
**10:00** - 67:21
**11** - 11:22, 13:7, 67:22, 68:23, 100:17
**110** - 3:6, 127:10
**1150** - 1:23
**11:00** - 61:13, 80:8
**11:30** - 1:19
**12** - 13:9
**12/14/01** - 24:13, 25:6
**12/17/01** - 3:18
**122** - 3:6
**127** - 3:7
**13** - 12:14
**150** - 113:15
**154** - 10:24
**16** - 1:19, 3:14, 7:17, 100:13, 115:23
**17th** - 24:5
**18** - 7:16, 27:24, 116:4
**18-inch** - 104:11
**19** - 3:16

## 2

**2** - 3:16, 19:7, 19:10, 19:14, 19:21, 20:7, 38:23
**20** - 37:10, 37:14
**2000** - 13:22, 14:6, 14:20, 15:7, 16:21, 18:20, 18:23, 22:14, 24:21, 26:13, 26:14, 33:17, 34:5, 34:12, 35:8, 37:24, 38:8, 40:2, 96:6, 96:22
**2001** - 24:5, 25:9, 25:22, 26:5, 26:7, 26:15, 33:18, 34:6, 34:12, 35:8, 37:24, 40:19, 41:9, 96:6, 96:23, 108:17, 111:7

**2002** - 108:17
**2004** - 7:22, 7:23, 8:1, 8:22, 59:14, 59:18, 101:15
**2006** - 1:19, 132:15
**2009** - 132:18
**23** - 3:18
**24th** - 132:14
**25** - 128:5
**250** - 1:18, 2:10
**25th** - 59:18
**26th** - 59:14
**27b** - 2:13
**28th** - 38:8
**2:00** - 69:3, 69:8
**2:40** - 69:6, 70:18, 71:2, 72:14, 73:4, 73:14, 74:19
**2:43** - 131:22

## 3

**3** - 3:18, 23:12, 23:15, 24:1, 24:16, 24:23, 25:14, 25:20, 25:24, 26:19, 38:24
**30** - 128:5
**38** - 3:20
**3:20** - 117:14
**3:40** - 71:18, 73:2, 73:4, 73:15, 74:4, 74:19
**3:42** - 75:8
**3rd** - 40:19

## 4

**4** - 3:5, 3:20, 17:3, 38:2, 38:5, 38:10, 38:20, 38:22, 39:7
**484** - 2:17

## 5

**5** - 3:22, 93:5, 93:8, 93:19, 94:6, 94:22, 94:24
**560** - 2:17
**5th** - 7:12, 13:13

## 6

**6** - 132:18
**608** - 2:4
**617** - 1:24
**6:30** - 76:14, 76:16, 77:15
**6th** - 24:21

## 7

**7** - 78:24
**7/11/00** - 3:14, 3:16
**7/6/00** - 24:13
**742-6900** - 1:24
**777** - 1:5
**7:00** - 76:11, 76:12

## 8

**8** - 14:13
**8/28/00** - 3:20
**80-year-old** - 36:22

## 9

**93** - 3:22
**93a** - 118:7
**99** - 2:7

## A

**ability** - 9:10, 127:9
**able** - 31:24, 61:23, 72:12, 76:5, 112:1
**Absolutely** - 11:20, 12:19, 35:17, 110:24, 124:8, 124:20
**accept** - 87:24
**accepted** - 87:12, 88:24
**access** - 31:24, 32:4, 37:18
**accomplished** - 35:14
**According** - 28:4
**according** - 54:5
**accurate** - 95:1
**act** - 29:5, 29:18, 84:1, 128:15
**action** - 132:12
**activated** - 111:4
**actual** - 123:11, 130:2
**add** - 27:10
**Addition** - 39:2
**addition** - 15:1, 15:4, 15:12, 15:19, 15:24, 20:17, 20:20, 20:22, 20:24, 21:3, 21:12, 21:23, 22:20, 31:23, 31:24, 32:4, 32:7, 32:14, 32:16, 32:19, 32:24, 33:2, 33:6, 33:10, 36:11, 36:14, 36:15, 36:18, 37:8, 37:15, 37:19, 37:23, 39:8, 39:19, 42:14, 43:10, 44:2, 47:3, 59:5, 67:18, 89:9, 89:10, 89:16, 89:24, 90:13, 90:15, 90:16, 91:15, 91:18, 92:13, 92:15, 122:21, 123:14, 123:15, 124:2, 124:7
**additional** - 23:4, 23:7
**address** - 7:11, 10:1, 10:19, 10:21, 10:23, 11:3, 11:4, 11:7, 18:21, 19:1, 67:5, 98:23
**addressed** - 93:11
**adjoining** - 92:22, 93:2
**adjuster** - 77:14, 77:18, 77:19, 78:8, 80:7, 81:19, 82:23
**adjusters** - 80:9, 82:11
**administer** - 132:6
**advised** - 50:14
**aesthetic** - 123:10, 123:12
**affect** - 100:16
**affected** - 63:6, 90:22, 92:23, 114:24, 115:4, 115:6, 115:9
**affixed** - 132:14
**afternoon** - 103:8
**agent** - 82:21, 82:22
**ages** - 7:15
**ago** - 12:7, 12:15, 13:13, 87:23, 115:23, 122:9
**agreeable** - 87:2
**agreed** - 4:9, 5:4, 87:16
**agreement** - 1:7,

**8:8, 8:18, 37:21, 88:20
**agreements** - 8:3
**air** - 46:9, 64:18, 123:20, 123:22, 123:23
**air-conditioners** - 46:9
**alarm** - 64:9, 71:17, 71:19, 74:3, 74:5, 117:13
**alert** - 73:12, 73:18
**allege** - 86:19
**allowed** - 31:8, 55:5, 101:8
**almost** - 21:6
**amount** - 87:2, 92:19, 111:19, 128:12
**Amy** - 46:21
**animals** - 71:7, 74:21, 74:23, 74:24, 75:4
**Ann** - 4:15, 6:22
**answer** - 5:15, 5:20, 6:4, 6:6, 30:8, 119:17, 127:17
**answered** - 126:24
**answering** - 71:24
**antique** - 21:22, 21:24, 121:4
**ants** - 16:5
**Appearing** - 2:5, 2:8, 2:11, 2:14, 2:18
**Appliances** - 105:10, 105:14, 105:17
**appoint** - 82:15
**approve** - 31:7, 97:10
**approved** - 113:6
**Approving** - 128:8
**Approximate** - 22:12
**April** - 26:15, 81:14, 100:7, 100:8, 101:15
**Architectural** - 9:22, 122:16
**area** - 57:16, 63:8, 63:15, 68:21
**areas** - 35:12, 86:3, 90:22, 98:4
**arrival** - 74:17
**arrive** - 75:7, 78:20
**arrived** - 62:3, 62:6, 62:10, 74:12
**arts** - 121:2
**aside** - 123:15
**asleep** - 69:6, 70:15
**assume** - 6:7, 30:12, 38:21, 43:3, 86:4, 94:4, 94:13, 94:17, 104:2, 105:23
**assumed** - 72:9
**assuming** - 25:3, 57:20, 60:22, 92:19
**attached** - 3:24, 63:8, 70:10, 90:17
**attempt** - 72:19, 73:5, 73:8, 73:12
**attempting** - 84:18
**attending** - 84:18
**attic** - 90:16, 90:18, 117:22
**Attorney** - 7:7
**attorney** - 118:10, 132:11
**attributed** - 120:13, 120:14
**Auburn** - 2:14
**August** - 38:8, 102:4

**authorized** - 132:6
**aware** - 9:13, 38:1, 61:14, 69:1, 78:16, 79:14, 79:24, 98:11, 119:12, 128:21

## B

**bachelor** - 121:2
**background** - 120:21
**bad** - 75:15
**bar** - 83:5, 84:16
**Based** - 87:10
**basement** - 17:9, 23:9, 27:7, 46:1, 55:3, 62:16, 62:17, 63:1, 63:5, 63:13, 63:14, 63:17, 63:20, 63:21, 64:1, 64:5, 65:17, 91:3, 91:5, 91:24, 92:3, 92:7, 93:3, 115:2, 115:3
**basements** - 63:18
**basis** - 35:10
**bathroom** - 38:23, 38:24, 60:21, 89:14, 90:1
**Bathrooms** - 13:2
**bathrooms** - 14:7, 14:22, 15:17, 19:4, 36:1, 36:2
**beam** - 92:6, 92:9, 92:10
**became** - 71:2
**become** - 61:14, 69:1, 78:16
**bed** - 49:5, 68:9, 68:23, 69:5, 70:13, 70:14, 124:16, 124:19
**bedroom** - 17:9, 55:4, 55:6, 56:19, 69:14, 69:16, 70:10, 108:5, 117:8, 117:15
**bedrooms** - 14:24, 57:1, 100:15
**Beekman** - 100:21
**began** - 13:16, 24:18, 24:20, 27:18, 40:5, 48:4, 48:13, 48:17, 48:24, 49:13, 49:18, 49:21, 49:24, 51:22, 52:2, 56:1, 58:21
**beginning** - 40:10, 52:6, 52:15, 58:8, 122:13
**begun** - 56:16
**behalf** - 1:15, 2:5, 2:8, 2:11, 2:14, 2:18
**behind** - 114:21
**below** - 63:5, 63:15, 91:3, 114:3, 115:1
**beneath** - 46:1
**Benjamin** - 101:14
**Ber** - 81:15
**Berman** - 78:10, 78:11, 79:16, 79:17, 80:2, 80:12, 80:17, 80:21, 81:2, 81:6, 81:8, 81:16, 81:20, 82:7, 84:22, 85:13, 85:21, 85:22, 85:23, 98:17, 99:3, 99:9, 120:9
**Berman's** - 87:10
**best** - 6:11, 13:9, 25:13, 26:11, 37:11, 95:1
**better** - 112:2

**Between** - 65:5, 73:4, 74:19
**between** - 13:15, 26:14, 32:8, 32:11, 32:13, 37:8, 37:15, 40:8, 50:6, 53:11, 53:16, 54:2, 57:17, 59:4, 71:13, 80:15, 89:8, 89:11, 99:15, 104:24, 111:8, 111:9, 118:4, 118:21, 120:1, 120:5, 127:23
**beyond** - 25:5
**Bfa** - 120:22
**big** - 91:9, 92:21
**bill** - 66:3, 66:6
**Bioscience** - 11:11
**Bisaillon** - 1:16, 132:3
**Blackburn** - 2:2
**blame** - 127:20, 130:14
**block** - 63:23
**blocked** - 94:10
**blocks** - 72:24, 73:20
**Bloomfield** - 120:24
**blowing** - 60:19
**Boston** - 1:18, 1:24, 2:8, 2:11, 10:19, 10:21, 10:24, 11:7, 11:13
**bottom** - 16:23
**bought** - 42:20, 42:21, 61:5, 114:14, 123:18
**Box** - 2:4
**box** - 56:11, 56:13, 108:4, 129:8
**boxes** - 104:16, 104:18, 104:20, 104:22, 104:24, 106:4, 106:6, 106:7, 106:14, 108:13, 121:12
**break** - 5:22
**breakfast** - 60:18
**breathing** - 70:8
**brick** - 21:24, 36:20, 36:22, 58:24
**Brick** - 36:19
**bricked** - 39:17
**bricks** - 36:24
**brickwork** - 41:1
**brief** - 127:12
**bringing** - 56:16
**broken** - 113:20
**broker** - 72:11
**brother** - 56:7, 103:13, 109:8, 109:15
**brought** - 12:13, 15:11, 42:4, 46:2, 53:2, 56:6, 56:13, 105:2, 105:12
**Bruce** - 2:12
**build** - 47:6, 47:8, 47:20, 48:3, 48:9, 48:16, 48:19, 50:14
**builder** - 96:9, 113:2
**Builders** - 1:9, 2:11, 3:14, 3:16, 3:18, 3:20, 10:10, 11:17, 13:16, 13:19, 14:5, 14:19, 17:15, 18:13, 24:8, 26:24, 28:9, 29:4, 29:16, 29:17, 30:9, 30:15, 31:4, 31:20, 37:22, 38:6, 44:17, 47:6, 102:7, 102:14,

102:21, 105:20, 112:13, 112:14, 112:17, 112:24, 122:5, 127:5, 128:6, 130:4, 130:12
**Builders'** - 23:18
**building** - 37:1, 93:14, 96:16, 123:17, 124:1, 124:24
**built** - 14:23, 15:1, 15:24, 16:7, 31:23, 36:17, 36:18, 47:13, 48:12, 49:7, 49:12, 51:2, 58:14, 59:2, 59:9, 63:18, 128:22
**burn** - 89:15, 89:20, 89:22, 130:24
**burned** - 130:22
**burning** - 43:23, 45:20, 57:3, 89:7, 90:3, 90:5, 90:10
**burst** - 59:22, 59:24, 60:5, 60:14, 61:6, 61:11, 63:7, 64:3, 64:10, 65:5, 65:23, 66:11, 66:16, 66:21, 67:1, 67:12, 67:17, 68:3, 68:6, 68:8, 72:1, 72:7, 72:10, 72:18, 92:10, 92:23, 99:6, 99:14, 99:15, 100:10, 100:12, 100:14, 102:1, 113:24, 114:24, 115:10, 115:18, 120:3, 125:14
**bursting** - 113:8, 113:10, 114:5, 117:16, 124:12, 126:6, 126:13, 126:14, 126:21
**business** - 9:21, 9:24, 10:2, 10:4, 10:7, 12:1, 12:3, 12:17, 14:2, 14:4, 29:19, 96:14, 101:12, 122:15, 122:17, 127:21, 128:5, 128:12
**businesses** - 29:12
**busy** - 65:1, 70:9
**button** - 107:7

**C**

**California** - 1:6
**cancel** - 117:23
**cannot** - 9:13, 56:24
**Canton** - 10:24
**capable** - 125:22
**capital** - 42:2
**caption** - 132:5
**car** - 72:4, 74:23, 75:14, 75:17, 76:7
**carbon** - 117:10
**card** - 121:18
**care** - 79:10, 120:15
**Carolina** - 56:7, 103:10, 109:8, 109:9
**Carpenter** - 2:10, 3:6, 121:23, 122:2, 122:4, 127:11, 128:17
**carpenter** - 16:5
**carpenters** - 18:1, 28:14, 30:11, 30:14, 30:17, 30:20, 30:21, 31:1, 47:12, 47:18, 47:22, 48:1
**carpentry** - 29:7, 30:2, 39:7, 39:10
**Carresi** - 1:9, 2:14, 2:15, 18:9, 18:10,

18:19, 18:22, 44:7, 44:9, 44:19, 44:23, 45:6, 45:16, 45:22, 47:1, 47:17, 53:17, 54:2, 54:7, 54:10, 54:24, 55:17, 62:3, 62:4, 62:6, 62:10, 64:12, 64:19, 65:6, 65:10, 65:19, 65:22, 66:3, 72:9, 110:5, 110:7, 110:16, 118:16, 118:23, 129:20, 130:7
**Carresi's** - 44:15
**case** - 4:17, 5:1, 8:5, 102:8, 116:21, 122:5, 126:9
**cat** - 66:24, 67:8, 75:2, 100:19
**cats** - 75:1
**causing** - 127:15, 130:5, 130:8, 130:11
**ceiling** - 58:1, 60:1, 60:12, 60:23, 64:24, 89:8, 92:12, 92:14
**cell** - 72:21, 72:22, 72:24, 73:21
**cement** - 118:21, 119:11, 119:14, 127:23
**Center** - 14:13
**Ceramic** - 112:1
**certain** - 48:7, 49:12, 128:12
**certainly** - 121:17
**Certified** - 1:17
**Certify** - 132:11
**chalk** - 49:8
**Chapter** - 118:7
**charge** - 76:24, 77:1, 81:6
**Charles** - 30:19, 47:24, 56:14, 105:11
**chase** - 89:11
**cheap** - 113:22
**cheaply** - 113:14
**chemist** - 42:1
**Chen** - 46:21
**Chestnut** - 7:3
**children** - 10:14, 34:15, 71:6, 71:9, 74:13, 74:20, 75:18
**chose** - 36:2
**City** - 96:8
**Civil** - 1:16
**claim** - 8:9, 87:13, 90:19, 114:4, 114:7, 114:10, 127:1
**claiming** - 10:7
**clarify** - 90:4
**class** - 97:24
**cleaned** - 62:18, 65:2, 121:7
**clear** - 5:17, 5:20, 69:18
**Cleary** - 88:15, 102:23
**client** - 127:4
**client's** - 13:2
**clients'** - 34:16
**close** - 26:10, 94:3, 95:3, 131:1
**closed** - 117:15
**closing** - 13:13
**clutter** - 108:10
**code** - 53:3, 53:7, 54:5, 55:5, 56:24, 106:12
**coils** - 123:21
**coincidentally** -

12:14
**cold** - 60:4, 60:19, 79:5, 107:18, 107:23, 125:15
**cold-spell** - 125:15
**collect** - 80:10
**collected** - 80:22, 81:3
**college** - 116:2
**coming** - 61:19, 64:24, 68:12, 68:16, 68:20
**commencing** - 1:19
**commercial** - 105:15
**Commission** - 132:18
**Commonwealth** - 1:17, 116:1, 132:1, 132:5
**communicated** - 50:9, 50:13, 53:4
**companies** - 103:18
**company** - 5:3, 11:16, 31:13, 71:19, 72:11, 80:11, 80:16, 80:23, 81:4, 82:15, 83:13, 87:1, 87:4, 87:8, 87:24, 88:18, 88:24, 102:7, 102:18, 103:3, 114:11
**Company** - 1:5, 8:8, 9:3
**company's** - 83:7
**competency** - 128:20
**complete** - 40:4
**completed** - 21:7, 21:11, 21:12, 22:20, 22:22, 27:21, 39:11, 41:2, 42:14, 97:3, 97:6, 97:13, 102:3, 107:3, 107:14
**completing** - 40:9
**completion** - 40:22
**computers** - 113:17
**concentrating** - 65:3, 66:12
**concerned** - 71:2
**concerning** - 8:12, 51:2, 51:11, 94:15
**concluded** - 131:22
**conclusion** - 106:16
**Concorde** - 2:3
**concrete** - 39:3
**condition** - 119:3
**conditioners** - 46:9
**confidence** - 127:8
**confined** - 89:8, 90:10
**Connecticut** - 2:4
**conection** - 78:15, 105:19
**consider** - 126:16
**Considering** - 96:14
**consist** - 49:3
**consistent** - 25:19, 28:5, 59:14
**Consoled** - 79:2
**constantly** - 129:24
**construct** - 51:6
**constructed** - 44:2, 52:21, 53:1, 57:18, 60:22, 131:18
**constructing** - 50:19
**Construction** - 1:8, 1:15, 2:8, 3:12
**construction** - 21:4,

21:6, 21:16, 22:18, 22:19, 27:8, 28:10, 28:11, 30:4, 34:9, 36:11, 37:23, 41:22, 50:1, 52:10, 53:17, 54:3, 56:15, 57:21, 95:15, 96:2, 96:22, 97:2, 97:23, 98:2, 109:4, 129:10, 129:11
**consult** - 5:23
**contact** - 33:24
**contain** - 132:9
**contained** - 94:24
**Conte** - 30:20, 30:22
**contingent** - 80:24
**continue** - 12:17, 81:8
**continued** - 100:18, 127:8
**continuing** - 49:20
**contract** - 37:22, 38:11, 38:17
**Contracting** - 58:12
**contractor** - 11:22, 28:16, 28:20, 29:5, 29:18, 87:10, 102:9, 113:2, 127:9, 128:7, 128:15
**contractor's** - 113:3, 116:8
**contractors** - 13:14, 14:14, 66:17, 106:9, 106:10, 107:5
**control** - 67:23
**conversation** - 22:4, 51:4, 53:16, 53:19, 54:1, 54:8, 54:14, 65:18, 77:5, 79:11, 79:16, 83:15, 95:10, 118:13, 118:16, 129:9, 129:12, 129:17, 129:22
**conversations** - 50:5, 53:11, 79:17, 84:3, 108:23
**cooperate** - 8:4
**cooperating** - 8:9
**coordinates** - 29:2
**copper** - 39:5
**copy** - 66:6, 106:5
**corner** - 20:16
**cornered** - 58:23
**corners** - 37:12
**Corp** - 1:8, 1:16, 2:8, 3:12
**correct** - 19:20, 24:9, 25:4, 25:10, 26:21, 53:12, 59:19, 85:11, 89:18, 93:23, 111:17, 115:19, 124:13, 126:6, 126:10, 132:9
**Correct** - 33:15, 73:16, 81:5, 89:2, 115:20, 126:7, 126:23
**correctly** - 24:14
**Correspondence** - 3:14, 3:16, 3:18
**cost** - 27:9, 115:14
**costs** - 27:16, 27:17
**coughing** - 69:3, 70:9, 70:24
**Coughing** - 69:9
**counsel** - 4:9, 4:18, 5:5, 82:15, 83:19, 84:1, 132:11
**counter** - 61:16
**counters** - 36:3
**couple** - 127:13

Court- 1:1, 1:23
cousins - 12:9
Covered- 17:1
crackling - 71:12
crash - 61:15
crawlspace - 90:17
created - 19:21,
19:23
crow - 37:14
Crowley - 2:7, 3:5,
3:7, 4:6, 4:9, 4:13,
4:16, 6:15, 6:19, 7:5,
7:9, 103:4, 119:16,
119:22, 123:3,
127:12, 127:14,
131:20
current - 10:18,
14:16
Current- 6:24
Curtis - 2:10, 122:4
cuts - 92:6

**D**

D.'s - 16:18, 17:10,
33:17, 40:22
d/b/a - 1:9, 2:15
daily - 35:10
damage - 16:4,
86:4, 86:19, 86:22,
87:5, 87:9, 87:24,
89:3, 89:7, 89:24,
90:7, 91:17, 92:8,
94:15, 97:15, 98:2,
98:9, 98:12, 99:6,
99:14, 99:19, 100:12,
101:9, 101:24, 102:5,
115:10, 115:17,
115:18, 120:3, 120:4,
120:12, 126:5
damaged - 90:3,
90:20, 90:21, 93:2,
93:4, 98:5, 116:23
dark - 70:2
date - 13:13, 22:12
dated - 3:14, 3:16,
3:18, 3:20, 24:5, 38:6
dates - 39:23, 100:9
daughter - 71:19,
97:19, 115:21
daughter's - 97:20
daughters - 7:14,
67:7
David - 2:7, 4:16,
30:18
days - 34:8, 34:10,
122:9
dealt - 17:19, 17:23,
18:5, 18:10, 104:4,
110:2
December - 24:5,
25:9, 25:22, 26:5,
26:7, 26:13, 26:14
decide - 13:24,
21:1, 57:10
decided - 20:12,
21:13, 21:17, 36:5,
42:8, 42:9, 42:12,
43:3, 43:7, 43:18
decision - 122:19
deck - 39:3
decorative - 117:5
Defendant - 1:12,
1:15
defendant - 102:8
Defendants - 1:10
defining - 29:10,
29:11
definition - 35:11
degree - 121:1

demand - 38:14
demarkation - 92:5
demolished -
15:20, 15:23
Department- 72:16,
72:17, 73:6, 73:13,
74:6, 74:9, 74:12,
75:7, 77:5, 77:17,
78:15, 79:8, 79:12,
91:8, 91:11, 92:11
department - 73:18,
74:14, 90:23, 98:13
deponent - 2:5,
6:17
deposed - 116:14,
116:19
deposition - 5:7,
6:3, 6:17, 16:12, 20:3,
23:15, 38:5, 82:16,
84:19, 93:8, 122:7,
122:11, 122:13,
132:4, 132:10
Deposition - 1:15,
3:2, 131:22
depositions - 5:12
depreciation -
115:15
describe - 69:12,
94:5
described - 86:10
Design - 34:15
design - 11:23,
13:2, 29:21, 34:17,
35:12, 35:13, 35:16,
35:18, 35:23, 36:10,
50:22, 109:10,
116:11, 121:3
designed - 35:22,
36:12
designer - 9:20,
28:19, 109:8
designing - 50:21
desire - 50:9
desk - 42:21
detail - 79:24,
128:19
detail-oriented -
128:19
detector - 117:10,
117:17, 117:20
detectors - 117:21
difference - 65:7,
120:12
different - 8:19,
60:1, 60:13, 63:17,
67:24
differentiating -
120:2
difficult - 30:7
difficulty - 120:6
dining - 14:23,
32:12, 32:13, 93:4
direct - 37:18
direct-line - 37:18
direction - 132:8
directions - 54:6,
121:9, 121:10,
121:13, 131:14
directly - 29:14,
44:19, 63:14, 74:5,
84:15, 86:16, 105:8,
127:24
disbursed - 29:17
discourage - 84:18
discover - 12:12,
119:3
discuss - 22:9
discussed - 104:3,
104:13
discussing - 51:13

discussion - 17:16,
51:11
discussions -
103:23, 110:8
disks - 99:4
dispute - 87:8
disputes - 87:5
dissatisfied - 82:8
distance - 37:7
District - 1:1
divorce - 106:22,
116:18, 116:19
document - 16:12,
19:10, 23:16, 24:3,
28:4, 93:9, 94:1
documents -
107:10, 122:10
dogs - 61:15, 67:8,
72:5, 75:1, 75:2,
100:19, 117:16
done - 14:5, 15:10,
16:17, 16:19, 19:3,
22:18, 23:5, 23:7,
23:19, 26:4, 33:21,
35:9, 36:4, 41:8,
52:14, 57:16, 59:7,
59:9, 86:5, 95:3, 96:6,
97:10, 97:23, 99:11,
100:1, 100:3, 102:10,
103:2, 106:21, 108:8,
110:16, 110:20,
113:16, 113:18,
117:4, 130:3
Donnelly - 2:16
door - 60:21, 74:16,
89:13, 91:12, 117:15
doors - 109:22
Down - 75:24
down - 8:16, 20:7,
36:13, 39:3, 49:8,
62:16, 63:12, 69:4,
69:16, 72:18, 75:14,
78:4, 88:8, 88:10,
91:14, 92:5, 93:3,
92:21, 107:1,
114:22, 130:22,
130:24
downstairs - 65:15,
71:12, 71:17, 74:22,
117:22
dozen - 13:8
draw - 43:14
drawing - 51:1
drawings - 35:20,
39:4
dressed - 71:7,
74:20, 74:21
drive - 46:13, 75:14
Drive - 1:5, 2:13
driver's - 4:3, 116:6
driveway - 71:22
ducts - 123:22
due - 27:6, 27:12,
87:16, 90:3, 90:5
duly - 4:4, 132:7
Dunn - 1:23
during - 6:3, 20:3,
22:14, 26:12, 26:16,
33:17, 34:6, 54:12,
40:1, 45:9, 46:10,
52:10, 73:14, 83:12,
84:8, 85:13, 96:22,
97:4, 101:19, 109:4,
125:17
During - 84:3

**E**

easier - 86:13
eaten - 16:6

eating - 126:10,
126:18
eaves - 60:19
Edge - 76:4
educational -
120:20
effect - 67:16,
100:14, 121:5
effectual - 82:7
effort - 92:2
efforts - 83:12
Eight - 104:20
eight - 45:8, 89:23
either - 73:23, 78:5,
128:5, 132:11, 132:12
Either - 61:7, 108:22
elapsed - 40:8
electric - 15:11
Electrical - 58:5
electrical - 15:7,
15:10, 15:13, 15:17,
39:1
electrician - 17:24,
18:2
electrician's - 58:9
electricity - 64:4
elements - 112:15
Eleven - 12:5
Ellen - 66:22
embers - 111:22
employed - 9:17
employees - 30:10,
30:12, 30:15
empty - 108:13
En - 6:24
end - 24:12, 69:17
ended - 24:24, 25:8,
25:17, 25:22
engineer - 87:14,
87:17, 87:22, 88:2,
121:14
engines - 74:1
enhancers - 9:16
enter - 69:20, 76:12,
76:15
entered - 69:23,
70:3, 77:22
enters - 7:7
entire - 32:20,
35:19, 35:22, 57:20,
62:2, 112:11
entitled - 16:24
entrance - 86:7
entrances - 64:1
entryway - 86:11,
102:15
Eric - 83:1, 120:7,
121:17
Erik - 2:3, 4:21,
122:8
Esquire - 2:3, 2:7,
2:10, 2:13, 2:16
essentially - 126:10
estimate - 6:11,
13:9, 16:19, 17:13,
23:1, 26:11, 27:4,
27:19, 37:7, 37:11,
40:13, 41:7, 88:11,
88:14, 88:16, 102:21,
102:23, 107:15
Europe - 46:7, 46:23
event - 6:12, 132:12
events - 127:6
eventually - 108:5
Eventually - 61:24
everywhere - 91:20
ex - 10:14, 10:15,
20:12, 20:14, 38:14,
41:20, 41:21, 45:2,
50:9, 51:21

ex-husband -
10:14, 20:12, 20:14,
38:14, 41:21, 45:2,
50:9, 51:21
ex-husband's -
10:15, 41:20
exactly - 49:8,
100:9, 107:22
Examination - 3:5,
3:6, 4:13, 103:7,
110:14, 122:2
examined - 4:4
except - 4:10
excluded - 17:10
exclusively - 126:5
Excuse- 32:12
excuse - 124:11
exercise - 23:8,
63:16
Exhibit - 3:11, 16:9,
16:11, 16:14, 16:18,
16:23, 19:7, 19:10,
19:14, 19:21, 20:7,
22:24, 23:12, 23:15,
24:1, 24:16, 24:23,
25:14, 25:20, 25:24,
26:19, 38:2, 38:5,
38:10, 38:20, 38:22,
39:7, 93:5, 93:8,
93:19, 94:6, 94:22,
94:24
exhibits - 3:23,
107:2
existing - 17:7,
39:5, 55:18, 56:22
exists - 44:12, 57:2
exit - 75:13
exited - 74:11
Exmoor - 14:13,
18:21, 19:1, 112:4,
112:8
expanded - 23:2
expect - 27:21
expenses - 126:8,
126:10, 126:18
experience - 128:3,
131:11
expert - 116:20,
119:8
expertise - 41:21
experts - 128:11
Expires - 132:18
explain - 80:12
explained - 80:6
explanatory -
107:6, 118:3
extended - 84:23,
125:5
exterior - 21:11,
21:12, 21:23, 36:15,
36:21, 37:1, 39:20,
40:1, 40:4, 40:9, 41:1,
42:13, 47:12, 47:19,
47:23, 49:20, 51:15,
51:16, 58:18, 58:24
extremely - 60:4,
94:11

**F**

fabricated - 54:19
facade - 51:9,
51:13, 51:15
facing - 33:5, 33:7,
33:12
Facing- 33:9
fact - 52:24, 84:6,
119:12, 121:6,
126:19, 130:22
fair - 16:18, 19:16,

19:23, 26:4, 28:1,
87:4, 92:19, 94:13,
94:17, 128:6, 128:9
**Falco**- 1:8, 1:15,
2:8, 3:12, 4:17, 17:19,
37:3, 39:13, 39:20,
39:24, 40:4, 40:9,
47:14, 48:4, 48:13,
48:17, 48:24, 49:13,
49:17, 49:20, 49:24,
50:6, 50:18, 51:22,
52:2, 52:6, 52:15,
52:20, 56:1, 118:13,
119:19, 119:20,
127:19, 127:20,
128:21, 129:3, 129:6,
129:13, 129:17,
129:22, 130:13,
130:16, 130:21,
131:2, 131:7, 131:10,
131:13, 131:16
**Falco's**- 50:7,
128:2, 128:8
**fall** - 69:6, 70:14,
111:6
**falling** - 86:18
**familial** - 12:12
**familiar** - 5:11,
11:16, 11:19, 16:14,
16:15, 28:15, 28:21,
101:22, 108:20, 128:2
**family** - 12:13,
14:22, 15:5, 71:13,
91:2, 91:21, 91:23,
110:21
**far** - 35:13, 35:14,
46:12, 79:20, 89:22
**fast** - 81:18
**faster** - 33:21, 77:20
**father** - 12:10
**February**- 1:19,
101:2, 132:15
**Federal**- 1:16
**fee** - 80:24
**feet** - 37:8, 37:15,
89:23
**field** - 41:22
**figured** - 72:12
**figures** - 24:12
**filled** - 70:7, 70:11,
71:20
**final** - 23:18, 23:24,
24:12, 26:23
**Finally**- 74:4
**finally** - 71:17, 80:6
**fine** - 121:2
**finish** - 5:19, 15:22,
21:10, 30:19, 73:11
**finished** - 27:13,
27:15, 108:15, 131:6
**finishing** - 57:20,
129:10
**Fire**- 72:16, 72:17,
73:5, 73:13, 74:6,
74:8, 74:11, 75:6,
77:5, 77:17, 78:15,
79:7, 79:12, 91:7,
91:11, 92:11
**fire** - 7:22, 7:24,
8:12, 8:21, 10:5, 10:8,
10:12, 10:13, 57:1,
57:19, 59:13, 66:11,
69:1, 69:7, 70:15,
70:20, 71:3, 71:11,
72:2, 72:10, 72:15,
73:6, 73:13, 73:18,
74:1, 74:5, 74:9,
74:14, 75:15, 77:2,
79:4, 79:9, 79:13,
79:15, 79:20, 80:2,

84:21, 84:22, 85:17,
85:20, 86:5, 86:20,
87:6, 87:9, 87:16,
88:1, 89:5, 89:8,
89:15, 89:20, 89:22,
90:3, 90:5, 90:11,
90:23, 92:24, 94:3,
94:15, 95:4, 95:7,
95:13, 95:15, 96:2,
96:3, 98:1, 98:13,
99:10, 99:11, 99:12,
99:16, 99:20, 101:9,
102:6, 107:15,
108:22, 109:2,
110:15, 110:17,
111:12, 112:15,
113:9, 115:18,
116:23, 117:19,
118:14, 118:17,
119:4, 119:21, 120:3,
121:5, 124:17,
125:14, 126:12,
126:20, 127:16,
127:20, 128:22,
130:5, 130:8, 130:11,
130:14, 130:17
**firebrick** - 127:23,
127:24
**firebricks** - 118:21
**fired** - 44:22
**firefighters** - 75:9,
75:11, 76:9, 76:19,
90:19, 92:8
**firefighting** - 92:2
**Fireman's**- 1:4, 5:2,
8:3, 8:8, 8:17, 8:20,
9:3, 82:23, 99:3,
114:7, 115:13,
117:23, 118:5, 119:5,
120:2, 120:5, 121:15,
126:9, 127:2
**firemen** - 71:21,
72:6, 76:17, 86:5,
90:4
**firemen's** - 86:15
**fireplace** - 20:8,
20:12, 20:14, 21:2,
21:13, 21:18, 21:20,
21:24, 22:5, 22:10,
26:1, 28:1, 39:19,
41:12, 42:5, 42:22,
43:1, 43:4, 43:7,
43:19, 43:21, 44:1,
44:4, 44:6, 44:8,
44:11, 44:16, 45:9,
45:16, 45:18, 45:20,
45:23, 46:6, 46:15,
46:22, 47:1, 47:3,
47:7, 47:8, 47:11,
47:16, 48:4, 48:13,
48:14, 48:17, 48:24,
49:2, 49:5, 49:13,
49:17, 49:22, 49:24,
50:2, 50:7, 50:10,
50:15, 50:21, 50:22,
50:24, 51:2, 51:7,
51:12, 51:14, 51:23,
52:3, 52:7, 52:15,
52:20, 53:17, 54:3,
54:7, 54:17, 54:22,
55:24, 56:10, 56:11,
56:16, 56:19, 56:22,
57:3, 57:17, 57:18,
57:22, 58:14, 58:20,
58:23, 59:2, 59:9,
67:13, 67:15, 67:18,
67:23, 68:2, 68:6,
68:9, 68:11, 68:13,
68:15, 68:17, 68:19,
69:24, 79:23, 92:17,

92:20, 97:6, 98:8,
103:11, 104:7, 107:3,
107:5, 107:14,
107:16, 107:19,
107:20, 109:22,
121:4, 122:20,
122:22, 122:24,
123:4, 123:16, 125:2,
128:22, 129:1, 129:4,
129:18, 129:21,
130:3, 131:4, 131:6,
131:11, 131:14,
131:17
**fireplaces** - 17:4,
17:7, 17:11, 55:7,
55:10, 55:13, 55:19,
57:1, 104:5, 104:11,
108:21, 108:24, 109:3
**fires** - 46:24
**first** - 10:12, 13:16,
13:19, 22:9, 24:7,
24:11, 24:16, 26:24,
32:4, 36:14, 59:4,
77:1, 79:18, 83:3,
84:10, 89:8, 97:5,
108:15, 109:16,
119:3, 119:5, 123:18,
124:5
**first-floor** - 32:4
**five** - 108:14,
119:23
**fixtures** - 38:24,
39:2, 61:18, 61:20
**flies** - 37:14
**floor** - 20:20, 20:21,
20:23, 21:2, 21:8,
21:23, 32:4, 36:13,
36:14, 58:2, 59:3,
59:4, 59:5, 89:9,
90:24, 91:1, 91:2,
91:22, 128:1
**Floors**- 100:3
**floors** - 92:1,
101:17, 110:21
**Florida**- 16:3
**flowing** - 61:22,
61:23, 62:9
**Folan**- 31:14, 31:16
**Folan's**- 58:12
**Folen**- 31:15
**following** - 24:12
**follows** - 4:5
**foot** - 125:1
**footings** - 88:9
**forced** - 64:18,
123:19, 123:20
**forcing** - 86:16
**foregoing** - 132:4,
132:9
**form** - 4:10
**format** - 5:15
**forth** - 96:14,
106:11
**forward** - 86:18
**four** - 55:1, 55:7,
57:7, 75:4, 104:19
**Four**- 14:21
**Fox**- 2:12
**frame** - 27:12,
27:14, 39:3
**framework** - 47:13,
47:20, 48:3, 48:9,
48:12, 49:2, 49:7,
49:12
**Frank**- 7:1
**freezing** - 79:5,
86:15
**friends** - 46:13
**front** - 32:5, 32:10,
32:13, 32:24, 33:7,

33:9, 33:12, 33:13,
51:19, 71:13, 78:2,
86:7, 86:10, 86:17,
86:19, 87:5, 89:13,
89:21, 89:22, 89:24,
90:2, 90:24, 91:1,
91:6, 91:12, 91:19,
92:18, 102:15
**froze** - 60:5, 60:19
**full** - 4:14, 122:23,
132:9
**fully** - 122:24
**functional** - 122:24
**functioning** - 55:13,
111:14
**Fund**- 1:4, 5:2, 8:3,
8:8, 8:17, 8:20, 9:3,
82:23, 99:4, 114:7,
115:13, 117:23,
118:5, 119:5, 120:2,
120:5, 121:15, 126:9,
127:2
**furnace** - 64:13,
65:11, 65:16, 65:19,
125:19
**furnishings** - 115:6,
115:8, 115:14
**furniture** - 42:10,
42:20, 42:23, 43:8,
43:11, 91:2, 91:3
**Furniture**- 42:24

## G

**garage** - 57:6,
75:16, 75:18, 75:21,
121:12
**Garfield**- 66:22,
66:24, 67:1, 98:19,
98:24, 99:2
**Garfield's**- 98:20
**gas** - 22:1, 22:5,
22:10, 26:1, 26:8,
26:11, 28:1, 41:12,
42:5, 43:19, 43:21,
44:1, 44:4, 44:6, 44:7,
44:11, 44:15, 44:22,
45:6, 45:9, 45:16,
45:23, 46:1, 46:6,
46:14, 46:22, 47:1,
47:2, 47:17, 50:10,
53:2, 54:4, 55:13,
55:24, 56:17, 56:20,
56:24, 64:18, 67:18,
67:23, 68:2, 69:24,
103:11, 108:21,
109:10, 111:2, 111:4,
111:9, 111:12,
111:14, 112:7,
112:21, 113:6,
116:23, 117:1, 117:7,
123:5, 123:7, 123:8,
123:16, 123:19,
123:20, 124:10,
124:18, 124:21,
125:1, 125:4, 125:8,
125:9, 129:3, 129:7,
131:3, 131:5, 131:11,
131:14, 131:17
**gas-fired** - 44:22
**gas-forced** - 64:18,
123:19
**gasoline** - 75:17
**general** - 28:15,
28:19, 29:5, 29:18,
127:9, 128:7, 128:15
**generating** - 124:22
**generations** - 12:7,
12:15
**girlfriend** - 66:22

**given** - 8:11, 8:17,
8:20, 8:24, 27:4, 27:9,
27:19, 102:21, 106:1,
106:16
**glow** - 111:23
**glowed** - 111:20,
111:23
**go-to** - 78:6
**Gordon**- 81:23,
81:24, 82:5, 82:10,
120:9, 120:10
**Goudreau**- 1:23
**grandfather** - 12:9
**grandmother's** -
12:10
**granite** - 36:2, 36:3
**great** - 12:9, 12:10
**great-great-
grandfather** - 12:9
**great-great-
grandmother's** -
12:10
**ground** - 5:11, 6:1,
14:23, 16:7
**Groups**- 9:22,
122:16
**guarantee** - 11:1
**Gubbins**- 30:19,
47:24, 48:3, 48:12,
48:16, 48:19, 48:20,
48:23, 49:12, 56:14,
56:16, 105:11
**guess** - 6:6, 25:1,
25:2
**guessing** - 6:7
**guest** - 69:16
**gut** - 60:6
**guy** - 119:4
**guys** - 35:24, 78:7,
119:23
**gym** - 27:7, 27:13

## H

**habit** - 53:8
**half** - 14:22, 27:16,
62:2, 62:6, 107:21
**hall** - 32:5, 32:8,
32:10, 32:13, 69:4,
69:16, 71:13, 89:21,
89:22, 90:1, 90:2,
90:24, 91:1, 91:19,
92:18, 117:22
**Hall** - 95:21, 95:23,
96:8
**hallway** - 91:14
**Hammondswood**-
7:3, 14:17, 14:20,
20:1, 20:4, 76:1,
112:9
**hand** - 33:10, 33:14
**handed** - 84:14
**handle** - 82:13
**Hassett**- 2:16
**hear** - 70:3, 71:12,
74:1
**heard** - 61:15,
109:17
**hearth** - 39:18,
50:24
**heat** - 64:11, 64:15,
64:20, 65:3, 68:20,
111:17, 123:11,
123:17, 123:22,
124:22, 125:1, 125:2,
125:19
**heater** - 113:19,
123:19
**Heating** - 1:9, 2:15
**heating** - 17:24,

123:23, 126:2
Heatmaster - 1:12, 2:18, 54:6, 54:22, 55:1, 55:7, 57:8, 103:9, 103:18, 105:18, 108:20, 108:24, 109:12, 109:15, 109:16, 110:2, 110:9, 112:4, 121:9
hell - 85:5
help - 24:17, 25:24, 62:4, 80:8
helpful - 5:17
hereof - 132:5
hereto - 3:24
hereunto - 132:14
herringbone - 50:23
hesitate - 127:4
high - 115:24, 120:23
High - 120:24
Hill - 7:3, 76:4
himself - 30:6
hire - 13:19, 13:24, 14:19, 17:23, 18:13, 18:16, 31:17, 44:19, 47:6, 80:17, 81:19, 82:10
hired - 14:15, 15:6, 17:15, 31:4, 44:16, 59:12
hiring - 31:10
hit - 89:12
hitting - 78:2
hold - 116:5
hole - 92:21, 98:8
home - 7:22, 7:24, 8:13, 8:21, 10:1, 10:4, 10:8, 10:10, 10:20, 11:2, 15:19, 15:24, 18:20, 31:24, 32:14, 32:16, 33:6, 34:5, 34:8, 37:6, 37:8, 37:9, 37:15, 37:23, 39:8, 41:17, 55:14, 64:11, 65:8, 67:7, 69:2, 73:6, 73:14, 74:11, 75:9, 75:11, 76:5, 76:10, 76:12, 76:15, 77:4, 77:10, 77:15, 77:17, 77:23, 86:11, 86:20, 87:19, 90:3, 90:14, 90:20, 90:21, 90:22, 91:8, 91:14, 91:18, 94:16, 95:7, 95:13, 95:21, 96:3, 96:20, 97:1, 98:24, 99:6, 99:19, 100:6, 100:11, 100:18, 101:5, 101:7, 101:24, 102:5, 102:12, 102:16, 105:2, 114:17, 121:19, 125:19
homes - 18:23, 34:16
hood - 47:14, 54:17, 54:19
hose - 86:15
hoses - 78:2, 91:7, 91:10, 91:14
Hot - 78:1
Hotel - 100:22, 101:14
hour - 62:2, 62:6, 62:8, 66:1, 107:21
hours - 66:10, 100:13, 113:8, 125:10
house - 13:2, 14:7, 14:21, 15:1, 15:14,

17:8, 22:18, 27:7, 32:1, 32:9, 32:17, 32:20, 32:23, 33:4, 33:8, 33:9, 33:12, 33:13, 33:14, 34:12, 36:7, 36:21, 36:23, 39:17, 41:4, 44:3, 46:12, 51:24, 52:1, 52:8, 53:20, 53:21, 60:2, 60:22, 62:8, 63:18, 64:4, 64:15, 66:11, 66:16, 66:20, 68:3, 69:7, 69:17, 70:16, 70:21, 70:22, 71:3, 71:8, 71:11, 71:16, 71:20, 72:2, 72:3, 72:15, 72:22, 73:2, 73:20, 73:24, 74:3, 75:13, 77:7, 78:5, 78:6, 79:4, 79:19, 84:22, 85:1, 85:2, 85:15, 85:18, 85:21, 85:24, 86:3, 86:17, 87:15, 89:16, 91:4, 91:6, 96:2, 101:13, 104:12, 105:8, 105:12, 110:3, 110:10, 110:16, 111:6, 112:3, 113:10, 113:15, 113:21, 114:14, 114:15, 117:4, 117:11, 117:18, 119:7, 120:16, 123:18, 124:6, 125:10, 125:23, 126:2, 126:17, 128:22, 130:22, 130:24
huge - 111:18
husband - 10:14, 20:12, 20:14, 21:1, 21:7, 21:13, 21:17, 21:20, 22:4, 38:14, 38:17, 40:15, 40:21, 40:24, 41:4, 41:8, 41:11, 41:21, 42:4, 42:9, 42:12, 42:18, 43:3, 43:11, 43:14, 43:18, 45:2, 50:9, 51:21, 98:20, 111:4
husband's - 10:15, 22:2, 41:20
Hvac - 110:19

**I**

I-beam - 92:6, 92:9, 92:10
ice - 78:3, 86:10
Icy - 78:1
Icynene - 92:15
idea - 42:4, 85:9, 96:15, 119:10
identical - 108:1
identification - 16:10, 19:8, 23:13, 38:3, 93:6
identified - 4:2
II - 7:1
Immediately - 62:5
immediately - 66:8, 66:13
impact - 86:16
impair - 9:10
Inc - 1:9, 1:12, 1:23, 2:11, 2:18, 3:14, 3:16, 3:18, 3:20, 38:6
inch - 91:9
inches - 62:23, 63:4
incident - 61:9,

126:13
incidents - 125:13
Incorporated - 9:23, 122:16
incorporated - 122:17
incorrect - 49:6
increase - 27:6
indeed - 87:16
indicate - 110:1
indicated - 33:2, 54:16, 112:17, 122:14
indicating - 55:9
indication - 111:11
industrial - 121:3
information - 25:20, 93:18, 94:24, 129:6
initial - 23:19, 27:9, 103:1
input - 42:12
inside - 3:21, 51:10, 52:2, 75:18, 106:4
Inside - 53:21
inspect - 35:8, 35:11, 95:13, 96:20, 97:8, 128:16, 128:18
inspected - 97:5, 113:6, 114:15
inspecting - 35:14, 128:8
Inspecting - 97:2
inspector - 93:14, 114:17
inspectors - 96:16
install - 39:5, 43:7, 44:6, 44:7, 44:11, 45:22, 48:21, 48:23, 54:7, 57:5, 122:19
installation - 27:6, 44:15, 107:13, 112:6
installed - 22:6, 26:2, 26:8, 26:12, 28:2, 41:12, 42:5, 44:23, 45:6, 45:16, 47:1, 47:3, 48:22, 54:17, 54:20, 54:24, 55:16, 55:18, 55:21, 55:22, 56:20, 57:2, 57:22, 58:1, 108:1, 108:2, 108:6, 109:4, 110:3, 110:5, 110:9, 113:15, 124:1
installing - 111:1, 119:14, 131:14, 131:16
instance - 114:10
instruction - 107:4, 129:2
instructions - 54:11, 71:10, 106:3, 106:6
insulation - 58:13, 58:17, 59:1, 59:11, 60:4, 60:6, 60:10, 60:11, 60:23, 113:13, 114:11, 114:19
Insurance - 1:4, 8:8, 9:3, 82:23
insurance - 5:3, 72:11, 80:11, 80:16, 80:22, 81:4, 82:15, 82:21, 82:22, 83:7, 83:13, 87:1, 87:4, 87:8, 87:24, 88:18, 88:23, 102:18, 103:3, 115:12
insured - 117:23
insurer - 5:4, 8:4, 87:12
interested - 17:22,

41:17, 56:20, 108:5
interested - 95:6, 132:12
interior - 9:20, 21:16, 39:18, 39:22, 40:6, 40:10, 41:5, 41:7, 43:10, 52:10, 58:6, 116:11
Interiors - 9:22, 80:15
intermediary - 80:15
introduced - 122:4
invoice - 23:18
involved - 38:22, 41:24, 102:14
involves - 7:21
issue - 88:4
issues - 120:1, 120:8
item - 54:24, 58:6
items - 17:3, 19:14, 53:5
itself - 58:15, 116:23

**J**

January - 7:22, 7:24, 8:22, 50:14, 59:18
Jeff - 119:5, 121:11
Jessica - 1:16, 132:3
Jim - 30:20, 30:22
job - 17:17, 17:20, 28:3, 28:22, 29:5, 33:17, 102:9, 112:11, 112:15, 112:20, 113:4, 128:11, 129:10, 129:11
jobs - 28:20, 29:21, 53:7
jobsite - 30:10
Joe - 37:3, 47:14, 118:13, 119:19, 119:20, 127:19
Joseph - 4:17, 17:19, 39:13
journal - 34:19
Julie - 1:5, 1:15, 3:3, 4:1, 4:15, 6:22, 24:8
July - 7:12, 13:13, 24:21
June - 13:21, 13:22, 14:6, 14:20, 15:6, 18:20, 18:23

**K**

keep - 34:19
kept - 85:3
kids - 71:16, 72:4, 74:22, 75:16, 79:4
killed - 78:5
kind - 53:6, 78:14, 118:3, 118:24
kitchen - 32:6, 32:11, 32:14, 32:22, 33:1, 33:2, 33:13, 36:4, 36:5, 37:9, 37:16, 37:19, 59:22, 60:2, 60:3, 60:7, 60:17, 60:24, 61:11, 61:12, 61:17, 62:13, 62:19, 63:5, 63:6, 63:8, 63:10, 63:11, 63:15, 64:5, 86:4, 92:4, 92:9, 92:23, 100:16, 100:17, 114:24, 115:1, 126:4, 126:5, 126:20, 126:22

knocked - 61:16, 64:6, 64:7, 64:8
knocking - 64:8
knowing - 55:4, 113:20
knowledge - 86:7, 86:8, 95:1, 105:17, 128:14
known - 6:20, 11:4, 11:16, 12:5
Known - 132:3
Kupferman - 60:9
Kupfermans - 60:24

**L**

Labor - 27:16
large - 38:24, 42:21, 90:21
Larry - 78:10, 82:7, 87:10, 98:17, 99:3, 99:9
last - 6:23, 7:16, 7:17, 11:4, 14:7, 18:4, 44:3, 52:18, 58:6, 66:23, 95:15, 108:11, 119:6, 123:6
Law - 2:2, 2:12
lawyer - 5:23
lawyers - 83:7
layout - 16:17, 37:6, 42:8, 42:9, 42:10, 42:13, 42:19, 43:15
least - 27:10
leave - 79:8, 101:5, 101:7
leaving - 123:15
ledge - 63:19
left - 33:14, 64:14, 65:11, 71:16, 73:1, 73:20, 98:13, 111:6
left-hand - 33:14
legal - 84:1
Len - 121:19
Lenny - 46:21
less - 82:7
letter - 3:22, 20:7, 24:7, 94:6, 94:7, 94:9, 94:14, 94:19, 95:9, 95:17, 95:19
letters - 118:7
level - 14:3, 16:7, 91:21
license - 4:3, 113:3, 116:6, 116:8, 116:12
licenses - 116:5
life - 19:13, 120:16
light - 61:18, 61:20
Line - 20:8
line - 22:11, 24:11, 37:18, 42:21, 43:2, 46:1, 54:4
linear - 37:12
lines - 25:11, 49:8, 72:18, 113:16
list - 19:14
listening - 119:1
litigation - 8:4, 84:8, 118:4
live - 7:2, 7:13, 10:17, 13:11, 45:5, 67:3, 100:6, 100:18
lived - 7:11, 10:10, 96:3
lives - 62:8, 98:22
living - 14:22, 17:8, 32:8, 32:10, 44:12, 52:8, 55:2, 91:1, 91:20, 91:23
Llp - 1:18, 2:6, 2:9

locate - 109:6
located - 9:24, 11:12, 14:12, 20:21, 20:23, 32:6, 32:22, 59:24, 60:20
location - 103:20, 104:1
locations - 60:13
Locks- 2:4
Loftus- 2:3, 4:8, 4:22, 4:23, 4:24, 5:2, 6:15, 6:18, 83:22, 83:24, 119:17
Loftus's- 83:17
log - 26:1, 26:8, 26:12, 28:1, 34:19, 42:5, 43:19, 43:21, 44:1, 44:4, 44:6, 44:8, 44:11, 44:15, 44:22, 45:6, 45:16, 45:23, 47:2, 56:20, 67:18, 67:23, 68:2, 69:24, 103:17, 110:3, 110:6, 111:2, 111:4, 111:9, 111:12, 111:14, 112:7, 112:15, 113:6, 116:23, 117:1, 119:21, 123:16, 124:10, 124:21, 125:4, 125:8, 125:9, 128:22, 128:24, 129:3
logically - 48:8, 48:9
logs - 22:1, 47:17, 53:2, 56:24, 57:12, 57:15, 104:11, 109:11, 111:23, 111:24, 112:21, 117:7, 123:5, 123:7, 123:8, 124:18, 125:1, 129:7, 131:3, 131:5
longest - 125:7
look - 14:14, 16:23, 20:7, 23:24, 71:10, 103:20, 121:15
looked - 57:12, 57:15
looking - 25:24
loss - 10:7, 88:24, 113:9, 117:9, 117:19
losses - 117:24
loud - 61:15
love - 11:8
Ls- 2:10
Lynn- 67:4, 98:22

M

Ma'am - 4:14, 6:20, 19:9, 38:4
ma'am - 120:21
machine - 71:24
Mahoney - 1:18, 2:9, 18:3, 18:5
maiden - 6:22, 6:23, 6:24
Main - 2:17
main - 89:16
majoring - 121:2
majority - 22:17
man - 77:1, 77:6, 77:10, 85:2
mantle - 21:22, 42:22, 43:1, 43:5, 47:20, 48:16, 48:18, 48:19, 48:20, 48:23, 51:20, 121:6
manual - 129:2
manuals - 107:8
manufactured -

103:18
Mara - 7:16, 7:17
marble - 36:1
March - 26:14, 132:18
Marin - 1:5
marked - 16:9, 16:11, 19:7, 19:9, 23:12, 23:14, 38:2, 38:4, 93:5, 93:7
mason - 127:21
masonry - 41:5, 41:8, 47:14, 49:14
Massachusetts - 1:1, 1:18, 1:24, 2:8, 2:11, 2:14, 2:17, 4:3, 7:4, 132:1, 132:6
match - 36:22
matched - 36:7
material - 111:24
materials - 27:17, 36:8, 36:24, 51:5, 51:12
matter - 7:21, 82:13
mean - 8:16, 12:8, 27:14, 30:5, 30:6, 33:19, 33:20, 58:17, 66:9, 77:13, 86:14, 90:7, 93:3, 102:24, 111:21, 112:19, 121:16
means - 81:2, 124:21
meant - 115:13, 123:9
medication - 9:5, 9:7, 9:10
meet - 95:20, 95:22, 96:8, 96:12
melted - 89:13, 90:1
member - 83:5, 84:16
members - 77:16
memory - 6:11, 24:17, 24:23, 25:5, 25:8, 25:13, 25:15, 25:19, 26:1, 28:5, 48:11, 49:10, 52:14, 59:15
mention - 114:19
mentioned - 46:5, 52:19, 115:9
merely - 105:4
mess - 43:22
messed - 25:11
met - 95:16, 95:18
metal - 47:14, 54:17, 54:19, 92:6
Michael - 1:9, 2:14, 10:16, 18:3, 18:9, 24:8, 44:7, 47:17, 55:17, 62:3, 62:4, 64:12, 72:9, 110:16
Michigan - 120:22, 120:24
middle - 13:21
Midstate - 2:13
might - 84:16
Mike - 30:20, 30:22, 58:10, 77:19, 88:15, 102:23
Mind - 9:6
mind - 94:11, 130:13
mine - 7:16, 66:22
minutes - 119:24
missed - 116:15
model - 57:8, 57:11
mold - 110:22
moment - 119:10,

120:18
Monaghan - 58:10
Monday - 72:13
money - 8:17, 29:16, 66:12, 80:22, 81:18, 83:12, 88:7, 88:18, 88:22, 120:15
monoxide - 117:10
months - 27:24, 45:8, 87:23, 100:17, 101:9, 108:15
morning - 69:8, 76:13, 77:16, 79:15, 80:2, 84:21, 85:16, 85:17, 85:20
Morrison - 1:18, 2:9
most - 17:18, 30:18, 34:8, 52:5, 68:5, 125:9, 125:11
motions - 4:12
moulding - 36:7
mouldings - 36:6
move - 75:21, 99:18
moved - 14:8, 40:15, 40:21, 40:24, 41:4, 41:9, 44:13, 46:5, 113:15, 126:16
moving - 85:2, 111:10
mural - 63:19
must - 60:23, 69:7, 70:15

N

nag - 34:1
nagging - 33:23, 34:23
name - 4:14, 4:16, 6:21, 6:22, 6:23, 7:16, 7:17, 9:21, 10:15, 11:18, 18:4, 58:9, 59:12, 66:23, 78:8, 87:18, 97:20, 103:8, 119:5, 119:6, 121:14, 121:16, 121:17, 121:19, 122:4, 122:14, 132:14
names - 7:15, 47:22, 76:23
Natick - 42:24
need - 5:22, 123:5, 123:7
needed - 15:11, 15:13, 23:24, 36:6, 51:19, 58:1, 58:2, 73:21, 110:20
neighborhood - 46:13
neighbors - 46:16, 73:23
neurotic - 53:6
never - 55:6, 57:2, 117:2
new - 11:3, 32:7, 88:9
New- 38:23, 100:23, 100:24, 101:10, 101:14, 101:19
Newton - 14:13, 72:16, 72:17, 73:5, 73:12, 74:5, 74:8, 74:11, 75:6, 77:5, 77:16, 78:15, 79:7, 79:12, 91:7, 91:11, 92:11, 93:14, 95:21, 95:22, 105:2, 105:3, 105:9, 105:11
next - 56:9, 107:3,

128:24, 129:8
night - 67:21, 68:23, 73:2, 124:16
nine - 89:23
Nobody - 106:9
nobody - 78:4, 79:24, 118:20
none - 92:22, 93:2
nook - 60:18
Noonan - 119:6, 121:11
North - 56:7, 103:10, 109:8, 109:9
Notary - 1:17, 4:4, 132:3, 132:5, 132:17
notes - 132:9
nothing - 58:22, 61:9, 73:17, 93:1, 103:3, 132:7
notice - 65:7, 68:12, 132:4
notify - 73:5
Novato - 1:5
number - 126:8
numbers - 23:24, 26:20
nursed - 113:19

O

O'connell - 30:21, 30:22
O'regan - 93:11, 93:12, 93:13, 93:21, 94:6, 94:7, 94:8, 94:14, 94:19, 95:6, 95:9, 95:12, 95:16, 95:18, 95:22, 96:8, 96:13, 96:19, 97:1, 97:5, 97:10, 113:5
oath - 5:15, 132:6
Ober - 2:16, 3:5, 103:7, 103:8, 110:12
Objection- 119:16, 119:22, 123:3, 126:17
objections - 4:7, 4:10
obtain - 83:12
obviously - 111:17
Occasionally - 67:14
occur - 7:24
occurred - 22:8, 53:23, 54:8, 59:13, 129:17
October - 25:7, 40:19, 41:9, 44:10
odors - 68:12
offer - 80:2, 89:1
offered - 88:18, 88:21
Office - 2:4, 20:8
office - 15:5, 20:23, 21:6, 21:14, 21:17, 22:10, 26:2, 39:6, 41:15, 41:17, 41:19, 42:8, 42:9, 42:13, 42:19, 42:23, 43:8, 43:12, 43:16, 47:7, 50:10, 52:2, 52:6, 52:11, 55:3, 55:22, 56:9, 56:13, 56:17, 57:17, 57:20, 57:21, 58:13, 58:15, 59:2, 67:13, 69:5, 69:15, 69:20, 69:23, 70:4, 70:10, 83:17, 104:7, 117:1, 121:8, 122:20, 123:14, 125:22, 129:16, 132:14

offices - 1:18
Offices- 2:2, 2:12
often - 45:12
oil - 64:15
old - 115:21
on-line - 42:21, 43:2
on-site - 53:2, 56:1
Once- 5:10, 65:9, 116:17
One - 1:23, 58:22, 60:18, 115:2
one - 3:15, 3:17, 3:21, 3:22, 5:21, 13:2, 13:3, 17:3, 17:8, 17:9, 23:8, 47:10, 48:18, 53:13, 55:2, 55:3, 55:4, 55:5, 56:9, 60:20, 61:9, 63:19, 63:24, 69:15, 75:2, 92:8, 99:23, 101:4, 107:16, 108:1, 108:13, 112:14, 114:22, 115:17, 117:5, 117:20, 119:13, 121:11, 125:8, 127:18, 129:15
ongoing - 34:9, 42:16, 57:21
open - 15:15, 46:9, 69:14, 69:20, 70:4, 74:16, 104:24, 129:2
opened - 15:15, 60:12, 69:4, 69:15, 69:17, 70:12, 106:7
operating - 10:2, 10:4
operation - 76:24, 106:2, 107:10
opportunity - 24:1, 94:21
opposed - 109:19
opposite - 33:3, 92:3
Opposite- 33:4
oral - 8:24
order - 8:17, 49:9, 59:10, 73:19
ordered - 51:21, 105:4
oriented - 128:19
original - 3:23, 16:17, 16:19, 17:13, 23:1, 27:3, 28:2, 36:7, 87:15, 87:19
originally - 88:19
ornamental - 122:22
otherwise - 132:12
Otherwise- 123:5, 123:7
outfit - 101:22
outside - 39:17, 50:24, 79:5, 86:16, 115:8
Outside- 114:1
outstanding - 127:1
own - 29:12, 117:4
owned - 44:1, 60:2, 75:4
owner - 38:24, 113:12, 114:11
owners - 16:4
owns - 11:1
Oxford- 11:11
oxygen- 89:12, 117:9
ozoned - 121:7

P

Page - 3:2, 3:11, 3:14, 3:16
page - 3:15, 3:17, 3:21, 3:22, 16:24, 24:3, 24:7, 24:11, 24:16, 26:19
pages - 3:19, 132:9
paid - 29:16, 115:13
painter - 58:11
painters - 31:12, 31:13
Painting - 58:5
painting - 58:6
panel - 51:19
paneling - 58:1
papers - 19:13
paperwork - 55:9, 105:21, 106:13, 106:21, 106:24
parameters - 49:5
Pardon - 57:13
parked - 76:7
Part - 35:11
part - 11:24, 15:4, 15:7, 28:2, 30:18, 39:2, 39:3, 44:16, 47:9, 63:9, 63:16, 63:19, 87:12, 88:24, 90:14, 92:6, 92:7, 116:15, 122:20, 123:6
particular - 57:10, 101:18
parties - 132:11, 132:13
parts - 60:1
party - 1:12
Pas - 120:6
pass - 107:1
past - 13:7, 14:16
pattern - 50:23
Paul - 11:14
Pavia - 1:5, 1:15, 3:3, 4:1, 4:15, 10:16, 10:17, 11:10, 24:8, 93:7, 103:4, 110:15, 116:14, 120:1, 121:21, 122:3, 122:6
Pavia's - 11:4
pay - 80:21
Pc - 2:16
Penfil - 6:22
people - 44:13, 46:5, 60:2, 67:9, 85:22, 109:10
Per - 96:18
percent - 81:7, 127:10
percentage - 81:3
perform - 30:3, 127:9
performed - 10:11, 18:19, 18:22, 28:13, 39:14, 41:5, 49:17, 59:11
performing - 39:24
period - 26:18, 27:22, 34:12, 45:10, 64:20, 70:13, 73:14, 84:23, 85:10, 99:22, 100:5, 100:10, 101:10, 101:19
periods - 99:18, 101:4, 125:5
permit - 97:11, 112:6, 112:10, 112:19, 112:21, 113:3
permits - 95:24, 96:5, 96:7, 96:10, 112:18, 112:24
permitted - 117:7

person - 33:24, 80:15, 130:14
personal - 14:3, 130:21
personally - 14:6
Peter - 6:24
Petronelli - 30:18
Ph.d - 42:1
Phil - 30:5, 34:2, 50:3, 51:8, 59:12, 71:23, 77:20, 77:21, 85:4, 128:4, 129:5
Phillip - 11:18, 11:19
phone - 35:2, 71:18, 72:18, 72:19, 72:21, 72:22, 72:24, 73:10, 73:21, 113:16
phonetic - 18:3, 58:10
photograph - 85:18, 98:24
photographed - 85:21, 85:23, 86:3, 86:9
photographer - 99:1
photographs - 85:14, 86:6, 97:15, 97:18, 97:22, 98:1, 98:4, 98:7, 98:11, 98:16, 99:2, 99:5, 99:8, 99:14
photography - 97:24
photos - 99:4, 115:17, 115:22
physical - 89:3, 89:7, 97:15, 103:20
Physical - 98:9
picked - 35:24, 36:8, 73:10, 105:11
piece - 48:19, 88:8
pieces - 36:5, 88:9
pipe - 64:3, 64:10, 65:23, 92:9, 92:24, 115:10, 115:18, 120:3, 125:13, 126:13, 126:21
Pipes - 126:14
pipes - 59:22, 59:23, 60:5, 60:14, 60:20, 61:6, 61:8, 61:11, 62:9, 63:7, 65:5, 66:11, 66:16, 66:21, 67:1, 67:12, 67:17, 68:3, 68:6, 68:8, 72:1, 72:7, 72:10, 72:18, 89:14, 90:1, 99:6, 99:15, 100:10, 100:12, 100:14, 102:1, 113:8, 113:10, 113:24, 114:5, 114:20, 114:24, 117:16, 124:12, 124:15, 126:6
place - 53:19, 54:5, 109:6, 109:18, 109:19, 129:9, 129:24, 132:4
Plaintiff - 1:6, 2:5
planned - 102:15
plans - 87:15, 87:19, 87:21
plenty - 98:14
plumber - 17:24, 18:8, 19:5, 20:9, 53:14
plumbing - 110:20, 110:22, 130:1

Plumbing - 1:9, 2:15
plumbing-related - 110:22
plus - 113:17
Pm - 68:23, 131:22
point - 17:12, 40:16, 42:4, 62:12, 66:14, 67:17, 74:8, 78:20, 79:10, 79:21, 81:10, 84:7, 85:20, 87:8, 106:5
pointed - 119:7, 131:3
policy - 115:12
pool - 113:19
porch - 78:2
Porier - 105:10, 105:13, 105:17
portico - 86:17, 86:20, 87:5, 88:1, 88:5, 91:6, 121:15, 127:2
portion - 32:20, 58:7, 63:14, 89:16, 90:2, 90:20, 90:21, 91:5, 92:20, 115:2, 123:17
possible - 72:4
possibly - 61:21
Post - 2:4
pouring - 61:17
power - 64:6, 64:7
preparation - 122:10
prepare - 122:6
prescription - 9:5, 9:7
present - 50:5, 51:22, 51:24, 53:10, 53:13, 53:15, 67:1, 78:9, 85:13, 85:23, 129:12
presently - 9:17
pretty - 107:6
Pretty - 131:1
previously - 14:1, 36:17, 65:10
primarily - 123:10
primary - 11:6
problem - 45:14, 59:17, 73:19, 78:7, 79:24, 80:16, 111:11
problems - 64:3, 64:10, 109:2, 113:10, 120:10
Procedure - 1:16
proceedings - 7:8
process - 62:2, 106:22, 130:2
produce - 35:20
produced - 94:1
product - 27:13, 27:15, 109:16, 109:20, 112:4
production - 4:2
products - 109:14, 110:2, 110:9
Professional - 1:17
professional - 99:1, 114:17
professionally - 18:5, 18:11
progress - 33:16, 34:20, 35:5, 35:9
project - 12:22, 13:1, 13:3, 17:23, 18:6, 18:11, 18:14, 18:17, 23:19, 24:13, 24:17, 24:20, 24:24,

25:8, 25:17, 25:22, 26:20, 26:24, 27:18, 28:10, 28:12, 29:9, 30:3, 30:17, 30:23, 31:2, 31:5, 31:8, 31:18, 35:16, 35:19, 35:23, 36:8, 41:1, 58:7
projects - 13:6
property - 10:11, 13:11, 13:14, 13:17, 14:8, 14:10, 14:15, 14:16, 14:17, 16:21, 17:11, 19:24, 20:4, 23:1, 23:5, 23:20, 24:18, 24:19, 24:20, 26:2, 26:9, 26:12, 31:11, 33:5, 39:14, 39:21, 40:1, 40:5, 40:10, 40:11, 40:16, 40:21, 40:24, 41:13, 45:5, 47:4, 47:7, 49:21, 59:18, 60:8, 61:2, 61:5, 64:19, 65:6, 65:12, 65:23, 66:18, 86:7, 89:4, 96:6, 97:16, 98:5, 98:9, 98:12, 100:1, 129:21
proposal - 3:20, 38:6, 103:1
provide - 5:4
provided - 88:14, 105:21, 106:5
public - 77:17, 77:19, 78:8, 80:7, 80:9, 81:19, 82:11
Public - 1:17, 4:4, 77:14, 132:3, 132:5, 132:17
pull - 96:5, 96:7, 112:6, 112:24
pulled - 112:10, 112:12, 112:19
pulling - 112:18
pulls - 113:3
purchase - 13:11, 42:23, 43:1, 44:22, 54:22, 57:10, 60:8, 103:10, 109:6
purchased - 13:15, 36:24, 43:2, 43:4, 43:8, 43:11, 45:3, 55:1, 55:4, 55:7, 55:11, 57:7, 61:2, 103:17, 104:1, 104:18, 105:1, 105:5, 105:6, 105:22
purchasing - 14:10, 108:19
purely - 117:5
purposes - 123:10, 123:13
pursuant - 1:16, 132:4
Put - 57:6
put - 16:3, 20:12, 21:2, 21:14, 21:18, 21:21, 22:10, 23:8, 32:16, 32:19, 33:10, 47:13, 47:17, 47:20, 48:10, 49:4, 49:7, 55:6, 58:1, 58:2, 58:3, 58:18, 58:19, 58:20, 59:2, 67:20, 78:4, 88:8, 104:10, 114:22, 118:20, 123:5, 123:7, 123:18, 127:22, 127:24

Q

questions - 9:14, 103:5, 127:13, 131:21
quickly - 64:23
quite - 106:23

R

Rachel - 7:16, 97:21, 97:22
Rachel's - 98:1, 98:4, 98:7
radiant - 110:20
radiated - 111:17
Ran- 61:21
ran - 91:8, 91:11
rang - 71:18
rarely - 111:5
rate - 113:5
razed - 16:17
read - 6:17, 24:14, 94:21, 107:8, 129:2, 131:13
reading - 6:18
ready - 7:9, 71:16
real - 46:24, 57:12, 57:15
realistic - 27:11
realized - 69:6, 70:15
really - 11:8, 13:8, 43:2, 45:24, 51:9, 58:22, 63:9, 64:21, 77:6, 79:9, 79:21, 85:3, 92:14, 94:10, 102:17, 107:18, 108:21, 112:5, 119:1, 119:8
rear - 32:16, 32:20, 32:22, 32:24, 33:6
reason - 9:9, 9:13, 94:14, 101:18
reasonable - 88:6
rebuild - 88:9
rebuilt - 100:3
receipt - 105:24
receive - 81:2, 83:16, 104:18, 107:4
received - 7:18, 82:20, 88:11
receiving - 83:10
recent - 52:5
recently - 61:1, 68:5
recognize - 16:12, 19:10, 23:15, 38:8, 38:13, 38:14, 93:8
reconstruction - 127:6
record - 5:17, 5:20, 7:5, 7:6, 7:10, 83:22, 83:23, 96:9, 120:17, 120:19, 121:23, 122:1
recorded - 8:24, 9:1
redid - 14:7, 19:4
redone - 60:3
reduced - 132:8
Reexamination - 3:7, 127:14
refer - 12:20, 16:18, 17:6, 20:3, 74:24
reference - 32:6
referred - 13:6, 34:23
referring - 74:24
refers - 17:7, 20:11
refresh - 24:23, 25:15
regarding - 53:17, 54:2

regards - 116:18
register - 71:1
Registered- 1:16
regular - 63:16,
125:19
relate - 38:10,
126:12, 126:13
related - 12:6,
12:14, 87:6, 87:9,
88:1, 110:22, 126:6,
126:9, 126:19,
126:20, 126:21,
127:2, 132:12
relates - 39:7
relating - 36:11,
106:1, 107:10, 108:24
relationship - 12:3,
12:12, 14:2
relegated - 51:13
relied - 31:20
remained - 57:24
remember - 5:18,
6:10, 19:11, 22:13,
23:23, 39:23, 44:5,
49:1, 49:8, 49:23,
59:8, 59:10, 65:14,
65:24, 66:2, 70:9,
76:23, 77:6, 85:19,
86:2, 87:18, 93:10,
94:10, 95:11, 95:14,
103:1, 103:15,
103:16, 103:19,
104:3, 104:13,
108:11, 113:23,
118:24, 121:16,
121:19
remind - 5:14
remodel - 14:21,
38:23
remove - 39:2
removed - 46:6,
46:7, 46:14, 46:18,
46:22, 60:10, 113:13
renovated - 61:1
repair - 102:10,
102:14, 120:16
repaired - 86:22,
89:4, 102:1, 102:5
replace - 110:19,
113:18
replaced - 15:17,
110:21
replacement -
115:14
report - 74:9, 88:3
reported - 72:7,
72:10, 132:3
Reporter- 1:17,
132:3
Reporting- 1:23
represent - 4:17,
4:24, 80:19, 81:8,
81:24, 82:16, 83:21,
103:9, 122:5
represented - 4:18
representing - 4:20,
6:16, 81:11, 81:17,
82:3, 82:5, 118:10
request - 22:2,
51:16, 81:10, 81:16
requested - 41:12,
94:19
require - 7:18, 35:4
required - 34:11,
100:2
residence - 11:6,
45:1, 45:7, 45:17,
47:2
respects - 123:1
respond - 5:16,

85:4
responds - 119:2
response - 131:7
responsible -
29:23, 112:18,
119:14, 127:15,
128:7, 130:5, 130:7,
130:10, 131:16
rest - 90:17, 125:23,
126:1
result - 10:8, 86:20,
99:19, 114:5
retain - 4:24, 127:4
retained - 3:23,
83:19
returned - 77:4,
77:15
review - 24:1,
87:21, 106:13, 122:10
reviewing - 24:16,
24:23, 25:14
Rick- 93:12, 93:13
rid - 108:9
right-hand - 33:10
Roach- 30:20,
30:22, 77:19, 77:22
Road- 7:3, 14:13,
20:1, 20:4, 76:1
Robert- 2:13, 60:9
rock - 63:18
role - 31:10, 33:16,
50:21, 80:12
roof - 16:5, 39:4,
39:5
room - 14:22, 14:23,
15:5, 16:3, 17:8,
20:21, 21:4, 23:8,
32:3, 32:8, 32:10,
32:12, 32:13, 44:12,
55:2, 63:16, 69:10,
70:6, 70:8, 71:14,
89:20, 91:1, 91:2,
91:21, 91:23, 93:4,
110:21, 113:17,
115:1, 117:16,
117:17, 117:18,
123:11, 125:3,
128:24, 129:14, 131:4
rooms - 14:5, 15:16,
63:6, 63:15, 64:6,
64:7, 91:18, 92:23,
93:2, 100:3, 115:4,
115:9
Rothschild- 11:14,
11:19, 11:24, 12:6,
12:18, 12:23, 13:7,
17:16, 17:22, 19:14,
22:6, 22:9, 22:24,
30:6, 30:9, 34:3, 35:4,
35:20, 50:3, 50:6,
50:11, 50:17, 51:5,
51:8, 51:11, 52:19,
53:4, 53:11, 53:16,
54:2, 54:10, 71:23,
72:8, 78:20, 79:1,
85:4, 96:8, 96:9,
96:12, 110:1, 127:5,
128:4, 129:5, 130:10
rough - 30:21, 39:7,
39:10, 49:4
roughly - 108:17
Rules- 11:16
rules - 5:11, 6:1
run - 125:4, 125:8,
125:10
running - 125:18
runs - 28:21, 33:13

S

sad - 129:7
safe - 76:15
sales - 105:24
salesperson -
104:2, 104:4, 104:6,
104:14
Salisbury - 103:12,
109:9
salt - 78:1
San - 1:5
sat - 72:5, 128:24
satisfactorily - 4:2
satisfied - 110:23,
111:1
sauna - 23:9
save - 4:10, 4:11,
126:2
scene - 74:12, 75:7,
76:20, 78:21
scheduled - 15:10
school - 115:24,
120:23
School - 120:24
Schwalbach - 83:1,
83:2, 83:5, 83:9,
83:16, 84:3, 84:5,
84:12, 84:17, 120:7
scope - 17:10, 23:2,
28:3
Scott - 2:16, 103:8
screens - 46:8
se - 96:18
seal - 126:1, 132:14
sealed - 121:7,
125:22
second - 20:20,
20:21, 20:23, 21:2,
21:7, 21:23, 26:19,
36:13, 59:4, 89:9,
91:4, 119:6, 121:24
second-floor -
21:23
section - 16:24
see - 14:21, 17:1,
17:4, 20:9, 69:23,
71:10, 76:5, 85:14,
85:17, 91:7, 91:9,
97:8, 114:21
seeing - 108:11
self - 28:13, 30:3,
107:6, 118:3
self-explanatory -
107:6, 118:3
self-perform - 30:3
self-performed -
28:13
sell - 105:17, 105:19
send - 94:19, 118:7
sending - 95:16,
95:18
senior - 116:4
Sent - 93:16
sent - 22:24, 93:21,
94:8, 94:14, 95:9,
106:3, 121:15
separate - 32:9,
64:1, 104:22, 112:21,
113:16
separated - 63:11,
63:21, 63:23
separating - 120:7,
120:11
September - 82:4,
82:6, 116:3
Service - 1:23
service - 73:21
services - 80:3,
80:21
set - 50:24
settings - 67:24

settle - 102:18
Seven - 45:8
several - 52:18,
85:22, 113:8, 117:21
sheet - 78:3, 86:10
shelves - 51:19
ship - 105:15
shipped - 105:3,
105:7, 105:8, 105:10,
105:13
shipper - 105:7
shock - 118:24
shorter - 27:22
Shorthand - 1:17,
132:3
shortly - 77:24, 99:9
show - 16:11, 19:9,
23:14, 38:4, 39:4,
84:13, 93:7, 98:4,
98:7, 98:12
shut - 68:8
side - 16:6, 23:8,
33:5, 33:11, 33:14,
63:13, 63:19, 63:20,
65:17, 73:23, 92:3,
92:8, 92:10
sides - 32:9, 33:4,
63:21, 63:23
sign - 6:17, 37:21,
97:12
signed - 8:18,
38:16, 97:11
sinks - 39:1
sit - 48:11, 52:13,
67:15, 72:6
site - 53:2, 56:1
sitting - 129:8
situation - 94:12
six - 7:12, 13:13,
62:23, 63:4, 107:19,
108:14
Sixteen - 66:10
size - 104:5, 104:7,
104:8, 104:9
sketch - 51:1
sketches - 43:14
slab - 118:21,
119:11, 119:15,
127:23
slate - 39:5
sleep - 67:22,
70:23, 70:24
small - 38:23, 90:16
smell - 70:6, 111:15
smoke - 69:10,
69:12, 69:13, 69:18,
70:6, 70:7, 70:11,
70:22, 71:20, 90:8,
90:9, 101:8, 117:13,
117:17, 117:20,
117:21, 120:3
so-called - 80:24
social - 96:17
sold - 11:2, 113:21
solid - 78:3
someone - 103:24,
112:6
Someone - 46:18,
59:12
sometime - 19:24,
22:14, 26:5, 26:12,
117:14, 124:11
Sometime - 26:14,
26:16
Somewhere - 12:10
somewhere - 19:12,
53:20, 79:22
soon - 72:3, 82:17,
106:7
soothing - 67:16

sorry - 123:6
sound - 70:23
soundproof - 59:1,
59:11
sounds - 68:16,
70:3, 77:3
sources - 78:17,
123:16
space - 39:6, 41:17,
117:5
specific - 33:24,
48:11, 51:16, 52:14,
109:20, 112:21
specifically - 45:22,
59:23, 60:16, 94:18,
123:14, 131:2
specify - 8:14,
36:20, 43:19, 43:21,
47:8
speculate - 6:5
speculating - 6:8
spell - 6:23, 66:23,
125:15
spoken - 52:20,
83:9
spot - 76:7
spray - 92:14
sprayed - 92:12,
92:17, 92:18, 92:19
spurring - 33:19,
33:20
staircase - 36:12,
36:13
stairs - 63:12
standing - 62:13,
62:17, 62:19, 63:1
start - 5:19
started - 20:1, 21:5,
21:17, 43:11, 69:5,
70:14, 89:10, 89:13,
89:15, 98:3, 128:23,
129:18, 131:4
starting - 87:2,
129:11
state - 4:14
State - 1:23
statement - 8:12,
8:21, 8:24, 9:1
States - 1:1
states - 17:3, 20:8,
24:11
status - 35:5
stayed - 92:8,
92:10, 101:14
staying - 100:21,
103:12
stenographer - 3:24
stenographically -
132:4
still - 11:1, 46:12,
57:2, 106:19, 108:4,
108:13, 121:6, 121:9
stipulations - 4:7
stood - 71:22
stop - 61:22, 61:23,
81:10, 81:16, 82:3,
82:5
store - 56:8, 103:14
stored - 56:11
Street - 1:18, 1:23,
2:7, 2:10, 2:17, 10:24
street - 67:5, 72:5,
75:14, 75:24, 76:3
strictly - 126:19
strike - 4:12, 40:20,
49:10, 81:15, 101:22,
103:23, 125:21
structural - 87:14,
87:17, 87:22, 88:2,
121:14

**structure** - 16:6, 99:14, 99:15

struts - 89:12

Stuart - 2:2, 98:19, 122:8

studio - 63:9

**study** - 41:13, 104:7, 107:17, 108:2, 109:22

study/office - 41:16

subcontractor - 47:10

subcontractor's - 128:16

subcontractors - 17:17, 17:22, 18:13, 18:16, 28:14, 28:24, 29:2, 29:10, 29:13, 29:19, 29:21, 30:7, 31:4, 31:7, 31:11, 31:17, 47:15, 50:18, 53:5, 53:12

subfloor - 127:23

subflooring - 118:22

**subject** - 20:4, 23:5, 23:20, 24:18, 24:20, 31:11, 33:5, 47:4, 47:7, 89:3, 96:6, 97:16, 98:4

submit - 43:14, 51:1

submitted - 126:8

subpoena - 7:18, 82:18, 82:20, 83:10, 84:9, 84:14

subrogee - 1:5

subscribed - 132:14

subsequent - 83:15, 124:12

subsequently - 80:17

substance - 54:1

substantially - 27:3

suddenly - 70:20

suggested - 109:15, 109:18, 109:19

**Suite** - 1:23, 2:13, 2:17

summer - 46:10

**Summer** - 1:18, 2:7, 2:10

summons - 82:17

**Sunday** - 72:12

supervises - 28:23

supervising - 29:23, 33:16

supplied - 39:1

supply - 99:3

supposed - 100:20

surround - 39:18

surrounding - 22:1

suspected - 72:14

sworn - 4:4, 132:7

**Sylvia** - 60:9

system - 110:19

**T**

table - 88:21

telephones - 64:8

**temperature** - 65:7, 113:23

ten - 61:4

**term** - 28:15, 28:18, 28:21

terms - 37:8, 88:20, 113:8

testified - 4:5, 65:10, 73:1, 124:10,

125:12, 126:4

testify - 9:3, 9:1, 9:14, 82:18, 84:7

testifying - 132:7

**testimony** - 5:14, 41:11, 42:3, 49:11, 92:22, 93:1, 132:8

themselves - 78:5, 11:1, 23, 113:17, 113:18

thereafter - 85:10, 99:9

therefore - 30:12

thereof - 132:6, 132:12

thinking - 30:11, 48:8, 49:6

Third- 1:12

third - 27:10

Third-party- 1:12

thirteen - 61:3

Thirteen- 12:7, 61:3

Three- 75:2

**three** - 39:3, 45:13, 61:7, 67:8, 68:7, 75:1, 91:9, 99:23, 100:2, 100:5, 100:19, 101:9, 107:23

three-inch - 91:9

three-week - 100:5

**Thursday** - 1:19

thyroid - 9:8

Tie- 39:4

tied - 124:7

tile - 18:1

**today** - 4:18, 5:5, 5:14, 7:19, 8:11, 9:5, 9:11, 9:15, 20:3, 48:12, 52:13, 82:16, 83:4, 84:1, 122:7

together - 74:21

toilet - 39:1

took - 27:16, 44:13, 60:6, 62:2, 88:20, 103:13, 115:17, 115:21

Toomey- 2:6

top - 51:20

tops - 107:21

Tortola- 10:20

Total- 14:21

**total** - 3:14, 3:16, 3:18, 3:20, 3:22, 26:23, 107:20

totally - 115:2

touch - 33:1, 101:9

toward - 16:23, 33:9

towards - 89:13

Tower- 100:21

**Town-** 95:21, 95:22

transcription - 132:9

tree - 12:13

trial - 4:11, 4:12

trip - 56:6

trouble - 70:8, 120:11

truck - 78:4

true - 95:1, 132:9

trust - 128:13

**truth** - 132:7, 132:8

truthfully - 9:14

trying - 65:1, 77:8, 88:6

turn - 37:12, 50:17, 67:15

turned - 61:21, 62:11, 62:14, 62:15, 62:20, 62:21, 62:24, 65:2, 67:21, 77:8,

107:6, 107:7, 116:4, 124:11, 124:18

**Turner-** 2:13, 3:6, 7:7, 57:13, 107:1, 110:14, 120:17, 121:21

**Twelve-** 10:3, 114:3

Two- 2:3

**two** - 3:18, 7:14, 10:14, 14:7, 19:4, 24:3, 45:13, 55:13, 58:23, 60:1, 60:13, 61:6, 61:7, 63:17, 63:21, 63:23, 64:6, 64:7, 68:7, 72:23, 73:20, 75:1, 87:23, 89:12, 104:22, 107:2, 107:23, 107:24, 113:20, 115:23, 117:24, 122:8, 125:10

two-page - 24:3

**type** - 21:20, 34:14, 34:19, 36:10, 36:20, 37:21, 40:13, 41:24, 44:4, 47:2, 93:18, 110:15, 131:11

typewriting - 132:8

Typewritten- 3:22

typically - 29:18

**U**

under - 5:14, 122:14, 132:8

undergoing - 125:15

underneath - 59:3, 60:21, 111:22

Underneath - 59:4

unfamiliar - 77:11

unfortunately - 86:12

**unit** - 55:22, 55:24, 56:17, 56:20, 57:4, 104:21, 107:3, 107:11, 108:4, 128:22, 129:4, 131:17

United- 1:11

**units** - 55:18, 55:21, 57:7, 103:17, 103:21, 104:1, 104:16, 104:19, 105:13, 105:18, 105:22, 106:2, 107:24, 108:19, 109:7, 110:3, 110:6

University - 120:22

unknown - 85:2

Unless - 126:16

unless - 6:8

unpleasant - 94:12

unusual - 68:12, 68:16, 68:20, 70:3

**up** - 14:23, 15:11, 16:8, 25:11, 27:11, 27:17, 32:19, 36:12, 38:20, 42:4, 42:18, 46:2, 47:13, 49:4, 56:13, 56:17, 58:1, 58:2, 58:19, 58:20, 60:12, 62:18, 65:2, 67:15, 69:3, 69:8, 69:14, 69:18, 70:16, 71:6, 71:9, 73:10, 74:20, 84:13, 93:18, 105:11, 108:21, 123:22, 123:24, 129:2

update - 15:13

updates - 35:5

upset - 79:3, 78:6

upstairs - 79:2

uses - 109:9, 109:12

usual - 4:6

**V**

vacate - 100:2, 100:11

vase - 61:16

vehicle - 75:19, 75:21

vendor - 105:16

venture - 42:1

verbally - 5:16

Viessman- 123:19

virtue - 132:6

visit - 52:5, 56:6, 96:17

vs - 1:7, 1:11

**W**

wait - 5:18

Waiting - 74:16, 74:17

waive - 6:18

walk - 32:3

walked - 71:12

walking - 78:5, 78:6

wall - 21:23, 39:2, 63:12, 63:13, 63:22, 63:23, 71:13, 77:3, 89:11

**walls** - 15:15, 15:16, 39:4, 58:15, 58:18, 58:19, 58:20, 58:24, 114:21

wanderings - 129:15

Warehouse- 42:24

warm - 123:23

warned - 125:4

**water** - 16:4, 61:8, 61:11, 61:17, 61:19, 61:21, 61:22, 61:23, 62:9, 62:13, 62:14, 62:15, 62:17, 62:19, 62:20, 62:21, 62:24, 63:1, 64:24, 65:17, 86:15, 90:19, 90:23, 90:24, 91:17, 91:20, 91:22, 92:2, 92:4, 92:7, 92:9, 92:12, 92:14, 92:16, 92:17, 92:24, 94:15, 98:5, 98:12, 99:6, 120:3, 120:4, 123:20, 123:21

water-forced- 123:20

week - 100:5

weekend - 99:24, 101:11

weeks - 68:7, 99:23, 100:2

welcome - 121:22

West- 10:24, 120:24

Whereof- 132:14

whole - 112:20, 125:3, 132:7

wind - 60:19

window - 69:17, 69:21, 70:4

windows - 46:8, 46:9, 69:4, 69:14, 70:12

Windsor- 2:4

winter - 107:23

winters - 107:22

wiring - 15:13

wishes - 4:9, 90:6

Withdraw - 93:17

withdraw - 100:4

**Witness** - 57:15, 121:22, 127:17, 132:14

witness - 1:15, 116:20, 119:8, 132:7, 132:8

woke - 69:3, 69:8, 71:6, 71:9

Woke- 74:20

woken - 70:23

**wood** - 21:24, 36:6, 39:2, 43:23, 45:20, 46:24, 49:4, 51:19, 57:3, 121:4

Wood- 58:1

wood-burning- 45:20, 57:3

Worcester- 2:17

works - 5:2, 112:22

worry - 117:6

write - 94:5

writing - 34:24, 38:15, 43:15

**written** - 8:7, 8:11, 8:16, 8:21, 34:19, 35:5, 37:22, 38:17, 107:8

**Y**

**year** - 13:21, 22:22, 26:10, 27:16, 40:1, 107:18

**years** - 7:12, 10:3, 11:22, 12:5, 13:7, 13:13, 52:18, 61:3, 61:4, 113:20, 115:23, 127:22, 128:5, 128:12

York- 100:23, 100:24, 101:10, 101:14, 101:19

yourself- 82:13, 97:18, 118:4, 120:2

Yudysky- 2:6

EXHIBIT 9

# DGF SERIES GAS LOG BURNER
## Manual and Millivolt

## INSTALLATION AND OPERATING INSTRUCTIONS

### FOR YOUR SAFETY

Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.

### FOR YOUR SAFETY
### WHAT TO DO IF YOU SMELL GAS

- ◆ Do not try to light any appliance.
- ◆ Do not touch any electrical switch; do not use any phone in your building.
- ◆ Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.
- ◆ If you cannot reach your gas supplier, call the fire department.

**WARNING:** Improper installation, adjustment, alteration, service or maintenance can cause injury or property damage. Refer to this manual. For assistance or additional information, consult a qualified installer, service agency or the gas supplier.

**IMPORTANT:** READ INSTRUCTIONS CAREFULLY BEFORE BEGINNING INSTALLATION OF LOG SET.

## DAMPER MUST BE FULLY OPEN WHEN LOG SET IS OPERATING.

This burner unit must be installed only in a *fully-vented, solid-fuel burning fireplace with a working flue* and constructed of non-combustible material. The damper and chimney must be free of any obstructions. This log set is designed to burn with a smoky, yellow flame and **must be fully vented** for this reason. The fireplace chimney must have a permanent vent opening to the atmosphere of not less than the minimum square inches stated on Table 1 on page 2 of these instructions. If it is smaller, do not use this log set.

**IMPORTANT:** Ensure that the chimney draft is adequate by holding a lit match or candle at the top edge of the fireplace opening. This will indicate if air movement is toward the fireplace. **If draft is inadequate, do not operate logs until draft is adequate.** If you smell fumes from the burner in the room when the damper is fully open, it indicates that the fireplace draft is insufficient. If the draft is insufficient, have the chimney inspected by a qualified chimney sweep. **DO NOT OPERATE LOGS UNTIL THE FIREPLACE DRAFT IS CORRECTED.** Do not burn solid fuels in a fireplace where a decorative appliance is installed.

11-2190

## GENERAL INFORMATION

◆ A fireplace screen must be in place when logs are operating and, unless other provisions for combustion air are provided, the screen must have an opening(s) for the introduction of combustion air.

◆ If glass doors are used with this log set, open doors fully when unit is operating.

◆ Open damper fully and be sure damper stop clamp is installed. (See damper stop instructions listed on page 4.) Ensure that all parts are included in the log set and that the burner has an air mixer (LP Gas) or burner orifice (Natural Gas) installed. Gas supply pipe must be ½" minimum I.D. or larger (¾") if gas line is longer than 20 feet. The minimum inlet gas supply pressure for the purpose of input adjustment is 7 inches for natural gas and 11 inches for LP gas. The maximum inlet gas supply pressure is 10.5 inches for natural gas and 13 inches for LP gas.

◆ Solid fuels shall not be burned in a fireplace where a decorative appliance is used.

◆ The installation and provisions for combustion and ventilation air must conform with the National Fuel Gas Code, ANSI Z223.1.

◆ The appliance and its individual shutoff valve must be disconnected from the gas supply piping system during any pressure testing of that system at test pressures in excess of 1/2 psig (3.5 kPa).

◆ The appliance must be isolated from the gas supply piping system by closing its individual manual shutoff valve during any pressure testing of the gas supply piping system at test pressures equal to or less than 1/2 psig (3.5 kPa).

◆ **KEEP APPLIANCE AREA CLEAR AND FREE FROM COMBUSTIBLE MATERIALS, GASOLINE AND OTHER FLAMMABLE VAPORS AND LIQUIDS.**

◆ Do not use this appliance if any part has been under water. Immediately call a qualified service technician to inspect the appliance and to replace any part of the control system and any gas control which has been under water.

## VENTING SYSTEM MAINTENANCE

An annual examination and cleaning of the venting system by a qualified person is recommended.

## CLEANING OF YOUR GAS LOG SET

Periodically you may want to remove the soot build-up on the logs by lightly brushing the logs with a soft brush. Also, occasionally, visually inspect your burner pan and pilot for proper operation (Fig. 1 and Fig. 2).





**Fig. 1**                                  **Fig. 2**

| Minimum Permanent Free Opening, Square Inches | | | |
|---|---|---|---|
| Chimney Height (Feet) | 39 | 51 | 64 |

| Appliance Input Rating, Btu Per Hour | | | |
|---|---|---|---|
| 10 | 55,800 | 74,400 | 96,400 |
| 15 | 62,400 | 84,000 | 108,800 |
| 20 | 68,400 | 94,000 | 122,200 |

2

## HOW TO INSTALL YOUR GAS LOG SET

This log set must be installed by a qualified person and instructions must be followed exactly to ensure safe operation.

Your log set is packaged in two (2) boxes. The complete burner assembly is packaged in one box and the logs are packaged in a separate box.

## GENERAL INSTALLATION

These logs require a minimum permanent free opening as stated in the chart on page 2 of these instructions, that must be provided by either the fireplace chimney of the fireplace damper to vent the gases. **The chimney damper must be fixed in a manner which will maintain the minimum permanent vent opening at all times.** This may be accomplished by installing a screw bolt in the edge of the damper to prevent its closing or by a hole(s) in the damper. These logs must be installed only in a vented fireplace with a working flue and constructed of noncombustible material. The minimum size fireplace in which these logs are to be installed is:

| Log Set Size | Depth | Height | Front Opening Width |
|---|---|---|---|
| 18″ | 14¾″ | 18″ | 22″ |
| 24″ | 14¾″ | 18″ | 27″ |
| 30″ | 14¾″ | 18″ | 33″ |

## GRATE AND BURNER ASSEMBLY

1. Turn off gas supply to fireplace.
2. Ensure that fireplace is clean.
3. Remove complete burner assembly and grate from box.
4. Place complete burner assembly on floor of fireplace with the open side of the pan facing the front of the fireplace.
5. Position the burner assembly centered from side to side and as far toward the back wall of the fireplace as possible. The fireplace will draft better with the burner unit toward the back of the fireplace. (**Never place the burner assembly more toward the front in larger fireplaces.**)
6. Place the grate over the burner assembly. Take note of the notches that are cut in the top of the pan of the burner assembly. The horizontal section of the front legs will fit into these notches, and the back leg of the grate will be behind the burner assembly. This will automatically put the grate in the correct position over the burner assembly. (See Figure 3)
7. Remove logs from log box and place on grate as described on page 4 under log placement.
8. Visually inspect the position of gas log set in the fireplace as described above.



**Fig. 3**

3

## CONNECTING GAS SUPPLY

There is a 3/8 flared fitting installed on your gas log set at the factory. Be sure fittings are of the appropriate size on any tubing that is used to be connected to your gas log set. If using tubing that has to be cut and shaped, be sure to use the proper tubing cutter and proper flaring tool. Also, be careful not to crimp the tubing when it is being bent to hook up the log set. A crimp in this line could restrict the gas flow to the log set. If a crimp does occur, do not use the line. Gas resistant pipe compound must be used on all threaded male connections, except brass to brass.

## BURNER PAN FILL INSTRUCTIONS

*NOTE:* LP GAS UNIT - fill the burner pan with rock wool only. NATURAL GAS UNIT - use sand and rock wool.
(With burner pan installed in the fireplace, remove the steel bar grate for better access to the pan.)

### LP GAS (rock wool only)
1. Locate the bag of rock wool, open it and tear off a small handful of material.
2. Separate the material into fine pieces and lightly sprinkle it evenly into the pan.
3. Continue to do this until you have filled the pan to the top, flush with the slope at the ends of the pan.
4. **Do not pack the rock wool.** Lightly place it into the pan. Packing the rock wool too tightly could prevent an even flame pattern and proper combustion.
5. When the unit is operating, the rock wool will give the appearance of burning ashes.
6. Upon starting the unit, adjust the rock wool pieces to attain the desired glowing effect.

### NATURAL GAS (sand and rock wool)
1. Locate the bag of sand, open it and pour it evenly into the burner pan..
2. Continue to do this until you have filled the burner pan.
3. Pour sand around the pan where it contacts the floor.
4. If a safety pilot is used do not pour sand onto it. The small pilot orifice could get stopped up.
5. Once the pan is filled with sand, locate the bag of rock wool, open it an tear off a small handful of material.
6. Separate the material into fine pieces and lightly sprinkle it evenly over the sand in the pan.
7. Continue to do this until you have covered the sand.
8. **Do not pack the rock wool.** Lightly place it into the pan. Packing the rock wool too tightly could prevent an even flame pattern and proper combustion.
9. When the unit is operating, the rock wool will give the appearance of burning ashes.
10. Upon starting the unit, adjust the rock wool pieces to attain the desired glowing effect.

## DAMPER STOP

**When log set is operating, damper must be fully opened (100%).**
Included in the burner assembly box is a damper stop clamp which attaches to the damper as shown in Figure 4. Install the damper blade and tighten with a wrench. This will prevent accidental closure of the damper. If the damper stop that was furnished with your log set does not fit, the installer will provide a permanent damper stop that will keep the damper open at a proper distance.



**Fig.4**



**Fig. 5**

4

Log sets are designed for natural gas, unless clearly labeled for LP gas. Never use LP gas in a log set designed for natural gas or natural gas in an LP gas log set.

The installation and the provisions for combustion and ventilation air must conform with local codes or, in the absence of local codes, must conform with the National Fuel Gas Code, ANSI Z223.1-1992.

The appliance and its individual shutoff valve must be discontinued from the gas supply piping system during any pressure testing of that system at test pressures in excess of 1/2 psig (3.5 kPa).

WARNING: When used without fresh air, gas logs may give off carbon monoxide, an odorless, poisonous gas. Carbon monoxide poisoning may lead to death. Ensure that provision for combustion air is provided. Open a window in room 1" to 2" when operating log set.



ELECTRICAL DIAGRAM FOR
MILLIVOLT SYSTEM ONLY

"If any of the original wire as supplied with the appliance must be replaced, it must be replaced with type SPT-1 wire or its equivalent."

5

## FOR YOUR SAFETY READ BEFORE LIGHTING

**WARNING:** If you do not follow these instructions exactly, a fire or explosion may result causing property damage, personal injury or loss of life.

A. This appliance has a pilot which must be lighted by hand. When lighting the pilot, follow these instructions exactly.

B. BEFORE LIGHTING smell all around the appliance area for gas. Be sure to smell next to the floor because some gas is heavier than air and will settle on the floor.
   WHAT TO DO IF YOU SMELL GAS
   ◆ Do not try to light any appliance.
   ◆ Do not touch any electrical switch; do not use any phone in your building.
   ◆ Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.
   ◆ If you cannot reach your gas supplier, call the fire department.

C. Use only your hand to push in or turn the gas control handle, Never use tools. If the handle will not push in or turn by hand, do not try to repair it. Call a qualified service technician. Force or attempted repair may result in fire or explosion.

D. Do not use this appliance if any part has been under water. Immediately call a qualified service technician to inspect the appliance and to replace any part of the control system and any gas control which has been under water.

## LIGHTING INSTRUCTIONS
## MANUAL VALVE

1. STOP! Read the safety information previously listed above.
2. Turn gas control handle clockwise ↻ to the "OFF" position.
3. Wait five (5) minutes to clear out any gas. Then smell for gas, including near the floor. If you smell gas, STOP! Follow "B" in the safety information above on this label. If you don't smell gas, go to the next step.
4. Locate pilot (Fig. 8) - located at center of pan burner mounted on the rear of the pan burner.
5. Turn control handle counterclockwise ↺ to the "PILOT" position (Fig. 7).
6. Place a lit match at the pilot burner, and simultaneously push in on the control handle. This should ignite the pilot. (If you have optional piezo ignitor on pilot, follow instructions below.)
7. Once the pilot lights, continue to depress the control handle for one (1) minute.
8. After one minute, slowly release control handle and it will pop back out. Pilot should remain lit. If it goes out, repeat steps 1 thru 8.
   ◆ If the handle does not pop out when released, stop and immediately call your service technician or gas supplier.
   ◆ If the pilot will not stay lit after several tries, turn the gas control handle to "OFF" and call your service technician or gas supplier.
   ◆ LIGHTING PILOT WITH OPTIONAL PIEZO LIGHTER (Not included.)
      1. Follow steps 1 thru 5 above.
      2. Push the control handle in and at the same time press the push-button ignitor several times. This should cause a spark at the pilot burner and ignite the pilot.
      3. Once the pilot lights, continue to depress the control handle for one (1) minute.
      4. After one minute, release control handle and the pilot should remain lit.
      5. If the pilot does not remain lit, rotate control handle to "OFF" position (Fig. 7).
      6. Wait five (5) minutes and repeat above steps.
9. Turn control handle counterclockwise ↺ to "ON".

## TO TURN OFF GAS TO APPLIANCE

Turn control handle clockwise ↻ to the "OFF" position. Do not force.



Fig. 7



Fig. 8

6

## FOR YOUR SAFETY READ BEFORE LIGHTING

**WARNING:** If you do not follow these instructions exactly, a fire or explosion may result causing property damage, personal injury or loss of life.

A. This appliance has a pilot which must be lighted by hand. When lighting the pilot, follow these instructions exactly.

B. BEFORE LIGHTING smell all around the appliance area for gas. Be sure to smell next to the floor because some gas is heavier than air and will settle on the floor.

WHAT TO DO IF YOU SMELL GAS

◆ Do not try to light any appliance.

◆ Do not touch any electrical switch; do not use any phone in your building.

◆ Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.

◆ If you cannot reach your gas supplier, call the fire department.

C. Use only your hand to push in or turn the gas control handle, Never use tools. If the handle will not push in or turn by hand, do not try to repair it. Call a qualified service technician. Force or attempted repair may result in fire or explosion.

D. Do not use this appliance if any part has been under water. Immediately call a qualified service technician to inspect the appliance and to replace any part of the control system and any gas control which has been under water.

## LIGHTING INSTRUCTIONS
## MILLIVOLT VALVE

1. STOP! Read the safety information previously listed above.
2. Turn gas control handle clockwise ⟳ to the "OFF" position.
3. Wait five (5) minutes to clear out any gas. Then smell for gas, including near the floor. If you smell gas, STOP! Follow "B" in the safety information above on this label. If you don't smell gas, go to the next step.
4. Locate pilot (Fig. 10) - located at center of pan burner mounted on the rear of the pan burner.
5. Make sure toggle switch is in the "OFF" position (Fig. 9).
6. Turn control handle counterclockwise ⟲ to the "PILOT" position (Fig. 9).
7. Place a lit match at the pilot burner, and simultaneously push in on the control handle. This should ignite the pilot. (If you have optional piezo ignitor on pilot, follow instructions below.)
8. Once the pilot lights, continue to depress the control handle for one (1) minute.
9. After one minute, slowly release control handle and it will pop back out. Pilot should remain lit. If it goes out, repeat steps 1 thru 8.
◆ If the handle does not pop out when released, stop and immediately call your service technician or gas supplier.
◆ If the pilot will not stay lit after several tries, turn the gas control handle to "OFF" and call your service technician or gas supplier.
◆ LIGHTING PILOT WITH OPTIONAL PIEZO LIGHTER (Not included.)
    1. Follow steps 1 thru 5 above.
    2. Push the control handle in and at the same time press the push-button ignitor several times. This should cause a spark at the pilot burner and ignite the pilot.
    3. Once the pilot lights, continue to depress the control handle for one (1) minute.
    4. After one minute, release control handle and the pilot should remain lit.
    5. If the pilot does not remain lit, rotate control handle to "OFF" position (Fig. 9).
    6. Wait five (5) minutes and repeat above steps.
10. Turn control handle counterclockwise ⟲ to "ON".
11. Place toggle switch in the "ON" position (Fig. 9).

## TO TURN OFF GAS TO APPLIANCE

Turn control handle clockwise ⟳ to the "OFF" position. Do not force.



Fig. 9



Fig. 10

7

# PARTS LIST for MANUAL



| KEY NO. | PART NO. | DESCRIPTION | KEY NO. | PART NO. | DESCRIPTION |
|---------|----------|-------------|---------|----------|-------------|
| A | 11-2090 | Handle cover | O | 11-2135 | Street elbow |
| B | 11-2095 | Rod handle | P | 11-2120 | Heatshield for 18" unit |
| C | 11-2091 | Plastic plug | | 11-2121 | Heatshield for 24" unit |
| D | 11-2110 | Handle tube assembly | | 11-2122 | Heatshield for 30" unit |
| E | 01-1078 | Cotter pin | | | |
| F | 11-1300 | 3/8" flare elbow | Q | 01-1095 | Nut |
| G | 07-1025 | Valve | R | 11-1117 | 90° elbow |
| H | 07-1008 | Pilot assembly | S | 11-1765 | Square nut |
| I | 07-1009 | Thermocouple | T | 01-1080 | Screw |
| J | 11-1870 | Grate for 18" unit | U | PAN2-18 | Pan assembly for 18" unit |
| | 11-1875 | Grate for 24" unit | | PAN2-24 | Pan assembly for 24" unit |
| | 11-1880 | Grate for 30" unit | | PAN2-32 | Pan assembly for 30" unit |
| K | AM-2 | Orifice for LP units | V | 04-1009 | Self-tapping screw |
| | BPO-2 | Orifice for natural gas unit | W | 11-2175 | Valve heat shield |
| L | 06-1032 | Screw | X | PI-FM | Optional piezo kit |
| M | 11-1116 | 45° elbow | | | |
| N | 11-2180 | Nipple for 18" unit | | | |
| | 11-2181 | Nipple for 24" unit | | | |

Parts may be ordered from your local retailer or from:
HEATMASTER, INC.
Route 2, Box 48
Angier, NC 27501
(919) 639-4568

*When ordering, please include complete part number, part name and gas type.*



**Listing # 1238**
**Complies with LARGA2-72**

8

# PARTS LIST for MILLIVOLT



| KEY NO. | PART NO. | DESCRIPTION | KEY NO. | PART NO. | DESCRIPTION |
|---------|----------|-------------|---------|----------|-------------|
| A | 11-2090 | Handle cover | P | 11-2076 | Connector pipe 18" |
| B | 11-2095 | Rod handle | | 11-2081 | Connector pipe 24" |
| C | 11-2091 | Plastic plug | | 11-2086 | Connector pipe 30" |
| D | 11-2250 | Handle bracket assembly | Q | 11-2120 | Chrome heatshield for 18" unit |
| E | 11-2255 | Wiring harness | | 11-2121 | Chrome heatshield for 24" unit |
| F | 01-1078 | Cotter pin | | 11-2122 | Chrome heatshield for 30" unit |
| G | 11-2260 | Millivolt valve | R | 11-1117 | 90° elbow |
| H | 07-1020 | 3/8" street elbow | S | 01-1095 | Nut |
| I | 11-1300 | 3/8" flare elbow | T | 01-1080 | Screw |
| J | 11-1870 | Grate for 18" unit | U | 04-1009 | Self-tapping screw |
| | 11-1875 | Grate for 24" unit | V | 01-1158 | 10 x 1/2 screw |
| | 11-1880 | Grate for 30" unit | W | PAN2-18 | Pan assembly for 18" unit |
| K | 09-1005 | Pilot burner | | PAN2-24 | Pan assembly for 24" unit |
| L | 01-1035 | Thermopile | | PAN2-32 | Pan assembly for 30" unit |
| M | 01-1557 | Brass street elbow | X | 11-2177 | Valve heatshield |
| N | AM-2 | Orifice for LP units | Y | 11-2265 | Switch |
| | BPO-2 | Orifice for NAT units | Z | PI-FM | Optional piezo kit |
| O | 06-1032 | Self-drilling screw | AA | 11-1765 | Square nut |

Parts may be ordered from your local retailer or from:
HEATMASTER, INC.
Route 2, Box 48
Angier, NC 27501
(919) 639-4568

*When ordering, please include complete part number, part name and gas type.*



**Listing # 1238**
**Complies with LARGA2-72**

9

# THIS PAGE WAS INTENTIONALLY LEFT BLANK.

EXHIBIT 10

# HEATMASTER, INC.
## LIMITED WARRANTY

All logs manufactured by HEATMASTER, Inc. have a lifetime warranty against breakage due to heat to the original owner in the original installation.

- ♦ Glowing Ember Burners and grate assemblies are warranted for five (5) years.
- ♦ All other mechanical parts are warranted for one (1) year.

## LIMITATIONS

1. HEATMASTER, Inc.'s obligations to the purchaser under this warranty is limited to the repair or replacement of defective part which will be made free of charge. Such repair or replacement shall constitute fulfillment of all HEATMASTER, Inc.'s liabilities to the purchaser.

2. Repairs or replacement will be performed by HEATMASTER, Inc. following delivery of the product by the purchaser to HEATMASTER, Inc.'s facility in Angier, North Carolina. The cost of mailing or other delivery to HEATMASTER, Inc. shall be borne by the purchaser. The mailing address is: HEATMASTER, Inc., Route 2, Box 48, Angier, NC 27501.

3. Along with the product, the purchaser shall include a written explanation of the approximate date the product was purchased, the dealer or person from whom the product was purchased, the date the defect was first noticed, a description of the nature of the defect, and what the purchaser did, if anything, to repair or correct the defect.

4. To the extent allowed by law, any implied warranty of merchantability or fitness applicable to this product is limited to the duration of this warranty. HEATMASTER, Inc. shall not be liable for loss of use of this product, loss of time, inconvenience, commercial loss, or consequential damages. The remedy of repair or replacement of a defective part during the warranty period herein specified shall be the purchasers exclusive remedy.

*Please complete the card below and return it so that we may record your purchase.*

00-1000

## WARRANTY REGISTRATION

Date of Sale: _____

Model No.: _____ Serial No.: _____

Purchased From: _____ City: _____ State: _____

Your Name: _____

Street Address: _____

City: _____ State: _____

Zip: _____ Phone No.: ( ____ ) _____

How did your hear about HEATMASTER Logs?

Installed by:  ☐ self    ☐ dealer    ☐ other: _____

Additional Comments: _____

Dear Purchaser:

We are pleased that you have selected our product and take this opportunity to assure yc that qualified service is available if required.

*Please Keep This Warranty Card*

**Who gets the warranty?**    The warranty is limited to the consumer wi originally purchased the product.

**What is covered?**    This limited warranty covers all imperfections workmanship and material.

**What is not covered?**    This limited warranty does **not** cover dama resulting from accident, misuse or abuse, lack proper maintenance, affixing of any attachments n provided with the products, or loss of parts. IN N EVENT SHALL HEATMASTER, INC. BE LIABL FOR ANY SPECIAL, INCIDENTAL O CONSEQUENTIAL DAMAGES RESULTIN FROM MISUSE OR MODIFICATION OF TH PRODUCT.

DEFECTIVE PARTS OR BROKEN LOGS FOR REPLACEMENTS MUST B RETURNED TO THE FACTORY PREPAID ALONG WITH **PROOF** O **PURCHASE.** FACTORY WILL REPAIR OR REPLACE AT FACTORY OPTIO AND RETURN TO PURCHASER FREIGHT PREPAID.

*Please complete the card below and return it so that we may record your purchase.*

HEATMASTER, INC.
RT 2 BOX 48
ANGIER NC 27501-9608

PLACE
STAMP
HERE

EXHIBIT 11



21 Father DeValles Blvd., Bldg. B
Fall River, MA  02723
Tf: 800-326-5811
Tel: 508-997-4900
Fax: 508-991-8824
www.efiglobal.com

Complex Issues • Solid Solutions

# FIRE INVESTIGATION
## Report One and Final

| | |
|---|---|
| **Insured:** | **Julie Pavia** |
| **Loss Location:** | **Newton, MA** |
| **Date of Loss:** | **January 25, 2004** |
| **Policy No.:** | **NZD2700996** |
| **Claim No.:** | **11004267142** |
| **EFI File No.:** | **94507-01708** |

**Report Date:**   March 31, 2006

**Prepared For:**   Firemans Fund
C/O Law Offices of Stuart Blackburn
Two Concorde Way, P.O. Box 608
Windsor Locks, CT  06096

**Attention:**   Erik Loftus, Esq.

*THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE. RELEASE TO ANY OTHER COMPANY, CONCERN, OR INDIVIDUAL IS SOLELY THE RESPONSIBILITY OF ADDRESSEE*

94507-01708                         March 31, 2006                         Page 1
Insured:  Julie Pavia

ASSIGNMENT

The assignment was received on January 26, 2004 with instructions to conduct an origin and cause investigation on a fire that occurred at 104 Hammondwood Road, Newton, Massachusetts on January 25, 2004.

ENCLOSURES

1.   Property Description Form.

2.   28 Printed Digital Images.

3.   Second Floor Diagram.

4.   Certificate of Use and Occupancy from The City of Newton.

5.   Fire Department Incident Report.

FIRE SCENE EXAMINATION

The fire scene examination was completed on January 27, 2004.  Ms. Julie Pavia was home and present during this inspection and provided access to the property.  I re-examined the incident site on February 6, 2004 in the presence of John Cameron of Craig IS and Genevieve Bures of Bures Consultants.  Miss Bures was retained specifically to address the issues pertaining to the construction of the masonry fireplace of the second floor office.

Conditions affecting the fire scene examination were normal salvage and overhaul operations as completed by the Newton Fire Department, as well as a municipal fire scene examination. There were no significant changes made to the fire origin location and I was able to determine the origin and cause of this fire.

The fire scene examination began with an inspection of the exterior surrounding grounds and building. This revealed that the large Victorian style home was of a classic vintage.  The surrounding exterior grounds were well maintained and the building was located in an upscale residential neighborhood in the City of Newton.

There was no evidence to indicate that the fire originated on the exterior of the structure.  There was further little or no damage to the exterior of the building.  Security of the exterior doors and windows was not at issue in this investigation, as the insured and her two daughters were home when this fire occurred.

94507-01708                     March 31, 2006                        Page 2
Insured: Julie Pavia

The interior fire scene examination then continued beginning at the area of least damage and progressing to the area of most severe. I began my inspection in the basement where no fire damage was observed. There were no indications of fire origin at this level.

The oil-fired primary heating system was located in the basement. It was undamaged and was still providing the necessary heating services to the building at the time of this inspection.

The electrical distribution panel was also undamaged. I did not see or locate any evidence to indicate that any type of an electrical malfunction occurred at the panel.

On the first floor, I found little or no damage, with the exception of in the back family room. This family room was located off the center rear exterior wall. The family room was positioned directly below the second floor office. This family room and second floor office were constructed as part of a renovation that occurred approximately three years prior to this loss occurring.

The first floor examination revealed only soot and some water damage in areas other than the family room. The family room was examined in detail and will be addressed later in this report. I ascended to the attic and noted only limited residual soot damage. I noted that the venting system for the gas log fireplace located in the second floor office extended up through the floor and then extended horizontally through an attic void space. It then passed vertically up through the roof.

The air conditioning unit located in the attic was virtually undamaged and it showed no signs of any type of malfunction and it was not involved in the cause of this fire.

On the second floor, I examined the bedrooms and bathrooms on the northeast side. There was little or no damage at this location. Towards the southwest were the master bathroom, master bedroom, and the second floor office. The master bedroom and bath exhibited limited soot damage.

I entered the office and also only detected limited or minor smoke and soot damage. All of the office furniture and equipment were virtually undamaged by this fire. There was little or no fire damage in the walls and ceiling.

At the north corner of the second floor office was a gas log fireplace. It operated on a remote control unit that the insured placed on the coffee table or at her desk. The gas log fireplace was manufactured by Heatmeister, Inc., 3625 Benson Road, Angier, NC 27501. It was a model number DGF-M-24NAT. It had a serial number of 2027 and was rated for 75,000 BTU output.

94507-01708                          March 31, 2006                          Page 3
Insured:  Julie Pavia

Some of the logs had been removed from the fireplace prior to this inspection. The actual gas burner and valve portion of the fireplace was still within the fireplace brick enclosure.  This is best shown in the attached photographs 4 – 9.

Closer examination of the fireplace brick enclosure and the area surrounding it revealed smoke and soot damage had begun to come up through the cracks and openings of the hearth and hearth extension and up through the wall opening between the brick fireplace and the adjacent wall finish.  The smoke, soot and heat damage was greatest at floor level indicating that the products of combustion and fire had communicated upward from below the fireplace.

Examination of all electrical wiring throughout the second floor office revealed that it was virtually undamaged.    There was no evidence of any type of electrical overheating or malfunction.  The wiring on the second floor was eliminated as being the cause of the fire.

I then went back down to the first floor family room and reexamined that area.  I noted that there was minimal damage to the actual living space of the family room. The hardwood floors were damaged by water and were in the process of being dried out. There was little or no soot or smoke damage to the sheetrock on the walls and the remaining furnishings were relatively undamaged.

The only damage observed at this level was within the ceiling construction at the extreme north corner.  This was the area directly below the gas log fireplace that was located in the second floor office. This area of burning, charring and loss of material was very concentrated and specific to the area directly below the fireplace.  This is best shown in the attached photographs 12 – 16.

Closer examination of this area revealed that the joists directly below the fireplace had been completely consumed.  Outside the area directly below the fireplace, the joists remained intact. The plywood sub floor that was on top of the joists was completely consumed in a similar fashion, that being directly below the fireplace.

I looked up to the area directly above the consumed joists and plywood and found a layer of what appeared to be concrete material.  Closer inspection revealed that it was a layer of Durarock.  The Durarock was located directly on top of the plywood and was the first layer of masonry that was placed down below the fireplace on the second floor above.   The thickness of the layer of Durarock was measured to be ½".

I examined the entire area where the joists and plywood was consumed.  There was no AC wiring in this area whatsoever.  The adjacent electrical wiring was closely examined and undamaged. The building's permanent electrical wiring was subsequently eliminated as being the cause of this fire.

94507-01708                          March 31, 2006                              Page 4
Insured: Julie Pavia

The only thing that ran through the ceiling at the area of severe damage was speaker wire for the surround sound Bose stereo system. This speaker wire was closely examined and not involved with the ignition of this fire. This equipment is shown in photographs 27 and 28.

I went back to the second floor office and reexamined the floor of the fireplace enclosure. In doing so, I carefully chipped away one brick from approximately the center of the fireplace floor. This revealed that the floor construction consisted only of a 2 ¼ " thick brick. The brick laid on top of the ½" thick sheet of Durarock. Directly below the Durarock was ¾" plywood. This left a total thickness of masonry to be less than 4".

No other potential accidental source of ignition, other than heat from the fireplace was found at or adjacent to the origin of this fire. There was no evidence to indicate that this fire was intentionally set or deliberately accelerated.

INVESTIGATION

I have spoken to Julie Pavia on several occasions. She is 45 years of age and she has owned the house herself for 3 ½ years prior to the fire occurring. She resides there with her 14 year old daughter Mara and 16-year-old daughter Rachel.

Miss Pavia stated that she last used the gas log fireplace at about noontime on the Sunday of the fire. She used it for approximately 2 – 3 hours on either side of noontime. After lunch, she did smell a steady smell which she described as "a fireplace smell". She thought it may have been some minor residual smoke from the operation of the fireplace. She did look around several times and saw no visible haze or smoke anywhere in the building. This smell persisted throughout the afternoon and early evening.

Miss Pavia stated that her daughters went to bed around 10:00, possibly earlier. She went to bed at approximately 11:30 p.m. on Sunday. She woke up at approximately 2:00 a.m. or 2:30 a.m., she is not exactly sure, to a strong smell of smoke. Smoke was in her master bedroom, but it was very minor.

Miss Pavia stated that she looked around her house for approximately 30 minutes. She could not locate a fire condition. She could not identify the source of the smoke. At approximately 2:30, she went downstairs to further investigate the smoke and heard crackling in the ceiling of the first floor family room. She did not see any visible fire at that time. She then yelled to her daughters and they exited the building.

Miss Pavia stated that she tried calling the fire department through the house phone, but the line was dead. This residential section of Newton that she resides in has little or no cellular service. She could not use her cell phone to call the fire department. She had to go to a neighbor's house, wake them up and tell them to call 911.

94507-01708                         March 31, 2006                         Page 5
Insured: Julie Pavia

Miss Pavia stated that the office and family room was constructed as part of an addition about three years prior to the fire. The general contractor who handled the building of the addition is P&D Builders of Weymouth, MA.  P&D has an office number of 781-331-6945 and a cell of 617-593-6051.

Miss Pavia stated that she did not know the name of the mason who constructed the fireplace brick work.  The plumber who installed the gas log fireplace goes by the name of Mike Carresi. Subsequent investigation revealed that the mason who constructed the masonry fireplace in the second floor office is Joseph Falco.

I have spoken to investigators from the Newton Fire Department Fire Prevention Bureau and Fire Investigation Unit.  They have determined the cause of this fire as accidental and related to the operation of the gas log fireplace.

Research with NFPA code and the Massachusetts Building Code reveals that the typical masonry fireplace should have a minimum of six or more inches of brick masonry on the floor surface. The construction of this particular fireplace and its operation is being address by Genevive Bures of Bures Consultants.

DETERMINATION OF ORIGIN AND CAUSE

The origin of this fire has been determined to be in the floor construction directly below the gas log fireplace that was located in the second floor office.  The material first ignited in this loss is the wooden combustible plywood floor construction at this location.

The cause of this loss has been determined to be accidental ignition of the combustible floor construction due to heat conducting down through the masonry floor of the fireplace and igniting the plywood and joists. The circumstances bringing the heat source and fuel together was the insufficient thickness of masonry of the fireplace floor construction.

RECOMMENDATIONS AND/OR COMMENTS

The instructions in this assignment have been completed.  Please advise if any additional investigation will be required.  This case is being considered closed at this time.


                                        JEFFREY K. LOWE, MSc., CFI, CFEI
                                        Investigator/Supervisor

94507-01708                          March 31, 2006                          Page 6
Insured:  Julie Pavia


File Closed

JKL/rcs

Enclosures

cc:  Richard D. Dietzman  इ0ा
     Vice President Northeast

EXHIBIT 13



GALLAGHER
MAHONEY &
ASSOCIATES

PROFESSIONAL
INVESTIGATIONS

September 28, 2006

Mr. Curtis Carpenter, Esq.
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02110

Re:     CARRIER:            Essex Insurance/Norfield Associates, Inc.
        CLAIM NUMBER:       5-563-204-1
        INSURED:            P. & D. Builders, Inc.
        CLAIMANT:           Julia Pavia
        LOSS LOCATION:      104 Hammonds Wood Rd., Newton, MA
        DATE OF LOSS:       January 26, 2004
        TYPE OF LOSS:       Fire
        OUR FILE NUMBER:    04-0420

Dear Mr. Carpenter:

As directed we have supplemented the origin and cause report regarding the captioned
fire loss. This supplement is provided based upon additional information obtained since
our initial investigation into this claim.

Information obtained from Craig Insurance Services indicates that the homeowner Julia
Pavia detected the odor of smoke several hours earlier than the approximate time of 3:20
AM when she notified the Newton Fire Department. Her failure to notify the fire
department when she first noticed the odor of smoke was a significant factor regarding
the development and spread of the fire and subsequent property damage.

In January 2004 the Newton Fire Department possessed thermal imaging devices. These
devices were available on the three ladder trucks used by the fire department as well as in
the deputy chiefs' vehicles. The devices could have been used at the time of an earlier
response to locate the origin of this fire. This early detection would have limited the
damage done by the smoldering fire.

**Origin and Cause**

The fire at 104 Hammonds Wood Road, Newton, Massachusetts on January 26, 2004 had its origin at the wooden sub flooring beneath the fireplace hearth and appears to be the result of conducted heat from the gas fire log set down through the one layer of brick and layer of cement board.

Information from the homeowner Julia Pavia regarding the events leading up to the discovery of the fire indicates that the fire smoldered for an extended period of time. If the fire department had been notified when the odor of smoke was first noticed it is more than likely that the fire would have been contained to the immediate area of origin. The failure to notify the fire department at the first indications of an odor of smoke was a significant factor effecting the growth and development of the fire and subsequent damage to the house.

**S.J. Bongiorno, CFI**

EXHIBIT 14

# BRIAN GORE & Associates

### BUILDING, FIRE & LIFE SAFETY CODE CONSULTING

Attorney David Crowley Esq.
Toomey and Yudysky, LLP
Attorneys at Law
99 Summer Street
Boston, MA 02110

August 28, 2006

Via e mail and First Class Mail

**Re**  Firemans Fund Insurance Co. v. Falco Construction Corp.v. Heatmaster Inc.
United States District Court
Civil Action Number 1:05-cv-10827-DPW

Dear Attorney Crowley;

I have reviewed the information and depositions which you forwarded under cover of your letter of August 7th 2006, including:

1. Plaintiff's expert disclosures;

2. Craig IS' file notes;

3. Splaine Investigations, Inc.'s report and photographs;

4. Newton Fire Department's photographs;

5. Steven Tower's photographs;

6. Joseph Falco, Jr.'s deposition;

7. Julie Pavia's deposition;

8. Phillip Rothschild's deposition;

9. Michael Carresi's deposition;

10. Charles Gubbins' deposition;

11. Michael Roach's deposition;

12. Michael Conte's deposition;

---

12 HOLBROOK LANE, PAXTON, MA 01612
Tel: 508-756-3330                    1                    Fax: 508-756-4442

13. James Dussault's deposition (with attached deposition exhibits); and

14. Third-Party Defendant, Heatmaster, Inc.'s expert disclosure.

The following information is presented as a supplement to my initial report addressed to Mr. Stephen Tower of Investigative Resources Incorporated dated March 9th 2005, which is incorporated herein by reference.

This supplemental letter report focuses on the responsibilities for code compliance of the various parties with respect to the Massachusetts State Building Code (780 CMR) and the Massachusetts Plumbing and Fuel Gas Code (248 CMR) the codes which regulate the construction of the fireplaces, and the installation of gas appliances including decorative gas logs.

Relevant Parties to the construction are:

   Philip Rothschild - Licensed Construction Supervisor

   P and D Builders - General Contractor

   Michael Carresi - Licensed Plumber/Gas Fitter - Installed gas log appliance

   Joseph Falco - Masonry Sub Contractor-Constructed Masonry Fireplace

   James Dussault-Heating Ventilation and Air Conditioning Subcontractor - Installed vent for gas logs

   Charles Gubbins-P and D Employee - Carpenter

   Michael Roach - Framing Sub Contractor

   Michael Conte-Framing Sub contractor

The basic facts of the case as related to the construction and venting of the fireplace and installation and venting of the gas logs are summarized as follows:

1. The homeowners, Julia and Michael Pavia contracted with P and D Builders to build an addition for an existing single family dwelling at 104 Hammondswood Road, Newton, MA and construct an addition thereto. Construction commenced in 2000 and a certificate of use and occupancy was issued by the City of Newton Building Department on August 15, 2001.

2. The Building Permit applicant was P and D Builders and Mr. Philip Rothschild is identified as the licensed construction supervisor responsible for building code compliance.

3. P and D Builders was general contractor and subcontracted portions of the work

2

to other trades, including Joseph Falco, an unlicensed mason and Michael Carresi, a licensed plumber.

4. During the project, P and D Builders instructed Mr. Falco to construct a fireplace in a second floor office in the addition. Mr. Falco understood that the fireplace was to be decorative or used for a zero clearance insert. It was not intended to act as a conventional fireplace where solid materials could be burned. No plans were filed for the construction of the fireplace. The approval of the construction of the fireplace will be shown, herein, to be the responsibility of the licensee, Mr. Rothschild.

5. Before the issuance of the certificate of use and occupancy, Mr. Carresi installed a gas burning log unit in the fireplace. Mr. Carresi, as the licensed plumber was responsible for ensuring code compliance with regards to 248 CMR for the installation and venting of the gas logs.

The construction of solid fuel burning fireplaces is regulated by the Massachusetts State Building Code (780 CMR 3610) while the installation and venting of gas logs referred to as decorative gas logs is regulated by the State Fuel Gas Code (248 CMR). Both of these codes require that licensed individuals be responsible for compliance with the respective code requirements in their areas of their respective licensure.

<u>Fireplace Construction - Responsibilities for Code Compliance</u>

780 CMR 108.3.5 identifies which individuals are permitted to supervise persons engaged in construction activities regulated by 780 CMR. Specifically 780 CMR 108.3,5 requires that individuals who supervise persons engage in construction possess a <u>construction supervisor license</u> issued by the Commonwealth of Massachusetts.

Furthermore, 780 CMR R5 establishes the rules and regulations for licensed construction supervisors relative to the duties and responsibilities of the licensee. Specifically, with regard to the required presence of the licensee during specific areas of construction, 780 CMR R 5.2.12 states:

> "*780 CMR R 52.12 On Site Presence of Supervisor: A licensed individual or licensed designee shall be present on the site at some point to approve construction reconstruction, alterations, removal or demolition involving the following work:*
> .......
>
> 6. *Chimneys*
>     *a. Excavation*
>     *b. At the top of the smoke chamber and support of the flue liner.*
>     *c. When the erection of the chimney is completed.* "

Furthermore 780 CMR R 5.2.15.1 and R 5.2.15.2 are unambiguous on who is responsible for code compliance for work regulated by 780 CMR, to wit:

3

"780 CMR R 5.2.15.1 *Responsibility for Work: The license holder shall be fully and completely responsible for all work which he is supervising. He shall be responsible*
*for seeing that all work is done pursuant to 780 CMR and the drawings approved by the building official"* {emphasis added}.

''780 CMR R 5.2.15.2 *Responsibility to Supervise Work: The license holder shall be responsible to supervise the construction, reconstruction, alteration. repair, removal or demolition involving any activity regulated by any provisions of 780 CMR only and all other applicable laws of the Commonwealth even though he, the license holder, is not the permit holder but only a subcontractor or contractor to the permit holder".* {emphasis added}

The construction requirements for solid fuel burning fireplaces are found in the Massachusetts State Building Code at 780 CMR 3610 and are partially summarized below:

3610.4.3 Fireplaces walls are required to be constructed of solid masonry units, stone or concrete and shall contain firebrick such that the fireplace wall thickness is not less than 8 inches. If firebrick is not used the wall thickness is required to be 12 inches.

3610.4.5; 3610.4.6 A hearth extension is required to extend in from of the fireplace opening and this hearth is required to be supported on a concrete slab at least 4 inches in thickness and be supported by noncombustible materials. Any combustible forms used to support the concrete during construction are required to be removed after construction is complete

3610.4.7 The fireplace walls are required to be at least 4 inches clear of any combustibles including wood framing.

3610.4.1 Foundations for masonry fireplaces and chimneys are required to be constructed of concrete or solid masonry at least 12 inches thick and are required to extend at least six inches beyond the face of the fireplace or supporting wall on all sides.

In essence the fireplace is required to be independently constructed and supported such that it passes through the combustible framing while maintaining a clearance of 4 inches from any combustible material. In the case of the subject property if a solid fuel burning fireplace were to have been constructed on the second floor provision would have had to have been made to construct masonry or concrete walls to support the fireplace and these walls would have needed to be extended through the second and first floors and a foundation for the walls constructed at the basement level. This would have necessitated cutting holes in the first and second floors, the second floor ceiling and the roof in order to accommodate the fireplace and hearth extension and the chimney. These openings would then have to be re framed. In order to support the fireplace and chimney, the basement floor slab would have to be saw cut and a concrete foundation constructed. Cutting a hole in the roof to accommodate the masonry chimney would also require reframing of the

4

roof and the application of flashing and then restoration of the portion of the roof impacted by the chimney construction.

In addition to the extensive structural modifications and reinstatement of finish materials such as ceilings, carpet, tile and wood flooring the area taken up by the fireplace support walls as they pass through the first floor and basement would most likely have a detrimental effect on the architecture and use of the spaces on floors below the fireplace level which may need to be redesigned. It is also possible that other utilities such as existing electrical wiring, electrical fixtures, plumbing lines and, heating and air conditioning ducts, pipes and equipment may also be effected.

Although there is contradictory evidence as to which parties knew that a gas log unit was to be installed in the fireplace, there is consistent evidence that Mr. Rothschild was aware that a fireplace was to be constructed.   Indeed, Mr. Rothschild arranged for and supervised its construction by subcontracting the construction of a brick facade to Mr. Falco and the installation of the gas log appliance to Mr. Carresi.  With respect to Mr. Falco's work, Mr. Rothschild billed the homeowner, Ms. Pavia, for the work, adding 20 percent overhead and profit as is customary for a general contractor who is managing sub contract work.

Also, Mr. Rothschild applied for the building permit for the project. He was the licensed construction supervisor responsible for the project. Mr. Rothschild inspected the work at the project daily.  *Regardless of the final form and use of the fireplace it was incumbent upon Mr. Rothschild as the construction supervisor and Mr. Carresi as the licensed plumber to coordinate their review of the gas log unit and the venting of the unit prior to placing this unit in service.*

The evidence indicates that the form of the fireplace was never established until a point in construction when framing had been completed and major structural and architectural changes would have been necessary in order to accommodate a working fireplace. Specifically, the evidence indicates that P and D's framing Subcontractors constructed the wood framing for the addition, including the plywood sub flooring.   The framing Subcontractors did not frame the addition to allow for the construction of a solid fuel burning fireplace.  Subsequently, Joseph Falco was hired to a construct a brick box with no top, and a brick hearth, which were constructed directly on top of the plywood sub floor.

After Mr. Falco completed the construction of the brick work and left the project, Mr. Dussault was hired by P and D Builders to install a vent from the fireplace through the roof. Also, Mr. Dussault fabricated a steel cap which had a hole for a flue vent and placed the steel cap plate on top of the open fireplace. This steel cap was custom fabricated to specifications provided by Mr. Rothschild. The brick fireplace facade constructed by Mr. Falco was further modified in an attempt to seal the top of the fireplace (left open by Mr. Falco) with the obvious intention to channel the flue gasses to a flue installed by Mr. Dussault. Thereafter, Mr. Carresi installed a gas log unit in the fireplace. The gas log's manufacturer's instructions warn that the gas log unit must be installed only in a solid-fuel burning fireplace with a working flue and constructed of non-combustible materials.

5

The construction of the fireplace and installation of the gas log unit was inspected and approved by Mr. Rothschild.

Before Mr. Falco constructed the subject fireplace, he had constructed numerous fireplaces and chimneys. and was cognizant of the State Building Code requirements for construction and inspection of fireplaces and chimneys. In the present matter, Mr. Falco was instructed by Mr. Rothschild to build decorative fireplace to dimensions which would match a mantel that the Pavia's owned and wished to use as the fireplace surround. This necessitated that the fireplace opening be constructed too small to be used as a conventional fireplace. Mr. Falco understood that this fireplace would not be used as a conventional fireplace. Rather, Mr. Falco understood that it would be used as a decorative unit or with a zero clearance insert.

Responsibility for the Installation and Venting of the Gas Burning Log.

The Massachusetts State Fuel Gas Code (248 CMR) is the governing code for the installation, gas supply and venting of the gas burning logs.

Review of the building department files shows that the extent of the gas fitting permit application was to replace a gas heater in the basement. The applicant was Michael Carresi Plumbing, 513 Bird Road, Mansfield, Ma (license number 11157).

248 CMR 5 section 2.1 prohibits the installation of gas piping systems until a permit has been issued by the Inspector of Gas Fitting. The code requires that the work be performed by a licensed gas fitter. In accordance with 248 CMR 2.1 the permit application is required to contain a statement of the work performed. The installation of gas burning logs is regulated by 248 CMR 6.7.2. However, the gas fitting permit application does not address the installation of a gas burning log nor the associated venting and gas piping. In fact the gas permit application simply indicates that the permit application is for replacement of a gas heater in the basement. Therefore, the gas burning log was installed without the required permit.

With regards to the physical installation itself, both the Massachusetts Fuel Gas Code (248 CMR) and page 1 of the manufacturers printed instructions requires that the gas unit be installed "...*only in a fully vented, solid fuel burning fireplace with a working flue*"

Prior to the installation of the gas burning decorative unit, this language requires that the licensed plumber/gas fitter verify that the fireplace is constructed as required by 248 CMR code and the manufacturer's instructions. In this case it is clear that Mr. Carresi did not comply with these requirements and should have not installed the gas logs at this location without modifications to the fireplace and installation of the appropriate venting system.

Additionally, Mr. Rothschild being the licensed construction supervisor and general contractor, was required to ensure that the fireplace was constructed in accordance with 780 CMR 3610 or alerted Mr. Carresi that the installation of gas logs in the fireplace as constructed was prohibited.

6

In conclusion, the responsibility for supervising and approving the construction of the gas log fireplace construction rests with the licensed construction supervisor as provided in 780 CMR 108.3.5, 780 CMR RS.2.12 and 780 CMR RS.2.15.1 and R5.2.15.2. Mr. Rothschild, as the licensed construction supervisor on this project, is responsible for ensuring building code compliance for all construction work, including the fireplace. He failed to do so in this matter.

With regard to the installation of the gas logs, both the plumbing and fuel gas code and the manufacturer's installation instructions are clear that the gas logs can only be installed in a fully vented, solid fuel burning fireplace with a working flue. It is incumbent on the gasfitter license holder, Mr. Carresi to ensure that the gas log unit was installed in such a fireplace. He failed to do so in this matter.

It is, therefore, my opinion, to a reasonable degree of engineering certainty, that Mr. Rothschild is responsible for the improper construction of the fireplace, as he failed to coordinate the work of P and D' Subcontractors and permitted the installation of a gas log unit in a fireplace that did not meet the requirements of the Massachusetts Building Code.

Further, it is my opinion, to a reasonable degree of engineering certainty, that Mr. Carresi is responsible for the improper construction of the fireplace, as he installed a gas log unit in a fireplace that obviously did not meet the requirements of the Massachusetts Building Code.

Lastly, it is my opinion, to a reasonable degree of engineering certainty, that Mr. Falco is not responsible for the improper construction of the fireplace, as he built a brick fireplace brick work pursuant to the general contractor's specifications. He was not instructed to build a solid fuel burning fireplace for the installation of a gas log appliance.

Very truly yours,
BRIAN GORE & ASSOCIATES

Brian Gore, PE.
Principal

7

EXHIBIT 15

# Splaine Investigations Inc.

14 North Hill Drive
N. Falmouth, Massachusetts 02556

Office: 508-563-5845
FAX: 508-563-3875
E-mail:splaineinv@verizon.net

August 14, 2006

David J. Crowley, Esquire
Toomey & Yudysky, LLP
99 Summer Street
Boston, Massachusetts 02110

Re: Fireman's Fund v. Falco Construction Corp, Heatmaster Inc.
U.S. District Court Civil Action N, 1:05-cv-10827-DPW
Date of Loss: January 26, 2004

Dear Mr. Crowley:

Based on the data and information contained in the parties' discovery responses, disclosures and depositions, I have formed the following opinions concerning the fire which occurred on January 26, 2004 at the home of Julie Pavia, 104 Hammondswood Road, Newton, Massachusetts. It is my professional opinion that the cause of the referenced fire incident was due to lack of proper required permits, improper design, improper supervision, lack of inspections by the general contractor, improper testing and a significant delay in reporting the fire incident to the fire department. It is also my professional opinion that the masonry company, Falco Construction Corporation was not responsible for the ignition of the fire incident.

Information received reveals, that at an unspecified time early on Sunday, January 25, 2004 broken water pipes within the Pavia's home caused extensive water damage. Ms. Pavia turned on the gas-fired log in the second floor office fireplace to provide a source of heat. Ms. Pavia reportedly shut down the fireplace at noon on Sunday, January 25, 2004. Ms. Pavia reported that after she shut down the fireplace she smelled a smoke odor all day. She went to bed at approximately 11:30 PM on Sunday night. Ms. Pavia awoke at approximately 2:00 AM to a stronger smell of smoke and a room full of smoke. She opened two windows in the office and proceeded down the hall and opened up two more windows. She went back to bed but could not sleep, she got up again and searched for the source of smoke. At this time she went downstairs and heard the crackling of a fire in the family room ceiling. She went back upstairs and woke her daughters and got the pet animals together and evacuated the house. The time was approximately 3:20 AM. The Newton Fire Department was notified of the fire at approximately 3:24 AM.

Ms. Pavia was negligent in failing to notify the fire department in the incipient stages of the fire. Even after Ms. Pavia awoke to a room full of smoke and heard fire crackling in the walls she did

not call or have a neighbor call the fire department. Minutes are a life time in the propagation of fire, in this case it was hours from the first abnormality until the Fire Department was notified.

Additionally, the Newton Fire Department is equipped with a "Thermal Imaging Detector" that can detect fire behind walls or in ceilings. If notification of the fire detected was received at the first abnormality or even 15 to 30 minutes earlier the fire incident could have been reduced to minor damage and inconvenience. This fire incident was started from a pyrolysis of the floor joists between the first floor ceiling and the second floor. The fire burned in a smoldering mode for several hours and could have been detected and extinguished if the fire department received proper notification.

The installation of the gas fired fire place was installed without proper building permits that would have required a rough and finished inspection by the City of Newton building inspectors to examine the system and determine if it was safe and properly installed according to the current code requirements. Permits for both the building and plumbing excluded the instillation of the gas fire place system.

The general contractor of the remodeling project was P&D Builders Corporation, Phillip Rothschild. Mr. Rothschild hired, instructed, supervised, and profited from the sub contractors. P&D Builders was responsible for proper permitting, supplying proper plans and information regarding the requirements of the project to meet or exceed code requirements and was responsible to supervise the work performed by the sub contractors to ensure it meets the requirements of the remodeling project and code requirements.

The plumbing contractor, Michael Carresi, installed the gas-fired fire place log system. Mr. Carresi had the responsibility to obtain the proper plumbing/gas permits that would have initiated the City of Newton inspection process. The inspection process would have required both a rough and finished inspection to ensure that the fireplace gas fired system was properly installed according to the current codes. He also had the responsibility that after he connected the gas-fired system and lit the stove that he insured that it was safe to operate and was properly installed. Mr. Carresi did not do any testing to insure that the vent was properly installed or had a proper draft or review the operating instructions with the owner.

The masonry contractor, Falco Construction Corporation, Joseph Falco, did not receive any type of plan, diagram or an operating manual describing the installation of the fire place system. Mr. Falco installed the fire place brick work as instructed by the general contractor. Mr. Falco understood that the fire place was for a zero-clearance unit fireplace insert for decoration. The general contractor, P & D Builders constructed the wood frame work at the fire place location and instructed the sub contractors on the requirements needed for the fireplace portion of the project.

The information I considered in forming and reaching my opinions includes my background and experience, including my thirty plus years of building construction experience, fire suppression and investigation procedures, fire causation, as set forth in various accepted treatises used as guidelines in basic fire investigations, my general knowledge of fire behavior and my knowledge of the specific facts and product involved in this fire, our examination of the fire scene, my review of available documents and photographs, public and private investigation reports, plaintiff's expert disclosures and my review of the deposition testimony of, Phill Rothschild, Julia Pavia and Michael Carresi.

I will rely in support of my opinions on the above mentioned photographs, additional photographs depicting the fire scene, related reports, deposition testimony and the following list of treatises:

*National Electric Code*, Article 250, 600, National Fire Protection Association
*Kirk's Fire Investigation*, John D. DeHaan
*NFPA 921 Guide for Fire and Explosion Investigation*, National Fire Protection Association
*Ignition Handbook*, Vytenis Babrauskeas.
*Massachuset'ts plumbing code*
*Massachusett's building code*

Splaine Investigations Inc.

Richard J. Splaine, ME, CFI

Enclosures

# EXHIBIT 16