UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE FIREMAN'S FUND INSURANCE | ) | |
| COMPANY as subrogee of JULIA PAVIA | ) | |
| 77 San Marin Drive Novado, California, | ) | |
|     Plaintiff | ) | CIVIL ACTION |
| | ) | NO. 05-cv-10827-DPW |
| VS. | ) | |
| | ) | |
| FALCO CONSTRUCTION CORP., | ) | |
| P & D BUILDERS, INC. and | ) | |
| MICHAEL CARRESI d/b/a | ) | |
|     CARRESI PLUMBING & HEATING | ) | |

**<u>AFFIDAVIT OF COUNSEL IN SUPPORT OF DEFENDANT/CROSS-CLAIM
DEFENDANT, FALCO CONSTRUCTION CORP.'S PROPOSED MOTION FOR
PARTIAL SUMMARY JUDGMENT ON CO-DEFENDANT/CROSS-CLAIM
PLAINTIFF, P&D BUILDERS, INC.'S CROSS-CLAIM FOR INDEMNIFICATION</u>**

1.     I am an attorney with Toomey & Yudysky, LLP and, with John F. Toomey, Esquire,

represent the Defendant, Falco Construction Corp. in the above referenced matter.  I am

duly licensed to practice in the Commonwealth of Massachusetts.

2.     Attached hereto as Exhibit No. 1 is a true and accurate copy of Plaintiff's expert,

Genevieve Bures' Report pg. 5.

3.     Attached hereto as Exhibit No. 2 is a true and accurate copy of Philip Rothschild's

Deposition pgs. 186-187, 199-200, 218.

4.     Attached hereto as Exhibit No. 3 is a true and accurate copy of Joseph Falco's

Deposition pgs. 8-9, 21-22, 32-33 51-54, 57, 61-63.

5.     Attached hereto as Exhibit No. 4 is a true and accurate copy of Michael Carresi's

Deposition pgs. 21-23, 37, 41.

6.      Attached hereto as Exhibit No. 5 is a true and accurate copy of Michael Roach's

Deposition pgs. 20-29.

7.      Attached hereto as Exhibit No. 6 is a true and accurate copy of Michael Conte's

Deposition pgs. 30-34 and 37-40.

8.      Attached hereto as Exhibit No. 7 is a true and accurate copy of P&D Builders, Inc.'s

Answers to Falco Construction Corp.'s Interrogatories #15.


**Signed Under The Penalties Of Perjury This 31st Day of January 2007**.


     /s/ David J. Crowley


**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on the
above date.


/s/  John F. Toomey


DC  78972.1  1/31/07

# EXHIBIT NO. 1



21 Father Devalles Blvd., Bldg. B
Tf: 800-326-5811
Tel: 508-997-4900
Fax: 508-991-8824
www.efiglobal.com

# FIRE INVESTIGATION
## Report One and Final

|  |  |
|---|---|
| **Insured:** | **Julie Pavia** |
| **Loss Location:** | **Newton, MA** |
| **Date of Loss:** | **January 25, 2004** |
| **Policy No.:** | **NZD2700996** |
| **Claim No.:** | **11004267142** |
| **EFI File No.:** | **94507-01708** |

**Report Date:**    March 31, 2006

**Prepared For:**    Firemans Fund
C/O Law Offices of Stuart Blackburn
Two Concorde Way, P.O. Box 608
Windsor Locks, CT  06096

**Attention:**    Erik Loftus, Esq.

*THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE. RELEASE TO ANY OTHER COMPANY, CONCERN, OR INDIVIDUAL IS SOLELY THE RESPONSIBILITY OF ADDRESSEE*

94507-01708                          March 31, 2006                          Page 5
Insured: Julie Pavia

Miss Pavia stated that the office and family room was constructed as part of an addition about three years prior to the fire. The general contractor who handled the building of the addition is P&D Builders of Weymouth, MA. P&D has an office number of 781-331-6945 and a cell of 617-593-6051.

Miss Pavia stated that she did not know the name of the mason who constructed the fireplace brick work. The plumber who installed the gas log fireplace goes by the name of Mike Carresi. Subsequent investigation revealed that the mason who constructed the masonry fireplace in the second floor office is Joseph Falco.

I have spoken to investigators from the Newton Fire Department Fire Prevention Bureau and Fire Investigation Unit. They have determined the cause of this fire as accidental and related to the operation of the gas log fireplace.

Research with NFPA code and the Massachusetts Building Code reveals that the typical masonry fireplace should have a minimum of six or more inches of brick masonry on the floor surface. The construction of this particular fireplace and its operation is being address by Genevive Bures of Bures Consultants.

DETERMINATION OF ORIGIN AND CAUSE

The origin of this fire has been determined to be in the floor construction directly below the gas log fireplace that was located in the second floor office. The material first ignited in this loss is the wooden combustible plywood floor construction at this location.

The cause of this loss has been determined to be accidental ignition of the combustible floor construction due to heat conducting down through the masonry floor of the fireplace and igniting the plywood and joists. The circumstances bringing the heat source and fuel together was the insufficient thickness of masonry of the fireplace floor construction.

RECOMMENDATIONS AND/OR COMMENTS

The instructions in this assignment have been completed. Please advise if any additional investigation will be required. This case is being considered closed at this time.

JEFFREY K. LOWE, MSc., CFI, CFEI
Investigator/Supervisor

# EXHIBIT NO. 2

**PHILLIP ROTHSCHILD**
**March 30, 2006**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THE FIREMAN'S FUND INSURANCE

COMPANY as subrogee of JULIA PAVIA,

     Plaintiff

vs.

FALCO CONSTRUCTION CORP., P&DK

BUILDERS, INC. and MICHAEL

CARRESI d/b/a CARRESI PLUMBING &

HEATING,       C.A. 05-10827DPW

     Defendants

vs.

HEATMASTER, INC.,

     Third-party Defendant

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**PHILLIP ROTHSCHILD**
**March 30, 2006**

| | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | DEPOSITION OF: PHILLIP ROTHSCHILD |
| 12 | MORRISON, MAHONEY, LLP |
| 13 | 250 Summer Street |
| 14 | Boston, Massachusetts |
| 15 | March 30, 2006        10:20 a.m. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | Darlene M. Coppola |
| 22 | Registered Professional Reporter |
| 23 | Certified Professional Reporter |
| 24 | |

| | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 | LAW OFFICES OF STUART G. BLACKBURN |
| 4 | Two Concord Way |
| 5 | P.O. Box 608 |
| 6 | Windsor Locks, CT 06096 |
| 7 | BY: STUART G. BLACKBURN, ESQ. |
| 8 | 860.292.1116 |
| 9 | fax 860.292.1221 |
| 10 | |
| 11 | Representing P & D Builders: |
| 12 | MORRISON, MAHONEY, LLP |
| 13 | 250 Summer Street |
| 14 | Boston, MA  02210 |
| 15 | BY: CURTIS L.S. CARPENTER, ESQ. |
| 16 | 617.439.7589 |
| 17 | fax 617.342.4841 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 4 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Michael Carresi d/b/a Carresi |
| 3 | Plumbing & Heating: |
| 4 | THE LAW OFFICES OF BRUCE R. FOX |
| 5 | 27B Midstate Drive |
| 6 | Suite 100 |
| 7 | Auburn, MA  01501 |
| 8 | BY: ROBERT P. TURNER, ESQ. |
| 9 | 866.290.7435 |
| 10 | fax 508.832.5716 |
| 11 | |
| 12 | Representing Heatmaster, Inc.: |
| 13 | HASSETT & DONNELL, PC |
| 14 | 484 Main Street |
| 15 | Suite 560 |
| 16 | Worcester, MA  01608 |
| 17 | BY: SCOTT T. OBER, ESQ. |
| 18 | 508.791.6287 |
| 19 | fax 508.791.2652 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

2 (Pages 2 to 5)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 186

1  by a solid fuel burning fireplace?
2      A It's a gas fireplace or wood,
3  either one.
4      Q Prior to the work at the Pavia
5  house, the construction of the addition, were
6  you familiar with the code requirements for a
7  solid fuel burning fireplace?
8      A No.
9      Q Did you know that there were
10 certain code requirements for a solid fuel
11 burning fireplace?
12     A Yes.
13     Q Do you own a copy of the
14 Massachusetts Building Code?
15     A Yes.
16     Q But prior to the Pavia job, you
17 had never made yourself familiar with those
18 provisions relating to solid fuel burning
19 fireplaces?
20     A No.
21     Q And with regard to the
22 construction of the addition at the Pavia
23 house, you were the general contractor for
24 that job?

Page 187

1      A Yes.
2      Q What were your duties and
3  responsibilities as the general contractor?
4      A To do the demolition work, the
5  excavation, the framing, the finish work,
6  insulation, plaster and the finish work.
7      Q That was the scope of work for
8  you?
9      A Yes. We did the kitchen,
10 bathrooms, anything that needed to be done
11 other than the fireplace.
12     Q So it's your position that the
13 fireplace was excluded from your scope of
14 work as the general contractor?
15     A Yes.
16     Q The work that you did supervise
17 as the general contractor, did you hire the
18 subcontractor for that work?
19     A Yes, some of it, the
20 electrician, plumber, plasterer, insulation
21 people and Falco was hired to do the brick
22 work.
23     Q On the work that you acted as
24 the general contractor, did you coordinate

Page 188

1  the work of the subcontractors for that work?
2      A I just told them what I needed,
3  gave them a schedule, yes. I didn't tell
4  them what to do, how to do it, but I
5  coordinated that; yes.
6      Q After the subcontractors
7  completed their work, did you inspect and
8  approve the work they did?
9      A Yes.
10     Q Would the general --
11         MR. CROWLEY: Strike that.
12     Q Were the subcontractors at the
13 Pavia house working under your license as a
14 construction supervisor?
15     A The plumber, electrician, all
16 those people pull their own permits.
17     Q So that the licensed trades on
18 the job were not working under your
19 supervisor's license?
20     A Right, yes.
21     Q Did you ever do anything to
22 exclude the fireplace work from the scope of
23 work where you were the general contractor?
24     A Yes.

Page 189

1      Q What did you do?
2      A I told her, Julie, I said, I
3  don't really want anything to do with the
4  fireplace, that's on your nickel, I said to
5  her.
6      Q Did you ever put anything in
7  writing to memorialize your conversation with
8  Julie Pavia excluding the fireplace work from
9  your scope of work?
10     A Other than on the paperwork
11 there where it says no fireplace, I'm not
12 sure where those are now, but it does say it
13 somewhere in there.
14     Q In the exhibits marked today?
15     A Yes.
16     Q That's the only place?
17     A Yes.
18     Q Did you hire Mr. Falco to do the
19 masonry work for the fireplace?
20     A I hired him, Mr. Falco, to do
21 the masonry -- no, to do the masonry work for
22 the addition.
23     Q Who hired Mr. Falco to do the
24 masonry work on the fireplace?

48 (Pages 186 to 189)

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 198

1    Q The fireplace, the masonry work
2    that Mr. Falco did on the fireplace in the
3    addition, that was the construction of a
4    brick structure that was about four feet
5    tall, four feet across?
6        A Yeah, it was in an angle corner
7    like that, maybe three feet something tall,
8    four foot across, two walls this way.
9
10       (Witness Indicating)
11
12       A Then a facade on the front like
13   that.
14
15       (Witness Indicating)
16
17       Q Mr. Falco's son helped him do
18   that?
19       A Yes.
20       Q And you believe that that work
21   took Mr. Falco three or four days to do?
22       A Yes.
23       Q Do you know why it took him so
24   long?

Page 199

1        A Well, he had to wait until he --
2    he got to a point where he had to wait for us
3    to get that cap that we put on there, then he
4    came back to put the cap on, finished up his
5    mortar, then started working on his hearth.
6        Q So the three or four days that
7    Mr. Falco worked on the fireplace, he was not
8    working all day on that?
9        A No.
10       Q Was there any break in time
11   between the time Mr. Falco concluded the
12   exterior work and the beginning of the
13   fireplace inside?
14       A Yes, I think three or four days.
15   He had to block up a window first.
16       Q But he was still doing work at
17   the Pavia home?
18       A Yes.
19       Q Did you understand that the
20   fireplace Mr. Falco built was not a solid
21   fuel burning fireplace?
22       A Yes.
23       Q And the fireplace that Mr. Falco
24   built, it was never intended to be a solid

Page 200

1    fuel burning fireplace, was it?
2        A Not a wood burning fireplace,
3    no.
4        Q So that your framing carpenters
5    did not do anything to frame the addition so
6    as to allow for the construction of a solid
7    fuel burning fireplace?
8        A No.
9        Q You indicated earlier that you
10   had seen a sketch for the fireplace. Do you
11   recall that?
12       A Yes.
13       Q Who produced that sketch?
14       A Mrs. Pavia.
15       Q Do you know whether she had any
16   training as an architect?
17       A I'm not sure.
18       Q What did this sketch consist of?
19       A It showed him how she wanted to
20   do the corner, how far she wanted to come out
21   off the corners, how far she wanted to go in
22   the corner this way, bring the two wings out.
23   She gave him the size of the opening she
24   wanted from the width to the height, then the

Page 201

1    design of the floor in the hearth.
2        Q So that Miss Pavia decided what
3    the dimensions of the fireplace should be?
4        A Yes.
5        Q Did she base that on anything in
6    particular?
7        A Yes. After the fireplace was
8    built, we put some bookcases on the
9    right-hand side of it and the bookcases had
10   to be so big. So it was laid out in the
11   corner so the bookcases would fit.
12       Q Was there any discussion with
13   Miss Pavia about a mantel that was going to
14   go over the fireplace?
15       A Yes.
16       Q What were those discussions?
17       A It was a wood mantel that she
18   designed.
19       Q Did she want the dimensions of
20   the fireplace to fit within the confines of
21   that mantel?
22       A She did it in the reverse. She
23   laid out the fireplace first, then we built
24   the mantel to fit the fireplace.

51 (Pages 198 to 201)

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 218

1 at that time?
2     A Yes, they were sitting in the
3 location.
4     Q When Mr. Carresi installed the
5 gas logs in the fireplace, was it obvious to
6 you that the fireplace was not a solid fuel
7 burning fireplace?
8     A I didn't pay any attention to
9 it. Yes, to answer that, it was not a wood
10 burning fireplace.
11     Q That was obvious to you at that
12 time?
13     A Yes. He told her not to ever
14 try to burn any wood in there, he meaning
15 Mike Carresi.
16     Q In your opinion, could any
17 reasonable person believe that the fireplace
18 built by Mr. Falco was a solid fuel burning
19 fireplace?
20         MR. BLACKBURN: Object to the
21 form. You can answer.
22     A No.
23     Q After the gas logs were
24 installed in the fireplace, you were present

Page 219

1 for an inspection done by the City of Newton
2 building department?
3     A No, I was not.
4     Q Well, you mentioned earlier that
5 there was a final inspection done on the job?
6     A Yes.
7     Q And at the time of the final
8 inspection, the fireplace and the gas log
9 work had been completed?
10     A Yes.
11     Q Correct?
12     A Yes.
13     Q And Mr. O'Regan I believe it
14 was --
15     A Yes.
16     Q -- came to the site and he
17 inspected all the work for the addition?
18     A Yes.
19     Q And did that inspection include
20 the fireplace and gas logs?
21     A Yes. But if I can -- if I may
22 add a comment here. When he looks at his
23 other people that work under him, because he
24 has the say so over everyone, he sees the gas

Page 220

1 inspector signing off, the plumbing inspector
2 signed it off, what is he going to do now?
3 They've already looked at it. It's okay for
4 them. So he just glances at it, walks off,
5 signs it, that's it.
6     Q At the time of the final
7 inspection, did Mr. O'Regan have any
8 paperwork indicating that the gas inspector
9 and the fire inspector had signed off on that
10 fireplace?
11     A Yes, they do that before they
12 show up on the job site. They will not come
13 out until that's signed off.
14     Q At the time of the final
15 inspection, did you see any paperwork
16 indicating that the gas inspector and the
17 fire inspector had signed off on that --
18     A They signed off on the
19 building -- the building card. I'm not sure
20 if that's in there.
21     Q So that they signed off on the
22 documents produced in this case?
23     A Yes.
24     Q That was part of the paperwork

Page 221

1 that was --
2     A Should have come from the town,
3 yes.
4     Q And that was done prior to the
5 final inspection and signing off by the
6 building department?
7     A Yes. You can't get that without
8 it being signed off.
9     Q So you're showing me the
10 certificate of use and occupancy from Exhibit
11 Number 5?
12     A Yes.
13     Q And it's your understanding that
14 the building department will not issue a
15 certificate of use and occupancy until the
16 gas inspector and the fire inspector have
17 reviewed and approved the fireplace?
18     A Yes.
19     Q But there's nothing on the
20 certificate of use and occupancy itself
21 indicating that the gas inspector and the
22 fire inspector had inspected and approved
23 that fireplace, is there?
24     A No.

56 (Pages 218 to 221)

# EXHIBIT NO. 3

District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
　　　　　Plaintiff

　　　vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
　　　　　Defendants

　　　vs.

Heatmaster, Inc.,
　　　Third-Party Defendant

**DEPOSITION OF JOSEPH FALCO, SR.**, a witness
called on behalf of the Plaintiff, pursuant to the
Federal Rules of Civil Procedure, before Jessica L.
Bisaillon, a Registered Professional Reporter,
Certified Shorthand Reporter, and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Toomey & Yudysky, LLP, 99 Summer Street,
Boston, Massachusetts 02110, on Friday,
March 3, 2006, commencing at 12:20 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

A P P E A R A N C E S :

The Law Offices of Stuart G. Blackburn
　　BY:  Stuart G. Blackburn, Esquire
　　Two Concorde Way
　　Post Office Box 608
　　Windsor Locks, Connecticut 06096
　　Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
　　BY:  David J. Crowley, Esquire
　　99 Summer Street
　　Boston, Massachusetts 02110
　　Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
　　BY:  Curtis L.S. Carpenter, Esquire
　　250 Summer Street
　　Boston, Massachusetts 02210
　　Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
　　BY:  Robert T. Turner, Esquire
　　27B Midstate Drive, Suite 100
　　Auburn, Massachusetts 01501
　　Appearing on behalf of Michael Carresi,
　　d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
　　BY:  Scott T. Ober, Esquire
　　484 Main Street, Suite 560
　　Worcester, Massachusetts 01608
　　Appearing on behalf of Heatmaster, Inc.

---

3

I N D E X

DEPOSITION OF:　　　　　　　　　　　　　　　PAGE

JOSEPH FALCO, SR.

Examination by Mr. Blackburn　　　　　　　　4
Examination by Mr. Turner　　　　　　　　　49
Examination by Mr. Ober　　　　　　　　　　61
Examination by Mr. Carpenter　　　　　　　63
Reexamination by Mr. Blackburn　　　　　　73
Reexamination by Mr. Turner　　　　　　　　80

E X H I B I T S

EXHIBIT NO.　　　　　　　　　　　　　　　　PAGE
　　　　　(Plaintiff's)

1　Hand-drawn diagram; a total of one page.　25

2　Hand-drawn diagram; a total of one page.　40

---

4

1　　　　　**JOSEPH FALCO, SR.**, after having been

2　satisfactorily identified by the production of

3　his Massachusetts driver's license and having

4　been duly sworn by the Notary Public, was

5　examined and testified as follows:

6　　　　　MR. BLACKBURN:  And we'll have the

7　same stipulations that we've had for the last

8　deposition.  Is that fine with everybody?

9　　　　　MR. CROWLEY:  Yes.

10　　　　MR. BLACKBURN:  You want him to read

11　and sign?

12　　　　MR. CROWLEY:  Yes, please.

13　　　　MR. BLACKBURN:  Okay.

14　　　　**EXAMINATION BY MR. BLACKBURN:**

15　Q.  Good afternoon, Mr. Falco.  My name is Glenn

16　　　Blackburn.  I represent the Fireman's Fund

17　　　Insurance Company in this case.  They were the

18　　　insurance company for the Pavias.

19　A.  Right.

20　Q.  Have you ever had your deposition taken before?

21　A.  No.

22　Q.  Let me give you a few ground rules.  Some of

23　　　these you may have -- you may have heard before.

24　　　　　I'm going to ask you some questions today

6

| | |
|---|---|
| 1 | about the work that you did out at the Pavia |
| 2 | residence prior to the fire. |
| 3 | If at any time I'm unclear to you or you |
| 4 | don't understand a word that I use or something |
| 5 | that I say, please stop me, ask me to repeat the |
| 6 | question, ask a different word. I want to make |
| 7 | sure that you and I -- |
| 8 | A. Okay. I understand you. |
| 9 | Q. Yeah. Fair enough. |
| 10 | A. Okay. |
| 11 | Q. The other instruction that I'll give you is that |
| 12 | the young lady is taking down everything that we |
| 13 | say. While ordinarily you and I could sit here |
| 14 | and have a conversation that involved both words |
| 15 | and nods of the head and things like that, at |
| 16 | least while we're on the record, we need to |
| 17 | converse only with words. All right? |
| 18 | A. Okay. |
| 19 | Q. I think what you'll find -- because my experience |
| 20 | is that when I question people, I have a tendency |
| 21 | to stutter a bit and draw out my questions. I |
| 22 | think what you're going to find is that often |
| 23 | you're going to understand the question that I've |
| | asked you before I've finished asking it. |

| | |
|---|---|
| 1 | A. That's okay. I got a dialect too from the old |
| 2 | country. |
| 3 | Q. And the tendency is that the witness starts |
| 4 | giving the answer before I've finished asking the |
| 5 | question. |
| 6 | A. Right. |
| 7 | Q. It's very difficult for the young lady to take us |
| 8 | both down speaking at the same time. So try to |
| 9 | resist that urge to start answering my questions |
| 10 | before I'm done sputtering them out, and I'll |
| 11 | give you the same courtesy when you're giving |
| 12 | your answers. All right? |
| 13 | A. Okay. |
| 14 | Q. What's your address, please? |
| 15 | A. 5 Coolidge Circle, South Easton, Mass. |
| 16 | Q. And how long have you lived at that address? |
| 17 | A. Oh, I would say about 24 years now. |
| 18 | Q. You have a business; correct? |
| 19 | A. Yes. |
| 20 | Q. What is the name of the business? |
| 21 | A. Falco Construction. |
| 22 | Q. Is that business a corporation? |
| 23 | A. No. A company. |
| 24 | Q. Have you ever had a corporation that you did |

7

| | |
|---|---|
| 1 | business under? |
| 2 | A. Yes. Years and years ago. |
| 3 | Q. And what was the name of that corporation? |
| 4 | A. Falco Construction. |
| 5 | Q. Incorporated? |
| 6 | A. Yeah. At that time, yeah. |
| 7 | Q. Okay. How long ago did that corporation seek to |
| 8 | exist? |
| 9 | A. Oh, God. Years and years ago. I would say about |
| 10 | 25 years ago, because I was doing a lot of |
| 11 | commercial work, and I just didn't want to do |
| 12 | commercial work anymore and just went down just |
| 13 | to regular house -- you know, homeowners. |
| 14 | Q. So at the time that you were doing this work at |
| 15 | Mrs. Pavia's house before the fire, you were |
| 16 | operating as a sole proprietor -- |
| 17 | A. Yes. |
| 18 | Q. -- with a trade name of Falco Construction? |
| 19 | A. Right. |
| 20 | Q. And was that business just your business? |
| 21 | A. Just my business. Yeah. |
| 22 | Q. Did you have any partners? |
| 23 | A. No. I just got -- I've had my two sons working |
| 24 | for me. |

8

| | |
|---|---|
| 1 | Q. Okay. But they did not have any ownership |
| 2 | interest in the business? |
| 3 | A. No. |
| 4 | Q. You're a mason; correct? |
| 5 | A. Yes. |
| 6 | Q. Do you do any work other than masonry work? |
| 7 | A. That's all I know how to do. |
| 8 | Q. How long have you been doing masonry work? |
| 9 | A. Oh, God. Forty-three years. |
| 10 | Q. And how long have you been doing that masonry |
| 11 | work by yourself or with the company that you |
| 12 | owned? |
| 13 | A. For 43 -- no. I'm sorry. I used to be in the |
| 14 | union for about seven years, and then I went on |
| 15 | my own. So out of 43 years, deduct seven. |
| 16 | Q. Okay. So for the last 36 years, you've worked on |
| 17 | your own? |
| 18 | A. Right. |
| 19 | Q. You've been building fireplaces that whole time? |
| 20 | A. I probably built about a million of them. |
| 21 | Stopped counting 25 years ago. |
| 22 | Q. During the course of that time that you've been |
| 23 | building fireplaces, have the requirements |
| 24 | changed for the construction of the fireplaces |

10

1     pursuant to the codes?
2  A.  Yes. Big time. Big time. Now you need -- you
3     need -- you need the rough inspection, finish
4     inspection, final inspection. Before, you just
5     build a chimney, and building inspectors weren't
6     even around. Now you can't breathe unless you
7     call the building inspector and -- for a rough
8     and finish.
9  Q.  And how did you learn about those changes in the
10    code?
11 A.  You learn by doing it for so many years. And you
12    got the code book, and you go according to the
13    code book. And that's how you build them.
14 Q.  So you have code books?
15 A.  Yes, I do.
16 Q.  You keep them on your truck?
17 A.  I don't need them anymore. They're all up here
18    after 45 years.
19 Q.  And "up here" means in your head?
20 A.  In my head, yeah.
21 Q.  When there are changes that occur with the code,
22    how do you learn about those?
23 A.  Usually if there is a change while I call for a
    rough inspection and -- the building inspector

11

1     And that's it.
2  Q.  Do you know who it was that introduced you to
3     him?
4  A.  Oh, God. I don't know. I don't really remember.
5     You know, it just -- word travels. Oh, Joe
6     Falco. Call Joe Falco. He's good. This and
7     this and that, and word goes to word. I don't
8     advertise or anything like that. I just -- I
9     don't look for work. They -- believe me. They
10    come to me. After so many years, you earn that
11    right, I guess, if you're good.
12 Q.  Do you recall what the jobs were that you did for
13    Mr. Rothschild prior to the Pavia house?
14 A.  Yes. I did a little tiny addition in Newton
15    for -- for a psychiatrist. I forget her name.
16    As a matter of fact, she writes books too. She's
17    a Harvard -- Harvard graduate. Martha or
18    something. I did a job for her, a little tiny
19    addition on her home that she was going to turn
20    into an office area for her patients, because she
21    worked out of the house, and then a walkway in
22    the back from the back to the -- to the driveway
23    so the people can go and use that exit in the
24    back to go into the driveway. And that's it.

10

1     says, oh, don't you know about this or don't you
2     know about that?
3      But they haven't changed for years now.
4     And I think the way you build them today, you
5     don't need to change them, because they're really
6     strict rules to a fireplace.
7  Q.  Do you hold any licenses?
8  A.  No. A mason -- a mason contractor does not
9     require to have a license. We usually work under
10    the general contractor's license, because he
11    pulls the permit, he calls for a rough inspection
12    and a finish, final inspection. I don't. I just
13    build it, and he's responsible by him calling
14    the -- the inspectors.
15 Q.  Are you a member of any associations about your
16    trade?
17 A.  No.
18 Q.  When is the first time that you met Phil
19    Rothschild?
20 A.  Oh, I think about a year -- about six months or
21    eight months before I did the -- the exterior
22    veneer for him, because he heard about me, and I
23    was very well referred. And I met him, and I did
24    a couple of jobs for him. Very, very pleased.

12

1     Then after that, Phil asked me to do the
2     exterior addition on Julia Pavia's house.
3  Q.  So there was one job before the Pavia house?
4  A.  Right.
5  Q.  In addition to doing the walkway at that other
6     job, what did the inside work entail?
7  A.  It was an outside little addition. Brick
8     veneered the outside. A little like a --
9     probably a 10-by-10 addition, because her house
10    was already exterior brickwork on the exterior,
11    so we matched the existing.
12 Q.  No fireplace?
13 A.  No fireplace, no.
14 Q.  Just a brick veneer and --
15 A.  Just a brick veneer.
16 Q.  And the outside walkway?
17 A.  And an outside walkway.
18 Q.  Other than your two sons, back at this time, did
19    you have anybody else that worked for you?
20 A.  No.
21 Q.  Through the course of doing the job at Mrs.
22    Pavia's house, did you have anybody else that
23    worked for you other than your two sons?
24 A.  No.

22

1  Q.  Okay. Had -- had the subflooring been put down
2      in the addition by -- at the time that you were
3      doing the exterior brick?
4  A.  It's just the plywood. Just -- just the
5      subfloor. Yeah. Got to walk on something.
6  Q.  Had there been any finished work done to any of
7      the floors or the walls at that point?
8  A.  No. It wasn't -- it was -- it was -- it just
9      got -- it just got framed. We were right on top
10     of the framers. So as soon as they finished,
11     boom, and the windows were in, we would start
12     laying bricks.
13 Q.  At some point were you asked to do something else
14     at the property?
15 A.  Nope. Not at all.
16 Q.  Were you ever asked to do any work on the
17     existing fireplace that was in the main portion
18     of the home, not the addition?
19 A.  Nope.
20 Q.  At some point did someone approach you to put
21     some type of fireplace structure into the
22     addition?
23 A.  The only time they approached me is the day that
24     I finished the exterior. And Phil came up to me

22

1      and said, Joe, I need you to do a little job for
2      me up on the second floor. Julia wants to
3      surprise her husband, because that was going to
4      be his office area, with a decorative fireplace.
5      I says, let's go look at it.
6          So he told me what -- we went up on the
7      second floor. He says, this is what I want, a
8      decorative fireplace, just so it -- so Julia's
9      husband will have something to look at besides
10     the -- the -- the four walls.
11 Q.  Did he show you the location of where that was
12     going to be?
13 A.  Yes.
14 Q.  And what was the location?
15 A.  Right in the -- on the -- when you go upstairs,
16     right in this corner right here. That would be a
17     corner one.
18 Q.  And the corner that you're referring to, where
19     was that in relationship to the main house?
20 A.  I don't get you.
21 Q.  Okay.
22 A.  It's the -- it would be the main house. It would
23     be the back of the house. And then the addition
24     is right here, and this is the back of the house.

23

1      And the back of the house is all ext -- it was --
2      it was an exterior wall with bricks -- brick
3      thing there. Then they added on the addition.
4      And the unit that they wanted was right on the
5      corner.
6  Q.  Okay. So the corner consisted of the brick --
7      the brick exterior wall of the main house?
8  A.  Right.
9  Q.  True?
10 A.  Yeah.
11 Q.  And the other side of the corner, was that new?
12 A.  Right.
13 Q.  A new wall?
14 A.  Yeah.
15 Q.  That had recently been framed?
16 A.  Right.
17 Q.  So when you're looking at this for the first time
18     with Mr. Rothschild, he's pointing to this
19     corner --
20 A.  Yeah.
21 Q.  -- of this room?
22     Would I be correct that one of the walls
23     that you're looking at of the corner was the old
24     exterior wall of the main house?

24

1  A.  Yes.
2  Q.  And the other wall that you're looking at was a
3      new wood-framed structure?
4  A.  Yeah.
5  Q.  Okay. Had anything been put over that framing,
6      that interior framing on that new wall?
7  A.  No. It was just exposed bricks.
8  Q.  Exposed bricks from where?
9  A.  From the old existing -- from the -- the original
10     house. The upstairs was all exposed bricks on
11     the ext -- on the old exterior wall.
12 Q.  Right. And then the second wall that --
13 A.  Then the second wall. Then there's the
14     exterior -- this is the house. That's the
15     exterior wall. That was all brick. And then
16     from there to here, this is the addition. And I
17     would be working right on the other side of this
18     wall, on the outside exterior.
19 Q.  Okay. I've just drawn a corner on this piece of
20     paper. I put an X next to one of the lines
21     that's a corner. Okay? You with me?
22 A.  Yeah. No. Well...
23 Q.  But I'm wrong already, I can tell.
24 A.  Like you want me to do it?

1  Q.  Yeah.  I'll flip it over.  You do it.

2  A.  Okay.

3  Q.  All right.

   A.  This is the house.  This is the addition.

5       MR. BLACKBURN:  We'll go off the

6  record for a minute.

7       (Off the record.)

8       (Whereupon, Exhibit 1 was marked for

9  identification.)

10 Q.  Mr. Falco, while we were off the record, the

11 drawing that you and I made together, which I

12 don't think is going to win us any awards, other

13 than --

14 A.  Not at all.  I'm not an artist.  I'm a

15 bricklayer.

16 Q.  -- other than possibly at -- at some elementary

17 school.

18 A.  Yeah.  Right.

19 Q.  But let me just try to explain what we drew just

20 so that it's clear on the record.

21      We have two boxes or two large boxes.  As

22 you look at the exhibit with the exhibit sticker

23 facing the right way, the box on the right, you

24 have made a number of squiggly lines around three

---

1  sides of it?

2  A.  Right.

3  Q.  As I understand it, those lines are to represent

4  the area that you put up the brick on the

5  exterior of the building?

6  A.  Right.

7  Q.  Inside one of the boxes, there's a smaller box

8  that's put into the corner?

9  A.  Right.

10 Q.  And as I understand it, that's the area where the

11 decorative fireplace was built?

12 A.  Right.

13 Q.  I have put the number 1 with an arrow to one of

14 the walls and a number 2 with an arrow to another

15 wall; correct?

16 A.  Yeah.

17 Q.  As I understand it, the arrow that I have

18 driven or -- drawn and put the number 2 next to,

19 that was a brick wall that was originally the

20 rear wall to the house?

21 A.  Right.

22 Q.  The wall that I drew the number 1 with an arrow

23 to was a new wall; correct?

24 A.  Right.

---

27

1  Q.  So when you first went up there with Mr.

2  Rothschild and you were looking in that corner

3  where this decorative fireplace was going to be

4  put, --

5  A.  Yes.

6  Q.  -- one wall of the corner was the brick wall from

7  the existing house; correct?

8  A.  Yes.

9  Q.  And the other wall to the corner was newly

10 framed?

11 A.  Yes.  You got it.

12 Q.  And at least when you first looked at it, what

13 you would have seen would have been the wall

14 framing and the backside of the plywood that

15 would have been installed on the exterior of the

16 house?

17 A.  Yeah.

18 Q.  Okay.

19 A.  But if I remember correctly -- I mean, I just

   drew a box here.  Excuse me.  From what I

21 remember correctly, this was the -- also the --

22 the old exterior brick.  But then also on this

23 side here, it -- it was -- like the house went

---

28

1       So over here it also was bricks, but --

2  because I remember when I was bricking this,

3  there was only like a -- a 4-foot return from the

4  exterior all the way here and then the

5  addition -- like it was also like still the old

6  brick exterior here too.  It wasn't like a box.

7  This was all jogged out.  Like even on this side,

8  this would be the house, and like the addition

9  started over here like this, you know.

10 Q.  Well, what I'm trying -- what I'm trying to

11 understand, sir, is that when you first went

12 there with Mr. Rothschild and he pointed to that

13 corner, --

14 A.  Yeah.

15 Q.  -- one wall of that corner was brick because it

16 was the old rear to the house; right?

17 A.  Yes.

18 Q.  The other wall to that corner was framed with

19 plywood?

20 A.  But like I said, there were -- also a jog here

21 that was also bricks too.  And then halfway,

22 the -- the new framing started from here all --

23 it -- it -- it was weird the way they did it,

1  this addition. So it was a weird-shaped

2  addition.

3  Q. That may be true. I'm just trying to -- I'm just

   trying to get an understanding, sir, of before

5  you did any work whether there was brick on both

6  of the two walls that were in that corner.

7  A. Yes, there was. Yes.

8  Q. Okay.

9  A. That I will guarantee it, because if you go there

10  now, you'll still see it.

11  Q. Okay. So when you looked at that corner that he

12  pointed out to you, it was a corner that existed

13  of two brick walls?

14  A. Yes.

15  Q. And I'm probably beating this to death, but I

16  just want to make sure that I understand.

17  So going back to Pavia Exhibit 1, the

18  arrow with the number 1 that I drew, that was a

19  brick wall on the interior?

20  A. Yes.

21  Q. That day that you looked at that corner with Mr.

22  Rothschild, was Mrs. Pavia there?

23  A. No.

   Q. Did you ever talk to Mrs. Pavia about this

1  fireplace directly?

2  A. Not at all for the fireplace. I only talked to

3  her, hi, how are you? How's everything?

4  After Phil told me what to do, then she

5  came over, because I didn't take no orders from

6  Phil -- I mean from Mrs. Pavia. Phil was my

7  boss. Whatever he wanted done, he come to me,

8  and I would do it.

9  Q. So let me make sure I understand.

10  Did you have any conversations with Mrs.

11  Pavia before you started doing any of the work on

12  that decorative fireplace?

13  A. Yes. Hi, Julia. How are you? How's everything?

14  Good morning.

15  Q. Did you talk to her at all about the fireplace?

16  A. No, I didn't. There was no need of me talking to

17  her about the fireplace.

18  Q. At any point before you left the job, did you

19  talk to her at all about the fireplace?

20  A. No.

21  Q. That day that Mr. Rothschild took you up there

22  and showed you where the fireplace was going to

23  go, --

24  A. Uh-huh. Yes.

1  Q. -- did he explain to you about whether there was

2  going to be any type of a mantle or facade that

3  was going to be put around that fireplace?

4  A. No, he didn't. He just says he wants a

5  decorative-looking fireplace so -- to break up

6  the room, and that's it.

7  Q. Did he give you dimensions?

8  A. It was a little tiny thing. It only took me

9  three and a half hours to do it, and I only

10  charged him 500 bucks for it. And that was it.

11  Just a little tiny box with an opening, bricks on

12  the floor, and that's it.

13  Q. Fair enough. Did he tell you how big he wanted

14  it built, or did he leave that up to you?

15  A. He just says, give me a little opening. It was

16  about this big. About -- I would say like a

17  2-foot opening. It's like a miniature -- a

18  miniature fireplace. It's -- it's not workable

    if it's that small.

    Q. I'm just trying to understand whether --

21  A. Yeah.

22  Q. -- Mr. Rothschild told you it should be a 2-foot

23  opening.

24  A. No. He just says -- we just laid it out on the

1  floor. He says, what do you -- what do you think

2  of this? He says, great. Go up so high. He

3  didn't give me no specs on it.

4  Usually if you're building a chimney and

5  a fireplace, they give you specs. And usually if

6  they -- if they want a chimney done afterthought,

7  you have to go back to the Building Department

8  and get another special permit just to do that.

9  MR. CROWLEY: Just listen to the

10  counsel's question, please.

11  THE WITNESS: Yeah.

12  Q. Well, I just -- I just want to make sure that I

13  understand what instructions you were given by

14  Mr. Rothschild.

15  All right. Did he tell you how high he

16  wanted the opening?

17  A. We went over as we went along. Like I would be

18  working there, and then he would say, well, go up

19  another higher or go down a little -- one lower.

20  It's -- it's whatever, you know, --

21  Q. Okay.

22  A. -- whatever made him happy.

23  Q. Did you do the job that first day that he talked

24  to you about it?

1  A.  I was ready to leave. I was done with the
2      exterior. And he said, Joe, you got to do
3      something for me upstairs. Julia wants to
       surprise her husband with this. And he took me
○      upstairs. He told me what he wanted. I built
6      it. Three and a half hours later, I was gone.
7  Q.  All the same day?
8  A.  Same day. Don't take that long for that.
9  Q.  Was Mr. Rothschild there the whole time?
10 A.  He was there, but I don't remember that he was
11     there all the time. You know, it was -- he -- I
12     mean, he's not -- he -- he wasn't watching me. I
13     just did the job, and that's it.
14 Q.  The -- at some point while you were doing it, he
15     came back and said, for example, put another row
16     of bricks on? You recall that?
17 A.  I don't recall it. But we already discussed it,
18     what we wanted. I just did it, and that's it. I
19     mean, he says, Joe, just build this, give me
20     this, give me that. And that's it. And then he
21     came in, and he says, beautiful, that's cute.
22     That's it. I says, okay, good-bye.
23 Q.  Did he pay you that day?
   A.  Yes, he did. He was a very good payer.

1  Q.  So did he pay you that day for the last payment
2      on the brick?
3  A.  Yes, he did.
4  Q.  Plus the 500 for the --
5  A.  Yes, he did. Yeah.
6  Q.  -- for the small fireplace?
7  A.  Yeah.
8  Q.  All right. So who -- who actually laid the
9      brick?
10 A.  I did.
11 Q.  Did your sons help you?
12 A.  Well, that was a small area, so there's no
13     reason. One of them is -- my other son is a
14     bricklayer, and the other son is a tender. That
15     was a small area. You can't put two people there
16     to work.
17 Q.  Okay. So you did the work yourself?
18 A.  Yes, I did.
19 Q.  There was subflooring going all the way into that
20     corner? True?
21 A.  Yeah. There was subflooring there, yeah.
22 Q.  Okay. Did you put anything down over the
23     subflooring before you began doing the brick?
24 A.  I really don't remember that. I really don't

1      remember that, what -- you just go there and do
2      it.
3  Q.  There are some reports that indicate that
4      underneath the brick there was a half-inch of
5      some type of a masonry board or some type of
6      material.
7          Do you have any recollection of whether
8      you put down some type of a masonry board or a
9      fireboard, some type of material underneath your
10     bricks?
11 A.  I wouldn't do that, because it's not my job. If
12     anybody is going to do that, that's a carpenter's
13     job, because he's got the screw -- he's got the
14     screw gun, and he would -- he would do it.
15 Q.  So do you have any recollection as you sit here
16     today about whether there was any type of masonry
17     board or fireboard in that corner before you
18     started laying brick?
   A.  No, I don't. No, I don't.
   Q.  Were there carpenters on-site?
21 A.  Yes. There was -- I mean, like next to me --
22 Q.  No.
23 A.  -- or on the job?
24 Q.  There working.

1  A.  Yes, there were. Yeah. There were always
2      carpenters there. But at one time -- one would
3      be there all the time. That's this guy named
4      Chip. And then if there's -- if they needed
5      another carpenter, you would pull him off another
6      job.
7  Q.  So all this happened the same day?
8  A.  Yeah.
9  Q.  At any point during that day, did you have any
10     discussions with Mr. Rothschild about whether
11     there was going to be any type of prefabricated
12     fireplace going into that structure that you were
13     building?
14 A.  No.
15 Q.  Did you have any discussions with Mr. Rothschild
16     about whether there was going to be any type of
17     gas log system that was going to be built into
18     that fireplace?
19 A.  No. I didn't discuss anything with him. He just
20     wanted a decorative-looking fireplace.
21 Q.  When is the first time that you learned that
22     somebody installed some type of a gas fireplace
23     into that structure that you built?
24 A.  The day that I got notified from -- from the

1    insurance company saying that there's a lawsuit
2    on Julia Pavia's house, that they had a fire
3    there. That's the day that I learned about it, a
      year and a half later.
5  Q. Okay. Now, take me through to the best of your
6    memory what you did to build that -- that
7    fireplace in that corner that day.
8  A. What I did?
9  Q. Yeah.
10 A. I laid bricks.
11 Q. Where?
12 A. The sides, the floor, and not even on the top.
13   Just the -- just the two sides, the front, the
14   opening, and the floor.
15 Q. One row of bricks each for -- for each wall?
16 A. Yeah. Just a -- two sidewalls and the front with
17   the opening and bricks on the floor. That's it.
18 Q. Was there any type of a ledge left between the
19   floor of the fireplace and the hearth area?
20 A. I don't get that, what you're saying, ledge.
21 Q. Was there any difference in height between any of
22   the bricks that you laid?
23 A. Different in height? No.
   Q. They were all laid the same --

1  A. Yeah.
2  Q. -- level?
3  A. One course after another.
4  Q. Okay. And were there bricks across the top?
5  A. Well, when you get to a certain height, you put a
6    little angle iron there, a piece of steel, and
7    then you cross over to close in that opening so
8    it looks like a firebox.
9  Q. Okay. And how was -- how was the top course of
10   bricks left? Did you finish it in any way, put
11   anything on top of it?
12 A. No. Just -- just a top course, and nothing was
13   put on the top.
14 Q. When you got done, were there any openings in
15   that structure at all?
16 A. On my -- on the -- the thing that I built?
17 Q. Yes.
18 A. Yes. It was the opening, and then on -- you
19   know, the opening, and then on the top, because
20   it was just three walls. And -- and there was
21   nothing put on the top.
22 Q. Okay. You didn't put anything on the top?
23 A. No.
24 Q. So if I'm looking at the top of this fireplace

39

1    that you built from inside the corner, what is
2    there, the metal piece that you put down to lay
3    your brick on top of?
4  A. There's no metal piece there. It's just -- you
5    see the floor -- you see the bricks on the floor.
6    No metal piece. I just did the brickwork.
7    There's no metal piece involved in it, except the
8    angle irons that you put when the -- the top of
9    your opening. Then you just probably cross it
10   over with two or three courses of brick so it's
11   closed in. But not the top. They're just -- an
12   angle iron they call it.
13 Q. I'm just trying to get a picture of what's at the
14   top of the opening of the -- of the chimney
15   hearth after you get done.
16 A. More bricks.
17 Q. Okay. So it's bricked at the top also?
18 A. You mean to close in the -- to close in the top?
19 Q. Yes.
   A. No. The top was not closed. They were supposed
21   to do some decorative mantles there or something
22   from what I understand. It was just supposed to
23   be a decorative-looking fireplace. That's all I
24   built them.

40

1  Q. Once again, I'm going to have to have you draw it
2    for me. I'm going to give you another piece of
3    paper. I'll give you the pen back.
4  A. You're a better drawer than me. That's all --
5    that's all it was is a box. Okay. A box. And
6    this is the opening. And then you cross over
7    with an angle iron, and this is the opening right
8    here. See, this is the piers. Dah-dah-dah. And
9    when you get to a certain height, you just put a
10   piece of metal from here to here, and then you
11   lay bricks until you reach a certain height,
12   whatever height he wanted.
13 Q. All right. Now, --
14 A. But this is the opening right here.
15 Q. And just so that I understand the picture that
16   you drew, this is if we're standing on the floor
17   looking at the front of the structure?
18 A. Standing right here and looking at it right
19   there.
20        MR. BLACKBURN: If you would mark
21   that, please.
22        (Whereupon, Exhibit 2 was marked for
23   identification.)
24 Q. Okay. Mr. Falco, I've had the court reporter put

50

EXAMINATION BY MR. TURNER:

2  Q.  My name is Robert Turner, and I represent Michael
3      Carresi.
          Sir, what was your date of birth and
5      place of birth?
6  A.  2/17/43. Foggia, Italy.
7  Q.  And what year did you come to the United States?
8  A.  In 1954.
9  Q.  And so where did you go to school in the United
10     States?
11 A.  In Roxbury. The Deerborne School.
12 Q.  And then where did you go after that?
13 A.  Go to work when I was 16.
14 Q.  Deerborne School was a high school?
15 A.  It was -- it's a long story. Came over here when
16     I was nine years old, and I started off in the
17     first grade, because I didn't know how to speak
18     English. The same year I got promoted to the
19     second grade. Dropped out of school when I was
20     in the seventh. By that time, I was 16 years old.
21 Q.  And how did you learn to be a mason?
22 A.  Self-taught.
23 Q.  Did you get a job as a tender and then --
   A.  Yes, yes.

1  Q.  I see. Are you married?
2  A.  Was.
3  Q.  Divorced?
4  A.  Divorced, yeah.
5  Q.  Just once?
6  A.  Yeah.
7  Q.  And you have just two children?
8  A.  No. I was -- well, the second one -- the second
9      one, I lived with her for ten years, and then she
10     talked -- conned me into getting married. A year
11     and a half later, she was gone too.
12 Q.  Should we count that or not?
13 A.  No. You don't count that. She was -- she was
14     just a fun person to be with. Believe me, she
15     was. She made me forget the aggravation from the
16     first one.
17 Q.  But you actually did get legally married to her?
18 A.  Yeah. And then -- then it didn't -- then it
19     didn't work out. She was like a -- what do you
20     call those -- you can only stay with a guy for so
21     long. You got to run to the next guy. But she
22     was fun. I didn't mind giving her some of my
23     money after that, a quarter of the house.
24 Q.  Oh, so you did go through a divorce, I guess?

51

1  A.  I got -- we got -- then we split up, and now I'm
2      on my own.
3  Q.  Sure.
4  A.  Can't go the third time. That...
5  Q.  Usually when you do a fireplace, did you say that
6      you do some rough work, have it inspected, and do
7      some more work, have it inspected, and --
8  A.  Yes.
9  Q.  -- finish up and get it inspected again?
10 A.  Yes. I did say that, yeah.
11 Q.  And in this job at Julia Pavia's house, did you
12     follow that procedure?
13 A.  There was no procedure to follow. There was just
14     a decorative fireplace, looking -- a looking
15     fireplace.
16 Q.  Mr. Falco, did you consider the possibility that
17     someday someone might think that's a real
18     fireplace and put a fire in there?
19         MR. CROWLEY: I object.
   A.  He object, I guess.
21         MR. CROWLEY: You may answer.
22 A.  Did I consider it?
23 Q.  Yes.
24 A.  Because it's not a fireplace. It's just a

52

1      decorative-looking unit, and it's not -- you got
2      to be -- excuse my language -- stupid in order to
3      think that it's a working fireplace. That's it.
4  Q.  Did you make it look like it was a fireplace so
5      Mr. Pavia could enjoy it in his office?
6  A.  That's the way he wanted it. Mr. Pavia didn't
7      even know nothing about it. It was his wife that
8      wanted to surprise him. A fireplace is different
9      from this. A fireplace is supposed to start from
10     the cellar, blockwork, ash dumps, flue pipes,
11     firebox, rough opening, all firebricks, smoke
12     chamber. You got to be an idiot in order to see
13     that this is not a fireplace. Because you need a
14     smoke chamber. You need a chimney on top of that
15     unit.
16 Q.  Was there a chimney up there?
17 A.  No. Of course not.
18 Q.  At any time?
19 A.  No, no. It would have been a fortune to build
20     that because of the tile roofs, and -- and you
21     had to go from downstairs all the way up through
22     the -- through the slate roof. That would have
23     been like a $30,000 job.
24 Q.  Was there some kind of venting?

53

1  A.  Not when I did that unit, that decorative

2      fireplace. There was no venting whatsoever.

3  Q.  Did you make it look like a real fireplace?

    A.  I -- it does look like a fireplace. But -- but

5      you still have to have firebricks in there, and

6      you still have to have a smoke chamber. This is

7      just a box. I mean, you cannot light a fire in

8      there, because the smoke will go up in the room

9      instead of the chimney. I mean, that's common

10     sense. You need a chimney for the smoke to go

11     up. Just like Santa Claus needs it to go down at

12     Christmastime. Where is he going to go, through

13     a little vent?

14  Q.  Would most people know that you used some kind of

15     bricks that weren't firebricks?

16          MR. CROWLEY: I object. Go ahead.

17     You answer.

18  A.  Say that again. Repeat that.

19  Q.  The bricks you used, do they look any different

20     from firebricks?

21  A.  Yes.

22  Q.  How so?

23  A.  A brick is a brick, and a firebrick -- a fire --

      a firebrick is a firebrick. A firebrick -- a

54

1     firebrick is supposed to absorb the heat and

2     takes a lot of heat. A brick doesn't.

3  Q.  But just the looks of those bricks, do they look

4     similar?

5  A.  No. The firebrick is white or dark red. They

6     got two colors, a white one and a dark one, a

7     dark red. And they don't allow no bricks inside

8     of a firebox. It's got to be firebricks.

9  Q.  And the bricks you used --

10  A.  Not a brick.

11  Q.  The bricks you used --

12  A.  It was a brick, not a firebrick.

13  Q.  You just call them a brick?

14  A.  Just a common --

15         MR. CROWLEY: Wait. Wait for a

16     question.

17  Q.  You just call them a brick?

18  A.  A brick, yeah. I call it a brick, yeah.

19  Q.  And what color?

20  A.  It was like charcoal, because it was a

21     water-struck brick.

22  Q.  What's charcoal? A dark gray?

23  A.  No. It's like a brown. Yeah. It's like a -- a

24     brown. Yeah.

55

1  Q.  Did you consider the possibility that someone

2     might mistake that for a conventional fireplace

3     and start a fire there?

4         MR. CROWLEY: Objection.

5  A.  No. I didn't consider it, because anybody could

6     see that it wasn't a chimney and a fireplace.

7     I mean, what do you want me to tell you?

8     This is the truth. Anybody can see that -- I

9     mean, people that live in those type of

10     neighborhoods, don't tell me that they don't know

11     that this is not -- this is -- this is just a --

12     a box. You got to have a chimney.

13  Q.  Did you have any warnings --

14  A.  Warnings?

15         MR. CROWLEY: Objection.

16  Q.  Yeah.

17  A.  About what?

18  Q.  Don't put a fire in this.

          MR. CROWLEY: Objection.

20  A.  I wasn't told. That's all I was told to do, was

21     build a decorative firebox, and that's it. Just

22     for looks. That's all.

23  Q.  Were you supposed to make it look like a real

24     fireplace?

56

1  A.  That's what he -- that's what they wanted.

2  Q.  Okay.

3  A.  Yeah.

4  Q.  Did you see any boxes around the house that

5     contained gas log fireplace equipment?

6  A.  I don't think --

7  Q.  Perhaps four of them?

8  A.  I'm not nosy enough to go poking through people's

9     houses. I just go do -- over there, go do the

10     exterior brickwork, and that's it.

11  Q.  Did you see one in that second-floor office where

12     you were working?

13  A.  No, no. Because that was new construction. Why

14     would it be up there?

15  Q.  To go into the fireplace maybe.

16  A.  If they're stupid enough to put it in there.

17  Q.  Did you ever hear that there was one there --

18         MR. CROWLEY: Objection.

19  Q.  -- in a box?

20  A.  Nope, nope. Not until the lawsuit took effect.

21     Never heard of a fire log in there whatsoever.

22     Like I said, I went there, I did my job,

23     left. And then all of a sudden, a year and a

24     half later, this happens.

1  have.

2  **EXAMINATION BY MR. OBER:**

3  Q.  Good afternoon, Mr. Falco. My name is Scott
   Ober. I represent Heatmaster in this case.

5  The decorative fireplace that you built
6  had no venting?

7  A.  No venting, no.

8  Q.  It wasn't designed to be a solid fuel-burning
9  fireplace?

10 A.  No, of course not.

11 Q.  It didn't have any working flue when you did any
12 work?

13 A.  No. No working flue. That's why it took only
14 three and a half hours to build.

15 Q.  It didn't include any concrete or hearth slab,
16 the work that you did?

17 A.  There wasn't one there.

18 Q.  Is that -- when you build a regular fireplace and
19 chimney, would your work include installing a
20 concrete or a hearth slab?

21 A.  Oh, yes. It's got to be all concrete through
22 the whole -- the hearth. That's supposed to be
23 20 inches. Like, you know, put a piece
   of bluestone for safety reasons through the

---

1  hearth and the -- the whole inside of the
2  firebox.

3  When you go up so high from the -- your
4  top of a foundation, you get to a certain height.
5  Then you got to pour all concrete in there for
6  the hearth plus the whole inside. Put -- you got
7  to put steel rods in there so it will support --
8  it gets stronger, so -- and that's all solid with
9  concrete. That's when you start doing your
10 firebox on top of your concrete. Like a -- the
11 fireplace, you see those firebricks there. And
12 it's -- all around there, it's all solid with
13 bricks behind the fire -- the fire -- firebricks.
14 So that's a solid unit. And it goes all the way
15 up solid, 8 inches on the exterior and 8 inches
16 against the plywood until they call -- the smoke
17 chamber is done. Then you go back and do a
18 4-inch in the front -- exterior and 4 inches
19 against the plywood.

20 Q.  And all those things you just talked about
21 are things that --

22 A.  Codes.

23 Q.  -- are dictated by the codes?

24 A.  They're all codes, yes.

---

63

1  Q.  And the decorative fireplace that you built
2  wasn't built according to those codes?

3  A.  Of course not. It's just a decorative fireplace
4  with no flues, no nothing. Just three walls.

5  MR. OBER: That's all I have. Thank
6  you.

7  THE WITNESS: Thank you.

8  **EXAMINATION BY MR. CARPENTER:**

9  Q.  Mr. Falco, my name is Curtis Carpenter. I
10 represent P. & D. Builders in this case.

11 You testified that you -- you were
12 instructed to build a decorative fireplace?

13 A.  Yes.

14 Q.  Okay. You also stated that you've never built a
15 decorative fireplace before?

16 A.  Well, I can build anything if you tell me what
17 you want.

18 Q.  Well, --

19 A.  Not necessarily a -- a decorative fireplace. I
   could build you a chapel if you wanted out of
21 bricks, you know, with the -- you know, with
22 the -- what do you call it? -- the arches.

23 Q.  But --

24 A.  I was going to say Mary there. That's my

---

64

1  girlfriend's name, St. Mary. Okay. Go ahead.

2  Q.  When you were told to build a decorative
3  fireplace, what did you understand decorative
4  fireplace to mean?

5  A.  Just to look at something to break up the look in
6  the room instead of looking at just his desk and
7  his computer, because he had the whole upstairs,
8  and there was just a desk there. I suppose he
9  would put an office desk there, and that's it.
10 So just for looks, something to break up the
11 room.

12 Q.  Do you have any understanding as to whether a --
13 a zero clearance unit was going to go in that
14 decorative fireplace?

15 A.  If a zero clearance unit was going to go there,
16 it would be done before I -- I put up the walls,
17 because that unit fits inside the brick.

18 Q.  So no one -- no one ever suggested to you that
19 this was a decorative fireplace for a zero
20 clearance unit?

21 A.  Phil said something about that, but then I
22 couldn't figure it out, because there was no unit
23 there anyway.

24 Q.  So what did Phil say about a zero clearance?

# EXHIBIT NO. 4

**MICHAEL CARRESI**
**March 31, 2006**

```
                    UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS




     * * * * * * * * * * * * * * * * * * * * * * * * * *

     THE FIREMAN'S FUND INSURANCE

     COMPANY as subrogee of JULIA PAVIA,

                    Plaintiff

     vs.

     FALCO CONSTRUCTION CORP., P&DK

     BUILDERS, INC. and MICHAEL

     CARRESI d/b/a CARRESI PLUMBING &

     HEATING,                     C.A. 05-10827DPW

                    Defendants

     vs.

     HEATMASTER, INC.,

                    Third-party Defendant

     * * * * * * * * * * * * * * * * * * * * * * * * * *
```

**MICHAEL CARRESI**
**March 31, 2006**

|  | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | DEPOSITION OF: MICHAEL CARRESI |
| 12 | THE LAW OFFICES OF BRUCE R. FOX |
| 13 | 27B Midstate Drive |
| 14 | Suite 100 |
| 15 | Auburn, Massachusetts |
| 16 | March 31, 2006        10:20 a.m. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | Darlene M. Coppola |
| 23 | Registered Professional Reporter |
| 24 | Certified Professional Reporter |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Michael Carresi d/b/a Carresi |
| 3 | Plumbing & Heating: |
| 4 | THE LAW OFFICES OF BRUCE R. FOX |
| 5 | 27B Midstate Drive |
| 6 | Suite 100 |
| 7 | Auburn, MA   01501 |
| 8 | BY: ROBERT P. TURNER, ESQ. |
| 9 | 866.290.7435 |
| 10 | fax 508.832.5716 |
| 11 | |
| 12 | Representing Heatmaster, Inc.: |
| 13 | HASSETT & DONNELL, PC |
| 14 | 484 Main Street |
| 15 | Suite 560 |
| 16 | Worcester, MA   01608 |
| 17 | BY: SCOTT T. OBER, ESQ. |
| 18 | 508.791.6287 |
| 19 | fax 508.791.2652 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 | LAW OFFICES OF STUART G. BLACKBURN |
| 4 | Two Concord Way |
| 5 | P.O. Box 608 |
| 6 | Windsor Locks, CT  06096 |
| 7 | BY: STUART G. BLACKBURN, ESQ. |
| 8 | 860.292.1116 |
| 9 | fax 860.292.1221 |
| 10 | |
| 11 | Representing P & D Builders: |
| 12 | MORRISON, MAHONEY, LLP |
| 13 | 250 Summer Street |
| 14 | Boston, MA  02210 |
| 15 | BY: CURTIS L.S. CARPENTER, ESQ. |
| 16 | 617.439.7589 |
| 17 | fax 617.342.4841 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 5 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Falco Construction Corp.: |
| 3 | TOOMEY & YUDYSKY, LLP |
| 4 | 99 Summer Street |
| 5 | Boston, MA  02110 |
| 6 | BY: DAVID J. CROWLEY, ESQ. |
| 7 | 617.946.0930 |
| 8 | fax 617.946.0989 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

2  (Pages 2 to 5)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# MICHAEL CARRESI
## March 31, 2006

| Page 18 | Page 20 |
|---|---|
| 1   own job, so you really don't -- I couldn't<br>2   tell you exactly how it was built.<br>3        Q Did you have an understanding<br>4   that any type of a concrete base was<br>5   necessary underneath a conventional solid<br>6   fuel burning fireplace --<br>7        A Yes.<br>8        Q -- prior to January of 2000?<br>9        A I couldn't say.<br>10       Q You couldn't say when you<br>11  learned that?<br>12       A Right, right; I know that now,<br>13  only because of jobs that I've seen.<br>14       Q Did you have some understanding<br>15  that a conventional solid burning fireplace<br>16  would have some type of combustion chamber?<br>17       A Rephrase that.<br>18       Q Is combustion chamber the thing<br>19  you're having trouble with?<br>20       A Yeah.<br>21            MR. BLACKBURN: Let me work<br>22  around it.<br>23       Q How about a damper?<br>24       A Yes. | 1   house that we had previously remodeled and<br>2   she was buying a new house, she wanted to<br>3   renovate it. So Phil told me that and we<br>4   were supposed to meet at the house and walk<br>5   through it.<br>6        Q And did you?<br>7        A Yes, uh-huh.<br>8        Q Who was there?<br>9        A I couldn't -- I can't recall<br>10  exactly. I know Phil Rothschild and myself.<br>11  I think there was an electrician there.<br>12       Q Mr. or Mrs. Pavia or both?<br>13       A Yes, one of them. I'm not sure<br>14  if both of them were there. Julie was there.<br>15  I'm not sure if her husband was there. I<br>16  don't remember.<br>17       Q When you came away from that<br>18  meeting, did you have some understanding of<br>19  whether you had a job?<br>20       A We were to put some prices<br>21  together. It wasn't a definite job. We had<br>22  to put some numbers together to see how much<br>23  it would cost to do the work.<br>24       Q Was the fireplace in the office |

| Page 19 | Page 21 |
|---|---|
| 1        Q Can you describe for me the<br>2   damper that you're talking about?<br>3        A The damper that opens and closes<br>4   to block off the flue is what a damper is.<br>5        Q Other than the zero clearance<br>6   fireplaces that you had worked on, had you<br>7   ever seen a fireplace that did not have some<br>8   form of a chimney as its flue?<br>9        A They have metal, metal chimneys,<br>10  you know, like metal pipe.<br>11       Q You've seen that in a solid<br>12  burning conventional type of fireplace?<br>13       A Uh-huh.<br>14       Q Yes?<br>15       A Yes.<br>16       Q Did you have any understanding<br>17  as to the type of brick that was necessary in<br>18  order to build a fireplace?<br>19       A No.<br>20       Q How was it that -- what's the<br>21  first memory that you have about being<br>22  contacted to work at the Pavia home on the<br>23  addition?<br>24       A Phil told me that Julie sold her | 1   mentioned during that first meeting?<br>2        A I don't recall.<br>3        Q Do you still have any of your<br>4   records regarding this project?<br>5        A No, unfortunately, I don't.<br>6        Q What happened to them?<br>7        A They got thrown away.<br>8        Q Do you know when?<br>9        A No.<br>10       Q Do you have any recollection<br>11  about whether you still had the records at<br>12  the time that the fire took place?<br>13       A No, I did not.<br>14       Q Do you recall during that first<br>15  meeting any discussion about any fireplace<br>16  inserts in existing fireplaces or otherwise?<br>17       A Julie I think mentioned that she<br>18  wanted to put fireplaces -- gas logs and --<br>19  but I know when I wrote my proposal that on<br>20  the bottom of my proposal, we were installing<br>21  four gas logs.<br>22       Q So even though you don't have a<br>23  copy of the proposal any more, you recall --<br>24       A Yeah. |

6 (Pages 18 to 21)

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# MICHAEL CARRESI
## March 31, 2006

|  | Page 22 |
|---|---|
| 1 | Q -- that in -- |
| 2 | A It exists. |
| 3 | Q What do you mean it exists? |
| 4 | A A copy of that proposal. |
| 5 | Somebody -- Phil probably has it. I'm not |
| 6 | sure exactly, I'm just speculating. |
| 7 | Q Who did you give the proposal |
| 8 | to? |
| 9 | A Phil. |
| 10 | Q Did you ever give a copy of the |
| 11 | proposal directly to Mrs. Pavia? |
| 12 | A I think so. I think she has a |
| 13 | copy. |
| 14 | Q The same one that you gave to |
| 15 | Phil? |
| 16 | A Correct. |
| 17 | Q Was the proposal actually |
| 18 | addressed to Phil as a general contractor? |
| 19 | A Yes. |
| 20 | Q By Phil, we're referring to Mr. |
| 21 | Rothschild; correct? |
| 22 | A Yes, correct. |
| 23 | Q Your recollection is that that |
| 24 | proposal called for four gas burning |

|  | Page 23 |
|---|---|
| 1 | fireplace log assemblies? |
| 2 | A Yes. |
| 3 | Q Did you have someone -- do you |
| 4 | have some recollection of where those four |
| 5 | were going to go? |
| 6 | A Well, I knew there was one going |
| 7 | out in the new addition. She wanted one in |
| 8 | the living room, one in the basement. She |
| 9 | had bought four because she wanted to put one |
| 10 | in her bedroom, but I told her that wasn't |
| 11 | code, we couldn't install it in there. So we |
| 12 | did not install that one. |
| 13 | Q Why couldn't you install the one |
| 14 | in the bedroom? |
| 15 | A Because that's -- the code says |
| 16 | you cannot install a gas log in a bedroom or |
| 17 | bathroom. |
| 18 | Q Do you know why that is? |
| 19 | A Combustion air. The gas log |
| 20 | takes the air from the room for combustion |
| 21 | and they're afraid that people sleeping in |
| 22 | the room and if that's no other air, |
| 23 | something, something like that. |
| 24 | Q So did you include it in your |

|  | Page 24 |
|---|---|
| 1 | proposal originally -- |
| 2 | A Yes. |
| 3 | Q -- the one for the bedroom? |
| 4 | A Yeah, I put four and not |
| 5 | realizing where they were going to go. I |
| 6 | didn't know if there was two on the first |
| 7 | floor, one on the second floor. I was not |
| 8 | clear on where they were going specifically |
| 9 | until after. |
| 10 | Q So at least as of the time that |
| 11 | you did your proposal, you were aware that |
| 12 | there was going to be one fireplace in the |
| 13 | new addition? |
| 14 | A Uh-huh. |
| 15 | Q Yes? |
| 16 | A Yes. |
| 17 | Q Do you recall any conversations |
| 18 | during that initial meeting about who was |
| 19 | going to build that fireplace -- |
| 20 | A No. |
| 21 | Q -- or how it was going to be |
| 22 | built? |
| 23 | A No. |
| 24 | Q Did you have any discussions |

|  | Page 25 |
|---|---|
| 1 | about the type of gas log assembly that was |
| 2 | going to be purchased? |
| 3 | A No. Julie was buying it |
| 4 | herself. |
| 5 | Q Was there any discussions about |
| 6 | a zero clearance insert? |
| 7 | A Not that I know about. |
| 8 | Q At any time? |
| 9 | A Not that I know about, no. I |
| 10 | never heard anything about a zero clearance. |
| 11 | Q So for the life of the project, |
| 12 | as far as you're concerned, no one ever |
| 13 | discussed with you the possibility of |
| 14 | installing a zero clearance fireplace insert? |
| 15 | A Nobody discussed it with me, no. |
| 16 | Q Did you hear anybody else |
| 17 | talking about a zero clearance -- |
| 18 | A No. |
| 19 | Q -- fireplace? |
| 20 | A No. |
| 21 | Q Never? |
| 22 | A No. |
| 23 | Q Did your -- did you get any |
| 24 | feedback from your proposal after you gave it |

7 (Pages 22 to 25)

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# MICHAEL CARRESI
## March 31, 2006

Page 34

1  there?
2     A Black iron.
3     Q Why?
4     A I thought cosmetically it would
5  look better.
6     Q So the use of the black iron
7  piping you didn't feel was any type of
8  requirement from the code?
9     A No.
10    Q Do you recall whether you
11 believed that it was a requirement based upon
12 the manufacturer's instructions of the gas
13 log assembly?
14    A It was not.
15    Q Within -- sticking with that
16 piping that came into the fireplace, were
17 there any provisions of the code that
18 addressed how that piping was to be installed
19 within the chamber of a fireplace that was
20 going to be working?
21    A No.
22    Q Did you install it in the same
23 fashion as you had done on other fireplaces,
24 what I'll refer to as conventional fireplaces

Page 35

1  where you had been installing a gas log
2  assembly?
3     A Yes.
4     Q Was there any connection within
5  the piping that was actually within the
6  fireplace itself?
7     A Yes.
8     Q And how were those connections
9  made, by screwing the pipe --
10    A Threaded --
11    Q A threaded connection?
12    A Threaded or flared.
13    Q Do you recall whether they were
14 threaded --
15    A Both.
16    Q They were both in this instance?
17    A Yes, in all instances, in all
18 the gas log fireplace installations that I've
19 done.
20    Q Is there any type of material
21 that you apply over the connections within
22 that piping that's in the fireplace in order
23 to prevent any gas leak?
24    A Compound.

Page 36

1     Q What type of compound?
2     A Thread compound.
3     Q Anything else?
4     A No.
5     Q Do you recall when it was --
6        MR. BLACKBURN:  Withdrawn.
7     Q Did you actually make the hole
8  in the ceiling so that your -- so that your
9  flexible piping could come down into the
10 room?
11    A No.
12    Q Do you know who did?
13    A There was a wide -- a wide
14 opening there.  There wasn't a hole for a gas
15 line.  The plaster didn't go into the corner.
16 As I recall, it was left open because of the
17 bookshelves that were being constructed.  So
18 there was a big opening for the flue and
19 coiled up was my gas line.  It was --
20    Q So by the time -- by the time
21 you actually brought the gas line down into
22 the fireplace, had the ceiling already been
23 plastered?
24    A Yes.

Page 37

1     Q But just not -- there was an
2  area in the corner where it had been left
3  open to accommodate the gas line in the flue?
4     A Yes.
5     Q How big of an opening, could you
6  estimate?
7     A It was in a corner.
8     Q So it was a triangular?
9     A A triangle, approximately 30
10 inches off each corner, 30, maybe 3 feet.
11    Q Ultimately did anything else run
12 through that opening other than the flue from
13 the fireplace and the gas line?
14    A Not that I'm aware of.
15    Q When you actually uncoiled your
16 pipe to bring it down into the fireplace, had
17 the structure of the fireplace already been
18 built?
19    A Yes.
20    Q Had Mr. Falco left the job?
21    A Yes.  I don't recall if he was
22 finished, but he wasn't there when I was
23 working there.
24    Q To your knowledge, does Mr.

10 (Pages 34 to 37)

# MICHAEL CARRESI
# March 31, 2006

Page 38

1  Falco -- was Mr. Falco present when the gas
2  line that you were bringing into the
3  fireplace was there, actually running from
4  the ceiling down into the fireplace?
5      A I don't recall. I don't recall
6  if he was totally done when I did my work. I
7  don't remember.
8      Q As I understand it --
9          MR. BLACKBURN: Withdrawn.
10     Q By the time you brought the line
11 down into that corner into the fireplace,
12 were the bookshelves already constructed?
13     A No.
14     Q So would I be correct that
15 wherever the top of the fireplace -- wherever
16 the top of the brick was that Mr. Falco had
17 made from there up to the ceiling was just
18 still open?
19     A Yeah, I think so.
20     Q So -- was there at least a
21 period of time when the pipe that you -- the
22 gas pipe that you were bringing down from the
23 attic into the fireplace was open and exposed
24 above the top of the fireplace?

Page 39

1      A Yes.
2      Q What ultimately covered it was
3  the bookshelves?
4      A Correct.
5      Q But they had not been built --
6      A Correct.
7          MR. BLACKBURN: Withdrawn. Let
8  me ask you this question. Maybe it's a
9  better one.
10     Q Were the bookshelves built after
11 you installed the gas log assembly in that
12 fireplace?
13     A To the best of my knowledge,
14 I -- as I remember.
15     Q One of the last things that was
16 done was the bookshelves --
17     A Yes.
18     Q -- and some other finish trim?
19     A Yes.
20     Q So that would also be true then
21 that whatever flue piping had been run out of
22 that fireplace up into the attic was also
23 installed before the bookcases were installed
24 to cover it?

Page 40

1      A Correct.
2      Q Did you do anything with respect
3  to that flue pipe, sir?
4      A No, sir.
5      Q Who did?
6      A I didn't -- I was not there. I
7  don't know who actually did it until a couple
8  of days ago, I found out who did it.
9      Q What did you --
10         MR. BLACKBURN: Withdrawn.
11     Q Did you find out from your
12 attorney a couple of days ago?
13     A No, Phil told me.
14     Q So who did you find out did it?
15     A A gentleman Jim Dusault.
16     Q Had you worked with Mr. Dusault
17 before?
18     A Yes.
19     Q Do you work with him -- have you
20 worked with him after the fact?
21         THE WITNESS: After what?
22         MR. BLACKBURN: After the fire.
23     A No, I haven't seen him in years.
24     Q So would it be fair to say --

Page 41

1          MR. BLACKBURN: Withdrawn.
2      Q Did you actually see him at the
3  Pavia house?
4      A No.
5      Q Do you know what he was doing at
6  the Pavia house other than running this flue,
7  if anything?
8      A To my knowledge, he wasn't even
9  there. I didn't know else he did the flue and
10 there was nothing else for him to do because
11 I -- my guy was doing the duct work.
12     Q What is Mr. Dusault's business?
13     A HVAC work.
14     Q Why is it that you didn't run
15 the flue from the fireplace?
16     A I don't do work like that. I
17 don't run flue pipes for a fireplace. I
18 don't build fireplaces. I wasn't hired to do
19 any of that work. My job -- my scope of work
20 consisted of running a gas line and tying in
21 a gas log that Julie Pavia was to purchase.
22     Q Going back, there was -- those
23 times that you installed a zero clearance
24 insert --

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# EXHIBIT NO. 5

UNITED STATES DISTRICT COURT
District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance                    **ORIGINAL**
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
          Plaintiff

          vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
          Defendants

          vs.

Heatmaster, Inc.,
          Third-Party Defendant


          **DEPOSITION OF MICHAEL J. ROACH**, a witness
called on behalf of the Defendant Falco Construction
Corp., pursuant to the Federal Rules of Civil
Procedure, before Jessica L. Bisaillon, a Registered
Professional Reporter, Certified Shorthand Reporter,
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Toomey & Yudysky,
LLP, 99 Summer Street, Boston, Massachusetts
02110, on Friday, March 3, 2006, commencing at
10:05 a.m.


DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

A P P E A R A N C E S:

The Law Offices of Stuart G. Blackburn
    BY:   Stuart G. Blackburn, Esquire
    Two Concorde Way
    Post Office Box 608
    Windsor Locks, Connecticut 06096
    Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
    BY:   David J. Crowley, Esquire
    99 Summer Street
    Boston, Massachusetts 02110
    Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
    BY:   Curtis L.S. Carpenter, Esquire
    250 Summer Street
    Boston, Massachusetts 02210
    Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
    BY:   Robert T. Turner, Esquire
    27B Midstate Drive, Suite 100
    Auburn, Massachusetts 01501
    Appearing on behalf of Michael Carresi,
    d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
    BY:   Scott T. Ober, Esquire
    484 Main Street, Suite 560
    Worcester, Massachusetts 01608
    Appearing on behalf of Heatmaster, Inc.

3

## I N D E X

DEPOSITION OF:                                          PAGE

MICHAEL J. ROACH


Examination by Mr. Crowley                                4
Examination by Mr. Turner                               58
Examination by Mr. Blackburn                            70
Examination by Mr. Ober                                 89
Examination by Mr. Carpenter                            91
Reexamination by Mr. Turner                             92

## E X H I B I T S

EXHIBIT NO.                                             PAGE

* * * * *

1       house, which was -- I think it was

2       Oxmoor (phonetic) -- Oxmoor Lane in Newton.  I'm

3       not sure of the -- it was the house that she

4       owned before this -- this one.  And that was a

5       long time ago.

6    Q.   The fire, that occurred at 104 Hammondswood Road?

7    A.   Yes.

8    Q.   When was the first time you worked at 104

9       Hammondswood Road?

10   A.   Maybe that was 2002.  That was what -- when we

11      put the addition on for -- for Julie.

12   Q.   So the first work you did at Hammondswood Road

13      was the construction of an addition?

14   A.   Yes.

15   Q.   Who was the general contractor for that work?

16   A.   P. & D. Builders.

17   Q.   Was there somebody who ran that job for P. & D.?

18   A.   No.

19   Q.   What work did you do on the addition?

20   A.   I -- I tore down the original structure, and then

21      I -- I built the addition.

22   Q.   Did you work as a framing carpenter?

23   A.   Yes.

24   Q.   Were there other framing carpenters on that job?

21

| | | |
|---|---|---|
| 1 | A. | Michael Conte and Chuck Burr. |
| 2 | Q. | How do you spell Chuck's last name? |
| 3 | A. | B-u-r-r. |
| 4 | Q. | Does Mr. Burr continue to work for P. & D. |
| 5 | | Builders? |
| 6 | A. | No. |
| 7 | Q. | When did he stop working at P. & D.? |
| 8 | A. | During that job. |
| 9 | Q. | Do you recall what the phase of the work was when |
| 10 | | Mr. Burr left the job? |
| 11 | A. | We had the roof on. So it was -- the framing was |
| 12 | | pretty much completed. |
| 13 | Q. | Do you know where Mr. Burr lived? |
| 14 | A. | Where he -- where he lived? He lived in East |
| 15 | | Bridgewater then, and I think he lives in |
| 16 | | Bridgewater now. |
| 17 | Q. | Do you know his current residential address? |
| 18 | A. | I know about where he -- I -- |
| 19 | Q. | If you know. |
| 20 | A. | I -- I know what street it is if I was driving |
| 21 | | down it. I don't know the name of it. |
| 22 | Q. | Somewhere in Bridgewater? |
| 23 | A. | Yes. |
| 24 | Q. | Do you know where Mr. Burr works now? |

```
 1    A.    He's self-employed.

 2    Q.    Does his business have a name?

 3    A.    I forget what he calls himself, what he goes

 4          under right now.

 5    Q.    I may have asked you this before, but does your

 6          self-employed business have a name?

 7    A.    It's M.R. Construction.

 8    Q.    The framing work that you did at 104 Hammondswood

 9          Road, were there plans that you followed for that

10          framing work?

11    A.    No.

12    Q.    How did you know what to do?

13    A.    Sort of description -- someone would describe

14          what they want, Julie and Phil.

15    Q.    Mr. Rothschild and Ms. Pavia would describe what

16          they wanted, and you would build it?

17    A.    Yes.

18    Q.    When you started work framing the addition, did

19          somebody describe for you what they intended the

20          addition to look like when it was completed?

21    A.    It's -- the best that they could, yes.

22    Q.    How did they do that?

23    A.    I want -- I want three windows in this wall, and

24          I want -- I want an L-shaped staircase, and
```

```
 1           then -- or a straight staircase.  I want the
 2           rooflines to match if -- if possible so it
 3           wouldn't look as much like an addition, it would
 4           look like it was always there.
 5     Q.    So that Mr. Rothschild and Ms. Pavia verbally
 6           told you what they wanted?
 7     A.    Yes.
 8     Q.    When you first started work framing the addition,
 9           was there any discussion about fireplaces in the
10           addition?
11     A.    Oh, yeah.
12     Q.    Who did you talk to about fireplaces?
13     A.    Phil and Julie.
14     Q.    When you first started work on the addition, what
15           did Mr. Rothschild say about fireplaces being
16           built into the addition?
17     A.    That there's going to be a fireplace for the
18           addition, and they didn't know the location yet.
19     Q.    So Mr. Rothschild just gave you some general
20           information that a fireplace was going to be
21           built somewhere in the addition?
22     A.    Yes.
23     Q.    Did Ms. Pavia say anything to you at that time
24           about constructing a fireplace in the addition?
```

```
 1    A.   Yes.  We had many conversations with Julie about

 2         where the fireplace was going to go, and it

 3         would -- it would change every day.  And at the

 4         beginning, it wasn't a big deal, because we

 5         weren't to the second floor of the addition, so

 6         we didn't have to worry about the framing.

 7              And when we got to the second floor,

 8         she -- the fire -- the conventional fireplaces --

 9         the fireplace wasn't going to work in -- in her

10         house.  It was going to take up too much space.

11         You had to support it, and she didn't want it.

12         So -- so she wasn't going to go with the

13         conventional fireplace.

14    Q.   From the beginning, did Ms. Pavia indicate that

15         the fireplace would be going in on the second

16         floor?

17    A.   That fireplace was moved all over the addition.

18         I don't know if they started in the cellar and

19         they brought it up to the second floor or what,

20         but it was an ongoing discussion.

21    Q.   As a framing carpenter, why would you need to

22         have information about where the fireplace was

23         going?

24    A.   Just to prepare the framing for it so Joey
```

```
 1          could -- so the mason could put his hearth in.

 2          We'd just have to frame for it.

 3    Q.    And what work would you need to do as a framing

 4          carpenter to prepare for the construction of a

 5          hearth?

 6    A.    In that particular job, where she was going to

 7          put it, what -- well, in all -- all jobs like

 8          that, we'd have to leave a -- leave an opening

 9          roughly on 2 feet off the face of the fireplace,

10          5 feet wide, or however wide they wanted it.  And

11          Joey would then have to pour a -- pour a cement

12          pad in that opening for -- for the firebrick.

13          And then in back of that, the fireplace would be

14          built.  And if she wanted that, then we had to do

15          more work inside the house, because that -- that

16          was the wall that abutted the house, and so we

17          would have had to do some rehab in there.

18    Q.    You would have had to do some work on the

19          exterior wall?

20    A.    It would have -- it would have went all the way

21          into her master bedroom.

22    Q.    Ms. Pavia's master bedroom adjoins the addition

23          where the fireplace was going to go?

24    A.    Yes.
```

| | | |
|---|---|---|
| 1 | Q. | And what do you mean that the fireplace would go |
| 2 | | into Ms. Pavia's master bedroom? |
| 3 | A. | You see the face -- like in a typical house, you |
| 4 | | see the face of the fireplace.  But in back of |
| 5 | | it, it -- it extends another 18 inches to 2 feet. |
| 6 | | And so -- so we'd have to also build that |
| 7 | | part of the framing for the fireplace, plus you |
| 8 | | would also need to support that structure all the |
| 9 | | way down to the basement.  And so that would not |
| 10 | | only go through her master bedroom but into the |
| 11 | | formal living room down below and then into her |
| 12 | | garage. |
| 13 | Q. | So that if a conventional fireplace was to be |
| 14 | | built in the addition, you would have to frame it |
| 15 | | from the basement up to the second floor? |
| 16 | A. | Oh, yeah.  Yes. |
| 17 | Q. | Is that correct? |
| 18 | A. | That's correct. |
| 19 | Q. | And you testified a little earlier that a |
| 20 | | decision was made that a conventional fireplace |
| 21 | | was not going to be put in there? |
| 22 | A. | No, it wasn't.  She didn't want it.  It was |
| 23 | | taking up too much space.  It wasn't going to |
| 24 | | work for her. |

1    Q.   What was the status of your work when Ms. Pavia

2         decided not to go with a conventional fireplace?

3    A.   Continue -- continue the framing, and we'll do

4         something different.

5    Q.   Did you actually have a conversation with Ms.

6         Pavia where she decided not to go with a

7         conventional fireplace?

8    A.   I remember I did.  But can I remember what --

9         what was said?  No.  I mean, we were talking.

10        Me -- me and Julie and Phil were talking always

11        about the job, what's going on that day, what's

12        to be done.

13             So if that fireplace didn't go in, it was

14        because Julie didn't want it to be put in, and it

15        was -- and she told me not to put it in.

16   Q.   Before you started your work every day, did you

17        speak to Ms. Pavia about the work you were doing?

18   A.   No, not every day.  It wasn't -- it wasn't -- we

19        didn't need to talk every day, because the work

20        wasn't progressing at such a fast pace that she

21        needed to be involved.  It was only until we --

22        we needed to ask her for her input or her

23        decisions.  So every couple days or so we'd touch

24        base.

1    Q.   Whenever the work was going to move to a new

2         level?

3    A.   Yeah.

4    Q.   During the discussions that you had with Mr.

5         Rothschild and Ms. Pavia about the conventional

6         fireplace, did anybody ever draw anything or make

7         a sketch of a proposed conventional fireplace?

8    A.   No.

9    Q.   After you were informed that a conventional

10        fireplace was not going in the addition, how did

11        you proceed with your framing?

12   A.   We finished the job.  We brought the wall -- we

13        put the roof on, just completed our framing.

14   Q.   Did you finish your framing as if no fireplace

15        was being built?

16   A.   Yes.

17   Q.   Did you build the floors for the addition?

18   A.   Yes.

19   Q.   What were the floors constructed out of?

20   A.   I forget.  We -- we had to double up our -- our

21        floor joists.  It was like a 2-by-8 and a 2-by-10

22        put together on top of each other to make up 18

23        inches.  And I can't remember why we did that

24        right now.  It was to flush up floors.  I know

```
 1           that.  But I don't -- I don't particularly
 2           remember why we had to go so deep with them.  But
 3           it was -- I don't know.  We -- it was just a
 4           typical -- it was still typical framing.  We just
 5           made extra-deep floor joists.
 6      Q.   So when you completed your framing of the
 7           addition, there was nothing to indicate that a
 8           fireplace was to be built?
 9      A.   No.
10      Q.   So I'm correct in stating that when you finished
11           your framing of the addition, there was nothing
12           to indicate that a fireplace was to be built on
13           the second floor of the addition?
14      A.   There was -- other than I knew there was
15           something going to be done.  I know that
16           something else was going to happen.  But there
17           was no -- no conventional fireplace framing for
18           that.  They were going to move to -- to another
19           solution.
20      Q.   How did you know that something was going to be
21           done there?
22      A.   Well, when they decided not to have a fireplace,
23           they -- they wanted a zero clearance.
24      Q.   What is a zero clearance?
```

# EXHIBIT NO. 6

1

1    # ORIGINAL    VOL. I
                     PAGES 1-61
2                    EXHIBITS NONE

3

4            UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS
5
             C.A. NO.:  05-CV-10827-DPW
6
7    * * * * * * * * * * * * * * * * * * *
     THE FIREMAN'S FUND INSURANCE
     COMPANY AS SUBROGEE OF JULIA
8    PAVIA 77 SAN MARIN DRIVE
     NOVADO, CALIFORNIA,
9        PLAINTIFF,

10   VS

11   ALCO CONSTRUCTION CORP.,
     P&D BUILDERS, INC. AND
12   MICHAEL CARRESI D/B/A
     CARRESI PLUMBING & HEATING,
13          DEFENDANTS,
     VS
14   HEATMASTER, INC.,
         THIRD-PARTY DEFENDANT
15   * * * * * * * * * * * * * * * * * * *

16

17          DEPOSITION OF MICHAEL CONTE, taken on

18   behalf of the Plaintiff, pursuant to the

19   provisions of the Massachusetts Rules of Civil

20   Procedure, before Bernadette J. D'Alelio,

21   Notary Public and Court Reporter within and for

22   the Commonwealth of Massachusetts, at the

23   Offices of Toomey & Yudysky, LLP, 99 Summer

24   Street, Boston, Massachusetts, on February 23,

     2006, at 10:00 a.m., as follows:

APPEARANCES:

**ON BEHALF OF PLAINTIFF:**
ERIC LOFTUS, ESQ.
Law Offices of Stuart G. Blackburn
Two Concorde Way
Windsor Locks, Connecticut 06096
(860)292-1116

**ON BEHALF OF HEATMASTER, INC.:**
SCOTT T. OBER, ESQ.
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, Massachusetts 01608
(508)791-6287

**ON BEHALF OF MICHAEL CARRESI:**
NICHOLLE R. PROULX, ESQ.
Law Offices of Bruce R. Fox
27B Midstate Drive, Suite 100
Auburn, Massachusetts 01501
(866)290-7435

**ON BEHALF OF P&D BUILDERS, INC.:**
CURTIS L.S. CARPENTER, ESQ.
Morrison Mahoney, LLP
250 Summer Street
Boston, Massachusetts 02210
(617)439-7589

**ON BEHALF OF JOSEPH FALCO:**
DAVID J. CROWLEY, ESQ.
Toomey & Yudysky, LLP
99 Summer Street
Boston, Massachusetts 02110
(617)946-0930

30

1    trying to stay neutral.

2        Q.    When you refer to "the mason," you are

3    talking about Mr. Falco?

4        A.    Yes.

5        Q.    Are you familiar with Julie Pavia?

6        A.    Yes.

7        Q.    Have you ever done any work for her?

8        A.    The only work that I did for her was

9    through P&D Builders.

10       Q.    Do you recall when you started working

11   at the Pavia house?

12       A.    Not the exact date, no.

13       Q.    What was the status of the project

14   when you started working there?

15       A.    Again, I'm not the general contractor

16   on the job.  I don't know what the contract

17   read, what the scope of the work was.  Phil,

18   P&D Builders, asked me to come in there and

19   frame a one-story addition on the back of the

20   existing house.  When we opened up the roof, I

21   believe it was, there was a lot of ant damage

22   to the first floor.  So we had to tear the

23   first floor addition down and rebuild that

24   also.

31

1        Q.    Initially the project was to build a

2    one-story addition onto the first floor to the

3    rear of the residence?

4        A.    Yes.  It was to tear off an existing

5    walk-out porch on top of the back and then just

6    go up one story with the roof.  But, again,

7    because of the ant damage, we had to tear down

8    the first floor and rebuild that.

9        Q.    When you worked as a subcontractor to

10   P&D on the job, did you have a written

11   subcontract with them?

12       A.    I did not have a contract with Phil at

13   any time for any job.  I would work by the

14   hour.  I would give him an invoice for an

15   hourly wage.

16       Q.    Did you keep a log or journal at that

17   job?

18       A.    No.

19       Q.    How did you keep track of your hours?

20       A.    They were written down on an invoice

21   every week and I would give him that invoice at

22   the end of the week or every two weeks,

23   whenever I saw him.

24       Q.    Were you hired to install the roof on

32

1    the addition?

2         A.   Yes.  It was to frame the roof, not to

3    do the slate roofing.  It was mainly frame,

4    install windows and doors.

5         Q.   Did you perform the demolition work on

6    the first floor?

7         A.   I believe we did most of it, meaning

8    myself and Mike Roach.

9         Q.   Were you and Mr. Roach the framing

10   crew for that job?

11        A.   That's what you would call us.  We

12   framed it and then everybody else comes in and

13   does their part.

14        Q.   While you were doing your framing work

15   at the Pavia house, were there other P&D

16   employees or subcontractors on the job?

17        A.   Yes.

18        Q.   Who were they?

19        A.   He had hired an electrician.  I do not

20   know him.  I believe his name was Frank.  Mike

21   Carresi was there doing -- I believe it was

22   heat and central air.

23        Q.   Were there other carpenters on the

24   job?

33

1      A.   I know Chip was there, and I'm just

2   trying to remember who else was working for him

3   at the time.  He had a carpenter named Dave.

4   As soon as you say his last name, I will

5   remember it.

6      Q.   Any other P&D workers that you can

7   recall?

8      A.   Prior to the demolition, I'm not

9   sure.  After the demolition, he would have

10  sheetrockers, plasterers, then the masons came

11  in.  They started by doing the exterior brick.

12  The whole house was brick.

13     Q.   Mr. Falco installed the exterior

14  brick?

15     A.   Yes.  It had a brick facade over the

16  brick frame.

17     Q.   Had you completed your framing work

18  when Mr. Falco started the brick facade work?

19     A.   We might have been doing a little bit

20  of interior frame as far as stairs go but

21  nothing major.  We did see Joe outside.  He had

22  started.  I remember the temperature was cold,

23  so we could only do so much.  We would have to

24  cover it up and try to heat things and keep

34

1  them from freezing.

2      Q.  So you were present at the job for

3  some of the exterior work that Mr. Falco did?

4      A.  I saw a lot of the exterior work that

5  Joe did, probably most of it.

6      Q.  Did Mr. Falco work alone?

7      A.  No.  He had his two sons with him.

8      Q.  Do you know approximately how long

9  Mr. Falco was working on the exterior of the

10  residence?

11      A.  I do not remember exactly.  I'm

12  assuming or calculating at least a couple of

13  weeks.

14      Q.  When you describe your work as framing

15  the addition, does that include the

16  construction of the floor?

17      A.  Yes.

18      Q.  And you also constructed the wood

19  frame for the interior walls of the addition?

20      A.  Yes.  I'm just trying to remember what

21  it had for interior walls.  I think the only

22  interior walls were for the stairway going to

23  the second floor.  I think the second floor was

24  an office and the first floor was a TV room.  I

37

1    existing or future.  I framed everything 16
2    inches or 12 inches on center, whatever we
3    needed to do per code, and we did not allow for
4    any chases, chimneys.  I wasn't told of any
5    protrusions coming through the roof.
6        Q.   Typically when a fireplace is intended
7    to be installed in an addition, would the
8    framers be advised that a fireplace was being
9    built so that they could frame it accordingly?
10       A.   Yes.
11       Q.   On the Pavia job, if you knew that a
12   fireplace was to be installed on the second
13   floor, would you have framed that job
14   differently?
15       A.   I would have framed the roof -- If it
16   was going to be a conventional fireplace, I
17   would have framed a whole new roof for the
18   chimney to go through, and I would have framed
19   the floor for a cement hearth.
20       Q.   And how would that have been different
21   from the framing that you actually did at the
22   Pavia job?
23       A.   It would have allowed for a masonry
24   chimney.  The print that I had didn't show a

38

1   chimney or a fireplace.  I framed a flat

2   floor.  I framed a regular, like I said, 16 on

3   center roof with no penetrations for a chimney.

4       Q.   If you had been told that a fireplace

5   was being built at the Pavia residence, what

6   allowances would you have made for the hearth?

7       A.   I would have framed -- Typically a

8   hearth you need, I believe, a two foot deep by

9   the width of the fireplace that has to be

10  framed with double members all the way around

11  so your joists can abut into them.  So there is

12  actually a hole in the floor and then the

13  masonry work comes out through that.  Then you

14  would be told what was being done for the flue,

15  either to leave a hole in the ceiling and roof

16  or if it was being vented some other way, you

17  would be told so you could allow for it.  I was

18  never told there was a fireplace or chimney of

19  any kind.  So I didn't make any arrangements

20  for it.

21      Q.   And the framing work that you did for

22  the roof, you put up an ice and water shield on

23  the roof?

24      A.   Yes.  You put your framing members up,

39

1   your plywood up and then the ice and water to

2   keep out the rain until a finished product goes

3   over it.

4       Q.   Would there have been a layer of

5   plywood on the roof for the finished product?

6       A.   No.   The finished product being the

7   slate.   Its framing members which support the

8   plywood, then you put the plywood on the

9   framing members, then you put the rubber ice

10  and water shield on the plywood to keep the

11  rain out until the slate goes down.

12      Q.   Would the slate roof go directly over

13  the ice and water shield?

14      A.   Yes.

15      Q.   So that when you framed the roof for

16  the Pavia job, you did not leave an opening for

17  any type of ventilation for a fireplace?

18      A.   Correct.

19      Q.   And when you built the -- strike that.

20           When you installed the floor in the

21  second floor addition, you didn't make any

22  allowances for a hearth for the fireplace?

23      A.   Correct, because I wasn't told that

24  there was going to be one.   The print didn't

40

 1    show one that I can recall.

 2         Q.   And you recall that the framing that

 3    you did was not consistent with a fireplace

 4    being installed in that second floor office?

 5         A.   It was definitely not consistent with

 6    the fireplace.

 7         Q.   Did you leave that job before any talk

 8    about a fireplace being installed?

 9         A.   I left the job and occasionally I

10    would come back in for a day here and there.

11    And I heard talk that Julie wanted some kind of

12    a -- The word I heard was a decorative

13    fireplace on the second floor.  She wasn't sure

14    what she wanted and that's the extent of what I

15    heard.  The conversation was between her and

16    Phil mainly.

17         Q.   When you speak about Julie, are you

18    referring to Ms. Pavia?

19         A.   Yes.

20         Q.   How did you hear that Ms. Pavia wanted

21    a decorative fireplace on the second floor?

22         A.   I'm not sure if I just overheard their

23    conversation or if Phil mentioned it, that she

24    wanted something upstairs.  It was basically at

DUNN & GOUDREAU

# EXHIBIT NO. 7

**ANSWER NO. 13**

P&D Builders, Inc., hired Falco Construction to perform masonry work on the subject premises.

**INTERROGATORY NO. 14**

Please describe in full and complete detail each and every contract and/or agreement and/or work order between P&D and the following entities relative to the subject premises:

      a.     Falco;

      b.     Julia Pavia; and

      c.     Michael Carresi d/b/a Carresi Plumbing & Heating

**ANSWER NO. 14**

a.     P&D Builders, Inc., hired Falco Construction to perform masonry work on the subject premises.

b.     Julia Pavia retained P&D Builders, Inc., as a general contractor to perform construction services on the subject premises from approximately July 6, 2000 to December 14, 2001, and then again from shortly after the subject fire on January 26, 2004 until approximately February 2, 2005. For further details concerning the nature and scope of the work performed by P&D Builders, Inc., please refer to the documents produced by the defendant is response to Falco's request for production of documents.

c.     P&D Builders, Inc., hired Michael Carresi, d/b/a Carresi Plumbing & Heating, to perform plumbing services on the subject premises.

**INTERROGATORY NO. 15**

Please list all factors or events which P&D contends caused or contributed to the alleged incident(s).

**ANSWER NO. 15**

The defendant objects to Interrogatory No. 15 to the extent that it calls for the mental impressions, conclusions, opinions or legal theories of an attorney or other representatives of a party concerning the litigation. In addition, said interrogatory is beyond the scope of discovery, as the defendant has no obligation to prove how the fire occurred, and the defendant has no personal knowledge of how the fire occurred. Notwithstanding and without waiving the objections, the defendant believes that the instructions and warnings that accompanied the gas log appliance installed on the subject premises, did not adequately warn of the potential hazards associated with the use of that product, and did not adequately describe the setting in which that product should be installed. Furthermore, the defendant believes that the plaintiff's subrogee, Julia Pavia, by leaving the gas log appliance on for an extended period of time, contributed the subject incident by using the product in a manner for which it was not intended. Finally, the

defendant further believes that fire suppression efforts on the Newton Fire Department contributed to the damages allegedly sustained at the subject premises.

The undersigned deposes and says that he is an agent of P&D Builders, Inc., named defendant in the above-captioned action, and that he signs the answers to the interrogatories for and on behalf of P&D Builders, Inc. and is authorized to do so; that the matters stated in the foregoing answers are not all within his personal knowledge and that he is informed that there is no officer or employee of said P&D who has personal knowledge of all such matters; that such facts as are stated in said answers which are not within the personal knowledge of the deponent have been assembled by authorized agents, employees and counsel of said defendant and the deponent is informed and believes that the facts stated in said answers are true and so states under the pains and penalties of perjury.

Signed under the pains and penalties of perjury this ___1st___ day of __February__, 2006.

P&D Builders, Inc.

BY: _____
Mr. Philip Rothschild

As to Objections:

_____
William Joseph Flanagan, BBO#556598
Curtis L.S. Carpenter, BBO#657358
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

1159079v1