UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE FIREMAN'S FUND INSURANCE COMPANY as subrogee of JULIA PAVIA, <br>         Plaintiff, <br><br> v. <br> FALCO CONSTRUCTION CORP., P&D BUILDERS, INC., and MICHAEL CARRESI d/b/a CARRESI PLUMBING & HEATING. <br>         Defendants, <br><br> v. <br> HEATMASTER, INC. <br>         Third-Party-Defendant. | CIVIL ACTION NO.: 05-10827RBC |

**DEFENDANT/CROSS-CLAIM PLAINTIFF, P & D BUILDERS, INC.'S OPPOSITION TO DEFENDANT/CROSS-CLAIM DEFENDANT, FALCO CONSTRUCTION CORP.'S MOTION FOR LEAVE TO FILE LATE A MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COMES the defendant/cross-claim plaintiff P&D Builders, Inc., which hereby states its opposition to the defendant/cross-claim defendant, Falco Construction Corp.'s motion for leave to file a late motion for partial summary judgment. As grounds for this opposition P&D Builders states that the proposed motion is untimely and without merit.

**I.  BACKGROUND**

This is a subrogation action arising out of a fire alleged to have occurred on January 26, 2004 at the home of the plaintiff's subrogee, Julie Pavia, at 104 Hammondswood Road, Newton, Massachusetts (hereinafter called "the property"). See Electronic Docket No. 1, Plaintiff's Complaint at ¶ 7.

The plaintiff, Fireman's Fund Insurance Company, alleges that, prior to January 26, 2004, the defendant, P&D Builders, Inc., performed extensive renovations to the property including the installation of a fireplace. See id. at ¶ 8.

The plaintiff alleges that during the course of those renovations the defendant, P&D Builders, Inc., acted as the general contractor, the defendant Falco Construction constructed a masonry fireplace, and the defendant Michael Carresi installed a gas log appliance in the fireplace. See id. at ¶ 9.

The plaintiff alleges that the work performed by the defendants was done in a negligent manner, and that the subject fire on the property occurred as a direct result of this negligence. See id.

Pursuant to Local Rule 5.4(c), "Unless exempt or otherwise ordered by the Court, all pleadings and other papers must be served on other parties by electronic means."

On June 23, 2005, the defendant/cross-claim defendant, P&D Builders, filed a document entitled "Answer and Cross-claim of Defendant, P&D Builders, Inc.'s to Plaintiff's Complaint and Jury Demand." See Electronic Docket No. 14, Answer and Cross-claim of Defendant, P&D Builders. This document was filed through the ECF system and was sent electronically to the registered participants. It is identified as Document No. 14 on the District Court's docket for this matter. Amongst the items plead by P&D Builders in this document were claims for indemnification and contribution against defendant Falco Construction. See id., at p. 7.

II. **THE DEFENDANT FALCO CONSTRUCTION'S MOTION FOR LEAVE TO FILE A MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AS UNTIMELY.**

On October 10, 2005, the Court entered a Scheduling Order, under which Motions for Summary Judgment were to be filed by June 30, 2006. See Electronic Docket No. 38, Scheduling Order.

On May 24, 2006, counsel for defendant Falco Construction filed on behalf of all defendants and the third-party defendant, a Joint Motion for Modification of the Scheduling Order, which, among other things set a new deadline for Summary Judgment Motions of

2

November 15, 2006. See Electronic Docket No. 49, at ¶ 14(5). On June 5, 2006, that motion was allowed by Judge Woodlock, with the warning that "No further extensions will be entertained." See Electronic Docket entry for June 5, 2006.

Defendant Falco Construction motion is untimely, as it was filed and served two-and-a-half months after the expiration of the summary judgment deadline.

### III. THE DEFENDANT FALCO CONSTRUCTION'S MOTION SHOULD BE DENIED AS THE DEFENDANT'S PROPOSED SUMMARY JUDGMENT MOTION IS FUTILE.

Based upon both the claims identified in the complaint and the evidence that has been developed during discovery, the defendant P&D Builders has legitimate grounds for alleging common law indemnity against co-defendant Falco Construction.

The right to indemnity allows a party "who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of the loss, including reasonable attorneys fees." Santos v. Chrysler Corp., 430 Mass. 198, 217 (1999), citing Elias v. Unisys Corp., 410 Mass. 479, 482, (1991). In order to give rise to a claim for indemnification, a party must establish either, (1) that an express agreement to indemnity exists, (2) a contractual right implied from the nature of the relationship between the parties, or (3) a common law right where one party is held derivatively or vicariously liable for the wrongful act of another. See Fall River Housing Auth. v. H.V. Collins Co., 414 Mass. 10, 13 (1992). In the present case, P&D Builders alleges that defendant Falco Construction owes it common law indemnity.

The principles of derivative and vicarious liability are necessary to sustain a common-law indemnity claim. Vicarious liability applies where the agent has committed a wrongful act, the liability of the principle arises simply by operation of law, and is thus, only derivative of the wrongful act of the agent. See Karcher v. Burbank, 303 Mass. 303, 305 (1939).

3

1009507v1

This case presents the potential that defendant P&D Builders may be held derivatively liable for Falco's negligent construction of the subject fireplace. If the jury were to find that P&D Builders contracted with the plaintiff's subrogor to construct the allegedly defective fireplace, then P&D Builders could be liable for the defective condition, regardless of who actually performs the contract obligation. See Restatement 2d of Contracts, § 318(3), see also Guiliani v. Penny, 1998 Mass. Super. LEXIS 502, *4-5 (Mass. Super. Ct. Aug. 19, 1998).

In the present case, the defendant Falco admitted at his deposition that he was retained as a sub-contractor by general contractor, P&D Builders. He acknowledged that he was retained to build the allegedly defective fireplace by P&D Builders' principal Philip Rothschild. See Exhibit 1, Deposition of Joseph Falco, at pp. 14, 21-22. Furthermore, Mr. Falco acknowledged that, as a mason contractor, he works under the license of the general contractor, in this case P&D Builders. See id., at p. 10.

Under the circumstances presented by this case, it is entirely possible for the jury to conclude that the subject fireplace was defective, that Falco Construction was negligent in the construction of that fireplace, and that Falco's negligence was the sole reason for the defective condition. If under such circumstances general contractor, P&D Builders, is liable for that condition, for failing to discover Falco's negligence, P&D Builders would be entitled to common law indemnity from Falco for that liability. See Slocum v. Donahue, 44 Mass.App.Ct. 937, 939 (1998) (indemnity, at common law, is permitted when the individual or entity seeking indemnity is not at fault for the negligent act, but is exposed to derivative or vicarious liability for the wrongful act of another). Consequently, defendant Falco Construction's proposed summary judgment motion is without merit.

1009507v1

WHEREFORE, for the above-discussed reasons, the defendant, P&D Builders Inc., respectfully requests that the defendant Falco Construction's motion for leave to file a motion for partial summary judgment be DENIED.

                    Respectfully submitted,
The Defendant/Third-Party plaintiff,
P&D Builders, Inc.,
By its attorneys,

/s/ *Curtis L.S. Carpenter*
_____
William Joseph Flanagan, BBO #556598
Curtis L.S. Carpenter, BBO #657358
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 13, 2007.

/s/ *Curtis L.S. Carpenter*
_____
Name, BBO No. 657358

1009507v1

# EXHIBIT 1

UNITED STATES DISTRICT COURT
District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
      Plaintiff

vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
      Defendants

vs.

Heatmaster, Inc.,
      Third-Party Defendant

**DEPOSITION OF JOSEPH FALCO, SR.**, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Jessica L. Bisaillon, a Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Toomey & Yudysky, LLP, 99 Summer Street, Boston, Massachusetts 02110, on Friday, March 3, 2006, commencing at 12:20 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

---

2

A P P E A R A N C E S:

The Law Offices of Stuart G. Blackburn
  BY:  Stuart G. Blackburn, Esquire
  Two Concorde Way
  Post Office Box 608
  Windsor Locks, Connecticut 06096
  Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
  BY:  David J. Crowley, Esquire
  99 Summer Street
  Boston, Massachusetts 02110
  Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
  BY:  Curtis L.S. Carpenter, Esquire
  250 Summer Street
  Boston, Massachusetts 02210
  Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
  BY:  Robert T. Turner, Esquire
  27B Midstate Drive, Suite 100
  Auburn, Massachusetts 01501
  Appearing on behalf of Michael Carresi,
  d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
  BY:  Scott T. Ober, Esquire
  484 Main Street, Suite 560
  Worcester, Massachusetts 01608
  Appearing on behalf of Heatmaster, Inc.

---

3

I N D E X

DEPOSITION OF:

JOSEPH FALCO, SR.            PAGE

| | |
|---|---|
| Examination by Mr. Blackburn | 4 |
| Examination by Mr. Turner | 49 |
| Examination by Mr. Ober | 61 |
| Examination by Mr. Carpenter | 63 |
| Reexamination by Mr. Blackburn | 73 |
| Reexamination by Mr. Turner | 80 |

E X H I B I T S

EXHIBIT NO.
    (Plaintiff's)            PAGE

1  Hand-drawn diagram; a total of one page.  25
2  Hand-drawn diagram; a total of one page.  40

---

4

JOSEPH FALCO, SR., after having been satisfactorily identified by the production of his Massachusetts driver's license and having been duly sworn by the Notary Public, was examined and testified as follows:

    MR. BLACKBURN:  And we'll have the same stipulations that we've had for the last deposition.  Is that fine with everybody?

    MR. CROWLEY:  Yes.

    MR. BLACKBURN:  You want him to read and sign?

    MR. CROWLEY:  Yes, please.

    MR. BLACKBURN:  Okay.

**EXAMINATION BY MR. BLACKBURN:**

Q.  Good afternoon, Mr. Falco.  My name is Glenn Blackburn.  I represent the Fireman's Fund Insurance Company in this case.  They were the insurance company for the Pavias.

A.  Right.

Q.  Have you ever had your deposition taken before?

A.  No.

Q.  Let me give you a few ground rules.  Some of these you may have -- you may have heard before.  I'm going to ask you some questions today

Page 5

1  about the work that you did out at the Pavia
2  residence prior to the fire.
3        If at any time I'm unclear to you or you
4  don't understand a word that I use or something
5  that I say, please stop me, ask me to repeat the
6  question, ask a different word. I want to make
7  sure that you and I --
8  A. Okay. I understand you.
9  Q. Yeah. Fair enough.
10 A. Okay.
11 Q. The other instruction that I'll give you is that
12    the young lady is taking down everything that we
13    say. While ordinarily you and I could sit here
14    and have a conversation that involved both words
15    and nods of the head and things like that, at
16    least while we're on the record, we need to
17    converse only with words. All right?
18 A. Okay.
19 Q. I think what you'll find -- because my experience
20    is that when I question people, I have a tendency
21    to stutter a bit and draw out my questions. I
22    think what you're going to find is that often
23    you're going to understand the question that I've
24    asked you before I've finished asking it.

Page 6

1  A. That's okay. I got a dialect too from the old
2     country.
3  Q. And the tendency is that the witness starts
4     giving the answer before I've finished asking the
5     question.
6  A. Right.
7  Q. It's very difficult for the young lady to take us
8     both down speaking at the same time. So try to
9     resist that urge to start answering my questions
10    before I'm done sputtering them out, and I'll
11    give you the same courtesy when you're giving
12    your answers. All right?
13 A. Okay.
14 Q. What's your address, please?
15 A. 5 Coolidge Circle, South Easton, Mass.
16 Q. And how long have you lived at that address?
17 A. Oh, I would say about 24 years now.
18 Q. You have a business; correct?
19 A. Yes.
20 Q. What is the name of the business?
21 A. Falco Construction.
22 Q. Is that business a corporation?
23 A. No. A company.
24 Q. Have you ever had a corporation that you did

Page 7

1     business under?
2  A. Yes. Years and years ago.
3  Q. And what was the name of that corporation?
4  A. Falco Construction.
5  Q. Incorporated?
6  A. Yeah. At that time, yeah.
7  Q. Okay. How long ago did that corporation seek to
8     exist?
9  A. Oh, God. Years and years ago. I would say about
10    25 years ago, because I was doing a lot of
11    commercial work, and I just didn't want to do
12    commercial work anymore and just went down just
13    to regular house -- you know, homeowners.
14 Q. So at the time that you were doing this work at
15    Mrs. Pavia's house before the fire, you were
16    operating as a sole proprietor --
17 A. Yes.
18 Q. -- with a trade name of Falco Construction?
19 A. Right.
20 Q. And was that business just your business?
21 A. Just my business. Yeah.
22 Q. Did you have any partners?
23 A. No. I just got -- I've had my two sons working
24    for me.

Page 8

1  Q. Okay. But they did not have any ownership
2     interest in the business?
3  A. No.
4  Q. You're a mason; correct?
5  A. Yes.
6  Q. Do you do any work other than masonry work?
7  A. That's all I know how to do.
8  Q. How long have you been doing masonry work?
9  A. Oh, God. Forty-three years.
10 Q. And how long have you been doing that masonry
11    work by yourself or with the company that you
12    owned?
13 A. For 43 -- no. I'm sorry. I used to be in the
14    union for about seven years, and then I went on
15    my own. So out of 43 years, deduct seven.
16 Q. Okay. So for the last 36 years, you've worked on
17    your own?
18 A. Right.
19 Q. You've been building fireplaces that whole time?
20 A. I probably built about a million of them.
21    Stopped counting 25 years ago.
22 Q. During the course of that time that you've been
23    building fireplaces, have the requirements
24    changed for the construction of the fireplaces

9

```
 1  pursuant to the codes?
 2  A.  Yes.  Big time.  Big time.  Now you need -- you
 3      need -- you need the rough inspection, finish
 4      inspection, final inspection.  Before, you just
 5      build a chimney, and building inspectors weren't
 6      even around.  Now you can't breathe unless you
 7      call the building inspector and -- for a rough
 8      and finish.
 9  Q.  And how did you learn about those changes in the
10      code?
11  A.  You learn by doing it for so many years.  And you
12      got the code book, and you go according to the
13      code book.  And that's how you build them.
14  Q.  So you have code books?
15  A.  Yes, I do.
16  Q.  You keep them on your truck?
17  A.  I don't need them anymore.  They're all up here
18      after 45 years.
19  Q.  And "up here" means in your head?
20  A.  In my head, yeah.
21  Q.  When there are changes that occur with the code,
22      how do you learn about those?
23  A.  Usually if there is a change while I call for a
24      rough inspection and -- the building inspector
```

10

```
 1      says, oh, don't you know about this or don't you
 2      know about that?
 3          But they haven't changed for years now.
 4      And I think the way you build them today, you
 5      don't need to change them, because they're really
 6      strict rules to a fireplace.
 7  Q.  Do you hold any licenses?
 8  A.  No.  A mason -- a mason contractor does not
 9      require to have a license.  We usually work under
10      the general contractor's license, because he
11      pulls the permit, he calls for a rough inspection
12      and a finish, final inspection.  I don't.  I just
13      build it, and he's responsible by him calling
14      the -- the inspectors.
15  Q.  Are you a member of any associations about your
16      trade?
17  A.  No.
18  Q.  When is the first time that you met Phil
19      Rothschild?
20  A.  Oh, I think about a year -- about six months or
21      eight months before I did the -- the exterior
22      veneer for him, because he heard about me, and I
23      was very well referred.  And I met him, and I did
24      a couple of jobs for him.  Very, very pleased.
```

11

```
 1      And that's it.
 2  Q.  Do you know who it was that introduced you to
 3      him?
 4  A.  Oh, God.  I don't know.  I don't really remember.
 5      You know, it just -- word travels.  Oh, Joe
 6      Falco.  Call Joe Falco.  He's good.  This and
 7      this and that, and word goes to word.  I don't
 8      advertise or anything like that.  I just -- I
 9      don't look for work.  They -- believe me.  They
10      come to me.  After so many years, you earn that
11      right, I guess, if you're good.
12  Q.  Do you recall what the jobs were that you did for
13      Mr. Rothschild prior to the Pavia house?
14  A.  Yes.  I did a little tiny addition in Newton
15      for -- for a psychiatrist.  I forget her name.
16      As a matter of fact, she writes books too.  She's
17      a Harvard -- Harvard graduate.  Martha or
18      something.  I did a job for her, a little tiny
19      addition on her home that she was going to turn
20      into an office area for her patients, because she
21      worked out of the house, and then a walkway in
22      the back from the back to the -- to the driveway
23      so the people can go and use that exit in the
24      back to go into the driveway.  And that's it.
```

12

```
 1          Then after that, Phil asked me to do the
 2      exterior addition on Julia Pavia's house.
 3  Q.  So there was one job before the Pavia house?
 4  A.  Right.
 5  Q.  In addition to doing the walkway at that other
 6      job, what did the inside work entail?
 7  A.  It was an outside little addition.  Brick
 8      veneered the outside.  A little like a --
 9      probably a 10-by-10 addition, because her house
10      was already exterior brickwork on the exterior,
11      so we matched the existing.
12  Q.  No fireplace?
13  A.  No fireplace, no.
14  Q.  Just a brick veneer and --
15  A.  Just a brick veneer.
16  Q.  And the outside walkway?
17  A.  And an outside walkway.
18  Q.  Other than your two sons, back at this time, did
19      you have anybody else that worked for you?
20  A.  No.
21  Q.  Through the course of doing the job at Mrs.
22      Pavia's house, did you have anybody else that
23      worked for you other than your two sons?
24  A.  No.
```

13

1  Q. After the Pavia house, did you do any other work
2     with Mr. Rothschild's company?
3  A. Nope.
4  Q. Why not?
5  A. Because I didn't like his attitude, and I don't
6     like the way he tend business.
7  Q. What was it about the manner in which he did
8     business that turned you off?
9  A. He was very arrogant, and he thought he -- he's
10    Mister-know-it-all.
11 Q. At the point where -- withdrawn.
12        Did he ask you to do any other jobs after
13    the Pavia house?
14 A. Yes.
15 Q. What did he ask you to do?
16 A. Another job. I think it was in Needham. I says
17    no, thank you, good-bye. I do not want to do no
18    more work for you.
19 Q. And at that point, had there been anybody that
20    had implicated you in causing the fire at the
21    Pavia house?
22 A. First of all, this was way, way, way, way before
23    the fire. It didn't have nothing to do -- I
24    didn't know until the -- the fire until about a

14

1     year later.
2  Q. Okay.
3  A. This was right after Julia's house, after I did
4     the exterior on Julia Pavia's house. And then he
5     asked me to do another job for him, and I said
6     no, thank you.
7  Q. So your decision to stop doing work or any
8     further work with Mr. Rothschild predated the
9     fire?
10 A. Yes. You mean before the fire?
11 Q. That's -- yeah. Good for you. Good for you.
12    Yeah. Yes.
13 A. Okay.
14 Q. Your decision to do any work for Mr. Rothschild
15    was before the fire; right?
16 A. Right.
17 Q. Okay. Who was it that contacted you to do the
18    work at the Pavia house?
19 A. Phil.
20 Q. Mr. Rothschild directly?
21 A. Yeah.
22 Q. What did he ask you to do?
23 A. I got an exterior on an addition in Chestnut Hill
24    in Newton. I call it Newton, but I guess it's

15

1     Chestnut Hill/Newton. You know, so -- so right
2     after I was doing the brick -- I just finished
3     the brick for the psychiatrist, and then I went
4     from the psychiatrist to Chestnut Hill.
5  Q. Did he ask you for a quote?
6  A. For a price?
7  Q. Yes, sir.
8  A. Yes.
9  Q. And did you give that to him in writing?
10 A. No. It was all shake -- that's how I do my job.
11    Shake my hand, shake your hand, and that's it.
12 Q. And how -- so you told him how much you were
13    going to charge him?
14 A. Right.
15 Q. And what was -- how was that based? Was it a
16    full price or was it so much for the time or
17    what?
18 A. For -- I just look at the job, estimate how many
19    bricks there are and what type of bricks they
20    are. And this happened to be a very difficult
21    job because it's a water-struck brick. And a
22    water-struck brick is a nightmare to lay because
23    it doesn't absorb the water like a regular porous
24    brick. So it would be like much more than laying

16

1     a regular brick.
2  Q. So did you give him one price for the whole job?
3  A. One price for the exterior.
4  Q. Do you remember what that price was?
5  A. I think it was like about -- I would say like
6     about 23, 24,000 with -- I'm pretty sure it was
7     also included with material. Don't quote me on
8     that. I'm not sure. Because like I said, I
9     forgot.
10 Q. But do you have a recollection as you sit here
11    today that you purchased the materials?
12 A. I'm pretty sure I did, because he doesn't know
13    supply yards. So I think I got the bricks out of
14    my supplier.
15 Q. Okay. And what were the terms of payment?
16 A. The terms were -- like if I says, hey, Phil, I
17    need five grand, the following week I would say,
18    hey, Phil, give me another seven or whatever, and
19    then the final payment.
20 Q. Okay. So do you have a recollection of whether
21    you received any payment before you started the
22    job?
23 A. I never ask for a payment up-front. My
24    reputation -- every time I do a job, I never ask

17

1  for money up-front unless it's like -- unless
2  it's like a -- like I got to get like 10 or
3  $15,000 worth of material.  This was like
4  probably about a couple of thousand dollars of
5  material.  So I basically buy it myself.  And
6  then the first payment, I says, give me such and
7  such amount.
8  Q.  To do this job, did it require you and both of
9      your sons to be there every day?
10 A.  Yes.
11 Q.  And when you went to do the job, what work had
12     been done before you started doing the brick
13     veneer?
14 A.  The framing, framing out the addition, all wood
15     structure with plywood exterior.  And then I go
16     in there and put the Tyvak paper on and start
17     laying bricks.  And that's it.
18 Q.  Okay.  Was the roof on?
19 A.  Yes, it was.  Yeah.
20 Q.  Was the slate on the roof yet?
21 A.  Yeah -- no, I don't think so.
22 Q.  Okay.  So everything was framed, the walls and
23     the roof?  True?
24 A.  Right.  Yeah.

18

1  Q.  And whatever plywood that would have been
2      covering the walls and the roof was in place?
3  A.  Uh-huh.
4  Q.  That's a yes?
5  A.  Yes.
6  Q.  And -- but to your recollection, there was no
7      finished roofing that was -- had been put on?
8  A.  No.  Because that was like an old slate roof, and
9      it's pretty hard to get the company to do the --
10     that type of work to -- to match the existing
11     roof.  So, I mean, you just can't get a new roof
12     and match -- to blend in with the old, old roof.
13 Q.  Do you know what the company was that eventually
14     put on the slate roof?
15 A.  No, I don't.  There's not -- there's not too many
16     of them that's -- I know that for sure -- that
17     does that in that area, --
18 Q.  You were gone --
19 A.  -- I assume.
20 Q.  You were gone by the time that --
21 A.  Yeah.
22 Q.  -- whoever came in to do it?
23 A.  Oh, yeah.  I was all -- I was -- I was history.
24 Q.  During the time that you were installing the

19

1  brick on the exterior of the house, did you go
2  inside at all?
3  A.  Well, the only time that we went inside was early
4      in the morning.  Knocked at the door, and Julia
5      let us in.  And that way I can go up -- upstairs
6      or downstairs to turn the water on.  Or my son.
7      But usually we would go in the backyard.  There's
8      a driveway.  And that's where the addition was,
9      where the driveway is.
10 Q.  And where were you turning the water on?
11 A.  I think it was like in the -- this -- the garage
12     were below the addition.  And right around the
13     corner, there would be a hose that we -- because
14     it was cold, and we would have to turn it off and
15     on every day.
16 Q.  In the basement?
17 A.  In the basement, yeah.
18 Q.  And I guess that gets to my next question,
19     whether you recall what time of year it was that
20     you were doing this.  You said it was cold?
21 A.  It was like -- that was a pretty mild winter.  I
22     was surprised that we were working.  I think it
23     was like in January or by the middle or -- or the
24     beginning of February.  And I was surprised,

20

1  because I said, wow, this is good weather.  You
2  know, just like this year.
3  Q.  You like that?
4  A.  Hey, we got to eat.  So, I mean, that's -- you --
5      you get a cold winter, you can't lay bricks.  It
6      just freezes.
7  Q.  On any of those occasions while you were doing
8      the exterior brick and you entered the house, did
9      you go into the addition area?
10 A.  Well, if I -- the addition was right there.  So I
11     would walk up the stairs, and I would --
12     sometimes, because I didn't want to try -- I
13     didn't want to climb the scaffolding.  I would go
14     right through the window.  It's much easier.  You
15     know, I'm getting old.  I don't want to be
16     climbing morning, noon, and night, you know, up
17     and down.
18 Q.  During the time that you were installing the
19     exterior brick, were there any stairways that had
20     been put in place?
21 A.  Yeah.  There were the stairways to go up to
22     the -- from the first floor to the second floor.
23 Q.  In the addition?
24 A.  Yeah.