UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE FIREMAN'S FUND INSURANCE COMPANY as subrogee of JULIA PAVIA, Plaintiff, <br><br> v. <br><br> FALCO CONSTRUCTION CORP., P&D BUILDERS, INC., and MICHAEL CARRESI d/b/a CARRESI PLUMBING & HEATING. Defendants, <br><br> v. <br><br> HEATMASTER, INC. Third-Party-Defendant. | CIVIL ACTION NO.: 05-10827RBC |

## DEFENDANT/CROSS-CLAIM PLAINTIFF, P & D BUILDERS, INC.'S OPPOSITION TO DEFENDANT/CROSS-CLAIM DEFENDANT, FALCO CONSTRUCTION CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES the defendant/cross-claim plaintiff P&D Builders, Inc., which hereby states its opposition to the defendant/cross-claim defendant, Falco Construction Corp.'s motion for partial summary judgment. As grounds for this opposition, P&D Builders states that the motion is without merit. Based upon both the claims identified in the complaint and the evidence that has been developed during discovery, the defendant P&D Builders has legitimate grounds for alleging common law indemnity against co-defendant Falco Construction.

## I.    STATEMENT OF THE FACTS

The defendant/cross-claim plaintiff, P&D Builders, Inc., respectfully submits the following response to defendant/cross-claim defendant, Falco Construction Corp.'s Concise Statement of Material Facts, for the purposes of this motion only.

1.    There is no genuine issue of fact regarding the statements made in this paragraph.

2.    There is no genuine issue of fact regarding the statements made in this paragraph.

3.      There is no genuine issue of fact regarding the statements made in this paragraph.

4.      There is no genuine issue of fact regarding the statements made in this paragraph.

5.      There is no genuine issue of fact regarding the statements made in this paragraph.

6.      There is no genuine issue of fact regarding the statements made in this paragraph.

7.      There is no genuine issue of fact regarding the statements made in this paragraph.

8.      There is no genuine issue of fact regarding the statements made in this paragraph.

9.      There is no genuine issue of fact regarding the statements made in this paragraph.

10.     There is no genuine issue of fact regarding the statements made in this paragraph.

11.     There is no genuine issue of fact regarding the statements made in this paragraph.

12.     The defendant/cross-claim plaintiff believes there is a genuine issue of fact as to the facts alleged in this paragraph.  Witnesses are expected to testify that a traditional fireplace was never considered.  See, e.g., P&D Builders' Exhibit 1, Deposition of Julia Pavia, at pp. 41-43.

13.     There is no genuine issue of fact regarding the statements made in this paragraph.

14.     The defendant/cross-claim plaintiff believes there are genuine issues of fact as to the facts alleged in this paragraph as P&D Builders' principal, Phillip Rothschild is expected to testify to the contrary.  See P&D Builders' Exhibit 2, Deposition of Phillip Rothschild at pp. 105-07.  Mr. Rothschild is expected to testify that he never asked Mr. Falco to build a purely decorative fireplace which was not intended for any conventional use.  See id., at p. 105.  Mr. Rothschild is also expected to testify that Mr. Falco was informed that the fireplace was going to have a gas log insert put in it.  See id. at 106-07.

15.     The defendant/third-party plaintiff believes there are genuine issues of fact as to the facts alleged in this paragraph.  Mr. Rothschild is also expected to testify that Mr. Falco was informed that the fireplace was going to have a gas log insert put in it.  See id. at 106-07.

2

16.     The defendant/cross-claim plaintiff believes there is a genuine issue of fact as to the facts alleged in this paragraph.  For one, the defendant/cross-claim defendant, Falco Construction, mischaracterizes the cited testimony.  Mr. Rothschild testified that he understood that Mr. Falco was not going to build a wood burning fireplace.  See id., at 199-200.  However, Mr. Rothschild is also expected to testify that Mr. Falco was informed that the fireplace was going to have a gas log insert put in it, and that he relied upon Mr. Falco's expertise as a mason to determine what type of fireplace would be needed to accommodate such an insert.  See id. at 105-07.

17.     There is no genuine issue of fact regarding the statements made in this paragraph.

18.     The defendant/cross-claim plaintiff believes there are genuine issues of fact concerning its indemnification claim against Falco Construction.  By its very nature, P&D Builders' indemnity claim is an argument in the alternative.  P&D Builders denies liability (direct or derivative) in this matter.  See Electronic Docket #14, P&D Builders Answer and Cross-claim. However, as outlined in the argument portion of this Opposition, the jury may conclude that Falco's negligent construction of the subject fireplace is the sole reason for the subject fire.  If the jury were so to find, P&D Builders would be vicariously liable for the plaintiff's damages, and it is argued, entitled to common law indemnity from Falco.  See Argument below.

        Moreover, in preface to the Interrogatory Answer Falco cites in this paragraph, the defendant P&D Builders provided the following objection:

> The defendant objects to Interrogatory No. 15 to the extent that it calls for the mental impressions, conclusions, opinions or legal theories of an attorney or other representatives of a party concerning the litigation.  In addition, said interrogatory is beyond the scope of discovery, as the defendant has no obligation to prove how the fire occurred, and the defendant has no personal knowledge of how the fire occurred.

> See Falco's Exhibit No. 7 at Ans. No. 15.

3

P&D Builders' indemnity argument is clearly a legal theory of defense counsel, which constitutes work product, and is therefore beyond the scope of discovery.  See FED. R. CIV. PRO. 26(b)(3).

19.     The defendant/cross-claim plaintiff believes there is a genuine issue of fact with respect to the facts alleged in this paragraph.  The cited Answer was provided in response to the following Interrogatory:  "Please list all factors or events which P&D contends caused or contributed to the alleged incident(s)."  See Falco's Exhibit No. 7 at Int. No. 15.  The answer provided by P&D Builders represents a complete response to this question.  However, at trial, the jury would be entitled to believe other evidence, namely evidence provided by the plaintiff.  In response to P&D Builders' interrogatories, the plaintiff stated, "P&D Builders was the general contractor for the construction of the masonry fireplace at the insured premises.  A fire occurred due to improper construction of that masonry fireplace due to the negligence of P&D Builders and/*or its subcontractors for which it will be held vicariously liable*."  See P&D Builders' Exhibit 3, The Plaintiff's Response to Defendant P&D Builders, Inc.'s First Set of Interrogatories, at Ans. No. 8 (emphasis added).  Moreover, the plaintiff is also expected to present expert testimony from Genevieve Bures, CFI, who will testify that defendant Falco was negligent in its construction of the subject fireplace, as said construction violated applicable safety standards.  See P&D Builders' Exhibit 4, Plaintiff's Disclosure of Expert Genevieve Bures, CFI.

4

## II.    ARGUMENT

### A.    Inherent in the Circumstances of this Case, is the Potential for Defendant P&D Builders To Be Held Vicariously Liable for the Negligence of Co-Defendant Falco Construction.

Among the plaintiff's allegations in this matter is that P&D Builders is vicariously liable for the negligent work of its sub-contractor, Falco Construction.  See P&D Builders' Exhibit 3, The Plaintiff's Response to Defendant P&D Builders, Inc.'s First Set of Interrogatories, at Ans. No. 8.  A jury hearing the present case would be entitled to find that the relationship between defendant P&D Builders and defendant Falco Construction was one of a general contractor to an independent sub-contractor, and that P&D Builders is vicariously liable for Falco's negligence.

While the general rule is that, the employer of an independent contractor is not held vicariously liable for the harm caused by a tortious act or omission of the contractor, that general rule is riddled with exceptions.  See Whalen v. Shivek, 326 Mass. 142, 150 (1950) (quoting RESTATEMENT OF TORTS § 409).  Among such exceptions is the contractual obligation exception. See Capital Chevrolet Co. v. Lawrence Warehouse Co., 227 F.2d 169, 173 (9th. Cir. 1955).  This exception to the general rule states that, "One who contracts to perform an undertaking is liable to his promisee for the negligence of an independent contractor to whom he delegates actual performance." See id. at 173 (citations omitted); see also Harkins v. Colonial Floors, 8 Mass. L. Rep. 127, 1998 Mass. Super. LEXIS 390, at *15 (Mass. Super. Ct., 1998) ("Under contract law, it is irrelevant whom [the general contractor] directed to perform [the] obligation, because it remains liable whether the failure was caused by an employee or an independent contractor.") (citing RESTATEMENT (SECOND) OF CONTRACTS § 318(3)); see also Guiliani v. Penny, 1998 Mass. Super. LEXIS 502, *4-5 (Mass. Super. Ct. 1998).

In the present case, the jury would be entitled to find that defendant P&D Builders entered into a contract with the plaintiff's subrogor, Julia Pavia, for performance of renovations

to her home that included construction of a fireplace.  See P&D Builders' Exhibit 2, Deposition of Mr. Rothschild, at pp. 186-87.  The jury would also be entitled to find that P&D Builders' delegated/sub-contracted the construction of the subject fireplace to defendant Falco Construction.  See P&D Builders' Exhibit 5, Deposition of Joseph Falco, at pp. 14, 21-22. Moreover, under the circumstances presented by this case, it is entirely possible for the jury to conclude that the subject fireplace was defective, as a result of Falco Construction negligent construction.  See P&D Builders' Exhibit 4, Plaintiff's Disclosure of Expert Genevieve Bures, CFI.

Under this set of jury findings, general contractor, P&D Builders, would be vicariously liable for Falco's negligence, as a general contractor who contracts to perform an undertaking is liable to his promisee for the negligence of sub-contractor to whom he delegates performance. See RESTATEMENT (SECOND) OF CONTRACTS § 318(3); Capital Chevrolet Co., 227 F.2d at 173; Harkins, 8 Mass. L. Rep. at *15; Guiliani, 1998 Mass. Super. LEXIS 502, *4-5.

**B.     If Defendant P&D Builders is Held Vicariously Liable for the Negligence of Co-Defendant Falco Construction, it may be Entitled to Common Law Indemnity from Falco.**

The right to indemnity allows a party "who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of the loss, including reasonable attorneys fees."  Santos v. Chrysler Corp., 430 Mass. 198, 217 (1999) (citing Elias v. Unisys Corp., 410 Mass. 479, 482 (1991)). In order to give rise to a claim for indemnification, a party must establish either, (1) that an express agreement to indemnity exists, (2) a contractual right implied from the nature of the relationship between the parties, or (3) a common law right where one party is held derivatively or vicariously liable for the wrongful act of another. See Fall River Housing Auth. v. H.V. Collins Co., 414 Mass. 10, 13

(1992). In the present case, P&D Builders alleges that defendant Falco Construction owes it common law indemnity.

The principles of derivative and vicarious liability are necessary to sustain a common-law indemnity claim. Vicarious liability applies where the agent has committed a wrongful act, the liability of the principle arises simply by operation of law, and is thus, only derivative of the wrongful act of the agent. See Karcher v. Burbank, 303 Mass. 303, 305 (1939).

As addressed above, this case presents the potential that defendant P&D Builders may be held derivatively liable for Falco's negligent construction of the subject fireplace. See P&D Builders' Exhibit 3, The Plaintiff's Response to Defendant P&D Builders, Inc.'s First Set of Interrogatories, at Ans. No. 8. Under the circumstances presented by this case, it is entirely possible for the jury to conclude that the subject fireplace was defective, that Falco Construction was negligent in the construction of that fireplace, and that Falco's negligence was the sole reason for the defective condition. The jury would further be entitled to find that P&D Builders' was not itself negligent, as it relied upon Mr. Falco's expertise as a mason to determine what type of fireplace would be needed to accommodate the gas log appliance. See P&D Builders' Exhibit 2, Deposition of Phillip Rothschild, at pp. 105-07. Under such circumstances, general contractor P&D Builders would be liable for the defective condition, and P&D Builders would be entitled to common law indemnity from Falco for that liability. See Slocum v. Donahue, 44 Mass.App.Ct. 937, 939 (1998) (indemnity, at common law, is permitted when the individual or entity seeking indemnity is not at fault for the negligent act, but is exposed to derivative or vicarious liability for the wrongful act of another). Consequently, defendant Falco Construction's proposed summary judgment motion is without merit.

### III.    CONCLUSION

As set forth above, this case presents issues of fact that must to be resolved by the fact finder.  The jury may find that Falco Construction was negligent in its construction of the subject fireplace.  Because of its underlying contractual obligations to the plaintiff's subrogor, defendant P&D Builders could potentially be vicariously liable for Falco's negligence.  If the jury were also to find that defendant Falco's negligence was the sole reason for the alleged defective condition, defendant P&D Builders would be owed common law indemnity from Falco for all liability it incurred as a result of Falco's negligence.

WHEREFORE, for the above-discussed reasons, the defendant, P&D Builders Inc., respectfully requests that the defendant Falco Construction's motion for partial summary judgment be DENIED.

Respectfully submitted,
The Defendant/Third-Party plaintiff,
P&D Builders, Inc.,
By its attorneys,


/s/ *Curtis L.S. Carpenter*
_____
William Joseph Flanagan, BBO #556598
Curtis L.S. Carpenter, BBO #657358
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

8

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 15, 2007.

/s/ *Curtis L.S. Carpenter*

_____
Name, BBO No. 657358

# Exhibit

# 1

UNITED STATES DISTRICT COURT
District of Massachusetts

2

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
              Plaintiff

        vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
              Defendants

        vs.

Heatmaster, Inc.,
              Third-Party Defendant

**DEPOSITION OF JULIE A. PAVIA,** a witness
called on behalf of the Defendant Falco Construction
Corp., pursuant to the Federal Rules of Civil
Procedure, before Jessica L. Bisaillon, a Registered
Professional Reporter, Certified Shorthand Reporter,
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Morrison Mahoney,
LLP, 250 Summer Street, Boston, Massachusetts
02210, on Thursday, February 16, 2006, commencing
at 11:30 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

A P P E A R A N C E S:

The Law Offices of Stuart G. Blackburn
    BY:  Erik Loftus, Esquire
    Two Concorde Way
    Post Office Box 608
    Windsor Locks, Connecticut 06096
    Appearing on behalf of the Plaintiff and
    the deponent

Toomey & Yudysky, LLP
    BY:  David J. Crowley, Esquire
    99 Summer Street
    Boston, Massachusetts 02110
    Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
    BY:  Curtis L.S. Carpenter, Esquire
    250 Summer Street
    Boston, Massachusetts 02210
    Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
    BY:  Robert T. Turner, Esquire
    27B Midstate Drive, Suite 100
    Auburn, Massachusetts 01501
    Appearing on behalf of Michael Carresi,
    d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
    BY:  Scott T. Ober, Esquire
    484 Main Street, Suite 560
    Worcester, Massachusetts 01608
    Appearing on behalf of Heatmaster, Inc.

3

I N D E X

DEPOSITION OF:                                      PAGE

JULIE A. PAVIA

Examination by Mr. Crowley                            4
Examination by Mr. Ober                            103
Examination by Mr. Turner                          110
Examination by Mr. Carpenter                       122
Reexamination by Mr. Crowley                       127

E X H I B I T S

EXHIBIT NO.                                         PAGE

        (Falco Construction Corp.)

1    Correspondence dated 7/11/00 from               16
     P. & D. Builders, Inc., Page 1; a total
     of one page.

2    Correspondence dated 7/11/00 from               19
     P. & D. Builders, Inc., Page 2; a total
     of one page.

3    Correspondence dated 12/17/01 from              23
     P. & D. Builders, Inc.; a total of two
     pages.

4    proposal dated 8/28/00 from                     38
     P. & D. Builders, Inc.; a total
     of one page.

5    Typewritten letter; a total of one page.        93

**    The original exhibits were retained by the
     stenographer and have been attached hereto.

4

1         **JULIE A. PAVIA,** after having been
2    satisfactorily identified by the production of
3    Massachusetts driver's license and having been
4    duly sworn by the Notary Public, was examined
5    and testified as follows:
6         MR. CROWLEY:  Want to have the usual
7    stipulations for objections?
8         MR. LOFTUS:  Yes.
9         MR. CROWLEY:  So counsel have agreed
10   to save all objections except as to the form of
11   the question until the time of trial, save all
12   motions to strike until the time of trial.
13        **EXAMINATION BY MR. CROWLEY:**
14   Q.  Ma'am, would you please state your full name?
15   A.  Julie Ann Pavia.
16   Q.  As you know, my name is David Crowley, and I
17       represent Joseph Falco in this case.  Are you
18       being represented by counsel today?
19   A.  Yes.
20   Q.  And who is representing you?
21   A.  Erik.
22        MR. LOFTUS:  Loftus.
23   A.  Loftus.
24   Q.  And when did you retain Mr. Loftus to represent

41

the exterior brickwork at the project been
completed?

A.   Yes.

Q.   When your husband moved out of the house, had the
     interior masonry work been performed?

A.   Yes.

Q.   Can you estimate for me how long the interior
     masonry work had been done when your husband
     moved out in October of 2001?

A.   No.

Q.   I believe your testimony is that your husband
     requested a gas fireplace be installed in the
     study at the property?

A.   Yes.

Q.   The office?  An office?

A.   The study/office.

Q.   Was that space intended to be your home office?

A.   No.

Q.   Whose office was it?

A.   My ex-husband's.

Q.   Did your ex-husband have any expertise in the
     construction field?

A.   No.

Q.   What type of work is he involved in?

42

A.   He's a Ph.D. chemist, and he's doing venture
     capital work.

Q.   I believe it was your testimony that at some
     point your husband brought up the idea of having
     a gas log fireplace installed?

A.   Yes.

Q.   You don't recall when that was?

A.   When he decided the layout of his office.

Q.   Your husband decided on the layout of his office?

A.   When I say layout, I'm talking about furniture
     and where things should be.  Yes.

Q.   When your husband decided to have some input into
     the layout of the office, had the exterior of the
     addition been completed?

A.   No.

Q.   Was that work ongoing?

A.   Yes.

Q.   What did your husband do to come up with the
     layout of his office?

A.   We went and bought furniture.  He already had a
     very large desk, and he went on-line and bought a
     fireplace mantle.

Q.   Where did you purchase furniture for the office?

A.   Furniture Warehouse in Natick.

43

Q.   And where did you purchase the fireplace mantle?

A.   He purchased it on-line.  I don't really know.

Q.   I assume that your husband had already decided on
     a fireplace when he purchased the fireplace
     mantle?

A.   Yes.

Q.   Had he decided to install a fireplace when he
     purchased the furniture for the office?

A.   Yes.

Q.   Had any work on the interior of the addition been
     started when your husband purchased the furniture
     for the office?

A.   No.

Q.   Did your husband ever draw any sketches or submit
     anything to you in writing about the layout of
     his office?

A.   No.

Q.   When your husband decided that he wanted a
     fireplace, did he specify a gas log fireplace?

A.   Yes.

Q.   Why did he specify a gas log fireplace?

A.   No mess.

Q.   He didn't want any wood burning?

A.   Right.

44

Q.   Had you ever owned a gas log fireplace prior to
     the addition being constructed?

A.   In our last house.

Q.   What type of gas log fireplace was that?

A.   I don't remember.

Q.   Did you install that gas log fireplace?

A.   We had Michael Carresi come and install that gas
     log fireplace.

Q.   And when did Mr. Carresi do that?

A.   Probably in October of '99.

Q.   And where did he install that gas log fireplace?

A.   In the living room.  And I don't think it exists
     anymore.  I think the people who moved in took it
     out.

Q.   Was Mr. Carresi's installation of the gas log
     fireplace part of the work that you hired P. & D
     Builders to do?

A.   No.

Q.   Did you hire Mr. Carresi directly to do that
     work?

A.   Yes.

Q.   Did you purchase that gas-fired log that
     Mr. Carresi installed at your --

A.   My --

# Exhibit

# 2

2

# PHILLIP ROTHSCHILD
# March 30, 2006

<table>
<tr><td colspan="2">

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11          DEPOSITION OF: PHILLIP ROTHSCHILD
12            MORRISON, MAHONEY, LLP
13              250 Summer Street
14              Boston, Massachusetts
15          March 30, 2006        10:20 a.m.
16
17
18
19
20
21              Darlene M. Coppola
22          Registered Professional Reporter
23          Certified Professional Reporter
24
```

</td><td>

Page 4

```
 1  APPEARANCES:
 2  Representing Michael Carresi d/b/a Carresi
 3  Plumbing & Heating:
 4      THE LAW OFFICES OF BRUCE R. FOX
 5      27B Midstate Drive
 6      Suite 100
 7      Auburn, MA  01501
 8      BY:  ROBERT P. TURNER, ESQ.
 9      866.290.7435
10      fax 508.832.5716
11
12  Representing Heatmaster, Inc.:
13      HASSETT & DONNELL, PC
14      484 Main Street
15      Suite 560
16      Worcester, MA  01608
17      BY:  SCOTT T. OBER, ESQ.
18      508.791.6287
19      fax 508.791.2652
20
21
22
23
24
```

</td></tr>
<tr><td>

Page 3

```
 1  APPEARANCES:
 2  Representing the Plaintiff:
 3      LAW OFFICES OF STUART G. BLACKBURN
 4      Two Concord Way
 5      P.O. Box 608
 6      Windsor Locks, CT  06096
 7      BY:  STUART G. BLACKBURN, ESQ.
 8      860.292.1116
 9      fax 860.292.1221
10
11  Representing P & D Builders:
12      MORRISON, MAHONEY, LLP
13      250 Summer Street
14      Boston, MA  02210
15      BY:  CURTIS L.S. CARPENTER, ESQ.
16      617.439.7589
17      fax 617.342.4841
18
19
20
21
22
23
24
```

</td><td>

Page 5

```
 1  APPEARANCES:
 2  Representing Falco Construction Corp.:
 3      TOOMEY & YUDYSKY, LLP
 4      99 Summer Street
 5      Boston, MA  02110
 6      BY:  DAVID J. CROWLEY, ESQ.
 7      617.946.0930
 8      fax 617.946.0989
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

</td></tr>
</table>

2 (Pages 2 to 5)

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 102

1  the inside. And I said to him at that time,
2  I said, Julia called me this morning and she
3  wants you to do a herring bone pattern on the
4  floor. Is that okay? He said, I'll do
5  anything she wants.
6      Q So had the hearth or the hearth
7  extension been built when you saw it?
8      A No.
9      Q So he was just working on the
10  sides?
11      A (Witness Nodding).
12      Q That's a yes?
13      A Yes.
14      Q Was he building it right on the
15  subfloor?
16      A I think there was some Durarock
17  put down on the floor, which is cement board.
18  They call it Durarock.
19      Q You saw the Durarock?
20      A Yes.
21      Q Do you know who installed the
22  Durarock?
23      A I think Chip, my guy Chip.
24      Q And do you know how it came to

Page 103

1  be that Chip installed the Durarock?
2      A I guess he did it because Joe
3  didn't want to do it, so he did it.
4      Q Joe being Mister --
5      A Joe Falco.
6      Q -- Falco?
7      A Right.
8      Q Do you have some understanding
9  of whether Mr. Falco asked Chip to put the
10  Durarock down?
11      MR. CROWLEY: Objection.
12      MR. BLACKBURN: You can answer.
13      A He probably did ask him. I'm
14  not sure, but he probably did.
15      Q Well, why was the Durarock put
16  down?
17      A As a concrete base between the
18  plywood subfloor and where he was going to
19  put his brick.
20      Q Who made the decision to install
21  the Durarock?
22      A I guess it was Joe Falco.
23      MR. BLACKBURN: This is going to
24  sound like I'm being a smart guy, but I'm

Page 104

1  really not trying to be it.
2      Q Am I to understand that at no
3  point in time up to today have you ever
4  discussed with Chip why he put that Durarock
5  down?
6      A He talked to me about it in
7  casual after he put it down. I said, well,
8  did you glue it and screw it? How did you
9  put it down? He said, yeah, I glued it and
10  screwed it down for him. That's the only
11  conversation I had with him.
12      Q But you never had a discussion
13  with him of why he put it down or who asked
14  him to put it down?
15      A No.
16      Q You didn't ask him to put it
17  down?
18      A No.
19      Q He didn't decide on his own to
20  put it down?
21      A I don't -- I don't think so.
22      Q But you don't know?
23      A I don't know. He and Joe were
24  having conversations back and forth about

Page 105

1  this.
2      Q So the first time you're there,
3  the walls of the fireplace are being built,
4  Durarock is down; correct?
5      A Yes.
6      Q Do you know how many layers of
7  it?
8      A One.
9      Q Is that okay with you?
10      A I really don't know because I'm
11  not the professional that does that. I
12  relied on these guys. If they have -- if
13  they're going to build a fireplace, they
14  should know what they're doing.
15      Q You understand that Mr. Falco's
16  position in this case is that he was only
17  asked to build the decorative fireplace,
18  never one that was going to be used in any
19  conventional way? Do you understand that to
20  be the case?
21      A I understand that, yes.
22      Q You don't agree with that?
23      A No.
24      Q What is -- what conversations

27 (Pages 102 to 105)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 106

1  did you have with Mr. Falco about what
2  fireplace, what type of fireplace needed to
3  be built at that Pavia property?
4      A The only conversation I had with
5  him is Julia gave me a sketch. We were all
6  three, four standing there. I handed him the
7  sketch. I said, this is how she wants it
8  built. He was looking at it. He said, okay.
9  I'll build it that way. That's the only
10  conversation I ever had with him.
11      Q Did you have a conversation with
12  him about whether it was going to be a
13  fireplace that needed to accommodate a gas
14  log system?
15      A I did not.
16      Q Were you present for any
17  conversations that anyone else had with him
18  where the subject of it being a gas log
19  system was discussed?
20      A Yes.
21      Q Who?
22      A Mrs. Pavia was there and Mike
23  Carresi was there.
24      Q And who was talking?

Page 107

1      A The two of them.
2      Q Who's the two?
3      A Mike Carresi and Mrs. Pavia.
4      Q Mike Carresi and Julia Pavia
5  were talking about what?
6      A Talking about the way the
7  fireplace had to be built off of her sketch.
8  They were discussing how they were going to
9  do it.
10      Q And that discussion included the
11  fact that there was going to be a gas log
12  insert put in there?
13      A Yes.
14      Q Mr. Falco was present for that?
15      A Yes.
16      Q Did that discussion include any
17  conversation between Mrs. Pavia, Mr. Carresi
18  or Mr. Falco about how the fireplace needed
19  to be constructed in order to accommodate
20  that gas log assembly?
21      A I'm not sure because I left
22  probably two or three minutes after that
23  conversation.
24      Q You left and the three of them

Page 108

1  were still talking?
2      A Yes.
3      Q They were still there?
4      A Yes.
5      Q Were you present for any
6  discussions after that concerning the method
7  that the fireplace was to be constructed?
8      A Just in brief conversations
9  after it was already started. When I got in
10  that metal piece, I said, you need to tell me
11  how -- what size you want this thing made so
12  I can have it made. That was the only other
13  discussion really. The cap piece he was
14  talking about.
15      Q Is that something that you had
16  seen constructed before for a prefabricated
17  insert fireplace?
18      A Yes.
19          MR. BLACKBURN: Do you mind if
20  we take fifteen minutes?
21          MR. CARPENTER: Sure.
22
23          (Recessed at 12:22 p.m.)
24

Page 109

1          (Resumed at 1:02 p.m.)
2
3      Q Mr. Rothschild, I think we left
4  off with conversations that you were part of
5  or present for concerning the fireplace on
6  that day that you were there and Mr. Falco
7  was building the walls of the fireplace but
8  had not yet started the hearth or the hearth
9  extension. Was Mr. Carresi there?
10      A He probably was.
11      Q Do you recall seeing the
12  roughed-in gas pipe at that point?
13      A He had it laying up in the attic
14  where he was getting ready to stick it down
15  through the wall.
16      Q So that the first day that you
17  were there, the gas pipe was not yet -- did
18  not yet enter the room where the fireplace
19  was being built?
20      A Right.
21      Q How long were you there that
22  day?
23      A Maybe an hour, but I was all
24  over the house.

28 (Pages 106 to 109)

# PHILLIP ROTHSCHILD
## March 30, 2006

Page 186

1  by a solid fuel burning fireplace?
2      A It's a gas fireplace or wood,
3  either one.
4      Q Prior to the work at the Pavia
5  house, the construction of the addition, were
6  you familiar with the code requirements for a
7  solid fuel burning fireplace?
8      A No.
9      Q Did you know that there were
10 certain code requirements for a solid fuel
11 burning fireplace?
12     A Yes.
13     Q Do you own a copy of the
14 Massachusetts Building Code?
15     A Yes.
16     Q But prior to the Pavia job, you
17 had never made yourself familiar with those
18 provisions relating to solid fuel burning
19 fireplaces?
20     A No.
21     Q And with regard to the
22 construction of the addition at the Pavia
23 house, you were the general contractor for
24 that job?

Page 187

1      A Yes.
2      Q What were your duties and
3  responsibilities as the general contractor?
4      A To do the demolition work, the
5  excavation, the framing, the finish work,
6  insulation, plaster and the finish work.
7      Q That was the scope of work for
8  you?
9      A Yes. We did the kitchen,
10 bathrooms, anything that needed to be done
11 other than the fireplace.
12     Q So it's your position that the
13 fireplace was excluded from your scope of
14 work as the general contractor?
15     A Yes.
16     Q The work that you did supervise
17 as the general contractor, did you hire the
18 subcontractor for that work?
19     A Yes, some of it, the
20 electrician, plumber, plasterer, insulation
21 people and Falco was hired to do the brick
22 work.
23     Q On the work that you acted as
24 the general contractor, did you coordinate

Page 188

1  the work of the subcontractors for that work?
2      A I just told them what I needed,
3  gave them a schedule, yes. I didn't tell
4  them what to do, how to do it, but I
5  coordinated that; yes.
6      Q After the subcontractors
7  completed their work, did you inspect and
8  approve the work they did?
9      A Yes.
10     Q Would the general --
11         MR. CROWLEY: Strike that.
12     Q Were the subcontractors at the
13 Pavia house working under your license as a
14 construction supervisor?
15     A The plumber, electrician, all
16 those people pull their own permits.
17     Q So that the licensed trades on
18 the job were not working under your
19 supervisor's license?
20     A Right, yes.
21     Q Did you ever do anything to
22 exclude the fireplace work from the scope of
23 work where you were the general contractor?
24     A Yes.

Page 189

1      Q What did you do?
2      A I told her, Julie, I said, I
3  don't really want anything to do with the
4  fireplace, that's on your nickel, I said to
5  her.
6      Q Did you ever put anything in
7  writing to memorialize your conversation with
8  Julie Pavia excluding the fireplace work from
9  your scope of work?
10     A Other than on the paperwork
11 there where it says no fireplace, I'm not
12 sure where those are now, but it does say it
13 somewhere in there.
14     Q In the exhibits marked today?
15     A Yes.
16     Q That's the only place?
17     A Yes.
18     Q Did you hire Mr. Falco to do the
19 masonry work for the fireplace?
20     A I hired him, Mr. Falco, to do
21 the masonry -- no, to do the masonry work for
22 the addition.
23     Q Who hired Mr. Falco to do the
24 masonry work on the fireplace?

48 (Pages 186 to 189)

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 198

1  Q The fireplace, the masonry work
2  that Mr. Falco did on the fireplace in the
3  addition, that was the construction of a
4  brick structure that was about four feet
5  tall, four feet across?
6  A Yeah, it was in an angle corner
7  like that, maybe three feet something tall,
8  four foot across, two walls this way.
9
10  (Witness Indicating)
11
12  A Then a facade on the front like
13  that.
14
15  (Witness Indicating)
16
17  Q Mr. Falco's son helped him do
18  that?
19  A Yes.
20  Q And you believe that that work
21  took Mr. Falco three or four days to do?
22  A Yes.
23  Q Do you know why it took him so
24  long?

Page 199

1  A Well, he had to wait until he --
2  he got to a point where he had to wait for us
3  to get that cap that we put on there, then he
4  came back to put the cap on, finished up his
5  mortar, then started working on his hearth.
6  Q So the three or four days that
7  Mr. Falco worked on the fireplace, he was not
8  working all day on that?
9  A No.
10  Q Was there any break in time
11  between the time Mr. Falco concluded the
12  exterior work and the beginning of the
13  fireplace inside?
14  A Yes, I think three or four days.
15  He had to block up a window first.
16  Q But he was still doing work at
17  the Pavia home?
18  A Yes.
19  Q Did you understand that the
20  fireplace Mr. Falco built was not a solid
21  fuel burning fireplace?
22  A Yes.
23  Q And the fireplace that Mr. Falco
24  built, it was never intended to be a solid

Page 200

1  fuel burning fireplace, was it?
2  A Not a wood burning fireplace,
3  no.
4  Q So that your framing carpenters
5  did not do anything to frame the addition so
6  as to allow for the construction of a solid
7  fuel burning fireplace?
8  A No.
9  Q You indicated earlier that you
10  had seen a sketch for the fireplace. Do you
11  recall that?
12  A Yes.
13  Q Who produced that sketch?
14  A Mrs. Pavia.
15  Q Do you know whether she had any
16  training as an architect?
17  A I'm not sure.
18  Q What did this sketch consist of?
19  A It showed him how she wanted to
20  do the corner, how far she wanted to come out
21  off the corners, how far she wanted to go in
22  the corner this way, bring the two wings out.
23  She gave him the size of the opening she
24  wanted from the width to the height, then the

Page 201

1  design of the floor in the hearth.
2  Q So that Miss Pavia decided what
3  the dimensions of the fireplace should be?
4  A Yes.
5  Q Did she base that on anything in
6  particular?
7  A Yes. After the fireplace was
8  built, we put some bookcases on the
9  right-hand side of it and the bookcases had
10  to be so big. So it was laid out in the
11  corner so the bookcases would fit.
12  Q Was there any discussion with
13  Miss Pavia about a mantel that was going to
14  go over the fireplace?
15  A Yes.
16  Q What were those discussions?
17  A It was a wood mantel that she
18  designed.
19  Q Did she want the dimensions of
20  the fireplace to fit within the confines of
21  that mantel?
22  A She did it in the reverse. She
23  laid out the fireplace first, then we built
24  the mantel to fit the fireplace.

51  (Pages 198 to 201)

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# Exhibit

# 3

1009766v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------X

FIREMAN'S FUND INSURANCE  COMPANY
as subrogee of JULIA PAVIA
77 San Marin Drive
Novado, California

CIVIL ACTION NO.
05-10827 (DPW)

Plaintiff,

vs

FALCO CONSTRUCTION CORP.;
P & D BUILDERS, INC.;
and
MICHAEL CARRESI d/b/a CARRESI
PLUMBING & HEATING

JURY TRIAL DEMANDED

JANUARY 16, 2006

Defendants.

-------------------------------------------------------------X

## PLAINTIFF FIREMAN FUND'S INSURANCE COMPANY'S RESPONSES TO DEFENDANT P&D BUILDERS, INC.'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION DATED JUNE 28, 2005

**Interrogatories**

**Response to Interrogatory #1**
Joseph Franco
Senior Associate
Craig Insurance Services
PO Box 40569
Jacksonville, FL  32203-0569

Responsible for investigating and pursuing subrogation claims on behalf of
Fireman's Fund Insurance Company.

**Response to Interrogatory #2**
The plaintiff's insured suffered fire damage to both her home and the contents of

that home.  She was also forced to incur additional living expenses while repairs were being made.  For more detailed description of damages, see the adjustment reports.

**Response to Interrogatory #3**
Building claim:                          $411,135.32
Contents claim:                        $425,000.00
Alternative Living Expenses:     $42,167.84
These numbers are as of date.  The adjustment is still being processed.  See adjustment documents for further information.

**Response to Interrogatory #4**
The Defendants

Julia Pavia
104 Hammondswood Road
Newton, MA
The insured, has knowledge of the construction project, the fire, and the damages.

Genevieve Bures, CFI
Bures Consultants, Inc.
297 Front Street
Berea, OH
Investigated the fire and made conclusions regarding cause and origin.

Jeffrey Lowe
Engineering and Fire Investigations
Investigated the origin of the fire.

Newton Fire Department
Newton, MA
Responded to fire, suppressed fire and investigated origin of fire.

Joseph Franco
Craig Insurance Services
PO Box 40569
Jacksonville, FL
Investigated the fire and insurance claim on behalf of Fireman's Fund Insurance Co.

Various other contractors and adjusters reviewed the claim and/or provided estimates for certain required work.  See their reports.

**Response to Interrogatory #5**
The Plaintiff has not decided which expert, if any, it intends to call at trial.  Expert

disclosure will be made in conformance with the court's scheduling order.

**Response to Interrogatory #6**

All communications that were detailed in writing are attached hereto.

**Response to Interrogatory #7**

The requested information is not known at this time. Plaintiff reserves the right to supplement its response.

**Response to Interrogatory #8**

P&D Builders was the general contractor for the construction of the masonry fireplace at the insured premises. A fire occurred due to improper construction of that masonry fireplace due to the negligence of P&D Builders and/or its subcontractors for which it will be held vicariously liable. P&D Builders' contract with the insured contained an implied duty to perform their work in a good workman like manner. They failed to do so and breached that contract.

**Response to Interrogatory #9**

Objection. This information is specifically within the knowledge of the Defendants and can be gathered by the defendant with greater ease than it can be provided by the Plaintiff.

Notwithstanding this objection, it is the Plaintiff's understanding that P&D Builders acted as a general contractor on the job, Falco Construction constructed the masonry fireplace and Michael Carresi Plumbing installed the gas log appliance in the fireplace.

**Response to Interrogatory #10**

Objection. This information is specifically within the knowledge of the Defendants and can be gathered by the defendant with greater ease than it can be provided by the Plaintiff.

Notwithstanding this objection, the Plaintiff has not been provided with any of the requested materials.

**Response to Interrogatory #11**

It is the Plaintiff's understanding that P&D Builders acted as a general contractor on the job, Falco Construction constructed the masonry fireplace and Michael Carresi Plumbing installed the gas log appliance in the fireplace. A combination of negligent installation of both the fireplace and the gas log appliance caused the fire. P&D Builders is liable as the general contractor.

**Response to Interrogatory #12**

No.

**Response to Interrogatory #13**

The Plaintiff has not been provided with any such documents.

- 3 -

**Response to Interrogatory #14**
Among others, NFPA Standard #54 was violated in that the gas vent and installation of the gas log violated the minimum fire code requirements. NFPA Standard #211 was violated in that the construction of the fireplace, firebox, smoke chamber, heart, hearth extension, flue and chimney all violated the minimum fire code requirements.

**Response to Interrogatory #15**
The contracts have not, as of yet, been provided to the Plaintiff.

**<u>Requests for Production</u>**

**Response to Request #1**
Attached (on cd).

**Response to Request #2**
Attached (on cd).

**Response to Request #3**
Attached (on cd).

**Response to Request #4**
The Plaintiff has not yet determined which, if any, expert it intends to call at trial. Expert disclosure will be made in accordance with the court's scheduling order.

**Response to Request #5**
Attached (on cd).

**Response to Request #6**
Attached (on cd).

**Response to Request #7**
Attached (on cd).

**Response to Request #8**
Attached (on cd).

**Response to Request #9**
Attached (on cd).

**Response to Request #10**
None.

**Response to Request #11**

- 4 -

None.

**Response to Request #12**
None.

**Response to Request #13**
Attached (on cd) all correspondence prior to the filing of the complaint.

**Response to Request #14**
Attached (on cd).

**Response to Request #15**
None.

**Response to Request #16**
None.

**Response to Request #17**
None.

**Response to Request #18**
Attached (on cd).

**Response to Request #19**
Attached (on cd).

**Response to Request #20**
None.

**Response to Request #21**
Attached (on cd).

**Response to Request #22**
Attached (on cd).

**Response to Request #23**
Attached (on cd).

**Response to Request #24**
Attached (on cd).

**Response to Request #25**
Attached (on cd).

**Response to Request #26**
Attached (on cd).

**Response to Request #27**
Attached (on cd).

**Response to Request #28**
No such documents have, as yet, been provided to the Plaintiff.

**Response to Request #29**
No such documents have, as yet, been provided to the Plaintiff.

**Response to Request #30**
None.

**Response to Request #31**
Attached (on cd).

**Response to Request #32**
No such documents have, as yet, been provided to the Plaintiff.

**Response to Request #33**
No such documents have, as yet, been provided to the Plaintiff.

THE PLAINTIFF,

By:_____
        Erik Loftus, Esq.
        Law Offices of Stuart G.
              Blackburn
        Two Concorde Way
        P.O. Box 608
        Windsor Locks, CT 06096
        Tel. 860-292-1116
        Juris No. 413638

## **CERTIFICATION**

I hereby certify that a copy of PLAINTIFF'S RESPONSES TO DEFENDANT P & D BUILDERS, INC., INTERROGATORIES AND REQUESTS FOR PRODUCTION has been mailed, first class mail, postage prepaid on the 16th day of January, 2006 to the following:

Robert P. Turner, Esq.
Law Offices of Bruce R. Fox
27 B Midstate Office Park
Auburn, MA 01501
(Michael Carresi dba Carressi
Plumbing & Heating)

William Joseph Flanagan, Esq.
Curtis L. S. Carpenter, Esq.
Morrison & Mahoney, LLP
250 Summer Street
Boston, MA 02210
(P & D Builders, Inc.)

David J. Crowley, Esq.
Patricia A. Larkin, Esq.
John F. Toomey, Esq.
Toomey & Yudysky LLP
99 Summer Street
Boston, MA 02110
(Falco Construction Corp.)

David F. Hassett, Esq.
Scott T. Ober, Esq.
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, MA 01608
(Heatmaster, Inc., Third party Defendant)

_____
Erik Loftus, Esq.

# Exhibit

# 4

1009766v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------X

FIREMAN'S FUND INSURANCE COMPANY as
subrogee of JULIA PAVIA                              CIVIL ACTION NO.
77 San Marin Drive                                  05-10827 DPW
Novado, California

Plaintiff,

vs

FALCO CONSTRUCTION CORP.;
P & D BUILDERS, INC.;
and
MICHAEL CARRESI d/b/a CARRESI                       APRIL 21, 2006
PLUMBING & HEATING

Defendants.
-----------------------------------------------------------------X

## PLAINTIFF FIREMAN'S FUND'S RULE 26(a)(2)(B) DISCLOSURE OF EXPERT WITNESS

### NAME AND ADDRESS OF WITNESS

Genevieve Bures, CFI
Bures Consultants, Inc.
297 Front Street
Berea, OH  44017

### SUBJECT MATTER ON WHICH THE EXPERT IS EXPECTED TO TESTIFY

Ms. Bures is expected to testify concerning her investigation and opinions

regarding the cause and origin of the January 25, 2004 fire loss that occurred at the

residence of Julia Pavia, located at 104 Hammondswood Road, Newton.

## THE SUBSTANCE OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY

Ms. Bures is expected to testify that, based upon her investigation and inspection, the origin of the January 25, 2004 fire was in the floor construction directly below the gas log fireplace in the second floor office at the premises. Ms. Bures is expected to testify that the cause of the January 25, 2004 fire was the accidental ignition of the combustible floor construction due to heat conducting down through the masonry floor of the fireplace and igniting the plywood and joists. Additionally, Ms. Bures is expected to testify that NFPA Standards 211 and 54 were violated during the construction of the fireplace and chimney including the construction of the hearth directly atop combustible materials. Ms. Bures' further opinions are expressed in the attached report.


## SUMMARY OF THE GROUNDS FOR EXPERT'S OPINION

Ms. Bures will testify based on her education and experience as a certified fire inspector, as well as her investigation and her inspections of the premises located at 104 Hammondswood Road, Newton. A list of Ms. Bures' qualifications, publications, and testimony history is attached.


THE PLAINTIFF,

By:_____
   Erik Loftus, Esq.
   Law Offices of Stuart G. Blackburn
   Two Concorde Way
   P. O. Box 608
   Windsor Locks, CT  06096
   860-292-1116
   BBO# 656315

4

## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed, first class mail, postage prepaid on the 21st day of April, 2006 to the following:

Robert P. Turner, Esq.
Law Offices of Bruce R. Fox
27 B Midstate Office Park
Auburn, MA 01501
(Michael Carresi dba Carressi
Plumbing & Heating)

William Joseph Flanagan, Esq.
Curtis L. S. Carpenter, Esq.
Morrison & Mahoney, LLP
250 Summer Street
Boston, MA 02210
(P & D Builders, Inc.)

David J. Crowley, Esq.
Patricia A. Larkin, Esq.
John F. Toomey, Esq.
Toomey & Yudysky LLP
99 Summer Street
Boston, MA 02110
(Falco Construction Corp.)

David F. Hassett, Esq.
Scott T. Ober, Esq.
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, MA 01608
(Heatmaster, Inc., Third party Defendant)

Erik Loftus, Esq.

# Exhibit

# 5

1009766v1

District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
        Plaintiff

      vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
        Defendants

      vs.

Heatmaster, Inc.,
       Third-Party Defendant

**DEPOSITION OF JOSEPH FALCO, SR.**, a witness
called on behalf of the Plaintiff, pursuant to the
Federal Rules of Civil Procedure, before Jessica L.
Bisaillon, a Registered Professional Reporter,
Certified Shorthand Reporter, and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Toomey & Yudysky, LLP, 99 Summer Street,
Boston, Massachusetts 02110, on Friday,
March 3, 2006, commencing at 12:20 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

---

A P P E A R A N C E S:

The Law Offices of Stuart G. Blackburn
    BY:  Stuart G. Blackburn, Esquire
    Two Concorde Way
    Post Office Box 608
    Windsor Locks, Connecticut 06096
    Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
    BY:  David J. Crowley, Esquire
    99 Summer Street
    Boston, Massachusetts 02110
    Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
    BY:  Curtis L.S. Carpenter, Esquire
    250 Summer Street
    Boston, Massachusetts 02210
    Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
    BY:  Robert T. Turner, Esquire
    27B Midstate Drive, Suite 100
    Auburn, Massachusetts 01501
    Appearing on behalf of Michael Carresi,
    d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
    BY:  Scott T. Ober, Esquire
    484 Main Street, Suite 560
    Worcester, Massachusetts 01608
    Appearing on behalf of Heatmaster, Inc.

---

I N D E X

DEPOSITION OF:               PAGE

JOSEPH FALCO, SR.

Examination by Mr. Blackburn      4
Examination by Mr. Turner        49
Examination by Mr. Ober          61
Examination by Mr. Carpenter      63
Reexamination by Mr. Blackburn    73
Reexamination by Mr. Turner      80

E X H I B I T S

EXHIBIT NO.                    PAGE
      (Plaintiff's)

1   Hand-drawn diagram; a total of one page.  25

2   Hand-drawn diagram; a total of one page.  40

---

1        **JOSEPH FALCO, SR.,** after having been

2   satisfactorily identified by the production of

3   his Massachusetts driver's license and having

4   been duly sworn by the Notary Public, was

5   examined and testified as follows:

6        MR. BLACKBURN:  And we'll have the

7   same stipulations that we've had for the last

8   deposition.  Is that fine with everybody?

9        MR. CROWLEY:  Yes.

10       MR. BLACKBURN:  You want him to read

11  and sign?

12       MR. CROWLEY:  Yes, please.

13       MR. BLACKBURN:  Okay.

14       **EXAMINATION BY MR. BLACKBURN:**

15 Q.  Good afternoon, Mr. Falco.  My name is Glenn

16   Blackburn.  I represent the Fireman's Fund

17   Insurance Company in this case.  They were the

18   insurance company for the Pavias.

19 A.  Right.

20 Q.  Have you ever had your deposition taken before?

21 A.  No.

22 Q.  Let me give you a few ground rules.  Some of

23   these you may have -- you may have heard before.

24       I'm going to ask you some questions today

**5**

1      about the work that you did out at the Pavia

2      residence prior to the fire.

3            If at any time I'm unclear to you or you

4      don't understand a word that I use or something

5      that I say, please stop me, ask me to repeat the

6      question, ask a different word.  I want to make

7      sure that you and I --

8  A.  Okay.  I understand you.

9  Q.  Yeah.  Fair enough.

10  A.  Okay.

11  Q.  The other instruction that I'll give you is that

12      the young lady is taking down everything that we

13      say.  While ordinarily you and I could sit here

14      and have a conversation that involved both words

15      and nods of the head and things like that, at

16      least while we're on the record, we need to

17      converse only with words.  All right?

18  A.  Okay.

19  Q.  I think what you'll find -- because my experience

20      is that when I question people, I have a tendency

21      to stutter a bit and draw out my questions.  I

22      think what you're going to find is that often

23      you're going to understand the question that I've

24      asked you before I've finished asking it.

**6**

1  A.  That's okay.  I got a dialect too from the old

2      country.

3  Q.  And the tendency is that the witness starts

4      giving the answer before I've finished asking the

5      question.

6  A.  Right.

7  Q.  It's very difficult for the young lady to take us

8      both down speaking at the same time.  So try to

9      resist that urge to start answering my questions

10      before I'm done sputtering them out, and I'll

11      give you the same courtesy when you're giving

12      your answers.  All right?

13  A.  Okay.

14  Q.  What's your address, please?

15  A.  5 Coolidge Circle, South Easton, Mass.

16  Q.  And how long have you lived at that address?

17  A.  Oh, I would say about 24 years now.

18  Q.  You have a business; correct?

19  A.  Yes.

20  Q.  What is the name of the business?

21  A.  Falco Construction.

22  Q.  Is that business a corporation?

23  A.  No.  A company.

24  Q.  Have you ever had a corporation that you did

**7**

1      business under?

2  A.  Yes.  Years and years ago.

3  Q.  And what was the name of that corporation?

4  A.  Falco Construction.

5  Q.  Incorporated?

6  A.  Yeah.  At that time, yeah.

7  Q.  Okay.  How long ago did that corporation seek to

8      exist?

9  A.  Oh, God.  Years and years ago.  I would say about

10      25 years ago, because I was doing a lot of

11      commercial work, and I just didn't want to do

12      commercial work anymore and just went down just

13      to regular house -- you know, homeowners.

14  Q.  So at the time that you were doing this work at

15      Mrs. Pavia's house before the fire, you were

16      operating as a sole proprietor --

17  A.  Yes.

18  Q.  -- with a trade name of Falco Construction?

19  A.  Right.

20  Q.  And was that business just your business?

21  A.  Just my business.  Yeah.

22  Q.  Did you have any partners?

23  A.  No.  I just got -- I've had my two sons working

24      for me.

**8**

1  Q.  Okay.  But they did not have any ownership

2      interest in the business?

3  A.  No.

4  Q.  You're a mason; correct?

5  A.  Yes.

6  Q.  Do you do any work other than masonry work?

7  A.  That's all I know how to do.

8  Q.  How long have you been doing masonry work?

9  A.  Oh, God.  Forty-three years.

10  Q.  And how long have you been doing that masonry

11      work by yourself or with the company that you

12      owned?

13  A.  For 43 -- no.  I'm sorry.  I used to be in the

14      union for about seven years, and then I went on

15      my own.  So out of 43 years, deduct seven.

16  Q.  Okay.  So for the last 36 years, you've worked on

17      your own?

18  A.  Right.

19  Q.  You've been building fireplaces that whole time?

20  A.  I probably built about a million of them.

21      Stopped counting 25 years ago.

22  Q.  During the course of that time that you've been

23      building fireplaces, have the requirements

24      changed for the construction of the fireplaces

9

```
1    pursuant to the codes?
2  A. Yes. Big time. Big time. Now you need -- you
3    need -- you need the rough inspection, finish
4    inspection, final inspection. Before, you just
5    build a chimney, and building inspectors weren't
6    even around. Now you can't breathe unless you
7    call the building inspector and -- for a rough
8    and finish.
9  Q. And how did you learn about those changes in the
10   code?
11 A. You learn by doing it for so many years. And you
12   got the code book, and you go according to the
13   code book. And that's how you build them.
14 Q. So you have code books?
15 A. Yes, I do.
16 Q. You keep them on your truck?
17 A. I don't need them anymore. They're all up here
18   after 45 years.
19 Q. And "up here" means in your head?
20 A. In my head, yeah.
21 Q. When there are changes that occur with the code,
22   how do you learn about those?
23 A. Usually if there is a change while I call for a
     rough inspection and -- the building inspector
```

10

```
1    says, oh, don't you know about this or don't you
2    know about that?
3         But they haven't changed for years now.
4    And I think the way you build them today, you
5    don't need to change them, because they're really
6    strict rules to a fireplace.
7  Q. Do you hold any licenses?
8  A. No. A mason -- a mason contractor does not
9    require to have a license. We usually work under
10   the general contractor's license, because he
11   pulls the permit, he calls for a rough inspection
12   and a finish, final inspection. I don't. I just
13   build it, and he's responsible by him calling
14   the -- the inspectors.
15 Q. Are you a member of any associations about your
16   trade?
17 A. No.
18 Q. When is the first time that you met Phil
19   Rothschild?
20 A. Oh, I think about a year -- about six months or
21   eight months before I did the -- the exterior
22   veneer for him, because he heard about me, and I
23   was very well referred. And I met him, and I did
24   a couple of jobs for him. Very, very pleased.
```

11

```
1    And that's it.
2  Q. Do you know who it was that introduced you to
3    him?
4  A. Oh, God. I don't know. I don't really remember.
5    You know, it just -- word travels. Oh, Joe
6    Falco. Call Joe Falco. He's good. This and
7    that and this, and word goes to word. I don't
8    advertise or anything like that. I just -- I
9    don't look for work. They -- believe me. They
10   come to me. After so many years, you earn that
11   right, I guess, if you're good.
12 Q. Do you recall what the jobs were that you did for
13   Mr. Rothschild prior to the Pavia house?
14 A. Yes. I did a little tiny addition in Newton
15   for -- for a psychiatrist. I forget her name.
16   As a matter of fact, she writes books too. She's
17   a Harvard -- Harvard graduate. Martha or
18   something. I did a job for her, a little tiny
19   addition on her home that she was going to turn
20   into an office area for her patients, because she
21   worked out of the house, and then a walkway in
22   the back from the back to the -- to the driveway
23   so the people can go and use that exit in the
24   back to go into the driveway. And that's it.
```

12

```
1         Then after that, Phil asked me to do the
2    exterior addition on Julia Pavia's house.
3  Q. So there was one job before the Pavia house?
4  A. Right.
5  Q. In addition to doing the walkway at that other
6    job, what did the inside work entail?
7  A. It was an outside little addition. Brick
8    veneered the outside. A little like a --
9    probably a 10-by-10 addition, because her house
10   was already exterior brickwork on the exterior,
11   so we matched the existing.
12 Q. No fireplace?
13 A. No fireplace, no.
14 Q. Just a brick veneer and --
15 A. Just a brick veneer.
16 Q. And the outside walkway?
17 A. And an outside walkway.
18 Q. Other than your two sons, back at this time, did
19   you have anybody else that worked for you?
20 A. No.
21 Q. Through the course of doing the job at Mrs.
22   Pavia's house, did you have anybody else that
23   worked for you other than your two sons?
24 A. No.
```

13

1  Q.  After the Pavia house, did you do any other work
2      with Mr. Rothschild's company?
3  A.  Nope.
4  Q.  Why not?
5  A.  Because I didn't like his attitude, and I don't
6      like the way he tend business.
7  Q.  What was it about the manner in which he did
8      business that turned you off?
9  A.  He was very arrogant, and he thought he -- he's
10     Mister-know-it-all.
11 Q.  At the point where -- withdrawn.
12         Did he ask you to do any other jobs after
13     the Pavia house?
14 A.  Yes.
15 Q.  What did he ask you to do?
16 A.  Another job.  I think it was in Needham.  I says
17     no, thank you, good-bye.  I do not want to do no
18     more work for you.
19 Q.  And at that point, had there been anybody that
20     had implicated you in causing the fire at the
21     Pavia house?
22 A.  First of all, this was way, way, way, way before
23     the fire.  It didn't have nothing to do -- I
       didn't know until the -- the fire until about a

14

1      year later.
2  Q.  Okay.
3  A.  This was right after Julia's house, after I did
4      the exterior on Julia Pavia's house.  And then he
5      asked me to do another job for him, and I said
6      no, thank you.
7  Q.  So your decision to stop doing work or any
8      further work with Mr. Rothschild predated the
9      fire?
10 A.  Yes.  You mean before the fire?
11 Q.  That's -- yeah.  Good for you.  Good for you.
12     Yeah.  Yes.
13 A.  Okay.
14 Q.  Your decision to do any work for Mr. Rothschild
15     was before the fire; right?
16 A.  Right.
17 Q.  Okay.  Who was it that contacted you to do the
18     work at the Pavia house?
19 A.  Phil.
20 Q.  Mr. Rothschild directly?
21 A.  Yeah.
22 Q.  What did he ask you to do?
23 A.  I got an exterior on an addition in Chestnut Hill
24     in Newton.  I call it Newton, but I guess it's

15

1      Chestnut Hill/Newton.  You know, so -- so right
2      after I was doing the brick -- I just finished
3      the brick for the psychiatrist, and then I went
4      from the psychiatrist to Chestnut Hill.
5  Q.  Did he ask you for a quote?
6  A.  For a price?
7  Q.  Yes, sir.
8  A.  Yes.
9  Q.  And did you give that to him in writing?
10 A.  No.  It was all shake -- that's how I do my job.
11     Shake my hand, shake your hand, and that's it.
12 Q.  And how -- so you told him how much you were
13     going to charge him?
14 A.  Right.
15 Q.  And what was -- how was that based?  Was it a
16     full price or was it so much for the time or
17     what?
18 A.  For -- I just look at the job, estimate how many
       bricks there are and what type of bricks they
       are.  And this happened to be a very difficult
21     job because it's a water-struck brick.  And a
22     water-struck brick is a nightmare to lay because
23     it doesn't absorb the water like a regular porous
24     brick.  So it would be like much more than laying

16

1      a regular brick.
2  Q.  So did you give him one price for the whole job?
3  A.  One price for the exterior.
4  Q.  Do you remember what that price was?
5  A.  I think it was like about -- I would say like
6      about 23, 24,000 with -- I'm pretty sure it was
7      also included with material.  Don't quote me on
8      that.  I'm not sure.  Because like I said, I
9      forgot.
10 Q.  But do you have a recollection as you sit here
11     today that you purchased the materials?
12 A.  I'm pretty sure I did, because he doesn't know
13     supply yards.  So I think I got the bricks out of
14     my supplier.
15 Q.  Okay.  And what were the terms of payment?
16 A.  The terms were -- like if I says, hey, Phil, I
17     need five grand, the following week I would say,
18     hey, Phil, give me another seven or whatever, and
19     then the final payment.
20 Q.  Okay.  So do you have a recollection of whether
21     you received any payment before you started the
22     job?
23 A.  I never ask for a payment up-front.  My
24     reputation -- every time I do a job, I never ask

17

1   for money up-front unless it's like -- unless
2   it's like a -- like I got to get like 10 or
3   $15,000 worth of material. This was like
4   probably about a couple of thousand dollars of
5   material. So I basically buy it myself. And
6   then the first payment, I says, give me such and
7   such amount.
8   Q. To do this job, did it require you and both of
9      your sons to be there every day?
10  A. Yes.
11  Q. And when you went to do the job, what work had
12     been done before you started doing the brick
13     veneer?
14  A. The framing, framing out the addition, all wood
15     structure with plywood exterior. And then I go
16     in there and put the Tyvak paper on and start
17     laying bricks. And that's it.
18  Q. Okay. Was the roof on?
19  A. Yes, it was. Yeah.
20  Q. Was the slate on the roof yet?
21  A. Yeah -- no, I don't think so.
22  Q. Okay. So everything was framed, the walls and
23     the roof? True?
    A. Right. Yeah.

18

1   Q. And whatever plywood that would have been
2      covering the walls and the roof was in place?
3   A. Uh-huh.
4   Q. That's a yes?
5   A. Yes.
6   Q. And -- but to your recollection, there was no
7      finished roofing that was -- had been put on?
8   A. No. Because that was like an old slate roof, and
9      it's pretty hard to get the company to do the
10     that type of work to -- to match the existing
11     roof. So, I mean, you just can't get a new roof
12     and match -- to blend in with the old, old roof.
13  Q. Do you know what the company was that eventually
14     put on the slate roof?
15  A. No, I don't. There's not -- there's not too many
16     of them that's -- I know that for sure -- that
17     does that in that area, --
18  Q. You were gone --
19  A. -- I assume.
20  Q. You were gone by the time that --
21  A. Yeah.
22  Q. -- whoever came in to do it?
23  A. Oh, yeah. I was all -- I was -- I was history.
24  Q. During the time that you were installing the

19

1   brick on the exterior of the house, did you go
2   inside at all?
3   A. Well, the only time that we went inside was early
4      in the morning. Knocked at the door, and Julia
5      let us in. And that way I can go up -- upstairs
6      or downstairs to turn the water on. Or my son.
7      But usually we would go in the backyard. There's
8      a driveway. And that's where the addition was,
9      where the driveway is.
10  Q. And where were you turning the water on?
11  A. I think it was like in the -- this -- the garage
12     were below the addition. And right around the
13     corner, there would be a hose that we -- because
14     it was cold, and we would have to turn it off and
15     on every day.
16  Q. In the basement?
17  A. In the basement, yeah.
18  Q. And I guess that gets to my next question,
19     whether you recall what time of year it was that
20     you were doing this. You said it was cold?
21  A. It was like -- that was a pretty mild winter. I
22     was surprised that we were working. I think it
23     was like in January or by the middle or -- or the
24     beginning of February. And I was surprised,

20

1   because I said, wow, this is good weather. You
2   know, just like this year.
3   Q. You like that?
4   A. Hey, we got to eat. So, I mean, that's -- you --
5      you get a cold winter, you can't lay bricks. It
6      just freezes.
7   Q. On any of those occasions while you were doing
8      the exterior brick and you entered the house, did
9      you go into the addition area?
10  A. Well, if I -- the addition was right there. So I
11     would walk up the stairs, and I would --
12     sometimes, because I didn't want to try -- I
13     didn't want to climb the scaffolding. I would go
14     right through the window. It's much easier. You
15     know, I'm getting old. I don't want to be
16     climbing morning, noon, and night, you know, up
17     and down.
18  Q. During the time that you were installing the
19     exterior brick, were there any stairways that had
20     been put in place?
21  A. Yeah. There were the stairways to go up to
22     the -- from the first floor to the second floor.
23  Q. In the addition?
24  A. Yeah.

21

1  Q.  Okay.  Had -- had the subflooring been put down
2      in the addition by -- at the time that you were
3      doing the exterior brick?
4  A.  It's just the plywood.  Just -- just the
5      subfloor.  Yeah.  Got to walk on something.
6  Q.  Had there been any finished work done to any of
7      the floors or the walls at that point?
8  A.  No.  It wasn't -- it was -- it was -- it just
9      got -- it just got framed.  We were right on top
10     of the framers.  So as soon as they finished,
11     boom, and the windows were in, we would start
12     laying bricks.
13 Q.  At some point were you asked to do something else
14     at the property?
15 A.  Nope.  Not at all.
16 Q.  Were you ever asked to do any work on the
17     existing fireplace that was in the main portion
18     of the home, not the addition?
19 A.  Nope.
20 Q.  At some point did someone approach you to put
21     some type of fireplace structure into the
22     addition?
23 A.  The only time they approached me is the day that
24     I finished the exterior.  And Phil came up to me

22

1      and said, Joe, I need you to do a little job for
2      me up on the second floor.  Julia wants to
3      surprise her husband, because that was going to
4      be his office area, with a decorative fireplace.
5      I says, let's go look at it.
6          So he told me what -- we went up on the
7      second floor.  He says, this is what I want, a
8      decorative fireplace, just so it -- so Julia's
9      husband will have something to look at besides
10     the -- the -- the four walls.
11 Q.  Did he show you the location of where that was
12     going to be?
13 A.  Yes.
14 Q.  And what was the location?
15 A.  Right in the -- on the -- when you go upstairs,
16     right in this corner right here.  That would be a
17     corner one.
18 Q.  And the corner that you're referring to, where
19     was that in relationship to the main house?
20 A.  I don't get you.
21 Q.  Okay.
22 A.  It's the -- it would be the main house.  It would
23     be the back of the house.  And then the addition
24     is right here, and this is the back of the house.

23

1      And the back of the house is all ext -- it was --
2      it was an exterior wall with bricks -- brick
3      thing there.  Then they added on the addition.
4      And the unit that they wanted was right on the
5      corner.
6  Q.  Okay.  So the corner consisted of the brick --
7      the brick exterior wall of the main house?
8  A.  Right.
9  Q.  True?
10 A.  Yeah.
11 Q.  And the other side of the corner, was that new?
12 A.  Right.
13 Q.  A new wall?
14 A.  Yeah.
15 Q.  That had recently been framed?
16 A.  Right.
17 Q.  So when you're looking at this for the first time
18     with Mr. Rothschild, he's pointing to this
19     corner --
   A.  Yeah.
21 Q.  -- of this room?
22         Would I be correct that one of the walls
23     that you're looking at of the corner was the old
24     exterior wall of the main house?

24

1  A.  Yes.
2  Q.  And the other wall that you're looking at was a
3      new wood-framed structure?
4  A.  Yeah.
5  Q.  Okay.  Had anything been put over that framing,
6      that interior framing on that new wall?
7  A.  No.  It was just exposed bricks.
8  Q.  Exposed bricks from where?
9  A.  From the old existing -- from the -- the original
10     house.  The upstairs was all exposed bricks on
11     the ext -- on the old exterior wall.
12 Q.  Right.  And then the second wall that --
13 A.  Then the second wall.  Then there's the
14     exterior -- this is the house.  That's the
15     exterior wall.  That was all brick.  And then
16     from there to here, this is the addition.  And I
17     would be working right on the other side of this
18     wall, on the outside exterior.
19 Q.  Okay.  I've just drawn a corner on this piece of
20     paper.  I put an X next to one of the lines
21     that's a corner.  Okay?  You with me?
22 A.  Yeah.  No.  Well...
23 Q.  But I'm wrong already, I can tell.
24 A.  Like you want me to do it?