UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE FIREMAN'S FUND INSURANCE COMPANY as subrogee of JULIA PAVIA, Plaintiff, <br><br> v. <br><br> FALCO CONSTRUCTION CORP., P&D BUILDERS, INC., and MICHAEL CARRESI d/b/a CARRESI PLUMBING & HEATING. Defendants, <br><br> v. <br><br> HEATMASTER, INC. Third-Party-Defendant. | CIVIL ACTION NO.:  05-10827RBC |

**AFFIDAVIT OF COUNSEL IN SUPPORT OF  DEFENDANT/CROSS-CLAIM PLAINTIFF, P & D BUILDERS, INC.'S OPPOSITION TO DEFENDANT/CROSS-CLAIM DEFENDANT, FALCO CONSTRUCTION CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1.      I am an attorney with the firm of Morrison Mahoney, LLP, and I with William Joseph Flanagan, Esq. represent the defendant/cross-claim plaintiff, P&D Builders, Inc., in the above captioned matter.  I am duly licensed to practice law in the Commonwealth of Massachusetts.

2.      Attached hereto as Exhibit No. 1 is a true and accurate copy of the Deposition of Julia Pavia pages 41-44.

3.      Attached hereto as Exhibit No. 2 is a true and accurate copy of the Deposition of Phillip Rothschild pages 102-109, 186-189, and 198-201

4.      Attached hereto as Exhibit No. 3 is a true and accurate copy of the Plaintiff's Response to Defendant P&D Builders, Inc.'s First Set of Interrogatories.

5.      Attached hereto as Exhibit No. 4 is a true and accurate copy of the Plaintiff's Disclosure of Expert Genevieve Bures, CFI.

6.      Attached hereto as Exhibit No. 5 is a true and accurate copy of the Deposition of Joseph

Falco pages 9-24

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15th DAY OF FEBRUARY, 2007.

/s/ *Curtis L.S. Carpenter*

_____

Curtis L.S. Carpenter, BBO #657358
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 15, 2007.

/s/ *Curtis L.S. Carpenter*

_____

Name, BBO No. 657358

2

# Exhibit

# 1

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
       Plaintiff

       vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
       Defendants

       vs.

Heatmaster, Inc.,
       Third-Party Defendant

    **DEPOSITION OF JULIE A. PAVIA**, a witness
called on behalf of the Defendant Falco Construction
Corp., pursuant to the Federal Rules of Civil
Procedure, before Jessica L. Bisaillon, a Registered
Professional Reporter, Certified Shorthand Reporter,
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Morrison Mahoney,
LLP, 250 Summer Street, Boston, Massachusetts
02210, on Thursday, February 16, 2006, commencing
at 11:30 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

---

**A P P E A R A N C E S :**

The Law Offices of Stuart G. Blackburn
  BY:  Erik Loftus, Esquire
  Two Concorde Way
  Post Office Box 608
  Windsor Locks, Connecticut 06096
  Appearing on behalf of the Plaintiff and
  the deponent

Toomey & Yudysky, LLP
  BY:  David J. Crowley, Esquire
  99 Summer Street
  Boston, Massachusetts 02110
  Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
  BY:  Curtis L.S. Carpenter, Esquire
  250 Summer Street
  Boston, Massachusetts 02210
  Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
  BY:  Robert T. Turner, Esquire
  27B Midstate Drive, Suite 100
  Auburn, Massachusetts 01501
  Appearing on behalf of Michael Carresi,
  d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
  BY:  Scott T. Ober, Esquire
  484 Main Street, Suite 560
  Worcester, Massachusetts 01608
  Appearing on behalf of Heatmaster, Inc.

---

## I N D E X

| DEPOSITION OF: | PAGE |
|---|---|
| JULIE A. PAVIA | |
| Examination by Mr. Crowley | 4 |
| Examination by Mr. Ober | 103 |
| Examination by Mr. Turner | 110 |
| Examination by Mr. Carpenter | 122 |
| Reexamination by Mr. Crowley | 127 |

## E X H I B I T S

EXHIBIT NO.              PAGE

(Falco Construction Corp.)

1  Correspondence dated 7/11/00 from    16
   P. & D. Builders, Inc., Page 1; a total
   of one page.

2  Correspondence dated 7/11/00 from    19
   P. & D. Builders, Inc., Page 2; a total
   of one page.

3  Correspondence dated 12/17/01 from   23
   P. & D. Builders, Inc.; a total of two
   pages.

4  proposal dated 8/28/00 from    38
   P. & D. Builders, Inc.; a total
   of one page.

5  Typewritten letter; a total of one page.  93

\*\*  The original exhibits were retained by the
   stenographer and have been attached hereto.

---

1      **JULIE A. PAVIA,** after having been

2  satisfactorily identified by the production of

3  Massachusetts driver's license and having been

4  duly sworn by the Notary Public, was examined

5  and testified as follows:

6      MR. CROWLEY:  Want to have the usual

7  stipulations for objections?

8      MR. LOFTUS:  Yes.

9      MR. CROWLEY:  So counsel have agreed

10  to save all objections except as to the form of

11  the question until the time of trial, save all

12  motions to strike until the time of trial.

13      **EXAMINATION BY MR. CROWLEY:**

14  Q.  Ma'am, would you please state your full name?

15  A.  Julie Ann Pavia.

16  Q.  As you know, my name is David Crowley, and I

17  represent Joseph Falco in this case.  Are you

18  being represented by counsel today?

19  A.  Yes.

20  Q.  And who is representing you?

21  A.  Erik.

22      MR. LOFTUS:  Loftus.

23  A.  Loftus.

24  Q.  And when did you retain Mr. Loftus to represent

41

the exterior brickwork at the project been completed?

A.  Yes.

Q.  When your husband moved out of the house, had the interior masonry work been performed?

6  A.  Yes.

7  Q.  Can you estimate for me how long the interior
8      masonry work had been done when your husband
9      moved out in October of 2001?

10  A.  No.

11  Q.  I believe your testimony is that your husband
12      requested a gas fireplace be installed in the
13      study at the property?

14  A.  Yes.

15  Q.  The office?  An office?

16  A.  The study/office.

17  Q.  Was that space intended to be your home office?

18  A.  No.

19  Q.  Whose office was it?

20  A.  My ex-husband's.

21  Q.  Did your ex-husband have any expertise in the
22      construction field?

23  A.  No.

    Q.  What type of work is he involved in?

42

1  A.  He's a Ph.D. chemist, and he's doing venture
2      capital work.

3  Q.  I believe it was your testimony that at some
4      point your husband brought up the idea of having
5      a gas log fireplace installed?

6  A.  Yes.

7  Q.  You don't recall when that was?

8  A.  When he decided the layout of his office.

9  Q.  Your husband decided on the layout of his office?

10  A.  When I say layout, I'm talking about furniture
11      and where things should be.  Yes.

12  Q.  When your husband decided to have some input into
13      the layout of the office, had the exterior of the
14      addition been completed?

15  A.  No.

16  Q.  Was that work ongoing?

17  A.  Yes.

18  Q.  What did your husband do to come up with the
19      layout of his office?

20  A.  We went and bought furniture.  He already had a
21      very large desk, and he went on-line and bought a
22      fireplace mantle.

23  Q.  Where did you purchase furniture for the office?

24  A.  Furniture Warehouse in Natick.

43

1  Q.  And where did you purchase the fireplace mantle?

2  A.  He purchased it on-line.  I don't really know.

3  Q.  I assume that your husband had already decided on
4      a fireplace when he purchased the fireplace
5      mantle?

6  A.  Yes.

7  Q.  Had he decided to install a fireplace when he
8      purchased the furniture for the office?

9  A.  Yes.

10  Q.  Had any work on the interior of the addition been
11      started when your husband purchased the furniture
12      for the office?

13  A.  No.

14  Q.  Did your husband ever draw any sketches or submit
15      anything to you in writing about the layout of
16      his office?

17  A.  No.

18  Q.  When your husband decided that he wanted a
19      fireplace, did he specify a gas log fireplace?

    A.  Yes.

21  Q.  Why did he specify a gas log fireplace?

22  A.  No mess.

23  Q.  He didn't want any wood burning?

24  A.  Right.

44

1  Q.  Had you ever owned a gas log fireplace prior to
2      the addition being constructed?

3  A.  In our last house.

4  Q.  What type of gas log fireplace was that?

5  A.  I don't remember.

6  Q.  Did you install that gas log fireplace?

7  A.  We had Michael Carresi come and install that gas
8      log fireplace.

9  Q.  And when did Mr. Carresi do that?

10  A.  Probably in October of '99.

11  Q.  And where did he install that gas log fireplace?

12  A.  In the living room.  And I don't think it exists
13      anymore.  I think the people who moved in took i
14      out.

15  Q.  Was Mr. Carresi's installation of the gas log
16      fireplace part of the work that you hired P. & D
17      Builders to do?

18  A.  No.

19  Q.  Did you hire Mr. Carresi directly to do that
20      work?

21  A.  Yes.

22  Q.  Did you purchase that gas-fired log that
23      Mr. Carresi installed at your --

24  A.  My --

# Exhibit

# 2

1009766v1

**PHILLIP ROTHSCHILD**
**March 30, 2006**

| | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | DEPOSITION OF: PHILLIP ROTHSCHILD |
| 12 | MORRISON, MAHONEY, LLP |
| 13 | 250 Summer Street |
| 14 | Boston, Massachusetts |
| 15 | March 30, 2006        10:20 a.m. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | Darlene M. Coppola |
| 22 | Registered Professional Reporter |
| 23 | Certified Professional Reporter |
| 24 | |

| | Page 4 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Michael Carresi d/b/a Carresi |
| 3 | Plumbing & Heating: |
| 4 | THE LAW OFFICES OF BRUCE R. FOX |
| 5 | 27B Midstate Drive |
| 6 | Suite 100 |
| 7 | Auburn, MA  01501 |
| 8 | BY:  ROBERT P. TURNER, ESQ. |
| 9 | 866.290.7435 |
| 10 | fax 508.832.5716 |
| 11 | |
| 12 | Representing Heatmaster, Inc.: |
| 13 | HASSETT & DONNELL, PC |
| 14 | 484 Main Street |
| 15 | Suite 560 |
| 16 | Worcester, MA  01608 |
| 17 | BY:  SCOTT T. OBER, ESQ. |
| 18 | 508.791.6287 |
| 19 | fax 508.791.2652 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 | LAW OFFICES OF STUART G. BLACKBURN |
| 4 | Two Concord Way |
| 5 | P.O. Box 608 |
| 6 | Windsor Locks, CT  06096 |
| 7 | BY:  STUART G. BLACKBURN, ESQ. |
| 8 | 860.292.1116 |
| 9 | fax 860.292.1221 |
| 10 | |
| 11 | Representing P & D Builders: |
| 12 | MORRISON, MAHONEY, LLP |
| 13 | 250 Summer Street |
| 14 | Boston, MA  02210 |
| 15 | BY:  CURTIS L.S. CARPENTER, ESQ. |
| 16 | 617.439.7589 |
| 17 | fax 617.342.4841 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 5 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing Falco Construction Corp.: |
| 3 | TOOMEY & YUDYSKY, LLP |
| 4 | 99 Summer Street |
| 5 | Boston, MA  02110 |
| 6 | BY:  DAVID J. CROWLEY, ESQ. |
| 7 | 617.946.0930 |
| 8 | fax 617.946.0989 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

2 (Pages 2 to 5)

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 102

1  the inside. And I said to him at that time,
2  I said, Julia called me this morning and she
3  wants you to do a herring bone pattern on the
4  floor. Is that okay? He said, I'll do
5  anything she wants.
6      Q So had the hearth or the hearth
7  extension been built when you saw it?
8      A No.
9      Q So he was just working on the
10 sides?
11     A (Witness Nodding).
12     Q That's a yes?
13     A Yes.
14     Q Was he building it right on the
15 subfloor?
16     A I think there was some Durarock
17 put down on the floor, which is cement board.
18 They call it Durarock.
19     Q You saw the Durarock?
20     A Yes.
21     Q Do you know who installed the
22 Durarock?
23     A I think Chip, my guy Chip.
24     Q And do you know how it came to

Page 103

1  be that Chip installed the Durarock?
2      A I guess he did it because Joe
3  didn't want to do it, so he did it.
4      Q Joe being Mister --
5      A Joe Falco.
6      Q -- Falco?
7      A Right.
8      Q Do you have some understanding
9  of whether Mr. Falco asked Chip to put the
10 Durarock down?
11         MR. CROWLEY: Objection.
12         MR. BLACKBURN: You can answer.
13     A He probably did ask him. I'm
14 not sure, but he probably did.
15     Q Well, why was the Durarock put
16 down?
17     A As a concrete base between the
18 plywood subfloor and where he was going to
19 put his brick.
20     Q Who made the decision to install
21 the Durarock?
22     A I guess it was Joe Falco.
23         MR. BLACKBURN: This is going to
24 sound like I'm being a smart guy, but I'm

Page 104

1  really not trying to be it.
2      Q Am I to understand that at no
3  point in time up to today have you ever
4  discussed with Chip why he put that Durarock
5  down?
6      A He talked to me about it in
7  casual after he put it down. I said, well,
8  did you glue it and screw it? How did you
9  put it down? He said, yeah, I glued it and
10 screwed it down for him. That's the only
11 conversation I had with him.
12     Q But you never had a discussion
13 with him of why he put it down or who asked
14 him to put it down?
15     A No.
16     Q You didn't ask him to put it
17 down?
18     A No.
19     Q He didn't decide on his own to
20 put it down?
21     A I don't -- I don't think so.
22     Q But you don't know?
23     A I don't know. He and Joe were
24 having conversations back and forth about

Page 105

1  this.
2      Q So the first time you're there,
3  the walls of the fireplace are being built,
4  Durarock is down; correct?
5      A Yes.
6      Q Do you know how many layers of
7  it?
8      A One.
9      Q Is that okay with you?
10     A I really don't know because I'm
11 not the professional that does that. I
12 relied on these guys. If they have -- if
13 they're going to build a fireplace, they
14 should know what they're doing.
15     Q You understand that Mr. Falco's
16 position in this case is that he was only
17 asked to build the decorative fireplace,
18 never one that was going to be used in any
19 conventional way? Do you understand that to
20 be the case?
21     A I understand that, yes.
22     Q You don't agree with that?
23     A No.
24     Q What is -- what conversations

27 (Pages 102 to 105)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**PHILLIP ROTHSCHILD**
**March 30, 2006**

---

Page 106

1  did you have with Mr. Falco about what
2  fireplace, what type of fireplace needed to
3  be built at that Pavia property?
4      A The only conversation I had with
5  him is Julia gave me a sketch. We were all
6  three, four standing there. I handed him the
7  sketch. I said, this is how she wants it
8  built. He was looking at it. He said, okay.
9  I'll build it that way. That's the only
10  conversation I ever had with him.
11      Q Did you have a conversation with
12  him about whether it was going to be a
13  fireplace that needed to accommodate a gas
14  log system?
15      A I did not.
16      Q Were you present for any
17  conversations that anyone else had with him
18  where the subject of it being a gas log
19  system was discussed?
20      A Yes.
21      Q Who?
22      A Mrs. Pavia was there and Mike
23  Carresi was there.
24      Q And who was talking?

---

Page 107

1      A The two of them.
2      Q Who's the two?
3      A Mike Carresi and Mrs. Pavia.
4      Q Mike Carresi and Julia Pavia
5  were talking about what?
6      A Talking about the way the
7  fireplace had to be built off of her sketch.
8  They were discussing how they were going to
9  do it.
10      Q And that discussion included the
11  fact that there was going to be a gas log
12  insert put in there?
13      A Yes.
14      Q Mr. Falco was present for that?
15      A Yes.
16      Q Did that discussion include any
17  conversation between Mrs. Pavia, Mr. Carresi
18  or Mr. Falco about how the fireplace needed
19  to be constructed in order to accommodate
20  that gas log assembly?
21      A I'm not sure because I left
22  probably two or three minutes after that
23  conversation.
24      Q You left and the three of them

---

Page 108

1  were still talking?
2      A Yes.
3      Q They were still there?
4      A Yes.
5      Q Were you present for any
6  discussions after that concerning the method
7  that the fireplace was to be constructed?
8      A Just in brief conversations
9  after it was already started. When I got in
10  that metal piece, I said, you need to tell me
11  how -- what size you want this thing made so
12  I can have it made. That was the only other
13  discussion really. The cap piece he was
14  talking about.
15      Q Is that something that you had
16  seen constructed before for a prefabricated
17  insert fireplace?
18      A Yes.
19          MR. BLACKBURN: Do you mind if
20  we take fifteen minutes?
21          MR. CARPENTER: Sure.
22
23          (Recessed at 12:22 p.m.)
24

---

Page 109

1          (Resumed at 1:02 p.m.)
2
3      Q Mr. Rothschild, I think we left
4  off with conversations that you were part of
5  or present for concerning the fireplace on
6  that day that you were there and Mr. Falco
7  was building the walls of the fireplace but
8  had not yet started the hearth or the hearth
9  extension. Was Mr. Carresi there?
10      A He probably was.
11      Q Do you recall seeing the
12  roughed-in gas pipe at that point?
13      A He had it laying up in the attic
14  where he was getting ready to stick it down
15  through the wall.
16      Q So that the first day that you
17  were there, the gas pipe was not yet -- did
18  not yet enter the room where the fireplace
19  was being built?
20      A Right.
21      Q How long were you there that
22  day?
23      A Maybe an hour, but I was all
24  over the house.

---

28 (Pages 106 to 109)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# PHILLIP ROTHSCHILD
# March 30, 2006

Page 186

1  by a solid fuel burning fireplace?
2      A It's a gas fireplace or wood,
3  either one.
4      Q Prior to the work at the Pavia
5  house, the construction of the addition, were
6  you familiar with the code requirements for a
7  solid fuel burning fireplace?
8      A No.
9      Q Did you know that there were
10 certain code requirements for a solid fuel
11 burning fireplace?
12     A Yes.
13     Q Do you own a copy of the
14 Massachusetts Building Code?
15     A Yes.
16     Q But prior to the Pavia job, you
17 had never made yourself familiar with those
18 provisions relating to solid fuel burning
19 fireplaces?
20     A No.
21     Q And with regard to the
22 construction of the addition at the Pavia
23 house, you were the general contractor for
24 that job?

Page 187

1      A Yes.
2      Q What were your duties and
3  responsibilities as the general contractor?
4      A To do the demolition work, the
5  excavation, the framing, the finish work,
6  insulation, plaster and the finish work.
7      Q That was the scope of work for
8  you?
9      A Yes. We did the kitchen,
10 bathrooms, anything that needed to be done
11 other than the fireplace.
12     Q So it's your position that the
13 fireplace was excluded from your scope of
14 work as the general contractor?
15     A Yes.
16     Q The work that you did supervise
17 as the general contractor, did you hire the
18 subcontractor for that work?
19     A Yes, some of it, the
20 electrician, plumber, plasterer, insulation
21 people and Falco was hired to do the brick
22 work.
23     Q On the work that you acted as
24 the general contractor, did you coordinate

Page 188

1  the work of the subcontractors for that work?
2      A I just told them what I needed,
3  gave them a schedule, yes.  I didn't tell
4  them what to do, how to do it, but I
5  coordinated that; yes.
6      Q After the subcontractors
7  completed their work, did you inspect and
8  approve the work they did?
9      A Yes.
10     Q Would the general --
11         MR. CROWLEY:  Strike that.
12     Q Were the subcontractors at the
13 Pavia house working under your license as a
14 construction supervisor?
15     A The plumber, electrician, all
16 those people pull their own permits.
17     Q So that the licensed trades on
18 the job were not working under your
19 supervisor's license?
20     A Right, yes.
21     Q Did you ever do anything to
22 exclude the fireplace work from the scope of
23 work where you were the general contractor?
24     A Yes.

Page 189

1      Q What did you do?
2      A I told her, Julie, I said, I
3  don't really want anything to do with the
4  fireplace, that's on your nickel, I said to
5  her.
6      Q Did you ever put anything to
7  writing to memorialize your conversation with
8  Julie Pavia excluding the fireplace work from
9  your scope of work?
10     A Other than on the paperwork
11 there where it says no fireplace, I'm not
12 sure where those are now, but it does say it
13 somewhere in there.
14     Q In the exhibits marked today?
15     A Yes.
16     Q That's the only place?
17     A Yes.
18     Q Did you hire Mr. Falco to do the
19 masonry work for the fireplace?
20     A I hired him, Mr. Falco, to do
21 the masonry -- no, to do the masonry work for
22 the addition.
23     Q Who hired Mr. Falco to do the
24 masonry work on the fireplace?

48 (Pages 186 to 189)

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 198

1    Q The fireplace, the masonry work
2   that Mr. Falco did on the fireplace in the
3   addition, that was the construction of a
4   brick structure that was about four feet
5   tall, four feet across?
6       A Yeah, it was in an angle corner
7   like that, maybe three feet something tall,
8   four foot across, two walls this way.
9
10          (Witness Indicating)
11
12      A Then a facade on the front like
13  that.
14
15          (Witness Indicating)
16
17      Q Mr. Falco's son helped him do
18  that?
19      A Yes.
20      Q And you believe that that work
21  took Mr. Falco three or four days to do?
22      A Yes.
23      Q Do you know why it took him so
24  long?

Page 199

1       A Well, he had to wait until he --
2   he got to a point where he had to wait for us
3   to get that cap that we put on there, then he
4   came back to put the cap on, finished up his
5   mortar, then started working on his hearth.
6       Q So the three or four days that
7   Mr. Falco worked on the fireplace, he was not
8   working all day on that?
9       A No.
10      Q Was there any break in time
11  between the time Mr. Falco concluded the
12  exterior work and the beginning of the
13  fireplace inside?
14      A Yes, I think three or four days.
15  He had to block up a window first.
16      Q But he was still doing work at
17  the Pavia home?
18      A Yes.
19      Q Did you understand that the
20  fireplace Mr. Falco built was not a solid
21  fuel burning fireplace?
22      A Yes.
23      Q And the fireplace that Mr. Falco
24  built, it was never intended to be a solid

Page 200

1   fuel burning fireplace, was it?
2       A Not a wood burning fireplace,
3   no.
4       Q So that your framing carpenters
5   did not do anything to frame the addition so
6   as to allow for the construction of a solid
7   fuel burning fireplace?
8       A No.
9       Q You indicated earlier that you
10  had seen a sketch for the fireplace. Do you
11  recall that?
12      A Yes.
13      Q Who produced that sketch?
14      A Mrs. Pavia.
15      Q Do you know whether she had any
16  training as an architect?
17      A I'm not sure.
18      Q What did this sketch consist of?
19      A It showed him how she wanted to
20  do the corner, how far she wanted to come out
21  off the corners, how far she wanted to go in
22  the corner this way, bring the two wings out.
23  She gave him the size of the opening she
24  wanted from the width to the height, then the

Page 201

1   design of the floor in the hearth.
2       Q So that Miss Pavia decided what
3   the dimensions of the fireplace should be?
4       A Yes.
5       Q Did she base that on anything in
6   particular?
7       A Yes. After the fireplace was
8   built, we put some bookcases on the
9   right-hand side of it and the bookcases had
10  to be so big. So it was laid out in the
11  corner so the bookcases would fit.
12      Q Was there any discussion with
13  Miss Pavia about a mantel that was going to
14  go over the fireplace?
15      A Yes.
16      Q What were those discussions?
17      A It was a wood mantel that she
18  designed.
19      Q Did she want the dimensions of
20  the fireplace to fit within the confines of
21  that mantel?
22      A She did it in the reverse. She
23  laid out the fireplace first, then we built
24  the mantel to fit the fireplace.

51  (Pages 198 to 201)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# Exhibit

# 3

1009766v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------X

FIREMAN'S FUND INSURANCE  COMPANY
as subrogee of JULIA PAVIA                                      CIVIL ACTION NO.
77 San Marin Drive                                               05-10827 (DPW)
Novado, California

                              Plaintiff,
              vs

FALCO CONSTRUCTION CORP.;                          JURY TRIAL DEMANDED
P & D BUILDERS, INC.;
and
MICHAEL CARRESI d/b/a CARRESI
PLUMBING & HEATING                                    JANUARY 16, 2006

                         Defendants.
-----------------------------------------------------------------X

**PLAINTIFF FIREMAN FUND'S INSURANCE COMPANY'S RESPONSES**
**TO DEFENDANT P&D BUILDERS, INC.'S FIRST SET**
**OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**
**DATED JUNE 28, 2005**

**Interrogatories**

**Response to Interrogatory #1**
Joseph Franco
Senior Associate
Craig Insurance Services
PO Box 40569
Jacksonville, FL  32203-0569

Responsible for investigating and pursuing subrogation claims on behalf of
Fireman's Fund Insurance Company.

**Response to Interrogatory #2**
The plaintiff's insured suffered fire damage to both her home and the contents of

that home.  She was also forced to incur additional living expenses while repairs were being made.  For more detailed description of damages, see the adjustment reports.

**Response to Interrogatory #3**
Building claim:                        $411,135.32
Contents claim:                        $425,000.00
Alternative Living Expenses:     $42,167.84
These numbers are as of date.  The adjustment is still being processed.  See adjustment documents for further information.

**Response to Interrogatory #4**
The Defendants

Julia Pavia
104 Hammondswood Road
Newton, MA
The insured, has knowledge of the construction project, the fire, and the damages.

Genevieve Bures, CFI
Bures Consultants, Inc.
297 Front Street
Berea, OH
Investigated the fire and made conclusions regarding cause and origin.

Jeffrey Lowe
Engineering and Fire Investigations
Investigated the origin of the fire.

Newton Fire Department
Newton, MA
Responded to fire, suppressed fire and investigated origin of fire.

Joseph Franco
Craig Insurance Services
PO Box 40569
Jacksonville, FL
Investigated the fire and insurance claim on behalf of Fireman's Fund Insurance Co.

Various other contractors and adjusters reviewed the claim and/or provided estimates for certain required work.  See their reports.

**Response to Interrogatory #5**
The Plaintiff has not decided which expert, if any, it intends to call at trial.  Expert

disclosure will be made in conformance with the court's scheduling order.

**Response to Interrogatory #6**

All communications that were detailed in writing are attached hereto.

**Response to Interrogatory #7**

The requested information is not known at this time.  Plaintiff reserves the right to supplement its response.

**Response to Interrogatory #8**

P&D Builders was the general contractor for the construction of the masonry fireplace at the insured premises.  A fire occurred due to improper construction of that masonry fireplace due to the negligence of P&D Builders and/or its subcontractors for which it will be held vicariously liable.  P&D Builders' contract with the insured contained an implied duty to perform their work in a good workman like manner.  They failed to do so and breached that contract.

**Response to Interrogatory #9**

Objection.  This information is specifically within the knowledge of the Defendants and can be gathered by the defendant with greater ease than it can be provided by the Plaintiff.

Notwithstanding this objection, it is the Plaintiff's understanding that P&D Builders acted as a general contractor on the job, Falco Construction constructed the masonry fireplace and Michael Carresi Plumbing installed the gas log appliance in the fireplace.

**Response to Interrogatory #10**

Objection.  This information is specifically within the knowledge of the Defendants and can be gathered by the defendant with greater ease than it can be provided by the Plaintiff.

Notwithstanding this objection, the Plaintiff has not been provided with any of the requested materials.

**Response to Interrogatory #11**

It is the Plaintiff's understanding that P&D Builders acted as a general contractor on the job, Falco Construction constructed the masonry fireplace and Michael Carresi Plumbing installed the gas log appliance in the fireplace.  A combination of negligent installation of both the fireplace and the gas log appliance caused the fire.  P&D Builders is liable as the general contractor.

**Response to Interrogatory #12**

No.

**Response to Interrogatory #13**

The Plaintiff has not been provided with any such documents.

**Response to Interrogatory #14**
Among others, NFPA Standard #54 was violated in that the gas vent and installation of the gas log violated the minimum fire code requirements. NFPA Standard #211 was violated in that the construction of the fireplace, firebox, smoke chamber, heart, hearth extension, flue and chimney all violated the minimum fire code requirements.

**Response to Interrogatory #15**
The contracts have not, as of yet, been provided to the Plaintiff.

**Requests for Production**

**Response to Request #1**
Attached (on cd).

**Response to Request #2**
Attached (on cd).

**Response to Request #3**
Attached (on cd).

**Response to Request #4**
The Plaintiff has not yet determined which, if any, expert it intends to call at trial. Expert disclosure will be made in accordance with the court's scheduling order.

**Response to Request #5**
Attached (on cd).

**Response to Request #6**
Attached (on cd).

**Response to Request #7**
Attached (on cd).

**Response to Request #8**
Attached (on cd).

**Response to Request #9**
Attached (on cd).

**Response to Request #10**
None.

**Response to Request #11**

- 4 -

None.

**Response to Request #12**
None.

**Response to Request #13**
Attached (on cd) all correspondence prior to the filing of the complaint.

**Response to Request #14**
Attached (on cd).

**Response to Request #15**
None.

**Response to Request #16**
None.

**Response to Request #17**
None.

**Response to Request #18**
Attached (on cd).

**Response to Request #19**
Attached (on cd).

**Response to Request #20**
None.

**Response to Request #21**
Attached (on cd).

**Response to Request #22**
Attached (on cd).

**Response to Request #23**
Attached (on cd).

**Response to Request #24**
Attached (on cd).

**Response to Request #25**
Attached (on cd).

**Response to Request #26**
Attached (on cd).

**Response to Request #27**
Attached (on cd).

**Response to Request #28**
No such documents have, as yet, been provided to the Plaintiff.

**Response to Request #29**
No such documents have, as yet, been provided to the Plaintiff.

**Response to Request #30**
None.

**Response to Request #31**
Attached (on cd).

**Response to Request #32**
No such documents have, as yet, been provided to the Plaintiff.

**Response to Request #33**
No such documents have, as yet, been provided to the Plaintiff.

THE PLAINTIFF,

By:_____
Erik Loftus, Esq.
Law Offices of Stuart G.
Blackburn
Two Concorde Way
P.O. Box 608
Windsor Locks, CT 06096
Tel. 860-292-1116
Juris No. 413638

- 6 -

## **CERTIFICATION**

I hereby certify that a copy of PLAINTIFF'S RESPONSES TO DEFENDANT P & D BUILDERS, INC., INTERROGATORIES AND REQUESTS FOR PRODUCTION has been mailed, first class mail, postage prepaid on the 16th day of January, 2006 to the following:

Robert P. Turner, Esq.
Law Offices of Bruce R. Fox
27 B Midstate Office Park
Auburn, MA 01501
(Michael Carresi dba Carressi
Plumbing & Heating)

William Joseph Flanagan, Esq.
Curtis L. S. Carpenter, Esq.
Morrison & Mahoney, LLP
250 Summer Street
Boston, MA 02210
(P & D Builders, Inc.)

David J. Crowley, Esq.
Patricia A. Larkin, Esq.
John F. Toomey, Esq.
Toomey & Yudysky LLP
99 Summer Street
Boston, MA 02110
(Falco Construction Corp.)

David F. Hassett, Esq.
Scott T. Ober, Esq.
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, MA 01608
(Heatmaster, Inc., Third party Defendant)

Erik Loftus, Esq.

# Exhibit

# 4

1009766v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------X

FIREMAN'S FUND INSURANCE COMPANY as
subrogee of JULIA PAVIA                                      CIVIL ACTION NO.
77 San Marin Drive                                          05-10827 DPW
Novado, California

                          Plaintiff,

        vs

FALCO CONSTRUCTION CORP.;
P & D BUILDERS, INC.;
and
MICHAEL CARRESI d/b/a CARRESI                               APRIL 21, 2006
PLUMBING & HEATING

                          Defendants.
-------------------------------------------------------------X

## PLAINTIFF FIREMAN'S FUND'S RULE 26(a)(2)(B) DISCLOSURE OF EXPERT WITNESS

### NAME AND ADDRESS OF WITNESS

Genevieve Bures, CFI
Bures Consultants, Inc.
297 Front Street
Berea, OH  44017

### SUBJECT MATTER ON WHICH THE EXPERT IS EXPECTED TO TESTIFY

Ms. Bures is expected to testify concerning her investigation and opinions

regarding the cause and origin of the January 25, 2004 fire loss that occurred at the

residence of Julia Pavia, located at 104 Hammondswood Road, Newton.

## THE SUBSTANCE OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY

Ms. Bures is expected to testify that, based upon her investigation and inspection, the origin of the January 25, 2004 fire was in the floor construction directly below the gas log fireplace in the second floor office at the premises. Ms. Bures is expected to testify that the cause of the January 25, 2004 fire was the accidental ignition of the combustible floor construction due to heat conducting down through the masonry floor of the fireplace and igniting the plywood and joists. Additionally, Ms. Bures is expected to testify that NFPA Standards 211 and 54 were violated during the construction of the fireplace and chimney including the construction of the hearth directly atop combustible materials. Ms. Bures' further opinions are expressed in the attached report.

## SUMMARY OF THE GROUNDS FOR EXPERT'S OPINION

Ms. Bures will testify based on her education and experience as a certified fire inspector, as well as her investigation and her inspections of the premises located at 104 Hammondswood Road, Newton. A list of Ms. Bures' qualifications, publications, and testimony history is attached.

THE PLAINTIFF,

By:_____
        Erik Loftus, Esq.
        Law Offices of Stuart G. Blackburn
        Two Concorde Way
        P. O. Box 608
        Windsor Locks, CT  06096
        860-292-1116
        BBO# 656315

4

## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed, first class mail, postage prepaid on the 21st day of April, 2006 to the following:

Robert P. Turner, Esq.
Law Offices of Bruce R. Fox
27 B Midstate Office Park
Auburn, MA  01501
(Michael Carresi dba Carressi
Plumbing & Heating)

William Joseph Flanagan, Esq.
Curtis L. S. Carpenter, Esq.
Morrison & Mahoney, LLP
250 Summer Street
Boston, MA 02210
(P & D Builders, Inc.)

David J. Crowley, Esq.
Patricia A. Larkin, Esq.
John F. Toomey, Esq.
Toomey & Yudysky LLP
99 Summer Street
Boston, MA  02110
(Falco Construction Corp.)

David F. Hassett, Esq.
Scott T. Ober, Esq.
Hassett & Donnelly, P.C.
484 Main Street, Suite 560
Worcester, MA  01608
(Heatmaster, Inc., Third party Defendant)

Erik Loftus, Esq.

# Exhibit

# 5

1009766v1

District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
     Plaintiff

vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
     Defendants

vs.

Heatmaster, Inc.,
     Third-Party Defendant

**DEPOSITION OF JOSEPH FALCO, SR.**, a witness
called on behalf of the Plaintiff, pursuant to the
Federal Rules of Civil Procedure, before Jessica L.
Bisaillon, a Registered Professional Reporter,
Certified Shorthand Reporter, and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Toomey & Yudysky, LLP, 99 Summer Street,
Boston, Massachusetts 02110, on Friday,
March 3, 2006, commencing at 12:20 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

A P P E A R A N C E S:

The Law Offices of Stuart G. Blackburn
  BY:  Stuart G. Blackburn, Esquire
  Two Concorde Way
  Post Office Box 608
  Windsor Locks, Connecticut 06096
  Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
  BY:  David J. Crowley, Esquire
  99 Summer Street
  Boston, Massachusetts 02110
  Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
  BY:  Curtis L.S. Carpenter, Esquire
  250 Summer Street
  Boston, Massachusetts 02210
  Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
  BY:  Robert T. Turner, Esquire
  27B Midstate Drive, Suite 100
  Auburn, Massachusetts 01501
  Appearing on behalf of Michael Carresi,
  d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
  BY:  Scott T. Ober, Esquire
  484 Main Street, Suite 560
  Worcester, Massachusetts 01608
  Appearing on behalf of Heatmaster, Inc.

---

### I N D E X

| DEPOSITION OF: | PAGE |
|---|---|
| JOSEPH FALCO, SR. | |
| Examination by Mr. Blackburn | 4 |
| Examination by Mr. Turner | 49 |
| Examination by Mr. Ober | 61 |
| Examination by Mr. Carpenter | 63 |
| Reexamination by Mr. Blackburn | 73 |
| Reexamination by Mr. Turner | 80 |

### E X H I B I T S

| EXHIBIT NO. | PAGE |
|---|---|
| (Plaintiff's) | |
| 1  Hand-drawn diagram; a total of one page. | 25 |
| 2  Hand-drawn diagram; a total of one page. | 40 |

1     **JOSEPH FALCO, SR.,** after having been

2   satisfactorily identified by the production of

3   his Massachusetts driver's license and having

4   been duly sworn by the Notary Public, was

5   examined and testified as follows:

6      MR. BLACKBURN:  And we'll have the

7   same stipulations that we've had for the last

8   deposition.  Is that fine with everybody?

9      MR. CROWLEY:  Yes.

10      MR. BLACKBURN:  You want him to read

11   and sign?

12      MR. CROWLEY:  Yes, please.

13      MR. BLACKBURN:  Okay.

14     **EXAMINATION BY MR. BLACKBURN:**

15 Q.  Good afternoon, Mr. Falco.  My name is Glenn

16   Blackburn.  I represent the Fireman's Fund

17   Insurance Company in this case.  They were the

18   insurance company for the Pavias.

19 A.  Right.

20 Q.  Have you ever had your deposition taken before?

21 A.  No.

22 Q.  Let me give you a few ground rules.  Some of

23   these you may have -- you may have heard before.

24     I'm going to ask you some questions today

5

```
1    about the work that you did out at the Pavia
2    residence prior to the fire.
3         If at any time I'm unclear to you or you
4    don't understand a word that I use or something
5    that I say, please stop me, ask me to repeat the
6    question, ask a different word.  I want to make
7    sure that you and I --
8  A.  Okay.  I understand you.
9  Q.  Yeah.  Fair enough.
10 A.  Okay.
11 Q.  The other instruction that I'll give you is that
12     the young lady is taking down everything that we
13     say.  While ordinarily you and I could sit here
14     and have a conversation that involved both words
15     and nods of the head and things like that, at
16     least while we're on the record, we need to
17     converse only with words.  All right?
18 A.  Okay.
19 Q.  I think what you'll find -- because my experience
20     is that when I question people, I have a tendency
21     to stutter a bit and draw out my questions.  I
22     think what you're going to find is that often
23     you're going to understand the question that I've
24     asked you before I've finished asking it.
```

6

```
1  A.  That's okay.  I got a dialect too from the old
2      country.
3  Q.  And the tendency is that the witness starts
4      giving the answer before I've finished asking the
5      question.
6  A.  Right.
7  Q.  It's very difficult for the young lady to take us
8      both down speaking at the same time.  So try to
9      resist that urge to start answering my questions
10     before I'm done sputtering them out, and I'll
11     give you the same courtesy when you're giving
12     your answers.  All right?
13 A.  Okay.
14 Q.  What's your address, please?
15 A.  5 Coolidge Circle, South Easton, Mass.
16 Q.  And how long have you lived at that address?
17 A.  Oh, I would say about 24 years now.
18 Q.  You have a business; correct?
19 A.  Yes.
20 Q.  What is the name of the business?
21 A.  Falco Construction.
22 Q.  Is that business a corporation?
23 A.  No.  A company.
24 Q.  Have you ever had a corporation that you did
```

7

```
1      business under?
2  A.  Yes.  Years and years ago.
3  Q.  And what was the name of that corporation?
4  A.  Falco Construction.
5  Q.  Incorporated?
6  A.  Yeah.  At that time, yeah.
7  Q.  Okay.  How long ago did that corporation seek to
8      exist?
9  A.  Oh, God.  Years and years ago.  I would say about
10     25 years ago, because I was doing a lot of
11     commercial work, and I just didn't want to do
12     commercial work anymore and just went down just
13     to regular house -- you know, homeowners.
14 Q.  So at the time that you were doing this work at
15     Mrs. Pavia's house before the fire, you were
16     operating as a sole proprietor --
17 A.  Yes.
18 Q.  -- with a trade name of Falco Construction?
19 A.  Right.
20 Q.  And was that business just your business?
21 A.  Just my business.  Yeah.
22 Q.  Did you have any partners?
23 A.  No.  I just got -- I've had my two sons working
24     for me.
```

8

```
1  Q.  Okay.  But they did not have any ownership
2      interest in the business?
3  A.  No.
4  Q.  You're a mason; correct?
5  A.  Yes.
6  Q.  Do you do any work other than masonry work?
7  A.  That's all I know how to do.
8  Q.  How long have you been doing masonry work?
9  A.  Oh, God.  Forty-three years.
10 Q.  And how long have you been doing that masonry
11     work by yourself or with the company that you
12     owned?
13 A.  For 43 -- no.  I'm sorry.  I used to be in the
14     union for about seven years, and then I went on
15     my own.  So out of 43 years, deduct seven.
16 Q.  Okay.  So for the last 36 years, you've worked on
17     your own?
18 A.  Right.
19 Q.  You've been building fireplaces that whole time?
20 A.  I probably built about a million of them.
21     Stopped counting 25 years ago.
22 Q.  During the course of that time that you've been
23     building fireplaces, have the requirements
24     changed for the construction of the fireplaces
```

9

```
 1      pursuant to the codes?
 2   A. Yes.  Big time.  Big time.  Now you need -- you
 3      need -- you need the rough inspection, finish
        inspection, final inspection.  Before, you just
 5      build a chimney, and building inspectors weren't
 6      even around.  Now you can't breathe unless you
 7      call the building inspector and -- for a rough
 8      and finish.
 9   Q. And how did you learn about those changes in the
10      code?
11   A. You learn by doing it for so many years.  And you
12      got the code book, and you go according to the
13      code book.  And that's how you build them.
14   Q. So you have code books?
15   A. Yes, I do.
16   Q. You keep them on your truck?
17   A. I don't need them anymore.  They're all up here
18      after 45 years.
19   Q. And "up here" means in your head?
20   A. In my head, yeah.
21   Q. When there are changes that occur with the code,
22      how do you learn about those?
23   A. Usually if there is a change while I call for a
        rough inspection and -- the building inspector
```

10

```
 1      says, oh, don't you know about this or don't you
 2      know about that?
 3         But they haven't changed for years now.
 4      And I think the way you build them today, you
 5      don't need to change them, because they're really
 6      strict rules to a fireplace.
 7   Q. Do you hold any licenses?
 8   A. No.  A mason -- a mason contractor does not
 9      require to have a license.  We usually work under
10      the general contractor's license, because he
11      pulls the permit, he calls for a rough inspection
12      and a finish, final inspection.  I don't.  I just
13      build it, and he's responsible by him calling
14      the -- the inspectors.
15   Q. Are you a member of any associations about your
16      trade?
17   A. No.
18   Q. When is the first time that you met Phil
19      Rothschild?
20   A. Oh, I think about a year -- about six months or
21      eight months before I did the -- the exterior
22      veneer for him, because he heard about me, and I
23      was very well referred.  And I met him, and I did
24      a couple of jobs for him.  Very, very pleased.
```

11

```
 1      And that's it.
 2   Q. Do you know who it was that introduced you to
 3      him?
 4   A. Oh, God.  I don't know.  I don't really remember.
 5      You know, it just -- word travels.  Oh, Joe
 6      Falco.  Call Joe Falco.  He's good.  This and
 7      this and that, and word goes to word.  I don't
 8      advertise or anything like that.  I just -- I
 9      don't look for work.  They -- believe me.  They
10      come to me.  After so many years, you earn that
11      right, I guess, if you're good.
12   Q. Do you recall what the jobs were that you did for
13      Mr. Rothschild prior to the Pavia house?
14   A. Yes.  I did a little tiny addition in Newton
15      for -- for a psychiatrist.  I forget her name.
16      As a matter of fact, she writes books too.  She's
17      a Harvard -- Harvard graduate.  Martha or
18      something.  I did a job for her, a little tiny
        addition on her home that she was going to turn
19      into an office area for her patients, because she
20      worked out of the house, and then a walkway in
21      the back from the back to the -- to the driveway
22      so the people can go and use that exit in the
23      back to go into the driveway.  And that's it.
```

12

```
 1         Then after that, Phil asked me to do the
 2      exterior addition on Julia Pavia's house.
 3   Q. So there was one job before the Pavia house?
 4   A. Right.
 5   Q. In addition to doing the walkway at that other
 6      job, what did the inside work entail?
 7   A. It was an outside little addition.  Brick
 8      veneered the outside.  A little like a --
 9      probably a 10-by-10 addition, because her house
10      was already exterior brickwork on the exterior,
11      so we matched the existing.
12   Q. No fireplace?
13   A. No fireplace, no.
14   Q. Just a brick veneer and --
15   A. Just a brick veneer.
16   Q. And the outside walkway?
17   A. And an outside walkway.
18   Q. Other than your two sons, back at this time, did
19      you have anybody else that worked for you?
20   A. No.
21   Q. Through the course of doing the job at Mrs.
22      Pavia's house, did you have anybody else that
23      worked for you other than your two sons?
24   A. No.
```

13

1  Q.  After the Pavia house, did you do any other work

2      with Mr. Rothschild's company?

3  A.  Nope.

4  Q.  Why not?

5  A.  Because I didn't like his attitude, and I don't

6      like the way he tend business.

7  Q.  What was it about the manner in which he did

8      business that turned you off?

9  A.  He was very arrogant, and he thought he -- he's

10     Mister-know-it-all.

11 Q.  At the point where -- withdrawn.

12         Did he ask you to do any other jobs after

13     the Pavia house?

14 A.  Yes.

15 Q.  What did he ask you to do?

16 A.  Another job.  I think it was in Needham.  I says

17     no, thank you, good-bye.  I do not want to do no

18     more work for you.

19 Q.  And at that point, had there been anybody that

20     had implicated you in causing the fire at the

21     Pavia house?

22 A.  First of all, this was way, way, way, way before

23     the fire.  It didn't have nothing to do -- I

       didn't know until the -- the fire until about a

14

1      year later.

2  Q.  Okay.

3  A.  This was right after Julia's house, after I did

4      the exterior on Julia Pavia's house.  And then he

5      asked me to do another job for him, and I said

6      no, thank you.

7  Q.  So your decision to stop doing work or any

8      further work with Mr. Rothschild predated the

9      fire?

10 A.  Yes.  You mean before the fire?

11 Q.  That's -- yeah.  Good for you.  Good for you.

12     Yeah.  Yes.

13 A.  Okay.

14 Q.  Your decision to do any work for Mr. Rothschild

15     was before the fire; right?

16 A.  Right.

17 Q.  Okay.  Who was it that contacted you to do the

18     work at the Pavia house?

19 A.  Phil.

20 Q.  Mr. Rothschild directly?

21 A.  Yeah.

22 Q.  What did he ask you to do?

23 A.  I got an exterior on an addition in Chestnut Hill

24     in Newton.  I call it Newton, but I guess it's

15

1      Chestnut Hill/Newton.  You know, so -- so right

2      after I was doing the brick -- I just finished

3      the brick for the psychiatrist, and then I went

4      from the psychiatrist to Chestnut Hill.

5  Q.  Did he ask you for a quote?

6  A.  For a price?

7  Q.  Yes, sir.

8  A.  Yes.

9  Q.  And did you give that to him in writing?

10 A.  No.  It was all shake -- that's how I do my job.

11     Shake my hand, shake your hand, and that's it.

12 Q.  And how -- so you told him how much you were

13     going to charge him?

14 A.  Right.

15 Q.  And what was -- how was that based?  Was it a

16     full price or was it so much for the time or

17     what?

18 A.  For -- I just look at the job, estimate how many

       bricks there are and what type of bricks they

       are.  And this happened to be a very difficult

21     job because it's a water-struck brick.  And a

22     water-struck brick is a nightmare to lay because

23     it doesn't absorb the water like a regular porous

24     brick.  So it would be like much more than laying

16

1      a regular brick.

2  Q.  So did you give him one price for the whole job?

3  A.  One price for the exterior.

4  Q.  Do you remember what that price was?

5  A.  I think it was like about -- I would say like

6      about 23, 24,000 with -- I'm pretty sure it was

7      also included with material.  Don't quote me on

8      that.  I'm not sure.  Because like I said, I

9      forgot.

10 Q.  But do you have a recollection as you sit here

11     today that you purchased the materials?

12 A.  I'm pretty sure I did, because he doesn't know

13     supply yards.  So I think I got the bricks out of

14     my supplier.

15 Q.  Okay.  And what were the terms of payment?

16 A.  The terms were -- like if I says, hey, Phil, I

17     need five grand, the following week I would say,

18     hey, Phil, give me another seven or whatever, and

19     then the final payment.

20 Q.  Okay.  So do you have a recollection of whether

21     you received any payment before you started the

22     job?

23 A.  I never ask for a payment up-front.  My

24     reputation -- every time I do a job, I never ask

17

```
 1      for money up-front unless it's like -- unless
 2      it's like a -- like I got to get like 10 or
 3      $15,000 worth of material.  This was like
 4      probably about a couple of thousand dollars of
 5      material.  So I basically buy it myself.  And
 6      then the first payment, I says, give me such and
 7      such amount.
 8   Q.  To do this job, did it require you and both of
 9      your sons to be there every day?
10   A.  Yes.
11   Q.  And when you went to do the job, what work had
12      been done before you started doing the brick
13      veneer?
14   A.  The framing, framing out the addition, all wood
15      structure with plywood exterior.  And then I go
16      in there and put the Tyvak paper on and start
17      laying bricks.  And that's it.
18   Q.  Okay.  Was the roof on?
19   A.  Yes, it was.  Yeah.
20   Q.  Was the slate on the roof yet?
21   A.  Yeah -- no, I don't think so.
22   Q.  Okay.  So everything was framed, the walls and
23      the roof?  True?
24   A.  Right.  Yeah.
```

18

```
 1   Q.  And whatever plywood that would have been
 2      covering the walls and the roof was in place?
 3   A.  Uh-huh.
 4   Q.  That's a yes?
 5   A.  Yes.
 6   Q.  And -- but to your recollection, there was no
 7      finished roofing that was -- had been put on?
 8   A.  No.  Because that was like an old slate roof, and
 9      it's pretty hard to get the company to do the
10      that type of work to -- to match the existing
11      roof.  So, I mean, you just can't get a new roof
12      and match -- to blend in with the old, old roof.
13   Q.  Do you know what the company was that eventually
14      put on the slate roof?
15   A.  No, I don't.  There's not -- there's not too many
16      of them that's -- I know that for sure -- that
17      does that in that area, --
18   Q.  You were gone --
19   A.  -- I assume.
20   Q.  You were gone by the time that --
21   A.  Yeah.
22   Q.  -- whoever came in to do it?
23   A.  Oh, yeah.  I was all -- I was -- I was history.
24   Q.  During the time that you were installing the
```

19

```
 1      brick on the exterior of the house, did you go
 2      inside at all?
 3   A.  Well, the only time that we went inside was early
 4      in the morning.  Knocked at the door, and Julia
 5      let us in.  And that way I can go up -- upstairs
 6      or downstairs to turn the water on.  Or my son.
 7      But usually we would go in the backyard.  There's
 8      a driveway.  And that's where the addition was,
 9      where the driveway is.
10   Q.  And where were you turning the water on?
11   A.  I think it was like in the -- this -- the garage
12      were below the addition.  And right around the
13      corner, there would be a hose that we -- because
14      it was cold, and we would have to turn it off and
15      on every day.
16   Q.  In the basement?
17   A.  In the basement, yeah.
18   Q.  And I guess that gets to my next question,
19      whether you recall what time of year it was that
20      you were doing this.  You said it was cold?
21   A.  It was like -- that was a pretty mild winter.  I
22      was surprised that we were working.  I think it
23      was like in January or by the middle or -- or the
24      beginning of February.  And I was surprised,
```

20

```
 1      because I said, wow, this is good weather.  You
 2      know, just like this year.
 3   Q.  You like that?
 4   A.  Hey, we got to eat.  So, I mean, that's -- you --
 5      you get a cold winter, you can't lay bricks.  It
 6      just freezes.
 7   Q.  On any of those occasions while you were doing
 8      the exterior brick and you entered the house, did
 9      you go into the addition area?
10   A.  Well, if I -- the addition was right there.  So I
11      would walk up the stairs, and I would --
12      sometimes, because I didn't want to try -- I
13      didn't want to climb the scaffolding.  I would go
14      right through the window.  It's much easier.  You
15      know, I'm getting old.  I don't want to be
16      climbing morning, noon, and night, you know, up
17      and down.
18   Q.  During the time that you were installing the
19      exterior brick, were there any stairways that had
20      been put in place?
21   A.  Yeah.  There were the stairways to go up to
22      the -- from the first floor to the second floor.
23   Q.  In the addition?
24   A.  Yeah.
```

21

| | | |
|---|---|---|
| 1 | Q. | Okay. Had -- had the subflooring been put down |
| 2 | | in the addition by -- at the time that you were |
| 3 | | doing the exterior brick? |
| 4 | A. | It's just the plywood. Just -- just the |
| 5 | | subfloor. Yeah. Got to walk on something. |
| 6 | Q. | Had there been any finished work done to any of |
| 7 | | the floors or the walls at that point? |
| 8 | A. | No. It wasn't -- it was -- it was -- it just |
| 9 | | got -- it just got framed. We were right on top |
| 10 | | of the framers. So as soon as they finished, |
| 11 | | boom, and the windows were in, we would start |
| 12 | | laying bricks. |
| 13 | Q. | At some point were you asked to do something else |
| 14 | | at the property? |
| 15 | A. | Nope. Not at all. |
| 16 | Q. | Were you ever asked to do any work on the |
| 17 | | existing fireplace that was in the main portion |
| 18 | | of the home, not the addition? |
| 19 | A. | Nope. |
| 20 | Q. | At some point did someone approach you to put |
| 21 | | some type of fireplace structure into the |
| 22 | | addition? |
| 23 | A. | The only time they approached me is the day that |
| 24 | | I finished the exterior. And Phil came up to me |

22

| | | |
|---|---|---|
| 1 | | and said, Joe, I need you to do a little job for |
| 2 | | me up on the second floor. Julia wants to |
| 3 | | surprise her husband, because that was going to |
| 4 | | be his office area, with a decorative fireplace. |
| 5 | | I says, let's go look at it. |
| 6 | | So he told me what -- we went up on the |
| 7 | | second floor. He says, this is what I want, a |
| 8 | | decorative fireplace, just so it -- so Julia's |
| 9 | | husband will have something to look at besides |
| 10 | | the -- the -- the four walls. |
| 11 | Q. | Did he show you the location of where that was |
| 12 | | going to be? |
| 13 | A. | Yes. |
| 14 | Q. | And what was the location? |
| 15 | A. | Right in the -- on the -- when you go upstairs, |
| 16 | | right in this corner right here. That would be a |
| 17 | | corner one. |
| 18 | Q. | And the corner that you're referring to, where |
| 19 | | was that in relationship to the main house? |
| 20 | A. | I don't get you. |
| 21 | Q. | Okay. |
| 22 | A. | It's the -- it would be the main house. It would |
| 23 | | be the back of the house. And then the addition |
| 24 | | is right here, and this is the back of the house. |

23

| | | |
|---|---|---|
| 1 | | And the back of the house is all ext -- it was -- |
| 2 | | it was an exterior wall with bricks -- brick |
| 3 | | thing there. Then they added on the addition. |
| 4 | | And the unit that they wanted was right on the |
| 5 | | corner. |
| 6 | Q. | Okay. So the corner consisted of the brick -- |
| 7 | | the brick exterior wall of the main house? |
| 8 | A. | Right. |
| 9 | Q. | True? |
| 10 | A. | Yeah. |
| 11 | Q. | And the other side of the corner, was that new? |
| 12 | A. | Right. |
| 13 | Q. | A new wall? |
| 14 | A. | Yeah. |
| 15 | Q. | That had recently been framed? |
| 16 | A. | Right. |
| 17 | Q. | So when you're looking at this for the first time |
| 18 | | with Mr. Rothschild, he's pointing to this |
| 19 | | corner -- |
| | A. | Yeah. |
| 21 | Q. | -- of this room? |
| 22 | | Would I be correct that one of the walls |
| 23 | | that you're looking at of the corner was the old |
| 24 | | exterior wall of the main house? |

24

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And the other wall that you're looking at was a |
| 3 | | new wood-framed structure? |
| 4 | A. | Yeah. |
| 5 | Q. | Okay. Had anything been put over that framing, |
| 6 | | that interior framing on that new wall? |
| 7 | A. | No. It was just exposed bricks. |
| 8 | Q. | Exposed bricks from where? |
| 9 | A. | From the old existing -- from the -- the original |
| 10 | | house. The upstairs was all exposed bricks on |
| 11 | | the ext -- on the old exterior wall. |
| 12 | Q. | Right. And then the second wall that -- |
| 13 | A. | Then the second wall. Then there's the |
| 14 | | exterior -- this is the house. That's the |
| 15 | | exterior wall. That was all brick. And then |
| 16 | | from there to here, this is the addition. And I |
| 17 | | would be working right on the other side of this |
| 18 | | wall, on the outside exterior. |
| 19 | Q. | Okay. I've just drawn a corner on this piece of |
| 20 | | paper. I put an X next to one of the lines |
| 21 | | that's a corner. Okay? You with me? |
| 22 | A. | Yeah. No. Well... |
| 23 | Q. | But I'm wrong already, I can tell. |
| 24 | A. | Like you want me to do it? |