UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE FIREMAN'S FUND INSURANCE COMPANY as subrogee of JULIA PAVIA 77 San Marin Drive Novado, California, Plaintiff | ) ) ) ) | |
| | ) | CIVIL ACTION NO. 05-cv-10827-DPW |
| VS. | ) ) | |
| FALCO CONSTRUCTION CORP., P & D BUILDERS, INC. and MICHAEL CARRESI d/b/a CARRESI PLUMBING & HEATING, Defendants | ) ) ) ) ) | |

## DEFENDANT, FALCO CONSTRUCTION CORPORATION'S MOTION _IN LIMINE_ TO EXCLUDE PLAINTIFF'S PROPOSED EXHIBITS

The Defendant, Falco Construction Corporation ("Falco"), hereby moves this Honorable Court, prior to trial and prior to impaneling a jury in this case, to exclude the following exhibits proposed by the Plaintiff: Estimates of Loss prepared by Richard Mancuso; Firemen's Fund's Sworn Statements In Proof of Loss; List of Damage Contents; P&D Builder's invoices for post-damage repair and Firemen's Fund draft payment detailed report.

In support hereof, Falco states as follows:

1.     At the outset, Falco objects to the Plaintiff's proposed exhibits as the documents are inadmissible hearsay.

2.     Relative to the Estimates of Loss prepared by Richard Mancuso, Falco submits that said Estimates of Loss are inadmissible because they contain expert opinion, and the Plaintiff failed to disclose Mr. Mancuso as an expert witness pursuant to Fed.R.Civ.P.26(a)(2)(B).

3.    Falco further submits that the Plaintiff has failed to demonstrate that the Estimates of Loss are relevant to the material issues in dispute.

4.    In addition, Falco submits that the Sworn Statement In Proof of Loss with respect to claim no. 110-04-267142 and dated December 14, 2005 is inadmissible because it is irrelevant, inaccurate and misleading and contains expert opinion for which there is no factual or technical basis.

5.    Specifically, P&D Builders performed construction work to repair the damage caused by the water loss related to the broken water pipe, and the damage caused by the subject fire on a time and materials basis. However, P&D Builders and its subcontractors failed to keep separate time and material records for work that was performed to repair damage caused by the broken water pipe work. Rather, the work that was performed to repair damage caused by the broken water pipe was included in invoices for work performed to repair damage caused by the subject fire. [See, Exhibit No. 1, Deposition of Philip Rothschild pgs. 1-2 and 225-230; Exhibit No. 2, Deposition of Michael Roach pgs. 1-2, 45-48 and 52-58].

6.    Accordingly, said Sworn Statement in Proof of Loss is not admissible because the actual amount of money spent to repair damage caused by the broken water pipe was in excess of the $425,000 amount listed in the Sworn Statement In Proof of Loss.

7.    Falco further submits that the Sworn Statement In Proof of Loss with respect to claim no. 110-04-267142 and dated December 14, 2005 contains improper expert opinion as to the value of the damage caused by the water loss, in that there will be no expert testimony at trial as to the value of the services rendered. Lastly, Falco submits that Plaintiff failed to

disclose the authors of the document as expert witnesses pursuant to
Fed.R.Civ.P.26(a)(2)(B).

8.    Moreover, Falco submits that all Sworn Statements in Proof of Loss related to claim
no. 004-04-069286 are inadmissible because they are irrelevant, inaccurate, misleading
and contain expert opinion for which there is no factual or technical basis.

9.    As noted above, P&D Builders performed construction work to repair the damage
caused by the water loss from the broken water pipe and damage caused by the subject fire
on a time and materials basis. However, P&D Builders and its subcontractors failed to keep
separate time and material records for work that was performed to repair damage caused by
the broken water pipe work. Rather, the work that was performed to repair damage caused
by the broken water pipe was included in invoices for work performed to repair damage
caused by the subject fire. Accordingly, Falco submits that said Sworn Statements in Proof
of Loss are not admissible because the actual amount of money spent to repair damage
caused by the subject fire was less than the amounts listed in the Sworn Statements in Proof
of Loss.

10.    Falco further submits that the Sworn Statements in Proof of Loss related to
claim no. 004-04-069286 contain improper expert opinion as to the value of the damage
caused by the fire loss. Also, Falco submits that the documents contain inadmissible expert
opinion as to the caused of the alleged fire. Lastly, Falco submits that Plaintiff failed to
disclose the authors of the documents as expert witnesses pursuant to
Fed.R.Civ.P.26(a)(2)(B).

11.    Additionally, Falco submits P&D Builders' billing and invoice for post-loss repairs
is inadmissible, in that they are irrelevant, inaccurate and misleading. As set forth above,

P&D Builders and its subcontractors failed to maintain accurate time and material billing records. Specifically, Falco submits that work performed to repair damage caused by the burst water pipe was billed as work performed to repair damage caused by the subject fire.

12.    Lastly, Falco submits that Plaintiff's draft payment detailed report is not admissible because it is irrelevant, inaccurate and misleading. Moreover, the amounts set forth in the draft summary are not supported by admissible expert opinion.

WHEREFORE, the Defendant, Falco Construction Corp. requests the Court to preclude the above exhibits.

Respectfully Submitted,
The Defendant,
Falco Construction Corporation,
By its attorneys,

 /s/ David J. Crowley
John F. Toomey, BBO # 500160
David J. Crowley, BBO # 630169
TOOMEY & YUDYSKY LLP
99 Summer Street
Boston, MA 02110
(617) 946-0930

Date: 5/23/07

4

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on the
above date.


/s/  David J. Crowley


DC  82220.1  5/23/07

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the above date.


/s/ John F. Toomey


DC  82220.1  5/22/07

# EXHIBIT NO. 1

**PHILLIP ROTHSCHILD**
**March 30, 2006**



Page 1

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5

 6

 7   * * * * * * * * * * * * * * * * * * * * * * * * * * *

 8   THE FIREMAN'S FUND INSURANCE

 9   COMPANY as subrogee of JULIA PAVIA,

10                    Plaintiff

11   vs.

12   FALCO CONSTRUCTION CORP., P&DK

13   BUILDERS, INC. and MICHAEL

14   CARRESI d/b/a CARRESI PLUMBING &

15   HEATING,                      C.A. 05-10827DPW

16                    Defendants

17   vs.

18   HEATMASTER, INC.,

19                    Third-party Defendant

20   * * * * * * * * * * * * * * * * * * * * * * * * * * *

21

22

23

24
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**PHILLIP ROTHSCHILD**
**March 30, 2006**



Page 2

1

2

3

4

5

6

7

8

9

10

11          DEPOSITION OF: PHILLIP ROTHSCHILD

12              MORRISON, MAHONEY, LLP

13                 250 Summer Street

14              Boston, Massachusetts

15       March 30, 2006          10:20 a.m.

16

17

18

19

20

21             Darlene M. Coppola

22       Registered Professional Reporter

23        Certified Professional Reporter

24

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 225

1    existing zero clearance fireplace?

2        A Wood burning fireplace, yes.

3        Q Is there such a thing as a zero

4    clearance wood burning fireplace?

5        A Yes.

6        Q What is that?

7        A It's the same as a gas

8    fireplace, only you open up the doors, put

9    wood in there and it works the same way.

10        Q It's a factory built unit?

11        A Yes.  You can plaster right to

12    it.

13        Q So they're self-contained?

14        A Yes.

15        Q Who did that work; Mr. Carresi?

16        A Yes.

17        Q Now, after the fire, you were

18    hired to repair the addition and repair the

19    kitchen; is that correct?

20        A Yes.

21        Q You hired Mr. Roach to assist

22    you with that work?

23        A Yes.

24        Q And you hired other

**PHILLIP ROTHSCHILD**
**March 30, 2006**

1    subcontractors to work there as well?

2         A Yes.

3         Q Those subcontractors were paid

4    on a time and materials basis?

5         A Yes.  Some of the subs she paid.

6         Q Meaning Miss Pavia paid them

7    directly?

8         A Yes.

9         Q Did Mr. Roach have two gentlemen

10   working for him?

11        A Yes.

12        Q And --

13        A He's the subcontractor from

14   2000, after that other first job until now.

15   He had two other guys, Rick and Pedro.

16        Q Mr. Roach is a subcontractor and

17   was paid on a time and materials basis?

18        A Yes.

19        Q When Mr. Roach worked for you on

20   the period of time after the fire, he was

21   working on the kitchen work and on the

22   addition work; is that fair to say?

23        A Uh-huh.

24        Q Yes?

PHILLIP ROTHSCHILD
March 30, 2006

Page 227

1      A Yes.

2      Q And during that time period, did

3  Mr. Roach and his two assistants do anything

4  to keep track of their hours with respect to

5  the work they did solely on the kitchen?

6      A No.

7      Q So that when Mr. Roach and his

8  workers provided you with time slips, they

9  merely gave you the total hours they worked?

10     A Yes.

11     Q And there was no designation as

12 to which hours the subcontractors worked on

13 the kitchen versus the addition?

14     A No.

15     Q Is there any way for you to

16 figure out now what hours of labor were spent

17 on the kitchen versus the addition?

18     A Yes, I could probably do it by

19 going back through all the paperwork.

20     Q How would you do that?

21     A I'd have to go home, get my

22 folder.  I've got two folders about that

23 thick.  I'd just go through them and read his

24 slips, Chip's slips, try to figure it out.

**PHILLIP ROTHSCHILD**
**March 30, 2006**

Page 228

1       Q Well, isn't it true that Mr.

2   Roach and his workers were working on the

3   kitchen and on the addition on the same days?

4       A Yes.

5       Q So how could you figure out what

6   hours were spent on the kitchen versus the

7   addition?

8       A It would be very difficult.  I

9   would have to kind of split it up.  I know

10  approximately how much time it took to do

11  certain aspects of the job.  That would be

12  the only way I could do it.

13      Q But you couldn't do it with any

14  level of certainty, could you?

15      A No.

16              MR. BLACKBURN:  Object to the

17  form.

18      A No.

19              MR. BLACKBURN:  You can answer.

20      A It would be a guess.

21      Q Sir, I'm going to show you a

22  document dated February 9th, 2004, and ask

23  you if you recognize it.  It may have been

24  marked previously.

PHILLIP ROTHSCHILD
**March 30, 2006**

Page 229

1      A Yes.

2      Q What is that?

3      A This covers the labor and

4   materials for the dumpster, to get all the

5   rubbish and everything out of there, my guy's

6   time, the electrician's time to solve the

7   problem with the heat.

8      Q So that is an invoice for work

9   done after the fire?

10     A Yes.

11     Q And on the first page of the

12  document, it's an invoice really from P & D

13  Builders; right?

14     A Yes.

15     Q It's dated February 9, 2004?

16     A Yes.

17     Q And the in beginning it says,

18  the following list covers labor, materials,

19  dumpster, electrician from your first problem

20  with the heat and up until 2/6/04.  Do you

21  see that?

22     A Yes.

23     Q The problem with the heat that

24  it refers to is the fact that the flooding

**PHILLIP ROTHSCHILD**
**March 30, 2006**

1    from the burst pipes knocked out the heat at

2    the home?

3         A Yes, water got in the electrical

4    box, knocked it right out.

5         Q So that the February 9, 2004

6    invoice, the total of $13,347.48 was for work

7    done in connection with the burst pipes?

8         A Yes.

9                   MR. CROWLEY:  Let's go off the

10   record for a second.

11

12                       (Off The Record Discussion)

13

14                   MR. CROWLEY:  Let's mark this.

15

16                       (Exhibit Number 14, Undated

17                        Letter, marked for

18                        identification.)

19

20         Q Sir, after we discussed it off

21   the record, the February 9, 2004 P & D

22   Builders's invoice that we just talked about,

23   that has been previously marked as part of

24   Exhibit 11?

# EXHIBIT NO. 2

UNITED STATES DISTRICT COURT
District of Massachusetts

No. 05-CV-10827-DPW

The Fireman's Fund Insurance
Company, as subrogee of Julie
Pavia, 777 San Marin Drive, Novato,
California,
          Plaintiff

**ORIGINAL**

vs.

Falco Construction Corp., P. & D.
Builders, Inc., and Michael Carresi,
d/b/a Carresi Plumbing & Heating,
          Defendants

vs.

Heatmaster, Inc.,
          Third-Party Defendant

**DEPOSITION OF MICHAEL J. ROACH**, a witness
called on behalf of the Defendant Falco Construction
Corp., pursuant to the Federal Rules of Civil
Procedure, before Jessica L. Bisaillon, a Registered
Professional Reporter, Certified Shorthand Reporter,
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Toomey & Yudysky,
LLP, 99 Summer Street, Boston, Massachusetts
02110, on Friday, March 3, 2006, commencing at
10:05 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street, Suite 1150
Boston, Massachusetts 02109
(617) 742-6900

A P P E A R A N C E S:

The Law Offices of Stuart G. Blackburn
    BY:   Stuart G. Blackburn, Esquire
    Two Concorde Way
    Post Office Box 608
    Windsor Locks, Connecticut 06096
    Appearing on behalf of the Plaintiff

Toomey & Yudysky, LLP
    BY:   David J. Crowley, Esquire
    99 Summer Street
    Boston, Massachusetts 02110
    Appearing on behalf of Falco Construction Corp.

Morrison Mahoney, LLP
    BY:   Curtis L.S. Carpenter, Esquire
    250 Summer Street
    Boston, Massachusetts 02210
    Appearing on behalf of P. & D. Builders, Inc.

The Law Offices of Bruce R. Fox
    BY:   Robert T. Turner, Esquire
    27B Midstate Drive, Suite 100
    Auburn, Massachusetts 01501
    Appearing on behalf of Michael Carresi,
    d/b/a Carresi Plumbing & Heating

Hassett & Donnelly, P.C.
    BY:   Scott T. Ober, Esquire
    484 Main Street, Suite 560
    Worcester, Massachusetts 01608
    Appearing on behalf of Heatmaster, Inc.

```
 1    Q.   Did you see the gas log fireplace at the Pavia
 2         residence after it was installed?
 3    A.   I seen it.  I can't remember what it -- what it
 4         looked like.  I was there.
 5    Q.   Did you perform any work at the Pavia residence
 6         after the fire?
 7    A.   Yeah.  I did all the rehab work in the house.  I
 8         tore apart all the damage that the fire created.
 9         And there was -- she had -- she also had a -- a
10         water problem at the same week.  And I -- and it
11         destroyed her kitchen, and I -- and I had to -- I
12         had to work on that area also.
13    Q.   When did you first enter the Pavia home after the
14         fire?
15    A.   That -- I think it was that morning or the -- or
16         the next morning.  It was -- I was like the --
17         one of the first carpenters there.
18    Q.   And you were aware that there was a flood at the
19         home prior to the fire?
20    A.   No.  I -- I -- I think Phil called me and said
21         all this happened in a weekend, I believe.
22    Q.   Both the flood and the fire?
23    A.   Yes.
24    Q.   And when you got to the property, you understood
```

1   that there were two separate events?

2 A. Yes.

3 Q. Do you know which one occurred first, the fire or

4   the flood?

5 A. The flood.

6 Q. Do you know what caused the flood?

7 A. It was that -- that winter that was really cold

8   and all the pipes were freezing around

9   Massachusetts.  A couple of her pipes froze in

10   her kitchen, and it -- I believe she wasn't home

11   when it happened.  And the pipes burst, and it

12   just flooded and destroyed her cabinets and her

13   flooring and her ceiling, and her cellar was a

14   mess.

15 Q. Do you know where the pipes were located in the

16   home?

17 A. They were in the kitchen ceiling.

18 Q. The ceiling above the kitchen?

19 A. Yes.

20 Q. Did you do any work on those pipes?

21 A. Afterwards, I -- I demo'd the ceiling and exposed

22   the pipes, and we found -- you know, we found the

23   places where they split from being exposed to the

24   cold.

| | | |
|---|---|---|
| 1 | Q. | How many pipes burst? |
| 2 | A. | At least three. |
| 3 | Q. | What types of pipes are we talking about? |
| 4 | A. | Half-inch copper pipes. |
| 5 | Q. | Do you know what caused the pipes to freeze? |
| 6 | A. | Yeah.  The wind -- the windchill would just get |
| 7 | | in through the overhang and just freeze -- you |
| 8 | | know, just freeze the pipe from the force of the |
| 9 | | wind, the constant temperature. |
| 10 | Q. | When you opened up the ceilings to look at the |
| 11 | | pipes, was there any insulation in the ceiling? |
| 12 | A. | There was old -- the house is very old, and so it |
| 13 | | was just old insulation. |
| 14 | Q. | Were those old pipes that were in there? |
| 15 | A. | They were copper pipes.  I don't know if -- if |
| 16 | | they were old. |
| 17 | Q. | There hadn't been any recent work done in that |
| 18 | | area? |
| 19 | A. | There was, but I don't know if they were the same |
| 20 | | pipes. |
| 21 | Q. | And what areas of the home were damaged by the |
| 22 | | flood? |
| 23 | A. | The kitchen and the cellar.  She had a finished |
| 24 | | room down her cellar. |

```
 1    Q.   Did you observe any flood damage to any rooms
 2         that were next to the kitchen?
 3    A.   Next to the kitchen, she has another room.  It's
 4         sort of like a large pantry -- pantry room of
 5         some kind.
 6              The -- the flood went out -- she -- she
 7         had hardwood flooring, so the flood went out
 8         there and it -- and it buckled the flooring.  And
 9         I'm not -- and just the kitchen and the cellar.
10         Yes.
11    Q.   And I take it that's the area of the cellar
12         directly below the kitchen?
13    A.   It's directly below -- there's two areas.
14         There's one -- she has like an exercise room
15         directly below.  She has an entranceway to --
16         it's sort of a big space against the exercise
17         room, and then she has a finished part of the
18         cellar which is -- she has a painted mural along
19         the walls that -- the water damaged it.
20    Q.   Water from the flood?
21    A.   From both.  From the flood and from the fire.
22         That's my guess.
23    Q.   You don't know?
24    A.   There was water damage down there.
```

| | | |
|---|---|---|
| 1 | | built -- is off the house. So you have the |
| 2 | | kitchen, you have the dining room, and then you |
| 3 | | have the living room. And then to get to the |
| 4 | | addition, you'd -- you'd have to take a left to |
| 5 | | go out into it. So it -- so it is... |
| 6 | Q. | Did you ever see any ice in the dining room? |
| 7 | A. | No. |
| 8 | Q. | Did you ever see any water damage in the dining |
| 9 | | room? |
| 10 | A. | I can't remember. |
| 11 | Q. | Okay. And after the fire, you worked on |
| 12 | | rehabbing the kitchen and the addition? |
| 13 | A. | Yes. |
| 14 | Q. | Did you do anything to keep a record of the work |
| 15 | | you did for the kitchen as opposed to the work |
| 16 | | you did on the addition? |
| 17 | A. | No. |
| 18 | Q. | You just billed Phil for the work? |
| 19 | A. | Yes. |
| 20 | Q. | Did you -- strike that question. |
| 21 | | Did you or anybody else from P. & D. ever |
| 22 | | keep any records to distinguish the work that you |
| 23 | | did on the kitchen from the work that you did on |
| 24 | | the addition? |

```
 1    A.   No.

 2              MR. BLACKBURN:   Object to the form.

 3    Q.   After the fire, did Mr. Rothschild keep any daily

 4         reports of the work activities at the home?

 5              MR. BLACKBURN:   Object to the form.

 6    A.   I don't -- I don't know what he keeps for

 7         records.

 8    Q.   You don't have any knowledge of that?

 9    A.   No.

10    Q.   What other P. & D. employees worked at the home

11         after the fire?

12    A.   Chip Gubbins worked there.   I don't know if

13         Frankie McTigh worked there or not.   He's another

14         employee.   I'm not sure.   I have two -- two

15         people that work for me.

16    Q.   Who are they?

17    A.   One was Enrique Pena (phonetic).   He lived -- he

18         no longer lives here.   He lives in Florida.   And

19         Pedro DePina.

20    Q.   Where does Mr. DePina live?

21    A.   Dorchester.

22    Q.   Do you know his street address?

23    A.   I can get it.   I -- I don't know it off the top

24         of my head.
```

1    Q.   Did Mr. DePina work at Ms. Pavia's house prior to

2         the fire?

3    A.   No.

4    Q.   How do you spell Mr. DePina's last name?

5    A.   D-e-P-i-n-a.

6    Q.   And his first name again?

7    A.   Pedro.

8    Q.   Mr. DePina worked directly for you?

9    A.   Yes.

10   Q.   After the fire, what work was done to the

11        kitchen?

12   A.   We repaired the -- the floor and the cabinets,

13        the walls and the ceiling.  That's what -- that's

14        what I was involved in.

15   Q.   When you say you repaired it, do you mean that

16        you demolished the kitchen and rebuilt it?

17   A.   Pretty much, yes.  We -- we took the floor right

18        out, and we took the walls down.  We -- we

19        dropped the floor -- we dropped the floor down

20        and just prepped out for a new floor to be put

21        in.

22   Q.   What work did you do in the basement, the

23        exercise area of the basement?

24   A.   They had -- we were -- they had a floor that we

1           had to repair down there.  And that's all that I

2           was involved in down there was the floor.

3     Q.    What work did you do in the addition after the

4           fire?

5     A.    I had to replace the -- the joists that were

6           burnt.  The fire damage also went into the

7           hallway of the house.  I had to expose all that

8           area, repair any -- any damaged wood, clean up --

9           clean up the fire -- the cinders on the wood.

10                Same thing in the -- in the second part

11          of the addition.  Just clean out any -- any

12          burnt-up wood and replace it and -- and all smoke

13          damaged -- any wood that was smoke damaged also.

14    Q.    Where was the wood smoke damaged in the house?

15    A.    In the attic.

16    Q.    How extensive was the smoke damage in the attic?

17    A.    It was pretty extensive.  I imagine the smell is

18          still there, even they -- you know, though

19          they -- they whitewashed it down.

20    Q.    Was the attic finished?

21    A.    No.

22    Q.    Was it more storage space up in the attic?

23    A.    (Witness indicating.)

24    Q.    You have to answer.

1    A.   Yes.  I'm sorry.  Yes.

2    Q.   Was the physical damage from the fire confined to

3         the ceiling between the first and second floor of

4         the addition and into the hallway?

5              MR. BLACKBURN:  Object to the form.

6    A.   Yes.

7    Q.   Did you see any other fire damage in the home?

8    A.   No.

9    Q.   How long did you work at the Pavia residence

10        after the fire?

11   A.   About five months.

12   Q.   Were you working every day there?

13   A.   Yes.

14   Q.   The opening that Mr. Falco built in the second

15        floor of the addition, did they keep that there?

16   A.   No.  We -- I -- I demo'd it and then -- I forget

17        what -- this -- they still have a -- something

18        there.  I forget.  They -- they have a fake

19        fireplace there now.  I think she has candles in

20        it or something decorative.  It's not a

21        fireplace.

22   Q.   You demolished the work that Joe Falco did?

23   A.   Yes.  I -- the area -- he had the bricks on the

24        floor.  I took them up to expose the floor.

1        residence after the fire, can you estimate for me

2        what percentage of the work you did in the

3        kitchen?

4                MR. BLACKBURN:  Object to the form.

5    A.  No.  I couldn't estimate a percentage either way,

6        because I was -- I was all over the job.  Both --

7        both were my -- my responsibilities to get them

8        both done.  I didn't -- they -- they were just

9        part of my day.

10   Q.  Were you working on both areas of the house at

11       the same time?

12   A.  No.  First we did the kitchen.  And after we got

13       the kitchen pretty -- so the -- I guess to the

14       point where other subs can come in, then I went

15       and I did -- handled the fireplace -- excuse

16       me -- the fire.

17               MR. CROWLEY:  Thank you, sir.  That is

18       all the questions I have for you right now.

19               THE WITNESS:  Thanks.

20               (Brief recess.)

21               **EXAMINATION BY MR. TURNER:**

22   Q.  Mr. Roach, good morning.  My name is Robert

23       Turner, and I represent Michael Carresi.

24               The gas log fireplace was installed in a