UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE FIREMAN'S FUND INSURANCE ) | |
| COMPANY as subrogee of JULIA PAVIA ) | |
| 77 San Marin Drive Novado, California, ) | |
| Plaintiff ) | CIVIL ACTION |
| ) | NO. 05-cv-10827-DPW |
| VS. ) | |
| ) | |
| FALCO CONSTRUCTION CORP., ) | |
| P & D BUILDERS, INC. and ) | |
| MICHAEL CARRESI d/b/a ) | |
| CARRESI PLUMBING & HEATING, ) | |
| Defendants | |

## DEFENDANT, FALCO CONSTRUCTION CORPORATION'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, ERIC SCHWALBACH

The Defendant, Falco Construction Corporation ("Falco"), hereby moves this

Honorable Court, prior to trial and prior to impaneling a jury in this case, to preclude expert

testimony by the Plaintiff's employee and proposed expert witness, Eric Shwalbach.

In support hereof, Falco states as follows:

1.      The Federal Rules of Civil Procedure require, *inter alia,* that parties serve expert

witness reports that contain a complete statement of all opinions to be expressed and the

basis and reasons therefore; the data or other information considered by the witness in

forming his opinions; and any exhibits to be used as a summary of or support for the

opinions.  Fed.R.Civ.P.26(a)(2)(B).

2.      Fed.R.Civ.P.37(c)(1) provides that a party that "without substantial justification fails

to disclose information required by Rule 26(a)… is not, unless such failure is harmless,

permitted to use evidence at trial… not so disclosed.  In addition to or in lieu of this

sanction, the court, on motion and after affording an opportunity to be heard, may impose

other appropriate sanctions." This rule is mandatory insofar as a party that fails to make the required disclosures is not permitted to use the undisclosed evidence. Klonski v. Mahlab, 156 F. 3d 225, 269 (1st Cir. 1998).

3.      Although the Rule permits the Court to impose other sanctions in lieu of barring the undisclosed expert evidence, the "required sanction in the ordinary case is a mandatory preclusion." Id. The federal courts have stated consistently that "expert disclosures are not merely aspirational, and courts must deal decisively with a party's failure to adhere to them. Lohmes, 272 F. 3rd at 60. The only exception to this general rule baring undisclosed expert opinion is: 1). when the failure to disclose is "substantially justified"; or 2). when the disclosure is harmless. Id.

4.      In the instant case, the Plaintiff disclosed that Mr. Schwalbach, the Plaintiffs' employee, is expected to testify concerning his investigation and adjustment of the Plaintiff's insured's claim for damaged caused by the subject fire. The Plaintiff further disclosed that the damages payable pursuant to the Plaintiff's insured's insurance policy for the fire claims were in excess of $953,303.16.

5.      However, Falco submits that Mr. Schwalbach is not qualified to give an expert opinion in this case.

6.      Specifically, the Plaintiff has failed to proffer any evidence that Mr. Schwalbach's education, training or experience is sufficient to entitle him to render an opinion that the replacement and/or reconstruction of property damaged in the fire was reasonably necessary in light of damage inflicted, or the expenditures to restore or replace property to pre-damage condition was reasonable.

7.     Further, the Plaintiff has failed to disclose the factual basis for Mr. Schwalbach's proposed expert opinions. In addition, the Plaintiff failed to produce an expert report written by Mr. Schwalbach. Clearly, the Plaintiff failed to provide the Defendants with the pre-trial expert disclosures required by Fed.R.Civ.P.26(a)(2)(B).

8.     More importantly, the Plaintiff has failed to establish that there is a factual or technical basis for Mr. Schwalbach's proposed expert opinions.

9.     Specifically, Mr. Scwalbach admitted on deposition that he had no personal knowledge that repairs to the subject premises were reasonable and related to the alleged fire.

10.    Mr. Schwalbach also admitted on deposition that, with respect to the Plaintiff's insured's claim for damage to the building's contents, he had no personal knowledge that repair or replacement of the Plaintiff's personal property damaged in the fire was reasonably necessary in light of damage inflicted. Likewise, Mr. Schwalbach had no personal knowledge that expenditures to restore or replace property to pre-damage condition were reasonable.

11.    Rather, Mr. Schwalbach testified that he relied on the Plaintiff's insured and public adjusters hired by the Plaintiff's insured to determine that the amounts claimed by the Plaintiff to repair the dwelling and repair and/or replace the contents of the dwelling were reasonable and related to the subject fire. In essence, Mr. Schwalbach testified that he negotiated a settlement with the Plaintiff's insured based on information submitted by the Plaintiff and her public adjusters. [Exhibit No. 1, pgs. 1-2, 18-20, 22-23, 25-30, 36-40 and 44].

12.    Accordingly, Falco submits that Mr. Schwalbach should be barred from testifying as

an expert at trial.  Fed.R.Civ.P.37.

    WHEREFORE, the Defendant, Falco Construction Corp. requests the Court to

preclude Mr. Schwalbach's proposed expert testimony at trial.

                            Respectfully Submitted,
                            The Defendant,
                            Falco Construction Corporation,
                            By its attorneys,

                            _/s/ David J. Crowley_____
                            John F. Toomey, BBO # 500160
                            David J. Crowley, BBO # 630169
                            TOOMEY & YUDYSKY LLP
                            99 Summer Street
                            Boston, MA 02110
                            (617) 946-0930

Date: 5/23/07


## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on the
above date.



                    /s/  David J. Crowley



DC 82208.1  5/23/07

# EXHIBIT NO. 1

Page 1

Volume: II
Pages: 1-53

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x
THE FIREMAN'S FUND INSURANCE
COMPANY as subrogee of
JULIA PAVIA, 77 San Marin Drive,
Novado, California,
                Plaintiff,      Civil Action
                                No. 05CV-10827-DPW

  v.

FALCO CONSTRUCTION CORP.,
P&D BUILDERS, INC., and
MICHAEL CARRESI, d/b/a
CARRESI PLUMBING & HEATING,
                Defendants,

  v.

HEATMASTER, INC.,
                Third-Party Defendant
- - - - - - - - - - - - - - - - - - x

  CONTINUED DEPOSITION of ERIC D. SCHWALBACH,

a witness called by counsel for Falco

Construction Corp., taken pursuant to the

applicable provisions of the Federal Rules of

Civil Procedure, before Toni F. Beckwith,

Registered Merit Reporter, CSR No. 111293 and

Notary Public in and for the Commonwealth of

Massachusetts, at the Offices of Toomey &

Yudysky, LLP, 99 Summer Street, Boston,

Massachusetts, on Monday,

July 31, 2006, commencing at 10:05 a.m.    ORIGINAL

Page 2

1  APPEARANCES:

2

3      ERIK LOFTUS, ESQUIRE
       Two Concorde Way
       P.O. Box 608
4      Windsor Locks, Connecticut 06096-0608
       Counsel for The Fireman's Fund
5      Insurance Company

6

7      TOOMEY & YUDYSKY, LLP
       By David J. Crowley, Esquire
       99 Summer Street
8      Boston, Massachusetts 02110
       Counsel for Falco Construction Corp.

9

10     MORRISON, MAHONEY & MILLER, LLP
       By Curtis L.S. Carpenter, Esquire
11     250 Summer Street
       Boston, Massachusetts 02210
12     Counsel for P&D Builders, Inc.

13

14     THE MAIN STREET AMERICA GROUP
       By Robert P. Turner, Esquire
       27B Midstate Drive, Suite 100
15     Auburn, Massachusetts 01501-1896
       Counsel for Michael Carresi d/b/a
16     Carresi Plumbing & Heating

17

18     HASSETTE & DONNELLY, P.C.
       By Scott T. Ober, Esquire
       484 Main Street, Suite 560
19     Worcester, Massachusetts 01608
       Counsel for Heatmaster, Inc.

20

21

22

23

24

1    Q.   In looking at the amounts paid on this
2  claim, it appears that the contents claim is
3  almost as much as the claim for damage to the
4  building.  Is that unusual?
5            MR. LOFTUS:  Objection.
6       A.   No.
7       Q.   When we refer to the contents claim,
8  is that the amount paid to reimburse Ms. Pavia
9  for personal property inside her residence?
10      A.   Yes.
11      Q.   What did Fireman's Fund do to verify
12  the amounts that Ms. Pavia claimed for her
13  contents claim?
14      A.   Well, some of them were invoices that
15  were submitted for work that was performed, and
16  we verified the invoices.  As far as the
17  contents inventory goes, we did some
18  spot-checking of prices.  That's generally how
19  we do it.
20      Q.   So that Ms. Pavia submitted some
21  invoices, and you reviewed certain of those
22  invoices to see whether the amounts were
23  consistent with the amounts alleged by
24  Ms. Pavia?

1      A.   Yes.

2      Q.   Are you aware that Ms. Pavia testified

3  in this matter that she was reimbursed for meals

4  that she ate out at restaurants due to damage

5  caused by burst pipes?

6      A.   Am I aware that she ate out due to the

7  burst pipes?

8      Q.   Yes.

9      A.   Not necessarily.

10     Q.   Have you reviewed any deposition

11 transcripts in this case?

12     A.   No.

13     Q.   As part of Ms. Pavia's claim for

14 damage from the fire, did she submit invoices

15 and credit card statements for food that she

16 consumed outside of her home?

17     A.   Yes.

18     Q.   Is it your understanding that part of

19 Ms. Pavia's claim for alternative living

20 expenses was for restaurant expenses she

21 incurred as a result of damage to her home?

22     A.   Yes.

23     Q.   Is that included in the $42,000 that

24 we have in answer to Interrogatory 13?

1          A.   Yes.

2          Q.   Was Ms. Pavia's kitchen damaged as a

3    result of the burst pipes?

4          A.   Yes.

5          Q.   And the entire kitchen had to be

6    gutted and rebuilt as a result of that damage?

7          A.   I believe so, yes.

8          Q.   Did Ms. Pavia submit amounts owed for

9    reimbursement of restaurant expenses in

10   connection with the burst pipes?

11         A.   I don't think she broke it out as to

12   which claim it was regarding.

13         Q.   So that Ms. Pavia submitted a group of

14   invoices for restaurant expenses?

15         A.   Yes.

16         Q.   And she didn't segregate out amounts

17   that she claimed were owed for restaurant

18   expenses in connection with the burst pipes?

19         A.   Not that I can remember, no.

20         Q.   Did Fireman's Fund do anything to

21   segregate out those amounts?

22         A.   No.

23         Q.   Is it fair to say that the total

24   amount of Ms. Pavia's claim for restaurant

1    done at the same time?

2         A.   Not necessarily, no.

3         Q.   Well, is it your understanding that

4    the reconstruction work for both losses was done

5    at the same time?

6         A.   I don't know, because the first time I

7    saw it all the work was done, so I can't -- I

8    can't say for sure that it was done at the same

9    time.

10        Q.   So your first knowledge of the repairs

11   was after they were done?

12        A.   Yes.

13        Q.   When was that?

14        A.   My first inspection, February or March

15   of 2005.

16        Q.   Have you ever seen any documents

17   indicating that the repair work from the water

18   loss was done before the repair work for the

19   fire loss?

20        A.   Not that I can recall.

21        Q.   If the representative from P&D

22   Builders testified in this case that he did that

23   work at the same time, would you have any reason

24   to dispute that?

DUNN & GOUDREAU

1        A.   No.

2        Q.   Are you aware P&D Builders didn't keep

3    any contemporaneous records as to what work was

4    being done at the Pavia house?

5        A.   Am I aware that they did not keep

6    records as to what work was being done?  No.

7        Q.   Has Fireman's Fund done anything to

8    segregate the damage caused by the water loss

9    from damage caused by the fire?

10       A.   Yes.  The original adjuster had

11   brought out a building consultant who wrote two

12   separate estimates: one related to the water and

13   one related to the fire.

14       Q.   What did Fireman's Fund do to ensure

15   that amounts paid for the fire loss were not

16   related to the water loss?

17       A.   Again, I didn't do anything because

18   all the work was done.  There was no way for me

19   to verify it.  I started at the point of the

20   original estimates from our building consultant.

21       Q.   Was the person in charge of the file

22   before you the person who set this up?

23       A.   Set what up?

24       Q.   Who had the building consultant go out

1        A.   I don't know, because there had been
2   advance payments given, so I'm assuming that
3   money went towards partial payments.
4        Q.   Was there any indication from the
5   documents in your file that the fire and water
6   losses damaged the same areas in the Pavia
7   residence?
8        A.   No.
9        Q.   Your understanding is that the areas
10  were separate?
11       A.   That's what my understanding is.
12       Q.   Did Ms. Pavia's policy with Fireman's
13  Fund require Fireman's Fund to pay for
14  improvements to her property?
15       A.   What do you mean by improvements?
16  Upgrades?
17       Q.   Any upgrades to the property?
18       A.   No.
19       Q.   So that the Fireman's Fund policy only
20  required the company to pay to bring the
21  property back to the same state that it was in
22  prior to the fire?
23       A.   Unless there was a code upgrade that
24  was necessary for local building codes.

DUNN & GOUDREAU

Page 26

1       Q.   So that if Ms. Pavia made improvements

2   to her attic after the fire, that work would not

3   be covered by her policy with Fireman's Fund?

4       A.   Yeah.  If they were not -- if they

5   were additional amounts not related to the

6   original damage, yes, they would not be covered.

7       Q.   Do you know whether Ms. Pavia made

8   improvements to her attic and billed Fireman's

9   Fund for that work?

10      A.   Again, I don't know what was there

11  existing, so I'm really not sure what she did.

12      Q.   There's an indication in the file that

13  a mural in the basement needed to be restored

14  after the fire?

15      A.   Yes.

16      Q.   You indicated earlier that there was

17  some damage to the basement that was caused by

18  the burst pipes?

19      A.   That's what I was told, yes.

20      Q.   Do you know where that damage was, the

21  damage in the basement from the burst pipes?

22      A.   I think it was an area -- a bathroom,

23  and I don't know if it was a kitchen or a

24  storage area, but I was told it was not the room

Page 27

1   where the mural was.

2       Q.  So that you were told that the damage

3   from the mural was caused by the fire?

4       A.  Yes.

5           MR. CROWLEY:  Can I have this marked

6   as an exhibit?

7           (Exhibit 15 marked

8           for identification)

9       Q.  I'll show you what has been marked as

10  Exhibit 15 to the deposition.  I'll represent to

11  you that that is a file note from some documents

12  that were produced by your lawyer as part of the

13  Craig IS file for this lawsuit.  I assume that

14  you haven't seen that before?

15      A.  No.

16      Q.  If you look in the middle of the page

17  under "Description," there's a second sentence

18  there that reads, The RGA said the claims were

19  kept completely separate but the damage was the

20  same areas of the home.

21          Do you see that?

22      A.  Yes.

23      Q.  Do you know what that refers to?

24      A.  No.

1          Q.    Has anybody ever told you that the

2     damage from the water loss and the damage from

3     the fire were to the same areas of the home?

4          A.    No.

5              MR. CROWLEY:    Can I have that marked

6     as an exhibit?

7              (Exhibit 16 marked

8              for identification)

9          Q.    I show you what's been marked as

10    Exhibit 16.    It's a letter from Gordon & Gordon

11    Adjusters.

12         A.    Okay.

13         Q.    And that was sent to you on September

14    the 15th of 2005.

15         A.    Okay.

16         Q.    Gordon & Gordon Adjusters were

17    Ms. Pavia's public adjusters?

18         A.    Yes.

19         Q.    What was their role with respect to

20    the fire?

21         A.    Besides making the claim more

22    difficult, they were Ms. Pavia's representative

23    for this loss.

24         Q.    So they were attempting to assist

DUNN & GOUDREAU

1    Ms. Pavia in recovering her costs to repair the

2    residence?

3         A.   That's what their job was supposed to

4    be, yes.

5         Q.   I assume from your answer that they

6    were not particularly helpful in that regard?

7         A.   No, they were not.

8         Q.   If you look at the fourth paragraph on

9    the first page of that letter Mr. Post wrote, I

10   explained to you before that the contractor's

11   records are not very detailed.  He did the best

12   he could to break out the work done for each

13   loss.

14         Do you see that?

15         A.   Yes.

16         Q.   What does that refer to?

17         A.   Apparently he's talking about P&D

18   Builders.

19         Q.   And that the records were not very

20   detailed as far as what work was done for the

21   water loss as opposed to the fire loss?

22         A.   That's what that sentence would

23   suggest, yes.

24         Q.   Is that your understanding as well?

1          A.   Yes.

2          Q.   In the next sentence Mr. Post suggests

3     that the two losses be considered and treated as

4     one.

5               Do you see that?

6          A.   Yes.

7          Q.   Do you know why he would suggest that?

8          A.   Because it would be easier for him.

9          Q.   Because he wouldn't have to go back to

10    try and figure out what work was done to repair

11    the fire loss and what work was done to repair

12    the water loss?

13         A.   Right.

14         Q.   So was it your understanding that

15    Ms. Pavia's public adjusters did not keep those

16    records in the first instance?

17         A.   Correct.

18         Q.   And that at some point they tried to

19    go back and figure out what work was related to

20    the fire loss and what work was related to the

21    water loss; is that correct?

22         A.   It is, but I'm trying to remember if

23    their builder, P&D Builders, had written two

24    separate estimates for the fire and water

1    documents before we have another round because

2    I'd rather get things done today because I know

3    I've given you quite a bit of documents.

4            MR. CROWLEY:  If you want to take a

5    ten-minute break and see if we can take a look

6    at some of these.

7            MR. LOFTUS:  I don't know if you want

8    to pass those log notes around the table or if

9    you already have.

10           (Recess taken)

11           MR. CROWLEY:  I have a few questions

12   for you.

13           CONTINUED REDIRECT EXAMINATION

14   BY MR. CROWLEY:

15       Q.   The first would be to take a look at

16   the documents that we've marked as Exhibit 8 and

17   see if you can identify what those documents

18   are.

19       A.   Invoices submitted by Ms. Pavia.

20       Q.   Were those invoices for damage caused

21   by the fire loss or the water loss?

22       A.   I'd say the majority are for the fire

23   loss.

24       Q.   Some of them are related to the water

1  loss?

2        A.   Yes and no.

3        Q.   What do you mean by that?

4        A.   Again, because I wasn't there and I

5  wasn't able to see the inventory and confirm

6  which damages were which, it was mostly

7  negotiation of what we related to the water.

8             Ms. Pavia would probably be the one to

9  verify that.   It was my understanding most of --

10  the contents was related to the fire loss and

11  that's how I worked my settlement.

12        Q.   So the way it worked was the insured,

13  Ms. Pavia, submitted invoices, and you

14  negotiated a settlement based on the amount that

15  she claimed?

16        A.   Yeah.   We had the original, again,

17  original inventories from the public adjusters,

18  which they changed often.   And I don't believe

19  there were any verifications done by Fireman's

20  Fund of the inventories.   It took them so long

21  to submit it.

22             So I just took what she submitted and,

23  again, looked at some of the pricing.   And a lot

24  of the invoices that she had sent in, obviously

DUNN & GOUDREAU

1    the biggest one would be the furniture

2    restoration.  That was a lot of content loss,

3    and I did the best I could to try to resolve it.

4         Q.   What do you mean by "verifications"?

5         A.   What do you mean?

6         Q.   I believe part of your answer was that

7    Fireman's Fund didn't perform any verifications

8    on the amount?

9         A.   Not the amounts, the items themselves.

10   Normally when you have a loss, especially with a

11   public adjuster, they submit an inventory of the

12   damages, and you -- the adjuster verifies

13   whatever is on the inventory, ten shirts, or as

14   best as they can, furniture, and that sort of

15   thing.  That's normally what is done.

16        Q.   How are those verifications done

17   typically, to go out and look at items?

18        A.   To go out and do a visual inspection.

19        Q.   Was any type of visual inspection done

20   by Fireman's Fund on the contents alleged by

21   Ms. Pavia?

22        A.   I don't know.  Prior to me, I'm not

23   sure.

24        Q.   There aren't any reports to that

 1    effect, that a verification was done?

 2         A.    I don't remember reading anything.

 3         Q.    So as far as you know, Fireman's Fund

 4    was relying on the list of contents submitted by

 5    the public adjuster?

 6         A.    And then subsequently by discussions

 7    with Ms. Pavia directly after she fired her

 8    public adjuster.

 9         Q.    So as far as you know, Fireman's Fund

10    didn't do any independent verification of the

11    contents listed by the public adjusters and

12    Ms. Pavia?

13         A.    You mean of the items, not of the

14    pricing?  Of the physical items themselves?  I'm

15    not sure.  I'm not sure.

16         Q.    One of the documents that was part of

17    Exhibit 8 is a list of items from the fire loss.

18         A.    Okay.

19         Q.    And there are headings for some of

20    these lists:  Garage, Attic, Basement.  Do you

21    see that?

22         A.    Yes.

23         Q.    Do those headings indicate that the

24    items below were items that were damaged while

Page 40

1    located in the attic or the garage?

2         A.   Apparently, yes.

3         Q.   Do you know how items in the garage

4    were damaged by the fire?

5         A.   I don't know, no.

6         Q.   The repair damage to the portico at

7    the property, did Fireman's Fund agree to pay

8    the total amount of the repair for that item?

9         A.   That Ms. Pavia submitted?

10        Q.   Yes.

11        A.   No.

12        Q.   What was the original estimate for

13   that work?

14        A.   I think her estimate was somewhere

15   around 88 or $89,000.

16        Q.   Why didn't Fireman's Fund agree to pay

17   that full amount?

18        A.   Because the engineering firm that had

19   written an estimate came in lower, and I know

20   there were other issues involved, so I basically

21   negotiated the final payment.

22        Q.   Was one of the issues that damage to

23   the portico preexisted the fire?

24        A.   I think there was some -- there

1    appeared to be some possible preexisting

2    repairs.  I don't want to necessarily say

3    preexisting damage, but I think there were some

4    preexisting repairs done.

5         Q.  So you negotiated a lower amount to be

6    paid to Ms. Pavia?

7         A.  Yes.

8              MR. CROWLEY:  Thank you.  That's all

9    the questions I have for you.

10             CROSS EXAMINATION

11   BY MR. CARPENTER:

12        Q.  I just have a couple questions.  My

13   name is Curtis Carpenter.  I represent P&D

14   Builders in this case.  I think we discussed the

15   first time we started this deposition that the

16   policy in effect for the Pavia residence did not

17   discount for depreciation of the contents; is

18   that accurate?

19        A.  Correct.

20        Q.  And the number that -- and I realize

21   you didn't answer these interrogatories.  If I

22   could just find them.

23             (Pause)

24        Q.  The content claim in this case is